ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004-1206
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999
Michael L. Bernstein
James L. Cooper
Kenneth L. Schwartz

ARNOLD & PORTER LLP
399 Park Avenue
New York, NY  10022-4690
Telephone: (212) 715-1000
Facsimile: (212) 715-1399
Anthony D. Boccanfuso

Attorneys for the Chrysler National Dealer Council

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                :
In re                                           :    Chapter 11
                                                :
Chrysler LLC, *et al.*,                         :    Case No. 09-50002 (AJG)
                                                :
               Debtors.                         :    (Jointly Administered)
--------------------------------------------------------------- x

**STATEMENT OF THE CHRYSLER NATIONAL DEALER COUNCIL REGARDING (1) THE MOTION OF DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004 AND 6006, FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND BIDDER PROTECTIONS FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND (B) SCHEDULING A FINAL SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH AND RELATED PROCEDURES, AND (C) GRANTING CERTAIN RELATED RELIEF AND (2) THE OMNIBUS MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER, PURSUANT TO SECTIONS 105, 365 AND 525 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6006, (A) AUTHORIZING THE REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF**

TO THE HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE:

The Chrysler National Dealer Council ("NDC"), by and through its undersigned counsel, hereby submits this statement regarding the Motions of the above-captioned debtors and debtors-in-possession ("Debtors" or "Chrysler") to approve the sale of substantially all of the Debtors' assets to Fiat and to reject certain executory contracts (collectively referred to herein as the "Motions"). We file this statement in order to set forth facts of which we believe the Court should be aware as it considers the Motions.

**Background**

1. On April 30, 2009, Chrysler filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). In motions filed in connection with its petitions, Chrysler acknowledged that "[t]he significance of this chapter 11 filing . . . to the United States economy is difficult to overstate." Motion of Debtors and Debtors in Possession, Pursuant to Sections 105(a) and 363(c) of the Bankruptcy Code, for Interim and Final Orders Authorizing the Debtors to Honor or Pay Prepetition Obligations for the Benefit of Their Dealers and Other Customers, and for Related Relief ("First Day Dealer Motion") ¶ 7.

2. On May 3, 2009, Chrysler filed the Motion of Debtors and Debtors in Possession, Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, for (I) an Order (A) Approving Bidding Procedures and Bidder Protections for the Sale of Substantially All of the Debtors' Assets and (B) Scheduling a Final Sale Hearing and Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets, Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts

and Unexpired Leases in Connection Therewith and Related Procedures, and (C) Granting Certain Related Relief ("363 Motion").

3. In the 363 Motion, Chrysler asked the Court to approve its proposed sale of substantially all of its assets to Fiat, as "New Chrysler," in exchange for $2 billion in cash and the assumption of certain liabilities. It also asked the Court to approve procedures for assuming and assigning contracts to New Chrysler, including dealership contracts.

4. On May 5, 2009, the Court granted Chrysler's motion with respect to the sale procedures, including the procedure for assuming and assigning contracts to New Chrysler.

5. On May 14, 2009, Chrysler filed a Motion pursuant to Sections 105, 365 and 525 of the Bankruptcy Code seeking authorization of the rejection of executory contracts and unexpired leases with certain domestic dealers and attaching schedules of dealership contracts (i) that it intends to reject, and (ii) that it intends to assume and assign to New Chrysler. Parties will have ten days to object to the assumption of their contract or to the amount that Chrysler proposes to pay to cure any defaults. After the Fiat sale closes, New Chrysler will have thirty days to add contracts from the assumed contracts list.

6. The Motions contemplate that Chrysler will not assume all of its dealer contracts and it appears from the initial lists of assumed and rejected contracts that Chrysler currently intends to reject 789 dealership contracts.

7. There are almost 3,200 Chrysler dealers employing over 140,000 people. Accordingly, there are many people, many families, and many local economies across the country directly affected by the Court's decisions regarding these matters.

3

8. The NDC is a council of Chrysler dealers from across the country that are elected by the dealership body as a whole to represent Chrysler dealers in issues of mutual concern and interest. The NDC interacts with Chrysler regularly with respect to manufacturer-dealer issues.

9. There are over 31 million Chrysler, Jeep, and Dodge owners. Each dealership serves an average of 9,800 Chrysler customers.

## STATEMENT REGARDING THE MOTION

New Chrysler will be dependent on its network of Chrysler dealers. Those dealers will purchase almost all of New Chrysler's production of cars, sell them to the public across the country and handle all of the consumer follow up, including repairs, parts and service that are essential to Chrysler's success in the automobile marketplace.

**1. Dealers produce revenue, not expense, for Chrysler**. As the testimony in this matter makes clear, it is Chrysler's dealers that bear the risks and costs associated with selling Chrysler's cars to the public. "Far from being a burden to the manufacturer . . . [dealers] support[] the manufacturer's efforts by providing a vast distribution channel that allows for efficient flow of the manufacturer's product to the public at virtually no cost to the manufacturer." Casesa Shapiro Group, *The Franchised Automobile Dealer* at 3 (Nov. 26, 2008) (attached hereto). There is no evidence that by rejecting dealership agreements New Chrysler will save money to any material degree or enhance its competitive position in the automobile market. To the contrary, closing dealers narrows distribution and reduces Chrysler's sales and income as fewer dealers buy fewer cars and retail sales are lost to other brands. "Chrysler's revenue is solely and exclusively dependent on its dealers." Ewasyshyn Decl. ¶ 25. That is why Chrysler witnesses have been clear in testifying to this Court that threats to Chrysler's dealer

network "threaten . . . the going concern value of the Debtors' businesses and assets." Grady Decl. ¶ 6. Without a robust dealer network, Chrysler itself is threatened.

2. **Dealers absorb inventory risks**. Chrysler also benefits from a wide dealer network because dealers, rather than Chrysler, bear the risk on unsold cars and cars in transit from the factory. An average automobile dealer owns $4.9 million in new car inventory. Casesa at 4. Some carry substantially more. *See, e.g.,* Arrigo Decl. ¶ 5 ("I currently carry over $25 million in new car inventory.") Fewer dealers will mean less inventory available to the public. Lower inventory reduces the chances that a customer will find the car they are looking for and therefore hurts sales. A wider supply of inventory improves Chrysler's competitive position and it is again an improvement for which the dealers, not Chrysler, bear the cost. *See* Arrigo Decl. ¶ 9 ("Chrysler records the wholesale purchase on its books when the vehicle leaves the factory.")

3. **Dealers invest in facilities and customer service**. Likewise, the physical facilities to which Chrysler customers go – the showrooms, new car lots, customer service areas, parts centers, the facilities where used cars are handled and exchanged – are all paid for by dealers, not Chrysler. These investments are roughly $2.5 million per dealer. Casesa at 4; *see also* Arrigo Decl. ¶ 5 (describing his dealerships as having over 400,000 square feet of facilities, 48 service bays, and more than 50 acres of land). Dealers also pay for advertising, training, regulatory compliance efforts and personnel to ensure that the customer's experience with Chrysler products is smooth and successful. Casesa at 5.

4. **Maintaining the Network is essential to Chrysler's future.** Chrysler witnesses have been very clear that the company's value as a going concern – and accordingly its value to Fiat – are closely tied to preserving customer confidence in the viability of Chrysler. *See, e.g.,* First Day Dealer Motion ¶ 17 (stating that maintaining the dealer network "is essential to the

5

preservation and protection of the Chrysler, Jeep and Dodge brands"), ¶ 35 ("Maintaining the Debtors' dealer network is critical to the proposed Fiat Transaction."), ¶ 46 ("A smoothly operating dealer network is a core component of the value to be transferred to the Purchaser in connection with any Sale Transaction.").

For example, warranty programs and extended service programs are among the most important interactions most people have with Chrysler. *See generally* First Day Dealer Motion. Almost all of these interactions take place between the customer and the dealer. *Id.* ¶ 29. Chrysler has already noted that its survival may depend on its ability to meet these obligations. *Id.* ¶ 58 ("Indeed, a failure to honor Customer Obligations . . . could destroy goodwill built over decades with respect to the Debtors' customers."); *id.* ("The Debtors' failure to honor or pay various outstanding Customer Obligations . . . will severely and irreparably impair the Debtors' customer relations at a time when the loyalty and support of their customers are extremely critical."); *id.* ¶ 33 ("[F]ailure to honor their warranty or extended service commitments worldwide almost certainly would undermine such brand value."); (*id.* ¶ 20) ("[C]onsumers considering a purchase of the Debtors' vehicles must have confidence that the Debtors (or any Purchaser) will . . . maintain a dealership network with service departments to perform warranty and recall repairs."); Grady Decl. ¶ 22-23, 25; Ewasyshyn Decl. ¶ 18. These important services are provided almost exclusively through the self-funded dealer network at virtually no delivery cost to Chrysler.

## CONCLUSION

This case is enormously complex and important to the nation's economy. Moreover, the outcome of these matters will dramatically impact the lives of hundreds of thousands of people. Because of the unprecedented complexity of this proceeding, its tremendous importance, and the

6

extremely short time periods in which the Court must consider the requests of Chrysler, it is essential that the Court have available to it all relevant information. For these reasons, the NDC urges the Court to consider the facts presented herein in assessing the Motions. The NDC also urges the Court, in ruling on Chrysler's rejection request, not to foreclose the right of any dealer whose contract Chrysler proposes to reject to argue that it is entitled to whatever protections may be afforded by applicable non-bankruptcy law. Any dealer whose contract is proposed to be rejected should have a full and fair opportunity to assert any rights it may have under applicable law.

Respectfully Submitted,

By: /s/ Michael L. Bernstein
Michael L. Bernstein
James L. Cooper
Kenneth L. Schwartz
Anthony D. Boccanfuso
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5000

*Attorneys for the Chrysler National Dealer Council*