Sale Approval Hearing: May 27, 2009 at 10:00 a.m.
Sale Objections Due: May 19, 2009 at 4:00 p.m.

SQUIRE, SANDERS & DEMPSEY, L.L.P.
1095 Avenue of the Americas, 31st Floor
New York, New York 10036
Phone: (212) 872-9800
Fax: (212) 872-9815
Stephen D. Lerner
slerner@ssd.com
Robert A. Wolf
rwolf@ssd.com

SQUIRE, SANDERS & DEMPSEY, L.L.P.
221 East Fourth Street, Suite 2900
Cincinnati, Ohio 45202
Phone: (513) 361-1200
Fax: (513) 361-1201
Mark J. Ruehlmann (pro hac vice pending)
Amy L. Brown (pro hac vice pending)
Jeffrey A. Marks (proc hac vice pending)
Pierre H. Bergeron (pro hac vice pending)

Counsel to the Committee
of Chrysler Affected Dealers

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                    :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CHRYSLER LLC., *et al*., | : | Case No.: 09-50002 (AJG) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------X

_____

**OBJECTION OF THE COMMITTEE OF CHRYSLER AFFECTED DEALERS TO MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' OPERATING ASSETS AND FOR OTHER RELIEF**

_____

TO THE HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE

The Committee of Chrysler Affected Dealers (the "Dealer Committee")[1], by and through its undersigned counsel, hereby files this objection (the "Objection") to the motion (the "Sale Motion") (Doc. No. 190) of the above-captioned debtors and debtors in possession (collectively, "Chrysler" or "Debtors") seeking authority to sell substantially all of their assets, free and clear of all liens and certain other claims and interests, to New CarCo Acquisition LLC (which would change its name to "Chrysler LLC" at closing) ("New Chrysler"), pursuant to a Master Transaction Agreement, dated as of April 30, 2009 (the "MTA"), and certain related documents (the "Chrysler Restructuring Transaction"). In a separate application today (the "Continuance Request"), the Dealer Committee also requests this Court to enter an Order to show cause why the following dates should not be postponed: (1) the hearing date on, and any disposition of, the Sale Motion; and (2) the response deadline and hearing date on the Omnibus Motion of Debtors and Debtors in Possession for an Order (A) Authorizing the Rejection of Executory Contracts and Unexpired Leases with Certain Domestic Dealers and (B) Granting Certain Related Relief (Doc. No. 780) (the "Motion to Reject"). The relief requested by the Dealer Committee and the Affected Dealers is also supported by the following declarations: (1) Declaration of Robert Archer dated May 18, 2009 ("Archer Decl."); (2) Declaration of Homer Cutrubus dated May 18, 2009 ("Cutrubus Decl."); (3) Declaration of Gary L. Curry dated May 18, 2009 ("Curry Decl."); (4) Declaration of Nicholas Parks dated May 18, 2009 ("Parks Decl.") (5) Declaration of Gerald

---

[1] The Dealer Committee was formed to advance the mutual and collective interest of Chrysler's dealers that are the subject of the Motion to Reject. Since the Dealer Committee's formation, nearly 300 of such dealers from 45 states have elected to participate with and support the Dealer Committee, and more are joining every day. This Objection is being filed on behalf of the Dealer Committee and the dealers that have elected and that subsequently elect to join the Dealer Committee's efforts (collectively, the "Affected Dealers"). A current list of the Affected Dealers is attached as Exhibit A to this Motion and incorporated herein. This list will be updated as further Affected Dealers join.

Spitler dated May 18, 2009 ("Spitler Decl."); (6) Declaration of Greg Taylor dated May 18, 2009 ("Taylor Decl."); (7) Declaration of Wade D. Walker dated May 18, 2009 ("Walker Decl."); and (8) Declaration of Guy Willey dated May 18, 2009 ("Willey Decl.").  In support thereof, the Dealer Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Chrysler Restructuring Transaction, when combined with the relief requested in the Motion to Reject, would devastate the Affected Dealers.  It would: (1) destroy several hundred independent businesses across the United States; (2) ruin the livelihoods of the owners of these businesses, many of whom have operated their dealerships for decades, if not generations; (3) cause the immediate loss of thousands of jobs at the Affected Dealers and quickly reverberate in countless additional job losses at the vendors, suppliers and financers of the Affected Dealers; (4) precipitate inevitable personal and business bankruptcies flowing from the closing of the Affected Dealers; (5) reduce tax revenues by millions of dollars annually in the states and communities where the Affected Dealers are located; (6) eliminate the significant civic and charitable support that the Affected Dealers contribute to their neighborhoods and communities; and (7) limit competition among the car-buying public, thereby harming consumers.  It is impossible to overstate the irreparable harm and suffering that will be inflicted on the Affected Dealers, their thousands of employees, and their employees' families by Chrysler's requested relief.

2.      And to what end?  Maintaining the Affected Dealers ***does not cost Chrysler anything.***  By design, Chrysler requires all of its dealers to pay for ***everything*** – inventory, parts and equipment, real estate, and salaries and benefits.  Keeping the Affected Dealers in business thereby does not harm Chrysler (and would certainly avert the harm to customer loyalty that the

Motion to Reject will surely cause). To the contrary, the primary source of revenue for Chrysler is its dealer network.

3. When attempting to justify why it needs to consummate the unprecedented rejection of 789 dealer relationships, Chrysler retreats to vague generalities about making itself more efficient some day down the road. That is a distant goal, which is of questionable certainty at best. It certainly cannot justify the rejection – on less than 30 days notice – of 789 franchises with all of the concomitant costs to the Affected Dealers, their employees, and their communities. The combined relief sought in the Sale Motion and Motion to Reject is unnecessarily punitive without any corresponding or measurable benefit to Debtors' estates.

4. The financial and emotional catastrophe that would be wrought by the relief requested in the Sale Motion and Motion to Reject need not and should not happen – and certainly not with only three business days notice.[2] Under well-settled principles of bankruptcy law and fundamental notions of due process, the Chrysler Restructuring Transaction cannot lawfully happen, at least as currently proposed. Rather, the Court must require Chrysler to subject its restructuring proposal to the transparency, fairness and equal treatment of similarly-situated creditors mandated by the disclosure and plan confirmation provisions of the Bankruptcy Code. And the Court must also afford the Affected Dealers the notice and procedural protections that due process and the Bankruptcy Rules command in responding to the Sale Motion and Motion to Reject.

5. As an initial matter, the Dealer Committee objects to the Chrysler Restructuring Transaction because it is an unlawful *sub rosa* plan. It is a *sub rosa* plan not merely because it

---

[2] As explained below, based on the structure and timing of these two motions, if the Court were to grant the Sale Motion, it may very well strip the Affected Dealers of any meaningful remedy in opposition to the Motion to Reject. Because the Affected Dealers have been provided inadequate notice, the Dealer Committee is filing this under extreme time pressure and without any opportunity to conduct discovery, and therefore it reserves the right to supplement this Objection.

provides for the sale of substantially all of Chrysler's assets outside of and before a formal plan of reorganization or liquidation is filed.  Rather, the transaction constitutes a *sub rosa* plan *also* because it contains nearly all other hallmarks of a plan and because it requires that only certain favored unsecured (or woefully undersecured) creditors – the "New VEBA" and the U.S. Treasury – receive value in the form of majority ownership of New Chrysler and new debt issued by New Chrysler, apparently in exchange for their prepetition claims.  Certain unsecured creditors, such as the Affected Dealers (if Chrysler prevails in rejecting their agreements and/or stripping them of their state law dealer protections), have no opportunity to participate in the ownership of New Chrysler.

6.      If that is Chrysler's desired outcome, then it should have presented the transaction to its constituencies with adequate disclosure and subjected it to the plan confirmation process, including the vote of impaired classes and ultimately this Court's determination of whether (among other standards) the plan was proposed in good faith, properly classified creditors, was fair and equitable, and did not unfairly discriminate against impaired dissenting classes.  And under the Bankruptcy Rules, Chrysler could have disclosed and sought confirmation of a plan as expeditiously as seeking approval under section 363.

7.      In addition, the Dealer Committee objects to the Sale Motion and seeks, in its contemporaneously submitted Continuance Request, a continuance of the hearing on the Sale Motion because the Sale Motion necessarily implicates (and may very well determine the outcome of) the Motion to Reject.  If the Court were to approve the requested restructuring transaction, it may effectively moot any objection to the Motion to Reject and deprive the Dealer Committee and Affected Dealers of any opportunity to be heard.

8.      Debtors freely admit the complexity, magnitude, and severe and wide-ranging repercussions of the contemplated rejections (Motion to Reject at ¶ 20), but they nevertheless invite this Court to reject 789 contracts based on nothing more than their conclusory statements that rejection of these contracts is an appropriate exercise of the Debtors' sound business judgment.  Notwithstanding the alleged urgency and even the intervention of the U.S. government in Chrysler's restructuring, due process, the Bankruptcy Rules, and basic notions of fundamental fairness require that the Dealer Committee and the Affected Dealers have adequate notice and an opportunity (including discovery) to defend against the elimination of the Affected Dealers' dealerships and their livelihood, as well as to resist the circumvention of the Affected Dealers' state law rights.

9.      Chrysler admittedly has spent years developing a business plan that will devastate 789 dealers and countless thousands of employees and their families (Motion to Reject at ¶¶ 33, 46), but has provided these parties with only three business days notice to respond to this unprecedented and unlawful request.

10.      Bankruptcy Rule 6006 provides that when a rejection request takes place outside of plan confirmation, such as here, those affected are entitled to the full scope of protections afforded to contested matters.  Such protections are vital and necessary in this case.  The prejudicial and harmful consequences to the Dealer Committee and Affected Dealers cannot be overstated.

## FACTUAL BACKGROUND

11.      On April 30, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code").

12. On May 1, 2009, the Court entered an Order directing the joint administration of the Debtors' chapter 11 cases. The Debtors' cases are consolidated for procedural purposes only.

**I. Facts Related To The Chrysler Restructuring Transaction.**

13. Under the prepetition First Lien Credit Agreement,[3] as of the Petition Date, Chrysler owed its first lien prepetition lenders approximately $6.9 billion, secured by a first priority lien on substantially all of Chrysler's assets. (Sale Motion at ¶ 13).

14. Under the prepetition Owner's Loan Agreement, Chrysler owes $2 billion, secured by a second priority lien on substantially all of Chrysler's assets. (*Id.* at ¶ 14). According to the Sale Motion, this debt may be forgiven under a proposed settlement. (*Id.* n.2).

15. Under the prepetition TARP Financing, Chrysler Parent owes $4.267 billion to the U.S. Treasury, secured by a third priority lien on the same collateral securing the approximate $8.9 billion aggregate first and second lien obligations and a first priority lien on "unencumbered assets and Chrysler's Mopar parts inventory." (*Id.* at ¶ 15).

16. The first lien holders, with claims at filing of $6.9 billion secured by first priority security interests in substantially all of the assets of Chrysler, would be expected to recover, in a liquidation, between 9% and 38% of their claims, on a net present value basis. The U.S. Treasury, with claims secured by first priority liens only on the Mopar inventory and certain real estate assets, would only be expected to recover between 3% and 6% of its claims, on a net present value basis. (Declaration of Robert Manzo ("Manzo Dec." ), ¶¶ 79 and 80).

17. Chrysler also has certain prepetition unsecured obligations arising from a 2008 Settlement Agreement with the UAW and Chrysler retirees, including an obligation to contribute cash and securities to a voluntary employee beneficiary association (the "New VEBA") and an

---

[3] Capitalized terms not defined herein have the meanings assigned them in the Sale Motion.

obligation to transfer to the New VEBA funds in an "existing internal VEBA." (Kolka Decl. at ¶ 44).

18. As set forth in the Sale Motion, Chrysler has been addressing its operational and financial challenges for a significant period of time. (*Id.* at 8-16). Moreover, it has been widely-known for several months that a chapter 11 filing by Chrysler was well within the realm of possibility. Indeed, Chrysler hired Jones Day as restructuring counsel by no later than early December of 2008. *See* THE WALL STREET JOURNAL, Dec. 5, 2008 ("In a statement, [Chrysler] confirmed it has retained Jones Day and other outside advisors 'to provide a comprehensive independent analysis of the various options available to the company.'").

19. Part of Chrysler's restructuring efforts was the pursuit of partnerships and strategic alliances, which led, after "extensive discussions," to a January 16, 2009 term sheet with Fiat S.p.A. ("Fiat") for a strategic alliance. (*Id.* at ¶¶ 18-22, 33).

20. As part of the Chrysler Restructuring Transaction, Chrysler and Fiat entered into the MTA (referred to in the Sale Motion as the "Purchase Agreement"), pursuant to which New Chrysler will acquire substantially all of the operating assets of Chrysler in exchange for assuming certain prepetition liabilities of Chrysler and paying $2 billion in cash. (*Id.* at ¶41; MTA at §§2.06, 2.08, 2.13).

21. Pursuant to the Chrysler Restructuring Transaction, New Chrysler will initially issue the membership interests in New Chrysler, as follows: 67.69% to the New VEBA, 9.85% to the U.S. Treasury and 2.46% to the Canadian government. Operating LLC Agreement (Exhibit H to MTA) ("New Chrysler LLC Agreement"), Schedule of Members. Fiat will retain 20% of the membership interests in New Chrysler. (Sale Motion at ¶41). Under the New Chrysler LLC Agreement, if certain performance criteria referred to as "Class B Events" are

attained, then Fiat's membership interest would increase by 15% and the members' ownership would shift to New VEBA - 55%, Fiat - 35%, U.S. Treasury - 8%, Canadian government - 2%. New Chrysler LLC Agreement at §3.4.

22.     For reasons that Debtors decline to explain, the Sale Motion recites the New Chrysler ownership percentages for the New VEBA, the U.S. Treasury and the Canadian government under the Chrysler Restructuring Transaction based on the assumption that the Class B Events will occur.  In any event, nowhere in the Sale Motion does Chrysler disclose the consideration in exchange for which these three prepetition creditors would receive equity interests in New Chrysler.  (*See, e.g.,* Sale Motion at ¶ 58 (summary of "Other Purchaser Transactions")).

23.     It appears, however, that the New VEBA's ownership interest in the restructured Chrysler, together with a $4.587 billion note, are being provided on account of its prepetition unsecured claim under the 2008 Settlement Agreement.  Pursuant to the terms of the UAW Retiree Settlement Agreement, a form of which is attached as Exhibit K to the MTA, between New Chrysler and the UAW, New Chrysler agreed, subject to consummation of the MTA, to, among other things, (a) divide Chrysler's Other Post-Employment Benefits ("OPEB") liability into two bookkeeping accounts in the existing Chrysler VEBA, with one account for employees and retirees not represented by the UAW and one account for UAW-represented employees and retirees (the "UAW Related Account"), (b) transfer the liabilities associated with the UAW Related Account to the New VEBA, (c) assume a fixed amount of such UAW Related Account liabilities by issuing a promissory note for the benefit of the New VEBA in the amount of $4.587 billion, and (d) issue the membership interest initially representing 67.69% of the membership

interests in New Chrysler. (UAW Retiree Settlement Agreement 5th Introductory Paragraph, and §§ 4, 6, 7, 9).

24.     Capstone Advisory Group, LLC ("Capstone"), Chrysler's financial advisor, estimates the amount of the prepetition OPEB liability converted to equity in New Chrysler to be $3.84 billion. (Exhibit D to Declaration of Robert Manzo, Chrysler Fiat Alliance Section 363 Analysis dated April 26, 2009, OPEB Activity and Member's Interest Changes, at 3 (back-up) and 5 (back-up)).

25.     Moreover, the Equity Recapture Agreement between the U.S. Treasury and the New VEBA demonstrates that the U.S. Treasury and Canadian government, together with Fiat, are the true equity holders in New Chrysler, with New VEBA's equity ownership merely transitional as a means of repaying the prepetition liability. The Equity Recapture Agreement provides that the U.S. Treasury is entitled to receive all "up-side" benefits of the New Chrysler membership interest in excess of $4.25 billion, increasing at a rate of 9% per annum compounded annually from January 1, 2010. (Equity Recapture Agreement at §§ II.C., III. and IV).

26.     Discovering the consideration given by the U.S. Treasury and the Canadian government in exchange for the membership interests in New Chrysler (and future "up-side") is likewise challenging. It does not appear in the Sale Motion, nor, apparently, even in the Chrysler Restructuring Transaction documents. Rather, hints of it only surface in the assumptions and analysis of Capstone. The membership interest in New Chrysler received by the U.S. Treasury pursuant to the MTA may be received in exchange for the conversion of the prepetition TARP Financing – which is overwhelmingly undersecured based on Capstone's liquidation analysis. (Manzo Dec., Exhibit D, Chrysler Fiat Alliance Section 363 Analysis dated April 26, 2009,

Member's Interest Changes, External Debt Activity and Footnotes to Cash Flow Statement 2009-2016 Plan, pp. 3, 5 (back-up), 8 (back-up)).

## II.      Facts Relating to the Affected Dealers.

27.      On May 14, 2009, the Debtors filed their Motion to Reject.  Attached as Exhibit A to the Motion to Reject is a schedule identifying 789 separate dealers (the "Dealers") whose franchise agreements the Debtors are seeking to reject.

28.      As a direct result of the Motion to Reject, the Affected Dealers are the subject of an unprecedented, wholesale mass franchise termination request that, if authorized by the Court, will result in the loss of tens of thousands of jobs.  Moreover, the requested dealer agreement rejection would be effective on June 9th, less than 30 days from the date the Motion to Reject was filed (notwithstanding Chrysler's alleged multi-year planning for such an eventuality).

29.      There are approximately 20,700 independent, franchised, new car automobile dealers in the U.S.  These dealers represent the largest retail segment in the U.S., with approximately $693 billion in revenues in 2007, while employing over 1.1 million people.  Casesa Shapiro Group, *The Franchised Automobile Dealer* at 2-3 (Nov. 26, 2008) (attached to Doc. No. 933) ("Casesa Report").  The U.S. dealers have $233.5 billion invested in their own businesses, more than the total industrial assets of any of the world's largest automobile manufacturers.  These dealers, in effect, deflect the financial risk from the manufacturers by putting their own capital at risk.  Additionally, these dealers comprise nearly 20% of all retail sales in the U.S., and, in total, pay billions annually in state and local income taxes.  *Id.*

30.      According to statistics compiled by the National Automobile Dealers Association ("NADA") for economic activity in the year 2007, new vehicle dealerships in the U.S. employed 1,114,500 people, with an average of 53 employees per dealership.  (*See "Driving the United*

*States' Economy*," available at http://www.nada.org/NR/rdonlyres/E51CEDC3-E39D-4C70-AD75-3ACCB5685251/0/StateeconomiesAnnualContributions.pdf).   The   average   annual earnings of the new vehicle dealership employees was $48,339, and the average annual payroll per new vehicle dealership was $2.59 million.  *Id.*

31.    The Debtors' domestic dealer network (the "<u>Dealer Network</u>") is of vital importance to the Debtors' business.  The Dealer Network is a largely independent and self-financed business, separate and apart from the Debtors, and provides the critical cog in the distribution network between the assembly line and the ultimate consumer.  The average dealership has approximately $2.5 million invested in land, buildings, furniture, fixture and equipment, and an additional $4.9 million in new car inventory.  (Casesa Report at 4).  The distribution channels provided by the Dealer Network operate at "virtually **no cost** to the manufacturer." (*Id.* at 5 (emphasis added)).

32.    As of the Petition Date, the Dealer Network (all but a small fraction of which is independently owned) was comprised of 3,181 dealers employing over 140,000 people.  (Motion to Reject at ¶ 23).  The Dealer Network includes dealers in every state in the nation and in every major metropolitan area, as well as extensive coverage in secondary and rural markets.  (*Id.; see also* Motion of Debtors and Debtors in Possession for Interim and Final Orders Authorizing the Debtors to Honor or Pay Prepetition Obligations to or for the Benefit of Their Dealers and other Customers, and for Related Relief (Doc No. 27) (the "<u>Prepetition Obligation Motion</u>")).  The Debtors describe the Dealer Network as "the public face of their businesses."  (Prepetition Obligation Motion at ¶ 19).  In light of the far-ranging depth and breadth of the Dealer Network and its many employees, the extraordinary relief requested by the Debtors will have extensive and severe repercussions among countless states, cities, communities and, ultimately, families.

33.    In support of their first day motions for relief, the Debtors filed the Declaration of James J. Arrigo (the "Arrigo Decl."). Mr. Arrigo is the owner of two Chrysler-Dodge-Jeep dealerships in South Florida. The Declaration of Mr. Arrigo, who also testified on behalf of the Debtors at the first day hearings, provided key, firsthand insight into the dire situation facing the Affected Dealers, including the following:

- "Chrysler's dealer network is a good example of the American entrepreneurial spirit. The Chrysler dealers located throughout the United States represent a small group of business owners. Although these small businesses have historically operated successful business operations, the dealerships are now in serious trouble and on the brink of collapse." (Arrigo Decl. at ¶8).

- "Many Chrysler dealerships are in financial distress and the situation has deteriorated rapidly in recent weeks. In my professional life, and over the past 30 years, this is the most dire situation I have ever seen in the car business." (Id. at ¶11).

- "These dealers were pillars of the local community, benefactors of local sports and charities and in some instances the community's largest employer and source of tax revenue." (Id. at ¶12).

34.    The Debtors found it advantageous and expedient to rely on the Arrigo Declaration in portraying the "dire straits" of the Affected Dealers while seeking relief from this Court at the first day hearings on April 30 and May 3. Such compunctions, however, were less than evident on May 13, 2009, when the Debtors unceremoniously mailed overnight UPS letters to 789 of their dealers, including the Affected Dealers, informing them that their dealership agreements will be rejected within less than 30 days (see, e.g. Correspondence attached as Exhibit A to the Declaration of Guy Willey) (the "Rejection Letter")).

35.    As set forth in the Rejection Letter, not only were the Affected Dealers notified that Chrysler would seek court approval for the rejection of their dealership agreements in less than 30 days, they were also informed of the following "transition" procedures being offered by

the Debtors to help assuage the pain of the highly accelerated and unprecedented wholesale rejections:

- "As a result of its recent bankruptcy filing, Chrysler LLC *is unable to repurchase your new vehicle inventory*. However we will assist with the redistribution of as many of your eligible vehicles as possible, among the dealers remaining in the Chrysler network."

- "As a result of its recent bankruptcy filing, Chrysler LLC *is unable to repurchase your Mopar parts inventory.* However we will endeavor to match you with a dealer to consider purchase of your parts. This redistribution will occur among the dealers remaining in the Chrysler network."

- "As a result of its recent bankruptcy filing, Chrysler LLC *is unable to repurchase your Essential/Special tools.* However we will assist with the redistribution of as many of your Essential/Special tools as possible. This redistribution will occur among the dealers remaining in the Chrysler network."

- "All warranty, MOPAR, Recall, Transportation and Chrysler Service Contract Claims must be submitted to Chrysler Motors LLC for payment within seven days of the expected court approved rejection date. . . Warranty repairs performed after the rejection date are not eligible for payment."

(Emphasis added). If the dealers are indeed the "public face" of Debtors' business, the Affected Dealers represent the proverbial nose being cut off in a fury of bankruptcy-induced spite. If Chrysler is permitted by the Court to carry out its restructuring plan, the Affected Dealers will be saddled with countless millions of dollars of inventory and equipment that Chrysler refuses to repurchase (among other claims). Deprived of any advance notice of the terminations, the Affected Dealers do not even have an opportunity to attempt to mitigate the dramatic nature of the harm befalling them. Instead, Chrysler seems intent on dragging many of the Affected Dealers into bankruptcy with it.

36.     The "transition procedures" described above are particularly egregious in the light of Chrysler's actions prior to the Petition Date. As set forth in the declarations, much of Affected Dealers' current inventory on hand was purchased in response to pressure from

14

Chrysler to be a "team player", *i.e.* by purchasing additional stock for the "good of Chrysler" despite the prevailing economic conditions. *See* Curry Decl. at ¶ 7; Parks Decl. at ¶ 9; Archer Decl. at ¶¶ 6-9; Taylor Decl. at ¶ 8; Walker Decl. at ¶ 7; Willey Decl. at ¶ 8; Spitler Decl. at ¶ 2. Should Chrysler be permitted to reject the dealership agreements, not only will the Affected Dealers be forced to liquidate their dealerships (including specialty tools and equipment purchased over the years at a cost of several hundreds of thousands of dollars) for pennies on the dollar, but the remaining inventory of vehicles will have to be sold as used cars without the benefit of Chrysler incentives. Forcing the Affected Dealers to suffer this loss of value only compounds the injustice, particularly as many only agreed to purchase the additional inventory as an accommodation to Chrysler in the first place. *Id.*

37.     In 2007, Chrysler's Dealer Network generated approximately $105 billion in revenue and spent $575 million on advertising. (<u>See</u>, News Archive, "*Chrysler LLC Dealers Deliver Main Street Message to Washington*," Nov. 16, 2008).[4] During the first nine months of 2008, Chrysler's Dealer Network invested $132 million of their own money solely to upgrade their U.S. facilities (often at Chrysler's behest). (<u>Id.</u>) Now, in less than a month, 789 members of that Dealer Network, the "public face of [the] business," will be effectively destroyed, with the inventory forcibly "redistributed" into the prevailing winds of their former competitors (who know that they will have to pay no more than firesale prices for the inventory).

38.     The Motion to Reject takes great pains to justify the rationale behind the wholesale rejection of the Affected Dealers; however, curiously enough, at no point is the justification broken down into actual costs to the Debtors and their estates. Rather, the Motion to Reject relies upon a vague and nebulous description of unspecified oversight, auditing and monitoring duties which allegedly compel the Debtors to "spend additional resources." (<u>See</u>,

---

[4] http://www.chryslerllc.com/en/news/article/?lid=chrysler_deliver_message_washington&year=2008&month=11

Motion to Reject at ¶15).  Additionally, a thorough review of the Second Declaration of Peter M. Grady, filed in support of the Motion to Reject (the "Second Grady Decl."), yields no further enlightenment regarding the actual cost to the Debtors and their estates, again pointing to the need to devote unspecified "additional resources" to "processes, and procedures, oversight of the dealer network, auditing and monitoring expenses for dealer operations, and all of the other operational expenses that must be incurred to maintain, support, facilitate and oversee a larger dealer network." (Second Grady Decl. at ¶16). In fact, it appears that the real impetus behind the rejections is to benefit certain creditors – dealers permitted to stay in business – at the expense of others, because these dealers will now have less competition to worry about.

39.    Although the Motion to Reject fails to adequately quantify the elusive costs and burdens that would inform the Debtor's business judgment in taking such drastic action, the Affected Dealers can explain the wholesale devastation being unleashed by the Debtors' actions.

40.    As the attached declarations from a small sampling of the Affected Dealers explain (given the Dealer Committee's limited time to investigate even within the Affected Dealers), the Affected Dealers have invested significant resources (usually at the request of Chrysler) into their dealerships.  For example, *as recently as April of 2009,* Chrysler urged Homer Cutrubus, owner of Dodge/Chrysler/Jeep franchises in Utah, to combine two of his facilities in Layton, Utah.  *See* Cutrubus Decl. at ¶¶ 4, 5.  Mr. Cutrubus resisted, but Chrysler kept pushing.  *Id.*   Indeed, Chrysler sent Mr. Cutrubus an e-mail regarding its "proposed plan to combine all franchises in Layton and Odgen into one location" and asking "Are you our guy?" *Id.* at ¶ 5 and Ex. C to Cutrubus Decl.  Being a team player, Mr. Cutrubus capitulated and consolidated the two facilities, at a cost of over $100,000.  *Id.* at ¶ 6. Now Chrysler is seeking to reject Cutrubus' dealer agreements.

41.     Rogers Dodge, Inc. ("Rogers") -- a family owned franchise -- has invested over $6,000,000 into its Dodge dealership, including the construction of a new state-of-the-art facility designed by Dodge in 2006 that "was specifically designed to sell Dodge vehicles and is ill-suited for any other purpose." Parks Decl. at ¶ 3. *See also* Curry Decl. at ¶ 5 (invested over $3.3 million in Baytown Chrysler/Jeep/Dodge franchise).

42.     At Chrysler's request, Gerald Spitler -- owner of Buzz Leonard Chrysler-Jeep -- sold his Mitsubishi franchise at a cost of $200,000 so that he could become a free-standing Chrysler Jeep dealer. *See* Spitler Decl. at ¶ 2.

43.     Moreover, in the last several months, Chrysler pressured dealers to purchase additional, unneeded stock in an effort to keep Chrysler afloat. *See* Curry Decl. at ¶ 7 (currently has 150-160 new vehicles and $220,000 worth of parts); Parks Decl. at ¶ 9 (currently has 190 vehicles and $120,000 worth of parts); Archer Decl. at ¶¶ 6-9 (for three dealerships, currently has approximately 700 vehicles in stock and approximately $1.7 million in parts); Taylor Decl. at ¶ 8 (currently has 21 vehicles and over $36,000 in parts); Walker Decl. at ¶ 7 (seven vehicles and $60,000 worth of parts); Willey Decl. at ¶ 8 (currently has 78 vehicles and over $150,000 in parts); Spitler Decl. at ¶ 2. Yet, Chrysler is now refusing to purchase this inventory. *See, e.g.,* Ex. A to Archer Decl. If the dealer agreements are rejected, the Affected Dealers will be forced to sell their inventory of vehicles as used cars without the benefit of the manufacturers' warranties or sales incentives. *See* Curry Decl. at ¶ 7; Parks Decl. at ¶ 9; Archer Decl. at ¶ 9; Taylor Decl. at ¶ 8; Walker Decl. at ¶ 4; Willey at ¶ 8.

44.     As independently owned franchises, dealers have to alone bear the costs and expenses incurred by their dealerships, including those relating to land, showroom, inventory, personnel, training, employee benefits, maintenance, signage, advertisements, insurance and

taxes.  Taylor Decl. at ¶ 3; Parks Decl. at ¶ 4; Curry Decl. at ¶ 3; Archer Decl. at ¶ 3; Walker

Decl. at ¶ 3; Willey at ¶ 3.  These costs and expenses are not subsidized by Chrysler.  *Id.*

45.     Because the dealerships were successful or because the dealers had made

significant investments at Chrysler's request, the declarants were surprised to learn that Chrysler

was asking to reject their dealer agreements.  Archer Decl. at ¶ 4; Curry Decl. at ¶¶ 4, 5; Parks

Decl. at ¶¶ 5-7; Spitler Decl. at ¶ 3; Taylor Decl. at ¶ 6; Willey Decl. at ¶¶ 4, 5.

46.     If Chrysler can successfully reject its dealer agreements with the Affected Dealers,

these dealers will suffer devastating losses, including be forced to liquidate assets at pennies on

the dollar.  *See* Curry Decl. at ¶ 5; Parks Decl. at ¶¶ 7, 8, 10; Spitler Decl. at ¶ 3; Taylor Decl. at

¶ 6; Willey Decl. at ¶ 8.

47.     A significant number of employees will be impacted.  *See* Curry Decl. at ¶ 5

(employs 34 people); Archer Decl. at ¶ 5 (three dealerships employ over 250 people); Parks Decl.

at ¶ 8 (employs 38 people); Cutrubus Decl. at ¶ 8 (in excess of 100 jobs are now at risk); Taylor

Decl. at ¶ 7 (employs over 25 people).

48.     And, in some cases, the dealerships will likely be forced to close their doors and

potentially file for bankruptcy.  *See* Curry Decl. at ¶ 5 ("Without a franchise, our investment of

approximately $3.3 million will be worth almost nothing.  Liquidation expenses and loss of

franchise will total in the millions and force us into bankruptcy."); Parks Decl. at ¶ 8 ("The loss

of the Dodge franchise will force Rogers to shutter its doors . . ."); Taylor Decl. at 6 ("uncertain

whether Taylor-Parker will be able to continue to pay its operational expenses or remain a viable

business"); Walker Decl. at ¶ 4 ("Many rejected dealers will immediately go out of business.").

49.     If the Affected Dealers are forced to close their doors, such closures will not only

impact the owners and employees of those dealerships; the communities where the Affected

Dealers are located will also be impacted.  Many of these dealerships play a vital role in their communities, including supporting charitable organizations.  *See* Walker Decl. at ¶ 6; Taylor Decl. at ¶ 9.

## **ARGUMENT**

50.      By this Objection and the Continuance Request, the Dealer Committee requests that the Court enter an Order: denying authorization for the Chrysler Restructuring Transaction, continuing the hearing on the Sale Motion and granting a continuance of the response and hearing deadlines for the Motion to Reject in order to enable the Dealer Committee a reasonable period of time to conduct basic discovery necessary to defend against the Sale Motion and the Motion to Reject and properly present the issues to the Court.  The Dealer Committee needs time not simply to conduct discovery, but also to fully investigate the facts known and evidence possessed by the Affected Dealers themselves.

51.      The Chrysler Restructuring Transaction is an improper and impermissible *sub rosa* plan that appears to seek, under the veiled guise of an asset sale, to subvert the normal distribution scheme and procedural rights of creditors mandated by chapter 11 in contravention of the basic purposes behind chapter 11 reorganization.

52.      The Chrysler Restructuring Transaction also tramples on the due process rights of Affected Dealers by effectively accomplishing the rejection of their contracts before they have any meaningful opportunity to be heard.  This Court must, at a minimum, permit discovery and record development in order to fully assess the responses of the Dealer Committee to the Motion to Reject, which by Chrysler's own admission includes consideration of several novel and important legal issues.

I.      **The Chrysler Restructuring Transaction Is An Improper *Sub Rosa* Plan That Cannot be Approved under Section 363(b)**

53.     Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing may use, sell, or lease, other than in the ordinary course of business, property of the estate ...." 11 U.S.C. § 363(b)(1).  Estate property may not, however, be so used "if it would amount to a *sub rosa* plan of reorganization."  *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (addressing proposed settlement).  *Sub rosa* plans are prohibited based on "a fear that a debtor-in-possession will enter into transactions that will, in effect, 'short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan.'"  *Id.,* quoting *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, 940 (5th Cir. 1983).  *See also Institutional Creditors of Continental Air Lines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 780 F.2d 1123, 1126-28 (5th Cir. 1986) (chapter 11 debtor "cannot use § 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization.... Likewise, if a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), creditor's [sic] rights under, for example 11 U.S.C. §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) might become meaningless.  Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan."); *Clyde Bergemann, Inc. v. The Babcock & Wilcox Co. (In re The Babcock & Wilcox Co.)*, 250 F.3d 955, 960 (5th Cir. 2001) ("[T]he provisions of § 363 . . . do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan.").

54.     The transactions contemplated by the Chrysler Restructuring Transaction contain many of the hallmarks of a chapter 11 plan of reorganization, while providing none of the

creditor protections afforded by the chapter 11 plan disclosure, solicitation and confirmation process.  As such, the Chrysler Restructuring Transaction constitutes a *sub rosa* plan that cannot be approved under section 363.  Section 1123(a)(5) of the Bankruptcy Code provides that a plan of reorganization must contain "adequate means for the plan's implementation."  These include (i) the "transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan" (§ 1123(a)(5)(B)); (ii) the "sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate" (§ 1123(a)(5)(D)); (iii) "satisfaction or modification of any lien" (§ 1123(a)(5)(E)); (iv) "curing or waiving of any default" (§ 1123(a)(5)(G)); and (v) "issuance of securities ... of any entity referred to in subparagraph (B) for cash, for property, for existing securities, or in exchange for claims or interests...." (§ 1123(a)(5)(J)).

55.     Under the Chrysler Restructuring Transaction (i) substantially all of the assets of the Debtors will be sold or transferred to New Chrysler, (ii) the cash coming into the estate will be distributed on account of prepetition secured claims against (*i.e.,* an interest in) property of the estate, (iii) a very significant portion of the Debtors' liabilities will be resolved, (iv) defaults under contracts to be assigned to New Chrysler will be cured, and (v) securities of New Chrysler will be issued to only certain holders of prepetition claims against the Debtors.  In short, the Chrysler Restructuring Transaction is a plan masquerading as a sale in order to avoid any of the burdens that accompany confirmation of a plan, including the protection of creditors, such as the Affected Dealers, against discrimination and unfair or inequitable treatment.

56.     The key case within the Second Circuit addressing the core issue before the Court – whether the Chrysler Restructuring Transaction constitutes an impermissible *sub rosa* plan that

cannot be approved under section 363 but must be subjected to the disclosure requirements and confirmation standards of chapter 11 – is the district court's decision in *Contrarian Funds, LLC v. WestPoint Stevens, Inc. (In re WestPoint Stevens, Inc.)*, 333 B.R. 30 (S.D.N.Y. 2005).

57.    In *WestPoint Stevens*, the bankruptcy court approved the sale of substantially all of the debtors' assets pursuant to sections 363(b) and (f) of the Bankruptcy Code.  The sale contemplated a transaction that would be accomplished in two "stages," though designed to occur contemporaneously.  In Stage 1, substantially all of the assets would be sold to WestPoint International, Inc. and WestPoint Home, Inc. ("Purchasers") in return for stock of Aretex, LLC ("Aretex"), the parent of the Purchasers, subscription rights for additional stock, some cash consideration and the assumption of certain liabilities.  *Id.* at 33-34.  The debtors' first lien secured lenders would receive a replacement lien on the stock and subscription rights up to the value of the first lien debt, pursuant to section 363(e).  *Id.*  In Stage 2, all of the stock and a significant portion of the subscription rights would be distributed to the first lien lenders in full satisfaction of their debt, with the remainder of the subscription rights issued to the holders of second lien debt in partial satisfaction of their claims.  *Id.*  The transaction would result in the first lienholders receiving stock and subscription rights valued at approximately $489 million in full satisfaction of their debt and the second lienholders receiving subscription rights valued at approximately $95 million in partial satisfaction of $167 million in second lien debt.  *Id.*

58.    The first lienholders (excluding Aretex, which held a minority portion of the first lien debt and a majority of the second lien debt), objected to the proposed transaction, particularly the in-kind distribution of the stock and subscription rights, the distributions to the second lienholders, and the claim satisfaction and lien release provisions of the sale.  *Id.*  The district court initially held that Stage 1 of the transaction – the sale of the debtors' assets to the

Purchasers in return for the stock and subscription rights and the creation of replacement liens thereon in favor of the first lien lenders – was "clearly within the scope of authority granted to the bankruptcy court by section 363 of the Bankruptcy Code." *Id.* at 51.

59. As to Stage 2 – the distribution of the stock and subscription rights on account of the first and second lien debt and elimination of the replacement lien granted in Stage 1 – the court determined that "[n]othing in the language of the relevant subsections of Bankruptcy Code section 363, however, provides the Bankruptcy Court with authority to impair the claim satisfaction rights of objecting creditors or to eliminate the replacement liens." *Id.* (emphasis added).

60. While not using the term "*sub rosa* plan," the district court relied heavily on Fifth Circuit authority (cited above) prohibiting *sub rosa* plans, explaining that:

> [I]t is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures. Where it is clear that the terms of a section 363(b) sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope of section 363(b) and should not be approved under that section.

*Id.* at 52. The district court then concluded that Stage 2 of the transaction, in directing the "distribution to creditors of the consideration paid for [the debtors'] assets and the termination of liens and other interests, clearly constituted an attempt to determine or preempt plan issues in the context of the Section 363(b) sale and was improper to that extent." 333 B.R. at 52.

61. Concluding, the district court pointedly observed:

> This is a Chapter 11 case. Chapter 11 authorizes the *alteration of objecting creditors' rights* through the plan confirmation process.… The Bankruptcy Court's utilization of sections 363(b) and 105(a) to overcome [the objectors'] anticipated objections to an attempt to cram down an equity-based plan of reorganization must be rejected.

*Id.* at 54 (emphasis added).

62.     The Chrysler Restructuring Transaction entails much more than a "Stage 1" transfer of substantially all of the Debtors' assets in exchange for $2 billion to the Debtors' estate for payment to the first lien lenders, the assumption and assignment of executory contracts and leases, and even more than the assumption of a very significant portion of the Debtors' liabilities. The transaction redirects billions of dollars in value away from the Debtors' estate (just how many billions is not disclosed) by positioning certain unsecured creditors – the New VEBA and the U.S. Treasury – as majority owners of New Chrysler, and it further channels consideration directly to the New VEBA in the form of the $4.587 billion note. Such direct distribution of value in the form of new debt and equity issued by New Chrysler, in exchange for the prepetition debt of the New VEBA, and perhaps the U.S. Treasury, deprives the Affected Dealers and Chrysler's other unsecured creditors whose debts are not being assumed of that value. This certainly "alters" the rights of the Affected Dealers, and, as explained below, "determines or preempts" plan issues.

63.     The Chrysler Restructuring Transaction dictates not only the disposition of substantially all of the Debtors' assets, but also allocates membership interests in New Chrysler, apparently according to some unexplained value assigned to certain prepetition claims held by preferred creditors in conversion of their claims against the Debtors. This is precisely the purpose of a chapter 11 plan. *See* 11 U.S.C. §§ 1123(a)(3) ("a plan shall – specify the treatment of any class of claims or interests that is impaired under the plan"); 1123(a)(5)(B), (J) ("a plan shall – provide adequate means for the plan's implementation, such as – transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan" or "issuance of securities of the debtor, or of any entity referred to in

subparagraph (B) …, for cash, for property, for existing securities, or in exchange for claims or interests ….").

64.     The Debtors thus seek to accomplish by motion what may only be properly achieved through the plan process, without affording the Affected Dealers and other creditors who are not among those favored under the Chrysler Restructuring Transaction with any of the protections of the chapter 11 plan solicitation and confirmation provisions of the Bankruptcy Code.  *See, e.g.,* §§ 1122(a) (allowing classification of only like claims); 1125 (requiring disclosure statement containing "adequate information" for solicitation of votes regarding plan); 1126(c) (amount and number thresholds for acceptance by a class of claims); 1129(a)(7) (best interests of creditors test); 1129(a)(11) (feasibility test); 1129(b)(2) (protection against unfair discrimination and unfair and inequitable treatment).

65.     Specifically, the Debtors' use of section 363 to attempt an end-run around the chapter 11 plan process (i) deprives non-favored creditors (such as the Affected Dealers) of sufficient information to determine the implications of the proposed Chrysler Restructuring Transaction on their claims against the Debtors' estates, (ii) denies creditors an opportunity to assess the extent of discrimination across classes of creditors holding claims of equal priority, and (iii) denies creditors the opportunity to vote on the disposition of substantially all of the Debtors' assets *bundled with* the allocation of interests in New Chrysler at least in part on the basis of prepetition claims.

66.     In order for a sale of substantially all of a debtor's assets under section 363 to be approved, the debtor must provide all creditors with notice of the proposed transaction.  *See In re Naron & Wagner, Chartered*, 88 B.R. 85, 89 (Bankr. D. Md. 1988).  According to the court in *Naron*, "[t]his notice should be sufficient to inform all interested parties of the anticipated impact

25

of the sale on debtor's business and/or anticipated plan. *Id.* at 88. Where the debtor seeks to sell substantially all of its assets and distribute the proceeds outside of a plan of reorganization, "appropriate notice should be a functional substitute for the adequate information which would be contained in a disclosure statement concerning the proposed transaction." *Id.* at 89. *See also In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 983 (Bankr. N.D.N.Y. 1988) ("the importance of notice cannot be underscored for it is the due process component of a § 363(b) transfer in that it gives all parties in interest an opportunity to be heard").

67.     The Debtors' disclosure of the Chrysler Restructuring Transaction fails to meet this standard and is in any event patently inadequate. As a result, all of the implications of the proposed Chrysler Restructuring Transaction on the rights and interests of the Affected Dealers are unclear. Foremost among the substantive notice deficiencies is the failure of the Sale Motion to disclose the consideration in exchange for which the prepetition creditors, New VEBA, the U.S. Treasury and the Canadian government, would receive equity in New Chrysler.

68.     Moreover, an approval of the Chrysler Restructuring Transaction under section 363 would eliminate the protections afforded dissenting unsecured creditor classes in a cramdown under section 1129(b) that any plan not "discriminate unfairly" and be "fair and equitable." Each dissenting class would be entitled to a determination by the Court that the plan (presumably in form and substance identical to the Chrysler Restructuring Transaction) does not discriminate unfairly against that class. *See* 11 U.S.C. § 1129(b)(1). By seeking to "confirm" a *sub rosa* plan, the Debtors are side-stepping the burden that they would have to appropriately justify (if that were possible) the disparate treatment of holders of claims of equal priority to those of the New VEBA and the U.S. Treasury.

69.     Assuming the Debtors could clear the initial hurdle of justifying the disparate treatment of the Affected Dealers and certain other unsecured creditors in favor of the New VEBA and the U.S. Treasury, the Debtors would also have the burden to demonstrate that a plan that embodies the Chrysler Restructuring Transaction is fair and equitable to each dissenting class of creditors.  *See id.*  The test of whether a plan is "fair and equitable" has two components: (i) the absolute priority rule, and (ii) the rule that no party receive more than the value of its claim.  *See generally* 7 Collier on Bankruptcy ¶ 1129.04[4][a] (15th rev. ed. 2009).  The Dealer Committee cannot determine the extent to which the fair and equitable rule is being violated because the Debtors have not, pursuant to a plan and disclosure statement, classified the claims against their estates or disclosed the expected recoveries among those claims, but instead sought to implement a *sub rosa* plan under section 363.

70.     The approval sought by the Debtors of the Chrysler Restructuring Transaction under section 363 preempts or deprives the Affected Dealers of each of the chapter 11 disclosure and confirmation provisions addressed above, particularly as they relate to the disparate and unfair treatment of creditors by reason of the transaction's channeling of an undisclosed amount of value to the New VEBA and perhaps the U.S. Treasury.  For this reason, among others, the Chrysler Restructuring Transaction cannot be approved under section 363(b).

71.     The Chrysler Restructuring Transaction also cannot be sustained under other authority, within or outside of the Second Circuit.  Chrysler relies heavily on *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983), and later decisions that stand for the general proposition that a bankruptcy court must determine, based on evidence, that a "good business reason" exists to authorize the sale of an important asset of the estate prior to and outside of a plan of reorganization.  *See, e.g.,* Debtors'

27

Memorandum of Law in Support of the Sale Motion (Doc. No. 191) (the "Sale Mem.") at 8. However, satisfaction of that standard alone speaks only to the first "stage" of a "two-stage" transaction, such as the transaction in *WestPoint Stevens* and the Chrysler Restructuring Transaction. There may be a good reason in a particular case for a sale that permits the estate to realize value prior to a plan, but if the transaction effects distributions (or, as here, diversions) of value, or provides for other actions that typically occur under a plan, it may be disallowed as a *sub rosa* plan. Indeed, the district court in *WestPoint Stevens*, which struck down the two-stage transaction as a *sub rosa* plan, noted that the bankruptcy court had determined that the *Lionel* standard had been met, and this determination was not challenged on appeal. Yet *WestPoint Stevens* disallowed the *sub rosa* plan in that case. *Lionel* and its progeny in the Second Circuit address only the first hurdle that the Debtors must overcome in this case. *Lionel* is, however, instructive in this matter, given the Second Circuit's admonition that, "[i]n fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups." *In re Lionel Corp.*, 722 F.2d at 1071. *See also In re Gulf Coast Oil Corp.*, Case No. 08-50213, 2009 Bankr. LEXIS 313 at * 47 (Bankr. S.D. Tex., Feb. 11, 2009) ("If the sale will not follow the 'carefully crafted [Congressional] scheme' by utilizing the 'balanced set of tools for both the debtor and the creditor [and]… multiparty bargaining' then it is hard to justify entitling the few lucky parties to the extraordinary benefits that Congress provided for those who do satisfy the statutory plan confirmation requirements.").

72.    Although Chrysler argues strenuously that delay in the approval and consummation of the Chrysler Restructuring Transaction will result in a loss of value to the estate and cause serious economic harm, (Sale Mem. at 9-13), Chrysler does not attempt to justify its effort to side-step the disclosure and plan confirmation process on the ground that

presenting the Chrysler Restructuring Transaction for approval as part of a plan would unduly delay the transaction.  Indeed, Chrysler had ample time to negotiate and prepare a plan for filing on day one – as noted above, Chrysler had retained restructuring counsel at least five months before filing and had other advisors available to it at that time.

73.    Given these facts, Chrysler's choice to proceed under section 363, knowing that the breadth of the Chrysler Restructuring Transaction would imperil it as a *sub rosa* plan, suggests that Chrysler recognized that the transaction might never be confirmed consensually or by cramdown under section 1129(b).

74.    Chrysler also contends, in various iterations, that the Court should approve the Chrysler Restructuring Transaction because it is the best, if not only, alternative available.  *See* Sale Mem. at 16-22 (arguing that Chrysler will receive "fair consideration"; the transaction will maximize its ability to pay claims and preserve going concern value; and is the only transaction that Chrysler's "principal" constituents and the U.S. and Canadian governments will support). Chrysler's argument cannot prevail and, indeed, was expressly rejected in *WestPoint Stevens*:

> Nor do the Bankruptcy Court's remarks and findings concerning the centrality of the distribution provisions (and their concomitant implications for practical control of the post-transaction operating entity) to the [purchasers and related parties] and the Bankruptcy Court's references to an *alternative scenario consisting of forced liquidation or piecemeal asset sales* supply the requisite link to authority for the challenged Sale Order provisions.  *The fact that a transaction including a section 363(b) sale of assets may ultimately be in the best economic interests of a debtor's various constituencies does not authorize the court to ignore the creditors' rights and procedural requirements of Chapter 11.*

333 B.R. 30 at 51-52  (emphasis added).

75.    Chrysler had two choices to seek approval of a transaction in a manner compliant with U.S. bankruptcy law.  It could have properly sought approval under section 363 if it had limited the scope of the transaction to a sale with a later distribution under a plan of the

consideration received, or it could have filed a plan to effectuate the far broader Chrysler Restructuring Transaction and subjected it to the disclosure and plan confirmation processes. Chrysler chose neither route. As a result, the Court must not approve the Chrysler Restructuring Transaction under section 363 regardless of the potential consequences suggested by Chrysler.[5]

## II.    The Timing of The Chrysler Restructuring Transaction Offends Due Process

76.    As explained above, the terms of the Chrysler Restructuring Transaction contain unnecessarily punitive timing restrictions that would sacrifice the rights of the Affected Dealers before having a chance to adequately defend themselves.

77.    Given the extraordinary nature of the relief sought by Chrysler and the irreparable harm that would be suffered by the Affected Dealers, the extent to which Chrysler has failed to comport with due process is stunning.   Chrysler:

- Failed to serve the Sale Motion on the Affected Dealers even though the Sale Motion may be dispositive of the Affected Dealers' contractual rights under their dealer agreements.

- Failed to notify the Affected Dealers that the relief sought in the Sale Motion directly and adversely impacts their rights and interests and may moot their rights to oppose rejection.

- Orchestrated the sequence and timing of the Motion to Reject to provide only three business days' notice between the date on which dealers were notified that their contracts would be the subject of the Motion to Reject and the date to respond to the Sale Motion.

- Provided the first sale-related notice, by regular mail, of the proposed sale and bidding procedures (but *not* the Sale Motion) to the Affected  Dealers on May 11.

---

[5] Courts routinely make a finding at the time a section 363 sale is approved that the purchaser is a "good faith purchaser" for purposes of section 363(m) of the Bankruptcy Code. *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 389 (2d Cir. 1997). The burden is on the Debtors to establish New Chrysler's good faith. *T.C. Investors v. Joseph (In re M Capital Corporation)*, 290 B.R. 743, 747 (B.A.P. 9th Cir. 2003) ("proponent of section 363(m) good faith has the burden of proof"); *In re W.A. Mallory Company, Inc.*, 214 B.R. 834, 838 (Bankr. E.D. Va. 1997) ("debtor has failed to carry its burden of proof of demonstrating that the sales are proposed in good faith"). The Dealer Committee reserves all rights regarding this issue, including, without limitation, seeking discovery, examination of witnesses at the Sale Hearing, and otherwise.

- Failed to disclose the true nature of the Chrysler Restructuring Transaction as significantly more than a sale of substantially all of Chrysler's assets.

- Failed to disclose, even in transaction documents filed last week, the specific consideration being provided to the New VEBA and the U.S. Treasury in respect of their membership interests in New Chrysler.

- Having had years to devise its scheme to reduce its dealer network, provided the Affected Dealers with virtually no notice and no meaningful opportunity to raise objections or prepare their defense against the Motion to Reject.

- Failed to comply with Rule 7001 of the Bankruptcy Rules in seeking injunctive relief against the Affected Dealers.

- Seeks to dictate and determine the nature and extent of the claims that Affected Dealers may assert in the event the Court authorizes rejection of their dealer agreements.

78.     Debtors filed the Motion to Reject on May 14.  At that time, objections to the Chrysler Restructuring Transaction were already due on May 19.  As explained below, that afforded the Dealer Committee and Affected Dealers only three business days to consult and hire counsel, and attempt to understand, and protect, their rights in conjunction with both the Chrysler Restructuring Transaction and the Motion to Reject.

79.     Currently, the hearing on the Chrysler Restructuring Transaction is slated for May 27, whereas the hearing for the Motion to Reject is scheduled for June 3.  If the Court approves the Chrysler Restructuring Transaction on May 27 (which is only one day after objections are due to the Motion to Reject), it may, for all practical purposes, dictate the result of the Motion to Reject.

80.     If the Court were to approve the Chrysler Restructuring Transaction and deny the Motion to Reject, the Affected Dealers may be left without any meaningful relief.  Unless state law otherwise provides, the Affected Dealers may not have any contractual or other relationship with New Chrysler.  This would likely prevent the Affected Dealers from being able: (1) to offer

warranties on new vehicles through New Chrysler; (2) to utilize manufacturer's incentives from New Chrysler (placing them at a serious competitive disadvantage with other Chrysler dealers); and (3) to use signage from Chrysler. The Dealer Committee has not yet had an opportunity to fully explore all ramifications attendant in such a scenario, and results may differ based on state law, but the risks are certainly substantial. Prevailing on the Motion to Reject may be a pyrrhic victory if the Affected Dealers' rights were already effectively adjudicated in the disposition of the Sale Motion.

81.     To protect their due process rights, this Court should ensure that the Dealer Committee and the Affected Dealers are given adequate time to conduct discovery and develop the record in light of the unprecedented proposed mass franchise termination that the Debtors are seeking. *See, e.g., In re Blast Energy Servs., Inc.*, 396 B.R. 676, 690 (Bankr. S.D. Tex. 2008) (granting continuances and allowing sufficient time for discovery "*to ensure that due process was afforded*") (emphasis added); *In re La Sierra Fin. Servs., Inc.*, 290 B.R. 718, 732-33 (9th Cir. B.A.P. 2002) (recognizing that due process "requires more than simply that the parties be aware of the litigation, *but also they have the opportunity to prepare adequately for an impending hearing*") (citations omitted, emphasis added); *In re Timely Secretarial Serv., Inc.*, 987 F.2d 1167, 1171 (5th Cir. 1993) ("Basic principles of due process required the bankruptcy court to give General Electric reasonable notice . . . . Indeed, the Supreme Court has recognized that 'an elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action *and afford them an opportunity to present their objections*.'") (citations omitted, emphasis added); *In re Indesco Int'l, Inc.*, 2005 Bankr. LEXIS 458, at *35-*36 (Bankr. S.D.N.Y. Mar. 25, 2005) ("In the interests of . . . due process . . . the

32

Court will afford AFA notice and opportunity to be heard with respect to the merits, and reasonable discovery in connection therewith . . . . The Court will then need to have an evidentiary hearing . . . .").

82.    If the Court approves the Chrysler Restructuring Transaction, the ultimate effect may be to moot the hearing on the Motion to Reject and deprive the Affected Dealers of any meaningful opportunity to be heard, in violation of the U.S. Constitution. *See United States v. Castro*, 243 B.R. at 383 ("the fundamental requisite of due process of law is the opportunity to be heard") (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314).   The Court must not countenance such a violation of due process.

## III.    At a Minimum, A Continuance Must Be Granted In a Way that Protects the Rights of the Affected Dealers

83.    Debtors have no one to blame but themselves for structuring the Chrysler Restructuring Transaction and the proposed rejection in the manner that they have.  Due process simply demands that the Dealer Committee and the Affected Dealers have a full and fair opportunity to take discovery and be heard before the Court adjudicates the Sale Motion and Motion to Reject.  At a minimum, therefore, a continuance must be granted in a way that fully affords the Dealer Committee and Affected Dealers a meaningful ability to protect their rights, which based on Debtors' current structure of the proceedings, necessitates a continuance of *both* the Sale Motion and the Motion to Reject.

### A.    The Dealer Committee and Affected Dealers Will Be Irreparably Harmed if the Continuance is Not Granted

84.    Several states provide that termination of a franchise or dealership without compliance with the contract or state laws constitutes irreparable harm. *See, e.g.,* Wash. Rev. Code Ann. § 135.065 ("[A]ny violation of this chapter by the grantor is deemed an irreparable

injury to the dealer for determining if a temporary injunction should be issued."); Mich. Comp. Laws § 445.1535(3) ("presumption of immediate and irreparable harm to the franchisee" where contract contains certain clauses).

85.     Chrysler itself recognized the perils of termination, as evidenced by its exemplar contract with Jeep dealers that it attached to Mr. Grady's declaration.  That contract provides for arbitration, and if the dispute concerns the termination of the dealer relationship, "***[Chrysler] will stay the implementation of the decision to terminate this Agreement***. . . until the decision of the arbitrator has been announced."   (Motion to Reject, Second Grady Decl. Jeep Contract, ¶ 9) (emphasis added).

86.     This very language was evaluated by the Second Circuit in *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993).  There, an automobile dealer signed a franchise agreement with Chrysler Corporation's subsidiary, Jeep-Eagle Sales Corp. ("Eagle Sales"). *Id.* at 431.  When Eagle Sales sought to open four new dealerships in the same market area as the original dealer, the dealer sought to arbitrate the legality of such action and, relying on the same contractual language quoted above, sought injunctive relief preventing Eagle Sales from implementing the four new franchises. *Id.* at 432.  In reversing the lower court and granting the injunction, the Second Circuit held that the parties' contract "contemplates that the manufacturer's decision . . . will cause an existing dealer serious harm, difficult to compensate with money damages . . . ."  *Id.* at 435.  Moreover, the court recognized that "[m]ajor disruption of a business can be as harmful as termination, and a 'threat to the continued existence of a business can constitute irreparable injury.'" *Id.* at 435.  Citing to original dealer's reduced sales and the number of customers entering its showroom, the court held that "appellant has

34

demonstrated that the four new Jeep-Eagle dealerships seriously threaten its continued existence and that money damages are inadequate compensation for such loss." *Id.* at 436.

87.     When a dealership is terminated, as Chrysler seeks to do *en masse* by June 9, it generally renders the dealer unable to sell new cars under many states' laws.  Even if the dealer has an inventory of new cars, it will be unable to sell them with a warranty (or any manufacturer incentives).  (*See* Taylor Decl. at ¶ 8; Archer Decl. at ¶ 9; Curry Decl. at ¶ 7; Parks Decl. at ¶ 10; Spitler Decl. at ¶ 3; Walker Decl. at ¶ 7; Willey Decl. at ¶ 8).  Dealers will immediately have to terminate employees, with many dealers employing 50 or more employees.  (*See* Walker Decl. at ¶¶ 4, 5; Parks Decl. at ¶ 8; Curry Decl. at ¶ 8; Archer at ¶ 5).

88.     Closing the dealership negatively impacts customer relations, and dealer goodwill may forever be lost.  Customers may not have anywhere to turn for questions about warranties, repairs, or other matters.

89.     Monetary damages (particularly monetary damages against an insolvent company) provide no substitute for the harm that a dealership will face if it is improperly terminated.

90.     The Second Circuit recognized this very point in the context of an attempt by Ford to terminate a dealer several years ago:

> Ford's contention that Semmes failed to show irreparable injury from termination is wholly unpersuasive.  Of course, Semmes' past profits would afford a basis for calculating damages for wrongful termination, and no one doubts Ford's ability to respond.  But the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damage award.  See *Madsen v. Chrysler Corp., 261 F. Supp. 488, 507 (N.D. Ill. 1966),* vacated as moot, *375 F.2d 773* (7th Cir. 1967).  Moreover, they want to continue living.  As Judge Goodrich said, a "judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who, as here, has had a Ford franchise" for many years,  *Bateman v. Ford Motor Co.,*

*302 F.2d 63, 66* (3d Cir. 1962). As against this, the hardship to Ford in continuing the Semmes dealership *pendente lite* was relatively small.

*Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (internal quotations and citations omitted).  *See also Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (granting preliminary injunction prohibiting Coca-Cola's termination of distributorship upon finding that "[t]he loss of [plaintiff's] distributorship, an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm.  What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages."); *Colonial Ford, Inc. v. Ford Motor Co.*, 1991 U.S. Dist. LEXIS 14421, at *4, *6 (W.D.N.Y. 1991) (finding Ford dealership made showing of irreparable harm where "[t]he bulk of [the dealership's] gross profits derive from its position as a Ford dealership.  Termination of that relationship would seriously jeopardize [the dealership's] continuing viability as a business enterprise."); *Automotive Electric Service Corp. v. Association of Automotive Aftermarket Distributors,* 747 F. Supp. 1483, 1514 (E.D.N.Y. 1990) (granting permanent injunction and finding that "[t]his is not a case of mere lost profits, but rather the basic existence of a seventy year old business may be threatened. . . . Like the plaintiffs in *Semmes*, the Judelsons have a virtually unmeasurable interest in continuing to operate their business and a damage award would, in this Court's view, be inadequate to afford complete relief.").

91.    The same points in the cases cited above apply here with even greater force, since it is not just one dealer being terminated, but nearly a thousand.

B.      Debtors Will Not Be Harmed by Permitting the Dealer Committee and the Affected Dealers an Opportunity to Defend Themselves

92.     The Dealer Committee is not seeking a continuance for the sake of delay.  Indeed, within the next few days, it will be serving a first set of discovery requests and deposition notices on Chrysler and the other parties to the Chrysler Restructuring Transaction in furtherance of this Objection and its anticipated opposition to the Motion to Reject.  *See, e.g., In re Khachikyan*, 335 B.R. 121, 127 (9th Cir. B.A.P. 2007) ("Tactically, one desiring discovery needs to be in the position of being able to argue that discovery was timely propounded, is appropriate to the situation, and that the contested matter should not be resolved until the required responses are provided. The court has discretion to shorten response times or to continue the hearing to permit responses to appropriate discovery that has been timely requested.").  The Dealer Committee has gone to great lengths to serve discovery within a few days of receipt of the Motion to Reject. With cooperation from Chrysler, discovery can be completed expeditiously.

93.     Any urgency suggested by Debtors in the Motion to Reject is manufactured, and they will incur no harm if the proposed rejection does not take place on the timetable that they desire.  For example, Chrysler does not incur any costs, beyond nominal ones, in connection with the Affected Dealers.  That is because Chrysler insists that the Affected Dealers pay for everything.

94.     In his declaration, Mr. Walker details the types of costs that dealers must bear. First, they must pay for all inventory that they receive from Chrysler.  (*See* Walker Decl. at ¶ 3). Second, they must pay for all training, salaries, and benefits of all of their employees.  (*Id.*). Third, dealers must pay for all real estate, showrooms, and signage.  (*Id.*).

95.     If a particular dealer is not profitable, it does not *cost* Chrysler anything.  (*See* Taylor Decl. at ¶ 3; Parks Decl. at ¶ 4; Curry Decl. at ¶ 3; Archer Decl. at ¶ 3; Walker Decl. at ¶ 3; Willey at ¶ 3).

96.     In the Motion to Reject, Chrysler strains (and ultimately fails) to explain why it is truly necessary to reject the contracts of the Affected Dealers.  It vaguely alludes to "oversight," "processes," and "procedures" that it prefers to avoid.   (Motion to Reject, at ¶ 15).   Such justifications are couched in generalities and vagueness; they beckon scrutiny through the discovery process.   If Chrysler were actually suffering concrete harm by perpetuating its relationships with the Affected Dealers, one would have expected it to substantiate that point, especially after spending years allegedly determining how to reduce its dealer network.  *See also Semmes*, 429 at 1205 ("As against this, the hardship to Ford in continuing the Semmes dealership *pendente lite* was relatively small.").

97.     A continuance will not harm the Debtors, and, in fact, proceeding forward with the Chrysler Restructuring Transaction may well end up causing serious harm to the Debtors' estates.  Contrary to the Debtors' bald assertions that rejection of the dealer agreements gives rise to a nonpriority prepetition claim (Motion to Reject at ¶ 61-63), claims arising from the state Dealer Laws (as defined in the Motion to Reject) must be accorded administrative priority. Under *Reading Co. v. Brown*, 391 U.S. 471, 484 (1968), claims "arising from acts committed by the debtor in possession which give rise to tort liability are accorded administrative expense status."  *Houbigant, Inc. v. ACB Mercantile (In re Houbigant, Inc.)*, 188 B.R. 347, 356-57 (Bankr. S.D.N.Y. 1995).  And there is no question that violations of statutory rights, including violations of the termination provisions of state dealer laws, are torts.  *Midwest Great Dane Trailers v. Great Dane Ltd. Pshp.*, 977 F. Supp. 1386, 1395 (D. Minn. 1997) (breaching a

"statutory duty" regarding termination under a Minnesota dealer's statue was a tort); *In re Charlesbank Laundry, Inc*., 755 F.2d 200, 203 (1st Cir. 1985) ("an intentional act which violates the law" should receive priority); *see also In re Caldor, Inc*., 240 B.R. 180, 195 (Bankr. S.D.N.Y. 1999) (rejecting administrative claim status because the debtor "simply breached a contract" and did not "violate[] any state law"). While a breach of contract may normally be deemed a prepetition claim, a debtor-in-possession's violation of a statutory duty under state law is a tort that creates an administrative claim.

98.     This result flows naturally from the post-filing decision of both Chrysler and New Chrysler to operate the business without the Affected Dealers. That violation of the state Dealer Laws was merely incidental to its long-term business decisions. *Mass. Div. of Empl. and Training v. Boston Reg'l Med. Ctr. (In re Boston Reg'l Med. Ctr.)*, 291 F.3d 111, 124-25 (1st Cir. 2002) ("Payments in lieu are costs incident to operation of a business -- or, at least, to operation of a nonprofit organization that has not chosen to make contributions."). Chrysler cannot escape the natural consequences of its economic decisions after filing. *See, e.g., Texas v. Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434, 438 n.4 (5th Cir. 1998) ("[T]he trustee likely could have avoided the need to plug the wells by resuming production, but made a rational economic calculation to cease production. Such a calculation, however, must include the cost of plugging operations as a cost of ceasing production."); *see also In re White Crane Trading Co*., 170 B.R. 694, 702 (Bankr. E.D. Cal. 1994) (a debtor-in-possession must "manage and operate the debtor's property and business in compliance with state laws -- good, bad, and indifferent -- that apply outside of bankruptcy"). The planned dealer network restructuring in violation of state law will result in tort liability by Chrysler to the Affected Dealers for which administrative expense priority will be accorded.

C.     There Are Novel and Serious Legal Issues That Warrant Both Full
       Exploration And Factual Development

99.     Chrysler freely acknowledges that "[t]here is little precedent for the bankruptcy of a major OEM. . . ." (Motion to Reject, at ¶ 20).  Against that backdrop, it expects this Court to enter an order on, at most, a couple of weeks notice that irreparably impacts the Affected Dealers and could be precedential in the event of a subsequent bankruptcy of another major automobile manufacturer.

100.     In addition to the reasons explained above, there is a compelling need for this Court to permit discovery and have a full hearing on, at a minimum, five critical legal issues: (1) whether the Chrysler Restructuring Transaction constitutes a *sub rosa* plan and, thus, may not be approved; (2) whether, in light of all of the evidence, Debtors have fulfilled their burden of establishing that all of the Affected Dealers' contracts should be rejected; (3) whether the litany of state Dealer Laws that are designed to protect dealers from adverse actions by parties such as Chrysler are enforceable in these chapter 11 cases; (4) whether, if the Court finds any basis for preemption, 28 U.S.C. § 959 mandates the application of state law; and (5) whether, preemption of the Dealer Laws notwithstanding, the Affected Dealers have viable claims under the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221, *et seq.*  Additional time may also permit state agencies or attorneys general the opportunity to be heard on these critical, and novel, questions (since Chrysler seeks to foreclose their rights as well).

1.     Chrysler Will Not Be Able to Prove that Rejection Is Warranted

101.     As an initial matter, Chrysler assumes in the Motion to Reject that the standard for determining rejection under Section 365 of the Bankruptcy Code is whether the rejection of the agreements with the Affected Dealers will benefit the Debtors' estates and is an exercise of sound business judgment by the Debtors (Motion to Reject at ¶¶ 19, 43).   Yet, Chrysler

40

acknowledges that "[t]here is little precedent for the bankruptcy of a major" automobile manufacturer. (*Id.* at 8). As such, the standard this Court should apply in determining whether to reject the agreements with the Affected Dealers is not as routine as Chrysler depicts.

102.   In *National Labor Relations Bd. v. Bildisco,* the Supreme Court held that the standard for determining the rejection of collective bargaining agreements should be stricter than the traditional "business judgment" standard, even though there was nothing in Section 365 indicating that there should be a different standard for collective bargaining agreements. 465 U.S. 531, 523-24 (1984), *superseded by statute,* 11 U.S.C. § 1113.

103.   The Court found that because of the special nature of the rights created for workers by collective bargaining agreements, a bankruptcy court should not reject collective bargaining agreements unless the debtor can show that the collective bargaining agreement burdens the estate and that after careful scrutiny, the equities balance in favor of rejecting the contract. 465 U.S. at 525-26. In fashioning this standard, the Court found that the bankruptcy court must balance the interests of the affected parties (including the debtor, creditors, and employees) and that in striking the balance, the court should consider both the type and the degree of hardship faced by each party. *Id.* at 527. Moreover, the Court stated that the bankruptcy court "must have great latitude to consider any type of evidence relevant to" the issue of rejection. *Id.*

104.   Like the special rights created by collective bargaining agreements, the dealer agreements that the Debtors are seeking to reject create special rights for the Affected Dealers by virtue of the state Dealer Laws. The Dealer Laws are specifically intended and designed to protect the important rights of dealers in connection with, among other things, the termination of franchise agreements. These laws recognize the imbalance in the bargaining power between

automobile manufacturers and dealers, as well as the extreme hardship that dealers would incur if automobile manufacturers were able to terminate franchise agreements at will without any further obligations.

105.     Given the special rights created for the dealers under the state Dealer Laws, this Court should apply a standard similar to that set forth in *Bildisco* to determine whether to reject the agreements with the Affected Dealers.

106.     However, regardless of whether this Court applies the "business judgment" standard or the stricter standard set forth in *Bildisco,* the Debtors will not be able to prove that rejection is warranted.

107.     Indeed, even under the "business judgment" standard, motions to reject contracts under Section 365(a) of the Bankruptcy Code are not rubber-stamped by bankruptcy courts as Debtors suggest.  Rather, a debtor's business judgment to reject a contract must undergo careful scrutiny to ensure that it will in fact be in the best interests of the unsecured creditors of the bankruptcy estate, and will not result in disproportionate harm to the non-debtor party to the contract.  *See, e.g., The Monarch Tool & Mfg. Co. v. Monarch Prod. Sales Corp. (In re Monarch Tool & Mfg. Co.)*, 114 B.R. 134, 137 (Bankr. S.D. Ohio 1990); *In re Petur U.S.A. Inst. Co., Inc.*, 35 B.R. 561, 563-64 (Bankr. W.D. Wash. 1983); *In re Midwest Polychem, Ltd.*, 61 B.R. 559, 562 (Bankr. N.D. Ill. 1986) (recognizing that judicial approval of contract rejection is not a "rubber stamp," balancing equities when assessing business judgment, and disallowing rejection that would not necessarily have benefited the debtor's unsecured creditors and could have "mortally wounded" the counterparty).  *See also In re Chipwich, Inc.*, 54 B.R. 427, 431 (Bankr. S.D.N.Y 1985) (authorizing rejection of two licensing agreements where there was no showing that the non-debtor would be "damaged disproportionately" and noting rejection would not force non-

42

debtor out of business); *Robertson v. Pierce (In re Chi-Feng Huang)*, 23 B.R. 798, 801 (B.A.P. 9th Cir. 1982) (rejection involves a balancing of interests such that the court should refuse to authorize rejection where the non-debtor would be damaged disproportionately to the benefit to be derived by the general creditors); *Infosystems Tech., Inc. v. Logical Software, Inc.*, C.A. No. 87-0042, 1987 U.S. Dist. LEXIS 6285, at *2-4 (D. Mass. Jun. 25, 1987) (citing *Huang*, *Midwest Polychem*, *Chipwich*, and *Petur* in reversing bankruptcy court's authorization of rejection of distributorship agreement under "bad faith, whim, or caprice" standard, and ordering the court to consider whether rejection will benefit general unsecured creditors, which includes balancing of interests and whether disproportionate harm would result to non-debtor).

108.    In *Monarch Tool*, the debtor manufactured coin inserting mechanisms for vending machines, which were sold by distributors pursuant to exclusivity agreements.  114 B.R. at 135. The debtor sought to reject the distribution agreement with one of its distributors, claiming that it had insufficient funds to meet payroll and that if the contract was not rejected the debtor would be forced to liquidate.  *Id.*  In considering the motion, the court pointed out that "a Chapter 11 debtor's right to reject executory contracts is not unlimited."  *Id.* at 137.    Rather, "[d]isproportionate damage to the other party to the contract provides a ground for disapproving rejection."  *Id.*  In disapproving the rejection, the court determined that this factor was paramount, in light of the exclusive distributorship arrangement:   "Quite simply, if rejection is permitted here, Distributor will be ruined."  *Id.*

109.    Similarly, in *Petur*, the debtor sought to shed a 20-year license agreement granting the non-debtor the exclusive right to use, manufacture, assemble, and sell its products in Canada.  35 B.R. at 562.  The debtor claimed that the agreement was the single biggest cause of its financial problems and estimated that rejecting the agreement would enable it to reorganize

and pay off its creditors within two years. *Id.* The court found that rejecting the contract based upon the non-profitability of the arrangement and the possibility of obtaining better profits constituted a proper exercise of business judgment. *Id.* at 563. Based upon "legal and equitable considerations," however, the court refused to authorize the rejection because it would force the non-debtor out of business: "we are dealing with the actual ruination of an otherwise profitable, successful and ongoing business. Equity will not permit such a result." *Id.* at 563-64 (citing *Chi-Feng Huang*, 23 B.R. at 801).

110. As in *Monarch* and *Petur*, rejection of the dealership agreements will put many of the dealerships on Chrysler's rejection list out of business. (*See* Curry Decl. at ¶ 5; Parks Decl. at ¶ 8; Taylor Decl. at 6; Walker Decl. at ¶ 4). For those dealerships with non-Chrysler brands to continue selling, the harm resulting from rejection will still disproportionately affect them. Indeed, the rejection will result in a swift and permanent reduction of a large proportion of their sales. Debtors cannot seriously contest the dire impact rejection will have on their dealerships, as shown by their failure to address it in the motion or the Second Grady Declaration.

111. Debtors also fail to provide an explanation of how the unsecured creditors of the Estate will benefit by these rejections. Instead, Debtors acknowledge that these rejections will result in hundreds of claims for breach of contract by the rejected dealerships. (Motion to Reject, ¶¶ 61-63). As a consequence, the rejections would actually harm the Estate by diluting the already existing claims (and the effect is much worse once the claims are properly classified, as explained above, as administrative claims).

112. Debtors' arguments that the rejections will aid New Chrysler are vague and unsupported by any concrete and verifiable evidence (and what little evidence the Debtors do proffer should be subject to discovery). Debtors assert that reducing the size of the dealership

network will reduce costs to New Chrysler because it will decrease inefficiencies in the distribution chain and strengthen the remaining dealers, thereby allowing them to enhance the Chrysler "consumer experience." The only support for these sweeping claims is found in the Second Grady Declaration. The Second Grady Declaration, however, also contains nothing more than broad and conclusory statements, and is devoid of any specific economic analysis or studies. For example, the Motion to Reject and Second Grady Declaration reference performance and planning factors applied in determining which dealerships to terminate, but they fail to provide that data and analysis.

113. Therefore, there is no credible evidence that the rejections will actually help New Chrysler anytime in the foreseeable future. Accordingly, Debtors will not be able to demonstrate that they have exercised sound business judgment in seeking to reject the dealership contracts. Debtors have not shown with any credible evidence that the Estate will be helped by the rejection of the agreements. To the contrary, Debtors' motion shows that the Estate will be harmed by the resulting dilution of the other unsecured creditors' claims. Debtors' claim that New Chrysler will be benefited rests on nothing more than bare assertions. Finally, it cannot be disputed that rejection of the dealership agreements will disproportionately harm the rejected dealerships and result in many of them going out of business.

### 2.    State Dealer Protection Laws Are Not Preempted

114. Chrysler insists that the state "Dealer Laws" are preempted by section 365 of the Bankruptcy Code because it grants the ability to accept or reject pre-petition contracts. But that section says nothing about abrogating statutory obligations that are independent of those contracts. Dealer Laws create statutory rights and statutory causes of action that, at least where termination is concerned, render the contracts largely unenforceable. *See, e.g.*, Tex. Occ. Code §

2301.453 ("Notwithstanding the terms of any franchise . . .").  Chrysler's proposed rejection of the contracts is largely irrelevant to the preemption and damages question.  Most of the damages claims of the Affected Dealers under the Dealer Agreements will be fully addressed by their statutory rights under the Dealer Laws.

115.     The real question is whether Chrysler's interest in a painless bankruptcy (for itself) should preempt all of the applicable state laws in a highly regulated industry.  Chrysler relies heavily on *Volkswagen of Am., Inc. v. Dan Hixson Chevrolet Co* (*In re Dan Hixson Chevrolet Co.*), 12 B.R. 917, 921 (Bankr. N.D. Tex. 1981), to argue that it has unlimited discretion to ignore any state law obligations.  But rather than ignoring the Texas franchise law, *Dan Hixson* only stopped parallel proceedings before a Texas agency through the automatic stay.  Though it ostensibly held that section 365 preempted the Texas statute, the court recognized that it and the state agency had the same policies, objects, and powers.  *Id*. at 923.  "Preemption" in *Dan Hixson* meant no more than that the bankruptcy court would decide the issues.  The rest of Chrysler's authority regarding Dealer Laws is even less apt.  *In re Tom Stimus Chrysler-Plymouth, Inc*., 134 B.R. 676, 678-79 (Bankr. M.D. Fla. 1991), said no "discussion" was necessary on preemption -- and thus can have no persuasive authority.  *In re City of Vallejo*, 403 B.R. 72 (Bankr. E.D. Cal. 2009), is similarly devoid of reasoning, beyond a reference to section 365 and the Supremacy Clause.  Not one of these cases addresses 28 U.S.C. § 959, which requires a debtor in possession to follow state law.

116.     Every state currently has a statute that restricts a car manufacturer's ability to terminate a dealer agreement.  Half of the states expressly require a dealer's failure to comply with a provision of the franchise before termination is justified.  The others analyze a broad range of factors that must be proven to a court or specialized agency.  An unjustified termination

often means a manufacturer must buy-back unsold new vehicles, parts, accessories, specialized tools and equipment. *See, e.g*., Ark. Code Ann. 23-112-403(a)(2)(K); Cal. Bus. & Prof. Code § 20035; 6 Del Laws c. 49, § 4907-4908; Fla. Stat. § 320.3205(3); New York L. (Vehicle & Traffic) 17-A § 463(o)(1); 63 Penn. Stat. § 818.17; Tex. Occ. Code § 2301.465; Wash. Rev. Code Ann. § 19.100.180(2)(i).   Other states impose similar buy-back requirements for terminations with or without cause. *See, e.g*., Conn. Gen. Stat. § 42-133f(c); Haw. Rev. Stat. § 482E-6(3); Md. Code Ann. Com. Law §11-1304; Mich. Comp. Laws § 445.1527(d); Wis. Stat. Sec. 135.045.  As mentioned previously, buy-back is especially important because the dealer can no longer sell new cars as "new" and will no longer need many of the parts.

117.    The Dealer Laws reflect a strongly-held public policy that protect decades-long investments in a brand and in a community and represent a state's fundamental public policy. *Dayan v. McDonald's Corp*., 125 Ill. App. 3d 972, 992 (1984) (Illinois franchise act is "an embodiment of the applicable public policy"); *Shell Oil Co. v. Marinello*, 307 A.2d 598 (N.J. 1973) (provision in dealer agreement giving absolute right to terminate on ten days' notice against public policy); *Ashland Oil, Inc. v. Donahue*, 223 S.E.2d 433 (W. Va. 1976) (same); *Britelink, Inc. v. Telecorp PCS, Inc*., 2004 U.S. Dist. LEXIS 29683, 23-25 (E.D. Ark. May 7, 2004) ("protections for franchisees . . . reflect fundamental public policy decisions").  Indeed, in some states, a willful violation of the dealer laws can result in a criminal felony action. *Electrical & Magneto Serv. Co. v. AMBAC Int'l Corp*., 941 F.2d 660, 663 (8th Cir. 1991).  Many others contain explicit anti-waiver clauses to protect dealers.  *Gabana Gulf Distrib. v. Gap Int'l Sales, Inc*., 2006 U.S. Dist. LEXIS 59799, 19-20 (N.D. Cal. Aug. 14, 2006) (California franchise statute "does not permit stipulations that waive the requirements of the statute"); Wis. Stat. 135.025(3) (same); Rhode Island Gen. L. 35-5.1-14 (same).

118.     Dealer Laws also allow other types of remedies for the termination of a dealership, including goodwill, lost profits, and double or treble damages. *See, e.g*., Conn. Gen. Stat. §42-133 (g)(a); Haw. Rev. Stat. § 482E-6; Ill. Comp. Stat. ch. 815, 705/26; Ind. Code Ann. §23-2-2.7-4, Iowa Code § 523H.6, 523H.13; Minn. Stat. Ann. § 80C.17(3); Miss. Code Ann. § 75-24-57; Mo. Rev. Stat. § 407.410; Neb. Rev. Stat. § 87-409; N.J. Stat. Ann. § 56:10-10; Ohio Rev. Code § 4517.65; Va. Code Ann. § 13.1-571; Wash. Rev. Code Ann. § 19.100.190(3); Wis. Stat. § 135.06. Perhaps most importantly, these laws provide the procedural protections of 60 or 90 days notice of termination, which allows dealers either to prepare themselves or to begin proceedings to prevent closure. These state policy interests are paramount to Chrysler's interest in closing down all of the Affected Dealers in three weeks.

119.     Chrysler also argues the Dealer Laws are preempted through field preemption and conflict preemption.[6] Field preemption, which occurs where "Congress evidences an intent to occupy a given field" *Silkwood v. Kerr-McGee Corp*., 464 U.S. 238, 248 (1984), cannot apply. Chrysler presents no evidence of a Congressional intent to occupy or eliminate the field of protecting local dealers. The only evidence of intent is Congress' express desire *not* to affect the consumer protection laws that are very similar to the Dealer Laws. H.R. Rep. No. 595, 95th Cong., 1st Sess. 343 (1977); reprinted in 1978 U.S. Code Cong. & Admin. News 5963, 6299 (consumer protection laws are "regulatory powers" exempt from the automatic stay). Chrysler's arguments for field preemption, complexity and uniformity, are generalities applicable to every state law. Yet the Supreme Court warns that "Congress did not intend for the Bankruptcy Code to pre-empt all state laws." *Midlantic Nat'l Bank,* 474 U.S. at 505 (1986).

---

[6] Chrysler appears to concede that express preemption does not apply, which is correct. There is no command anywhere in the Bankruptcy Code that the Dealer Laws be preempted.

120.    Similarly, Chrysler's argument for conflict preemption rests on a misunderstanding of the purpose of bankruptcy.  Conflict preemption applies where state law prevents "the accomplishment and execution of the full purposes and objectives of Congress." *Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 31 (1996).  Chrysler argues that *any* limitation on its ability to *immediately* end all commercial contact with the Affected Dealers is preempted, regardless of the health and welfare of the community.  As explained above, immediate termination will result in unnecessary bankruptcies, unemployment, and a waste of cars, tools, and inventory.  Affected Dealers will lose millions to save Chrysler pennies.  This is wholly inconsistent with the purpose of the Bankruptcy Code "to minimize a fiscal chaos and disruption, not to aggravate it."  *In re Friarton Estates Corp.*, 65 B.R. 586, 594 (Bankr. S.D.N.Y. 1986) (citation omitted).  "Congress's purpose in enacting the Bankruptcy Act was not to mandate that every company be reorganized at all costs."  *Baker & Drake, Inc. v. Public Serv. Comm'n (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1354 (9th Cir. 1994).

121.    There is no conflict between the procedures in the Dealer Laws and the Bankruptcy Code.  Dealer Laws create fair and equitable procedures for termination, including the disposition of cars, accessories, and tools that are valuable to Chrysler but have little value for Affected Dealers.  As they are sold at rock-bottom prices, Chrysler will have engineered a large transfer of wealth from the Affected Dealers to the remaining dealers.  There is no conflict between procedures meant to ensure a fair termination and the Bankruptcy Code.  For example, *Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 588 (6th Cir. 1990), refused to preempt state law procedures for termination of utility service, even though the Code allows for termination: "Although 11 U.S.C. § 366(b) does not stand in the way of utility termination in this

case, it does not control the procedure by which such termination may occur.  It does not, therefore, preempt state and municipal procedural regulations."

122.    Finally, under no theory of preemption could Chrysler be exempt from state law when creating the list of Affected Dealers, such as if it retaliated against certain dealers.  *Ford Motor Credit Co. v. Garner*, 688 F. Supp. 435, 445 (N.D. Ind. 1988) (franchisor must not retaliate when choosing which franchisees to close).  State laws therefore specifically bar consideration of metrics that Chrysler appeared to use, such as advertising, parts ordering, and carrying other lines when deciding whether to close a franchise.  *See* 63 P.S. § 818.12(6) ("Refrain from participation in the management of, investment in or the acquisition of any other line of new vehicle or related products."); Ark. Stat. 23-112-403(a)(1) (cannot coerce dealers to ordering parts or participate in advertising programs); *see also* Hawaii Rev. Stat. § 482E-6(2)(C) and (H); Wash. Rev. Code § 19.100.180(2)(c) and (i); Iowa Code, Title XIII, § 523H.8.  Chrysler has disclosed only a very few details.  It lists a few factors, including "other," without any indication as to how each was measured or how much weight it was given.

3.      Even if Otherwise Preempted, State Laws Are Saved by 28 U.S.C. § 959

123.    Regardless of the general preemptive reach of the Bankruptcy Code, Congress has refused to allow debtors to violate important state laws with impunity.  Congress enacted 28 U.S.C. § 959 as a specific order to debtors to operate "according to the requirements" of state law.  *See Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection*, 474 U.S. 494, 505 (1986) (in addition to other statutes, Section 959 shows that "Congress did not intend for the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of a trustee's powers").  This statute curtails an overly aggressive use of the Bankruptcy Code (it is a *limitation* on the Code, after all) to run roughshod over state laws, and its power is at its apex

when requiring debtors to comply with statutes based on public policy, such as consumer protection laws. *In re White Crane Trading Co.*, 170 B.R. 694, 705 (Bankr. E.D. Cal. 1994) ("Since section 959(b) admits no exceptions, the court cannot carve out an exemption from state [consumer protection] law."). As discussed above, state Dealer Laws embody some of the most important public policies of state law.

124.   In considering the reach of Section 959, courts often look to the "police and regulatory power" exception under 11 U.S.C. § 362(b)(4). *In re Friarton Estates Corp.*, 65 B.R. 586, 590 (Bankr. S.D.N.Y. 1986) (considering both § 959 and § 362 to resolve the "apparent conflict between state and federal law"); *In re Synergy Dev. Corp.*, 140 B.R. 958, 961 (Bankr. S.D.N.Y. 1992) (same). Limiting Section 959 to the reach of Section 362 interprets it into redundancy, but the illustration is helpful because "[c]onsumer protection is included in the ambit of the [state] government's police and regulatory powers" under § 362(b)(4). *In re Synergy Dev. Corp.*, 140 B.R. at 961; H.R. Rep. No. 595, 95th Cong., 1st Sess. 343 (1977); reprinted in 1978 U.S. Code Cong. & Admin. News 5963, 6299 (same). And consumer protection laws are parallel in many respects to the Dealer Laws.

125.   In both situations, a sophisticated, powerful party provides a non-negotiable form contract to a party with little bargaining power. In response, state legislatures have enacted strong protections for both consumers and automobile dealers. *Shell Oil Co. v. Marinello*, 63 N.J. 402, 409 (1973) (franchise statute "reflects the legislative concern over long-standing abuses in the franchise relationship"); *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 1992 Ohio App. LEXIS 4883, at *5 (Sept. 24, 1992) ("Against a backdrop of abusive and unfair franchise practices by the powerful automobile manufacturing industry, the federal government and many states enacted motor vehicle franchise legislation to protect motor vehicle dealers from such

abuses and essentially change the balance of economic power between these enterprises."). This strong public policy of giving dealers the same protections as consumers is the basis of an important regulatory scheme, whether recognized under Section 959 or Section 362.

126. At a minimum, the mixed federal policies of the Bankruptcy Code and Section 959 caution that this Court must consider the interests of the states. This is especially so when the state interest is so high -- ignoring state laws will affect tens of thousands of employees and their families and communities in all 50 states.

127. Ironically, Chrysler's focus on closing the dealerships *immediately* violates the state laws that are most exempt from preemption. The notice provisions in the Dealer Laws are purely regulatory. They provide fairness and social order and cannot be preempted by the Bankruptcy Code. Those statutes help employees find new jobs, avoid fire-sale liquidations (before the dealerships lose their licenses to sell new cars), and allow time to re-tool for a different business model. *Electrical & Magneto Serv. Co. v. AMBAC Int'l Corp.*, 941 F.2d 660, 664 (8th Cir. 1991) ("the ninety-day notice requirement . . . represents fundamental public policy of Missouri"); *Britelink, Inc. v. Telecorp PCS, Inc.,* 2004 U.S. Dist. LEXIS 29683, 23-25 (E.D. Ark. May 7, 2004) ("notice provisions" "reflect[] public policy which is fundamental under these circumstances"). This is especially important here because Chrysler pressured dealers it intended to close down to buy new cars in the months leading up to bankruptcy.

128. Finally, the complexity and novelty of the issues also implicate due process concerns of notice and an adequate opportunity to be heard. *In re Victory Mkts*., 221 B.R. 298, 310 (B.A.P. 2d Cir. 1998) (due process applies in the bankruptcy process).

4.   The Bankruptcy Code Does Not Preempt the Federal Automobile Dealers' Day in Court Act

129.   The Court has further grounds for denying the Motion to Reject because, even if the Dealer Laws are preempted, such relief may contravene the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221, *et seq.*, ("Dealers' Act"), which is not preempted.   The Dealers' Act is a federal remedial statute enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices.   *See, e.g., In re Frank Meador Buick*, 13 B.R. 841, 844 (W.D. Va. 1981) ("The Dealers' Day in Court Act is a remedial statute aimed at curtailing coercive behavior by manufacturers in dealing with their franchise's dealers.").   The Dealers' Act authorizes an action to be brought against an automobile manufacturer engaged in interstate commerce when the manufacturer has failed "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer . . . ."   15 U.S.C. § 1222. The Act defines the term "good faith" as "the duty of each party to any franchise . . . to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party. . . ."   15 U.S.C. § 1221(e).

130.   This Court should permit discovery in order to determine whether the Dealer Committee and Affected Dealers may successfully oppose the Motion to Reject based on the Dealers' Act.   *See In re Frank Meador Buick*, 13 B.R. at 844-46 (recognizing that "[t]he existence of coercion or intimidation is a factual determination in each case," and finding that the manufacturer engaged in "coercive conduct, lacking in good faith as that term is defined under 15 U.S.C. § 1221(e)").

53

D.        The Motion to Reject Overreaches and Seeks Sweeping, Unsupported Relief.

131.    Another reason why closer scrutiny of the Motion to Reject is warranted is that the Motion to Reject does not just seek a determination from this Court authorizing the rejection of certain agreements with the Affected Dealers.  Rather, in the guise of a motion under Section 365 of the Bankruptcy Code, it seeks far-reaching and unprecedented relief, including:  (1) a declaration that all of the Debtors' "unperformed obligations" under the rejected agreements give rise to dischargeable prepetition damages claims (Motion to Reject at ¶¶ 61-63); (2) a declaration that a rejection of the agreements is the "conclusion of the commercial relationship and cuts off the rights of the Affected Dealers thereunder, except to the extent that the Affected Dealers may wish to pursue rejection damages in this Court." (Motion to Reject at ¶ 66); and (3) injunctive relief for New Chrysler and the remaining Dealers -- in addition to the Debtors -- against the Affected Dealers and unidentified Governmental Entities under Section 525 of the Code (Motion to Reject at ¶¶ 57-60).

132.    First, as discussed above, claims arising from breaches of the state Dealer Laws are entitled to administrative priority.  Moreover, there is no legal basis to permit the Debtors to pre-determine the priority of any and all claims the Affected Dealers will undoubtedly incur as a result of the contemplated rejections.  Nor should they be permitted "for the avoidance of doubt" to shovel as many categories of claims as possible into a single category which "must be asserted only as Rejection Damages Claims."  (Motion to Reject at ¶ 63).  Indeed, in their Motion to Reject, Debtors ask this Court to declare that the following claims may only be asserted as damage claims in this Court.

- The repurchase of unsold inventories of vehicles and parts;

- Payment assistance in connection with Affected Dealers' obligations to third parties;

- Payment of incentives, commissions or other compensation for having sold vehicles or parts;

- Alleged loss of future profits or other consequential damages;

- Payment of any amounts claimed to be due under any statutes governing the termination, nonrenewal, cancellation or discontinuance of the dealership agreements or franchise rights; and

- Alleged damages suffered as a result of the loss of rights and benefits under Dealer Laws.

(Motion to Reject at ¶ 63).

133.    Section 502(g) of the Bankruptcy Code provides that damages resulting from the rejection of an executory contract are treated as general unsecured claims.  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984), citing section 502(g) ("Damages on the contract that result from the rejection of an executory contract, as noted, must be administered through the bankruptcy and receive the priority provided general unsecured creditors.").  Generally, creditors are entitled to file their claims, and the debtor is entitled to object to such claims, as they see fit.  As with everything else in these cases, however, the Debtors are trying to move at light-speed and side-step established processes in seeking to pre-determine the priority of any and all claims the Affected Dealers may be entitled to assert in relation to the rejection of the Rejected Dealer Agreements.  The Debtors will have ample opportunity to object to any claims filed by the Affected Dealers.  There is no justification for seeking a determination at this juncture that will foreclose any arguments Affected Dealers may assert relative to the priority of their claims.

134.    Moreover, the term "rejection damages" refers to damages resulting from the rejection of an executory contract.  *See, NLRB v. Bildisco & Bilsdisco*, 465 U.S. at 531.  While the Debtors initially limit the "rejection damages" to unperformed obligations *under the proposed rejected dealer agreements*, they subsequently expand this category to include, among

others,  rights to payment of *any* amounts claimed to be due under *any* statutes governing the termination, nonrenewal, cancellation or discontinuance of the dealership agreements or franchise rights.  The Debtors cite to no case law in support of the proposition that rights to payment under such statutes constitute "damages" at all, let alone damages resulting from the rejection of the franchise agreements.  There is simply no basis on which to justify pre-determining these claims as rejection damages claims.

135.    The Debtors also seek Court recognition that they "are concluding their commercial relationships with the Affected Dealers" and through rejection they are "mak[ing] a clean and complete break from their business relationships with the Affected Dealers."  (Motion to Reject at ¶ 64).  Notwithstanding such request, however, the Debtors then inexplicably take the position that certain agreements (*i.e.,* the "Site Control Agreements") between Debtor Chrysler Realty Company LLC and the Affected Dealers will remain in effect.  (Motion to Reject at ¶ 22 n.7).  Of course, they do not attach any sample Site Control Agreements.  Nor do they explain the content of the agreements or how the Debtors can conclude their business relationships with the Affected Dealers yet maintain rights under these agreements.

136.    In addition, the Debtors' request for a declaration that rejection "concludes the relationship" between the Affected Dealers and the Debtors (Motion to Reject at ¶ 64), likewise overreaches.  The plain language of section 365(g) makes clear that the rejection of an executory contract constitutes only a pre-petition breach, not a termination or conclusion, of the contract (unless, of course, there is a basis for it to be an administrative claim as described above).  11 U.S.C. § 365(g).

137.    The Second Circuit, time and again, has made it abundantly clear that the rejection of an executory contract does not terminate the contract.  *See Medical Malpractice*

56

*Insurance Association v. Hirsch (In re Lavigne)*, 114 F.3d 379, 386 (2d Cir. 1997) ("If the contract has not been previously assumed, rejection of the debtor's executory contract constitutes a breach of the contract."); *COR Route 5 Co., LLC v. The Penn Traffic Company (In re The Penn Traffic Company, et al.)*, 524 F.3d 373, 378 (2d Cir. 2008) ("Rejection is in effect a decision to breach the contract or lease."). Rather, "rejection merely frees the estate from the obligation to perform; it does not make the contract disappear." *In re Lavigne*, 114 F.3d at 386-87, *quoting In re The Drexel Burnham Lambert Group*, 138 B.R. 687, 703 (Bankr. S.D.N.Y. 1992).

138.    Additionally, while the Bankruptcy Code treats rejection as a breach, it is state law that determines the rights of the parties to the contract and the effects of the breach. *In re Lavigne*, 114 F.3d at 387 ("However, the Bankruptcy Code does not determine parties' rights regarding the contract and subsequent breach. To determine these rights, we must turn to state law."); *see also*, *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. at 709 ("Consistent with bankruptcy law's general deference to state-law rights in or to specific property, rejection of a contract does not terminate such rights that arise from rejected contracts. Rejection is not itself an avoiding power.").

139.    Here, the proposed rejection of the dealer agreements will serve to breach, not terminate, the agreements. The effect of the breach will be to simply free the Debtors from their obligations to perform *under the agreements*. The rejection will neither terminate the agreements nor eradicate the Debtors' obligations under relevant state laws that protect the Affected Dealers. Nor can the Court enter an order prohibiting the Affected Dealers from discussing (or seeking relief from) the Government Entities without running afoul of the First Amendment.

140.    Finally, Debtors also seek a prospective injunction against "any interference" with New Chrysler by "Government Entities" and any other parties, including the Affected Dealers. Notwithstanding that the relief sought by Debtors is hopelessly vague, it fails to comply with the requirements of Bankruptcy Rule 7001 that injunctive relief must be sought through an adversary proceeding.  Such relief in this context would accordingly violate fundamental due process by not providing these unidentified Government Entities and other affected parties with notice and an opportunity to be heard.

141.    Bankruptcy Rule 7001 provides that a request for an injunction ***must*** be commenced by filing an ***adversary proceeding***.  An injunction cannot be obtained through a motion to reject executory contracts in the main case.  *See, e.g., Kish v. Verniero (In re Kish)*, 221 B.R. 118, 140 (Bankr. D.N.J. 1998) ("The court further notes that an action against a state official for declaratory or ***injunctive*** relief . . . to terminate an ongoing violation of bankruptcy law will presumably require an adversary proceeding.") (emphasis in original); *In re Martin*, 268 B.R. 168, 172 (Bankr. E.D. Ark. 2001) ("In order to ensure that due process and property rights are preserved, Rule 7001 . . . requires that a request to obtain an injunction, or other equitable relief be filed as an adversary proceeding. . . .  Since, the debtor may not obtain an injunction by motion, the motion must be denied."); *In re Williston Oil Corp.*, 54 B.R. 10, 12 (Bankr. D.N.J. 1984) (Chapter 11 debtor in possession cannot obtain equitable relief moving state's environmental enforcement proceeding to Bankruptcy Court because Bankruptcy Rule 7001(7) requires that debtor file an adversary proceeding and debtor instead chose to make motion in main case); *In re Southern Inst. for Treatment and Evaluation, Inc.*, 217 B.R. 962, 964 (Bankr. S.D. Fla. 1998) (in action for relief under § 525 and other provisions, the court found that the debtor's failure to file an adversary proceeding precluded injunctive relief).  Because Debtors

58

have simply tacked on their request under section 525 for an injunction against "any interference" with New Chrysler by Government Entities, Affected Dealers and other parties as part of their Motion to Reject in the main proceeding, and not by filing an adversary proceeding, the request should be denied.

142.    In addition to the fact that Rule 7001 precludes the requested relief, the Debtors' attempted end run around the due process rights of the unidentified Government Entities, Affected Dealers and other parties also precludes it.  It is well-established that an injunction may not apply to persons who are not parties to the proceeding.  *See, e.g., Chase Nat'l. Bank v. Norwalk*, 291 U.S. 431, 436-37 (1934) (finding injunction clearly erroneous where it extended to "all persons to whom notice of the injunction should come" because it purported to affect rights of those who had "not been adjudged according to law."); *United States v. Kirschenbaum*, 156 F.3d 784, 796 (7th Cir. 1998) (finding injunction that purported to enjoin a non-party to be void). Accordingly, Debtors' request for an injunction under Section 525 should be denied.

143.    Perhaps an even more fundamental flaw in the Debtors' request for a prospective injunction, is that they lack standing to assert claims of a hypothetical purchaser, and the Court lacks jurisdiction to protect such a purchaser from theoretical future violations of section 525(a). It is further questionable at best whether New Chrysler (or another hypothetical buyer) and the non-terminated dealers are "associated with" the Debtors for the purposes of section 525.

144.    It is axiomatic that a debtor has no standing to pursue the rights of an unknown non-party.  *See, e.g., Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (general rule that a party must assert his own legal rights and interests can only be overcome by showing a "close relationship" with third-party *and* that the third-party is unable to pursue its own rights); *Raghavendra v. Trustees of Columbia Univ.*, 06 Civ 6841, 2008 U.S. Dist. LEXIS 51995, at *33-

38 (S.D.N.Y. Jul. 7, 2008) (denying motion for preliminary injunction on behalf of unidentified third parties due to lack of standing and other deficiencies).  Thus, Debtors have no standing here to seek a prospective injunction for New Chrysler (or another hypothetical purchaser) and the non-terminated dealers.

145.    Even if New Chrysler (or another hypothetical purchaser) and the non-terminated dealers were to seek the injunction themselves, this Court would lack jurisdiction to entertain it because it is neither a core proceeding, nor a related proceeding.  *Monaco v. Dept. of Educ. (In re County Schools, Inc.)*, 163 B.R. 424, 430-31 (Bankr. D. Conn. 1994).  In *County Schools*, the purchasers of a bankrupt school's assets, who were officers and owners of the bankrupt, brought an adversary proceeding under section 525(a) against the Department of Education to enjoin it from disqualifying them from participating in federal programs due to their affiliation with the debtor.  The court raised *sue sponte* the issue of its subject matter jurisdiction under 11 U.S.C. § 157.  It concluded that the proceeding was not a "core proceeding" because it was not integral to the administration of bankruptcy estate.  *Id.* at 430.  Nor was the proceeding "related" because its outcome would not affect the amount of property available for the creditors.  *Id.  See also Betty Owens Schools, Inc. v. Dept. of Educ. (In re Betty Owens Schools, Inc.)*, 195 B.R. 23, 29-30 (Bankr. S.D.N.Y. 1996) (in adversary proceeding under section 525 the court was constrained by jurisdictional limitations over non-debtor's claim and considered its motion only to the "limited extent" that non-debtor's motion was effected by the debtor's section 525 motion).

146.    The same is true here.  Theoretical "interference" by Government Entities or the Affected Dealers against New Chrysler (or another hypothetical buyer) and the non-terminated dealers will not affect the administration of the Debtors' estates, nor will it affect the amount of property available to the creditors of the Estate.  And unlike *Betty Owens*, New Chrysler (or

another hypothetical buyer) and the non-terminated dealers cannot even seek adjudication of such a claim to a "limited extent," because Debtors do not themselves seek protection under section 525, as they will no longer be operating.  Accordingly, the Court lacks jurisdiction to hear such theoretical claims involving hypothetical parties.

147.    Notwithstanding the foregoing hurdles that Debtors cannot clear, New Chrysler (or another buyer) and the non-terminated dealers, as buyers of the Debtors' assets and former customers of Debtors, are not afforded protection under section 525 as parties "associated with" a debtor.  *See In re Draughon Training Inst., Inc.*, 119 B.R. 927, 933 (Bankr. W.D. La. 1990).  In *Draughon*, the debtor argued that the Department of Education's refusal to transfer the debtor's licenses, accreditation, and certification to the purchaser of its assets constituted discrimination under section 525(a).  The court found no violation of section 525 as to the debtor.  *Id.* at 933.  Moreover, the court held that "although § 525 also prohibits discriminatory treatment of one who has been associated with a debtor, ***this Court finds that this protection more properly extends to one who has been a co-owner, co-obligor, co-debtor, joint venturer, partner, agent, representative, or spouse of the debtor, rather than a transferee of the debtor***." *Id.* (emphasis added).  Accordingly, the Court should reject any attempt by Debtors to prospectively seek an injunction against Government Entities on behalf of New Chrysler (or another hypothetical purchaser) and the non-terminated dealers.

## **MEMORANDUM OF LAW**

148.    The Dealer Committee submits that the points and authorities set forth above satisfy the requirements of Local Bankruptcy Rule for the Southern District of New York 9013-1(b).

WHEREFORE, the Committee of Chrysler Affected Dealers respectfully requests that the Court deny the Sale Motion and grant the relief requested in the Continuance Request.

Respectfully submitted,


Dated: May 19, 2009

s/Stephen D. Lerner
Stephen D. Lerner
Robert A. Wolf
SQUIRE, SANDERS & DEMPSEY, L.L.P.
1095 Avenue of the Americas, 31st Floor
New York, New York 10036
Phone: (212) 872-9800
Fax: (212) 872-9815

Mark J. Ruehlmann (pro hac vice pending)
Amy L. Brown (pro hac vice pending)
Jeffrey A. Marks (pro hac vice pending)
Pierre H. Bergeron (pro hac vice pending)
SQUIRE, SANDERS & DEMPSEY, L.L.P.
221 East Fourth Street, Suite 2900
Cincinnati, Ohio 45202
Phone: (513) 361-1200
Fax: (513) 361-1201