| | |
|---|---|
| SUNSHINE SLOTT & SUNSHINE PC | Hearing Date and Time: June 3, 2009, 10:00 a.m. (ET) |
| 150 W 25th St, #503 | Response Deadline: May 26, 2009, 4:00 p.m. (ET) |

SUNSHINE SLOTT & SUNSHINE PC
150 W 25th St, #503
New York, NY 10001-7404
Telephone: (212) 695-9112
Robert Slott, Esq.
Donald M. Sunshine, Esq. of Counsel

and

DAVIDSON LAW FIRM, LTD.
724 Garland, Cantrell at State
Little Rock, AR   72201
Telephone: (501) 374-9977
Facsimile: (501) 374-5917
Charles Darwin Davidson, Esq. (admitted *Pro Hac Vice*)
Stephen L. Gershner, Esq. (admitted *Pro Hac Vice*)
Matthew D. Wells, Esq. (admitted *Pro Hac Vice*)

*Attorneys for Crain CDJ, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x
                                :

In re:                               :        Chapter 11
                                :

Chrysler LLC, *et al.*,              :        Case No. 09-50002 (AJG)
                                :

              Debtors.        :        (Jointly Administered)

------------------------------------------------------------------------x

**CRAIN CDJ, LLC's OBJECTION TO OMNIBUS MOTION OF DEBTORS
AND DEBTORS IN POSSESSION FOR AN ORDER, PURSUANT TO
SECTIONS 105, 365 AND 525 OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULE 6006, (A) AUTHORIZING THE REJECTION OF
EXECUTORY CONTRACTS AND UNEXPIRES LEASES WITH CERTAIN
DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF**

COMES NOW Crain CDJ, LLC (hereinafter "Crain"), by and through its attorneys, and

for its objection states as follows:

1

1.      Crain joins with and adopts by reference the Statement of the Chrysler National Dealer Counsel (hereinafter the "CNDC Statement"), filed May 16, 2009. (Docket No. 933).

2.      Crain joins with and adopts by reference the Objection of the Committee of Chrysler Affected Dealers (hereinafter "Committee Objection"), filed May 19, 2009. (Docket No. 1045).

### *Background*

3.      Crain is a full line Chrysler, Dodge, Dodge Truck, and Jeep dealer located in Little Rock, Arkansas.  Crain became a Chrysler dealer in November of 2006 upon acquiring the dealership formerly owned and operated as Little Rock Dodge.  Crain is a Chrysler "Genesis" dealer, meaning that it sells and services all three Chrysler nameplates.

4.      Since its inception in 2006, Crain has never received a negative report from Debtors concerning its sales, service, or customer satisfaction levels.

5.      Little Rock is the capitol of the State of Arkansas, and is the most populous city in that State.  There are only two Chrysler, Dodge, or Jeep dealerships in Little Rock, Arkansas— Cook Chrysler Jeep and Crain.  Crain is the only Genesis dealer selling all three Chrysler nameplates at the same location; Cook does not.

6.      Pursuant to the terms of Crain's Terms Sales and Service Agreement (hereinafter "TSSA"), Crain has been in the process of locating and constructing a new dealership facility in the newer, more heavily traveled part of Little Rock, know as West Little Rock.  Crain has continually sought the Debtor's advice and approval on the new location.

7.      In 2008, Crain and the Debtor settled on a new location for Crain, and Crain put two parcels of property under contract for purchase.  The Debtor informed Crain that it approved

of the new location, and on November 11, 2008, Crain and the Debtor entered into a Dealership Improvement Agreement (hereinafter "DIA").

8.      Pursuant to the terms of the DIA, the Debtor committed to loan $1.25 million in construction expenses for relocation of Crain to West Little Rock.  In exchange, Crain committed to selling at least 966 new vehicles from the facility within 18 months of opening at that location.

9.      Crain is confident that it would meet and exceed that number of vehicles sold; the Debtor accepted that figure as reasonable and acceptable.

10.     So far in 2009, and despite its current dealership location, Crain's sales volume ranks in the top 20 percent of dealerships in the Southwest Region.

11.     Throughout 2008, Crain was never informed by the Debtor that the Debtor was considering not honoring the TSSA or DIA; to the contrary, the Debtor specifically reassured Crain on multiple occasions that it supported Crain's dealership and construction of a new facility.

12.     Then, in 2009, Debtors began to push Crain to purchase additional new vehicles and inventory, requiring that Crain purchase 47 new units in March 2009 in order to participate in Debtors' retail incentive programs.

13.     Crain, already flush with inventory due to pressures from Debtors, requested that it only be required to purchase 12 units.  Debtors' refused, however, insisting that Crain buy unneeded vehicles to improve Debtors' bottom line.

14.     Crain subsequently reported what it believed to be a violation of Arkansas law to the Arkansas Motor Vehicle Commission (hereinafter "AMVC").  The AMVC agreed that Debtors' tactics were indeed a violation of the Arkansas Motor Vehicle Act (hereinafter

3

"AMVA"), and issued a warning to every dealer in the State of Arkansas that such actions were illegal.

15.     On May 14, 2009, the Debtor moved to reject its executory TSSA with Crain; the Debtor, however, seeks to reject the Crain TSSA for reasons other than stated in its Motion.

***Crain's TSSA Is not Burdensome, and Rejection Is Not in the Debtor's Business Interests***

16.     In its Motion, the Debtor states that its intent is to reduce the number of dealers in its dealership network as part of an effort to improve profitability for New Chrysler and its remaining dealers.  Reducing the number of dealers, however, will not increase the profitability of New Chrysler.

17.     As part of its business plans, the Debtor allegedly seeks to consolidate all three of the Debtor's nameplates at each retail dealership, realigning retail outlets using the 'best dealers' in the 'best locations.'  Debtor's plan seems to focus heavily on the quality of dealership facilities.

18.     The Debtor's stated reasons for rejection of executory dealer agreements is pretextual as to Crain.

19.     The Debtor seeks to reject its only two retail dealerships in Little Rock, Arkansas, including Crain, its only all-nameplate Genesis dealer.  This action would illogically leave the largest market in the State of Arkansas without a Chrysler, Dodge, or Jeep dealership at all.

20.     Todd Stewart, Chrysler's Southwest Regional Manager, informed Crain that Chrysler intends to have a dealer in Little Rock.

21.     The Debtor fails to inform the Court that its true reason for rejecting Crain's TSSA is simply to replace Crain with another new dealer and circumvent otherwise applicable Arkansas law. *See* ARK. CODE ANN. § 23-112-101, *et seq.* (LEXIS 2009).

4

22.     In Paragraphs 37 and 38 of its Motion, the Debtor sets forth the criteria that it purportedly used to determine which dealers to terminate. The criteria of Paragraphs 37 and 38, as they relate to Crain, are as follows:

(a) the dealer's ----

(i)      brand affiliations:

*Crain is a full line Chrysler, Dodge, Dodge Truck, and Jeep dealer.*

(ii)     raw sales volume:

*Crain's 2009 yea- to-date sales are in the top 20% of the dealers in its area. Crain exceeds its sales objectives, notwithstanding being in a inferior location and Chrysler's delays and failure to follow through with final approval of Crain's proposed new location and facilities as set forth in subparagraph (iv) and (vi) below.*

*Crain also achieved favorable sales notwithstanding being handicapped by poor performance of the former dealer, Little Rock Dodge and being unable to qualify as a Five Star Dealer as a result of its poor facility and location. Chrysler gives no internet leads to non-Five-Star Dealers.*

*Crain has been further impaired by Chrysler's failure to provide new signs for the current facility, as promised by Chrysler for over two years.*

(iii)     sales performance relative to its Minimum Sales Responsibility:

*MSR is not relevant to the Crain dealership. Crain's ability to meet MSR requirements has been adversely affected by the Debtors refusal to cooperate with Crain's efforts to move to a new location and construct a new facility. In addition, and upon information and belief, the Debtor and New Chrysler have selected already selected a replacement for Crain in the Little Rock market. Chrysler's designated replacement, through affiliated entities, has sold Chrysler manufactured vehicles through a non Chrysler dealership in Little Rock in violation of the Arkansas Motor Vehicle Commission Act and in violation of Crain's contracts. These actions have adversely affected Crain's ability to meet its MSR.*

(iv)    Location:

*Crain's dealership is in a poor location. Crain acquired its dealership from Little Rock Dodge in November of 2006. Crain acquired the dealership with the intention of moving to the intersection of I-30 and Baseline Road in Little Rock. Chrysler's representative, Bill Lombardo, requested that Crain look for alternate sites. Crain proposed another site and the intersection of I-430 and I-30. After lengthy consideration, Chrysler determined that this location was too close to the Chrysler dealership in Benton, Saline County, Arkansas, and requested that Crain try to find a location at the I-430 and Colonel Glenn Road area. Crain complied with Chrysler's request and located two sites that Chrysler verbally stated were acceptable. Crain executed contracts to purchase the locations, subject to Chryslers' approval. Darrick Todd, a Chrysler representative, informed Crain that Chrysler preferred the site north of Colonel Glenn Road. Crain immediately proceeded toward acquiring Chryslers' preferred site, including obtaining zoning approval, a grading permit, and a building permit. Crain also developed floor plans for the building. Full building plans were reviewed and approved by William Pye, Chryslers' architect. Crain Executed a Dealer Improvement Agreement in May of 2008 to construct a new facility but did not receive an executed agreement from Chrysler until November of 2008. In November and December of 2008, Crain again requested formal approval of the site from Chrysler and received no response.*

(v)    type of market:

*Little Rock is a mid-sized metropolitan market.*

(vi)    Facilities:

*Crain stands ready to commence construction of a new facility in West Little Rock, Arkansas, as repeatedly approved by Chrysler.*

(vii)    customer service:

*Crain has met Chrysler all customer service requirements.*

(viii)    history of experience:

*While Crain has been a Chrysler dealer since late 2006, Crain's ownership has 20 years dealer experience and holds Ford, GM, Kia and Hyundai dealerships.*

(ix)    market share:

6

*Crain has well above average market share.*

(x) the planning potential for the dealership:

*Crain currently exceeds sales quotas.*

(xi) other factors:

*Crain has approximately 60 employees. Upon completion of its planned new facility, Crain would expect to have approximately 100 employees.*

*Chrysler has also moved to reject the contract for Cook Chrysler Jeep, the only other Chrysler product dealer in Little Rock. However, Todd Stewart, Chrysler's Southwest Regional Manager has informed Crain that Chrysler intends to have a dealer in Little Rock.*

*Crain currently has the employment capacity to employ all or nearly all of the trained employees displaced by the requested closure of Cook Chrysler Jeep.*

23. Crain's TSSA is not burdensome on the continued operations of the Debtor. Rejection of the Crain TSSA will not benefit unsecured creditors or result in a reduction of the number of Chrysler dealerships in Little Rock.

24. The Debtor actually sells its vehicles to dealers, such as Crain. Lessening the number of dealers lessens overall sales by the Debtor. It correspondingly reduces the quality of inventory from which buyers of Chrysler products in the region may choose, degrading Chrysler's position against outside competition.

25. The Debtor does not finance the independent operation of Crain; Crain finances its own operation. The continued operation of Crain as a going concern will not free up working capital or lessen direct operating expenditures for the Debtor.

26.     Rather, if the Debtor were to eliminate all of its dealerships in Little Rock, an entire market would be left devoid of sales, increasing the foothold of competition from Ford, General Motors, Honda, Toyota, Hyundai, and the like.

27.     Equally troubling, essentially Crain's entire loss and damages occasioned by Debtors' breach of its franchise agreement would result in a multi-million dollar priority administrative claim against the estate.

28.     As described *infra*, the AMVA enacted under Arkansas's police powers requires that, should Debtors terminate Crain's franchise, Crain will have a state-law statutory tort claim against Debtors should they not repurchase Crain's inventory, equipment, parts, tools, signs, and so forth, and compensate Crain for its future lost business. *See infra*. This claim will reach the millions of dollars, and is mandated by state statutory law, not common law breach of contract.

29.     A chapter 11 debtor "is not pro tanto excused by virtue of its bankruptcy from complying with valid and enforceable state and local regulations. By virtue of 28 U.S.C. § 959(b), it is required to obey them." *In re Beker Industries Corp.*, 57 Bankr. 611, 624 (Bankr. S.D.N.Y. 1986).(quoting *In re Synergy Dev. Corp., 140 B.R. 958, 959 (Bankr. S.D.N.Y. 1992)*).

30.     As the United States Supreme Court has dictated, claims arising from acts of a debtor-in-possession that result in tort liability must be given administrative priority status. *Reading Co. v. Brown*, 391 U.S. 471 (1968). Violations of state law automobile dealers' statutes are torts. *Midwest Great Dane Trailers v. Great Dane Ltd. Ptshp.*, 977 F.Supp. 1386 (D.Minn. 1997).

31.     The result of Debtors' actions to reject Crain's dealership franchise will be a staggering administrative priority claim whose burden to the estate will certainly eclipse any marginal benefit that might otherwise be achieved (if any).

8

32.     But if the Debtors truly use this bankruptcy maneuver as a way to extinguish the existing dealership franchise and replace it with a new operation from ground-up, such a move would certainly in no way benefit the estate, while resulting in additional millions in unsecured and priority claims.

### *Rejection of Crain's TSSA Under Proposed Terms Violates Arkansas Law*

33.     In order to protect automobile dealers and the auto-buying public who have their vehicles repaired and maintained at factory dealerships, Arkansas law requires that any manufacturer intending to terminate a dealer franchise agreement give at least 60 days prior notice in writing to the dealer so terminated and copy the AMVC, stating the reason(s) for termination. ARK. CODE ANN. § 23-112-403 (LEXIS 2009).

34.     Failure to notify the affected dealer and the AMVC as required constitutes an unfair termination. *Id.*

35.     It is unlawful to terminate or cancel the franchise or selling agreement of any dealer without due cause. *Id.* Debtor's rejection of Crain's contracts is in retaliation Crain's resistance to Debtor's pre-petition attempts to coerce Crain to order or accept delivery of vehicles as set forth in paragraphs 12 through 14 above, and in violation of ARK. CODE ANN. § 23-112-403(a)(1)(A).

36.     Arkansas law further requires that when an automotive dealership is closed by the franchisor, it must pay the dealer the dealer's cost, plus any charges from the manufacturer, distributor, or representative, delivery, and taxes of all new vehicle inventory, accessories, and parts. It must also pay the dealer the fair market value of all signs purchased by the dealer bearing the manufacturers' trade names and trademarks, all special tools and service equipment, the costs of transporting all of the returned vehicles, parts, accessories, signs, tools, and

9

equipment, the balance of all claims for warranty and recall work performed by the dealer, and reasonable compensation for the actual pencuniary loss caused by the franchise termination. ARK. CODE ANN. 23-112-403(a)(2)(K). It is unlawful in the State of Arkansas for a manufacturer to fail to do so, and the manufacturer may be subject to administrative proceedings by the AMVC. *Id.*; ARK. CODE ANN. § 23-12-106.

37.    The Debtor's plan makes no provision for repurchase of Crain's vehicles, parts, accessories, signs, tool, equipment, or other inventory; it makes no provision for payment of warranty work and recall work performed by Crain or remuneration for the pecuniary loss caused by the termination.

38.    The statutes above requiring repurchase are enacted pursuant to the State of Arkansas' police powers, and encompass a strong public policy favoring competition in the marketplace for the benefit of the auto-buying public. *See* ARK. CODE ANN. § 23-112-102 ("The General Assembly finds and declares that the distribution and sale of motor vehicles in Arkansas vitally affects the general economy of the state and the public interest and the public welfare... The General Assembly further finds and declares that it is necessary, in the exercise of its police power, to... [a]void undue control of the independent motor vehicle dealer by motor vehicle manufacturing and distributing organizations, [and] [f]oster and keep alive vigorous and healthy competition.")

39.    The Debtor seeks to reject Crain's contracts without repurchasing the vehicles and parts. At the same time, Debtor seeks to prohibit Crain from selling its vehicles and parts. If Debtor's Motion is granted, Crain's ability to mitigate damages will be eliminated. If Debtor's Motion is granted, the Debtor should be required to comply with its purchase obligations under Arkansas law. Alternatively, the termination of Crain's contracts should be delayed for a

10

reasonable time to allow Crain to liquidate its inventory and parts as an authorized dealer in mitigation of its damages.

40.    The Debtor uses this proposed rejection as an attempt to circumvent Arkansas statutory law, strong public policy, administrative procedures, and police power which it cannot and should not be allowed to do.

41.    Although Debtors argue vainly that state laws, such as Arkansas's, are preempted by the Bankruptcy Code, such an argument runs contra to all existing authority.   Congress specifically enacted Title 28, Section 959 of the United States Code to require bankruptcy debtors-in-possession and trustees to operate—even during bankruptcy—in accordance with the requirements of state law.  28 U.S.C. § 959.  Congress has never intended that the Bankruptcy Code supplant all existing state (or federal) laws governing the subject of the bankruptcy.  *See Midlantic Nat'l Bank v. New Jersey Dep't of Envir. Protection*, 474 U.S. 494 (1986).

42.    State dealer laws are not preempted by field preemption. While debtor argues that state dealer laws are preempted through field preemption, that is not the case.  Field preemption is essentially Congressional intent to occupy a specific field.  *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).  In regard to the protection of local auto dealers, Congress has only expressed an intent not to effect consumer protection laws.  H.R. Rep. No. 595 95th Cong., 1st Sess. 343 (1977) (stating consumer protection laws are "regulatory powers" which are exempt from automatic stay).  Additionally, "Congress did not intend for the Bankruptcy Code to pre-empt all state laws." *Midatlantic Nat'l Bank,*  474 U.S. at 505.

43.    The Arkansas State Dealer protection laws promote fair competition by preventing manufacturers from favoring certain dealers with better prices of terminating agreements with certain dealers. The dealer protection laws should be considered as consumer

11

protection laws. Competition and fair prices to the consumer result from these laws. Additionally, the dealers may be considered to be consumers despite not being the end buyers of the products. There is no reason that a consumer should be protected from unfair selling practices while a dealer who buys from the manufacturer should not be afforded the same protections. When buying, dealers can be subject to the same unfair practices that end consumers are, and possibly even more so as the number of auto manufacturers is small in comparison to the number of retail dealers. So, the dealers have even fewer options for purchasing their cars and parts than end consumers do, and should be afforded similar protection as a result. As such, the state dealer protection laws should not be subject to field preemption as Congress has no intent to occupy the field of consumer protection.

44.     State Laws are not preempted by conflict preemption. Additionally, Chrysler claims that conflict preemption prevents the application of state laws. Conflict preemption exists where a state law would prevent the carrying out of Congressional intentions. *Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 31 (1996). Chrysler argues that any law standing in the way of a swift bankruptcy proceeding, which requires the cessation of commercial ties with any terminated dealers, is preempted. However, Chrysler misconstrues the intent of the Bankruptcy code, which is to "minimize financial chaos and disruption, not aggravate it." *In re Friarton Estates Corp.*, 65 B.R. 586, 594 (Bankr. S.D.N.Y. 1986).

45.     If rejection of Crain's dealer agreement is allowed, Crain will become insolvent and will most likely file bankruptcy. Causing another bankruptcy with minimal benefit to this estate aggravates financial disruption. State laws that prevent the rejection of this agreement or provide financial redress so as to keep the non-debtor out of bankruptcy if the agreement is

12

rejected avoids conflict with the Congressional intent of the bankruptcy code and offer no conflict.

### *Rejection of Crain's TSSA Is an Act of Bad Faith, and Works a Significant Hardship*

46.     Rejection of the Crain TSS will result in a large loss to Crain, the loss jobs for at least 60 employees, and large unsecured and priority claims against the estate.

47.     At this time, Crain currently has approximately $6,700,000.00 in vehicle and parts inventory. Crain also has specialized equipment and material such as signage.

48.     The Debtor has no intention of repurchasing any of these items, and Crain will be forbidden to sell its inventory after June 9, 2009. This does not even consider the lost income that Crain will have from inability to sell and service vehicles in the future, which vastly exceeds its current stake in inventory.

49.     Moreover, in reliance upon the Debtor's repeated assurances of continuation and expansion of Crain's business, Crain continued to purchase from the Debtor vehicles, parts, and inventory. Crain also executed contracts for property and invested in excess of $100,000 in anticipation of new construction.

50.     Even when rejecting a executory contract, the Debtor is obligated to act in good faith in the exercise of its business judgment. *In re Helm,* 355 B, R. 528 (Bankr. S.D.N.Y. 2006).

51.     Chrysler's intent to replace Crain with another dealer is not disclosed to the Court or other parties-in-interest; it is entirely inconsistent with its stated goal of reducing the number of dealers. The Debtor is not acting in good faith in rejecting its contract with Crain.

52.     As late as November of 2008, the Debtor admitted in the DIA that sales of 966 vehicles in 18 months by Crain would not only be acceptable performance to keep the dealership

running, but also to loan it $1.25 million for construction. To take an opposition position now is disingenuous, and shows that the Debtor's actions are indeed pretextual.

53.     Crain acquired special rights pursuant federal and state laws regulating automobile dealers. A standard greater than the business judgment standard should be applied. The court should balance the equities between the affected parties and consider harm that will be suffered by Crain if its dealer agreements are rejected. See *National Labor Relations Board v. Bildisco 465 U.S. 531 (1984.)* holding that special nature of collective bargaining agreement required a stricter standard to govern the decision to reject an executory contract.

54.     The primary issue under the business judgment test is whether the rejection of the contract would benefit general unsecured creditors. *Bregman v. Meehan (In re: Meehan),* 59 B.R. 380 (E.D.N.Y. 1986). Upon showing a benefit to the estate by the debtor, the burden shifts to the objecting party to show that the rejection is not in good faith. *In re: Helm,* 355 B.R. 528 (Bankr. S.D.N.Y. 2006).

55.     The Court should use its own "business judgment" to determine if rejection of the contract is in the Debtor's best interest. *Orion Pictures Corp. v. Showtime Networks (In re: Orion Pictures Corp.),* 4 F.3d 1095 (2d Cir. 1993). "The process of deciding a motion to assume is one of the bankruptcy court placing itself in the position of the trustee or debtor-in-possession and determining whether the contract would be a good business decision or a bad one." *COR Route 5 Co., LLC v. Penn Traffic (In re: Penn Traffic Co.),* 524 F.3d 373, 383 (2d Cir. 2008).

56.     A good-faith analysis of the criteria purportedly relied upon by Chrysler and New Chrysler does not result in rejection of Crain's TSSA.

57.     Moreover, it is proper for the Court to also consider the burden or forfeiture which will be worked upon Crain by rejection of the contract. "It is proper for a court to refuse

14

to authorize rejection of a lease or executory contract where the party whose contract is to be rejected would be damaged disproportionately to any benefit to be derived by the general creditors of an estate..." *Robertson v. Pierce (In re: Chi-Feng Huang)*, 23 B.R. 798 (9th Cir. BAP 1982).

58.     The Court on considering rejection must exercise its discretion fairly and in the interest of *everyone* who has had the misfortune of dealing with the Debtor. *In re: Minges*, 59 B.R. 380 (2nd Cir. 1979). The aim of Chapter 11 reorganization is to rehabilitate the Debtor while avoiding forfeitures by its creditors. *Pioneer Invest. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380 (1993).

59.     The Courts will flatly reject a proposition of rejection where the contract being rejected is essentially the sole asset of the opposing party, and would render the opposing party completely insolvent. *In re: Petur USA Instr. Co.*, 35 B.R. 561 (Bankr.W.D.Wash. 1983). This is true *even though* the Court finds that the debtor exercised its best business judgment in attempting to reject the contract. *Id.*

60.     If its TSSA is rejected, Crain and its employees will experience significant financial loss which will not be reclaimed by merely filing an unsecured claim in bankruptcy. Crain will lose its inventory, parts, employees, issued building permits, and real estate contracts. In contrast, the Debtor seeks to gain nothing (or at the least very little) by rejection of the TSSA.

61.     Viewing this transaction both from the standpoint of the Debtor and Crain, it becomes clear to the Court that the harm to Crain greatly outweighs any marginal benefit to the estate, and the rejection should not be allowed.

15

### Rejection of the Contracts Violates the Sherman Antitrust Act and Automobile Dealers' Franchise Act

62.     The debtor's termination of Crain's contract, combined with the sale of its assets to New Chrysler with the intent to replace Crain with another dealer raises the substantial likelihood of the existence of a combination or conspiracy between the debtor, New Chrysler, Crain's undisclosed replacement and possibly others.

63.     Forced or coerced restraints on free trade among the states are presumed to be illegal pursuant to the Sherman Antitrust Act. 15 U.S.C. §§ 1, *et seq.*

64.     The Automobile Dealers Franchise Act 15 U.S.C. §§1221 *et seq.* reaches activities of an automobile manufacturer which would constitute an unreasonable restraint of trade under the Sherman Act. In evaluating good faith in terminating a dealer franchise, the presence or absence of invalid trade practices is a foremost consideration. Retaliatory actions of the manufacturer are also relevant to the good faith inquiry. *Randy's Studebaker Sales, Inc. v. Nissan Motor Corporation* 533 F2d 510 (10th Cir. 1976).

65.     The Sherman Act and the *Automobile Dealers' Franchise Act* are not preempted.

66.     In an article with the Associated Press, Chrysler officials stated that one goal to be achieved in rejecting dealership agreements was to decrease competition in the marketplace, with the hopes of artificially driving up the prices of new vehicles through lowered competition.

67.     Driving up the prices of Chrysler vehicles does not help the Debtor, but damages it; the Debtor will become less competitive against other manufacturers in the marketplace and will be forced to rely on future incentives to remain competitive.

16

68.     More importantly, however, if Chrysler is conspiring with some of its dealers to decrease competition to artificially increase the cost of new vehicles, it has engaged in an unfair and prohibited restraint on trade.

69.     In addition, if the Debtor intends to eliminate Crain from the Little Rock market and then replace it with another dealership to increase the costs of new vehicles, such is also a prohibited restraint on trade.

70.     Debtor is also taking retaliatory action toward Crain as a result of Crain resisting Debtor's attempts to coerce Crain to accept delivery of vehicles not ordered by Crain and reporting this illegal practice to the Arkansas Motor Vehicle Commission.

71.     The Bankruptcy Court cannot be used as a vehicle to otherwise violate Federal law and accomplish an illegal goal.

### *The Debtor Improperly Seeks Declaratory And Injunctive Relief*

72.     The debtors' request for an injunction against "any interference" with New Chrysler by "Government Entities" and any other parties is improper as it has not been sought through an adversary proceeding pursuant to Bankruptcy Rule 7001(7).

73.     The debtor also requests declaratory relief limiting and defining the damages that may be available to Crain as a result of the rejection of its contracts.  This requested declaratory relief is improper as it has not been sought through and adversary proceeding.  Bankruptcy Rule 7001(9).

74.     Crain alleges that the debtor has committed post petition tortious acts in connection with the rejection of its contracts.  Crain's damages claims should not be determined through a rejection motion.

75.     Granting an injunction or declaratory relief without an adversarial proceeding violates due process by not allowing Crain, Government Entities or other parties mentioned with any notice of or opportunity to be heard in regard to the injunction.  Additionally, injunctions cannot apply to persons or entities that are not parties to the proceeding.  So, without an adversary proceeding that includes Crain, the Government Entities and other parties, this request for an injunction and declaratory relief should be denied.

76.     The debtor's request for an order establishing procedures for affected dealers engaging in conduct inconsistent with relief granted in an order granting the rejection motion is unnecessary and overreaching.  Should any such act occur, a party with standing is entitled to seek appropriate relief from a court having jurisdiction over the matter.

77.     It is incredulous that debtor has taken the position that 11 U.S.C. §525 applies to this case.  The debtor's request for an advance determination that any actions by Crain or government entities motivated by dissatisfactions with or protests over the rejection of contracts is a violation of section 525 is a request for declaratory relief which must be brought by adversary proceeding in accordance with Bankruptcy Rule 7001 *et seq.*  Further, section 525 only applies to actions taken *solely* because of the debtors having been in bankruptcy.  The Debtor's request to prejudge whether future actions violate section 525 is inappropriate.

78.     Further, Chrysler lacks standing to assert any claim for New Chrysler, a hypothetical purchaser at this point, and there is no jurisdiction to protect a hypothetical purchaser from possible future violations of 525(a)

### *Relief Sought*

79.     Bankruptcy Rule 6006(f)(6) limits a rejection motion to no more than 100 executory contracts.  Contrary to the Debtor's assertion in its pleading, the legal and factual

18

support for proper determination of rejection of the dealership contracts are not uniform.  The Debtor's allegation that it is rejecting its executory contracts with Crain as part of an overall plan to reduce the number of dealers is disingenuous in light of Todd Stewart's admission to Crain that Chrysler would have a dealer in Little Rock.  Debtor's true plan is to replace a Crain, a dealer performing well in spite of handicaps created by Chrysler, with another dealer.  Debtor's true plan will create significant loss to Crain, loss of jobs held by Crain's employees, and a large unsecured rejection claim by Crain and an administrative tort claim in this bankruptcy case.  Waiver of Bankruptcy Rule 6006(f)(6) should be denied.

80.    The Debtor and New Chrysler should be required to disclose all objective and subjective material used in evaluating the dealers that it rejects and retains in the Southwest Region.

81.    The Debtor and New Chrysler should be required to identify the entities that it is considering to replace Crain as a dealer in Little Rock, and disclose this information to creditors and parties in interest.  Creditors and parties in interest are entitled to this information to determine whether to object to the Debtors' motion to reject.

82.    Crain requests a day for trial and argument of the issues raised in this objection.

### *Memorandum of Law*

83.    Crain submits that the points and authorities set forth above satisfy the requirements of Local Bankruptcy Rule for the Southern District of New York 9013-1(b).

WHEREFORE Crain respectfully prays that the Debtor's motion to reject its executory contracts with Crain be denied, that Debtor's request for waiver of the requirements of Bankruptcy Rule 6006(f)(6) be denied, and that it be granted any and all other just and proper relief.

Davidson Law Firm, Ltd.
724 Garland, Cantrell at State
Little Rock, AR  72201
Telephone: (501) 374-9977
Facsimile: (501) 374-5917
E-mail: skipd@dlf-ar.com
         slg@dlf-ar.com
         mattheww@dlf-ar.com

By: _____

    Stephen L. Gershner, Esq. 6727 (admitted *Pro Hac Vice*)
    Charles D. Davidson, Esq. 6040 (admitted *Pro Hac Vice*)
    Matthew D. Wells, Esq. 7957 (admitted *Pro Hac Vice*)

and

Robert Slott, Esq. 4622
Donald M. Sunshine, Esq. 5281 – of Counsel
Sunshine Slott & Sunshine, PC
150 W 25th St, #503
New York, NY 10001-7404
Telephone: (212) 695-9112
Email: ssslaw@broadviewnet.net

*Attorneys for Crain CDJ, LLC*