ENTWISTLE & CAPPUCCI LLP
280 Park Avenue, 26th Floor West
New York, New York 10017
Telephone: (212) 894-7200
Facsimile: (212) 894-7272
Andrew J. Entwistle
Josh K. Porter

*Counsel for George T. Tator &
Sons, Inc. (d/b/a Tator's Dodge)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Chrysler LLC, *et al.*, | Case No. 09-50002 (AJG) |
| Debtor. | (Jointly Administered) |

**LIMITED OBJECTION OF TATOR'S DODGE TO OMNIBUS MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER, PURSUANT TO SECTIONS 105, 365 AND 525 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6006, (A) AUTHORIZING THE REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF**

George T. Tator & Sons, Inc. ("Tator's Dodge"), a long-time Dodge dealership, through its counsel, Entwistle & Cappucci LLP,[1] hereby submits this limited objection to the Debtors' omnibus motion, dated May 14, 2009 (the "Motion") (Docket No. 780), for entry of an order pursuant to sections 105, 365 and 525 of the Bankruptcy Code and Bankruptcy Rule 6006 (i) authorizing the rejection of executory contracts and leases with certain domestic dealers; and (ii) granting certain related relief, which will authorize Debtors to reject Tator's Dodge's agreement

---

[1] Entwistle & Cappucci LLP is representing Tator's Dodge *pro bono*. Founding partner Andrew Entwistle lives in the area where Tator's Dodge is located, and is aware of the high esteem Tator's Dodge and its proprietor Chuck Tator are held among their customers and in their community.

EC.21173.1

to act as an authorized dealer and servicer of Dodge products, thus destroying the dealership. In support of its objection, Tator's Dodge states:

## INTRODUCTION

1. Founded 95 years ago, Tator's Dodge is the last original family-owned Dodge dealership in the country. Located in the same spot in rural New York throughout its history, Tator's Dodge has developed a nearly unprecedented reputation for personal service among its customers and community, and, remarkably, a world-wide reputation for its expert servicing of Dodge Vipers, a sports car with a small but exceedingly loyal following.

2. Now, under the pretext of saving Chrysler from liquidation through a sale of its assets, Debtors seek to summarily abandon Tator's Dodge and hundreds of dealerships like it under the cover of Section 325 of the Bankruptcy Code. In so doing, Debtors will destroy the Tator's family business and cost the dealership's employees their jobs, along with the jobs of the thousands of employees of the other 788 dealerships that the Motion, if granted, also will all but destroy. Moreover, Chrysler will inexplicably intentionally destroy part of its history by eliminating the last original Dodge dealership left.

3. As is well settled, Section 325 permits a debtor to reject burdensome executory contracts for the benefit of the estate at the expense of contractual counterparties. But here, the putative benefits to the estate must be evaluated in the context of the near total harm rejection will cause to Tator's Dodge and others like it. More to the point, Chrysler has made no meaningful showing that its dealer agreements such as the one with Tator's Dodge (or its agreements with similar Affected Dealers[2]) can possibly be burdensome to the estate. Tator's

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Dodge costs Chrysler nothing and the putative benefits to the estate that Debtors identify for abandoning it and dealers like it do not withstand scrutiny.

4. Moreover, Debtors' Motion, if granted, will not only destroy Tator's Dodge and hundreds like it, it will do so *immediately* and with no meaningful possibility that the Affected Dealers can reorganize or realign themselves with other manufacturers, or even sell existing Chrysler inventory.

5. We respectfully submit that caution is in order here. Section 325 is not intended to be operate so punitively or in a manner that creates such manifest injustice. Section 325 is intended to be a shield from hardship, not a sword to be wielded by debtors to sever contractual relationships of manifest benefit to the estate -- particularly where, as here, the result is to destroy a 95-year old family business that is as much a piece of American history as Dodge itself. The record as it stands today is bereft of any basis for the destruction of the Tator family's Dodge franchise (or any of the other Affected Dealers) and accordingly the Debtors' Motion, at least insofar as it relates to Tator's Dodge, should be denied with prejudice in all respects.

## BACKGROUND

**A.  The Chrysler Asset Sale**

6. On April 30, 2009, less than one month ago, Chrysler and 24 of its direct and indirect subsidiaries (the "Debtors"), commenced their reorganizations by filing petitions for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code.[3] Contemporaneously therewith, Debtors' filed the Affidavit of Ronald E. Kolka (Docket No. 23), Executive Vice President and Chief Financial Officer of Chrysler LLC (the "Kolka Affidavit" or "Kolka Aff."), in support of their first day motions.

7. According to the Kolka Affidavit, the Debtors' Chapter 11 cases were filed in

---

[3] On May 1, 2009, the Court ordered that the cases be jointly administered (Docket No. 97).

EC.21173.1    3

connection with and to facilitate a sale transaction that will effect an alliance with Italian automobile manufacturer Fiat S.p.A. ("Fiat"), without which Chrysler purportedly will be forced to liquidate. (*See* Kolka Aff. ¶ 4.) Under the proposed sale, Chrysler's assets will be transferred to New Chrysler, which will be owned in certain percentages by, among others, Fiat, the U.S. Treasury, the Canadian Government, the UAW's new pension trust, and certain of Chrysler's pre-petition lenders. (*See* Kolka Aff. ¶¶ 13, 78.)

8. The transaction is apparently the result of negotiations between Chrysler and numerous contingencies, including but not limited to unions, parts suppliers, secured creditors, the U.S. government, shareholders, and Chrysler dealers, each of which made "important concessions" to facilitate the transaction and avoid liquidation. (*See* Kolka Aff. ¶ 6). For example, according to Mr. Kolka, Chrysler's dealers "agreed to reduce both their dealer and service contract margins and reimbursement programs." (*See* Kolka Aff. ¶ 6.) Indeed, certain concessions made by the dealers already in effect since February 2009 will save the reorganized company approximately $350 million annually. (*See* Kolka Aff. ¶ 80.)

9. The Kolka Affidavit is 62 pages long and describes Chrysler's business, the asset sale transaction and the circumstances leading up to it. Significantly, it nowhere gives any indication that the asset sale or Fiat alliance that will purportedly save Chrysler are at all contingent on the elimination of existing dealers.[4] To the contrary, the affidavit states that without the transaction and alliance with Fiat, among other things, "[a]pproximately ***3,200 Chrysler dealers*** will be put out of business and over 140,000 employees of those dealerships

---

[4] According to the Kolka Affidavit, more than ten years ago Chrysler initiated a comprehensive long-term viability plan, under which it, among other things, reduced its dealer network to its current 3,181 dealers. (*See* Kolka Aff. ¶ 42.) The Kolka Affidavit indicates that, according to a February 2009 submission to the U.S. Treasury concerning its long-term plans, Chrysler intended to continue to reduce its dealer network through buy-outs and consolidation. (*See* Kolka Aff. ¶ 80.) But, contrary to the claims in the Motion, as discussed below, there is no indication in Mr. Kolka's Affidavit that the long-term viability plan or sale transaction is contingent on summarily closing dealerships.

will lose their jobs." (*See* Kolka Aff. ¶ 4.) (emphasis added)  In other words, as of April 30, 2009, Debtors at least publically contemplated that the proposed transaction would benefit ***all*** 3,181 existing Chrysler dealers, and the Kolka Affidavit indicates that the dealers apparently agreed to concessions accordingly.

  **B. Tator's Dodge**

  10. It is safe to say that Tator's Dodge is one of the most loyal dealerships in the Chrysler dealer network.  Indeed, the dealership is as old as the Dodge car brand itself.

  11. When John and Horace Dodge began selling cars as the Dodge Brothers Motor Car Company 1914, George T. Tator, a mechanic in rural Westchester County, was one of only 25 applicants out of thousands to receive a first franchise to sell Dodge Motor Cars.[5]  In fact, Tator's Dodge is older than Chrysler itself, which was founded in 1925, purchased Dodge three years later, and, ironically, now seeks to close the dealership.

  12. The Dodge brothers were wise to select George Tator as a first franchisee.  In the 95 years since he opened Tator's Dodge, each of the 24 other original franchises has folded or been sold, making Tator's Dodge the oldest family-owned Dodge dealership and servicer in the world.  (*See* Tator Aff. ¶ 4.)  In fact, the dealership, now run by George's grandson Chuck Tator, himself a world-renowned Dodge mechanic, still operates at its original location in South Salem, New York.  (*See* Tator Aff. ¶ 5.)

  13. Because of its location in rural Westchester County, Tator's Dodge is a low-volume dealership relative to the mega-dealerships and auto-malls that have come to dominate the new vehicle market in the U.S.  (*See* Tator Aff. ¶ 5.)  The dealership is and has always been located some distance away from any urban population center that would drive volume sales, and it is surrounded by an increasingly more affluent customer base that, though no fault of Tator's

---

[5] *See* Affidavit of Charles W. Tator, Jr., dated May 26, 2009 (the "Tator Aff."), ¶ 3.

Dodge, turned away from the "Big Three" automakers years ago in favor of imports and luxury cars.

14. Because of its rural location and comparatively low sales volume, the dealership often needs only to display one example of each Dodge model at a time. (*See* Tator Aff. ¶ 6.) Nevertheless, the dealership enjoys consistent sales, usually about 30 new vehicles a year. (*See* Tator Aff. ¶ 6.)

15. Fortunately for Dodge owners in and around Westchester County, there is significantly more to Tator's Dodge than its relatively modest new vehicle sales. It has also long been an expert provider of service and parts to all types of Dodge vehicles, which accounts for about 85% of the dealership's total business. (*See* Tator Aff. ¶ 7.) Remarkably, Tator's Dodge had a mechanic in the service department that worked on Dodges at the dealership for 64 years. One of its current mechanics has been there for more than 17 years and his son has been employed at the dealership for the last two. (*See* Tator Aff. ¶ 7.) Indeed, Chuck Tator was 11 years old when he first began working in the shop. (*See* Tator Aff. ¶ 4.)

16. In addition to serving ordinary Dodge vehicles, Tator's Dodge has become world renowned for its expertise in servicing the Viper, Dodge's top-of-the-line sports car that engenders remarkable loyalty among its owners. (*See* Tator Aff. ¶ 8.) The dealership currently services more than 500 of the vehicles and ships Viper parts to customers in all 50 states and Europe. (*See* Tator Aff. ¶ 8.) Mr. Tator, who frequently dispenses free advice and maintenance tips over the phone as a service to customers worldwide, twice yearly travels overseas to hold seminars and service Vipers belonging to owners in England. (*See* Tator Aff. ¶ 8.) Indeed, even larger Dodge dealerships and Chrysler LLC often send Mr. Tator Vipers to repair, choosing not to deal with the complex machines themselves. (*See* Tator Aff. ¶ 8.)

17. Tator's Dodge is also an asset to its community in other ways. For example, every spring since 1997 Tator's Dodge has held a Viper barbeque at the dealership for Viper owners and the surrounding community. (*See* Tator Aff. ¶ 9.) What began as a "thank you" to the dealerships' customers has grown to an annual event involving approximately 200 Vipers and brining attendees to South Salem from all over the country and Europe. (*See* Tator Aff. ¶ 8.)

**C. The Motion**

18. On May 14, 2009, Debtors filed the instant Motion seeking, among other things, an order of this Court (i) authorizing Debtors immediately to reject 789 dealership agreements that the Debtors assert are burdensome to the estate; and (ii) providing that, if the Motion is granted, Affected Dealers will each be immediately prohibited from acting as a new vehicle dealer for Chrysler, selling replacement Chrysler parts, or servicing Chrysler vehicles under its warranty program as if it were still on authorized dealer. (*See* Motion ¶ 22.)

19. According to the Motion, Debtors have evaluated Chrysler's 3,818 member dealer network and determined that it would be beneficial to the reorganized company to cull 789 dealers from the network through immediate rejection of their dealership agreements. (*See* Motion ¶ 19.) Debtors theorize that eliminating the Affected Dealers, most of which are comparatively small, will streamline New Chrysler's dealer network and increase profits among the larger remaining dealerships that the Debtors favor. (*See* Motion 40.) In turn, Debtors speculate that the profits of New Chrysler will be correspondingly higher.

20. In particular, Debtors assert that contraction of smaller dealerships will increase efficiency by preventing competition among closely situated dealerships (*see* Motion ¶ 10), will increase profitability of remaining dealerships, thereby enabling them to offer extra services and benefits that will improve customer service (*see* Motion ¶ 14), and will ease the putative burden

on New Chrysler for the increased costs of administering a large dealer network, including distribution to, and the oversight and auditing of dealerships (*see* Motion ¶ 15).

21.     These assertions are demonstrably false.  Competition is the backbone of America and if anything it promotes Chrysler's brand on a local level and encourages higher levels of customer service and greater customer satisfaction.  Of course in this case the Debtors' suggestion that eliminating some dealerships will increase the profitability of others is no basis for a Section 325 application by the Debtors because they do not own the dealerships and so dealership profitability can be of no moment here.  Nor have Debtors shown that more profits for larger dealerships at the expense of smaller ones correspond to company profits.  Moreover, customer loyalty to local dealers is strong, and the notion that customer service can be enhanced by destroying long-time family businesses and forcing customers to travel many miles to other unknown dealers has no basis in logic or fact.  The other putative grounds -- including audit costs, oversight, and distribution -- are equally without basis as Chrysler charges most such costs (to the extent they exist at all) back to the dealers in one way or another.

22.     At bottom, rejection of the Affected Dealers' agreements is just a vehicle through which Debtors are attempting to conveniently accelerate a program that began in 2001 to "rationalize" Chrysler's dealer network in favor of the larger dealerships.  (*See* Motion ¶ 16.)  Since 2001, Debtors have reduced their dealer network from 4,320 to 3,181 as part of their heretofore unsuccessful long-term viability plan.  (*See* Motion ¶ 16.)  Chrysler's February 2009 submission to the U.S. Treasury indicated that the process of dealer rationalization would continue through consensual buy-outs or consolidation.  (*See* Kolka Aff. ¶ 80.)  However, now, for the first time and without support, the Motion claims that the rejection of the Affected Dealers' agreements is a condition of the consummation of the sales transaction and Fiat

alliance. (*See* Motion ¶ 18.)

23. In addition to an order authorizing the Debtors to reject agreements, the Motion seeks to reject the dealer agreements on June 9, 2009, **less than 30 days after notifying the Affected Dealers**. (*See* Motion ¶ 22.) On that date, the Motion contemplates that the Affected Debtors will be completely forbidden to sell or service Chrysler products as an authorized dealer. (*See* Motion ¶ 68.) Debtors claim that immediate rejection of the dealer agreements is necessary to accelerate organization of the smaller dealer network, (*see* Motion ¶ 41), but again offer little specifics in support. Moreover, the Motion does not even contemplate that Debtors will repurchase the current inventory of vehicles or replacement parts held by the Affected Dealers.

## ARGUMENT

### A. Debtors Cannot Demonstrate that Their Dealer Agreement with Tator's Dodge is Burdensome

24. Given the near total harm that will befall Tator's Dodge if its dealer agreement is rejected, Debtors' efforts in this regard should be evaluated by whether keeping the dealership and others like it in New Chrysler's dealer network would cause burden to the estate. *See*, *e.g.*, *In re Chateaugay Corp.*, 10 F.3d 944, 954-55 (2d Cir. 1993) (purpose of permitting rejection of executory contract is to relieve estate of burdensome contract); *In re Minges*, 602 F.2d 38, 42 (2d Cir. 1979) ("the power to reject derives from the long held doctrine that the bankruptcy estate may abandon burdensome property"). It plainly would not.

25. Debtors' proffered reasons for rejecting smaller dealerships like Tator's Dodge are speculative and do not withstand scrutiny. For example, Tator's Dodge sells less than 30 new vehicles annually, making it virtually no competition or threat to the viability of surrounding dealerships. (*See* Motion ¶ 10). Nor does its small volume prevent it from offering greater services and benefits to its customers. (*See* Motion ¶¶ 11, 14). Indeed, by all measures, Tator's

Dodge provides exemplary customer service and satisfaction that should be envied by larger dealerships; its service department is in fact world-renowned. Further, concerns that New Chrysler will be forced to spend additional resources on training, oversight and distribution due to having smaller dealerships in its network is simply inapplicable to Tator's Dodge. (*See* Motion ¶ 15). The dealership has been running the same business at the same location for 95 years and Mr. Tator and his family are experts at running their dealership. Tator's Dodge will require little or no oversight or auditing by New Chrysler, and certainly no training of Chrysler employees to deal with the dealership. Moreover, the dealership typically displays only one of each of Dodge's current models, which hardly creates distribution problems. Debtors conveniently will argue, and have argued, that the burden comes not from each small dealer, but the aggregate effect on the dealer network. However, for purposes of Section 325, the fact that Chrysler now does not want to be bothered with small dealerships such as Tator's Dodge is not the same as being burdened by honoring its agreement to do so.

26. Contrary to Debtors' apparent belief, this Court should not automatically grant the Motion based on Debtor's asserted "business judgment," which is here based almost entirely on vague, unsupported and subjective assertions.[6] To the contrary, given the disproportionate harm that Tator's Dodge and other Affected Dealers will suffer, Debtors' judgment should be carefully scrutinized to evaluate the true benefits to the estate, if any. *See*, *e.g.*, *In re Monarch Tool &*

---

[6] Debtors mistakenly rely on *In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) (Motion ¶ 44). But *Riodizio* actually supports the notion that an assertion of "business judgment" should not relieve the Debtors' obligation to meaningfully show that the agreements are burdensome before they are permitted to reject them. *Riodizio* involved two agreements between two parties. The first the court could plainly see was beneficial to the estate to reject and authorized its rejection. *Id*. at 425. However, with respect to the second agreement, the court determined that an evidentiary basis was needed:

> The record is insufficient, however, to determine whether the debtor should be permitted to reject this contract. Having outlined only some of the relevant benefits and burdens of the Shareholders Agreement, the Court must leave it to the parties to quantify these rights and obligations, and provide an evidentiary basis to support the decision to reject.

*Id*. at 426.

EC.21173.1                                                 10

*Mfg. Co.*, 114 B.R. 134, 137 (Bankr. S.D. Ohio) ("a Chapter 11 debtor's right to reject executory contracts is not unlimited. Disproportionate damage to the other party to the contract provides a ground for disapproving rejection") (*internal citations omitted*); *In re Chipwich, Inc.*, 54 B.R. 427, 431 (Bankr. S.D.N.Y. 1985) (rejection authorized where there was no showing that party "will be damaged disproportionately to any benefit to be derived by the debtor and the general creditors of the estate," in contrast to cases where rejection "would have resulted in the nondebtor licensee being forced out of business because the licensee's entire business was based upon the executory contract") (*internal citations omitted*).

27. Once again, the Motion argues that it is the aggregate burden from the Affected Dealers that has informed Debtors' "business judgment" concerning the need to reject the dealership agreements. In other words, no one Affected Dealer is a burden, but it is rather the collective group that will burden the new dealer network. Conveniently for Debtors, by lumping together a huge volume of dealers they can refuse to provide specifics as to any one, allowing them assert a collective burden without offering details or proof.

28. Similarly vague is the Debtors' assertion that the asset sale and Fiat alliance is now contingent on culling the dealer network. Debtors do not identify the party to the transaction or negotiations who has issued such a condition. Nor do we see where such a condition appears in the transaction documents submitted to the Court.

29. Here the harm to Tator's Dodge, and presumably many other of the Affected Dealers would be nearly total. Tator's Dodge will lose its only product line, and its service department will be expressly prohibited from repairing cars in Dodge's warranty program or purchasing replacement parts from the manufacturer. Rather than a rubber stamp, Debtors' exercise of their "business judgment" should be carefully evaluated to ensure that whatever

benefits may inure to the estate do not disproportionately harm small dealers such as Tator's Dodge. The putative benefits or burdens should be tangible and non-speculative before Debtors are authorized to destroy Tator's Dodge and the other Affected Dealers. Section 325 should not be a shortcut for Chrysler to remake its dealer network in an unreasonable manner based solely on theoretical judgments that the estate will benefit.

### B. Debtors Cannot Demonstrate Why Closing Dodge's Last Original Dealership Will Benefit the Estate

30. Debtors' business judgment should additionally be scrutinized because they appear to ignore the adverse effect that closing dealerships may have on overall customer loyalty to New Chrysler. For example, Tator's Dodge has loyal customer base created over decades, and its service department is world renowned for servicing Dodge Vipers, one of Chrysler's most unique and appreciated products. Indeed, every spring the dealership hosts a barbeque for its customers and community. Not surprisingly, Debtors have not shown why closing Tator's Dodge and other dealerships like it -- thus making customers travel miles to an unfamiliar dealership -- improves how customers view the company.

31. Moreover, Debtors inexplicably are intentionally destroying part of Chrysler's history. Mr. Kolka describes Chrysler as "the quintessential American automobile company" (*see* Kolka Aff. ¶ 18), yet the Debtors are severing one of the few remaining links to its heritage, the last of the original 25 Dodge dealerships. It passes understanding why a troubled U.S. car manufacturer trying to reassert its traditional American brand would believe it was beneficial to abandon its history.

### C. Debtors Cannot Demonstrate Why Rejection Must be Immediate and Without Review

32. Remarkably, based on little more than speculation that the estate will benefit, Debtors want to reject the dealer agreement with Tator's Dodge (and the other Affected Dealers) on June 9, 2009, *less than one month after it first sent notice*, and seek an order of this Court that Tator's Dodge and the other Affected Dealers will immediately be prohibited from acting as a new vehicle dealer of Chrysler products or repairing or servicing such products. In other words, if the Motion is granted at the hearing, after 95 years Tator's Dodge will lose its viability six days later and will even be unable meaningfully to sell its existing inventory of new vehicles or replacement parts (except perhaps at cents on the dollar to non-affected Chrysler dealers); all based solely on Debtors' untested "business judgment" that the dealership and others like it have no place in New Chrysler's dealer network.

33. Moreover, Debtors' Motion seeks a waiver of Bankruptcy Rule 6006(f)(6), which prohibits omnibus motions that seek to reject more than 100 executory contracts at once. Debtors assert that the dealership agreements they seek to reject are substantially the same for each of the 789 Affected Dealers, and thus a single motion containing a list of the Affected Dealers should be sufficient. (*See* Motion ¶¶ 70-71.) But the affected agreements are also identical to thousands of dealer agreements Debtors are assuming. The fact that the Motion does not provide specifics of how Debtors differentiated between the "beneficial" and "burdensome" agreements suggests and arbitrariness and capriciousness that is wholly inapposite to Section 325 and wholly inconsistent with the sound exercise of this Court's equitable powers in the application of the section.

34. The unqualified approval of Debtors' Motion (and the waiver of Rule 6006(f)(6)) will allow the immediate rejection of 789 other dealer agreements at a substantial

harm to the Affected Dealers, without providing the Court time to adequately scrutinize the assertions of burden and the "business judgment" Debtors exercised in selecting the Affected Dealers. Indeed, one could surmise that Debtors' omnibus Motion a request for a waiver of Rule 6006 is designed to avoid just such scrutiny.

35. With a nod to caution, and in the interest of fairness and equity, we respectfully submit that at very least the Motion should be adjourned until discovery can be conducted concerning any actual benefit or burden to the estate from the Affected Dealer agreements, the criteria Debtors used to pick and choose dealers to reject, and the corresponding harm that will befall the Affected Dealers. Section 325 was never intended to operate in a way that would create manifest injustice to so many rejected counterparties.

## **CONCLUSION**

Tator's Dodge requests that the Court deny the Motion to the extent that it seeks to reject any agreement between Debtors and Tator's Dodge. In the alternative, the dealership requests that it be given the opportunity to take discovery, or participate in discovery taken by other Affected Dealers, regarding the criteria under which Debtors' selected it for elimination from the dealer network, and what benefit the estate actually will derive from that decision.

Date: May 22, 2009

/s/ Andrew J. Entwistle
Andrew J. Entwistle (AE-6513)
Josh K. Porter (KP-2660)
Entwistle & Cappucci LLP
280 Park Avenue, 26th Floor West
New York, New York 10017
Telephone: (212) 894-7200
Facsimile: (212) 894-7272

*Counsel for George T. Tator & Sons, Inc. (d/b/a Tator's Dodge)*