CARSON FISCHER, P.L.C.
Counsel for Mt. Clemens Dodge, Inc.
4111 Andover Road, West-2nd Floor
Bloomfield Hills, MI  48302
(248) 644-4840
Robert A. Weisberg (P26698)
Patrick J. Kukla (P60465)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : | Case No.: 09-50002(AJG) |
| CHRYSLER LLC, *et al.*, | : | (Jointly Administered) |
|  | : |  |
| Debtors | : |  |

-----------------------------------------------------x

## MT. CLEMENS DODGE, INC.'S OBJECTION TO OMNIBUS MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER, PURSUANT TO SECTIONS 105, 365 AND 525 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6006, (A) AUTHORIZING THE REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF

**Mt. Clemens Dodge, Inc.** ( "Mt. Clemens Dodge"), by and through its attorneys,

Carson Fischer, P.L.C., for *Mt. Clemens Dodge, Inc.'s Objection To Omnibus Motion Of*

*Debtors And Debtors In Possession For An Order, Pursuant To Sections 105, 365 And 525 Of*

*The Bankruptcy Code And Bankruptcy Rule 6006, (A) Authorizing The Rejection Of Executory*

*Contracts And Unexpired Leases With Certain Domestic Dealers And (B) Granting Certain*

*Related Relief,* states as follows:

## INTRODUCTORY STATEMENT

1. To the extent the relief requested in the Rejection Motion (defined below) is granted by the Court, Mt. Clemens Dodge will be forced to almost immediately close its doors and this would result in the following devastating consequences: (i) ruining the livelihood of the owner of Mr. Clemens Dodge, which has been in business for 26 years; (ii) causing the termination of approximately 67 employees (23 of which have been with the company for 10 or more years); (iii) likely causing additional job losses at vendors and suppliers to Mt. Clemens Dodge; (iv) potentially causing personal bankruptcy filings by certain of the approximate 67 employees who will lose their jobs; and (v) further erode the already struggling local economy of the cities of Mt. Clemens and Clinton Township, Macomb County, the metropolitan Detroit area, and the State of Michigan.

2. The Rejection Motion must be denied by this Court because, minimally, (i) the Debtors cannot establish that rejection of the dealer agreements is warranted as an exercise of the Debtors' sound business judgment, (ii) Mt. Clemens Dodge provides a benefit to (and is not a burden on) the Debtors' estates; (iii) Chrysler's egregious conduct (before and after the bankruptcy filing) should not be rewarded by this Court granting the requested relief; and (iv) Chrysler is attempting to inequitably deprive Mt. Clemens Dodge (through questionable means, which may implicate anti-trust concerns), of any commercially reasonable opportunity to liquidate approximately $7 million of inventory. Under any circumstances, Mt. Clemens Dodge should be provided with no less then one year to liquidate its new vehicle inventory.

## BACKGROUND

3.      On April 30, 2009 (the "Petition Date"), Chrysler LLC and its affiliated debtors (collectively, "Chrysler" or the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

4.      Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their business and manage their property as debtors-in-possession. Though one has been requested, no trustee or examiner has been appointed in these Chapter 11 cases.

5.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.      On May 14, 2009, the Debtors filed a motion [Docket No. 780] (the "Rejection Motion") seeking an Order from the Court authorizing Chrysler to reject certain dealer agreements or other agreements or contracts that Chrysler has with 789 automobile dealerships. Mt. Clemens Dodge was one of the 789 dealerships proposed by Chrysler for contract rejection.

7.      In addition to the Rejection Motion, Mt. Clemens Dodge received Chrysler's May 13, 2009 letter (the "Rejection Letter") advising Mt. Clemens Dodge of Chrysler's decision.

8.      The Rejection Letter offered the following empty promises by Chrysler:

- "As a result of its recent bankruptcy filing, Chrysler LLC is unable to repurchase your new vehicle inventory. However we will assist with the redistribution of as many of your eligible vehicles as possible, among the dealers remaining in the Chrysler network."

3

- "As a result of its recent bankruptcy filing, Chrysler LLC is unable to repurchase your Mopar parts inventory.  However we will endeavor to match you with a dealer to consider purchase of your parts.  This redistribution will occur among the dealers remaining in the Chrysler network."

- "As a result of its recent bankruptcy filing, Chrysler LLC is unable to repurchase your Essential/Special tools.  However we will assist with the redistribution of as many of your Essential/Special tools as possible.  This redistribution will occur among the dealers remaining in the Chrysler network."

- "All warranty, MOPAR, Recall, Transportation and Chrysler Service Contract Claims must be submitted to Chrysler Motors LLC for payment within seven days of the expected court approved rejection date. . . Warranty repairs performed after the rejection date are not eligible for payment."

9.     To date, none of the foregoing has resulted in any relief, or reasonably foreseeable relief, or guarantee of any relief, for Mt. Clemens Dodge.

## OBJECTIONS

**A.     DEBTORS HAVE NOT AND CANNOT ESTABLISH THAT REJECTION IS WARRANTED**

### i.     The Court should apply a standard stricter than "business judgment"

10.     While Chrysler acknowledges the lack of precedent for the bankruptcy of a once major automobile manufacturer (Rejection Motion at ¶20), it simply presumes that this Court will apply the business judgment standard to its decision to reject the dealer contracts.  However, given the magnitude of the Debtors' requests, this Court should not simply adopt the "business judgment standard," but instead it must give careful consideration to an appropriate standard for determining whether rejection is appropriate.

11.     In the context of a debtor's attempt to reject a collective bargaining agreement, the Supreme Court has held  that the standard should be stricter than the traditional "business judgment" standard, even though there is nothing in Section 365 to suggest that a different standard should apply.  National Labor Relations Bd. v. Bildisco, 465 U.S. 531, 523-24 (1984), *superseded by statute*, 11 U.S.C. § 1113.  In reaching its conclusion, the Supreme Court explained that, because of the special nature of the rights created for workers by collective bargaining agreements, a bankruptcy court should not reject a collective bargaining agreement unless the debtor can show that the collective bargaining agreement burdens the estate and that after careful scrutiny, the equities balance in favor of rejecting the contract.  Id., 465 U.S. at 525-26.  In fashioning this standard, the Court found that the bankruptcy court must balance the interests of the affected parties (including the debtor, creditors, and employees) and that in striking the balance, the court should consider both the type and the degree of hardship faced by each party.  Id. at 527. Moreover, the Court stated that the bankruptcy court "must have great latitude to consider any type of evidence relevant to" the issue of rejection. Id.

12.     Like the special rights created by collective bargaining agreements, the dealer agreements that the Debtors are seeking to reject create special rights for Mt. Clemens Dodge and other similarly situated dealers by virtue of state dealer laws, including the state dealer law in Mt. Clemens Dodge's home state of Michigan, being MCL 445.1561 *et seq.*  The Michigan and other state dealer laws are specifically intended and designed to protect the important rights of dealers in connection with, among other

things, the termination of franchise agreements. These laws recognize the imbalance in the bargaining power between automobile manufacturers and dealers, as well as the extreme hardship that dealers would incur if automobile manufacturers were able to terminate franchise agreements at will without any further obligations. Given the special rights created for the dealers under the dealer laws, this Court should apply a standard similar to that set forth in Bildisco to determine whether to reject the agreements with Mt. Clemens Dodge and the other dealers.

### ii.    Debtors cannot satisfy even the "business judgment" standard

13.    Contrary to the suggestions of the Debtors, rejection motions are not to be merely rubber-stamped by Bankruptcy Courts. Instead, a debtor's business judgment to reject a contract must undergo careful scrutiny to ensure that its decision is in the best interests of the unsecured creditors of the bankruptcy estate, and will not result in disproportionate harm to the non-debtor party to the contract. See, e.g., In re Monarch Tool & Mfg. Co., 114 B.R. 134, 137 (Bankr. S.D. Ohio 1990); In re Petur U.S.A. Inst. Co., Inc., 35 B.R. 561, 563-64 (Bankr. W.D. Wash. 1983); In re Midwest Polychem, Ltd., 61 B.R. 559, 562 (Bankr. N.D. Ill. 1986) (recognizing that judicial approval of contract rejection is not a "rubber stamp," balancing equities when assessing business judgment, and disallowing rejection that would not necessarily have benefited the debtor's unsecured creditors and could have "mortally wounded" the counterparty). See also In re Chi-Feng Huang, 23 B.R. 798, 801 (B.A.P. 9th Cir. 1982) (rejection involves a balancing of interests such that the court should refuse to authorize rejection where the non-debtor would be damaged disproportionately to the benefit to be derived by the general

creditors); <u>Infosystems Tech., Inc. v. Logical Software, Inc.</u>, C.A. No. 87-0042, 1987 U.S. Dist. LEXIS 6285, at *2-4 (D. Mass. Jun. 25, 1987) (<u>citing</u> <u>Huang</u>, <u>Midwest Polychem</u>, and <u>Petur</u> in reversing bankruptcy court's authorization of rejection of distributorship agreement under "bad faith, whim, or caprice" standard, and ordering the court to consider whether rejection will benefit general unsecured creditors, which includes balancing of interests and whether disproportionate harm would result to non-debtor).

14.     In considering the debtor's motion to reject an exclusivity agreement, the court in <u>Monarch Tool</u> pointed out that "a Chapter 11 debtor's right to reject executory contracts is not unlimited." <u>Id</u>. at 137.  Rather, "[d]isproportionate damage to the other party to the contract provides a ground for disapproving rejection." <u>Id</u>.  In disapproving the rejection, the court determined that this factor was paramount, in light of the exclusive distributorship arrangement: "Quite simply, if rejection is permitted here, Distributor will be ruined." <u>Id</u>.

15.     In <u>Petur</u>, the debtor sought to reject a 20-year license agreement granting the non-debtor the exclusive right to use, manufacture, assemble, and sell its products in Canada. <u>Petur</u>, 35 B.R. at 562.  The debtor claimed that the agreement was the single biggest cause of its financial problems and estimated that rejecting the agreement would enable it to reorganize and pay off its creditors within two years. <u>Id</u>.  The court found that rejecting the contract based upon the non-profitability of the arrangement and the possibility of obtaining better profits constituted a proper exercise of business judgment. <u>Id</u>. at 563.  Based upon "legal and equitable considerations," however, the court refused to authorize the rejection because it would force the non-debtor out of

business: "we are dealing with the actual ruination of an otherwise profitable, successful and ongoing business. Equity will not permit such a result." Id. at 563-64 (citing Chi-Feng Huang, 23 B.R. at 801).

16.     Just as in Monarch and Petur, rejection of the subject dealership agreement will put Mt. Clemens Dodge out of business. The Debtors have not and cannot seriously contest the dire impact rejection will have on the affected dealerships.

17.     The Debtors also fail to offer an explanation of the purported benefit to unsecured creditors of the Estate if rejection is granted. The Debtors do, however, acknowledge that rejection of the dealer contracts will result in hundreds of claims for breach of contract by the rejected dealerships. (Motion to Reject, ¶¶ 61-63). As a consequence, the rejections would actually harm the Debtors' estates by diluting the already existing and substantial claims against the Debtors' estates.

18.     Accordingly, Debtors have not and will not be able to demonstrate that they have exercised sound business judgment in seeking to reject the Mt. Clemens Dodge dealership contract specifically or the dealer contracts generally.

###     iii.     Mt. Clemens Dodge Is An Asset To the Debtors' Estate, Not a Liability

19.     While Debtors assert that the Rejection Motion is intended to sever underperforming dealerships, the facts tell a different story. Mt. Clemens Dodge has been a constant over-achiever for the Debtors and a continuous source of revenue, including recognition as "Best in the Nation," and "Top 50 Dodge Dealers," winner of "Leadership Challenge" and numerous other honors and awards. Indeed, Mt. Clemens Dodge generates revenues, not costs, for the Debtors. Without profitable, successful

dealerships like Mt. Clemens Dodge, the Debtors' opportunity to sell vehicles would be significantly diminished.

20.     Mt. Clemens Dodge also bears the inventory risk so that Chrysler does not. At any given time, Mt. Clemens Dodge owns a substantial new car inventory. At no cost to Chrysler, Mt. Clemens Dodge (and other dealerships like Mt. Clemens Dodge) provides consumers with a vast selection of new vehicles from which to purchase.

21.     At no cost to Chrysler, Mt. Clemens Dodge supports its physical facilities, including a new car showroom, customer service areas, and parts center. Mt. Clemens Dodge also pays for advertising and employee training.

22.     Notwithstanding the picture painted by the Debtors, Mt. Clemens Dodge and other dealers support Chrysler and provide value and revenue to the Debtors. They are not a liability.

### iv.    Debtors Cannot Justify The Proposed June 9, 2009 Rejection Date

23.     Under no circumstances should the Court approve a June 9, 2009 rejection date. Chrysler has provided no basis to justify such an expedited rejection date. It is self-evident that the more Chrysler vehicles that Mt. Clemens Dodge (and other dealers) can sell, the better for all involved (dealers, the Estate and Chrysler).

24.     In contrast, if the Court were to grant the relief requested by Debtors, Mt. Clemens Dodge would immediately be forced to close its doors and lose the ability to sell its inventory of in excess of $7 million, except upon draconian terms effectively dictated by Debtors Mt. Clemens Dodge should be allowed a period of no less than one

year to liquidate its existing inventory with the continued ability to utilize the Dodge logo and other licensed intellectual property rights.

## B. DEBTORS' CONDUCT JUSTIFIES DENIAL OF THE REJECTION MOTION

25.     Like many dealerships, Mt. Clemens Dodge was induced by Chrysler to purchase vehicles from Chrysler immediately prior to the bankruptcy filing.  Indeed, much of Mt. Clemens Dodge's current inventory on hand (valued at approximately $7 million) was purchased in the months leading up to the Petition Date in direct response to (i) pressure from Chrysler to be a "team player", i.e. by purchasing additional stock for the "good of Chrysler" despite the prevailing economic conditions; and (ii) threats that "if you don't purchase cars, I'll remember." See, Motor Authority.com February 6, 2009, quoting Jim Press, Co-President of Chrysler LLC.  Specifically, Mt. Clemens Dodge purchased, in aggregate, 130 cars more than needed for the months of December '08 – April '09.

26.     Moreover, upon information and belief, notwithstanding the grand promises made in the Rejection Letter, Chrysler has required "surviving dealers" to sign onerous agreements with major commitments (including, for example, putting new faces on their buildings) in order to remain a "surviving dealer."  This conduct necessarily limits the "surviving dealers" financial ability to buy cars from Mt. Clemens Dodge and other rejected dealerships and restricts the market for the sale of their excess inventory, especially given the obviously depressed credit market.  Such conduct cries for Court scrutiny to determine whether Chrysler has violated any state or federal anti-

tying laws. Debtors' Rejection Motion is an ill conceived attempt to constrain a free market.

27.    The Court should not condone these types of business tactics or "reward" Chrysler for its behavior. Instead, the Court should send a clear message to all businesses (including future major automotive bankruptcy debtors), that such inequitable conduct will not be allowed and, to that end, deny the Rejection Motion.

## C.    DEBTORS CANNOT STRIP MT. CLEMENS DODGE OF ITS INTELLECTUAL PROPERTY RIGHTS

### A.    Mt. Clemens Dodge's Rights Under Its Dealer Agreement Are Protected Under 11 U.S.C. 365(n)

28.    The Bankruptcy Code allows the trustee, subject to court approval, to reject or terminate executory contracts. 11 USC §365(a). This provision was perceived as having a chilling effect on intellectual property licensing because it authorized the stripping of an innocent licensee's rights—rights which are central to the licensee's ongoing business. S. Rep. 100-505, at 4 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3200, 3203.

29.    In response, Congress enacted § 365(n) to give these licensees the option to retain certain rights despite the trustee's rejection of the license. Pub. L. No. 100-506, 102 Stat. 2538 (1988). Section 365(n) strikes a fair balance between the rights of the bankrupt and the interests of the licensee of the bankrupt's intellectual property. 8 Am. Bankr. I. L. Rev. No. 2 (2000). The bankruptcy cannot terminate and strip the licensee of rights the licensee has bargained for. Id.

30.    Section 365(n) provides that, if a trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee

11

under such contract may elect to either terminate the contract or retain certain rights under the license. 11 U.S.C. § 365.

31.     Specifically, the licensee may elect to retain its rights under such contract and under any agreement supplementary to such contract, to such intellectual property, as such rights existed immediately before the case commenced, for the duration of such contract and any additional period for which such contract may be extended by the licensee under applicable nonbankruptcy law. 11 U.S.C. § 365(n)(1)(B).

32.     If the licensee elects to retain its rights to use of the intellectual property or technology pursuant to § 365(n)(1)(B) of the Bankruptcy Code, the licensor is required to: (1) provide the licensee with access to the subject intellectual property and technology; (2) not to interfere with the exercise of the licensee's rights under the license and any supplemental agreement; and (3) to comply with any exclusivity provision in the license agreement. 11 U.S.C. §365(n)(1)(B), (n)(2)(A), (n)(3)(B).

33.     In the event the dealer agreement with the Debtors is terminated, Mt. Clemens Dodge will certainly elect to retain its license to intellectual property rights under the Dealer Agreement, as these rights are essential to Mt. Clemens Dodge's business.

34.     Despite the protections afforded to Mt. Clemens Dodge under §365(n) and Mt. Clemens Dodge's desire to continue under the license agreement, the Debtors propose to deprive Mt. Clemens Dodge of the ability to continue to retain certain license rights provided under the dealer agreement in its Rejection Motion.

35.     The Debtors propose to terminate Mt. Clemens Dodge's license to display, distribute or otherwise use any signage, promotional or other materials bearing or containing the Debtors' trademarks and service marks, including without limitation, company and vehicle make and model names and logos upon rejection of the dealer agreement.    Additionally, the Debtors are attempting to prohibit Mt. Clemens Dodge from undertaking any advertising, sales, trades, repair or service of any Chrysler branded products under the terms of its dealer agreement.  Moreover, the Debtors have informed Mt. Clemens Dodge that its access to the DealerConnect internet program will be terminated upon rejection of the dealer agreement.    (See Transition period information attached hereto as Exhibit A.)

36.     The Debtors' proposed course of action is exactly what § 365(n) was enacted to protect against.

i.      **The License Granted Pursuant to the Dealer Agreement is an Executory Contract within the Meaning of §365(n).**

37.     The Bankruptcy Code does not define the term "executory contract." In construing the term "executory contract" the majority of courts, including the United States Court of Appeals for the Second Circuit, have adopted the "Countryman Definition" formulated by Professor Vern Countryman. See *In re U.S. Wireless Data, Inc.*, 547 F.3d 484, 488 (2d Cir. 2008).  Under the Countryman Definition an executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."

See Countryman, *Executory Contracts in Bankruptcy*, 57 Minn. L. Rev. 439, 446 (1973). See also In re U.S. Wireless Data, Inc.,  547 F.3d 484, 488 (2d Cir. 2008).

38.    The case law uniformly holds that license agreements are executory contracts within the meaning of §365. See In re Catapult Entertainment, Inc., 165 F.3d 747 (9th Cir. 1999) (recognizing patent license as executory); In re Superior Toy & Mfg., Co., 78 F.3d 1169 (7th Cir. 1996) (holding same for trademark license); In re Patient Educ. Media, Inc., 210 B.R. 237 (Bankr. S.D. N.Y. 1997)(recognizing same for copyright license).

39.    The dealer agreement is a license agreement.  The dealer agreements expressly grants Mt. Clemens Dodge a license to utilize the Debtors' proprietary information, and use, and sell the Debtors' goods and services.   Additionally, Mt. Clemens Dodge is  licensed as an authorized dealer to access dealer connect, an internet data base program established by the Debtor to communicate current information regarding rebates, incentives, special bulletins, service information, maintenance, and vehicle history..

40.    Therefore, Mt. Clemens Dodge's license agreement with Debtors constitutes an executory contract protected, and, thus, Mt. Clemens Dodge should be afforded the protections under §365(n).

### ii.    The Rights Granted Under the License Constitute Intellectual Property within the Meaning of §365(n) and §101(35)(A).

41.    The Debtors claim that the rights licensed to Mt. Clemens Dodge under the dealer agreement are simply trademarks or service marks, which are not rights

contemplated or protected by §365(n).   (The Debtors conveniently ignore such practical

business ramifications for rejected dealers as the necessity to change corporate names,

which, as in the case of Mt. Clemens Dodge, incorporate a Debtor name, or modifying

existing corporate websites or the like.)

42.     Section 365(n) protects intellectual property rights, which are defined by

the Bankruptcy Code to include patents, copyrights, trade secrets, and semi-conductor

mask works. 11 U.S.C. 101(35)(A); In re Gucci, 126 F.3d 380 (2d Cir. 1997).

43.     While the Debtors cite case law which has held that trademarks are not

protected as intellectual property under §365, such case law is irrelevant because the

Debtors have mischaracterized Mt. Clemens Dodge's rights under the dealer agreement

as simply trademark or service mark rights.  On the contrary, the rights licensed to Mt.

Clemens Dodge by the Debtors under the dealer agreement incorporate far broader

rights than trademark or service mark rights and easily fit within the Bankruptcy

Code's definition of intellectual property.

44.     A trademark is simply a word or name or symbol used to identify and

distinguish the goods of one manufacturer or seller from goods manufactured or sold

by others. Qualitex Co. v. Jacobson Products Co., Inc., 514 U.S. 159 (1995). Similarly, a

service mark is a word or name or symbol used to identify and distinguish the services

from one provider from the services provided by others.

45.     The license granted under the dealer agreement did not just provide for

the use of the Debtor's name. Mt. Clemens Dodge was intimately involved with the

goods and services that stood behind the logo. Mt. Clemens Dodge is selling the

Debtors' product, servicing it, marketing it, and guaranteeing its performance. The rights licensed under the dealer agreement are Mt. Clemens Dodge's entire business and livelihood.

46.     Specifically, Mt. Clemens Dodge was licensed as an authorized dealer to have direct access to DealerConnect, an on line program which communicated crucial information about the sale, service and history of new and used vehicles.

47.     The DealerConnect program clearly qualifies as intellectual property. The DealerConnect program provides Mt. Clemens Dodge and other dealers with access to critical support programs necessary to the effective operation of the dealerships.

48.     Similarly, the Third Circuit held that the right to utilize proprietary information, the manufacture, sale and use of certain goods and services constitute intellectual property for the purposes of protection for a licensee under §365(n). In re Prize Frize, Inc. 32 F.3d 426 (9th Cir. 1994). The Third Circuit held that the licensee was entitled to continue under the license for intellectual property at its discretion despite the debtor's rejection of the agreement.

49.     Therefore, the rights licensed under Dealer Agreement constitute intellectual property within the meaning of § 365(n). Therefore, Mt. Clemens Dodge is entitled to retain such rights and benefits at its discretion in the event the Dealer Agreement is rejected, contrary to the relief requested in the Rejection Motion. Thus, the Rejection Motion should be denied.

## D.   STATE DEALER PROTECTION LAWS ARE NOT PREEMPTED BY THE DEBTORS' BANKRUPTCY OR THE REJECTION MOTION

50.     Michigan's Dealer Protection Law is found in MCL § 445.1567, which

provides in relevant part:

> Cancellation, termination, nonrenewal, or discontinuance of dealer agreement; conditions; existence of good cause.

> Sec. 7. (1) Notwithstanding any agreement, a manufacturer or distributor shall not cancel, terminate, fail to renew, or refuse to continue any dealer agreement with a new motor vehicle dealer unless the manufacturer or distributor has complied with all of the following:

> (a) Satisfied the notice requirement of section 10.

> (b) Acted in good faith.

> (c) Has good cause for the cancellation, termination, nonrenewal, or discontinuance.

> (2) Notwithstanding any agreement, good cause shall exist for the purposes of a termination, cancellation, nonrenewal, or discontinuance under subsection (1)(c) when both of the following occur: (a) there is a failure by the new motor vehicle dealer to comply with a provision of the dealer agreement and the provision is both reasonable and of material significance to the relationship between the manufacturer or distributor and the new motor vehicle dealer and (b) the manufacturer or distributor first acquired actual or constructive knowledge of the failure not more than 2 years prior to the date on which notification was given pursuant to section 10.

> (3) If the failure by the new motor vehicle dealer to comply with a provision of the dealer agreement relates to the performance of the new motor vehicle dealer in sales or service, good cause shall exist for the purposes of a termination, cancellation, nonrenewal, or discontinuance under subsection (1) when the new motor vehicle dealer fails to effectively carry out the performance provisions of the dealer agreement if all of the following have occurred:

> (a) The new motor vehicle dealer was given written notice by the manufacturer or distributor of the failure.

(b) The notification stated that the notice of failure of performance was provided pursuant to this act.

(c) The new motor vehicle dealer was afforded a reasonable opportunity to exert good faith efforts to carry out the dealer agreement.

(d) The failure continued for more than 180 days after the date notification was given pursuant to subdivision (a).

51.    Chrysler insists that the state Dealer Laws are preempted by section 365 of the Bankruptcy Code because it grants the ability to accept or reject pre-petition contracts. But that section says nothing about abrogating statutory obligations that are independent of those contracts.    Michigan's Dealer Law creates statutory rights and causes of action that, at least where termination is concerned, render the contracts largely unenforceable. MCL § 445.1567. Chrysler's proposed rejection of the contracts is largely irrelevant to the preemption and damages question.  Most of the damage claims of the Michigan dealers will be fully addressed by the Michigan Dealer Law.

52.    The issue is whether section 365 of the Bankruptcy Code preempts Michigan's Dealer Law in the highly regulated automobile industry. Chrysler relies on In re Dan Hixson Chevrolet Co., 12 B.R. 917, 921 (Bankr. N.D. Tex. 1981) in claiming that it has plenary power to ignore state law obligations. Dan Hixson, however, does not so hold.   Instead, it held that the automatic stay applied to parallel Texas agency proceedings.  The upshot was that the bankruptcy court would decide the state law issues and not that the state law issues were preempted. Similarly, In re Tom Stimus Chrysler-Plymouth, Inc., 134 B.R. 676, 678079 (Bankr. M.D. Fla. 1991) did not hold that the Dealer Laws were preempted but rather merely stated that no preemption

discussion was necessary. Without such a discussion, <u>In re Tom Stimus Chrysler-Plymouth, Inc.</u> is not binding or persuasive. Similarly, <u>In re City of Vallejo</u>, 403 B.R. 72 (Bankr. E.D. Cal. 2009), although it references section 365 and the Supremacy Clause, does not discuss them and does not hold that section 365 preempts the California Dealer Law.

53. Michigan's Dealer Law significantly restricts a car manufacturer's ability to terminate a dealer agreement and requires a dealer's failure to comply with a provision of the dealer agreement before the prerequisite "good cause" is established. MCL § 445.1567.

54. Michigan's Dealer Law shifts the burden of proof to the manufacturer to prove good cause and that the statutory notice requirements were met notwithstanding any agreement to the contrary. M.C.L. § 445.1569.

55. Michigan's Dealer Law imposes notice requirements on the manufacturer notwithstanding any agreement to the contrary. M.C.L. § 445.1570.

56. Michigan's Dealer Law requires fair compensation for vehicles purchased. M.C.L. § 445.1571.

57. Michigan's Dealer Law also requires the manufacturer to indemnify it from certain claims arising from the sale of the manufacturer's vehicles notwithstanding any agreement to the contrary. M.C.L. § 445.1579.

58. Finally, Michigan's Dealer Law provides:

§ 445.1580. Action for damages or declaratory judgment; liability.

Sec. 20. (1) If a manufacturer or distributor terminates, cancels, fails to

renew, or discontinues a dealer agreement for other than good cause as defined in this act, the new motor vehicle dealer may bring an action against the manufacturer or distributor to recover actual damages reasonably incurred as a result of the termination, cancellation, failure or discontinuance.

(2) A manufacturer or distributor who violates this act is liable for all damages sustained by a new motor vehicle dealer as a result of the violation.

(3) A manufacturer or distributor or new motor vehicle dealer may bring an action for declaratory judgment for determination of any controversy arising pursuant to this act.

(4) A manufacturer or distributor who violates this act shall be liable for all court costs and reasonable attorney's fees incurred by the dealer.

59.    In short, Michigan's Dealer Law strongly regulates the dealer-manufacturer relationship.

60.    Michigan's Dealer Law reflects a strongly-held public policy that protects decades-long investments in a brand and in a community.

61.    Michigan's state policy interest is paramount to Chrysler's interest in closing down hundreds of dealers in the next few weeks.

62.    Chrysler claims that Michigan's Dealer Law (and all other state Dealer Laws) is preempted through field preemption and conflict preemption. Chrysler does not and cannot argue that the Bankruptcy Code expressly preempts State Dealer Laws because the Bankruptcy Code is silent on that point.

63.    Field preemption, which occurs where "Congress evidences an intent to occupy a given field," Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984), cannot apply. Chrysler presents no evidence of such Congressional intent to occupy the field of protecting local auto dealers.

64.    Congress did not intend for the Bankruptcy Code to pre-empt all state laws. <u>Midadlantic Nat'l Bank</u>, 474 U.S. at 505.

65.    Conflict preemption applies where state law prevents the "accomplishment and execution of the full purposes and objectives of Congress." <u>Barnett Bank, N.A. v. Nelson</u>, 517 U.S. 25, 31 (1996).  Chrysler claims that any limitation on its ability to immediately terminate its dealer agreements is preempted regardless of the health and welfare of the community.

66.    Immediate termination of the Michigan Dealers will cause unnecessary bankruptcies, unemployment and waste, which will lose millions of dollars to save Chrysler pennies.  Such a circumstance is wholly inconsistent with the Bankruptcy Code policy to minimize and not aggravate financial chaos and disruption.  <u>In re Friaton Estate Corp.</u>, 65 B.R. 586, 594 (Bankr. S.D.N.Y. 1986).

67.    There is no conflict preemption because the Bankruptcy Code and Michigan's Dealer Law are not in conflict.

68.    Dealer Laws create fair and equitable termination procedures which conflicts with no provision of the Bankruptcy Code.  <u>Robinson v. Michigan Consol. Gas Co.</u>, 918 F.2D 579, 588 (6th Cir. 1990) (Bankruptcy Code provisions that permit termination of utility service do not preempt state law procedures which require utility service termination procedures").

69.    Assuming *arguendo* that Michigan's Dealer Law is within a field that the Bankruptcy Code occupies or is in conflict with some Bankruptcy Code provision, 28 U.S.C. § 959 mandates that Michigan's Dealer Law is not preempted. Congress enacted

28 U.S.C. § 959 to require debtors to operate according to state law requirements. Midatlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection, 474 U.S. 494, 505 (1986). 28 U.S.C. § 959 limits the Bankruptcy Code, which limit is most important when requiring debtors to comply with state statutes that reflect strong public policy interests. In re White Crane Trading Co., 170 B.R. 694, 705 (Bankr. E.D. Cal. 1994).

70.    The complexity and novelty of the issues raised here implicate due process concerns of notice and opportunity to be heard. In re Victory Mkts., 221 B.R. 298, 310 (B.A.P. 2d Cir. 1998) (due process applies in the bankruptcy process).

71.    The Bankruptcy Code does not preempt the Federal Automobile Dealers Day in Court Act. Even if the Michigan Dealer Law is preempted, such relief may contravene the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221, *et seq.*, ("Dealers' Act"), which is not preempted. The Dealers Act is a federal remedial statute enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices. In re Frank Meador Buick, 13 B.R. 841, 844 (W.D. Va. 1981). The Dealers' Act authorizes an action to be brought against an automobile manufacturer that acts in bad faith in terminating the dealer's contract. 15 U.S.C. § 1221.

72.    The Court should permit discovery to determine whether Chrysler acted in bad faith in terminating [the client's] dealer agreement. In re Frank Meador Buick, 13 B.R. at 844-46.

## LEGAL MEMORANDUM

73.     Mt. Clemens Dodge submits that the points and authorities adopted herein satisfy the requirements of Local Bankruptcy Rule for the Southern District of New York, 9013-1(b).

## RESERVATION OF RIGHTS

74.     Mt. Clemens Dodge hereby expressly reserves its right to assert additional objections to the Rejection Motion by way of a supplemental objection to the Rejection Motion, at the hearing on the Rejection Motion, or otherwise, which supplemental objections shall be deemed incorporated herein and timely asserted with regard to the Rejection Motion.

WHEREFORE, based upon the foregoing, Mt. Clemens Dodge respectfully requests that the Court deny the Rejection Motion and that the Court grant such other and further relief as is just and equitable.

CARSON FISCHER, P.L.C.
*Attorneys for Mt. Clemens Dodge, Inc.*

By: /s/ Patrick J. Kukla
Robert A. Weisberg (P26698)
Patrick J. Kukla (P60465)
4111 Andover Road, West-2nd Flr.
Bloomfield Hills, MI 48302
Tele: (248) 644-4840

Dated: May 22, 2009

# EXHIBIT

# A

# Transition Period Information

## New Vehicle Inventory

As a result of its recent bankruptcy filing, Chrysler LLC is under no obligation to repurchase your new vehicle inventory. However, we will assist with the redistribution of as many of your eligible vehicles as possible, among the dealers remaining in the Chrysler network. All vehicles will be inspected by a third party for equipment, damage, and mileage prior to redistribution. Any vehicles "reported sold" and in stock will not qualify.

Vehicle eligibility will be as follows:
- New and unused
- Undamaged
- No demos
- No more than 125 miles
- No vehicle previously reported sold

## Parts and Accessory Inventory

### Redistribution of Parts
As a result of its recent bankruptcy filing, Chrysler LLC is under no obligation to repurchase your Mopar parts inventory. However, we will endeavor to match you with a dealer to consider purchase of your parts. This redistribution will occur among the dealers remaining in the Chrysler network. All agreements and transactions will be between the buying and selling dealers.

With your agreement, your parts inventory information will be provided to the remaining dealerships. The sales, payment, and delivery terms of the parts inventory are between dealerships.

### Parts Ordering
Ordering will remain available for Daily Stock and Special Handling orders. Order delivery and return pick-up will continue per current delivery schedules.

At the time the rejection motion is filed, dealerships subject to rejection that are enrolled in ARO (Automatic Replenishment Ordering) will be removed from the program to alleviate an increase in dealer parts inventories.

## Essential/Special Tools

As a result of its recent bankruptcy filing, Chrysler LLC is under no obligation to repurchase your Essential/Special tools. However, we will assist with the redistribution of as many of your Essential/Special tools as possible. This redistribution will occur among the dealers remaining in the Chrysler network. All agreements and transactions will be between the buying and selling dealers.

**Warranty Claims Processing**

All Warranty, MOPAR, Recall and Transportation Claims must be submitted to Chrysler Motors LLC for payment by June 16th, 2009 or seven (7) days after the expected court approved rejection date, whichever occurs later. Approved and processed claim payments will be credited to your Dealer Statement.
- Warranty repairs performed after the rejection date are not eligible for payment.
- Submission of claims via DealerConnect is available until June 16th or seven (7) days after the expected court approved rejection date, whichever occurs later.
- Upon rejection all current Warranty Material Return requirements remain in effect until June 16th or seven (7) days after the court approved rejected date, whichever occurs later.
- Continue to maintain all supporting documents in the event of claim denials or chargebacks.

**Sales Incentive Claims Processing**

Incentive Claim Processing will be available for final claim submission and payment until June 16th, 2009 or seven (7) days after the court approved rejection date, whichever occurs later. Approved and processed claims will be credited to your statement, and the Incentive Payment Detail will be available for 90 days past the rejection date for your review.

- Only those new vehicles retailed to bona fide customers prior to June 9, 2009 are eligible to be reported through the NVDR system.
- Vehicles with retail delivery dates prior to June 9, 2009 must be reported through the NVDR system in order for incentive claims to be processed.
- If a vehicle is reported through the NVDR system and incentives are claimed, that vehicle can not be redistributed to another dealer's inventory.
- Incentive claims not paid prior to June 9, 2009 will be credited to the Dealer Statement and will be reconciled before the account is closed.
- Chrysler reserves the right to reject any claims for incentives that do not meet established program rules as indicated in the Gold Book.

**Brand Signs**

Upon rejection, all Chrysler Motors LLC owned signage will be removed at the earliest possible date.

**DealerConnect Access**

All DealerConnect user S-ID access, with the exception of the Dealer Principal, will be deactivated on the rejection date. Thereafter, only the Dealer Principal's S-ID and password will be able to access and utilize available applications within DealerConnect.

**Discontinued Use of Chrysler LLC Trade Names, Trademarks, Logos, etc.**

After June 9th or the court approved rejection date of your Sales and Service Agreement, whichever occurs later, you must immediately discontinue using any trade names applicable to Chrysler LLC and its subsidiaries in your corporate, firm or trade name and using any trade names, trademarks or insignias adopted or used by Chrysler LLC or its divisions, parent, affiliate or subsidiary companies, and take such steps as may be necessary to change such corporate, firm, or trade name. In addition, you must eliminate advertising containing any such trade names, trademarks or insignias, or anything else that would identify you as an authorized dealer for Chrysler Motors vehicles or products.