Rejection Motion Hearing: June 3, 2009 at 11:00 A.M.
Objection Due: May 26, 2009 at 4:00 P.M.

MURTHA CULLINA LLP
CityPlace I-185 Asylum Street
Hartford, CT 06103
Telephone: (860) 240-6000
Facsimile: (860) 240-6150
Robert E. Kaelin
rkaelin@murthalaw.com

Counsel for Jim Boast Dodge, Inc.

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X

| | |
|---|---|
| In re: | Chapter 11 |
| Chrysler LLC, et al.,, | Case Nos. 09-50002 (AJG) |
| Debtors. | (Jointly Administered) |

------------------------------------------------------------ X

**OBJECTION OF JIM BOAST DODGE, INC. TO THE
DEBTORS' MOTION FOR AN ORDER PURSUANT TO
SECTIONS 105, 365 AND 525 OF THE BANKRUPTCY
CODE AUTHORIZING THE REJECTION OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES
WITH CERTAIN DOMESTIC DEALERS AND FOR OTHER RELIEF**

Jim Boast Dodge, Inc., d/b/a Bob Boast Dodge ("JBD" or "Bob Boast Dodge"), a stand alone Florida Dodge Dealer, by and through its attorneys, hereby submits this Objection to the Motion For an Order Pursuant to Sections 105, 365 and 525 of the Bankruptcy Code Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases with Certain Domestic Dealers and For Other Relief (Doc. No. 780) (the "Rejection Motion") filed by Chrysler LLC and 24 of its domestic and indirect subsidiaries (collectively, the "Debtors" or "Chrysler").

As more fully set forth below, the Court must deny the Rejection Motion as to JBD for the following reasons: (1) the Debtor has failed to comply with Fed. R. Bankr. P. 6006(f)(6) and has not demonstrated grounds for ignoring that Rule; (2) 28 U.S.C. § 959 preempts and otherwise mandates that any proposed rejection of JBD's Dealer Agreement be in compliance with state law – and undeniably the Debtors are flagrantly ignoring and violating Florida's state statute, Fla. Stat. § 320.641, regarding the discontinuance of any dealer franchise agreements; and (3) the Debtors have not and cannot satisfy the "business judgment" test with respect to rejecting JBD's Dealer Agreement.

In support of its Objection, JBD states as follows:

## PROCEDURAL AND BACKGROUND INFORMATION

<u>Prepetition History Between JBD and Chrysler</u>

1. The Boast family has been a Dodge dealer for almost 70 consecutive years. (Affidavit of James F. Keedy dated May 22, 2009 "Keedy Aff." attached hereto as Exhibit 1, ¶ 4.) Jim Boast, Sr. was a Dodge dealer near Cleveland, Ohio during the 1940's and in the early 1950's moved to Leesburg, FL and opened a Dodge, Desoto, Fiat dealership at that location. (<u>Id.</u>) Jim Boast, Jr. worked for his father at the Leesburg, FL location until 1963 when Jim Boast, Jr. opened the dealership in Bradenton, FL now known as Bob Boast Dodge. (<u>Id.</u>) In 1991, Bob Boast, the son of Jim Boast, Jr. and grandson to Jim Boast, Sr. purchased his father's interest in the corporation Jim Boast Dodge, Inc. and was the dealer principle at Bob Boast Dodge until his death. (<u>Id.</u>) Since March 30, 2003, Mr. Keedy has been the owner and operator of the dealership known as Bob Boast Dodge in the capacity of Trustee of the Robert James Boast (Bob Boast) Marital Trust. (<u>Id.</u>)

2. For the year 2003 through 2008 inclusive generated net income such that the Dealership was in a top tax bracket. (Keedy Aff., ¶ 6.)

3. During the last six years and currently, Chrysler has provided no financial assistance to Bob Boast Dodge. (Id., ¶ 7.) The corporation, which is the owner of Bob Boast Dodge, pays all expenses, facility cost, advertising, personnel and all other expenses to own and operate the dealership. (Keedy Aff., ¶ 7.)

4. The termination of Bob Boast Dodge does not in any way save Chrysler any money. (Keedy Aff., ¶ 7.) Conversely for Chrysler to cancel 25% of its dealer body is simply to reduce the number of its customers by 25%. (Id.)

5. In October, 2005, JBD commenced a legal action against Chrysler in the United States District Court for the Middle District of Florida, entitled <u>Jim Boast Dodge, Inc. v. Daimler Chrysler Motors Company, LLC</u>, Doc. No. 8:05-CV-1999-T-30 MAP (the "Florida Action"). (Keedy Aff., ¶ 8.) After months of litigation, discovery, depositions, and motions for summary judgment, in June of 2007, Chrysler and JBD settled the Florida Action pursuant to a written settlement agreement. (Id.)

6. Pursuant to the terms of the Settlement, Chrysler agreed, among other things, for a period of two years from the effective date not to take any adverse action against Bob Boast Dodge relating to or based upon new vehicle sales performance as measured against the Minimum Sales Performance for Bob Boast Dodge as determined by Chrysler. (Keedy Aff., ¶ 9.) The two year period has not yet expired. (Id.)

7. The Debtors have not sought to reject the Settlement Agreement and without knowing more specifics as to why the Debtors are really seeking to terminate Bob Boast Dodge, Chrysler is going to be in breach of the Settlement Agreement. (Keedy Aff., ¶ 10.)

8. Earlier this year, between January through March, JBD noticed that the Debtors began a high pressure campaign for dealers to order extra inventory. (Keedy Aff., ¶ 11.) The stated goal was to vastly increase shipments and sales to their dealers in order to convince the United States government of Chrysler's viability to avoid a possible bankruptcy. (Id.)

9. All Chrysler dealers in the United States were under severe pressure to order extra inventory to the point that on February 13, 2009, there was a telephone conference between the Chrysler executives and all dealers in the United States wherein the President of Chrysler, James Press, actually threatened the dealer body by explaining that the dealers that were accepting more units, even though they did not need them, were helping the corporation avoid bankruptcy and helping the corporation survive. (Keedy Aff., ¶ 11.) JBD was told, among others, that the dealers that were not ordering their full allocations for January, February and March of 2009 were not helping the corporation and those dealers better hope that Chrysler did not survive because Mr. Press and the other Chrysler executives knew who the dealers were that were not ordering their full allocation and they would never forget that those dealers did not help the company when it desperately needed help. (Id.)

10. Significantly, approximately 7 to 10 days later, after the date had passed to order additional Chrysler line units, Mr. Press, in another national telephone conference apologized for his earlier remarks. (Keedy Aff., 12.)

11. Each time Chrysler has a telephone conference with its dealer body there is always an announcement prior to the conference that each conference is being recorded. (Keedy Aff., ¶ 13.) Subsequent to February 13, 2009, the date of the telephone conference between Mr. Press and the dealer body, Mr. Keedy wrote to Mr. Press' office requesting a copy of said recording so as to preserve his threatening

4

remarks. (Keedy Aff., ¶ 14., see Exhibit A thereto.) A few days, a representative from Mr. Press' office called explaining that due to "unforeseen technical difficulties" tapes of that particular phone conference were not available. (Id.) More than a small coincidence.

12. During the months of January through March of 2009, the allocation of units to order for Bob Boast Dodge was approximately 60 units. (Keedy Aff., ¶ 15.) During that same period of time, Bob Boast Dodge only ordered 4 units. (Id.)

13. As a result of the above, the Debtors failed to pay several thousand dollars in warranty claims owed to Bob Boast Dodge for February, 2009. (Keedy Aff., ¶ 16.) On February 9, 2009, Bob Boast Dodge personnel contacted Dean Wittholz, the Chrysler Southeast Business Center individual charged with approving said warranty claims. (Id., ¶ 17; see Exhibit B which is an E-Mail to Mr. Wittholz.) In response, Mr. Wittholz advised that he would not be able to deal with the payment of these claims in the normal course of business for Bob Boast Dodge because Bob Boast Dodge had failed to order all of its' allocated inventory in January and February and noted that those Dealers who hadn't agreed to purchase more cars are being moved to a "lower priority." (Keedy Aff., ¶ 17; see Exhibit C thereto which is Mr. Wittholz's E-Mail.)

The Bankruptcy Filing

14. On April 30, 2009 (the "Petition Date"), the Debtors filed petitions under Chapter 11 of the Bankruptcy Code with this Court. Since the Petition Date the Debtors have operated their businesses and managed their properties as debtors-in-possession pursuant to Bankruptcy Code Sections 1107 and 1108.

15. On May 3, 2009, the Debtors filed the Motion Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code seeking an Order, among other things, Authorizing

5

the Sale of Substantially All of Its Assets and Granting Certain Related Relief (Doc. No. 190) ("the "Sale Motion").

16. As represented by the Debtors, these Chapter 11 cases were filed with the purpose to sell assets *"without delay."* (Sale Motion, ¶ 1 *emphasis added*.) To support this expedited process, the Debtors contend that this sale process will achieve the ultimate goals of a Chapter 11 reorganization process and maximizing value. (Sale Motion, ¶ 6.)

17. Following on the heals of the Sale Motion was the filing of the Rejection Motion on May 14, 2009 with a hearing date only nineteen (19) days later on June 3, 2009. Convenient to the Debtors goal of pursing its objectives in this Chapter 11 "without delay" and without any due process considerations, the Debtors set the objection deadline for Tuesday, May 26, 2009 – twelve (12) days later, not to mention falling over the extended national Memorial Day holiday weekend!

18. For JBD and the other approximately 781 Dealers around the country, who had sprung on them last week the shocking news that their livelihoods, as well as those of their employees, and their years of dedicated affiliation with the Debtors, was about to come to an *expedited* crashing halt effective June 9th, they were given a mere twelve (12) days to retain legal counsel and file an Objection to the Rejection Motion!

19. While the Debtors purportedly had sufficient time to determine which Dealers would be eliminated as they allege the decision was based on "extensive analysis" (Rejection Motion, ¶ 19), which one would reasonably conclude means over time and not with haste, the Dealers on the other hand get a mere 12 days because now the Debtors allege rejection, like everything else in this case, must happen *"without delay."* (Rejection Motion, ¶ 48, emphasis added.) While the Debtors may hope for

6

results without delay, for the reasons set forth below, the Court must deny the Rejection Motion as to JBD.

## ARGUMENT

**The Rejection Motion Must Be Denied as the Debtor Has Failed to Comply With Fed. R. Bankr. P. 6006(f)(6) and Has Not Demonstrated Grounds for Ignoring That Rule**

20. The Rejection Motion must be denied as the Debtor has failed to comply with Federal Rule of Bankruptcy Procedure 6006(f). Bankruptcy Rule 6006(f) provides:

> A motion to reject or, if permitted under subdivision (e), a motion to assume or assign multiple executory contracts or unexpired leases that are not between the same parties shall:
> (1) state in a conspicuous place that parties receiving the omnibus motion should locate their names and their contracts or leases listed in the motion;
> (2) list parties alphabetically and identify the corresponding contract or lease;
> (3) specify the terms, including the curing of defaults, for each requested assumption or assignment;
> (4) specify the terms, including the identity of each assignee and the adequate assurance of future performance by each assignee, for each requested assignment;
> (5) be numbered consecutively with other omnibus motions to assume, assign, or reject executory contracts or unexpired leases; and
> (6) be limited to no more than 100 executory contracts or unexpired leases.

Fed. R. Bankr. P. 6006(f).

21. In this case, the Debtors seek to disregard the Rule's specific prohibition against combining more than 100 executory contracts in one omnibus motion and ask this Court to waive that provision as to the 789 executory contracts at issue. (Rejection Motion, ¶¶ 70-71.)

22. Besides failing to seek approval in advance of actually filing the Omnibus Motion, the Debtors fail to cite any legal support for this extraordinary relief. The Debtors' assertion that a court may order exceptions to the Rule (Rejection Motion, ¶ 71) is misplaced. Pursuant to the 2007 Advisory Committee Notes to the Rule, "An omnibus motion to assume, assign, or reject multiple executory contracts and unexpired

7

leases must comply with the procedural requirements set forth in subdivision (f) of the rule, unless the court orders otherwise. These requirements are intended to ensure that the non-debtor parties to the contracts and leases receive effective notice of the motion." USCS Bankruptcy R. 6006 (emphasis added).

23. While subsections (1) through (5) of Rule 6006(f) set forth the notice requirements for non-debtor parties, which pursuant to the Advisory Committee Notes, must be followed unless a court orders otherwise, Subsection (6), however, pertains only to the 100 contract limitation and there is no provision in the Rule allowing for the combination of more than 100 contracts in one omnibus motion. 10-6006 Collier on Bankruptcy 6006.05 (Alan N. Resnick & Henry J. Sommer eds.-in-chief, 15th ed. rev. 2009) (stating, "That omission would appear to be intentional, so the court should not entertain a request ... to allow the filing of such a large omnibus motion...." If a purchaser is assuming more than 100 contracts and leases, then more than one motion will have to be filed.

24. As set forth in the Administrative Order Establishing Case Management and Scheduling Procedures (Doc. No. 661) ("Administrative Order"), Omnibus hearings shall be deemed evidentiary hearing at which witnesses may testify. (Administrative Order, p. 10, ¶ 15.) Similarly, Federal Rule of Bankruptcy Procedure 6006(a) governing the procedures for a motion to reject an executory contract provides that such proceeding shall be governed by Rule 9014, which governs contested hearings.

25. Thus, rather than a more manageable contested, evidentiary hearing providing parties their respective rights as otherwise contemplated by all the aforementioned Rules and Order, based on the Debtors' bold assertions that some how all 789 dealers all around the country are the same and the rationale for rejecting the contracts is the same, this can all be done at once. JBD respectfully submits that the

Debtors do not get to unilaterally re-write the Rules and JBD believes it is entitled to challenge the rationale for its proposed rejection in a more meaningful and manageable proceeding.

26. Accordingly, for this reason, JBD submits the Court must deny the Rejection Motion.

**The Rejection Motion Must Be Denied Because 28 U.S.C. § 959 Preempts and Otherwise Mandates That the Debtor Comply With Florida's State Statute Governing Any Proposed Termination of JBD's Dealer Agreement**

27. As with ignoring a procedural rule, Chrysler's attempt to reject its Dealership Agreement with JBD in a matter of a mere 19 days flies squarely in the face of Florida's Motor Vehicle Dealer Protection Act, which provides that a licensee must give to a motor vehicle dealer and the Florida Department of Highway Safety and Motor Vehicles at least 90 days notice of its intention to terminate a franchise agreement. Fla. Stat. § 320.641(1)(a).

28. The Debtors, however, argue in the abstract that Section 365 of the Bankruptcy Code allows it to ignore altogether state dealer protection laws, or indeed any state laws regarding the rejection of contracts in the context of bankruptcy. (Rejection Motion, ¶¶ 49, 56.) Such an argument is wrong as a broad matter of policy.

29. The Bankruptcy Code does not preempt all state and local laws. In re Kennise Diversified Corp., 34 B.R. 237, 245 (Bankr. S.D.N.Y. 1983) ("The provisions of the Bankruptcy Code do not and are not intended to provide an automatic mechanism for relieving property owners of the unpleasant effects of valid local laws embodying police and regulatory provisions.").

30. More specifically, in making its argument, the Debtors turn a blind eye to 28 U.S.C. § 959(b), which provides, "Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United

States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof" (emphasis added).

31. Section 959(b) evidences that "Congress did not intend for the Bankruptcy Code to pre-empt all state laws." Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot., 474 U.S. 494, 505 (1986). See also In re Synergy Dev. Corp., 140 B.R. 958, 959 (Bankr. S.D.N.Y. 1992) ("A chapter 11 debtor 'is not *pro tanto* excused by virtue of its bankruptcy from complying with valid and enforceable state and local regulations. By virtue of 28 U.S.C. § 959(b), it is required to obey them'") (quoting In re Beker Indus. Corp., 57 B.R. 611, 624 (Bankr. S.D.N.Y. 1986).

32. Indeed, federal courts, including this Southern District of New York, have found Section 959(b) to allow the application of state and local law in the context of Section 365 of the Bankruptcy Code. See, e.g., In re Friarton Estates Corp., 65 B.R. 586, 588 (Bankr. S.D.N.Y. 1986) (finding that Section 959(b) "obviate[s] the effect of the Supremacy Clause of the United States Constitution" and thus that a debtor "cannot avoid the application of New York City rent control or housing laws through use of Code § 365); Saravia v. 1736 18th Street, N.W., Ltd. P'Ship, 844 F.2d 823, 826 (D.C. Cir. 1988) ("no inherent conflict exists between section 365(h) of the bankruptcy code and section 959(b) of the judicial code. Nothing in the bankruptcy code or in reason leads to the debtor's desired conclusion that District of Columbia housing law is preempted by the federal right of rejection in section 365").

33. The Debtors rely on a number of cases to support its contention that it may ignore state dealer laws. (Rejection Motion, ¶ 50-54.) None deal directly with

10

Section 959(b). One case cited by the Debtors – In re Tom Stimus Chrysler-Plymouth, Inc., 134 B.R. 676 (Bankr. M.D. Fla. 1991) – is notable not for its relevance, but rather for the remarkable irony quotient created by the Debtors citing it. In that case, when it was to its benefit, the Debtors made the very same argument that it is attempting to defeat today: namely, that the Florida Motor Vehicle Dealer Protection Act should apply in the face of Section 365 of the Bankruptcy Code. The court in Tom Stimus provided no discussion of a Section 959 preemption issue. As such, the decision is not compelling precedent.

34. Here, applying the Florida Motor Vehicle Dealer Protection Act and thus requiring the Debtors to furnish the required 90-day notice rather than taking the drastic step of rejecting a franchising agreement in a mere three weeks would in no way frustrate the purpose of Section 365.[1] If anything, denying application of the 90-day notice provision would frustrate the fundamental due process rights of a Florida motor vehicle dealership under Florida law.

35. Accordingly, Section 959(b) and hence the Florida Motor Vehicle Dealer Protection Act apply. The Debtors must furnish both JBD as well as the Florida Department of Highway Safety and Motor Vehicles of its intent to cancel the franchising agreement at least 90 days prior to such cancellation.

---

[1] Although JBD believes the Debtors should have to fully comply with Florida Motor Vehicle Dealer Protection Act in seeking to terminate its Dealer Agreement, and without waiving that argument at the present, assuming the Debtors contend full compliance with the Florida law frustrates the Bankruptcy Process, they cannot, regardless escape the 90 day notice requirement.

### The Rejection Motion Must Be Denied as the Debtors Has Not and Cannot Satisfy the "Business Judgment" Test With Respect to Rejecting JBD's Dealer Agreement

36. Assuming, *for sake of argument*, the Court was to find that the Debtors' authority to reject JBD's Dealer Agreement is not preempted by 28 U.S.C. § 959, JBD submits that the Debtor cannot demonstrate that the proposed rejection of its Dealer Agreement meets the "business judgment" test. It is, after all, the Debtors' burden of proof to demonstrate that rejection will benefit the estate. Sundial Asphalt Co. v. V.P.C. Investors Corp. (In re Sundial Asphalt Co.), 147 B.R. 72, 81 (Bankr. E.D.N.Y. 1992).

37. JBD does not dispute that the standard governing the decision to reject an executory contract or lease under Section 365 is the "business judgment" test. That test is not, however, unfettered discretion, but a standard "which basically means that if it makes economic sense for the debtor in the judgment of management." In re Delta Air Lines, Inc., 359 B.R. 468, 476 (Bankr. S.D.N.Y. 2006) (citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984)).

38. The "business judgment" test enables the court to consider as a factor in approving the rejection of a contract the rights of vendees and other affected parties. Sundial Asphalt Co., 147 B.R. at 81-82. While the primary issue when applying the "business judgment" test is whether rejection would benefit the general unsecured creditors, it does also include a balancing of interests. Id. at 82. Moreover, the Court may refuse to authorize rejection where the party whose contract is to be rejected would be damaged disproportionately to any benefit to be derived by the general creditors of the estate. Id.

39. Despite the blanket assertion that the decision to reject hundreds of dealerships agreements all across the country was based on the alleged "sound exercise of their business judgment and after extensive analysis" (Rejection Motion,

¶ 19), JBD submits that the decision <u>as to its proposed rejection</u> is made based on retaliation for JBD having previously sued Chrysler (Keedy Aff., ¶ 8) and for JBD having not given into the pressure being exerted by the Debtors in the months leading up the filing by taking an increased allotment of new vehicles. (Keedy Aff., ¶¶ 11-15.)

40.  In light of a long history together and very strong sales levels, it is more than reasonable to surmise the Debtors are carrying through on Mr. Press' threats during the February 13, 2009 Conference Call (Keedy Aff., ¶¶ 11, 22) which even became apparent in how the Debtors were responding to JBD's warranty claims – those not purchasing more cars have been moved to a "lower priority." (Keedy Aff., ¶ 17.) It would seem that "lower priority" has now become extinction. This does not appear to be the test for "making economic sense.

41.  It will be worth finding out, however, in discovery, which is clearly called for by Bankruptcy Rules 6006 and 9014, how many other dealers who failed to adhere to the Debtors threats have now found themselves on the chopping block.

42.  Since the Debtors are, upon information and belief, retaining many other stand alone dealers, JBD disputes any claim it is being eliminated because it is a stand alone Dodge Dealer. Again, only through discovery can the truth be told. Furthermore, to the extent the Debtors' rejection decision as to JBD is premised on so-called market consolidation, that too appears undercut by Mr. Press' recent alleged statements that Chrysler will, despite closures, be back in those markets. (<u>See</u> Exhibit D to Keedy Aff.)

43.  Moreover, leaving JBD in place does not cost the Debtors anything, while its termination unequivocally will result in a large rejection claim against the Debtors' estates (for both breach of the Dealership Agreement and breach of the Settlement Agreement). This is not going to benefit general unsecured creditors, at least not as being proposed by the Debtors.

13

44. Finally, in balancing the equities, with no credible evidence presented as to the cost to the estates, rejection will clearly put an end to a independently owned dealer, result in the loss of some 47 jobs, and leave JBD with a lot full of inventory and parts for which it will be lucky to get pennies on the dollar for if rejection is accomplished in the manner in which the Debtors propose. (Keedy Aff., ¶¶ 18-21.)

45. Accordingly, based on the aforementioned, and without the benefit of the discovery JBD intends to pursue, the Court must deny the Rejection Motion as to JBD.

### Omnibus Hearing Practice Disclosure

46. Pursuant to the Administrative Order, and to the extent the hearing is not postponed for reasons requested above, JBD intends to call James F. Keedy as a witness. Mr. Keedy will testify in conformity with his attached Affidavit, most notably regarding the contents of Mr. Press' statements during the February 13, 2009 Conference Call.[2] Mr. Keedy will present the exhibits to his Affidavit, documents demonstrating the financial performance of JBD, demonstrating the financial harm if rejection is permitted and potentially having to present the contents of the Settlement Agreement.[3]

### Memorandum of Law

47. JBD submits that the legal authority set forth above satisfies the requirements of S.D.N.Y. LBR 9013-1.

---

[2] Without question Mr. Keedy's testimony regarding what Mr. Press stated is admissible evidence and not hearsay in accordance with Fed. R. Evid. 801(d)(1).

[3] As the Settlement Agreement contains a Confidentiality Provision, JBD will coordinate with Debtors' counsel how best to handle this document.

WHEREFORE, based on all the aforementioned reasons, JBD respectfully submits this Objection, and requests that the Court deny the Rejection Motion as to JBD and grant such further relief as is just.

**MURTHA CULLINA LLP**
Attorneys For Jim Boast Dodge, Inc., d/b/a
Bob Boast Dodge

By: /s/ Robert E. Kaelin
Robert E. Kaelin – RK4185

CityPlace I - 185 Asylum Street
Hartford, Connecticut 06103-3469
Telephone: 860-240-6000
Facsimile: 860-240-6150

DATED: Hartford, CT
May 23, 2009