KLESTADT & WINTERS, LLP       Hearing Date: June 3, 2009 (10:00 AM)
Tracy L. Klestadt      Obj. Deadline: May 26, 2009 (4:00 PM)
Samir P. Gebrael
292 Madison Avenue, 17th Floor
New York, New York 10017-6314
Telephone No. (212) 972-3000

A. Edward Quinton III, Esq.
Kenneth L. Paretti, Esq.
Adams, Quinton & Paretti, P.A.
Brickell Bayview Centre
80 S.W. 8th Street
Suite 2150
Miami, Florida 33130
Telephone no. (305) 358-2727

Counsel for Monarch Dodge, Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:                                              :
                                                    :    Chapter 11
CHRYSLER LLC, et al.,                               :    Case No. 09-50002 (AJG)
                                                    :
                    Debtors.                        :    (Jointly Administered)
                                                    :
----------------------------------------------------------------x

**OBJECTION OF MONARCH DODGE INC. TO MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER, PURSUANT TO SECTIONS 105, 365 AND 525 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6006, (A) AUTHORIZING THE REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF**

Monarch Dodge, Inc. ("Monarch Dodge") hereby submits its objection to the Debtors' Motion (A) Authorizing the Rejection of Executory Contracts and Unexpired Leases with Certain Domestic Dealers and (B) Granting Certain Related Relief (the "Objection"), and in support thereof, respectfully submits as follows:

**PROCEDURAL BACKGROUND**

1. On April 30, 2009 (the "Petition Date"), each of the debtors ("Debtors") filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code"). The Debtors are presently managing their properties and operating their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. On May 14, 2009, the Debtors filed their Omnibus Motion of Debtors and Debtors in Possession for an Order, Pursuant to Sections 105, 365 and 525 of the Bankruptcy Code and Bankruptcy Rule 6006, (A) Authorizing the Rejection of Executory Contracts and Unexpired Leases with Certain Domestic Dealers and (B) Granting Certain Related Relief (the "Rejection Motion") [Docket No. 780].

**FACTUAL BACKGROUND**

3. Monarch Dodge is a new motor vehicle franchise Dodge dealership ("a Dodge Dealership") and is a party to a Dodge Sales and Service Agreement with the Debtors (the "Monarch Dodge Franchise Agreement"). Monarch Dodge has been a new motor vehicle Dodge dealer, family owned and operated, for over 35 years.

4. The Monarch Dodge dealership is situated at 2000 North State Road 7, Lauderdale Lakes, Florida 33313 in Broward County, Florida. Broward County has a population of approximately 2,000,000 people which constitutes 15% of the overall population for the State of Florida. There are currently only five Dodge Dealerships in Broward County including Monarch Dodge.

5. Monarch Dodge is a Certified *Five Star* Dodge Dealership. *Five Star* certification is a quality based designation created by the Debtors and bestowed upon certain elite dealers who meet stringent criteria. Monarch Dodge was the first dealership

2

to attain *Five Star* certification in South Florida. *Five Star* certified dealerships must satisfy strict training, facility, and process requirements created and implemented by the Debtors.  In order to first attain and thereafter maintain such status, the Monarch Dodge must consistently meet score standards implemented by the Debtors. The standards are rigorously monitored on an annual basis.

6. Monarch Dodge has successfully maintained uninterrupted *Five Star* status, since the inception of the certification program.

7. One of the criteria that is considered by the Debtors for both *Five Star* status and in evaluating dealership performance is adequacy of dealership facilities. The Debtors impose specific facility guidelines and requirements. The Monarch Dodge facility exceeds such facility guidelines.

8. Monarch Dodge has invested millions of dollars in facility upgrades, independently and at the behest of the Debtors, most recently in 1998 and in 2006.

9. Monarch Dodge has a state of the art repair facility and body-shop equipped with all special tools and machinery necessary to repair and service all the lines of motor vehicles offered by the Debtors.

10. Chrysler has demonstrated great confidence in Monarch Dodge by entrusting Monarch Dodge to perform the majority of final repair attempts for lemon law vehicles and manufacturer buy-back vehicles for South Florida.

11. Monarch Dodge also performs 100% of all repairs to vehicles bought back by the Debtors for the entire State of Florida for all line makes offered by the Debtors, including Chrysler, Jeep and Dodge motor vehicles and trucks.

12. In the category of sales effectiveness and sales volume, Monarch Dodge is routinely ranked, on average, ninth among twenty-five Dodge dealers situated in Central and South Florida in retail sales. A copy of recent sales reports for Central and South Florida is annexed hereto as **Exhibit "A."**

13. Monarch Dodge has excelled in Customer Satisfaction Index ("CSI") performance. The Debtors track customer satisfaction and compare each dealer's performance to the average performance for the entire Southern Region. In 35 categories scored in CSI Performance Tracking Reports prepared or generated by the Debtors, Monarch Dodge has routinely outperformed the business center group average. A copy of the CSI Performance Tracking Report is annexed hereto as **Exhibit "B"**.

14. Monarch Dodge maintains adequate capitalization. Its principal has committed significant finances over the past 35 years and is prepared to do so in the future to ensure that Monarch Dodge maintains the necessary working capital to perform as an elite *Five Star* Dodge Dealership.

## THE REJECTION MOTION

15. The Rejection Motion seeks to reject 789 discrete and unique dealership agreements, including the Monarch Dodge Franchise Agreement.

16. The Rejection Motion recognizes the discrete and unique nature of the 789 dealership agreements. In particular, the Rejection Motion admits that the dealership agreements were memorialized by a variety of written agreements. Although the Rejection Motion claims that the Debtors used a standard uniform agreement, it goes on to explain that a large portion of the dealership agreements are not subject to a standard

4

uniform agreement and that even the standard uniform agreement has been modified from time to time.

17. The Rejection Motion further recognizes the discrete and unique nature of the 789 dealership agreements, when it explains that the dealership agreements are also subject to Ancillary Agreements. The Ancillary Agreements govern matters as broad as "business matters."

18. The Rejection Motion goes on to portray all of the 789 dealership agreements including, ostensibly, the Monarch Dodge Franchise Agreement, as if they are governed by a standard uniform agreement.

19. The Rejection Motion mentions Monarch Dodge once, on page 25 of 40 of Exhibit A. In reference to Monarch Dodge, the Rejection Motion lists its majority owner as Mark S Hodos, its address as 2000 North State Road #7, Lauderdale Lakes, FL 33313-7098, its dealer code as 41322, and its linemakes as Dodge and Dodge Trucks.

20. The Rejection Motion does not mention which type of agreement governs the Monarch Dodge Franchise Agreement or, if it was the uniform standard agreement, whether and how it was modified. The Rejection Motion also does not mention any Ancillary Agreements to the Monarch Dodge Franchise Agreement and certainly does not mention any Ancillary Agreements to the Monarch Dodge Franchise Agreement governing "business matters."

21. The Rejection Motion contains no other information particular to Monarch Dodge or the calculus used to determine that the Monarch Dodge Franchise Agreement, in particular, should be rejected.

22. Instead, the Rejection Motion describes "Project Genesis."

5

23. According to the Rejection Motion the purpose of Project Genesis was to:

(a)evaluate their dealership network and key locations; (b) identify the most desirable dealerships and dealership locations from the perspective of long term planning; and (c) streamline the Domestic Dealer Network to meet long term goals, including, among other things, the consolidation of the Debtors' brands at "partial line" dealers to make them "full line" dealers.

24. The Rejection Motion claims that as a result of Project Genesis and using some analytical methods "the Debtors can create comprehensive statistical assessments of each dealer and make reasoned judgments regarding the optimal configuration for each market." Although the Rejection Motion outlines the factors gathered in Project Genesis, it does not, in any way, explain the actual analytical methods used to transform those factors into comprehensive statistical assessments and reasoned judgments.

25. More importantly, the Rejection Motion does not include the specific factors used to evaluate the Monarch Dodge Franchise Agreement or any of the information gathered in Project Genesis with respect to Monarch Dodge.

26. Furthermore, in the same way the Rejection Motion fails to provide its analytical methodology generally, it also fails to provide the methodology, if any, used to evaluate Monarch Dodge and the Monarch Dodge Franchise Agreement.

## ARGUMENT

27. Section 365(a) of the Bankruptcy Code provides that a debtor, "*subject to the court's approval*, may assume or reject any executory contract or unexpired lease." 11 U.S.C.§ 365(a)(italics added).

28. A bankruptcy court reviewing a debtor-in-possession's decision to assume or reject "an executory contract should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be

6

beneficial or burdensome to the estate to assume it." <u>Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)</u>, 4 F.3d 1095, 1099 (2d Cir. 1993)(emphasis added).

29. Under the business judgment standard, motions to reject contracts under Section 365(a) of the Bankruptcy Code are not rubber-stamped by bankruptcy courts as Debtors suggest. Rather, a debtor's business judgment to reject a contract must undergo careful scrutiny to ensure that it will in fact be in the best interests of the unsecured creditors of the bankruptcy estate. <u>See</u>, <u>e.g.</u>, <u>The Monarch Tool & Mfg. Co. v. Monarch Prod. Sales Corp. (In re Monarch Tool & Mfg. Co.)</u>, 114 B.R. 134, 137 (Bankr. S.D. Ohio 1990); <u>In re Petur U.S.A. Inst. Co.,</u> Inc., 35 B.R. 561, 563-64 (Bankr. W.D. Wash. 1983); <u>In re Midwest Polychem, Ltd.</u>, 61 B.R. 559, 562 (Bankr. N.D. Ill. 1986) (recognizing that judicial approval of contract rejection is not a "rubber stamp,")

***This Court Was Not Provided With Sufficient Information To Assess the Debtor's Business Judgment with Respect to Monarch Dodge Individually***

30. As the Second Circuit Court of Appeals held in <u>Minges</u> and reasserted in <u>Orion</u>, "the process of deciding a motion to assume is one of the bankruptcy court placing itself in the position of the trustee or debtor-in-possession and determining whether assuming the contract would be a good business decision or a bad one." 4 F.3d at 1099 (citing <u>In re Minges,</u> 602 F.2d 38 (2d Cir. Conn. 1979)).

31. Therefore, in deciding whether the Debtors may reject the Monarch Dodge Franchise Agreement, the Court must be presented with sufficient evidence that it may step into the shoes of the Debtors to determine whether rejecting the Monarch Dodge Franchise Agreement is a good business decision. The Court must have before it more than conclusory statements devoid of actual data and analysis.

7

32. Given the information presented in the Rejection Motion, the Court is unable to step into the shoes of the Debtors to determine whether rejecting the Monarch Dodge Franchise Agreement is a good business decision. The Court is presented with neither the underlying data about Monarch Dodge that was gathered during Project Genesis, nor the analytical methods used to evaluate that data.

33. The Rejection Motion does not even disclose how Monarch Dodge performed in the "comprehensive analytical analysis" that the Debtor purportedly conducted. Did the "comprehensive analytical analysis" result in a ranking and, if so, where did Monarch Dodge fall in those rankings? Did the "comprehensive analytical analysis" result in an absolute minimum score that Monarch Dodge failed to meet? Did Monarch Dodge fail the "comprehensive analytical analysis" because of a particular factor or piece of data gathered during Project Genesis? The Rejection Motion provides no answers.

34. In fact, the only particularized evidence of the Debtors' business judgment and resultant decision to reject the Monarch Dodge Franchise Agreement is that the name Monarch Dodge appears on page 25 of 40 of Exhibit "A" of the Rejection Motion.

35. In addition, the Rejection Motion fails to provide any general or specific information concerning the terms and provisions of the Monarch Dodge Franchise Agreement. The Rejection Motion does not disclose the potentially harmful effects rejecting would have on the estate of the Debtor.

36. Instead of providing the Court with any evidence concerning its decision to reject the Monarch Dodge Franchise Agreement, the Debtors have attempted to replace the requirement of sound business judgment with alchemy. Instead of data, facts, analysis

and sound business decisions, the Debtors have offered a magical formula that has produced a list of 789 dealers, with no details about the formula's actual methodology or inputs.

37. The Debtors have offered no legal support for replacing the long established legal precedent that bankruptcy courts evaluate individual contracts and the surrounding circumstances of those particular contracts to determine if it would be beneficial or burdensome to the estate to assume or reject it. Instead, the Debtors would like the Court to adopt a much lesser standard, whereby bankruptcy courts are forced to rely only on lists produced by vague projects, from undisclosed data, using comprehensive analytical methodologies that are, apparently, too complex or cumbersome to disclose in real substance to the Court, the creditor body or the affected counterparties.

### *The Rejection of the Monarch Dodge Franchise Agreement Works a Significant Hardship to Monarch Dodge and Is An Act of Bad Faith*

38. Monarch Dodge acquired special rights pursuant federal and state laws regulating automobile dealers. A standard greater than the business judgment standard should be applied. The court should balance the equities between the affected parties and consider harm that will be suffered by Monarch Dodge if its dealer agreements are rejected. In re Midwest Polychem, Ltd., 61 B.R. at 562 (balancing equities when assessing business judgment, and disallowing rejection that would not necessarily have benefited the debtor's unsecured creditors and could have "mortally wounded" the counterparty). Also see National Labor Relations Board v. Bildisco, 465 U.S. 531 (1984) (holding that special nature of collective bargaining agreement required a stricter standard to govern the decision to reject an executory contract).

9

39. Moreover, it is proper for the Court to also consider the burden or forfeiture which will be worked upon Monarch Dodge by rejection of the contract. "It is proper for a court to refuse to authorize rejection of a lease or executory contract where the party whose contract is to be rejected would be damaged disproportionately to any benefit to be derived by the general creditors of an estate... " <u>Robertson v. Pierce (In re Huang)</u>, 23 B.R. 798 (9th Cir. BAP 1982).

40. The Court in considering rejection must exercise its discretion fairly and in the interest of *everyone* who has had the misfortune of dealing with the Debtor. <u>In re Meehan, 59 B.R. 380, 385 (E.D.N.Y. 1986)</u>. The aim of Chapter 11 reorganization is to rehabilitate the Debtor while avoiding forfeitures by its creditors. <u>Pioneer Invest. Servs. Co. v. Brunswick Assocs.</u>, 507 U.S. 380 (1993).

41. If the Monarch Dodge Franchise Agreement is rejected, Monarch Dodge and its employees will experience significant financial loss which will not be reclaimed by merely filing an unsecured claim in this bankruptcy case. Monarch Dodge will lose its inventory of vehicles and related parts, a significant number of its employees and it will get nothing more than salvage value for the specialized equipment it acquired from the Debtors and other material such as signage.

42. In contrast, the Debtors seek to gain nothing (or at the least very little) by rejection of the Monarch Dodge Franchise Agreement. In fact, Monarch Dodge and the Monarch Dodge Franchise Agreement are valuable assets to the Debtors. As noted above, Monarch Dodge has an exemplary record of customer service, sales volume and overall commitment to excellence. As evidenced by its *Five Star* certification, Monarch Dodge has been recognized by the Debtor as one of the elite Dodge dealerships.

43. Preserving the Monarch Dodge Franchise Agreement and the Debtors' relationship with Monarch Dodge is without a doubt in the best interest of the Debtors and their stakeholders.

44. Moreover, even when rejecting an executory contract, the Debtor is obligated to act in good faith in the exercise of its business judgment. In re Helm, 355 B.R. 528 (Bankr. S.D.N.Y. 2006).

45. In reliance upon the Debtors' repeated assurances of continuation and expansion of Monarch Dodge's business, Monarch Dodge continued to purchase from the Debtors vehicles, parts, and inventory. The Debtors have no intention of repurchasing any of these items, and Monarch Dodge will be forbidden to sell its inventory after June 9, 2009. This does not even consider the lost income that Monarch Dodge will have from inability to sell and service vehicles in the future, which vastly exceeds its current stake in inventory.

46. Viewing this transaction both from the standpoint of the Debtors and Monarch Dodge, it becomes clear to the Court that the harm to Monarch Dodge greatly outweighs any marginal benefit to the estate and the Debtors are not acting in good faith. Consequently, the rejection should not be allowed.

## RESERVATION OF RIGHTS

47. Monarch Dodge reserves all rights, including, but not limited to the right to supplement or amend this Objection.

**WHEREFORE**, Monarch Dodge respectfully requests that the Court enter an order denying the Debtors' Motion for an Order, Pursuant to Sections 105, 365 and 525 of the Bankruptcy Code and Bankruptcy Rule 6006, (A) Authorizing the Rejection of

Executory Contracts and Unexpired Leases with Certain Domestic Dealers and (B) Granting Certain Related Relief, and granting Monarch Dodge such other and further relief as is just.

Dated: New York, New York
       May 25, 2009

                                    KLESTADT & WINTERS, LLP

                                    By: ___*/s/ Samir Gebrael*___
                                        Tracy L. Klestadt
                                        Samir P. Gebrael
                                  292 Madison Avenue, 17th Floor
                                  New York, New York 10017-6314
                                  Phone: (212) 972-3000
                                  Fax: (212) 972-2245

                                      and

                                  A. Edward Quinton III, Esq.
                                  Kenneth L. Paretti, Esq.
                                  Adams, Quinton & Paretti, P.A.
                                  Brickell Bayview Centre
                                  80 S.W. 8th Street
                                  Suite 2150
                                  Miami, Florida 33130
                                  Phone: (305) 358-2727

                                  Counsel for Monarch Dodge, Inc.