UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50002

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


CHRYSLER LLC, et al.



          Debtors.

- - - - - - - - - - - - - - - - - - - -x



          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          June 3, 2009

          11:06 AM


B E F O R E:

HON. ARTHUR J. GONZALEZ

U.S. BANKRUPTCY JUDGE

1

2  HEARING re Motion by Debtors authorizing the rejection of

3  certain unexpired leases of property.

4

5  HEARING re Motion by Debtors authorizing the rejection of

6  executory contracts and unexpired leases with certain

7  domestic dealers and granting certain related relief.

8

9  FINAL HEARING re Motion by Debtors authorizing them to continue

10  purchase card agreement and granting relief from the automatic

11  stay.

12

13  HEARING re Motion by Fifth Third Bank for relief from the

14  automatic stay.

15

16  HEARING re Motion by CSX Transportation, Inc. for adequate

17  protection.

18

19  HEARING re Motion by Debtors granting additional time to file

20  reports of financial information or to seek a modification of

21  such reporting requirements.

22

23

24

25

1    HEARING re Motion by Debtors authorizing the retention and

2    employment of Cahill Gordon & Reindel LLP as special counsel to

3    three members of the Board of Managers of Debtor Chrysler LLC,

4    nunc pro tunc to the petition date.

5

6    HEARING re Second Omnibus Motion of Debtors authorizing the

7    rejection of certain executory contracts.

8

9    HEARING re Motion by Debtors approving procedures to sell or

10   transfer certain de minimis assets, free and clear of liens,

11   claims and encumbrances, and to pay market rate broker

12   commissions in connection with such sales without further court

13   approval.

14

15   HEARING re Motion to appoint Official Non-Union, Non-Retiree,

16   short term, and long term disabled employee committee.

17

18   HEARING re Motion of Hoegh Autoliners as for adequate

19   protection.

20

21   HEARING re Motion of the Ad Hoc Committee seeking fairness for

22   warranty and Lemon Law Claimants for the appointment of an

23   official committee of warranty claimants.

24

25

1   HEARING re Motion by Debtors authorizing adequate protection

2   procedures for certain potential possessory lien holders and

3   granting certain related relief.

4

5   HEARING re Motion by Debtors authorizing Chrysler LLC to enter

6   into a settlement of their terms set forth in the binding terms

7   sheet among Chrysler LLC, Chrysler Holding LLC, Daimler AG,

8   Cerberus, the DC Contributors, and the Pension Benefit Guaranty

9   Corporation.

10

11  HEARING re Motion by Debtors authorizing the Debtors to

12  implement post closing modifications to Chrysler LLC's

13  governance structure, approving the release of officers and

14  directors and authorizing the Debtors to obtain replacement

15  directors and officers liability insurance.

16

17  HEARING re Crain CDF LLC's motion for continuance of hearing on

18  Debtors omnibus motion to authorize the rejection of executory

19  contracts and unexpired leases with certain domestic dealers.

20

21

22

23

24

25  Transcribed By:  Sharona Shapiro

1

2    A P P E A R A N C E S :

3    JONES DAY

4        Attorneys for Debtors and Debtors-in-Possession

5        1420 Peachtree Street, N.E., Suite 800

6        Atlanta, Georgia 30309

7

8    BY:    JEFFREY B. ELLMAN, ESQ.

9

10   JONES DAY

11       Attorneys for Debtors and Debtors-in-Possession

12       325 John H. McConnell Blvd.

13       Suite 600

14       Columbus, OH 43215

15

16   BY:    ROBERT W. HAMILTON, ESQ.

17

18   FROST BROWN TODD, LLC

19       Attorneys for AK Steele

20       2200 PNC Center

21       201 East Fifth Street

22       Cincinnati, OH 45202

23

24   BY:    DOUGLAS L. LUTZ, ESQ.

25       (TELEPHONICALLY)

1    FROST BROWN TODD, LLC

2         Attorneys for AK Steele

3         Lexington Financial Center

4         250 West Main Street,  Suite 2800

5         Lexington, KY 40507

6

7    BY:   ROBERT V. SARTIN, ESQ.

8         (TELEPHONICALLY)

9

10   FOLEY & LARDNER LLP

11        Attorneys for Getrag Mfg., Tower Auto and Meridian Auto

12        One Detroit Center

13        500 Woodward Avenue, Suite 2700

14        Detroit, MI 48226

15

16   BY:   SCOTT T. SEABOLT, ESQ.

17

18   KRAMER LEVIN NAFTALIS & FRANKEL LLP

19        Attorneys for Official Committee of Unsecured Creditors

20        1177 Avenue of the Americas

21        New York, NY 10036

22

23   BY:   THOMAS M. MAYER, ESQ.

24        GREGORY GENNADY PLOTKO, ESQ.

25

1   LAW OFFICE OF ROBERT N. BASSEL

2        Attorneys for Eberspaecher

3        201 West Big Beaver Road

4        Suite 60

5        Troy, MI 48084

6

7   BY:   ROBERT N. BASSEL, ESQ.

8

9   PENSION BENEFIT GUARANTY CORPORATION

10        1200 K Street NW

11        Washington, DC 20005

12

13   BY:   JAMES L. EGGEMAN, ESQ.

14

15   SHEARMAN & STERLING LLP

16        Attorneys for Daimler AG

17        599 Lexington Avenue

18        New York, New York 10022

19

20   BY:   SUSAN A. FENNESSEY, ESQ.

21        JAMES L. GARRITY JR., ESQ.

22        HEIKO SCHIWEK, ESQ.

23        CURT E. GOLDMAN, ESQ.

24

25

```
 1   SONNENSCHEIN NATH & ROSENTHAL LLP

 2          Attorneys for PBGC

 3          1221 Avenue of the Americas

 4          New York, NY 10020

 5

 6   BY:   CAROLE NEVILLE, ESQ.

 7

 8   SULLIVAN & CROMWELL LLP

 9          Attorneys for Fiat and Purchaser

10          1888 Century Park East

11          Los Angeles, CA 90067

12

13   BY:   HYDEE R. FELDSTEIN, ESQ.

14

15   SULLIVAN & CROMWELL LLP

16          Attorneys for Fiat and Purchaser

17          125 Broad Street

18          New York, NY 10004

19

20   BY:   ANDREW G. DIETDERICH, ESQ.

21

22

23

24

25
```

1  U.S. DEPARTMENT OF JUSTICE

2       United States Attorney's Office

3       Southern District of New York

4       86 Chambers Street

5       New York, NY 10007

6

7  BY:   JOSEPH N. CORDARO, AUSA

8

9  U.S. DEPARTMENT OF JUSTICE

10      Office of the United States Trustee

11      33 Whitehall Street

12      Suite 2100

13      New York, NY 10004

14

15  BY:   SUSAN D. GOLDEN, ESQ.

16

17  VARNUM RIDDERING SCHMIDT & HOWLETT, LLP

18      Attorneys for Fifth Third Bank

19      39500 High Pointe Boulevard

20      Suite 350

21      Novi Michigan, 48375

22

23  BY:   JASON BANK, ESQ.

24      (TELEPHONICALLY)

25

1

2    VEDDER PRICE P.C.

3        Attorneys for Export Development Canada (EDC)

4        1633 Broadway

5        47th Floor

6        New York, NY 10019

7

8    BY:   ERIN ZAVALKOFF-BABEJ, ESQ.

9

10   VINSON & ELKINS LLP

11       Attorneys Cerberus

12       666 Fifth Avenue

13       26th Floor

14       New York, NY 10103

15

16   BY:   STEVEN R. PARADISE, ESQ.

17         WALTER B. STUART, ESQ.

18

19   WILLIAM THOMAS WILSON

20       Pro Se Petitioner

21       1715 Gilbert Road

22       Toledo, OH 43614

23

24   BY:   WILLIAM T. WILSON, PRO SE

25         (TELEPHONICALLY)

1   OTHER TELEPHONIC APPEARANCES:

2   ROBERT BURNS, ESQ. for Monarch Alternative Capital LP

3   MARTIN ALANIZ, ESQ. for Cardenas Motors, Inc.

4   R. GLEN AYERS, ESQ. for Imel Motors

5   DOUGLAS BURKE, ESQ. for Lenihan, Berlin,

6                       Hamilton Chrysler et al.

7   SUSAN M. COOK, ESQ. for Linamar Corporation

8   JEREMY DOWNS, ESQ. for Wheels, Inc.

9   SHERRY K. DREISEWERD, ESQ. for Reuther Dodge, LLC

10                      Reuther's Investment Co. d/b/a

11                      Reuther's Jeep Chrysler Plymouth

12  DANIEL FREELAND, ESQ. for River Oaks Chrysler

13  ERIC GELLER, ESQ. for CitiGroup

14  DAVID GOLIN, ESQ. for Continental Chrysler Jeep, Inc. et al.

15  JOHN J. HALE, ESQ. for Perella Weinberg Partners

16  DALE M. HOLIDAY, ESQ. for Allen Samuels Austin Dodge, Inc.

17                      d/b/a Allen Samuels Dodge

18  JOSEPH B. LYLE, ESQ. for Alley's Kingsport, Inc.

19  MARIE NIENHUIS, ESQ. for Debtor, Jones Day

20  SHEILA A. RAMACCI, ESQ. for River Oaks Chrysler

21  ERIC A. RICE, ESQ. for Stillwater Motor Co.

22  TONI RUMSCHLAG, ESQ. for Robert Bosch

23  GABRIELLA SKIMICK, ESQ., Aurelius Capital Management

24  CLARK WATSON, ESQ. for Don Chrysler Jeep

25  ROBERT WEISBERG, ESQ. for Mt. Clemens Dodge

1          P R O C E E D I N G S

2          THE COURT:  Please be seated.

3          MR. ELLMAN:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. ELLMAN:  This is Jeffrey Ellman from Jones Day on

6     behalf of the debtors.  I wanted to begin with the agenda for

7     today.  We had submitted an approved agenda letter which is a

8     forty-two page, sixteen item agenda.  It's fairly long, but I

9     think we only have eight matters of the sixteen that are going

10    forward today.  Only two of them have any partial contest at

11    all as far as I'm aware.  So we're hoping to be fairly quick

12    today.  For the record, the first four items, I believe, are

13    all adjourned and the fifth item has been withdrawn.

14          So I believe, Your Honor, the first item actually up

15    for consideration today is number 6 which is a motion by Fifth

16    Third Bank for relief from the stay.  I believe their counsel

17    is either here or on the phone to present that.

18          MR. BANK:  Yes.  Jason Bank, Your Honor, on behalf of

19    Third Bank.  Good morning.

20          THE COURT:  Good morning.

21          MR. BANK:  This is a motion for relief from the

22    automatic stay.  No objections have been filed to the motion.

23    Pursuant to discussions with the debtors' counsel we have made

24    certain changes to the order and the debtors have approved

25    those changes.  And the proposed order was uploaded with a

notice of presentment under docket number 3079.  So unless the

Court has any questions regarding the motion, we would request

that the Court enter that revised order.

THE COURT:  All right.  Anyone else wish to be heard?

MR. ELLMAN:  Your Honor, again, Jeffrey Ellman for

the debtors.  Just standing to confirm that we have approved

the form of order as submitted.

THE COURT:  Thank you.  Anyone else?  Based upon the

pleadings as filed, the representations made on the record, and

no opposition having been posed, I will grant the relief.

MR. BANK:  Thank you, Your Honor.

THE COURT:  You're welcome.

MR. ELLMAN:  Your Honor, the next item on the agenda,

number 7, was a motion that's been approved on an interim basis

previously to authorize continued use of a purchase card.  Your

Honor, although we had notice of this for today as a final

hearing on that motion, I understand that there's been a

request that we've agreed to adjourn this matter to June 18th,

and we would intend to put this over to that date, Your Honor.

THE COURT:  All right, it's adjourned.

MR. ELLMAN:  The next item is number 8, and this is a

motion by the debtors for additional time to file reports under

Bankruptcy Rule 2015.3 or for additional time to file a motion

to request modifications of those reporting requirements.  Your

Honor, this is a fairly new rule that requires periodic

1    reporting relating to the value, operations, and profitability

2    of nondebtor entities that the debtors hold a substantial or

3    controlling interest in and that are not publicly traded

4    companies.

5            In this case, looking at our corporate structure, we

6    have about forty-eight entities that would fall into this

7    category and would require reporting.  The first of these

8    periodic reports would be due five days before our Section 341

9    hearing under the rule.  The 341 hearing is on the 22nd of

10   June, so this would be due -- if my math is correct -- the 17th

11   of June.

12           We had asked to extend the date to July 31st, to

13   either file the report or the motion to modify the

14   requirements.  We believe there's ample cause under Rule

15   9006(b)(1) for the extension, given the substantial size and

16   complexity of this matter, the numerous activities the debtors

17   are involved in, especially in preparing for our now approved

18   sale, and the number of entities that are involved here that

19   will actually be sold and no longer be part of the estate.  We

20   think it suggests that we should have more time to work through

21   what the report should look like if it's needed, etcetera, and

22   work with the U.S. Trustee and the creditors' committee on

23   that.

24           Although the rule is fairly new, we did cite a few

25   examples of precedent for extensions of this deadline.  There

1    has been no opposition to this relief and we'd ask that the

2    Court approve it.

3              THE COURT:  All right.  Anyone else wish to be heard?

4    The request is granted.

5              MR. ELLMAN:  I have a form of order, if I might

6    approach?

7              THE COURT:  Yes.  Thank you.

8              MR. ELLMAN:  Your Honor, the next item is docket

9    number 9 -- agenda item number 9, which is a motion seeking

10   relief to reject certain aircraft leases pursuant to Section

11   365.  These are aircraft leases with an affiliate of General

12   Electric.  These leases are not needed or valuable to the

13   debtors' estates.  They're not part of the sale to New

14   Chrysler.  In addition, Your Honor, our DIP financing facility

15   and the credit agreement at section 5.1 in fact requires the

16   debtors to divest of these aircraft.  And so this motion, we

17   believe, is appropriate for all those reasons.  Also the motion

18   seeks rejection of some related agreements we've referred to as

19   charter agreements that address things like management

20   operation, storage and maintenance of the aircraft.  Obviously

21   those are no longer needed either if we don't have the

22   aircraft.

23             We have turned over, surrendered possession of the

24   aircraft on May 12th.  That would be the effective date of the

25   proposed rejection.  There is some other ancillary relief in

1    the form of order dealing with the security deposits that had

2    been posted in respect of the aircraft and to allow those to be

3    applied to the claims of the lessor.  And that's been described

4    in our motion.

5              There are no objections filed, Your Honor, to this

6    motion.  There have been a couple of new paragraphs added to

7    the form of order, which I'm happy to hand up a blackline.

8    These deal with the charter agreements, the ancillary

9    agreements, and some setoff rights that exist in those

10   agreements, the monies owed back and forth.  So the order

11   effectively allows for the permitted setoffs under the

12   agreement, only pre versus pre-petition setoffs and post versus

13   post-petition setoffs.  The net effect of all of that would be

14   the debtors receiving back from Pentastar, which is the

15   counterparty to those agreements, $263,763.87.

16             These setoff arrangements have been discussed with

17   our creditors' committee.  My understanding is that they have

18   no objection to the additional setoff relief that we've added

19   to the order.  We believe it's an exercise of our appropriate

20   business judgment to reject these agreements and enter into the

21   rest of the proposed relief, and we'd ask the Court to approve

22   the order as modified.

23             THE COURT:  Anyone else wish to be heard?  No further

24   comment being heard, I'll grant the relief as requested.

25             MR. ELLMAN:  Your Honor, if I might approach, I have

1  a copy of the order with the blackline.

2          THE COURT:  Yes.  Thank you.

3          MR. ELLMAN:  The next item, Your Honor, agenda item

4  number 10, is another motion for rejection.  This is the second

5  omnibus motion to reject certain executory contracts.  This

6  deals simply with two hotel contracts for meetings, conferences

7  that had been scheduled by the debtors that in light of the

8  bankruptcy have now been cancelled.  The contracts are no

9  longer needed, provide no value, and are a burden to the

10 estate.  It's not part of the sale, Your Honor, and in our

11 business judgment the debtors have determined to reject these

12 agreements.  There are no objections and we'd ask for this

13 motion as well to be approved.

14         THE COURT:  Anyone else wish to be heard?  No further

15 comment being heard, I'll grant the relief.

16         MR. ELLMAN:  May I approach?

17         THE COURT:  Yes.  Thank you.

18         MR. ELLMAN:  Your Honor, number 11 on our agenda

19 letter was the application by the debtors to retain Cahill

20 Gordon as special counsel.  Cahill represents, as we describe

21 in that application, three independent members of the board of

22 managers of Chrysler, LLC.

23         The role that Cahill would serve would be to advise

24 the independent board members about the Chapter 11 process,

25 issues that arise in these cases and the like.  This would be a

1   retention under Section 327(e) and Cahill would charge on an

2   hourly basis.  There has been disclosure by Cahill of their

3   connections to these cases.  There was an affidavit filed by

4   Joe Levitan which is attached as Exhibit A to the application.

5   Since that time, there have been discussions with the U.S.

6   Trustee's Office and some additional information had been

7   provided by the Cahill firm.  We understand that satisfied any

8   inquiry that the U.S. Trustee's Office might have had about

9   this application.  And information also has been submitted to

10  the Court and filed as a supplemental affidavit in the last

11  couple of days, and so that's of record as well.  There have

12  been no other objections filed.  And Your Honor, with a few

13  moderate corrections to the order, mostly typographical type of

14  corrections, we would ask that this application be approved.

15          THE COURT:  Anyone else wish to be heard?  No further

16  comment being heard, I'll grant the relief.

17          MR. ELLMAN:  May I approach?

18          THE COURT:  Yes.

19          MR. ELLMAN:  Your Honor, number 12 on the agenda 12

20  is the pro se motion of William Thomas Wilson that we've

21  discussed in this court several times previously.  I think each

22  time we've made sort of a step forward in resolving this issue.

23  I think we're probably at this point completed with this.

24          You might recall that Mr. Wilson is a participant --

25  is a beneficiary of a long term disability plan that the

1   debtors have.  The questions that have been raised were largely

2   relating to whether that plan would continue into the future,

3   if it would be taken on by the buyer.

4          Last time we were here we pointed to docket number

5   1963, which was the notice of intent to assume and assign,

6   which it did -- I think on page 5 of the attachment, it's annex

7   B -- identify the plan that Mr. Wilson was concerned with, a

8   long term disability plan, as a plan that would be the intent

9   of the debtors to assume and assign to the new buyer.  At that

10  time we indicated that the buyer still had the right to

11  confirm, or not, that agreement as one to be assumed and

12  assigned.

13         Since that time, we have spoken to the buyer's

14  counsel and we understand and we can represent now that that is

15  in fact a plan that will be assumed and assigned to the buyer.

16  It will an assumed liability that will continue with the new

17  company post-closing.  And with that, we would hope that this

18  would resolve the concerns raised by Mr. Wilson.

19         THE COURT:  Mr. Wilson, are you on the phone?

20         MR. WILSON:  I am, Your Honor.  I apologize for how I

21  sound.  I had an emergency admittance to the hospital a very

22  few days ago.  I had a large part of my spine removed from my

23  sacral nerve.  But I'm here and I thank counsel for the

24  comments.  They've kept their word across the board, Your

25  Honor, and I thank you for the integrity of your court.  You

1   guys have been -- for somebody that doesn't know anything about

2   the law, you've made me feel very comfortable and not

3   intimidated and that my voice would be heard.  And I didn't

4   want to miss today.  Thank you, Your Honor.

5           THE COURT:  I hope you feel better.  But Mr. Wilson,

6   I want to explain, I think they've satisfied your concern, but

7   what you have before me is a motion for a committee, which I

8   don't believe is necessary.

9           MR. WILSON:  Right.

10          THE COURT:  Would you agree with that?

11          MR. WILSON:  I do, sir.

12          THE COURT:  So you can either -- should I just mark

13  that motion as withdrawn on your part at this point?

14          MR. WILSON:  Yes, please.

15          THE COURT:  All right, thank you.  I hope you feel

16  better.

17          MR. WILSON:  Thank you, sir.  Thank you.

18          MR. ELLMAN:  Thank you, Your Honor.  That would take

19  us to -- I think right on schedule to item 13.  And I'll cede

20  the podium to my colleague, Mr. Hamilton, who will present that

21  motion.  Thank you.

22          MR. HAMILTON:  Good morning, Your Honor.  Robert

23  Hamilton of Jones Day on behalf of Chrysler, LLC and its

24  affiliated debtors.  With respect to the motion of the debtors

25  and debtors-in-possession for entry of an order authorizing the

1   debtor Chrysler, LLC to enter into a settlement on the terms

2   set forth in the binding term sheet with the PBGC, Cerberus and

3   Daimler.

4         We originally filed this motion on May 19th, and with

5   the Court's permission, set it for a hearing on May 27th in

6   connection with a sale hearing, and presented Mr. Chapman to

7   testify as to the terms of this settlement at that hearing.  He

8   was crossed by counsel for the UCC and Getrag.  At the

9   conclusion of the sale hearing, we asked the Court to adjourn

10   the consideration of this motion till today in contemplation

11   that we would be able to reach an agreement with all the

12   parties to the term sheet on the actual terms of the settlement

13   agreement that was contemplated by the term sheet.  And we have

14   been successful in doing so, in terms of reaching an agreement

15   in principal on that basis.

16         Three parties filed an objection to the motion that

17   we filed on May 19th.  One was filed by the unsecured

18   creditors' committee.  And since the time that they filed their

19   objection, the parties have been successful in resolving the

20   concerns that were raised by the creditors' committee in that

21   objection.  And the settlement agreement that we intend to

22   submit to Your Honor resolves the concerns that were expressed

23   by the unsecured creditors' committee.  And I'm sure Mr. Mayer

24   will be able to confirm that fact at today's hearing.

25         The only other two objections that were filed to the

1    motion -- one was filed as part of a sort of omnibus objection

2    by the ad hoc Committee of Affected Dealers, represented by the

3    Squire, Sanders firm, that objected to this motion, the tax

4    settlement agreement motion and the corporate governance motion

5    as being motions that prove their argument that our sale motion

6    was really a sub rosa plan.

7          We believe that that omnibus objection, to the extent

8    it's predicated on the sub rosa plan argument, was effectively

9    overruled by the Court in the approval of a sale motion.

10   Nevertheless, Squire, Sanders certainly has the right to object

11   to this motion today based on their filing, but I don't believe

12   they're in the courtroom today, and I don't think they intend

13   to pursue that objection, Your Honor, because it was predicated

14   solely on their sub rosa plan argument.

15          THE COURT:  Is there anyone here or on the telephone

16   with respect to this motion on behalf of the Affected Dealers

17   represented by Squire, Sanders?

18          All right.  No response being heard, I'll assume that

19   they recognize that this issue was dealt with in the opinion

20   dealing with the sale order.

21          MR. ELLMAN:  Thank you, Your Honor.  The only other

22   party that objected to our motion was Getrag, and they did

23   cross-examine Mr. Chapman at the hearing.  They raised what I

24   think are two legal issues.  One is based on our right to

25   release all derivative claims that belong to the estate because

1    it impacts their estate because one of them is in bankruptcy.

2    And they also challenged some of the language in the schedule F

3    that we attached, suggesting that it went too far in releasing

4    creditors' claims under the Second Circuit's decision in

5    Metromedia.

6          We believe, and are prepared to address both of those

7    legal arguments.  We think that the second one has been

8    resolved by the actual terms of the release and that is going

9    to be included in the final settlement agreement that we submit

10   to the Court.  And I did have the opportunity to discuss that

11   with counsel for Getrag right before the start of the hearing.

12   And I believe that their first argument with respect to the

13   dueling battles of the estates is something that we're prepared

14   to argue today, Your Honor.

15         What I would propose -- we reached an agreement, in

16   principal, with all of the parties to the settlement agreement,

17   depending on how you define it, either late last night or early

18   this morning.  We are in the process of putting down on paper

19   the draft that reflects all of the issues that were finally

20   resolved, in principal, last night and this morning.  That

21   draft has been circulated among the parties to the settlement

22   agreement.  It is still being wordsmithed, Your Honor.

23         And what we would propose is to take a recess with

24   respect to this motion at this time and submit the actual

25   settlement agreement that we want the Court to authorize the

1    debtors to enter into, to the Court after a lunch break,

2    perhaps at 2 o'clock.  And we believe that that will give us

3    the opportunity to show the actual final language to counsel

4    for Getrag and determine whether or not we need to go forward

5    with his objection, and if so, then have legal argument on his

6    objection at that time.

7          If the Court determines, at the end of that argument,

8    that the debtors should be given the authority to enter into

9    the settlement agreement, then we will submit it to the Court

10   and to counsel for Getrag.  We would then ask the Court to

11   enter an order that just authorizes us to enter into the

12   settlement agreement attached as Exhibit A to the proposed

13   order that we'd then give to the Court, if that would be

14   acceptable to the Court.

15         THE COURT:  Before I answer that question, let me

16   hear from the objector involved in this particular issue.

17         MR. SEABOLT:  Your Honor, Scott Seabolt on behalf of

18   Getrag.  Your Honor, with respect to the proposal that's just

19   been laid out, I have not had an opportunity to review any of

20   the revised drafts or what is currently under consideration,

21   and obviously would like an opportunity to do that.  I am more

22   than happy to recess this argument until this afternoon after

23   I've had a chance to review that revised language and make an

24   assessment as to whether or not it addresses our concerns or

25   not, whatever Your Honor's pleasure.  Or we would proceed with

argument now.  It probably would make more sense -- I don't

know the Court's schedule -- to give us that opportunity so we

can determine what, if anything, we're really fighting about at

this point.  I just haven't had an opportunity to see that new

language.

THE COURT:  All right, thank you.  Anyone else?

MS. FELDSTEIN:  Yes.  Good morning, Your Honor, Hydee

Feldstein of Sullivan & Cromwell on behalf of Fiat and the

purchaser.  And Your Honor, I think it's unfortunate that I

have to rise this morning in response to the settlement, but I

simply wanted to leave a couple of thoughts with the Court.

At this time this transaction and the settlement

language I have seen, I am concerned, may inadvertently or

advertently release claims that relate to purchased assets and

assumed contracts under the sale agreement.  We've been working

very diligently with counsel to try to make sure that the final

language of the settlement agreement does not do so.

But in fact, the language that we have seen would

have this settlement agreement take effect immediately prior to

the sale to Fiat.  And we have a number of concerns regarding

ongoing commercial relationships between the nondebtor

subsidiaries who are not before this Court and some of the

entities that might be deemed to be affiliates encompassed

within this release as well as a few of the contracts and

assets that are being acquired.

1          So I didn't want to leave this morning without at

2     least letting the Court know that we do have those concerns,

3     that the timing of these releases vis-a-vis the purchase

4     agreement is, at least insofar as ongoing commercial

5     relationships and leasing and indemnity arrangements, of

6     concern to us, and we would expect that our concerns be taken

7     into account in the final language.  I hope not to have to rise

8     this afternoon.

9          THE COURT:  All right.

10          MS. FELDSTEIN:  Thank you.

11          THE COURT:  Thank you.  Mr. Mayer?

12          MR. MAYER:  Thank you, Your Honor.  Thomas Moers

13     Mayer of Kramer Levin Naftalis & Frankel, counsel to the

14     official committee of unsecured creditors.  We filed a limited

15     objection, and the headline is that Mr. Hamilton is correct

16     that we have reached an agreement that will allow us to

17     withdraw that limited objection and not object to this

18     settlement.

19          I wanted to put a few things on the record, because I

20     may or may not be able to return this afternoon.  I may leave

21     some colleagues to watch the store.  But first, our objection

22     focused on the fact that the settlement agreement was releasing

23     claims against Daimler, and we had not had a chance to

24     investigate that.  We have an agreement with Daimler that's

25     been worked out, and I don't mean to vary the terms of what's

1    in text.  The broad strokes are that we have forty-five days

2    after the entry of this order to investigate.  And I won't go

3    through the mechanics.  Those are laid out in the document.

4    But we have an agreement with Daimler on that score, and Mr.

5    Garrity can confirm.

6           MR. GARRITY:  Good morning, Your Honor.  Jim Garrity

7    from Shearman & Sterling on behalf of Daimler.  Mr. Mayer is

8    correct.  We have, after some discussion, reached an agreement,

9    which we understand, and Mr. Mayer has confirmed, addresses

10   their concerns.  And it is going to be more fully laid out, to

11   Mr. Mayer's point, in the agreement.

12          THE COURT:  Thank you.  Anyone else?  Oh, you haven't

13   finished yet?

14          MR. MAYER:  If I may, Your Honor, just a few more

15   things.  With respect to claims against Cerberus, our pleading

16   in the case -- we did a moderate amount of diligence, we

17   continue to do that diligence.  And the final agreement is

18   going to contain a representation and warranty that I have

19   already confirmed with Cerberus's counsel to the effect that

20   Cerberus did not receive, directly or indirectly, dividends or

21   other distributions on account of its equity interests in

22   Chrysler, LLC or in any of Chrysler, LLC's debtor subsidiaries.

23   That will be part of the final document.  I understand there is

24   not a problem with that.

25          And finally, as a general rule, the other objection

1   we had advanced, and which is relevant to the Getrag argument,

2   is that we were concerned about the scope of the releases and

3   their effect that it might have on claims that creditors had.

4   And there was at some point some reference in the papers to any

5   sort of an injunction.  It was very material to the committee

6   that those claims of creditors are not affected by this

7   agreement.  Whatever claims creditors have, they continue to

8   have against these parties.  And the order will not contain an

9   injunction against any creditor pursuing any claim.  The order

10  that is before Your Honor today will not contain any injunction

11  of that effect.

12          And the details of what I've just said will be set

13  forth in the final order that is provided to you and in the

14  agreement, but both of those things were important to us and we

15  have reached agreement on both of them.  It is possible that my

16  colleague, Mr. Daniels, will be here this afternoon to monitor

17  this.  But we effectively have a deal and we withdraw our

18  limited objection based on that.

19          THE COURT:  All right, thank you.  Mr. Hamilton?

20          MR. HAMILTON:  Your Honor, I --

21          THE COURT:  Go ahead.

22          MR. HAMILTON:  I did leave one thing out.  I meant to

23  mention to the Court that while the United States government

24  did not file an objection to our motion, they did raise

25  concerns regarding a clarification.  And I wanted to confirm on

1    the record at this time that the settlement agreement that we

2    intend to submit to Your Honor this afternoon resolves all of

3    the concerns that the United States government had expressed to

4    us as well.

5         THE COURT:  All right.  Regarding adjourning till

6    this afternoon, though, how much time do you actually need to

7    see if you could work this out?

8         MR. HAMILTON:  I need time to get the document

9    physically here from midtown, that is being prepared on our

10   system at the offices of Jones Day in midtown.  And then I'm

11   going to need, presumably, a sufficient amount of time to find

12   out if other parties to the agreement continue to have

13   substantive objections to the language that we believe

14   everybody's agreed to.  I don't believe that will take more

15   than a half hour to determine if they have problems.  We intend

16   to go forward and ask the Court to authorize us to enter into

17   this settlement agreement based on the document that we deliver

18   to you this afternoon.  And if another party to the settlement

19   agreement or another party-in-interest wants to suggest that

20   this Court should not authorize us to enter into a settlement

21   agreement based on those terms, I don't need additional time to

22   try to talk them out of it at this point.  We have a document

23   that we're prepared to ask the Court to approve.  We just need

24   to get it here from midtown.

25        THE COURT:  All right.  And how large is this

1       document?

2               MR. HAMILTON:  It's --

3               THE COURT:  I think Mr. Mayer's looking at it.

4               MR. HAMILTON:  Yes, it's a thick document, Your

5       Honor.

6               MS. FELDSTEIN:  It's twenty pages.

7               MR. HAMILTON:  The controversial provisions, the ones

8       that relate to the Getrag objection and to any issues that

9       Sullivan & Cromwell may have on behalf of the purchaser, or

10      parties to the agreement may have, are all contained in

11      essentially one section of the document, section 6, which is

12      the terms of the releases that are exchanged by the parties.

13      And that provisions is about three to four pages, I think.

14              THE COURT:  All right.  Well, it's probably more

15      efficient if you have someone e-mail that to my chambers.  I'll

16      direct them to make enough copies.  And the reason I suggest

17      this, from my standpoint, is I would like to be concluded with

18      this process by 2 o'clock, as opposed to starting at 2 o'clock.

19              MR. HAMILTON:  We can reconvene at any time, Your

20      Honor, that's convenient for you.

21              THE COURT:  All right.  I'd like to reconvene at 1

22      o'clock.

23              MR. HAMILTON:  Fair enough.

24              THE COURT:  If you need a little more time because

25      you're making progress, then I can be flexible with that.  But

1  I'd like to get the controverted sections here as soon as

2  possible so that you can work through them.

3      MR. HAMILTON:  I will undertake to have them e-mailed

4  to chambers within -- if we can, within the next twenty minutes

5  or half hour, Your Honor.

6      THE COURT:  All right.  Thank you.

7      MR. HAMILTON:  Thank you.

8      THE COURT:  Then I'll adjourn -- we'll stand now

9  adjourned until 1 o'clock.  Continue till 1 o'clock.

10     (Break in audio)

11     All right, Mr. Ellman, two more.

12     MR. ELLMAN:  The next item, Your Honor, was item 13.

13  It was a debtors' motion -- or number 14, excuse me -- debtors'

14  motion on the governance issues, which I understand had been

15  bifurcated previously, partially to be heard today and

16  partially to be heard on the 18th of June.  My understanding is

17  that is now, by agreement, going to be all heard together on

18  the 18th of June.  So that would be adjourned.  So that's not

19  going to go forward.

20     And there is one other matter on our agenda.  I don't

21  know if it's being pursued or not, but there was a motion filed

22  by Crain CDJ for a continuance of the dealer rejection hearing

23  which is scheduled, at this point now, to start tomorrow

24  morning with evidence, as you're aware.  That was item 16 on

25  this agenda.

1          Then item 15 was the motion by the Crain CDJ dealer

2     to continue the motion for another ninety days.  I don't know

3     if anyone from the Sonnenschein or the Davidson firms are here

4     to present that.  But that was their motion.

5          THE COURT:  All right.  Well, I'll ask.  Is anyone

6     here on behalf of Crain CDF, LLC's  motion for continuance,

7     either here in the courtroom or on the phone?  All right, no

8     response being heard, the Court will treat it as either

9     resolved or denied, and I'll raise it tomorrow.  I assume

10    counsel will be here tomorrow.

11         MR. ELLMAN:  And just for the record, we had filed

12    opposing papers to that.

13         THE COURT:  Yes.

14         MR. ELLMAN:  And we did oppose the adjournment, as

15    the Court is probably aware.

16         THE COURT:  I think as a practical matter, it's

17    probably moot, but --

18         MR. ELLMAN:  I would think so, Your Honor.  That's

19    all we have today.

20         THE COURT:  All right.  Thank you all.

21       (Recess from 11:37 a.m. until 2:04 p.m.)

22         THE COURT:  Please be seated.  All right, go ahead.

23         MR. HAMILTON:  Your Honor, Robert Hamilton on behalf

24    of the debtors.  We are prepared to go forward with the motion

25    and to argue the objection that was filed by the Getrag

1     parties.  And then at the conclusion of that argument, we hope

2     to have a hand marked-up document that represents the

3     settlement agreement, with some open issues that the parties

4     will talk to the Court about at that time.

5          When we originally filed our motion on May 19th, we

6     were asking for authority to enter into the settlement

7     agreement based on the terms in the binding term sheet that was

8     signed by the parties on April 27, 2009, and also to include

9     language of the release that we attached to schedule F.  The

10    release was much broader than the releases that were

11    contemplated in the binding term sheet.  And they were broader

12    because that was the additional consideration that Cerberus and

13    Daimler, two of the parties to the settlement agreement, were

14    requesting as consideration for, among other things, forgiving

15    the second lien debt of two billion dollars that they had

16    advanced to the debtors in the 2008 time period which wasn't

17    expressly provided for in the binding term sheet that the

18    parties signed on April 27th.

19         The language that we submitted for the release in

20    Exhibit F has provisions in it that were broad and that

21    generated some concerns from certain parties and objections.

22    At all times, it has been the debtors' intent to seek court

23    authority to release claims that the debtors had authority to

24    bring on behalf of their estates against other parties,

25    Cerberus and their affiliates and Daimler and their affiliates.

1   At no time did the debtors ever intend to seek court authority

2   to release claims that belong to someone else other than the

3   debtors.

4        There is, as I'm sure the Court is aware, an

5   overlapping grey area that has produced three decades of case

6   law, where a debtor has authority to assert its claims, and

7   outside of bankruptcy individual creditors or shareholders of a

8   corporate entity have the authority under certain state law to

9   assert claims that are a derivative of the corporation's claims

10  against third parties.  And those individual creditors or

11  shareholders sometimes are given, under state law, standing to

12  assert such claims, on a derivative basis, against third

13  parties.

14       And we were purporting in the release language to

15  release such claims on behalf of the debtor.  And pursuant to

16  established case law in this circuit, and in particular one of

17  the first cases and one of the seminal cases was approximately

18  twenty years ago, Your Honor, that St. Paul Fire & Marine

19  Insurance Company case v. Pepsico -- the cite on that is 884

20  F.2d 688, and the key language is on page 701 of that decision.

21  It's from 1989.  But that case and its progeny, in this circuit

22  and elsewhere, have established clearly that a debtor-in-

23  possession or a Chapter 11 trustee, if one is appointed, has

24  the authority to assert, prosecute, and compromise and settle

25  all claims of the estate, including claims that could otherwise

1    be asserted derivatively by creditors and/or shareholders

2    against third parties.  And any such compromise or settlement

3    of a claim by a debtor-in-possession or a Chapter 11 trustee,

4    if one is appointed, is in fact binding on all creditors and

5    shareholders of the debtor.

6         And in fact, the case law says that once the debtor

7    files its Chapter 11 petition, the standing of individual

8    creditors and shareholders of that debtor to pursue such claims

9    derivatively is eliminated, and the only party that has

10   standing to pursue such claims against third parties is the

11   debtor or the Chapter 11 trustee.

12        And that's what we are proposing to do here.  The

13   language that we had submitted in schedule F asked for an order

14   that expressly declared that derivative claims of third parties

15   are being released.  And it also had a provision in it that

16   would enjoin creditors from pursuing such derivative claims

17   that we have the authority to release under the St. Paul Fire &

18   Marine Insurance Company case law and its progeny.

19        The authority of the Court to enjoin third parties in

20   the context of a 9019 settlement is somewhat mixed.  And in the

21   actual negotiation of the actual settlement agreement, that we

22   expect to submit to Your Honor shortly, we no longer are

23   including an injunction provision that would enjoin third

24   parties from pursuing derivative claims, nor are we asking for

25   an express declaration that all such parties are deemed to have

1    released derivative claims.  Instead, the settlement agreement

2    just clearly says that we are going to release all claims that

3    the estates have against Cerberus and its affiliates and

4    Daimler and its affiliates, subject to certain carve-outs and

5    exceptions.

6         THE COURT:  So then except for the carve-out

7    exceptions, what you're asking for is that you release the

8    claims that belong to the estate.  To the extent someone then

9    goes out and sues Cerberus, Cerberus raises the defense that

10   the claim that they're suing under belongs to the estate and

11   therefore was released.

12        MR. HAMILTON:  Exactly, Your Honor.

13        THE COURT:  All right.

14        MR. HAMILTON:  Okay?  We believe that has

15   resolved most of the objections and concerns that were raised

16   by various parties, including Getrag.  But we do have some

17   continued objections.  That resolved all the concerns that the

18   United States government had as well, since there's no reason

19   to carve out the government, since we're not releasing any

20   claims that might arguably belong to the government.  We're

21   only releasing the state claims.

22        The continuing objection that I expect Getrag's

23   counsel to pursue still here at the podium arises out of the

24   fact that one of the Getrag parties is itself in Chapter 11.

25   And they are, as they have set forth in their objection, the

1    Getrag party that is itself in Chapter 11, went into Chapter 11

2    before we did.  And his assertion is that their right under

3    state law to bring a derivative claim -- derivative of

4    Chrysler's right to bring a derivative claim against Cerberus

5    or Daimler or an affiliate of Cerberus or Daimler, is property

6    of their Chapter 11 estate.  And therefore we can't compromise

7    that.  We can't do anything with that without violating the

8    automatic stay in their case, under Section 362(a)(3).  I think

9    that's the essence of the argument.  He wants to argue we have

10   competing bankruptcy assertions of jurisdiction over a race,

11   which is the claim against third parties that we're trying to

12   release.

13        I think the fallacy of his argument is that while

14   under state law his client who is now in Chapter 11 may have

15   had standing to assert a claim that belongs to Chrysler against

16   third party, that did not create a property right or a property

17   interest.  It's still our claim not his.  And when we filed --

18   when Chrysler filed for Chapter 11, his standing to assert that

19   claim was eliminated, not by any action that we're taking in

20   violation of the automatic stay, but his standing was

21   eliminated as a matter of both state law and federal bankruptcy

22   law, in that the only entity that has the right to assert a

23   claim on behalf of all creditors of our debtor, is the debtor-

24   in-possession, or alternatively, a Chapter 11 trustee, if one

25   were appointed.

1          I believe, sometimes the absurd of the example

2     sometimes clarifies one's thinking in this regard.  It has to

3     be that way, otherwise any time an individual that happened to

4     own shares of stock in a corporation, any time that individual

5     were to file their own bankruptcy petition, they could argue

6     that the corporation in which they own stock is therefore

7     barred from ever compromising a claim that they could have

8     asserted derivatively as a shareholder derivative action or as

9     a creditor derivative action.  And there's just no authority

10    for that proposition, because obviously it would make no sense.

11         They do cite a case in which someone was trying to

12    deprive a debtor/creditor of sharing in proceeds of a

13    derivative action.  And I would concede that their right to

14    share in any recovery of an action that we were to pursue on

15    behalf of all our creditors, is a property right that we can't

16    compromise.  We couldn't, for instance, compromise a claim

17    against a third party for money and take money, and then say

18    we're not going to give it to you because you're in Chapter 11.

19    That would deprive them of their right to share in a recovery

20    of that derivative claim.  And I believe that's all that case

21    establishes.  It doesn't establish that their right to share in

22    the recovery of a derivative claim is the same thing as they

23    own the claim.

24         And I believe that properly analyzed, state law does

25    not give them an ownership right in the claims that we have the

1   authority to pursue against Daimler and Cerberus and their

2   affiliates and therefore have the authority to settle in

3   compromise of this settlement agreement.  So we believe that

4   the Court should enter an order that authorizes us to release

5   all claims that we have, including claims that could otherwise

6   be asserted under state law derivatively by third parties.

7           Now, unless you have any further questions, I'll let

8   him make his presentation.

9           THE COURT:  No, I don't have any further questions.

10          MR. SEABOLT:  Thank you, Your Honor.  Scott Seabolt,

11  appearing on behalf of the Getrag entities.  Just by way of

12  background, Your Honor, Getrag is a debtor in bankruptcy in the

13  Eastern District of Michigan, as counsel mentioned.  Getrag was

14  in a contract with Chrysler to build an 800,000 square foot

15  facility in Tipton, Indiana, and had eighty percent complete

16  construction on that project, including the machinery and

17  equipment, when the plug on that project was pulled by Chrysler

18  in October of last year.

19          Under the terms of the contract, Getrag has certain

20  reimbursement rights to the costs incurred in preparing and

21  constructing that facility, and those reimbursement claims

22  exceed 500 million dollars in this case, with respect to their

23  claims against Chrysler.

24          One of the things that Getrag is doing at present is

25  investigating claims that it may have against other parties

1  arising out of the termination, if you will, of this project.

2  And my charge here, given that my client is a debtor in

3  bankruptcy, is to preserve whatever right it may have to pursue

4  third parties or any other party, any parties at all, whether

5  those claims be direct, derivative or otherwise.  And as a

6  debtor in bankruptcy, obviously we have fiduciary duties to our

7  own creditors.  And we have creditors in that bankruptcy who

8  have filed claims in excess of 500 million dollars.  So that's

9  first and foremost, is to preserve whatever claims this client,

10  this debtor in bankruptcy has, whether those claims be direct

11  or derivative.

12  With respect to the releases being sought here.  The

13  first thing I would note is that typically in the case law on

14  this dealing with these third-party releases, demonstrate that

15  the releases typically are done in the context of a plan of

16  reorganization, not in the context of a 363 sale motion.

17  They're done at the conclusion of a bankruptcy proceeding where

18  there has been an opportunity for constituents to investigate

19  whatever potential claims may exist to bring funds into the

20  estate in the context of that plan of reorganization.

21  In this particular case, what we know is that there

22  has been no investigation of any potential claims that are

23  purported to be released here.  As counsel alluded to this

24  morning, I was here last week during the testimony, and I had

25  an opportunity to examine Mr. Chapman relative to these

1   releases and this settlement agreement.  And what Mr. Chapman

2   made clear is that the board and the corporation had not

3   undertaken any investigation whatsoever with respect to claims

4   that this estate might have against the parties currently being

5   released.

6          And our position is that without such an

7   investigation, there simply is not an appropriate basis

8   presented to the Court to assess whether or not the settlement

9   being proposed is fair and reasonable; that that investigation

10  is the minimum of what is required in order for the Court to

11  assess the fairness and the reasonableness of the proposed

12  settlement.  And here, because there has been absolutely no

13  investigation, and in fact, if you read the moving papers, one

14  of the costs that they're trying to avoid is the cost of

15  actually performing that investigation, we have no idea what

16  potential claims may exist from the debtor against these

17  released parties, and therefore no idea whether or not the

18  consideration that's being offered here is fair and reasonable

19  and provides appropriate value to this bankruptcy estate.  And

20  consequently, without that minimum showing, there simply isn't

21  a basis upon which to asses it.

22         In addition to that, Your Honor, we do believe that

23  while we understand the limitations on the ability of a

24  creditor to maintain derivative claims, there are circumstances

25  where a debtor can choose to abandon a claim --

1            THE COURT:  Right.  If you go there under 1109 and

2       focus on it for a second.  In this circuit, it's STN.  And

3       under STN, let's say the creditors' committee takes over the

4       action.  Who does that claim belong to?

5            MR. SEABOLT:  I understand, Your Honor.

6            THE COURT:  No, just answer the question first, and

7       then you can argue the distinction.

8            MR. SEABOLT:  The claim --

9            THE COURT:  Who does the claim belong to?

10           MR. SEABOLT:  -- the claim belongs to the estate.

11           THE COURT:  Okay.  Because that's important.  Because

12      in a number of cases, even one issued by the Second Circuit

13      citing another case from the Southern District, they talk to

14      ownership.  But it's really not ownership, it's the standing to

15      bring the action.  The ownership belongs to the estate, but

16      unless the claims -- and I know in Enron certain claims were

17      actually -- the ownership of the claims was transferred to a

18      particular committee to pursue.  But generally in these areas,

19      it's always standing, it's not ownership.  It belongs to the

20      estate.

21           MR. SEABOLT:  Right.

22           THE COURT:  So taking that to the next step, whether

23      your client had standing or not at one point, the ownership of

24      who they would -- or in other words, who they would recover for

25      would have been the estate --

1          MR. SEABOLT:  Understood.

2          THE COURT:  -- or the corporation.  So the filing of

3   bankruptcy merely changes the standing that your client has and

4   vests it all into the debtor and the debtor's estate.  So how

5   does that then implicate the automatic stay?

6          MR. SEABOLT:  Well, Your Honor, while I understand

7   the claim ownership issue, the standing to bring the claim is

8   nevertheless a right that is being impacted here.

9          THE COURT:  Definitely.

10          MR. SEABOLT:  And here, that right, to the extent

11   there is still a residual right to assert claims derivatively,

12   that right is being impacted --

13          THE COURT:  But it's not a property interest.

14          MR. SEABOLT:  -- I'm sorry?

15          THE COURT:  It's not a property interest of your

16   estate.

17          MR. SEABOLT:  Well --

18          THE COURT:  It's a right to act on behalf of someone.

19   Now, what would happen if someone had the right to act on

20   behalf of them, but if they filed bankruptcy they didn't have

21   that right?  If you had a situation where the individual could

22   act on behalf of someone in some capacity but the individual

23   files bankruptcy and it's a disqualifier to act?  Have you

24   taken the property away from the entity that was authorized to

25   act?

1          MR. SEABOLT:  Well, the issue comes down to, when is

2     that property interest being impacted here?

3          THE COURT:  Well, I didn't -- that's the point.  Is

4     it a property interest?

5          MR. SEABOLT:  Well, I would submit, Your Honor, that

6     here it is.  It may not be the claim.  It may not be ownership

7     of the claim.  But it is still a right, still the ability to

8     assert that claim, and still the ability to obtain value.  The

9     value's going to come into the --

10         THE COURT:  Well, then go back --

11         MR. SEABOLT:  -- estate --

12         THE COURT:  -- go back to -- it's not going to go

13    into your estate.

14         MR. SEABOLT:  Oh, I understand that.

15         THE COURT:  Right.

16         MR. SEABOLT:  But --

17         THE COURT:  Go back to Mr. Hamilton's example of a

18    shareholder in a corporation that has derivative -- the ability

19    to take derivative action pre-petition; they file bankruptcy

20    and then the corporation files.  Hasn't that standing vested in

21    the estate of the corporation away from the individual who may

22    have owned one share?

23         MR. SEABOLT:  Well, if -- that goes back to the

24    standing.  You said the standing?

25         THE COURT:  Standing, right.

1          MR. SEABOLT:  Well, I thought that the original

2     example was, the assumption was that there could be standing

3     here, whether brought by the creditors' committee or otherwise.

4     And if that standing does exist, if that standing does exist,

5     that is a right.  That is a property interest.  And an interest

6     in being able to assert that claim derivatively and bringing

7     value in and recognizing the value would ultimately go to this

8     estate, but my client, as a claimant --

9          THE COURT:  That would lead to absurd results.  How

10    could you manage a case like that?

11         MR. SEABOLT:  I --

12         THE COURT:  It would be absurd.

13         MR. SEABOLT:  Well, Your Honor, even if -- I still go

14    back to the original point that I made.

15         THE COURT:  What would be the meaning, then, of

16    vesting in a debtor the derivative actions upon filing, if each

17    shareholder could still -- who happen to be in bankruptcy, say

18    wait a minute, my right to do that hasn't been impacted?  I

19    could still bring a derivative action because the automatic

20    stay prevented the operation of law that would normally vest

21    that shareholder's right to bring a derivative action back into

22    the estate.

23         MR. SEABOLT:  Your Honor, I believe there actually

24    are examples of instances where derivative claims have been

25    brought in the name of a debtor and those claims have been

1   allowed to continue.

2          THE COURT:  Sure.  They lift the stay and ask to

3   represent the estate.  That hasn't happened here.

4          MR. SEABOLT:  No, it hasn't, Your Honor.  And I'm not

5   asking to do it right now.  What I am asking is --

6          THE COURT:  But that's the right to have stand --

7   that's the basic can I have standing or can I continue my

8   standing to act on behalf of the estate.

9          MR. SEABOLT:  Right.

10          THE COURT:  Right.  But since that hasn't happened

11   and no one's granted you, revested that right in you, that

12   right you had vested in the debtor upon the debtor's filing of

13   bankruptcy.  And there's no effort been made to revest it.

14          MR. SEABOLT:  Not at this point, Your Honor.  And all

15   I am asking, given how early this case is in the process, is to

16   preserve that right.

17          THE COURT:  Well, then you're getting to the

18   substantive issue as to whether or not to lift the automatic

19   stay.  Because by asking to revest, you acknowledge that it

20   vested back into the estate.  So there's nothing to do with the

21   automatic stay, and it's back to the substantive issue, should

22   this relief be granted at all?

23          MR. SEABOLT:  Okay.  Understood what you're saying,

24   Your Honor.  I understand your point.  But I do get back to

25   that initial point that I made which is, at this early stage in

1 the proceedings, this type of compromise, this type of release,

2 ought not be granted in the context of a 363 sale, not a plan

3 of reorganization, particularly when the record demonstrates

4 that there's been no investigation whatsoever of what these

5 potential claims are or what the value of those claims are.

6    THE COURT:  All right.

7    MR. SEABOLT:  Thank you, Your Honor.

8    THE COURT:  Thank you.  All right, Mr. Hamilton.

9    MR. HAMILTON:  Thank you, Your Honor.  First,

10 counsel's suggestion that this is a third-party release that is

11 normally done in the context of a plan, I think is a semantical

12 game with the word third-party release.  We are releasing our

13 claims against Cerberus and its affiliates and Daimler and its

14 affiliates.  It's not what parties or people normally refer to

15 third-party releases in the context of a plan, where a plan

16 purports to release claims held by nondebtors against on other

17 non debtors.  That is typically done in a plan for

18 consideration, as provided --

19    THE COURT:  I understand.

20    MR. HAMILTON:  -- in a plan.  This is a typical 9019

21 action in which the debtor-in-possession, standing in the shoes

22 of a trustee, exercises its business judgment that it's in the

23 best interests of all of its creditors to compromise the claims

24 of the estate against third parties for benefits that are

25 received that benefit all interested parties in the estate.

1       Second, counsel's suggestion that we haven't done the

2   analysis that's necessary to exercise that business judgment is

3   erroneous.  What Mr. Chapman said in response to his questions

4   on cross examination, is that the debtors haven't done a

5   factual investigation into the possible claims that we may have

6   with respect to Cerberus and Daimler and their affiliates.  And

7   that was a correct answer of Mr. Chapman.  That doesn't mean

8   the debtors have not considered what the possible recovery is

9   on any potential claims that might be pursued, and whether

10  those benefits of possible recoveries on such hypothetical

11  claims are substantially outweighed by the benefits of pursuing

12  this transaction at this time.

13      And, in fact, that's exactly what the debtors have

14  done here.  They have looked at the potential possible claims

15  that could be pursued against Daimler or Cerberus and their

16  affiliates, whether it be fraudulent conveyance, whether it be

17  breach of fiduciary duty, or any other type of action, they've

18  looked at the potential theories that could be asserted, and

19  have determined that to undertake the forensic investigation to

20  analyze whether or not such claims could prevail, would be one,

21  extremely protracted process, and two, extremely expensive.

22  And that's important, because there's no money here in this

23  estate to fund such an investigation and such protracted

24  litigation.

25      The other thing that they have determined is that

even if you could undertake that factual investigation, find a

claim that might have merit, and pursue it, there is no claim

that appears to have any potential recovery that could exceed

the threshold to make it worthwhile for the estate.  And in

that context, you need to keep in mind, Your Honor, that the

government, of both the United States and Canada, pursuant to

their DIP loan, have a lien on whatever recovery is made on

these claims that we are compromising in this settlement.  That

lien is in excess of 4 billion dollars.  Which means that even

if we could find a claim that after extensive and expensive

factual investigation we could pursue, unless such claim could

be pursued and result in a monetary recovery that exceeded 4

billion dollars, there would be no benefit to the creditors of

this estate.  It would go to the government.  And the

government has not indicated any interest in funding such

litigation nor funding a factual investigation that preceded

such litigation, nor has the government objected to these

releases.

Second, independent of that 4 billion dollar

threshold, you also have to keep in mind, Your Honor, that the

primary purpose of this settlement is to get Daimler to

contribute the 600 million dollars in cash and provide the 200

million dollar guarantee to the PBGC for the benefit of our

pension plans, which will address the extreme under-funding in

the plans at this time, which will eliminate or virtually

1    eliminate the risk that the PBGC will undertake to terminate

2    the plans involuntarily prior to the closing of the Fiat

3    transaction, in order to prevent the 1 billion dollar guarantee

4    given by Daimler from going into the ether upon a change of

5    control.

6         The benefit of this transaction, the benefit of

7    releasing these claims enables us to consummate the Fiat

8    transaction.  Without that benefit we have no Fiat transaction,

9    and we are in a freefall liquidation in which we might then be

10   able to pursue, if we could find the money, these hypothetical

11   claims against Cerberus and Daimler, but the ultimate result

12   would be a far less recovery for all people that have an

13   interest in these estates.  That is why the debtors' board, in

14   the exercise of their business judgment, made the determination

15   that the compromise of these claims on these terms for these

16   benefits was clearly in the benefit of all of the parties with

17   interests in these estates, and therefore we ask the Court to

18   approve it on that basis.

19        THE COURT:  All right.  Anyone else wish to be heard?

20        MR. STUART:  Yes, Your Honor.  Walter Stuart on

21   behalf of CG Investment Group LLC and CG Investor LLC, which

22   are referred to in these proceedings as Cerberus.

23        I simply wanted to add a couple of citations to echo

24   the points made by Mr. Hamilton with respect to ownership of

25   these derivative claims, since no one had filed anything in

1    writing before the Court in response to the objection from

2    Getrag.  One is the case of In re 1031 Tax Group, which is

3    found at 397 B.R. 670, a 2008 case in the Southern District,

4    for the point that a derivative action clearly belongs to the

5    estate.  And perhaps directly relevant is the case of In re

6    Mrs. Weinberg's Kosher Foods, Inc., at 278 B.R. 358, in the

7    Southern District, 2002, which held that settlements may bind

8    third parties, including creditors, who seek to assert

9    derivative claims on behalf of the debtor or the debtor's

10   estate.  So I simply wanted to point out those two precedents.

11   Thank you.

12           THE COURT:  All right.  Anyone else?

13           MS. FELDSTEIN:  Your Honor, I apologize, Hydee

14   Feldstein.  I'm not clear on whether you're simply dealing with

15   this objection and then we would take up other matters

16   afterwards, or whether you wish to hear all comments or

17   reservations with respect to the motion before you at this

18   time.

19           THE COURT:  Well, I was under the impression that

20   there was one remaining objection and everything else was going

21   to be worked out with language changes.  Now, if that is not an

22   accurate state of the affairs of this matter, I guess let me

23   know.

24           MS. FELDSTEIN:  Your Honor, I believe everything,

25   with one small language issue has been worked out.  And perhaps

1    if I could take a moment to explain to the Court what that

2    issue is?

3            We came before this Court on a binding term sheet and

4    a proposed release on May 19th.  The issue that the purchaser

5    has had with the form in which the settlement has been

6    negotiated as amongst the parties has to do with timing.  At

7    this particular juncture, Chrysler LLC and the other debtors

8    before this Court have a number of subsidiaries who are not

9    debtors before this Court.  If, in fact, the release of Daimler

10   and Cerberus and their affiliates were to take place after the

11   sale, after the point in time at which the purchaser had

12   acquired that which it thought it was acquiring under the

13   master transaction agreement in the sale, we would have no

14   issues.

15           The issue arises because this settlement agreement

16   and release is not only coming before the Court, but by its

17   terms, is now likely to take effect before the purchase

18   agreement is consummated.  Accordingly, the scope and the

19   extent of the releases as negotiated between the estates and

20   Cerberus and Daimler, needed to be revisited in light of the

21   purchased assets, the assumed contracts and the nondebtor

22   subsidiaries, who the purchaser assumed it was acquiring as

23   part of the master sale transaction.

24           Under the master transaction agreement, specifically

25   section 5.01(b)(15), the debtors cannot, prior to consummation

1  of the sale, enter into any affiliate transaction other than as

2  set forth in a disclosure schedule or in the ordinary course of

3  business, without Fiat's consent.  Accordingly, Fiat did not

4  file an objection to this matter.  Whether it came before the

5  Court before or after the sale seemed an irrelevancy to us.  If

6  it came before the Court after the sale, we no longer had an

7  interest, since no release could, in fact, affect the entities

8  whose equity interests we were acquiring or the assets we were

9  purchasing.  If it came before the Court prior to the closing

10 of the sale, we believed we were protected under the master

11 transaction agreement section 5.01(b)(15).

12         We have spent the last several hours, I think, and

13 the last several days, Your Honor, productively.  I believe we

14 have a settlement agreement that is agreed to by all parties,

15 including Fiat as the purchaser, with one small exception,

16 which we will continue to try to work on.  The sections of the

17 settlement agreement that would come before you have two types

18 of releases.  Section 6(a) of the document has specific

19 releases that are defined with respect to specific contracts

20 and agreements that the purchaser understands and can look to.

21 Section 6(b) is a more general release.

22         The only issue on which we have not yet reached

23 agreement is whether the more general release would be won by

24 the debtors' only or would pick up the nondebtor subsidiaries.

25 There is a carve-out that we've been working on to ensure that

1    purchased assets and assumed contracts by the debtors -- the

2    release by the debtors does not pick up purchased assets or

3    assumed contracts as transferred to the purchaser under the

4    master transaction agreement.  And we are attempting to make

5    that carve-out parallel such that the nondebtor subsidiaries

6    also transfer their assets and their liabilities in their

7    entirety, since we are applying the equity to the purchaser.

8    But it is the scope of the release and how it intersects with

9    those nondebtor subsidiaries who are not before Your Honor that

10   has been the sticking point.

11        This is not simply a question of some insignificant

12   subsidiaries.  The Canadian debtors who, as the Court knows,

13   represent twenty percent or so of the financing that is being

14   provided in connection with the sale, are not debtor

15   subsidiaries before this Court.  And so the extent to which

16   those entities are releasing claims against affiliates of

17   Daimler or Cerberus when there are a number of ongoing

18   commercial relationships, is what has created the issue.

19        THE COURT:  All right.  Thank you.  Anyone care to

20   respond to that?

21     (Pause)

22        MR. HAMILTON:  Your Honor, I'm not sure exactly how

23   you would like us to proceed.  But let me tell you --

24        THE COURT:  I'm going to give you some options.  I'm

25   going to leave here, as I said, I think -- I have to leave by

1   5:15.  In the interim, I was going out for an hour and then

2   coming back.  So I would be back here by 4:15, 4:30.  Does that

3   give you enough time to work out whatever differences you have

4   if I grant the motion?

5            MR. HAMILTON:  It gives me the time, Your Honor, that

6   I need.  But I'm hopeful the parties will be able to work these

7   out as well.  What we would like to have for you by the time

8   you come back is a document that represents what the debtors

9   seek authority to enter into, and then hand it -- provide it to

10  you.  And then to the extent that the parties are not ready to

11  execute it until certain matters are resolved, as long as it's

12  within the authority that the Court has granted us to, we would

13  just submit a conforming copy that's executed at a later time.

14  That, I think we can get done this afternoon.

15           THE COURT:  And for that, you would need to come back

16  on the record?

17           MR. HAMILTON:  Yes.  We would need an order

18  authorizing us to enter into that settlement agreement in

19  substantially that form.  Then we could take -- what I have

20  here is a work of a lot of lawyers with handwritten marks and

21  everything.  We could get that approved as at least we'd have

22  authority to enter into it on that basis.  We would then create

23  a typewritten document and get parties' signatures and file a

24  conforming document with the parties' signatures at a later

25  time.  It may be that there will be one or perhaps two disputes

1    that the Court will need to rule on if we cannot resolve the

2    concerns that Ms. -- that counsel for Fiat just articulated

3    here.

4         I don't want to concede that we agree with her

5    characterization of her rights under the MTA. But it is

6    certainly fair to say that we need to get as close as we can to

7    consent among all parties, including the purchaser, on these

8    releases.

9         THE COURT: All right. What I believe I can do now,

10   though, is rule on the objection that was argued.

11        MR. HAMILTON: Thank you.

12        THE COURT: All right? And then leave it for later

13   this afternoon to resolve any other issues. First, I think the

14   claims at issue belong to the estate. The automatic stay, the

15   Court finds, is not implicated -- the automatic stay of the

16   objectors of state is now implicated by the actions being

17   sought to be approved by the Court, and that the debtor has

18   established a basis under 9019 to enter into this agreement and

19   the associated relief. And I would grant the relief subject to

20   the presentation of the order along with the agreement, and the

21   agreement of the parties to the language therein. All right?

22        So I would say, probably 4:15 -- well, I guess about

23   4:30, we should reconvene. That would give forty-five minutes

24   to argue any points about language.

25        MR. HAMILTON: Thank you, Your Honor.

1          THE COURT:  All right.  Thank you.

2     (Recess from 2:41 p.m. to 4:18 p.m.)

3          THE COURT:  Please be seated.  Mr. Hamilton.

4          MR. HAMILTON:  Thank you, Your Honor.  And if I could

5     beg your indulgence, not to be distracted by the scurrying of

6     activity behind me.  We are assembling the settlement agreement

7     that has been agreed to with the language by all the parties

8     with one exception.  The agreed upon language involves a lot of

9     handwritten notations and markups and inserts.  But it has, as

10    I understand it, resolved the concerns that were expressed by

11    counsel for New Chrysler, the purchaser, before the break.

12         And as we assemble this document, what we would

13    propose to do is submit it to the Court, and to the extent the

14    Court finds it acceptable, with a proposed order that

15    authorizes the debtor to enter into a settlement agreement and

16    to execute this settlement agreement, and a cleaned-up version

17    that we would clean up over the night, get the parties to sign

18    it, and file it tomorrow or Friday morning.  What I need to do

19    now is bring to the Court's attention the one remaining issue

20    that I believe has not been resolved, so that we can be clear

21    how we're going to go forward in that regard.

22         In the motion that we filed on May 19th, at that time

23    we asked the Court for authority to enter into a settlement

24    agreement based on the binding term sheet and the release that

25    we set forth in Schedule F that was attached to the motion.

1    The Schedule F was the releases that was the broader releases

2    from the estates that were required in order to have Cerberus

3    and therefore Daimler forgive the second-tier debt of 2 billion

4    dollars.  Those broader releases involved a release of Daimler

5    and Cerberus and their affiliates of all general claims, not

6    just those arising under the contribution agreement and related

7    agreements, with the carve-out exception for ongoing

8    operational agreements, which was the source of all the

9    problems with Ms. Feldstein and the purchaser of the assets,

10   which we have now resolved.

11          In the Schedule F that we submitted, and I apologize,

12   Your Honor, I took it how I got it at the time.  It had a lot

13   of complicated definitions and it takes a while to work your

14   way through it.  But in the Schedule F, 6(b) involved -- or

15   paragraph b of Schedule F involved the claims of the estates

16   that were going to be released.  And in Schedule F, paragraph

17   b, what we had proposed on May 19th was for the debtors to

18   release all claims against Cerberus and Daimler and their

19   related parties subject to the carve-out for ongoing

20   operations.

21          In the definitions, if you looked at the definition

22   of "related party" in what we filed in Schedule F -- I'm sorry,

23   "related persons", it said: "Related persons means with respect

24   to any person, such person's predecessor, successors, assigns,

25   and present and former affiliates (and each of their respective

present and former members, partners, equity holders,

officers)"..."in each case, acting in such capacity, and any

person claiming by or through them; provided that none of FinCo

HoldCo, or any of its direct or indirect subsidiaries shall

constitute a related person of any party hereto."

What that means is, in the document that we submitted

on May 19th, we had carved out from the release that we are

proposing to provide to Cerberus, a release of FinCo and its

immediate parent FinCo HoldCo. We weren't going to release our

general claims against FinCo HoldCo or its subs, including

FinCo.

Since the time we filed this document on May 19th,

we've engaged in further negotiations with Cerberus on this

point. And the document that we are going to hand up to the

Court that has all the little arrows and inserts and

handwritten notations, that everybody's been working on

diligently since 6 o'clock this morning, it involves -- it

contemplate that the estates will release their claims against

FinCo generally, subject to a specified carve-out with respect

to ongoing operational agreements, including the MAFA. So we

aren't releasing any claims that we have against FinCo for

breach of the MAFA or anything in connection with the MAFA.

However, we are providing a general release to FinCo,

as requested by Cerberus. We are demanding, requesting, that

Cerberus use its efforts to cause FinCo to give us a comparable

1   general release, subject to a carve-out for ongoing operational

2   agreements, including the MAFA. At this time, the document

3   that we are handing up to you does not obligate Cerberus to

4   require its subsidiary FinCo to give us the comparable, mirror,

5   general release that we are giving to FinCo at Cerberus'

6   request.

7           The debtors do not intend, at this time, to sign this

8   settlement agreement until Cerberus agrees to that provision.

9   However we do intend to continue to negotiate this provision

10  with Cerberus and we are now seeking authority to enter into an

11  agreement that will allow us to consummate this settlement

12  agreement. And if we need to soften or compromise or reach

13  some sort of settlement with Cerberus on this issue, we can do

14  so and modify the agreement without having to come back to

15  court and notice everybody to have another hearing to get

16  additional authorization to do so.

17          And with that one proviso, unless I've been

18  misinformed by the parties, I think all other issues have been

19  resolved, and I think, if they've finished assembling it behind

20  my back, I'm ready to hand it up to the Court.

21          THE COURT: All right.

22          MR. HAMILTON: It's not only a settlement, Your

23  Honor -- settlement agreement, but attached to it is also the

24  new guarantee that Daimler will provide for the pension funds

25  going forward, I believe. Is that right? That the 200 million

1   dollars going forward.  And it has a handwritten modification

2   as well that will need to be made when we file a conforming

3   copy.

4           And again, Your Honor, on behalf of everybody here,

5   we do appreciate the Court's indulgence and cooperation.  Under

6   the circumstances, this is what we were able to do.  May I

7   approach?

8           THE COURT:  Yes, please.  Thank you.  I just wanted

9   to say in furtherance of the Court's approval a couple hours

10  ago of this, that I wanted to add to that by saying with

11  respect to the reason that I find that the debtor has complied

12  with its obligations under 9019; is that the record shows that

13  any benefit that would flow, arguably, from any claims that

14  could be asserted, would benefit the DIP lenders, and could

15  only conceivably -- could not conceivably reach the unsecured

16  creditor body, and the DIP lenders have not opposed the

17  releases at issue.

18          All right.  With that, I will grant the relief as

19  requested.  I have the marked up version.  Anyone have any

20  desire of trying to fix this here?  You're more than welcome to

21  get a computer and do it.  And then we can give you access --

22  I'm pretty sure that you can get access to that computer over

23  there.

24          MR. HAMILTON:  Your Honor, we could do that.  I think

25  in order to get the parties to actually execute the document,

1    which is the preferred approach, we may need till tomorrow

2    anyway.

3          THE COURT:  All right.

4          MR. HAMILTON:  So we might as well take it back to

5    Jones Day and get it done.

6          THE COURT:  All right.  Fine.

7          MR. HAMILTON:  Can we prevail upon the Court to

8    photocopy what we handed to you so we could take it back with

9    us?

10         THE COURT:  You actually want me to photocopy it, or

11   you want to --

12         MR. HAMILTON:  I'm sure we'll find someone.

13         THE COURT:  It will get photocopied.

14         MR. HAMILTON:  Thank you, Your Honor.

15         THE COURT:  All right.  Thank you.

16      (Proceedings concluded at 4:28 p.m.)

17

18

19

20

21

22

23

24

25

I N D E X

RULINGS

|                                                          | Page | Line |
|----------------------------------------------------------|------|------|
| Motion by Fifth Third Bank for relief from the stay granted | 13 | 9 |
| Motion to authorize continued use of a purchase card adjourned to 6/18/09 | 13 | 21 |
| Debtors' motion for additional time to file reports under Bankruptcy Rule 2015.3 granted | 15 | 5 |
| Motion seeking relief to reject certain aircraft leases pursuant to Section 365 granted (as modified) | 16 | 25 |
| Second omnibus motion to reject certain executory hotel contracts granted | 17 | 15 |
| Application by the debtors to retain Cahill Gordon as special counsel approved | 18 | 16 |
| Motion of William Thomas Wilson withdrawn | 20 | 13 |
| Relief granted, subject to the presentation of the order along with the agreement, and the agreement of the parties to the language therein | 56 | 20 |
| Settlement agreement granted | 61 | 19 |

C E R T I F I C A T I O N

I, Sharona Shapiro, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

SHARONA SHAPIRO

AAERT Certified Transcriber (CET**D-492)

Veritext LLC

200 Old Country Road

Suite 580

Mineola, New York 11501

Date: June 4, 2009