JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
David G. Heiman

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
Jeffrey B. Ellman

Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
In re                                      :
                                           :
Old Carco LLC                              :
(f/k/a Chrysler LLC), et al.,              :
                                           :
                        Debtors.           :
                                           :
------------------------------------------------------------x
```

Chapter 11

Case No. 09-50002 (AJG)

(Jointly Administered)

## OBJECTION OF DEBTORS AND DEBTORS
## IN POSSESSION TO AMENDED MOTION OF CERTAIN
## DEALERS TO RECONSIDER THE COURT'S JUNE 9, 2009
## <u>REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION</u>

# TABLE OF CONTENTS

Overview .................................................................................................................... 1

Argument ................................................................................................................... 5

    The Motion Is More Than Six Months Too Late ............................................... 5

    The Motion Is a Transparent Attempt at an Untimely Appeal ........................ 10

    There Was No Mistake, Omission or Error Warranting Relief Under Federal
        Rule 60(b)(1), As the Dealer Rejection Order and the Dealership Rejection
        Opinion Were Well-Supported By an Extensive Evidentiary Record and
        Thorough Briefing ....................................................................................... 12

        The Court Considered Ample Evidence, and the Parties — Including
            Virtually All of the Movants — Submitted Thorough Briefs Making
            Most of the Arguments in the Motion ............................................... 12

        The Business Judgment Rule Was Satisfied ......................................... 17

        The Movants' Other Arguments Do Not Diminish the Validity of the
            Court's Findings and Conclusions Concerning Satisfaction of the
            Business Judgment Rule .................................................................. 22

    The Movants' Accusation That the Court Committed a Fraud Upon Itself Is False ........ 25

    None of the Additional Relief the Movants Request Is Supported or Appropriate ......... 28

        The Court Was Aware of Its Options and Equitable Powers .............................. 28

        The Few Movants Who Filed Claims Are Not Entitled to
            Administrative Priority ..................................................................... 30

        Much of the Other Relief the Movants Request Is Inappropriate and
            Unavailable as Being Outside of the Scope of Federal Rule 60 and
            Otherwise Nonsensical ..................................................................... 32

Conclusion ............................................................................................................. 35

ATI-2406148v5

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

Old Carco LLC f/k/a Chrysler LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") hereby object to the Motion to Reconsider the Court's June 9, 2009 Rejection Order and June 19, 2009 Rejection Opinion (Docket No. 6132) (collectively with the Memorandum in Support attached thereto,[1] and as amended on January 15, 2010,[2] the "Motion"), filed jointly by a total of 75 former Chrysler, Dodge and/or Jeep dealers (collectively, the "Movants") whose dealer agreements were rejected by the Debtors under section 365 of title 11 of the United States Code (the "Bankruptcy Code") pursuant to the Order, Pursuant to Sections 105 and 365 of the Bankruptcy Code and Bankruptcy Rule 6006, (A) Authorizing the Rejection of Executory Contracts and Unexpired Leases with Certain Domestic Dealers and (B) Granting Certain Related Relief (Docket No. 3802) (the "Dealer Rejection Order").  In support of this Objection, the Debtors respectfully represent as follows:

## Overview

1.      By the Motion, the Movants ask the Court, pursuant to Rule 60 of the Federal Rules of Civil Procedure (the "Federal Rules"),[3] to vacate its findings and conclusions of more than six months ago in the Dealer Rejection Order and the written opinion supporting the Dealer Rejection Order, In re Old Carco, LLC, 406 B.R. 180 (Bankr. S.D.N.Y. 2009) (the "Dealer Rejection Opinion").  As a corollary, the Movants seek a wide array of additional affirmative relief going far beyond the confines of the challenged rulings.  This additional relief includes requests to:

---

[1]      The Memorandum in Support is cited herein as "Mem. of Law."

[2]      The Movants originally were 20 dealers.  However, on the same day that the Movants set as the response deadline for their Motion, they filed an amendment to the Motion (Docket No. 6212) adding 55 more dealers as Movants.

[3]      Federal Rule 60 is applicable in cases under the Bankruptcy Code pursuant to Rule 9024 of the Federal Rules of Bankruptcy Procedure.

(a) compel the Debtors to assume retroactively the Movants' former dealer agreements; (b) grant administrative priority to the Movants' claims, even though nearly half of the Movants failed to file any proofs of claim at all; and (c) "revers[e] payment to priority lien holders" of the proceeds of the Fiat Transaction even though the Movants acknowledge that they are not challenging the Court's order approving that sale. As grounds for their extraordinary requests, the Movants argue that the Court "overlooked important factual matters . . . and . . . controlling decisions and statutes," resulting in the Court having "misapplied the law, committed clear error and . . . caused a manifest injustice." See Mem. of Law at 3-4. For a host of reasons, however, the Court should deny the Motion in its entirety.

    2.   On procedural grounds, the Motion is untimely and an improper use of Federal Rule 60 in place of an appeal. Notably, all but two of the Movants objected to the Debtors' motion to reject their dealer agreements (Docket No. 780) (the "Dealer Rejection Motion"), and all but eight of them objected to the Debtors' motion to sell to Chrysler Group LLC ("New Chrysler") substantially all of the estates' assets (Docket No. 190) (the "Sale Motion").[4] All of the Movants had notice of the relief requested and granted in connection with the Dealer Rejection Motion and the Sale Motion and an opportunity to be heard with respect to those matters. To that end, each Movant had an opportunity to file a timely appeal of the Dealer Rejection Order, but chose not to do so. The Movants have not offered any explanation for that choice. They cannot evade the consequences of that choice now — inexcusably having let more than six months pass — or use Federal Rule 60 to make arguments of so-called "error" that were readily available to them at the time of the challenged rulings.[5]

---

[4]  Capitalized terms not otherwise defined herein have the meanings given to them in either the Dealer Rejection Motion or the Sale Motion, as applicable.

[5]  In particular, given that 32 of the 75 Movants (including virtually all of the 20 original Movants) decided not to file proofs of claim and their unanimous determination not to move for reargument or appeal on a timely

3. On the merits, the Motion mischaracterizes the record and the Court's reasoning and rulings, alleging "error" where none exists. Even a passing review of the Dealer Rejection Opinion reveals that the Court directly addressed the issues and points that the Movants accuse the Court of having "overlooked." Indeed, the record shows not only that the Court considered an extensive evidentiary record and volumes of thorough legal briefing in rendering its findings and conclusions, but that most of the very same arguments the Movants assert now were asserted at the time of the rulings, but failed. The original failure of these arguments does not mean that the Court overlooked them or committed error, and the Movants' dogmatic persistence in repeating them now does not require the Court to consider them yet again. The record fully supports the Court's challenged findings of fact and conclusions of law.

4. Moreover, the Movants offer no support for using Federal Rule 60 to grant any of the far-reaching and case-altering affirmative relief they seek — including the request to have the rejected dealer agreements deemed assumed retroactively. Indeed, the Movants' entire argument is internally inconsistent. They seek to have the dealer agreements "assumed" — presumably with the hope of becoming dealers for New Chrysler since the Debtors have no remaining business operations — but acknowledge at the outset that they are not challenging the Sale Order or its provisions. That "concession" is fatal to their claims. The Sale Order decided the question as to which contracts were being assumed and assigned to New Chrysler and found that the sale could proceed free and clear of other claims that could have been brought by parties to

<hr />

(continued…)

basis, the Debtors respectfully suggest that the Movants' right to be heard on the Motion warrants skepticism, despite the broad rights of parties in interest to be heard under section 1109 of the Bankruptcy Code. At this juncture, the Movants that lack any remaining contracts or commercial relationships with the Debtors and that did nothing to preserve their claims are not parties in interest with any stake in the outcome of these cases.

contracts that had not been assumed. The Movants cannot concede the validity of the Sale Order with one hand and then seek to unravel it with the other.

5. As the record amply reflected, the Debtors had no realistic choice but to reject the agreements in question under the circumstances presented. In light of the sale of the Debtors' primary business assets to New Chrysler, and New Chrysler's clear expression of its determination not to take assignment of the Movants' dealer agreements, the decision to reject these agreements reflected the practical realities of the situation and was well within the Debtors' sound business judgment. As of the Petition Date, the Debtors were no longer operating their businesses and, as a result of the sale to New Chrysler, never would operate these businesses again. Without a car manufacturing business, the Debtors (a) had no need for a dealer network, (b) had no ability to maintain such a network and (c) lacked the ability to fulfill their obligations under the dealer agreements on a going-forward basis.[6] Thus, any approach other than rejection would have been irrational — the opposite of sound business judgment.

6. In light of the practical business circumstances that compelled the Debtors to request the rejections, and that have the same if not greater force today as they did then, undoing the Dealer Rejection Order would make no sense. It also would be squarely at odds with the Court's approval of the Fiat Transaction — which the Movants expressly have not challenged[7] — a critical component of which was the transfer of a smaller dealer network to New Chrysler, free and

---

[6] The Debtors lack any funding for the potentially significant administrative liabilities that could be incurred by the assumption of the Movants' rejected dealer agreements. By contrast, the Court has made clear that claims created by the rejection of these agreements (if timely and properly preserved by the filing of a proof of claim) are general unsecured nonpriority claims. See Opinion Denying Motion of the 23 Affected Dealers for Allowance of Administrative Expenses Pursuant to 11 U.S.C. §§ 503(b) and 507(a)(2) [Docket No. 6160], dated January 5, 2010.

[7] See Mem. of Law at 4 (stating that the Movants do not challenge the Sale Order).

clear of burdens and claims associated with the rejected dealers.[8]  Accordingly, for all of these

reasons and the other reasons set forth below, the Court should deny the Motion in its entirety.

**<u>Argument</u>**

***The Motion Is More Than Six Months Too Late***

7.     The Motion is based on Federal Rule 60, which addresses the Court's ability

to grant relief from a judgment or order under certain circumstances.[9]  To the extent that the Motion

seeks relief under Federal Rule 60(b), it is governed by the timeliness requirements of Federal

Rule 60(c); *i.e.*, that "[a] motion under Rule 60(b) must be made *within a reasonable time*. . . ."

Federal Rule 60(c)(1) (emphasis added).  The provision further states that a motion under Federal

Rule 60(b)(1), (2) or (3) must be made "no more than a year after the entry of the judgment or

order. . . ." Federal Rule 60(c)(1).

8.     Tellingly, the Movants omit the "reasonable time" limitation in their

description of the requirements of Federal Rule 60(c)(1) — thereby ignoring the standard

established by the rule.  <u>See</u> Mem. of Law at 3.  Moreover, the Movants say nothing about their

delay in filing their Motion until more than six months after the entry of the Dealer Rejection

Order.  The Movants merely conclude, without elaboration, that the Motion is "well within" the

one-year outside time limit.  <u>See</u> Mem. of Law at 3.  This logic, however, mischaracterizes the

timeliness standard in Federal Rule 60.[10]

---

[8]     Along these lines, among other things, the Movants' request to unwind the payment of sale proceeds to the First Lien Lenders fails because these payments were made pursuant to the terms of the Sale Order.

[9]     Federal Rule 60(b) provides for relief from a final judgment or order under the following circumstances, among others:  "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . .[,] misrepresentation, or misconduct by an opposing party."

[10]     Perhaps in recognition of their inexcusable and prejudicial tardiness with their attempted Federal Rule 60(b)(1) arguments, the Movants point out that Federal Rule 60 does not impose any time limit for motions brought under Federal Rule 60(d)(3) for "fraud on the court," which is another basis of the Motion.  <u>See</u> Mem. of Law at 3.  As demonstrated later in this Objection, however, the Movants' "fraud on the court" argument is devoid

- 5 -

9.      Despite the reference to a one-year time limit in Federal Rule 60(c), all motions under Federal Rule 60(b) remain subject to the more general "reasonable time" requirement, and there is nothing in the rule mandating that any and all motions filed within one year are deemed to be filed within a reasonable time.  Indeed, numerous courts have found Federal Rule 60(b) motions to be untimely despite having been filed within the one-year outside deadline.  See Schildhaus v. Moe, 335 F.2d 529, 531 (2d Cir. 1964) (finding untimely a Federal Rule 60(b) motion based on an alleged mistake of fact by the court that was brought eight months after the court's judgment); Sallie Mae Servicing v. Williams (In re Williams), 287 B.R. 787, 793-94 (9th Cir. B.A.P. 2002) (finding untimely a Federal Rule 60(b) motion filed nearly three months after the entry of a judgment, where the defendant knew of the judgment at the time and did not offer any reason for its three-month delay); Sasso v. M. Fine Lumber Co., Inc., 144 F.R.D. 185, 188-89 (E.D.N.Y. 1992) (finding untimely a Federal Rule 60(b) motion brought nine months after judgment); Freschi v. Grand Coal Venture, 103 F.R.D. 606, 607 (S.D.N.Y. 1984) (finding untimely a Federal Rule 60(b) motion brought approximately six weeks after judgment); Robinson v. E. P. Dutton & Co., 45 F.R.D. 360, 361 (S.D.N.Y. 1968) (finding that the movant's delay of ten months in bringing a Federal Rule 60(b) motion was "unreasonable and inexcusable").

10.      Here, for several reasons, the Movants have failed to bring their Motion "within a reasonable time" as mandated by Federal Rule 60(c)(1).  The Movants had ample notice and the opportunity to bring their Motion promptly upon entry of the Dealer Rejection Order.  Because the Motion effectively seeks to appeal or reargue the Court's findings and conclusions, the proper procedure would have been to appeal or move for reargument within the ten days following

_____

(continued…)

of merit and offers no proper basis for relief under Federal Rule 60 here.  Consequently, that argument does not cure the dramatic lateness of the Motion.

entry of the challenged rulings.  <u>See</u> Bankruptcy Rule 8002 (setting the time limit for a notice of appeal); Local Rule 9023-1 (establishing an opportunity and the time limit to request reargument).[11]

11.     Notably, virtually all of the 75 Movants participated directly in the litigation that led to the challenged rulings.  As stated earlier, all but two of them (John Hine Pontiac and Wilson Dodge Nissan) objected to the Dealer Rejection Motion and all but eight (Bruce Campbell Dodge Inc.; Jim Fiore Motors; John Hine Pontiac; M&M Dodge Inc.; Mt Clemens Dodge Inc.; Russo Group Enterprises Inc.; SNOW, LLC; and Wilson Dodge Nissan) objected to the Sale Motion.  All of the Movants received notice of the proceedings and had an opportunity to be heard.  Thus, the Movants cannot claim ignorance of the relief granted in the Dealer Rejection Order or a lack of an earlier ability to assert their arguments.[12]

12.     Moreover, as the Motion itself reveals, there are no new arguments here.  Every point of fact and law about which the Movants argue either was (a) addressed expressly in the Dealer Rejection Opinion; or (b) available to the Court at the time, in the form of (i) evidence in the record and (ii) law cited in the oral and written legal arguments, or which was in the public record at the time.  The Movants do not cite to any law that changed or evidence that came to light after the challenged rulings.  Under such circumstances, using Federal Rule 60 instead of a timely appeal is highly disfavored, as shown below.  <u>See</u> <u>infra</u> paragraphs 18 - 22.  Even when courts have permitted a Federal Rule 60 motion to take the place of an appeal, courts have required that such a motion be brought within the required timeframe for an appeal or have denied the motion as late.  <u>Schildhaus</u>, 335 F.2d at 531 (determining that "a reasonable time for making a motion under [Federal] Rule 60(b) on the basis of judicial error should not exceed that allowed for an appeal"); <u>Freschi</u>, 103

---

[11]     As of December 1, 2009, amendments to these rules expanded the periods in question from ten days to 14 days.  At the time of entry of the Dealer Rejection Order, the appeal period remained ten days.

[12]     In any event, the Debtors do not acknowledge that any such excuse would be sufficient if proffered.

F.R.D. at 608 (explaining that if a Federal Rule 60(b) motion is used to challenge an alleged judicial mistake, the motion must be made within the time period to appeal).

13.     Because the Movants offer no explanation whatsoever for their election not to appeal or for their extended delay in bringing their Motion,[13] they have failed to meet their burden.  See Amoco Overseas Oil Co. v. Compagnie Nationale Algeriennes de Navigation, 605 F.2d 648, 656 (2d Cir. 1979) (requiring that as "the delay [in filing a Federal Rule 60 motion]. . . approaches one year there should be a corresponding increase in the burden that must be carried to show that the delay was 'reasonable'"); Sasso, 144 F.R.D. at 189 (denying a Federal Rule 60(b) motion for various reasons including tardiness, and finding that the movant had failed to provide any "evidence of good cause" for its delay in filing the motion).

14.     In addition, granting the requested relief at this late date would cause great prejudice to the Debtors' estates.  Undoing the rejection of the dealer agreements could create additional, and potentially significant, administrative liabilities and other burdens on the Debtors' estates.  Since the entry of the Dealer Rejection Order, and in reliance upon its terms and its finality

---

[13]     Given their extreme lateness and the absence of any new development in the record or law, it is unclear what has motivated the Movants' sudden change of heart and request for relief at this late juncture. Although the Debtors have no independent knowledge of these matters, the Debtors have taken note of certain public statements connecting the Motion to a crusade involving the Movants' counsel to challenge Barack Obama's legitimacy as President of the United States.  For example, one report has stated:

> Birthers are launching yet another scheme to challenge President Obama's legitimacy as President of the United States. The scheme involves a legal maneuver known as "*quo warranto*," a prerogative *writ* requiring the person to whom it is directed to show what authority he has for exercising some right or power (or "franchise") he claims to hold. This new attempt to get at Obama is a circuitous affair, centering on the Chrysler bailout, and Obama's authority to use Troubled Asset Relief Program funds to bail out Chrysler. Former Chrysler dealers who lost their businesses as part of the restructuring of the automobile company are filing a legal challenge to that restructuring in bankruptcy court. . . . The attorneys of record are . . . Leo Donofrio . . . and Stephen Pidgeon.

Michael Stone, Quo Warranto: Return of the Birthers, EXAMINER.COM, http://www.examiner.com/x-4383-Portland-Progressive-Examiner~y2009ml2d9-Quo-warranto-Return-of-the-Birthers (last visited January 6, 2010); see also Bob Unruh, Closed Chrysler Dealers to Drive Obama's Eligibility, WORLDNETDAILY, Dec. 8, 2009, http://www.wnd.com/index.php?fa=PAGE.view&pageId=l18403 (last visited January 10, 2010) ("Two lawyers have joined forces to assemble a case challenging in U.S. bankruptcy court the federal government's . . . bail out [of] Chrysler and in doing so may have created a scenario that finally will bring to a head the issue of Barack Obama's eligibility to be [P]resident.")

(among other things), the Debtors completed the negotiation of a winddown budget with their debtor in possession lenders to fund the conclusion of these cases, which was approved by the Court as part of an agreed order entered on November 19, 2009 (Docket No. 5982) (the "Winddown Order").  In addition, premised on the Winddown Order and the available funding thereunder, the Debtors have formulated a proposed plan of liquidation (as it may be amended from time to time, the "Plan") and an accompanying disclosure statement (as it may be amended from time to time, the "Disclosure Statement").  The Plan and the Disclosure Statement, as filed on December 14 and 15, 2009 (Docket Nos. 6077 and 6078, respectively), reflect the outcome of the Debtors' longstanding negotiations with their key constituencies and provide a mechanism to complete the winddown of the Debtors' affairs and for creditor recoveries in these cases.  Consequently, vacating the Dealer Rejection Order would threaten the remaining administration of the Debtors' estates.

15.  With respect to dealer matters in particular, since the entry of the Dealer Rejection Order, this Court has enforced the terms of the Dealer Rejection Order against certain rejected dealers and expressed again and again the importance of this order in connection with the Fiat Transaction.  See Opinion dated August 31, 2009 (Docket No. 5372) at 6, 9 (enjoining certain dealer actions that were in violation of the Dealer Rejection Order; noting, among other things, that "the Court found that a crucial condition of the Fiat Transaction was that New Chrysler would assume only the dealer agreements that the Debtors elected to assume" and "[b]oth the [Dealership] Rejection Order and the [Dealership] Rejection Opinion found that, in their business judgment, the Debtors' rejection of the [dealership] agreements was necessary and appropriate to consummate the Fiat Transaction").  Thus, vacating the Dealer Rejection Order would unravel relief that the Court has recognized, throughout this case, was a central feature of the Fiat Transaction - a transaction the Movants agree is beyond challenge.  See Mem. of Law at 3.

16. Under such circumstances, relief under Federal Rule 60 is inequitable and inappropriate. See Feldman v. Trans-East Air, Inc., 497 F.2d 352, 355-56 (2d Cir. 1974) (declining to vacate an order concerning a debtor's rejection of airplane leases, because the lessors had relied on the order and re-leased the airplanes, and vacating the order would therefore cause harm and prejudice to the lessors); In re Teligent, Inc., 326 B.R. 219, 227-28 (S.D.N.Y. 2005) (denying the debtor's motion to vacate an order approving assumption of a healthcare insurance policy, because the insurance company and the debtor's employees had incurred costs and otherwise acted in reliance upon the assumption order and the policy); Robinson, 45 F.R.D. 360 at 362 (finding that vacating an order under Federal Rule 60 would prejudice the nonmovant because the main witnesses had passed away during the ten months between the order and the untimely motion).

17. Thus, the Court may deny the Motion on timeliness grounds alone.

**The Motion Is a Transparent Attempt at an Untimely Appeal**

18. The Motion is an unashamed collateral attack upon the reasoning of, and the findings and conclusions in, the Dealer Rejection Order and the Dealer Rejection Opinion. The Movants do nothing more than pick through the rulings and second-guess them, contending that the Court committed "error" because it "overlooked" arguments and facts. As such, the Motion is nothing more than an opening appellate brief, which is an inappropriate use of Federal Rule 60 at this point. "Rule 60(b) was not intended as a substitute for a direct appeal. . . ." Schildhaus, 335 F.2d at 531 (internal quotes and citations omitted); Freschi, 103 F.R.D. at 608 (same).[14]

19. Indeed, time and again, when parties have attempted the kind of transparent end-run around the appellate rules that the Movants are attempting here, courts have denied such

---

[14] To the limited extent that some authority in the Second Circuit permits the use of Federal Rule 60 as a substitute for a motion for reargument or reconsideration, this exception is viewed as a means of achieving judicial efficiency through reconsideration instead of appeal, and it requires that the motion be brought within the deadline for appeal — not more than six months afterward. See supra paragraph 12.

efforts as an abuse of procedure.  See, e.g., Kellogg Brown & Root Int'l, Inc. v. Altanmia

Commercial Mktg Co., H-07-2684, 2009 WL 514054, *8 (S.D. Tex. Mar. 2, 2009) (denying both

the plaintiffs and the defendant's motions under Federal Rule 60(b) because, among other grounds,

"[a] motion for relief under Rule 60(b)(1) is 'not a substitute for the ordinary method of redressing

judicial error—appeal'") (internal citation omitted); Williams v. Artus, 06-cv-0356, 2008 WL

4516241, * 2 (W.D.N.Y. Oct. 2, 2008) (denying a motion under Federal Rule 60(b) on grounds that

such a motion does not stand in place of an appeal other than in exceptional circumstances, and a

movant's mere disagreement with the court's interpretation of facts and law is not a qualifying

exceptional circumstance; stating that "Rule 60(b)(1) is not to be invoked to 'provide a movant an

additional opportunity to make arguments or attempt to win points already carefully analyzed and

justifiably disposed.'") (internal citation omitted); A.P. v. McGrew, No. 97 C 5876, 1998 WL

808879, *2 (N.D. 111. Nov. 16, 1998) (denying a motion under Federal Rule 60(b) that challenged

a summary judgment ruling for the court's alleged failure to have considered certain arguments and

facts and alleged reliance upon disputed facts; noting that "an appeal from a summary judgment,

rather than a Rule 60(b) motion, is the proper avenue to redress legal errors by the trial court").

20.     The very decision the Movants hold up as the standard bearer — Hoffenberg

v. Hoffman & Pollok, 296 F.Supp.2d 504 (S.D.N.Y. 2003); see Mem. of Law at 3 — was another

example of this principle.  In that case, the court denied a motion for reconsideration. Id. at 506.

The court saw no grounds for granting the relief because the movant "ha[d] not alleged any new

facts. . . .  Rather, his submission is a reiteration of his previous arguments."  Id.

21.     Even when courts indulge movants by entertaining Federal Rule 60(b)

motions that allege error or "mistake" based only on the same facts and arguments known and

available at the time of the challenged rulings, such courts impose a heavy burden on the movants.

This heavy burden recognizes that such use of Federal Rule 60 would be "extraordinary relief' and,

- 11 -

therefore, such a motion "may only be granted upon a showing of exceptional circumstances." Serrano v. Smith, 05-civ-1849, 2009 WL 1390868, * 1 (S.D.N.Y. May 13, 2009) (holding that the appellant's "disagreement with the resolution of the legal and factual issues presented by his *habeas* petition [did] not amount to the kind of 'exceptional circumstances' which warrant Rule 60(b)(1) relief').  The Movants make no such showings here.

22.     Here, the Movants' arguments constitute nothing more than a thinly-veiled appellate brief after the deadline to file one expired.

***There Was No Mistake, Omission or Error Warranting Relief Under***
***Federal Rule 60(b)(1), As the Dealer Rejection Order and the Dealership Rejection***
***Opinion Were Well-Supported By an Extensive Evidentiary Record and Thorough Briefing***

23.     The Movants argue that the Dealer Rejection Order should be vacated because the Court allegedly was mistaken, "overlooked" important matters or otherwise committed "error" in its conclusion that the Debtors met the business judgment test in asking to reject the applicable dealer agreements.  See Mem. of Law at 13-30.  The Movants fail to meet their heavy burden to meet the "mistake" standard under Federal Rule 60 for vacating the Dealer Rejection Order because, as demonstrated below, the record provided solid support for the Court's findings and conclusions, and those findings and conclusions were correct on the merits.

*The Court Considered Ample Evidence, and the Parties — Including Virtually All of the*
*Movants — Submitted Thorough Briefs Making Most of the Arguments in the Motion*

24.     As a threshold point about the quality of the Court's analysis, a review of the record and the Dealer Rejection Opinion confirm that the Court's consideration of the evidence and law was comprehensive.  After having heard evidence and argument on many of the same issues at three days of hearings on the Sale Motion, the Court then conducted another two days of hearings on the Dealer Rejection Motion, "at which 15 witnesses testified . . . and an additional

approximately 66 witnesses presented testimony by proffered declaration." Dealer Rejection Opinion at 187.[15]

25. The Court incorporated into the Dealer Rejection Opinion its opinion on approval of the Fiat Transaction, In re Chrysler, LLC, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) (the "Sale Opinion"). Dealer Rejection Opinion at 187. The Movants not only accept this extension of the record, they use it for their own purposes too. See Mem. of Law at 4 ("Movants only seek relief from the Rejection Order and not the actual Sale Order" and "address [their] arguments to the entire record."). As the Movants must and do concede, the "legal issue controlling [the] Motion to reject 789 dealer agreements was considered in the Sale Hearing, Order and Opinion as well as the Rejection Hearing, Order and Opinion." Mem. of Law at 4.[16]

26. Every affected dealer, including each of the Movants, had a full and fair opportunity to object to the Dealer Rejection Motion. In total, the Debtors received no fewer than 197 timely and untimely responses to the Dealer Rejection Motion (collectively, the "Rejection Responses"), which responses purported to represent the interests of 431 dealers, 21 states and 9 other parties.[17] See Debtors' Consolidated Reply in Support of the Dealer Rejection Motion (Docket No. 3166) (the "Consolidated Rejection Reply") at 5. Approximately 21 of the Rejection Responses also included objections to the Sale Motion. See Debtor's Consolidated Reply in

---

[15] "[S]everal of the Debtors' employees, including ... the Director of Dealer Operations ... made declarations to the Court, participated in depositions, and offered live testimony in various hearings regarding the [Dealer Rejection] Motion and its subject matter." Dealer Rejection Opinion at 187. In addition, the Debtors and other parties filed designations and counter-designations of evidence concerning the Dealer Rejection Motion. See, e.g, Docket Nos. 3276, 3645, 3683 and 3733. Under some of these designations, evidence from the hearing on the Sale Motion and other hearings were moved, without objection, and admitted into evidence for purposes of the Dealer Rejection Motion. See Dealer Rejection Opinion at 187 n.4.

[16] Of course, the Movants' acceptance of the Court's order approving the sale (Docket No. 3232) (the "Sale Order") is no sacrifice, because the Sale Order has been upheld on appeal and has become final, so the Movants are not entitled to relief from it in any event.

[17] In all, the Debtors estimate that the Court had before it more than 1,000 pages of briefs, letters and affidavits in support of and in opposition to the Dealer Rejection Motion. As such, the Court was exceptionally well informed of the parties' positions on the facts and the law.

Support of the Sale Motion (Docket No. 2155) at 22.  The Rejection Responses raised dozens of arguments against approval of the Dealer Rejection Motion, including many of the Movants' main arguments here,[18] and the Debtors addressed each of the arguments in their Consolidated Rejection Reply.  See Consolidated Rejection Reply at 6-41.

27.     The principals of four Movants testified in person at the hearings.[19] In addition, at least 23 Movants submitted declarations or affidavits for the Court's consideration. See, e.g., Decl. of Cheryl W. Nelson in support of objection of Continental Chrysler Jeep, Inc. (Docket No. 2336); Decl. of James L. Golick (Docket No. 2984); Decl. of Christopher J. Kalmar (Docket No. 2991).  At the hearings, counsel representing various affected dealers, including 73 of the 75 Movants, made numerous arguments against rejection of the dealer agreements, including many of the same issues the Movants now allege were overlooked by the Court:

---

[18]     See, e.g., Objection to Dealer Rejection Motion filed by the Committee of Chrysler Affected Dealers (Docket No. 2001) (the "Dealer Committee Objection") at ¶¶ 43-46 (arguing that rejection of the dealer agreements would provide no benefit to the Debtors' estates, would yield a large rejection damages claim and would serve to benefit only New Chrysler); Objection to Dealer Rejection Motion filed by Performance Dodge, LLC, et al. (Docket No. 2201) (the "Performance Dodge Objection") at ¶¶ 14-24 (arguing that rejection of the dealer agreements would not benefit the Debtors' estates; quoting Minges in connection therewith); Objection to Dealer Rejection Motion filed by the Affected Dealers (Docket No. 2346) (the "Affected Dealer Objection") at ¶¶ 11-14 (arguing that rejection of the dealer agreements would harm the Debtors' estates by creating substantial rejection damages claims).

[19]     Live testimony was provided at the hearings by principals of the following Movants:  Archer Chrysler Jeep (testimony of Robert Archer, May 29, 2010 Hr'g at pp. 95-108); Birmingham Chrysler Plymouth, Inc. (testimony of Richard Mealy, May 29, 2010 Hr'g at pp. 58-74); Bob Taylor Jeep, Inc. (testimony of Bob Taylor, June 4, 2010 Hr'g at pp. 24-36); and Orleans Dodge Chrysler Jeep Inc. (testimony of Michael Comiskey, June 4, 2010 Hr'g at pp. 200-07).

| Movants' Argument | Citations to Hearing Transcripts |
|---|---|
| The Court failed to consider the testimony of Alfredo Altavilla, Chief Executive of Fiat's Powertrain Technologies Group, allegedly indicating that Fiat was unconcerned about the timing of any restructuring of the dealer network. Mem. of Law at 7-10. | • Tr. of May 29, 2009 Hr'g at 282-83 (argument of Stephen D. Lerner, Esq., counsel to the Committee of Chrysler Affected Dealers)[20] (arguing that Mr. Altavilla's testimony indicated that "[i]t did not matter to Fiat whether, if there were going to be dealer reductions, that they be done in the bankruptcy or afterwards");<br>• Tr. of May 29, 2009 Hr'g at 294 (argument of Eric Snyder, Esq. counsel to 31 affected dealers)[21] ("And I believe, as Mr. Lerner stated, Fiat doesn't care. It wasn't a factor in Fiat's decision to purchase the assets of Chrysler that 789 dealers be left behind.");<br>• Tr. of June 9, 2009 Hr'g at 69-70 (argument of Michael J. Connolly, Esq., counsel to Palmer Chrysler Dealership) (arguing that Mr. Altavilla's testified that the timing of dealer restructuring was not a major concern to Fiat);<br>• Tr. of May 29, 2009 Hr'g at 399-400 (argument of Hydee R. Feldstein, Esq., counsel to Fiat) (clarifying that Mr. Altavilla testified that dealer rationalization was indeed an integral component of the Fiat Transaction); and Tr. of June 9, 2009 Hr'g at 156-57 (argument of Kevyn D. Orr, Esq., counsel to the Debtors) (same). |
| The Court disregarded the testimony of Mr. Altavilla allegedly indicating that Fiat required no specific number of dealerships to be rejected, allowing for the assumption and assignment to New Chrysler of every dealership agreement. Mem. of Law at 11. | • Tr. of May 29, 2009 Hr'g at 282-83 (argument of Stephen D. Lerner, Esq., counsel to the Committee of Chrysler Affected Dealers) ("There was no target number of any kind that Fiat, as the principal operational party to the purchaser, required."). |
| The Court failed to apply the business judgment test as allegedly required by In re Minges, 602 F.2d 38, 44 (2d Cir. 1979). Mem. of Law at 14-15, 16-17. | • Tr. of June 9, 2009 Hr'g at 53-54 (argument of Russell McRory, Esq., counsel to certain affected dealers)[22] (arguing that Minges requires "detailed support" for a debtor's decision to reject an executory contract). |
| The Court failed to consider that rejection of the dealer agreements would expose the Debtors' estates to rejection damages claims in an alleged amount of $1 billion. Mem. of Law at 15, 21-23. | • Tr. of May 29, 2009 Hr'g at 284 (argument of Stephen D. Lerner, Esq., counsel to the Committee of Chrysler Affected Dealers) (arguing that the rejection of the dealer agreements would "result in liabilities easily over one billion dollars"); and |

[20]  Each of the Movants was a member of the so-called Committee of Chrysler Affected Dealers, which filed the Dealer Committee Objection, among other objections and was represented by Stephen D. Lerner, except for Movants Island Jeep Inc.; John Hine Pontiac; Neil Huffman Incorporated; Rallye Auto Plaza Inc.; Thomas Dodge Corp.; and Wilson Dodge Nissan.

[21]  Movants Axelrod Chrysler Inc.; Berlin Chrysler Inc.; Bob Taylor Jeep Inc., Bollinger's Inc.; Bruce Campbell Dodge Inc.; Island Jeep Incorporated; Mauro Motors, Inc.; Rallye Auto Plaza Inc.; Scotia Motors Inc.; Tenafly Chrysler Jeep Inc.; Terry Chrysler Jeep Inc.; and Thomas Dodge Corp. were members of the group calling itself the Affected Dealers, which filed the Affected Dealer Objection, among other objections, and was represented by Eric Snyder.

[22]  Movants Golden Motors; Neil Huffman Incorporated; Southeast Automobile; South Holland Dodge; and South Shore Chrysler were among a group of dealers that filed the Performance Dodge Objection, among other objections, and which was represented by Russell McRory.

| Movants' Argument | Citations to Hearing Transcripts |
|---|---|
| | • Tr. of June 9, 2009 Hr'g at 47 (argument of Eric Snyder, Esq., counsel to 31 affected dealers) (arguing that rejection of the dealer agreements would lead to an "enormous increase in rejection damages claims"). |
| The Court failed to consider that the benefits of restructuring allegedly inured exclusively to New Chrysler. Mem. of Law at 18. | • Tr. of June 9, 2009 Hr'g at 54 (argument of Russell McRory, Esq., counsel to certain affected dealers) (arguing that the benefit of rejecting dealer agreements "accrued solely to [New Chrysler]"); and<br>• Tr. of June 9, 2009 Hr'g at 70-71 (argument of Michael J. Connolly, Esq., counsel to Palmer Chrysler Dealership) (arguing that the Debtors would not benefit from the rejections, that New Chrysler would, and that benefits to New Chrysler should not influence the analysis). |
| The Court failed to consider that rejection of the dealer agreements allegedly would yield "not one penny" of benefit to the estate. Mem. of Law at 19-20. | • Tr. of May 29, 2009 Hr'g at 282-83 (argument of Stephen D. Lerner, Esq., counsel to the Committee of Chrysler Affected Dealers) (arguing that no witness could identify "a single dollar" of benefit to the Debtors);<br>• Tr. of June 9, 2009 Hr'g at 27-28 (argument of Stephen D. Lerner, Esq., counsel to the Committee of Chrysler Affected Dealers) (arguing that the rejections would result in no benefit to the Debtors' estates);<br>• Tr. of June 9, 2009 Hr'g at 47 (argument of Eric Snyder, Esq., counsel to 31 affected dealers) (same). |
| The Court failed to consider that assumption and assignment of the rejected dealer agreements allegedly would have the same impact on the Debtors' DIP budget as rejection. Mem. of Law at 20. | • Tr. of June 9, 2009 Hr'g at 27-28 (argument of Stephen D. Lerner, Esq., counsel to the Committee of Chrysler Affected Dealers) (arguing that the Debtors could have sought to assume and assign the dealer agreements instead of rejecting them). |
| The Court failed to consider that the Debtors allegedly breached a fiduciary duty by allegedly failing to weigh the impact of rejection damages on their estates. Mem. of Law at 21. | • Tr. of May 29, 2009 Hr'g at 288-89 (argument of Stephen D. Lerner, Esq., counsel to the Committee of Chrysler Affected Dealers) (arguing that certain of the Debtors' former executives breached their fiduciary duty by exposing the estates to the dealers' rejection damages claims). |
| The Court failed to consider the allegation that no other entity demanded the rationalization of the dealer network. Mem. of Law at 23-24. | • Tr. of May 29, 2009 Hr'g at 303 (argument of Russell McRory, Esq., counsel to certain affected dealers) (arguing that "New Chrysler did not demand this reduction in the dealer body, nor did any of the constituent parts of New Chrysler: the American government, the Canadian government, the UAW or Fiat itself'). |

As the foregoing chart demonstrates, the Court was presented with and considered the same arguments now rehashed in the Motion.

ATI-2406148v5

*The Business Judgment Rule Was Satisfied*

28.     The Movants stumble through a series of overlapping, disjointed and sometimes confusing arguments as to why the business judgment test supposedly was not satisfied in connection with the rejection of the Movants' agreements. These arguments are identified in the table above and can be further categorized as follows:

- The Court allegedly failed to consider properly the alleged lack of benefit to the Debtors' estates from the rejections. <u>See</u> Mem. of Law at 14-18.

- The Court allegedly overlooked the fact that New Chrysler, not the Debtors, derived the benefit of the cost savings from the rejections. <u>See id.</u> at 19.

- The Court allegedly failed to consider the impact on the Debtors' estates of the rejected dealers' rejection damages claims. <u>See id.</u> at 21.

- The Court allegedly gave improper consideration to the debtor in possession financing budget. <u>See id.</u> at 20.

- The Court allegedly overlooked the fact that no party in interest demanded that the dealer agreements be rejected. <u>See id.</u> at 23.

- The Court allegedly erred in finding that the Alliance Viability Plan obligated the Debtors to reject the dealer agreements. <u>See id.</u> at 25-29.

- The Court allegedly failed to consider the impact of the rejections on the rejected dealers and their employees and communities. <u>See id.</u> at 29-30.

29.     The first three points essentially are the same; that the Debtors allegedly did not satisfy the business judgment test because, in one form or another, the rejections did not benefit general unsecured creditors. The other four points are attempts by the Movants to argue that the rejections were improper for various reasons even if the Debtors satisfied the business judgment test. All of these arguments should be overruled, as the Court's finding that the business judgment rule was satisfied was clearly correct. There is no scenario under which such findings warrant relief under Federal Rule 60(b)(1).

30.     The evidence made available to the Court demonstrated the critical interplay between the dealership rejection relief and the Fiat Transaction, and why the rejection relief made

sound business sense in that context.  Notwithstanding the Movants' attempt to mischaracterize the testimony of Fiat representative Alfredo Altavilla with regard to the restructuring of the dealer network, a wealth of evidence confirmed that Fiat not only accepted and agreed to, but *bargained for and expected*, rationalization of the dealer network as part of the Fiat Transaction.[23]

31.     Indeed, as the record showed, Section 2.10 of the Master Transaction Agreement governing the Fiat Transaction provided New Chrysler the right to designate which contracts it would not be taking assignment of as part of the Fiat Transaction.  This provision was a critical part of the bargained-for terms, which induced New Chrysler to agree to consummate the Fiat Transaction and provide $2 billion to the Debtors' estates.  Under the Master Transaction Agreement and the Sale Order, New Chrysler would purchase the Debtors' assets only if they were free and clear of any liabilities related to agreements that were not being assigned to it.  And, as detailed in the Sale Opinion, if the Fiat Transaction were not consummated quickly, an immediate liquidation of the Debtors would have ensued, which would have jeopardized the recoveries for all creditors in these cases.  <u>See</u> Sale Opinion at 106 (noting that the record at the Sale Hearing showed the absence of options for the Debtors other than the consummation of the Fiat Transaction).

32.     With respect to the dealer agreements specifically, in accordance with the Master Transaction Agreement, New Chrysler provided the Debtors with a notice specifying that it would not take assumption and assignment of any of the dealer agreements that were identified to be rejected by the Dealer Rejection Motion by designating these agreements as "Excluded

---

[23]     <u>See</u> Tr. of May 27, 2009 Hr'g at 350-51 (testimony of Mr. Altavilla stating repeatedly that the Fiat Transaction term sheets called for a restructuring of the dealer network); Tr. of May 28, 2009 Hr'g at 431-32 (testimony of Peter M. Grady stating that the Debtors were required to transfer a robust dealer network and that Fiat agreed to "a restructuring of the dealer network which includes rationalization"), 449 (stating that Fiat was advised of, agreed with and signed off on the dealer selection and rejection process), 487 (confirming that the Debtors showed the assumption list to Fiat, discussed the underlying methodology and obtained Fiat's approval of which dealer agreements were selected for assumption) and 488 (stating that, absent rejection of the rejected dealer agreements, Fiat would not have proceeded with the Fiat Transaction).

Contracts." <u>See</u> Notice of Filing Designation of Excluded Contracts (Docket No. 3478).  Of course, neither the Debtors nor the Court could compel New Chrysler to take these agreements, and the Debtors lacked the wherewithal or any business reasons to maintain these contractual relationships after the closing of the Fiat Transaction.[24]  Thus, as the record further showed, rejecting these agreements allowed the Debtors to avoid the potential administrative liabilities that might have accrued had the contractual relationships continued.  Any such administrative liabilities would have been detrimental to the Debtors' efforts to complete the chapter 11 process and would have adversely impacted other creditors.

33.     Accordingly, there was ample evidence to support the Court's crucial findings that a dealership network rationalization was an integral component of the Fiat Transaction, and that the Debtors exercised sound business judgment in connection with the rejections.[25]

34.     Undaunted, the Movants argue that the Dealer Rejection Opinion fails to meet the standard set in <u>Control Data Corp. v. Zelman (In re Minges)</u>, 602 F.2d 38, 44 (2d Cir. 1979), which the Movants argue requires the court to find that "general [unsecured] creditors will derive substantial or significant benefit from the rejection." <u>See</u> Mem. of Law at 15.  To suggest

---

[24]     As the evidence showed, following the closing of the Fiat Transaction, the Debtors would no longer be in the car manufacturing business.  <u>See</u> Dealer Rejection Opinion at 196.  In addition, the Debtors would no longer own the "Chrysler" name following the sale closing. <u>See id.</u>  As a result, it would not be possible for the Debtors to perform their obligations under the dealer agreements after the closing.  <u>See id.</u>

[25]     The Court's record-supported findings and rulings in the Dealer Rejection Opinion included, among others things, that: (a) the Debtors made a valid business decision to reject the applicable dealer agreements, in light of New Chrysler's determination not to accept assignment of the dealer agreements, <u>see</u> Dealer Rejection Opinion at 193-95 (finding an exercise of sound business judgment and noting, among other things, that New Chrysler agreed that a reduced dealer network was necessary for the new company to be viable); (b) there was no basis to require New Chrysler to accept the dealer agreements as a condition to the asset sale, and the Debtors demonstrably had no use for any dealers after the sale, <u>see id.</u> at 196-97 (recognizing that "the Debtors would no longer be in the car manufacturing business" after the asset sale, and that a reduction of dealer networks was part of the long-term viability plan the Debtors and Fiat had agreed upon); and (c) because of the sale, the Debtors have no ability to honor the dealer agreements, <u>see id.</u> at 196 (noting, among other things, that after the sale the Debtors "would not even have the right to 'authorize' the [dealers] to continue doing . . . work under the Debtors' name").

that the Court did not meet that requirement here, the Movants quote the Court's statement in the Sale Opinion that "[n]ot one penny of value of the Debtors' estates is going to anyone other than the First-Lien Lenders." Id. at 16-17 (quoting Sale Opinion at 47). Based on this language, the Movants argue that unsecured creditors received no benefit from the rejections. The Movants thus conclude that the Debtors failed to satisfy the Minges standard and the Court committed error in approving the rejections. See id. at 16-17 (quoting Sale Opinion at 97). Even if the Minges standard is relevant (which the Debtors do not concede), the Movants' reasoning fails because, although none of the cash proceeds from the Fiat Transaction flowed directly to general unsecured creditors, the Court correctly found that the Debtors' estates and general unsecured creditors obtained numerous benefits from the sale transaction, which included the designation of assumed contracts, and the rejection of the remaining dealer agreements.[26]

35.     Fundamentally, the rejection of the dealer agreements was critical to the consummation of the Fiat Transaction. The Court noted in the Sale Opinion that "other OEM's are engaged in cost-cutting efforts to enhance their liquidity and are following similar strategies by rationalizing their dealership networks." Sale Opinion at 99. The Court summarized the Debtors' own, similar efforts to streamline and rationalize their own dealer network in the years leading up to

---

[26]     The Movants actually mischaracterize Minges, which was a case under the Bankruptcy Act of 1898 and not the Bankruptcy Code. In Minges, the Second Circuit expressly declined to rule on whether rejection requires a showing of benefit to general unsecured creditors, deciding instead to remand the matter for further findings to determine if such a benefit existed. See Minges, 602 F.2d at 44. The weight of contemporary authority under the Bankruptcy Code looks to benefit to the estate generally, without adopting the Movants' narrow focus on general unsecured creditors. See, e., COR Route 5 Company, LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.), 524 F.3d 373, 383 (2d Cir. 2008) ("Under the 'business judgment' test, an executory contract ... should be rejected if the debtor can demonstrate that rejection will benefit the estate.") (quoting Sundial Asphalt Co. v. V.P.C. Investors, Corp. (In re Sundial As halt Co.), 147 B.R. 72, 81 (E.D.N.Y. 1992)); In re Helm, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) ("To meet the business judgment test, the debtor in possession must 'establish that rejection will benefit the estate. Once the debtor meets its burden, the non-debtor party bears the burden of proving that the debtor's decision derives from bad faith, whim or caprice." ' (quoting In re Cent. Jersey Airport Servs., LLC, 282 B.R. 176, 183 (Bankr. D.N.J. 2002)). Of course, the Dealer Rejection Opinion reveals that the Court was aware of Minges and did not overlook it, but rather determined that other precedent better establishes the current business judgment standard. See Dealer Rejection Opinion at 191-92 (citing Minges in connection with consideration of the theory that "benefit derived by unsecured creditors . . . represent[s] the primary criteria for rejection").

the Petition Date. See Dealer Rejection Opinion at 193-94. As summarized above, extensive evidence demonstrated that the rejection of the dealer agreements facilitated the consummation of the only available restructuring option — the Fiat Transaction. It is of no moment that New Chrysler obtained direct cost benefits from this action. The dealer rationalization increased the attractiveness of the assets for sale, and thereby permitted the Debtors to obtain the benefits of consummating the sale. See Dealer Rejection Opinion at 192 n. 10 ("The Affected Dealers also argue that the Debtors impermissibly considered the benefit to New Chrysler in their rejection decisions, but a 'debtor may reject a contract to make itself more attractive to a buyer.' G Survivor, 171 B.R. at 759 (citing In re Maxwell Newspapers, Inc., 981 F.2d 85 (2d Cir. 1992))."). Among the benefits of the sale to creditors was the assumption of more than 2,000 dealer agreements and thousands of other agreements that would have been rejected absent the Fiat Transaction. The rejection of the Movants' dealer agreements under these circumstances falls squarely within the business judgment standard.

36. Moreover, the Debtors' prompt rejection of these agreements resulted in the corresponding elimination of the potential administrative claims that rejected dealers otherwise could have asserted against the Debtors' estates on account of the Debtors' inability to perform under these agreements after the closing of the Fiat Transaction. As the Court concluded, "[r]ejection thus benefits the estates by removing the burden of postpetition performance under these contracts and instead giving the Affected Dealers claims against the Debtors' estates." Dealer Rejection Opinion at 196.[27] The possible allowance of such administrative claims[28] would

---

[27]     In addition, this conclusion and the findings supporting it also disprove the Movants' contention that the Debtors, in their capacity as fiduciaries of the estates, and the Court, failed to consider the potential for rejection damages claims. See Mem. of Law at 16. In any event, as noted earlier, it is questionable whether all of the Movants even have standing to raise this issue, as many of them have not filed any proofs of claim.

[28]     The Court has confirmed in a recent opinion that rejection damage claims of any of the rejected dealers are not entitled to administrative priority. See Docket No. 6160.

have significantly threatened the Debtors' ability to obtain confirmation of the Plan and would have threatened the Debtors' ability to comply with the debtor in possession budget established under the financing orders in these cases.[29] Of course, confirmation of a plan represents the only possibility for general unsecured creditors (as well as many priority creditors) to receive any recovery in these cases. Accordingly, the rejections benefited unsecured creditors by promoting the possibility of a recovery for them. This benefit accrued even though the dealer rejections increased the amount of unsecured claims as a class. <u>See</u> Dealer Rejection Order at 196.[30]

37. In another collateral attack on the Court's analysis, the Movants assert that the analysis was flawed because there was no evidence in the record that "Fiat, the U.S. Government or the United Auto Workers ever requested [that] dealers be rejected by the Debtor." <u>See</u> Mem. of Law at 23-25. The Movants cite to no authority in suggesting that rejection is inappropriate absent the request of a particular constituency. To the contrary, the plain language of section 365 of the Bankruptcy Code reveals, and relevant case law further demonstrates, that whether any particular constituency requests rejection is not a controlling factor in deciding whether the business judgment test is satisfied. <u>See</u> <u>Penn</u> <u>Traffic</u>, 524 F.3d at 383 (collecting cases).

*The Movants' Other Arguments Do Not Diminish the Validity of the Court's Findings and Conclusions Concerning Satisfaction of the Business Judgment Rule*

38. Continuing their confused appellate arguments, the Movants contend that the rejections were improper because reduction of the dealership network had been contemplated as

---

[29] The Movants argue that this Court erred in finding that the rejections kept the Debtors in compliance with the debtor in possession financing budget, because the Debtors — in the Movants' view — could have stayed within the budget by assuming and assigning the agreements to New Chrysler instead. <u>See</u> Mem. of Law at 20. As described above, however, this argument ignores the crucial premises that the sale was approved free and clear of these agreements and any obligations associated with them, and the Debtors had no ability to compel New Chrysler to accept the agreements.

[30] The Movants' refusal to consider the prevention of administrative claims as a benefit to the estate from rejection is hypocritical, given their theory that they are entitled to administrative claims for the post-sale nonperformance by the Debtors under these agreements if the rejection is undone. <u>See</u> Mem. of Law at 33-34.

ATI-2406148v5

part of the prepetition Alliance Viability Plan, and the Court committed "clear error" by "finding that prepetition discussions became binding postpetition, when in reality, no legal obligation to reject the dealers under the failed Alliance Viability plan existed."  Mem. of Law at 26.  The Movants further argue that a prepetition obligation under the Alliance Viability Plan to reject agreements in bankruptcy would be unenforceable under <u>In re Trans World Airlines, Inc.</u>, 261 B.R. 103 (Bankr. D. Del. 2001).

   39. This convoluted argument mischaracterizes the Court's findings, misses the point about the rejections and misapplies <u>Trans World Airlines</u>.  <u>First</u>, there is nothing in the Dealer Rejection Order or the Dealer Rejection Opinion constituting a finding that the Alliance Viability Plan amounted to a prepetition contractual obligation to reject dealer agreements.  <u>Second</u>, although the Debtors had long contemplated and attempted to achieve a rationalization of their dealership network before bankruptcy and spent considerable time reviewing contracts prepetition in anticipation of the chapter 11 filing and negotiation of the Fiat Transaction, the final decision identifying dealer agreements to reject was made postpetition, and the Dealer Rejection Motion was a postpetition event exercising the Debtors' rights under section 365 of the Bankruptcy Code.[31]

   40. <u>Third</u>, the Movants' reliance on <u>Trans World Airlines</u> is misplaced because that case is factually and otherwise inapposite.  In <u>Trans World Airlines</u>, the debtor had entered into a prepetition ticketing agreement that included a waiver of bankruptcy rights; specifically, a provision expressly prohibiting the debtor from rejecting the agreement in bankruptcy.  261 B.R. at 116-17.  Here, by contrast, the Debtors never incurred any such a prepetition contractual obligations to burden the bankruptcy estates by waiving fundamental bankruptcy rights.  Rather, Debtors' prepetition planning focused on how to utilize the provisions of the Bankruptcy Code for the <u>benefit</u>

---

[31] Nevertheless, the Debtors submit that there would have been absolutely nothing improper if the Debtors had finalized those rejection decisions prepetition and filed their rejection motions on the Petition Date.

of the Debtors' estates. In particular, the <u>Trans World Airlines</u> court held that "a . . . prepetition agreement *not to reject* an executory contract violates public policy." <u>Id</u>. at 114 (emphasis added). The concern in <u>Trans World Airlines</u> thus was that the prepetition debtor contracted away valuable bankruptcy rights that, if such contract were enforced, would burden the estate of the postpetition debtor. The same concern does not arise here. The Debtors did not enter into agreements that, by their terms, foreclosed the right to reject them. Instead, the Debtors' prepetition planning focused on how to address executory contracts as necessary or appropriate to consummate the Fiat Transaction and benefit the estates. Such planning is both responsible and desirable.

   41. In closing their series of flawed arguments about alleged errors and "overlooked" matters, the Movants refer to the Debtors' prepetition dealership network right-sizing efforts under Project Genesis and proclaim that there "is a major difference between dealer *restructuring* as contemplated by Project Genesis and dealer *rejections*," because "Project Genesis . . . respected the rights of each party," while "Project Tiger destroyed 789 small businesses in its path and approximately 39,000 jobs by circumventing state and federal franchise laws." Mem. of Law at 29-30. According to the Movants, the Court "completely overlooked" this difference. <u>Id.</u> at 30. Yet, in the Dealer Rejection Opinion, the Court addressed these very issues head-on. <u>See</u>, <u>e.g.</u>, Dealer Rejection Opinion at 192 ("The Court is sympathetic to the impact of the rejections on the dealers and their customers and communities, but such sympathy does not permit the Court to deviate from well-established law. . . ."); <u>id.</u> at 199-207 (preemption of franchise laws). In addition, the Movants' argument is at odds with their own concessions that (a) "[n]o 'heightened standard' or 'public interest standard' . . . was required to be applied by the Court in its analysis;" and (b) "the Court was not required to apply the 'fairness' standard." Mem. of Law at 2. Thus, in sum, neither this nor any other alleged mistake or error in "overlooking" issues holds up to scrutiny. The Court therefore should deny the Motion.

***The Movants' Accusation That the Court Committed a Fraud Upon Itself Is False***

42.     The Movants offer up the remarkable and illogical theory that the Court somehow committed a fraud upon itself when the Court interpreted the live testimony of Mr. Altavilla in a manner that, according to the Movants, displayed a "reckless disregard for the truth" and "judicial ventriloquism," among other indictments.  <u>See</u> Mem. of Law at 7-11.  In particular, the Movants parse the second sentence of footnote 21 of the Dealer Rejection Opinion, arguing that it mischaracterizes Mr. Altavilla's testimony by including the statement that "a restructuring [of the dealership network] needs to occur," while ignoring other statements by Mr. Altavilla expressing indifference as to whether the rejections occurred before or after the sale closing.  (<u>Id</u>.)  The notion, however, that the Court committed fraud by merely performing its judicial fact-finding function simply is not plausible.  Nor is it an accurate characterization of the Dealer Rejection Opinion or the import of Mr. Altavilla's testimony.

43.     It is axiomatic that Judge Gonzalez, as the finder of fact in this matter, was free to interpret testimony and weigh the evidence presented to him.  <u>In re Boyer</u>, 328 Fed. Appx. 711, 714 (2d Cir. 2009) (stating that an appellate court must accept a bankruptcy court's findings of fact unless clearly erroneous); <u>In re Ionosphere Clubs, Inc.</u>, 922 F.2d 984, 988-89 (2d Cir. 1990) (same), <u>cert.</u> <u>denied</u>, 502 U.S.C. 808 (1991).  It therefore is not extraordinary — and it certainly is not "fraud" or "error" — that the Court chose to quote from particular excerpts of testimony while choosing not to quote other testimony.  Try as they may, the Movants never explain how a court could commit fraud on itself or cite any authority for that unusual proposition.

44.     Further, the Dealer Rejection Opinion disproves the Movants' argument on the merits. The Court's statements therein show that the Court did not conceal, mischaracterize or alter Mr. Altavilla's testimony and was fully aware of his statement that Fiat did not perceive a material difference in whether the dealership rejections occurred before or after the closing of the

Fiat Transactions, as long as the network restructuring did, in fact, occur as part of the sale transaction. See Dealer Rejection Opinion at 195-97 (containing several references to Altavilla's testimony).[32] Rather, the Court determined that Fiat's deference to the Debtors' methodology[33] did not detract from the soundness of the Debtors' business judgment or provide grounds to deny the rejections.

45. Indeed, the Movants' underlying argument — based on one snippet of testimony take out of context — is just wrong. The record clearly established that restructuring the dealer network and the process of identifying dealer contracts for assumption was a critical and necessary condition of the sale. Mr. Altavilla's snippet of testimony on which Movants rely merely addressed the issue of timing — i.e., did the contract designations have to take place before or after closing. Mr. Altavilla testified that either was fine, as long as the restructuring was accomplished as part of the sale transaction. That is entirely consistent with the order approving certain bidding procedures (Docket No. 492) (the "Bidding Procedures Order"), which provided New Chrysler with a 30-day post-closing window to designate either the assumption and assignment of additional dealer agreements or the rejection of them as Excluded Contracts. See Bidding Procedures order, § 19(c). With respect to the rejected dealer agreements, this feature became moot when Fiat provided the Debtors with written notice after Mr. Altavilla's testimony but before the sale closing of its designation of the agreements as Excluded Contracts. See Docket No. 3478. But the Court's application and discussion of Mr. Altavilla's testimony was completely accurate. Indeed, it is the Movants that are recklessly taking the record out of context, not the Court.

---

[32] In fact, the very point that the Movants contend should have been quoted in footnote 21 was quoted by the Court quoted earlier, in footnote 18. See Dealer Rejection Opinion at n. 18 (pointing out that "Altavilla testified that it did not make a material difference whether the restructuring of the dealership network occurred before or after the closing of the Fiat Transaction.")

[33] See Dealer Rejection Opinion at 195 (finding that "New Chrysler agreed[ ] that rejection . . . was necessary and appropriate," and " was made aware of and agreed with the Debtors' selection methodology and criteria").

46.    Critically, moreover, the Motion is devoid of precedent to support the Movants' theory that a court's own fact-finding could possibly constitute "fraud" within the meaning of Federal Rule 60.  After conducting a diligent search, the Debtors have been unable to uncover any reported authority supporting such proposition.  In fact, in the only published case the Debtors could locate in which a movant attempted the same type of argument, the court dismissed the argument as "specious" and a "waste of this court's precious resources."  Hobbs v. Pennell, 2009 WL 1975452, at *3-4 (D. Del. July 8, 2009) (denying a motion under Federal Rule 60(d)(3) that argued that the judge's bench opinion represented a fraud on the court by falsifying the testimony and evidence at trial to justify arriving at a conclusion; the record, however, demonstrated that no fraud had occurred).

47.    The few cases offered by the Movants in support of their "fraud on the court" theory are irrelevant, as they solely involve alleged fraud by counsel, witnesses and bankruptcy trustees that are alleged to have misled the judge.  Fraud committed by such parties on the court (not fraud by the court itself) is the widely adopted, common sense understanding of what Federal Rule 60(d)(3) requires.  See, e.g., Workman v. Bell, 245 F.3d 849, 851-52 (6th Cir. 2001) (the "fraud on the court" argument was based on statements to the court by lawyers for the state of Tennessee about the availability of clemency hearings); Salsberg v. Trico Marine Servs., 360 B.R. 53, 60 (S.D.N.Y 2006) (the "fraud on the court" argument was based on the alleged perjury of a witness); James v. U.S., 603 F. Supp. 2d 472, 485-86 (E.D.N.Y. 2009) (the "fraud on the court" argument was based on an allegedly misleading statement by lawyers for the government at closing argument and the introduction of testimony that was false or misleading); In re M.T.G., Inc., 366 B.R. 730, 748-53 (E.D. Mich. 2009) (finding a "fraud on the court" from the trustee's failure to disclose a conflict of interest arising out of a fee agreement with one of the secured creditors).

48.     Even indulging the Movants and applying the factors they cite from the Sixth Circuit's <u>Workman v. Bell</u> opinion is of no help to them.  Those factors define "fraud on the court" for Federal Rule 60 purposes as "conduct:  (a) on the part of an officer of the court; (b) that is directed to the judicial machinery itself; (c) that is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth; (d) that is a positive averment or a concealment when one is under a duty to disclose; and (e) that deceives the court." 245 F.3d at 852.  Here, however, (a) Judge Gonzalez made no "positive averment or a concealment" with respect to the testimony, as shown above; (b) Judge Gonzalez was not under any "duty to disclose" the text of the testimony; (c) there was no deception of the Court by the Court itself or by any party or witness; and (d) as also shown above, the actual treatment of the testimony in the Dealer Rejection Opinion was not "reckless," but instead was entirely correct.

49.     Accordingly, for all of these reasons, there was no "fraud on the court" under Federal Rule 60(d)(3) to provide a basis for vacating the Dealer Rejection Order and the Dealer Rejection Opinion, and the Court should deny the Motion.

### None of the Additional Relief the Movants Request Is Supported or Appropriate

#### The Court Was Aware of Its Options and Equitable Powers

50.     With respect to proposed relief, the Movants argue first that the Court could have fashioned relief *sua sponte* that was different from what the Debtors had proposed and requested in the Sale Motion and the Dealer Rejection Motion.  In particular, the Movants argue that the Court could have denied the Dealer Rejection Motion while otherwise granting the Sale Motion.  <u>See</u> Mem. of Law at 30.  Thus, in the Movants' view, "the Court overlooked legal authority respecting its power to withhold approval of the rejections."  <u>Id</u>. at 7.  This argument has no merit, and the Court should reject it.

51.     The premise of the Movants' argument — that the Court was not "powerless" but instead had the power to deny the Dealer Rejection Motion — is so self-evident as to be a truism.  Obviously, the Court could have denied the Dealer Rejection Motion if the Court felt that the record and the law did not support the relief.  The Court's awareness of this option is implicit; in every ruling any court ever makes, the court has the option of granting or denying the requested relief.[34]  To argue that a court should vacate one of its own order on grounds that it "overlooked" its authority *not* to grant the order is preposterous.[35]

52.     In tandem with arguing that the Court failed to considered its option to deny the Dealer Rejection Motion, the Movants argue that the Court also failed to consider its equitable powers under section 105(a) of the Bankruptcy Code to save the "39,000 jobs [that] were in jeopardy" and the "rejected dealer reputations [that] would be stigmatized."  Mem. of Law at 34.  Not only does this argument suffer from the same flaw as described above — *i.e.*, it is axiomatic that a bankruptcy court has powers of equity and that the Court was aware of these powers — it also is factually incorrect.  The Bankruptcy Court had no power, equitable or otherwise, to save jobs associated with the rejected dealer agreements on the record before it, as the agreements set forth the terms and conditions of the sale that was proposed and the material terms underlying it.[36]  In addition, this argument is another violation of the Movants' self-imposed concession that "the Court was not required to apply the 'fairness' standard."  Mem. of Law at 2.  Accordingly, the Court should reject this argument.

---

[34]     The Movants' quoted excerpts of the Court's observations at the hearing on the Sale Motion, concerning "the only real authority here that I think I have, I either approve the sale or I don't approve the sale," <u>see</u> Mem. of Law at 7 & 30, reflect only the Court's acknowledgment that it could not compel New Chrysler to take assignment of the applicable dealer agreements.  Thus, the Court's acknowledgment of the limits of its powers actually supported its approval of the rejections, rather than vice versa.

[35]     This argument is yet another appellate-style challenge, which the Court should not entertain at this time.

[36]     The Court had no power to force New Chrysler to take on unwanted contractual obligations.  Of course, by approving the assumption and assignment of the more than 2,000 other dealer agreements that New Chrysler did opt to accept, the Court was able save tens of thousands of other jobs.

*The Movants Who Filed Claims Are Not Entitled to Administrative Priority*

53.     Extrapolating from their suggestion that the Court should have granted the

Sale Motion but denied the Dealer Rejection Motion, the Movants speculate that the denial of the

rejection of their dealer agreements would have entitled them to administrative priority for their

claims under the agreements, see Mem. of Law at 30, to the extent of the Movants who actually

filed proofs of claim.  As far as the Debtors can decipher the Movants' argument, the Movants

appear to theorize that a denial of the Dealer Rejection Motion "in the context of a 363 sale," which

the Movants contend is an approach supported by cases such as In re Lady H. Coal Co., 193 B.R.

233 (Bankr. W.D. W.Va. 1996), "would strongly indicate that [their agreements had] value and

should be preserved by estate via assumption."  See Mem. of Law 32-34.[37]  The Movants next

appear to reason that because there allegedly would have been value in their unrejected agreements,

they would have been entitled either to an assumption or, if the Debtors had "refuse[d] to assume

the contract[s] after the [C]ourt refuse[d] to approve rejection," they would have been "entitled to

an administrative claim as per Lady H."  See id. at 34.

54.     As a threshold matter, a Federal Rule 60 motion concerns only

reconsideration of an earlier ruling and whether to vacate that ruling.  Here, the Dealer Rejection

Order made no ruling concerning the validity, priority or amount of the Affected Dealers' claims, if

any.  To the contrary, the Court expressly deferred all such issues.  See Dealer Rejection Order at

¶ 4) ("All issues relating to the allowance, amount, priority, and treatment of any Rejection Damage

---

[37]     The Movants also seem to be arguing that their due process rights were impaired because, according to them, the Debtors did not identify the dealer agreements for rejection before the Court granted the Sale Motion. This assertion is both factually and legally incorrect.  The Debtors filed the Dealer Rejection Motion on May 14, 2009, which preceded the hearing on the Sale Motion by 13 days.  In fact, the filing of the Dealer Rejection Motion preceded the deadline for objecting to the Sale Motion, and many dealers whose agreements were included in the Dealer Rejection Motion (including many of the Movants) did, in fact, timely assert a wide range of objections to both the Sale Motion and the Dealer Rejection Motion.  Further, as the Dealer Rejection Opinion makes clear, the Court considered the timing and due process issues and determined that the dealers' rights in that regard were satisfied.  See Dealer Rejection Opinion at 207-208.

ATI-2406148v5

Claim or any other claim, right or remedy asserted by the Affected Dealers are preserved.").  Thus,

argument concerning priority of claims has no place in a Federal Rule 60 motion against the Dealer

Rejection Order.  Even if the Motion were granted and the Dealer Rejection Order were vacated,

which would be unwarranted, that relief by itself could have no effect on any alleged contract

claims of the Movants.[38]

> 55.     Even beyond that threshold, the primary support offered by the Movants —

Lady H. Coal — is irrelevant and does not stand for the position for which the Movants offer it.  In

Lady H. Coal, the debtor-coal mine operators moved for simultaneous approval of the sale of their

operations and the rejection of a collective bargaining agreement (a "CBA").  See Lady H. Coal,

193 B.R. at 237-38.  The debtors, however, failed to fulfill certain key requirements of section 1113

of the Bankruptcy Code with respect to rejection of the CBA.  Id. at 241.  Specifically, the court

found that the debtors had failed to make a fair and equitable proposal to the union in good faith

before seeking rejection, as required by the statute.  Id.

> 56.     In stark contrast to the treatment of general executory contracts under

section 365 of the Bankruptcy Code, the court in Lady H. Coal recognized that section 1113 of the

Bankruptcy Code provides a specific process for seeking rejection of a CBA and requires a debtor

to honor, postpetition, the terms of a CBA pending its assumption or rejection.  See id. at 240.

Because the debtor had not satisfied the statute, the court approved of the sale but denied rejection

of the CBA, awarding union employees an administrative expense claim for their damages

associated with the debtors' failure to perform under the CBA as required by the statute.  Id. at 249.

In sum, Lady H. Coal has no application to the inquiry at hand.  Accordingly, the Court should

deny the Movants' unsupported and procedurally improper bid for administrative priority.

---

[38]     As noted above in footnotes 6 and 30, the Court recently issued an opinion denying administrative priority for the rejection damages claims of dealers. See Docket No. 6160.

*Much of the Other Relief the Movants Request Is Inappropriate and Unavailable as Being Outside of the Scope of Federal Rule 60 and Otherwise Nonsensical*

57.    In addition to administrative priority, the Movants seek numerous forms of affirmative relief beyond the mere reconsideration and vacation of the Dealer Rejection Order and the Dealer Rejection Opinion.  For the reasons set forth below, the requested relief either is: (a) outside of the scope of permissible relief under Federal Rule 60; (b) not tied to the relief granted in the Dealer Rejection Order and, therefore, would not follow from vacating the Dealer Rejection Order; or (c) nonsensical and poorly described.  Thus, the requests should be denied.

58.    <u>Relief Outside of the Scope of Federal Rule 60</u>.  The following requested relief improperly seeks affirmative relief that Federal Rule 60 does not offer and, therefore, cannot be granted even if the Court were to grant the Motion in other respects:

> (c) Order Old Chrysler to retroactively assume the dealers' contracts; (d) Approve "Nunc Pro Tune an implied Statutory Assumption" of the rejected dealers' contracts by the Debtors; (e) Order that Movants' claims are priority administrative claims; (f) Reverse payment to priority lien holders; and (g) Order payment of damages to Movants as priority lien holders.

(Motion at 2-3.)  <u>See</u> <u>United States v. One Hundred Nineteen Thousand Nine Hundred Eight Dollars</u>, 680 F.2d 106, 107-108 (11th Cir. 1982) (vacating the district court's order granting a Federal Rule 60(b) motion because the district court granted additional affirmative relief therein without authority to do so under Federal Rule 60(b), which is "available . . . only to set aside the prior order or judgment.  It cannot be used to impose additional affirmative relief").

59.    For example, compelling the Debtors to assume the dealer agreements would require satisfaction of the standards for such an injunctive remedy as well as affirmative findings that the requirements for assumption under section 365 of the Bankruptcy Code, including adequate assurance of future performance (which the Debtors cannot provide) had been met.  These issues clearly are not within the scope of Federal Rule 60 and would not be a natural consequence of

- 32 -

undoing the Dealer Rejection Order.  Critically, the Movants have not established any legal basis or

followed proper procedures for obtaining these remedies and, thus, they should be denied in their

entirety.

60.     <u>Challenge to Payment of Sale Proceeds Implicating the Sale Order</u>.  The

request that the Court "[r]everse payment to priority lien holders" would require reversal of the Sale

Order, which is a final, non-appealable order.  <u>See</u> Sale Order at Paragraph 10 (authorizing and

directing the Debtors to pay $2 billion in immediately available funds to the First Priority Agent to

be applied as set forth in the First Priority Consent).  Such a result would be both unjustified and

also contrary to the Movants' own representations that they are not challenging the Sale Order.

<u>See</u> Mem. of Law at 4.  Accordingly, this relief should summarily be denied.

61.     <u>Relief That Is Nonsensical or Poorly Described</u>.  The following relief is so

poorly described that it would be impossible to effectuate, assuming that it even were appropriate

under Federal Rule 60 and the circumstances, which it is not:

> (d) Approve "Nunc Pro Tunc an implied Statutory Assumption" of
> the rejected dealers' contracts by the Debtors; . . . (g) Order
> payment of damages to Movants as priority lien holders.

(Motion at 2-3.)  For example, "implied Statutory Assumption" is a meaningless phrase that the

Movants leave unexplained.  Likewise, there is no explanation of what the Movants suggest

payment as "priority lien holders" should entail, or why the Court should treat them as "priority

lien holders."  There has been no evidence or even allegations that the Movants have security

interests in any of the Debtors' assets.  Under the circumstances, and absent a clear and

supportable request for relief, the Debtors assert that these requests should summarily be denied

as well.

## Conclusion

62.    For the foregoing reasons, the Court should deny the Motion and grant such other and further relief to the Debtors as the Court may deem proper.

Dated:  January 15, 2010
        New York, New York

Respectfully submitted,


 /s/ Corinne Ball
Corinne Ball
Veerle Roovers
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

David G. Heiman
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

Jeffrey B. Ellman
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION