**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re                                              :        Chapter 11

Chrysler LLC, et al.,                              :        Case No. 09.50002 (AJG)

                          Debtors.                 :

                                                   :

------------------------------------------------------------x


**RESPONSE TO DEBTOR'S OBJECTION**
**TO CREDITORS' DEALERS MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009**
**REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION**


*OVERVIEW*

        Our original memorandum in support of the Motion to Reconsider argued that this

Court's Rejection Opinion contained a statement alleged to have been made by key witness -

Fiat Executive, Alfredo Altavilla - which was not contained anywhere in the record.  We argued

that allowing the record to remain as it was would perpetrate a fraud upon the Court.  However,

we never alleged that the fraud upon the Court was intentional.  Instead, we argued that leaving

the fraudulent statement in the record would exhibit a reckless disregard for the truth and we

respectfully requested appropriate relief from the Rejection Order on that basis.  Movants

understand there are thousands of pages of documents, testimony and depositions which have

been entered into the record.  An inadvertent mistake was made and the Court published a fact

which does not exist in the record.  Unfortunately, the severity of that falsehood upon our clients'

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE
COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 1

PIDGEON & DONOFRIO GP
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

cause was so damaging that it was necessary for us to demonstrate how it disturbed the judicial machinery's normal function of being an impartial arbiter of the truth. Regardless, we do not allege it was intentional.

Unfortunately, Debtor's Counsel has now taken that false statement published by the Court and run with it in their memorandum supporting the Objection. Instead of quoting to the actual record of the case, Debtor's Counsel has taken the extraordinary step of quoting to the disputed version of testimony published by this Court in its Rejection Opinion. By this we mean that Debtor's Counsel has based their Objection, not upon Altavilla's actual testimony, but upon statements which do not appear in the record.

Whereas the Court's erroneous publication was done unintentionally, the Debtors' Objection memorandum contains multiple instances of *intentional* fraud upon this Court. It appears that Debtors' Counsel has assumed this Court will never acknowledge its error and so they've chosen to cite this Court's Rejection Opinion instead of citing to the actual record of the case. Moreover, as we will demonstrate below, when Debtors' Counsel does actually cite to the record for supplementary support of the fictional statement, the citation itself is fictional and non-existent.

These instances should be struck from their Objection. Debtors' counsel - instead of basing arguments upon the actual record of the case - have taken the radical step of *supplementing* the record on their own - and not under oath - by testifying for key witnesses and making reference to statements which do not exist anywhere in the record. They should not be allowed to take such liberty with the judicial machinery by placing fictional statements in the

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE
COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 2

record which self serve their cause in this egregious manner.  There are rules to proceeding before this Court which require litigants to base their arguments upon the record, not Counsel's fictional interpretation thereof.  We respectfully request that all alleged testimony discussed by Debtor's Counsel which is not supported by genuine citations to the record be stricken by this Court.

Our response to Debtors' Objection - as well as our memorandum in support of our Motion to Reconsider - are entirely grounded in the record and all statements attributed to witnesses are accomplished by the use of quotation marks and citations, a practice to which Debtors' Counsel should also be required to adhere.  Debtors' Counsel has liberally substituted its own view of testimony for the actual testimony entered into the record.  So we respectfully urge this Court to require Debtors' Counsel to supplement their Objection memorandum- everywhere they attribute quotes to Mr. Altavilla and other key witnesses - with quotation marks and accurate citations to the record.

Finally, before we begin our legal argument in response to Debtors' Objection, we draw the Court's attention to Page 8, Footnote 13 of Debtor's Objection memorandum.  In that Footnote, Debtors' Counsel improperly attempts to psychoanalyze the motivations of our clients in bringing the Motion to Reconsider by making reference to news reports which discuss non-related Constitutional causes which have absolutely nothing to do with the Motion before the Court.  Footnote 13 is an entirely improper attack upon Movants' and their Counsel by way of reference to controversial lawsuits which Movants' Counsel have been involved with.  Such distractions serve no purpose before this Court other than to distract, confuse, and delay justice by throwing

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 3

dirt in the Court's eyes. Our Motion pointed out that the Government never requested dealers be rejected and so this Footnote serves no purpose other than to muddy the waters in which this Court must now swim. We request this Footnote be stricken and that Debtors' Counsel be required to resubmit their memorandum without it.

Furthermore, if Debtors' Counsel has not comprehended the true motivation for this Motion, we would remind them that our clients lost their businesses when the Debtors instituted Project Tiger and ripped our clients' livelihood from them along with approximately 40,000 community jobs during this most difficult recession. Our clients are suffering. Their communities are suffering. That suffering is directly motivating this Motion. Should the Rejection Opinion be reversed, our clients will find relief from that suffering.


*FRAUD UPON THE COURT*

Debtors have failed to comprehend the true nature of our allegation of fraud upon the Court. Page 25 at ¶ 42 of the Debtors' Objection memo states:

> The Movants offer up the remarkable and illogical theory that the Court somehow committed a fraud upon itself when the Court interpreted the live testimony of Mr. Altavilla in a manner that, according to the Movants, displayed a "reckless disregard for the truth" and "judicial ventriloquism," among other indictments.

We do not contend that the Court *misinterpreted* Altavilla's testimony. Instead, we have shown that the Court *misstated* Altavilla's testimony. And in doing so, the Court has changed the actual record of the case. Interpreting the record is the proper judicial machinery in action, whilst changing the record impairs the judicial machinery of the case.

An interpretation occurs when the Court cites to the actual record - i.e. a direct citation to

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 4

PIDGEON & DONOFRIO GP
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

a specific question and a specific answer - and then the Court interprets the importance and/or meaning of the quoted record. That's an interpretation. But when the Court enters a new fact, or new statement into the record which does not exist in the record, then the Court has erred. And when that misstatement concerns the most important issue of the case and the single most important testimony of the case, a fraud will have been perpetrated upon the Court, especially as to future review.

Please review the relevant sections of Footnotes 18 and 21 from the Court's Rejection Opinion (Footnote 18 is found at *In re Old Carco*, 406 B.R. 180, 195; Footnote 21 is from 406 B.R. at 197.):

> 18 Altavilla testified that it did not make a material difference whether the restructuring of the dealership network occurred before or after the closing of the Fiat Transaction...

> 21 ...Altavilla also responded affirmatively to a question regarding whether a dealership network needed to be restructured for the Fiat Transaction to close, stating that a "restructuring needs to occur."

Obviously, the two Footnotes are in direct contradiction to each other. Footnote 18 indicates that restructuring did *not* need to occur before the transaction closed, while Footnote 21 indicates that dealer restructuring *did* need to occur for the transaction to close. Had there truly been two conflicting sections of testimony, the Court would certainly have been entitled - as the finder of fact - to give more weight to one than the other. But there are not two separate excerpts relating to Footnotes 18 and 21. In reality, Footnotes 18 and 21 refer to the same exact question and answer. Whereas Footnote 18 properly characterizes Altavilla's testimony, there is absolutely no basis for the statement made by the Court in Footnote 21.

PIDGEON & DONOFRIO GP
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

Please review the actual testimony of Altavilla (May 27, 2009 Hearing Tr. at 352) which is referred to in both Footnotes 18 and 21 of the Court's Rejection Opinion:

> Q. If this transaction closes without an absolute requirement of a particular number of dealers that are being terminated, would Chrysler still go through with this deal -- I mean, rather, would Fiat still go through with this deal?
>
> A. The answer is that a restructure needs to occur. Whether it occurs before or after the closing of the deal is not a material difference.

This is the exact testimony to which the Court makes reference in both Footnotes 18 and 21. But there is no logical reason for this one answer to have been surgically parsed into separate footnotes on two separate pages thereby giving the appearance of two separate questions and two separate answers.

Debtors' allegation that we have taken issue with the Court's *interpretation* of this testimony is misplaced. It's not that we take issue with the Court's *interpretation* of testimony, it's that we take issue with the Court's *misstatement* of the testimony. Footnote 21 makes it appears as if the witness stated that restructuring needed to occur for the sale to close. The answer is parsed after the word "occur". But the very next sentence (as properly described in Footnote 18) continues the response to the very same question. There was no intervening question. It's all part of the same Q & A. Footnote 21 therefore improperly supplements the record. This is not merely "fact finding" as Debtors' Counsel has alleged, this is *fact making* which is improper in the extreme and exhibits a reckless disregard for the truth.

Furthermore, the record of the case is absolutely devoid of any specific testimony which opposes the fact that no relevant party ever requested dealers be rejected. But Footnote 21 gives

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 6

the fraudulent appearance that Altavilla's testimony provides just such a request.  It doesn't.

The witness testified that whether restructuring occurred before or after the closing was not a "material difference".  Those words are direct, unambiguous and perfectly responsive to the time sensitive question asked on cross-examination.  The core issue before this Court was whether the purchaser required that the seller restructure the dealership network as a condition precedent to the deal closing.  Since the record is clear that no other party (US Government, Canadian Government or VEBA/UAW) requested dealer rejections, then without the purchaser making such a request, there was no sound reason for the Debtor to reject the dealers if the purchaser was willing to close the deal without dealers having been rejected.

Altavilla's answer to this one question did not require the surgical parsing implemented by this Court.  Despite the devastating effect such parsing has on the record, we understand that the Court was under tremendous pressure due to the immense record of the case.  Regardless, Footnote 21 creates a fraudulent record and a fraudulent record creates the appearance of impartiality.

To make matters worse, Debtors' Counsel has rallied behind this false record and is now citing to it instead of the actual record.  Moreover, Debtors' Counsel has created new facts out of thin air by adding statements into the record which are not quoted and do not contain citations and do not even exist.  Instead of citing to the actual record to challenge our arguments on this point, Debtors' Counsel has circularly chosen to cite the Court's Rejection Opinion to challenge our argument that the Rejection Opinion contains a fraudulent statement (see Debtor's Objection Memo at par. 44, pgs. 25-26):

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 7

Further, the Dealer Rejection Opinion disproves the Movants' argument on the merits. The Court's statements therein show that the Court did not conceal, mischaracterize or alter Mr. Altavilla's testimony and was fully aware of his statement that Fiat did not perceive a material difference in whether the dealership rejections occurred before or after the closing of the Fiat Transactions, as long as the network restructuring did, in fact, occur as part of the sale transaction.

This is quite amazing. Debtors' Counsel has mysteriously supplemented the record by alleging that Mr. Altavilla's testimony states that dealer restructuring needed to occur "as part of the sale transaction". That amounts to an intentional fraud upon this Court. Mr. Altavilla never said that. Counsel is now continuing the ventriloquism effect by this audacious statement which contains no quotation marks because no such testimony exists anywhere in the record. It's a blatant lie. Debtors' Counsel cites as follows, *"See Dealer Rejection Opinion at 195-97 (containing several references to Altavilla's testimony).32"* But when you visit the Rejection Opinion at 195-197, there is no such quote from Altavilla. Where one would expect the record to be cited, Debtor instead relies upon the Court's Opinion - the very thing being challenged in the first place. It's circular.

Debtor's Objection memo at pg. 25, par. 43 states:

> It therefore is not extraordinary — and it certainly is not "fraud" or "error" — that the Court chose to quote from particular excerpts of testimony while choosing not to quote other testimony. Try as they may, the Movants never explain how a court could commit fraud on itself or cite any authority for that unusual proposition.

It would not have been extraordinary had the Court truly been choosing to quote from *"particular excerpts of testimony while choosing not to quote other testimony"*. But that's not what the Court did here. The Court chose to quote the very same testimony in two different Footnotes as if there were multiple excerpts to choose from when in reality there was only one.

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 8

That one excerpt provides one clear answer, but the Court chose to create the appearance of two separate excerpts and as such committed a fraud upon the record of the case. And in doing so, the Court has now inspired Debtors' Counsel to rally behind this improper fact making exhibition by adding further fictional testimony to the record.

This is a perfect example of the judicial machinery breaking down into chaos. It gives the appearance that Movants are being ganged up on in a tag team intellectual wrestling match.

The Debtors' fabrication is repeated again (on pg. 26 at par. 45 of Debtors' Objection memo) by their insertion of words into Mr. Altavilla's mouth which he did not utter on the record. Of course, they do this without quoting Altavilla or providing any citation whatsoever:

> Mr. Altavilla's snippet of testimony on which Movants rely merely addressed the issue of timing — i.e., did the contract designations have to take place before or after closing. Mr. Altavilla testified that either was fine, as long as the restructuring was accomplished as part of the sale transaction.

Altavilla said no such thing. This is another intentional fraud upon the Court. Debtors know very well there is no testimony by Mr. Altavilla which states that dealer restructuring had to be accomplished as part of the sale transaction. Debtors' Counsel cannot quote to any such testimony because it does not exist. This behavior is the very definition of fraud and Debtors' Counsel should be dealt with in a judicially appropriate manner. But their fraudulent attacks upon the record continue on pg. 18, Footnote 23 where they state:

> See ...Tr. of May 28, 2009 Hr'g at [488]...(testimony of Peter M. Grady)... stating that, absent rejection of the rejected dealer agreements, Fiat would not have proceeded with the Fiat Transaction).

If you go to page 488, no such statement appears. Nothing even close to the statement appears on that page which concerns a different issue entirely. The fictional statement attributed to Mr.

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE
COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 9

Grady does not exist in the record. So Debtors' Counsel - who appears conveniently allergic to quotation marks - has once again fabricated testimony and placed it into a witness's mouth. In fact, Mr. Grady did testify directly on this issue (at pg. 477 of the May 28, 2009 Hearing Tr.) and he stated quite clearly that Fiat did *not* request dealer restructuring and that the rejections were not done at Fiat's insistence:

> Q. But Fiat did not require the rejection of the 789 agreements, did it?
>
> A. No. But Fiat did encourage and buys into a restructuring of the dealer network which includes rationalization.
>
> Q. And this was not done at their insistence, though, was it?
>
> A. It was not done at their insistence, but it was part of what we looked at as an opportunity --

This is now the third example of intentional fraud upon this Court. The witness unambiguously stated that Fiat did not request or insist upon dealer restructuring. Debtors' Counsel has turned this testimony around and provided a mistaken citation to accompany it. This is not right and it should not be tolerated, especially in light of the following audacious statement found on pg. 26 at par. 45 of Debtors' Objection memo:

> The record clearly established that restructuring the dealer network and the process of identifying dealer contracts for assumption was a critical and necessary condition of the sale.

It would be interesting to know at what record Debtors' Counsel is looking, but alas they do not cite to the record once again. Here, they are simply providing fictional testimony about the record. There is not one shred of evidence anywhere in the entire record of the case which indicates that dealer restructuring was "a critical and necessary condition of the sale". If there

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 10

were, Debtors' Counsel would have cited the record. But Counsel has not done so and instead has substituted its own desires for the record.

Debtors' Counsel, as quoted above, also takes issue with our focus upon the timing aspect of the issue in question. But it is the timing aspect which defined the relevant question presented to Mr. Altavilla. The question was time sensitive as to whether dealer restructuring needed to take place before the deal closed. Altavilla testified that whether it took place before or after the deal closed was not a "material difference".

Nothing, not one piece of evidence or testimony taken from the *actual record* provides any support for the contention that the purchaser made dealer rejections a condition precedent to the sale closing. Indeed, it's preposterous to imagine that a foreign company such as Fiat - whose purchase of this American institution was financed entirely by the American people - would demand a wholesale gutting of almost 40,000 American jobs and 800 small businesses as a condition precedent to their acceptance of this free American gift. Accordingly, the actual record of the case clearly demonstrates that Fiat did not demand these rejections. And Debtors' Counsel, try as they might to keep playing this tune, simply have no lyrics to accompany the discordant musical farce they have so desperately composed to conceal the truth of the record.

*Fraud On The Court - Elements*

Debtor takes issue with the elements necessary to prove fraud on the Court as listed in *Workman v. Bell*, 227 F.3d 331 (6th Cir. 2000), on pg. 28 at par. 48 of their Objection memo. Those factors, for Federal Rule 60 purposes are conduct: (1) on the part of an officer of the court; (2) that is directed to the judicial machinery itself; (3) that is intentionally false,

PIDGEON & DONOFRIO GP
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

willfully blind to the truth, or is in reckless disregard for the truth; (4) that is a positive averment

or a concealment when one is under a duty to disclose; and (5) that deceives the court." Workman v. Bell,

227 F.3d 331 (6th Cir. 2000).

Debtors erroneously assert the following as to these elements:

> Here, however, (a) Judge Gonzalez made no "positive averment or a
> concealment" with respect to the testimony, as shown above;

Incorrect. Judge Gonzalez did make a positive averment in that Footnote 21 of the Rejection Opinion

states:

> Altavilla also responded affirmatively to a question regarding whether a
> dealership network needed to be restructured for the Fiat Transaction to close,
> stating that a "restructuring needs to occur."

There are two parts to this averment. The question requested an answer based upon the

timing of the closing. While Altavilla's two sentence answer to that question did respond by time referencing

the closing, the parsed answer published by Judge Gonzalez in Footnote 21 does not include a time

sensitive answer. "Restructure needs to occur" does not indicate when restructure needed to

occur and so it is not an "affirmative response" to the time sensitive question. An affirmative

response would have stated, "Restructure needs to occur before the sale closes", but that's not

what the witness said.

When Judge Gonzalez stated that the witness gave an "affirmative response" to the

question of whether restructuring needed to occur for the sale to close, the Court made an unfortunate

positive averment which is not drawn from the actual record of the case. Altavilla never said restructuring

needed to occur as a condition precedent to the sale closing. "Restructure needs to occur", on its

own, - without the very next sentence where Altavilla states that it made no "material difference"

to Fiat whether restructuring occurred before or after the sale closed - is actually non-responsive

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE
COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 12

to the question asked on cross-examination.  It is not an affirmative response to the actual question.

The question wasn't - "Does restructure need to occur?" - the question asked whether restructuring needed to occur before the sale closed.  And it was the single most important question and answer - with regard to the dealer rejection issue - in the entire record of the case.  Therefore, the positive averment to the question asked was made by Judge Gonzalez and not the witness.  As such, it is fraudulent.

Debtors then misconstrue other factors required by *Workman v. Bell* as follows:

(b) Judge Gonzalez was not under any "duty to disclose" the text of the testimony;

The actual Workman factor being referred to here is, "(4) that is a positive averment or a concealment when one is under a duty to disclose...".  *Id*.  This factor requires either, a positive averment, or, a concealment when one is under a duty to disclose.  It doesn't require both.  And it doesn't require that the positive averment only be uttered when the witness has a duty to disclose something.  If an officer of the Court offers a positive averment when no such duty requests him to do so - and such averment is false - then the averment will have defrauded the Court.

Debtors' Counsel appear to be arguing that an Officer of the Court may provide false averments to the Court as long as no duty calls for that Officer to disclose information.  That is preposterous, but then again, Debtors' Counsel has made a habit of false averments in their Objection memo.

Additionally, the Court was required to make findings of fact.  Unfortunately, Footnote 21 does not contain a finding of fact, it makes a new fact which the record does not support.  The

PIDGEON & DONOFRIO GP
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

other factors listed in *Workman v. Bell* are also met;  Judge Gonzalez is an officer of the Court; Footnote 21 exhibits a reckless disregard for the truth; and therefore it deceives the Court's Judicial record for all who may return to it, be they other judges, lawyers or the public.

Debtors rely on *Hobbs v. Pennell*, 2009 WL 1975452 at 3-4 (D. Del. July 8, 2009) for their contention that a court's own fact-finding could not possibly constitute "fraud" within the meaning of Federal Rule 60(d)(3).  But that case is distinguished because the Court there found that the record of the case demonstrated that no fraud took place.  Here, Debtors have not relied on the record of the case to make their challenge.  Instead, they've relied upon the Court's Opinion and the actual false averment of Footnote 21 therein.  As such, the record here actually demonstrates that a fraud did take place.

*Fraud on the Court - Effect*

"Fraud upon the court" makes void the orders and judgments of that court.  "Fraud destroys the validity of everything into which it enters. It affects fatally even the most solemn judgments and decrees. Bankrupt Act, sec. 35; 1 Story's Eq., sec. 252; Freeman on Judgments, sec. 486." *Nudd v. Burrows,* 91 US 426, 440 (1875); "There is no question that fraud vitiates the most solemn contracts, documents and even judgments." *United States v. Throckmorton*, 98 US 61, 64 (1878).

Accordingly, for all of these reasons, there was a "fraud on the court" under Federal Rule 60(d)(3) which provides sound basis for vacating the Dealer Rejection Order and the Dealer Rejection Opinion, and the Court should grant the Motion.

*THE MOTION IS TIMELY*

There is no statute of limitations under Rule 60(d)(3) and so the Motion is timely thereto.

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 14

This is not disputed by Debtor's Counsel.

As to our Rule 60(b)(1) arguments, Debtors contend that the one year statute of limitation imposed by Rule 60(b)(1) should not be respected here and urges this Court to hold, via Rule 60(c), that the Motion has not been brought in a reasonable time. We contend that six months is well within the one year statute of limitations and we further contend that Movants brought this Motion as fast as possible considering the immense record of the case coupled with the confusion caused by the false statement contained in Footnote 21 of the Dealer Rejection Opinion.

The trend as to Rule 60(b) motions has been to allow them if they are brought within one year of the judgment in question. "Usually, a Rule 60(b)(1), (2), or (3) motion brought anytime within one year will be timely, although some motions made within one year have been found to be unreasonably late." *Motion Practice,* Fourth Edition at 24-15 (2002 Supplement), by David F. Herr, Roger S. Haydock, and Jeffrey W. Stempel.

Due to the complexities of bankruptcy law and the immense discovery involved in this case, coupled with the confusion sewn therein by Footnote 21, we respectfully submit that this Motion - having been brought six months after the Rejection Order was issued - is well within the one year statute of limitations imposed by Rule 60(b). Furthermore, in its discussion of Rule 60(b)(1), the United States Supreme Court in *Pioneer Inv. Servs. v. Brunswick Assocs*. 507 U.S. 380 (1993) failed to even mention Rule 60(c), stating, "...Rule 60(b)(1)... permits courts to reopen judgments for reasons of "mistake, inadvertence, surprise, or excusable neglect," but only on motion made within one year of the judgment."

Accordingly, the Motion to Reconsider is timely and should be granted.

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 15

*MOVANTS HAVE STRICTLY LIMITED THE MOTION TO RECONSIDER TO FACTS AND*

*LAW NOT ADDRESSED BY THE COURT)S ORDERS AND OPINIONS AND IS THEREFORE*

*PROPER AND NOT AN UNTIMELY APPEAL.*

On pg. 7 at par. 12 of Debtor's Objection memo, Debtor states:

> [T]here are no new arguments here. Every point of fact and law about which the Movants argue either was (a) addressed expressly in the Dealer Rejection Opinion; or (b) available to the Court at the time, in the form of (i) evidence in the record and (ii) law cited in the oral and written legal arguments, or which was in the public record at the time.

Movants' stipulations have been respected and we do not seek to relitigate those issues as doing so would be an improper attempt to appeal. As to Debtor's allegation that all of the facts raised by Movants have been before the Court - we certainly agree. Had those facts not been before the Court, we could not raise them in a Rule 60(b) motion. As we stressed in our original memorandum, a motion to reconsider "...is appropriate where a court overlooks controlling decisions or factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court." *Hoffenberg v. Hoffman & Pollok*, 296 F. Supp. 2d 504, 505 (S.D.N.Y. 2003).

Therefore, Debtors' contention that our Motion to reconsider is improper - because every "point of fact" Movants raised in the Motion to Reconsider had already been before the Court - is mistaken under the law. As the Court stressed in Hoffenberg, Movants are restricted to arguing factual matters which were before the Court on the underlying Motion. Other than Movants' fraud on the court argument, Movants' Motion to Reconsider relies exclusively on facts which were

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 16

PIDGEON & DONOFRIO GP
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

before the Court but which the Court failed to acknowledge in its Opinions and were therefore overlooked.

In Footnote 17 (pg. 13, Objection memo), Debtors emphasize the following relevant point:

> In all, the Debtors estimate that the Court had before it more than 1,000 pages of briefs, letters and affidavits in support of and in opposition to the Dealer Rejection Motion. As such, the Court was exceptionally well informed of the parties' positions on the facts and the law.

We agree. But the Court also had before it thousands of pages of hearing transcripts and depositions. And it is precisely because of the monolithic discovery involved with this case that it was possible for the Court to overlook important facts and law before it on the underlying motions. By anyone's standards, the record in this case was highly unusual in its breadth and scope and multitude of legal issues. The docket alone has over 6200 entries. The Court is only human and we have full empathy for the burden upon Judge Gonzalez in having the obligation to consider every relevant fact before the Court. And this incredible flood of information certainly created the distinct possibility that the Court might overlook important facts and law.

Accordingly, Movants respectfully submit that all parties were unusually overwhelmed by the immense record of this case and as such a Motion to Reconsider is not unreasonable and should be entertained.

*THE BUSINESS JUDGMENT STANDARD WAS NOT SATISFIED*

*Debtor Received No Value For Rejecting The Dealers*

Debtors' Counsel states with sheer audacity another fabrication on pg. 18 of their Objection memo:

> Notwithstanding the Movants' attempt to mischaracterize the testimony of Fiat

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 17

representative Alfredo Altavilla with regard to the restructuring of the dealer
network, a wealth of evidence confirmed that Fiat not only accepted and agreed
to, but *bargained for and expected*, rationalization of the dealer network as part of
the Fiat Transaction.23

Movants have quoted Mr. Altavilla's testimony, and that testimony - when not surgically

parsed or mystically paraphrased by the Debtor - speaks for itself as discussed in detail above. But in

this passage, Debtors have once again testified on behalf of the record instead of allowing the record to

testify for itself. In doing so, Debtors' Counsel fails to acknowledge the testimony of Debtor Chairman and

CEO, Robert Nardelli, whose testimony was brought to this Court's attention in our Motion memo at pg. 22:

> The Debtor received no value for rejecting the dealership agreements (see May
> 28, 2009 Hearing Transcript at 392):
>
> > Q. Okay. And I just want to reiterate -- ask another point to what we
> > discussed before that did Chrysler receive any concession or value for
> > accelerating the rationalization program by rejecting almost 800 dealers?
> >
> > A. Not to my knowledge.

Debtors' Counsel alleges there is a "wealth of testimony" to support their position, while the

testimony of Debtors' very own Chairman and CEO completely contradicts them on this point. In support

of Debtors' position, they also offer Footnote 23 (pg. 18, Objection memo), which states in part:

> See Tr. of May 27, 2009 Hr'g at 350-51 (testimony of Mr. Altavilla stating
> repeatedly that the Fiat Transaction term sheets called for a restructuring of the
> dealer network);

The term sheets discussed here were from the failed Alliance Viability Plan which came to

nothing for the Debtor. That plan was rejected and the Debtor - instead of implementing that

plan - filed for Bankruptcy. Why terms of a failed business plan which died in negotiations

between the parties is now trotted out as having created a binding obligation in a future bankruptcy has

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE
COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 18

never been explained before this Court or by this Court. A contract is formed when two parties

exchange consideration. The term sheets for the Alliance Viability Plan were not binding since

the parties failed to enter into that contract. Had the Alliance Viability Plan been implemented,

we wouldn't be arguing before this Bankruptcy Court.

Furthermore, while Debtors wish to rely on that plan, Debtors conveniently overlook - as we

pointed out on pg. 21 of our Motion memo - the undisputed fact that on April 29, the entire

dealership network (with the 789 rejected dealers) would have been continued if the Alliance

Viability Plan had succeeded. (See May 28 Hearing Transcript of Debtor CEO Nardelli at pg. 389.):

> Q. Now, if Chrysler had not filed for bankruptcy and an alliance with Fiat
> occurred outside of bankruptcy, isn't it correct that Chrysler would have been
> bringing approximately 3,200 dealers into the alliance?
>
> A. Yes. As I mentioned earlier, we would have continued to carry the dealers
> except for those that would have been on some performance letter.

But instead of following the lead of the Alliance Viability Plan where that plan called for

the continuation of the entire dealership network, the Debtor turned its back on that aspect of the

Alliance Viability Plan and needlessly exposed the estate to a potential damages claim

of one billion dollars. Conversely, assigning the 789 dealers to New Chrysler would have cost

the estate nothing at all.

Movants find it very convenient that Debtors simply choose from whatever part of the

failed Alliance Viability Plan they like in making ridiculous assertions that a conceptual business

endeavor somehow dictates the rights and obligations of the parties in a future bankruptcy. The

Court will surely be making a psychedelic precedent for future litigants should this creative

mischief be condoned.

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE
COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 19

*Administrative Claim Potential vs. Rejection Damages/Unsecured Claims; Benefit to Unsecured Creditors*

On pg. 19 of the Objection Memo, Debtors acknowledge that absent rejection, Movants would have an administrative claim against Debtors' estate resulting from breach of their franchise agreements:

> Thus, as the record further showed, rejecting these agreements allowed the Debtors to avoid the potential administrative liabilities that might have accrued had the contractual relationships continued. Any such administrative liabilities would have been detrimental to the Debtors' efforts to complete the chapter process and would have adversely impacted other creditors.

Debtors should not be concerned with favoring one group of creditors over another. Either the 789 dealers would have an administrative claim or an unsecured creditors' claim. Why the Debtor believed it benefited the estate to force the dealers into unsecured creditor status is unfounded in law. In fact, this suggestion clearly contradicts the Second Circuit holding in the controlling decision of *Control Data Corp. v. Zelman* (*In re Minges*), 602 F.2d 38 (2d Cir. 1979).

This is best explained by Judge Mansfield's concurring opinion, which states:

> As a representative of the bankruptcy court, which is a court of equity, the trustee should not play favorites between the lessee and secured creditors by manipulating the obligations affecting them, absent some significant benefit to the creditors generally. To do so would be inequitable. Although rejection of onerous lease obligations would increase the value of the mortgagees' security, thereby reducing the size of any portion of their claims that could not be satisfied out of the security, it would simultaneously generate claims by the lessee against the estate for loss of his rejected executory rights.

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 20

*In Re Minges*, 602 F.2d 38, 45

Applying this logic to the facts before the Court here, Debtors should not be playing

favorites between the dealers and the priority lien holders while doing so also burdens the other

unsecured creditors.  There is no equity in that play.  Furthermore, in support of their mistaken

assumption that the *Minges* decision does not define the requirements of the Business Judgment

Standard, Debtors seek to convince this Court that the longstanding principle of linking the

"benefit of the estate" requirement to whether unsecured creditors benefit is wrong by citing *In*

*Re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006).  (See Debtor's Objection memo at pg.20,

Footnote 26).  But Debtors do not explain how that case contradicts *Minges*.  Regardless, the

following passage from *Helm* (at 538-539) leads to a very important revelation on this issue in another case

cited therein:

> "The business judgment rule requires the Court to determine whether a reasonable
> business person would make a similar  decision under similar circumstances." See
> *In re Vencor, Inc.,* 2003 Bankr. LEXIS 659, 2003 WL 21026737 at *3 (Bankr. D.
> Del. Apr. 30, 2003);

The Court in Vencor stated:

> In this case, we conclude that even if Vencor derived no direct economic benefit
> from the Agreement, the avoidance of a large claim is a factor which would cause
> a reasonable business person to assume this contract. See, e.g*., In re Sun City.*
> *Investments, Inc.,* 89 B.R. 245, 249 (Bankr. M.D. Fla. 1988)(cited in *In re*
> *Riodizo, Inc,* 204 B.R. 417, 425 (Bankr. S.D.N.Y. 1997)(concluding debtor had
> not exercised good business judgment in rejecting a contract because rejection
> created a large claim against the estate).

Rejecting the dealership agreements here created the undisputed potential for one billion

dollars in rejection damage claims against the Debtors' estate, whereas assuming the dealership

agreements back on May 14th would have cost Debtors nothing at all.  And New Co might have accepted

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE
COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 21

the full dealership network as was contemplated by the Alliance Viability Plan. After all, on May 14th, the Master Transaction Agreement was in place and it did not call for these dealership rejections. And Nardelli testified that Debtors received nothing for rejecting the dealers. (See May 28, 2009 Hearing Tr. at 390-392.)

Since Debtor Chairman and CEO Nardelli testified that no value was tendered by New Chrysler for the rejections, and since Nardelli also testified that a future restructuring would cost New Chrysler $200 million (see May 28, 2009 Hearing Tr. at 444-445 and 464-465), Debtor essentially gave away a $200 million freebie to New Chrysler and that is just bad business judgment by any standard, especially in light of the potential for a one billion dollar claim against the estate resulting therefrom. The size of this potential claim is so massive that ignoring it in favor of passing on a $200 million gift to New Chrysler not only fails to meet the business judgment standard, it offends the business judgment standard and perhaps indicates why Old Chrysler's leadership failed so miserably that the only solution the lender of last resort would submit to was a future without any of them on board.

The Courts in *Vencor* and *Minges* both stressed the importance of avoiding rejection damage claims while *Minges* also stresses that the Debtor has no business playing favorites amongst classes of creditors. Debtors' Objection memo fails to grasp these rulings.

Additionally, it wasn't until June 2nd that New Chrysler sought to exclude the rejected dealers. (See Docket No. 3478.) This is proof positive that until that date, New Chrysler had *not* excluded the rejected dealers. Therefore, all dealer contracts should have been assumed and assigned to New Chrysler on May 14th. New Chrysler could have later designated those contracts for exclusion had they been so inclined.

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 22

In Footnote 26 of the Objection memo, Debtors misconstrue the *Minges* holding and further seek to diminish its controlling precedent:

> In *Minges*, the Second Circuit expressly declined to rule on whether rejection requires a showing of benefit to general unsecured creditors, deciding instead to remand the matter for further findings to determine if such a benefit existed. See *Minges*, 602 F.2d at 44.

Debtors' Counsel seriously bungles it here by failing to acknowledge that the Court in *Minges* did in fact rule that rejection requires a showing of benefit to "general creditors". Unsecured creditors are certainly a member of the class of general creditors. Where the parties in *Minges* locked horns was on the issue of whether the secured creditors were receiving the only benefit. The Second Circuit held that the issue was irrelevant if the Bankruptcy Court's finding - that general creditors received a benefit - was accurate:

> The parties thus lock horns on whether benefit to the secured creditors is enough, on these facts, to justify rejection of the lease covenants under the business judgment test. The disagreement, however, is irrelevant if there was a sound basis for the finding of the bankruptcy judge, quoted above, that the general creditors would benefit from the "enhance(d) . . . value of the premises." We are not satisfied that the record before us on the issue is adequate to decide this issue. We find only the most general estimate of increase in market value if the covenants involved here are rejected and no detailed support, by appraisal or otherwise, for this statement. Nor do we know the amount of the secured debt...In short, we do not know whether a sound basis exists for a finding that there is a reasonable likelihood that general creditors will derive substantial or significant benefit from the proposed lease rejection. *In Re Minges*, 602 F.2d 38, 44.

Clearly, when Debtors state that "the Second Circuit expressly declined to rule whether rejection requires a showing of benefit to general unsecured creditors", they got it very wrong. This passage from *Minges* explains that the Second Circuit remanded for more information so that it could decide whether "general creditors would receive substantial or significant benefit".

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE
COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 23

Unsecured creditors are general creditors and the Minges Court required that general creditors receive a benefit before rejection could be approved.

Also, in Footnote 23 (pg. 18, Objection memo), Debtors erroneously rely upon the Sundial case:

> The weight of contemporary authority under the Bankruptcy Code looks to benefit to the estate generally, without adopting the Movants' narrow focus on general unsecured creditors. See, e., *COR Route 5 Company, LLC v. The Penn Traffic Co.* (*In re The Penn Traffic Co.*), 524 F.3d 373, 383 (2d Cir. 2008) ("Under the 'business judgment' test, an executory contract ...should be rejected if the debtor can demonstrate that rejection will benefit the estate.") (quoting *Sundial Asphalt Co. v. V.P.C. Investors, Corp.* (*In re Sundial Asphalt Co.*), 147 B.R. 72, 81 (E.D.N.Y. 1992));

But *Sundial* actually supports our proper focus upon benefit to unsecured creditors:

> The Court looks to other cases which have applied the business judgment test to contracts in a bankruptcy setting...The bankruptcy court held that the business judgment test was applicable and required only that the trustee demonstrate that rejection of the executory contract would benefit the estate ( id. at p. 596)
> (... The primary element of such a showing is the extent to which a rejection will benefit the general unsecured creditors of the estate (id., citing *Matter of Minges*, 602 F.2d 38 [2d Cir. 1979]).

*In re Sundial Asphalt,* 147 B.R. 72, 81.

On pg. 20 of the Objection memo, Debtors fail to satisfy the *Minges* requirement that unsecured creditors benefit from the dealer rejections:

> Even if the *Minges* standard is relevant (which the Debtors do not concede), the Movants' reasoning fails because, although none of the cash proceeds from the Fiat Transaction flowed directly to general unsecured creditors, the Court correctly found that the Debtors' estates and general unsecured creditors obtained numerous benefits from the sale transaction, which included the designation of assumed contracts...

Debtors miss by a wide margin here by analyzing the alleged benefits of *the sale* whilst failing to properly analyze whether the unsecured creditors received a benefit from *the rejection*

PIDGEON & DONOFRIO GP
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

of dealership contracts.  The business judgment standard - as to whether an executory

contract may be rejected - is only satisfied if rejecting the contract will benefit the estate.  The

rejection business judgment test is not analyzed by benefits of the Sale.  And there was no

benefit to unsecured creditors emanating from rejection of the dealership contracts.  In fact, there

was a monolithic burden to unsecured creditors flowing from the rejected dealership contracts in

the sum of approximately one billion dollars.   Debtors have failed to apply the proper test.


*NO RELEVANT PARTY REQUESTED DEALERSHIP REJECTION*

There is no evidence whatsoever in the record of the case indicating that Fiat, the US

Government, the Canadian Government or the United Auto Workers ever requested dealers be

rejected by the Debtor.  (See Movants' Motion memo at 23-25.)  On pg. 22 at par. 37 of the

Objection Memo, Debtors make a nonsensical legal argument by stating, "The Movants cite to

no authority in suggesting that rejection is inappropriate absent the request of a particular

constituency."  This is rather absurd.  If no party required dealer rejections, then there was no

obligation to reject the dealers.  Hypothetically speaking, had the Debtor insisted upon giving

$200 million of the purchase price back to purchaser for no reason at all, it certainly would not

meet the business judgment standard either.


*ALLEGED PREPETITION OBLIGATIONS; THE TWA CASE*

On pgs. 23-25 of the Objection Memo, Debtors attempt to undermine the precedent set by

In re Trans World Airlines, Inc., 261 B.R. 103 (Bankr. D. Del. 2001):


RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE
COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 25

The Movants further argue that a prepetition obligation under the Alliance Viability Plan to reject agreements in bankruptcy would be unenforceable under *In re Trans World Airlines, Inc.*, 261 B.R. 103 (Bankr. D. Del. 2001)... [T]here is nothing in the Dealer Rejection Order or the Dealer Rejection Opinion constituting a finding that the Alliance Viability Plan amounted to a prepetition contractual obligation to reject dealer agreements.

Debtors fail to recognize that the Court *did* expressly find that the Alliance Viability Plan amounted to a prepetition obligation to reject dealer agreements in the Rejection Opinion at 406 B.R. 180, 197:

Dealership rationalization was a component of the Alliance Viability Plan, and the Debtors were obligated to accelerate this program, as stated above, to fulfill their commitment to their lenders.

The Court specifically used the word "obligated". As was discussed previously in our Motion Memo, the *TWA* case ruled as follows:

I hold that *TWA*'s prepetition agreement to waive its debtor-in-possession authority to assume or reject an executory contract under § 365 is contrary to the purpose of chapter 11 and unenforceable.

To the extent that this Court found the Debtors were obligated to reject the dealership contracts because of any alleged prepetition obligations, such prepetition obligations to reject executory contracts - post-petition - amount to a waiver of the Debtors' authority to assume an executory contract under Section 365 of the Bankruptcy Code and are therefore "contrary to the purpose of chapter 11 and unenforceable".

In reality, the Debtor was under no obligation whatsoever to reject the dealership contracts and approval of the rejections should not have been provided by this Court. The Debtors have failed to recognize that giving up the right assume executory contracts by way of prepetition obligations, is just as unenforceable as giving up the right to reject executory contracts by way of prepetition obligations.

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 26

*PROJECT TIGER vs. PROJECT GENESIS*

On pg. 24 of the Objection Memo, Debtors erroneously analyze our arguments concerning the difference between Project Tiger and Project Genesis. While the Court did previously discuss harm to the dealers and their communities, Movants only point out the differences between the two plans for the sake of proving that dealer rejections were not a result of the acceleration of Project Genesis. Dealer rejections were the result of Project Tiger. Project Genesis could have been accelerated had the Debtor chosen to negotiate with the dealership network under State law. But the Debtor specifically chose not to accelerate Project Genesis. Instead, the Debtor unleashed Project Tiger using its talons to slash 789 dealerships and approximately 40,000 jobs. Furthermore, the Court's Opinions fail to mention Project Tiger.

*THE LADY H CASE; IMPLIED STATUTORY ASSUMPTION; PROSPECTIVE RELIEF FROM REJECTION ORDER*

Debtors fail to recognize that a collective bargaining agreement is an executory contract and is controlled by section 365 as well as Section 1113. Movants see no reason why - if this Court's Rejection approval is reversed - Movants claims shouldn't be given administrative claim status just as the CBA in *Lady H* was given administrative claim status. Debtors' Counsel has previously agreed with this contention on pg. 8 at par. 14 of their Objection memo, stating that "...undoing the rejection of the dealer agreements could create additional, and potentially significant, administrative liabilities..." On this point, we agree with Debtors' Counsel. Should the Rejection Order be undone, Movants are entitled to retroactive administrative claim status.

PIDGEON & DONOFRIO GP
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

On pg. 4, Footnote 6 of the Objection memo, Debtors state:

> The Debtors lack any funding for the potentially significant administrative liabilities that could be incurred by the assumption of the Movants' rejected dealer agreements. By contrast, the Court has made clear that claims created by the rejection of these agreements (if timely and properly preserved by the filing of a proof of claim) are general unsecured non-priority claims. See Opinion Denying Motion of the 23 Affected Dealers for Allowance of Administrative Expenses Pursuant to 11 U.S.C. §§ 503(b) and 507(a)(2) [Docket No. 6160], dated January 5, 2010.

Debtors fail to recognize that if the Rejection Order is undone, Movants will be entitled to have their claims satisfied out of the $2 billion payment from New Chrysler to the Debtor. This is because an implied statutory assumption can be found in the Bankruptcy Code in that Sections 365(g) and 365(a) must operate in harmony.  365(a) requires Court approval before an executory contract may be rejected.  Once that approval is granted by the Court, 365(g) kicks in and relegates any claim by the non-debtor rejected party to unsecured creditor status.  But if the Court does not grant approval, or - in the alternative - if prior Court approval is reversed - then 365(g) cannot transform the non-debtor's breached contract to an unsecured claim.  As was held in *In re Thinking Machines,* 67 F. 3d 1021 (1st Cir. 1995) (discussed and quoted more thoroughly in the Motion Memo), the Court's approval under 365(a) is important and may not be trivialized.

To this issue, Debtors contend on pg. 29 of the Objection memo that "...the Court could have denied the Dealer Rejection Motion if the Court felt that the record and the law did not support the relief."  But the issue isn't that simple since the Court's comments during the Hearings indicate that the Court did not consider the ramifications of its power to withhold approval of the dealer rejections.  This is most evident during the May 28, 2009 Hearing (at pg.

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 28

431) when the Court stated:

> THE COURT: Well, Mr. Lerner, I disagree with your analysis in one regard. And that is, under the terms as I just understood, whether the sale hearing and a rejection hearing were done at the same time, if the sale hearing were approved and a rejection hearing request by the debtor was denied, the consequences would be the same.

It's inconceivable that the consequences would be the same because this would "reduce the Bankruptcy Court's approval to a bagatelle". *Id.* Lack of Court approval fails to trigger 365(g).

Furthermore, had the Debtor assumed the 789 dealership contracts on May 14th, 2009 - well before the June 2nd designation by New Chrysler excluding the 789 rejected dealers - then those 789 dealers would have been entitled to an administrative claim as per the holding in *In re Klein Sleep*, 78 F.3d 18 (2d Circuit 1996).

Debtors also contend that a Rule 60 motion cannot grant affirmative relief. But Movants have requested that the Rejection Order be vacated, which is proper relief. However, should this relief be granted, it will automatically elevate Movants' claims from unsecured creditor status and such elevation should be applied retroactively. To this issue, Movants' Motion has requested various forms of relief including a separate hearing thereto. Movants - should such a hearing be granted - will argue that they are entitled to have their breach of contract claims satisfied out of the $2 billion payment made by New Chrysler to the Debtor. Unwinding disbursement of that $2 billion will have absolutely no effect whatsoever on any faction of New Chrysler. (Furthermore, Movants wish to make clear that the Motion to Reconsider does not request any relief whatsoever from New Chrysler.)

On pg. 33 at par. 60 of the Objection memo, Debtor contends that the two billion dollars

RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 29

have already been paid out and cannot be accessed by Movants. This is effectively a *mootness* argument. In reply, Movants draw the Court's attention to, *In The Matter Of: Resource Technology Corporation*, 430 F.3d 884, 888 (7th Cir. 2005), Cert. Denied *by Banco Panamericano, Inc. v. Chastang Landfill, Inc.*, 2006 U.S. LEXIS 5706 (U.S., Oct. 2, 2006):

> Unscrambling a transaction may be difficult, but it can be done. No one (to our knowledge) thinks that an antitrust or corporate-law challenge to a merger becomes moot as soon as the deal is consummated. Courts can and do order divestiture or damages in such situations.

Movants Motion to Reconsider requests - first and foremost - that the Rejection Order be vacated along with the Claims Bar Date. Should this relief be forthcoming, Debtors' arguments pertaining to the fact that various Movants failed to file a claim would be moot.

Accordingly, for all of the foregoing, Movants respectfully request the Motion for Reconsideration be granted, the Rejection Order and Claims Bar Date be vacated, and any other relief the Court may find appropriate.

Respectfully submitted this 22nd day of January, 2010.


  //Leo C. Donofrio//
LEO C. DONOFRIO - On The Brief
STEPHEN PIDGEON
PIDGEON & DONOFRIO GP
Attorneys for Certain Affected Dealers
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774


RESPONSE TO DEBTOR'S OBJECTION TO MOVANTS' MOTION TO RECONSIDER THE COURT'S JUNE 9, 2009 REJECTION ORDER AND JUNE 19, 2009 REJECTION OPINION - 30