JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                :

| | |
|---|---|
| In re | Chapter 11 |
| Old Carco LLC (f/k/a Chrysler LLC), *et al.,* | Case No. 09-50002 (AJG) |
| Debtors. | (Jointly Administered) |

------------------------------------------------------------x

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION
## FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES
## FOR THE SALE OF TWINSBURG, OHIO STAMPING PLANT,
## (B) APPROVING CERTAIN BIDDER PROTECTIONS AND
## (C) SCHEDULING A FINAL SALE HEARING AND APPROVING THE
## FORM AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER
## AUTHORIZING THE SALE OF TWINSBURG, OHIO STAMPING PLANT
## <u>FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES</u>

TO THE HONORABLE ARTHUR J. GONZALEZ,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Old Carco LLC f/k/a Chrysler LLC ("Old Carco") and its affiliated debtors and debtors in possession (collectively with Old Carco, the "Debtors") respectfully represent as follows:

### Background

1.    On April 30, 2009 (the "Petition Date"), Old Carco and 24 of its affiliated Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On May 19, 2009, Debtor Alpha Holding LP commenced its bankruptcy case by filing a voluntary petition under chapter 11 of the Bankruptcy Code.  By orders of the Court (Docket Nos. 97 and 2188), the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered.

2.    On May 5, 2009, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"), pursuant to section 1102 of the Bankruptcy Code.

3.    As of the Petition Date, the Debtors and their nondebtor direct and indirect subsidiaries (collectively, the "Old Carco Companies") comprised one of the world's largest manufacturers and distributors of automobiles and other vehicles, together with related parts and accessories.  On the Petition Date, the Old Carco Companies employed approximately 55,000 hourly and salaried employees worldwide, 70% of whom were based in the United States.

4.    For the 12 months ended December 31, 2008, the Old Carco Companies recorded revenue of more than $48.4 billion and had assets of approximately $39.3 billion and liabilities totaling $55.2 billion.

5.     In connection with the commencement of these cases, Old Carco and its Debtor subsidiaries, Fiat S.p.A. ("Fiat") and New Chrysler (as defined below) entered into a Master Transaction Agreement dated as of April 30, 2009 (as amended and collectively with other ancillary and supporting documents, the "Purchase Agreement").  The Purchase Agreement provided, among other things, that:  (a) Old Carco would transfer the majority of its operating assets to New CarCo Acquisition LLC n/k/a Chrysler Group LLC ("New Chrysler"), a newly established Delaware limited liability company formed by Fiat; and (b) in exchange for those assets, New Chrysler would assume certain of the Debtors' liabilities and pay to Old Carco $2 billion in cash (collectively with the other transactions contemplated by the Purchase Agreement, the "Fiat Transaction").

6.     On May 31, 2009, this Court issued:  (a) an Opinion Granting the Debtors' Motion Seeking Authority to Sell, Pursuant to § 363, Substantially All of the Debtors' Assets (Docket No. 3073) (the "Sale Opinion"); and (b) an Opinion and Order Regarding Emergency Economic Stabilization Act of 2008 and Troubled Asset Relief Program (Docket Nos. 3074 and 3229).  On June 1, 2009 and consistent with the Sale Opinion, this Court entered an Order authorizing the Fiat Transaction (Docket No. 3232) (the "Sale Order").  Consistent with the Sale Order, the Fiat Transaction was consummated on June 10, 2009 (the "Closing Date").

7.     On January 22, 2010, the Debtors filed:  (a) the Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, dated January 22, 2010 (Docket No. 6272) (as it may be further amended or modified, the "Plan"); and (b) the Disclosure Statement with Respect to the Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, dated January 22, 2010 (Docket No. 6273) (the "Disclosure Statement"). The Court approved the Disclosure Statement as containing "adequate information" within the

meaning of section 1125 of the Bankruptcy Code pursuant to an order (Docket No. 6264) entered on January 21, 2010. The hearing to consider confirmation of the Plan currently is scheduled for March 16, 2010.

## Jurisdiction

8. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

9. Old Carco has executed a stalking horse Agreement of Purchase and Sale (including all exhibits, schedules and ancillary agreements related thereto, the "Purchase Agreement") with Twinsburg Industrial Park LLC (the "Buyer"), dated as of February 12, 2010, for the sale of certain real and personal property comprising the Debtors' Twinsburg, Ohio stamping plant (collectively, as further defined in the Purchase Agreement, the "Property"). A copy of the Purchase Agreement is attached hereto as Exhibit A. A declaration of Peter Chadwick, an Executive Director of Capstone Advisory Group, LLC ("Capstone"), describing the marketing process for the Property and the Debtors' decision to enter into the Purchase Agreement is attached hereto as Exhibit B (the "Chadwick Declaration").

10. By this Motion, pursuant to sections 105 and 363 of the Bankruptcy Code, Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1 and 6004-1 of the Local Rules (the "Local Bankruptcy Rules") for the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and General Order M-331 of the Bankruptcy Court ("General Order M-331"), the Debtors hereby seek the entry of two orders.

11.     *First*, the Debtors request the entry of an order in substantially the form attached hereto as Exhibit C (the "Bidding Procedures Order"):

(a)     scheduling a hearing (the "Sale Hearing") to be held before the Court on March 11, 2010 to consider approval of the sale of the Property to the Buyer or a higher and better bidder at an auction (the "Auction") to be held (if qualifying competing bids are received) on March 10, 2010; and

(b)     authorizing and approving (i) notice of the Auction and Sale Hearing in the form attached hereto as Exhibit D (the "Sale Notice") and (ii) the Debtors' proposed procedures for further marketing of the Property (the "Bidding Procedures"), including the establishment of certain deadlines for indications of interest and the submission of qualifying bids, assistance with certain due diligence, the granting of certain stalking-horse bidder protections to the Buyer and the conduct of the Auction.

12.     *Second*, upon conclusion of the Sale Hearing, the Debtors request the entry of an order substantially in the form attached hereto as Exhibit E (the "Sale Order") authorizing the sale of the Property, free and clear of liens, claims, interests and encumbrances to the Buyer or a higher or better bidder at the Auction.

## Facts Relevant to This Motion

### The Property

13.     The Property consists of:  (a) 11 parcels of real property totaling approximately 195 acres located at 2000 East Aurora Road, Twinsburg, Summit County, Ohio together with all facilities (including a state-of-the-art stamping facility), buildings, fixtures and other improvements located thereon and certain ancillary rights related thereto (as further defined in the Purchase Agreement, the "Real Property"); (b) all intangible property pertaining thereto (as further defined in the Purchase Agreement, the "Intangible Property"); and (c) certain personalty, trade fixtures and equipment located and/or used at the Real Property, including, but not limited to, the tangible personal property described on Exhibit E to the Purchase Agreement

(the "<u>Scheduled Assets</u>") and equipment or parts that are out for repair, if any (collectively, the "<u>Equipment</u>").[1]

14.     The Property was pledged as collateral to secure the Debtors' obligations under the Amended and Restated First Lien Credit Agreement, dated as of November 29, 2007 (as amended, the "<u>First Lien Credit Agreement</u>"), between and among Carco Intermediate Holdco II LLC, Old Carco, the lender parties thereto (collectively, the "<u>First Lien Lenders</u>") and JPMorgan Chase Bank, N.A., as the agent to the First Lien Lenders (the "<u>First Lien Agent</u>"). The First Lien Lenders hold the first priority lien on all of the Property, subject to certain permitted liens.

15.     Pursuant to the Transition Services Agreement, by and between Old Carco and New Chrysler, dated as of June 10, 2009 (as it may have been, or may be, amended or supplemented from time to time, the "<u>TSA</u>"), New Chrysler (a) is entitled to use the Property through July 31, 2010 (the "<u>License Period</u>") and (b) since the Closing Date (as such term is defined in the TSA), has been conducting, and currently conducts, operations at the Property. Pursuant to the TSA, New Chrysler does not pay rent for use of the Property during the License Period, but is responsible for (a) all carrying costs during the License Period and (b) the phase out and deactivation of the premises at the conclusion of the License Period. The carrying costs associated with the Property are substantial and are estimated to be approximately $2.4 million on an annual basis. New Chrysler's obligation to pay these costs terminates at the expiration of the License Period — <u>i.e.</u>, in less than six months. <u>See</u> Chadwick Declaration at ¶ 4; Disclosure Statement, at 27; Exhibit B.

---

[1]    The Equipment does not include certain personalty, trade fixtures and equipment owned by New Chrysler and identified on Exhibit B to the Purchase Agreement (the "<u>New Chrysler Equipment</u>"), as modified by the terms of the Letter Agreement (as such term is defined in the Purchase Agreement).

***The Marketing of the Property***

16.    <u>The Initial Marketing Process</u>.  The marketing process for the Property began around the time of the Fiat Transaction, with the Debtors receiving numerous indications of interest from various parties with respect to a potential purchase of the Property. <u>See</u> Chadwick Declaration at ¶ 6.  In response to their solicitations of interest, the Debtors executed 31 non-disclosure agreements with interested parties and, as of October 16, 2009, had received seven letters of intent offering to purchase the Property.  <u>See</u> <u>id.</u>

17.    Throughout the marketing process, the Debtors have consulted with the First Lien Agent, in its capacity as agent for the First Lien Lenders, whose liens completely encumber the Property on a first priority basis (subject to certain permitted liens).  Given the level of interest in the Property, the Debtors determined in consultation with the First Lien Agent that the engagement of real estate brokers to market the Property was unnecessary.  <u>See</u> <u>id.</u> at ¶ 7.  During the period from October 2009 through January 2010, the Debtors received offers from multiple purchasers.  These offers contained proposals for steadily increasing cash consideration.  <u>See</u> <u>id.</u>

18.    <u>The Stalking Horse Bid</u>.  On January 29, 2010, a Non-Binding Letter of Intent/Offer was submitted on behalf of the Buyer to the Debtors, pursuant to which offer the Buyer, as more fully described herein:  (a) offered cash consideration well in excess of any previously received offer; (b) offered to serve as the stalking horse bidder for the Property in connection with a Court-approved auction process; and (c) sought certain bidding protections (such offer, the "<u>Stalking Horse Bid</u>").  <u>See</u> <u>id.</u> at ¶ 8.  After further negotiations between the Buyer and the Debtors, in consultation with the First Lien Agent, the Debtors determined that the Stalking Horse Bid was the most attractive offer for the Property, accepted the Stalking Horse Bid and executed the Purchase Agreement as the means by which the Debtors will maximize the

value of the Property for their chapter 11 estates and creditors, including the First Lien Lenders. See id.

19.     The First Lien Lenders' Approval of the Stalking Horse Bid and Auction Process.  As described above, there are substantial carrying costs for property taxes, utilities, security and other expenses associated with the Property, which costs currently are borne by New Chrysler under the TSA.  New Chrysler's obligation to pay these costs expires as of July 31, 2010.  As a result, the Debtors may be forced to bear the entirety of these carrying costs in the next six months.

20.     Pursuant to paragraph 3 of the Agreed Order (Docket No. 5982) (the "DIP Lender Winddown Order") by and between the Debtors, the Debtors' debtor-in-possession lenders (collectively, the "DIP Lenders") and the Creditors' Committee, entered by the Court on November 19, 2009, the DIP Lenders, whose liens on the Property are junior to the liens securing the indebtedness under the First Lien Credit Agreement, are not funding any of the expenses associated with the sale of the Property (which Property is "First Lien Collateral" as such term is defined in the DIP Lender Winddown Order).  These costs instead currently are funded pursuant to a separate Agreed Order (Docket No. 5981) (the "First Lien Winddown Order") by and between the Debtors and the First Lien Lenders (i.e., the parties with the primary economic stake in the sale of the Property), entered by the Court on November 19, 2009, from the Reserve (as such term is defined in the First Lien Winddown Order) established from the First Lien Lenders' Collateral.

21.     In accordance with paragraph 7 of the First Lien Winddown Order, the Debtors have reviewed the sale process for the Property with the First Lien Agent and the First Lien Agent has:  (a) designated the Property as an "Estate Asset" (as such term is defined in the

First Lien Winddown Order); (b) indicated to the Debtors that the First Lien Lenders have consented to the sale of the Property pursuant to the terms of the Purchase Agreement; and (c) indicated to the Debtors that the First Lien Lenders (as the primary economic parties in interest) agreed that the sale of the Property ultimately be effected pursuant to the bidding procedures and auction process proposed herein. See id. at ¶ 5.

***Principal Terms of the Purchase Agreement***

22.     The principal terms of the Purchase Agreement are summarized below:[2]

- Acquired Assets:  Insurable fee simple title to the Real Property (as specifically described on Exhibit A to the Purchase Agreement); subject to the terms of the Letter Agreement, all right, title and interest in and to the Scheduled Assets; and subject to the terms of the Letter Agreement, all of Old Carco's right, title and interest, if any, in and to the Intangible Property and the Equipment (other than the Scheduled Assets).  Purchase Agreement, at ¶ 2(a).

- Excluded Assets:  The New Chrysler Equipment (as such equipment is identified on Exhibit B to the Purchase Agreement).  Purchase Agreement, at ¶ 1 (definition of "Equipment"); ¶ 2(a).

- Excluded Liabilities:  Buyer expressly does not assume and shall not assume any liabilities, Claims, other claims, debts, commitments and obligations of Old Carco of any and all kind whatsoever, whether or not relating to the Property (except for those obligations disclosed in the Permitted Liens) and/or Old Carco's business, whether arising prior to, on or after the closing of the transaction contemplated by the Purchase Agreement (the "Closing").  Purchase Agreement, at ¶ 2(b).

- Purchase Price:  $27,500,000 (the "Purchase Price").  Purchase Agreement, at ¶ 3.

- Deposit:  $2,750,000, which was delivered by wire transfer in immediately available funds to First American Title Insurance Company (the "Title Company") prior to the execution of the Purchase Agreement (the "Deposit"), and is refundable to the Buyer in the event the Purchase Agreement is terminated for any reason other than (a) the Buyer's material breach of any representation, warranty, covenant or agreement contained in the Purchase Agreement and such breach is not cured within ten days of the Buyer's receipt of notice of such breach

---

[2]     The description of the principal terms of the Purchase Agreement set forth herein is for the convenience of the Court and other parties in interest.  In the event of any inconsistency between this description and the Purchase Agreement, the terms of the Purchase Agreement shall govern.  Capitalized terms used in this summary and not otherwise defined herein have the meanings given to such terms in the Purchase Agreement.

from Old Carco or (b) the Buyer's failure to (i) timely perform each of its required obligations, covenants and deliveries under the Purchase Agreement or (ii) deposit the remaining balance of the Purchase Price with the Title Company prior to the Closing Date.  Purchase Agreement, at ¶ 3(a).

- Limitation on Right to Amend TSA:  From and after the date of execution of the Purchase Agreement (the "Agreement Date"), Old Carco has agreed not to amend the TSA (except for the Third Amendment) without Buyer's prior written consent to the extent such amendment would relate to the Property.  Purchase Agreement, at ¶ 4(c).

- General Conditions to Closing:  The parties' respective obligations to effect the Closing are subject to:  (a) the absence of any governmental injunction, order or decree that effectively prohibits the consummation of the sale of the Property (the "Transaction"); (b) the entry of the Sale Order; (c) the consent of New Chrysler to an assignment of the TSA; and (d) Old Carco's delivery to the Buyer of a duly executed certification confirming that, except for the Third Amendment, the TSA has not been amended in any manner relating to the Property since the Agreement Date.  Purchase Agreement, at ¶ 5(c)(i).

- Conditions on Buyer's Obligation to Close:  The Buyer's obligation to close the sale of the Property is conditioned on:  (a) the Buyer's receipt from the Title Company of an irrevocable commitment to issue a Title Policy (i) in a dollar amount to be determined by the Buyer (but in no event more than the Purchase Price) and (ii) subject only to the Permitted Liens; (b) Old Carco's delivery to the Title Company of (i) a duly executed and recordable quitclaim deed conveying insurable fee simple title to the Real Property (as attached to the Purchase Agreement as Exhibit H, the "Deed"), free and clear of all Liens, except for the Permitted Liens, and any other interests to the extent provided in the Sale Order pursuant to section 363(b) and section 363(f) of the Bankruptcy Code, (ii) a duly executed bill of sale conveying (A) all right, title and interest in and to the Scheduled Assets and (B) Seller's right, title and interest, if any, to the Equipment (other than the Scheduled Assets) and the Intangible Property, in each case free and clear of all Liens and any other interests to the extent provided in the Sale Order pursuant to section 363(b) and section 363(f) of the Bankruptcy Code, as attached to the Purchase Agreement as Exhibit I, (iii) a duly executed standard owner's affidavit, as attached to the Purchase Agreement as Exhibit G, (iv) a duly executed affidavit certifying that Old Carco is not a "foreign person" as such phrase is defined by the United States Internal Revenue Code, (v) a copy of the Sale Order as entered by the Court, (vi) an assignment of Old Carco's rights and obligations under the TSA with respect to the Property and (vii) all such other certificates or forms required by law to transfer the Property or necessary for the recordation of the Deed; (c) Old Carco's timely performance of all obligations, covenants and deliveries under the Purchase Agreement; and (d) Old Carco's representations and warranties under the Purchase Agreement having been true as of the execution thereof (such date, the "Agreement Date") and the Closing, as applicable.  Purchase Agreement, at ¶ 5(c)(ii).

- <u>Conditions on Old Carco's Obligation to Close</u>:  Old Carco's obligation to close the sale of the Property is conditioned on:  (a) the Buyer's timely performance of all obligations, covenants and deliveries under the Purchase Agreement; and (b) the Buyer's deposit of the remaining balance of the Purchase Price with the Title Company on or before the Closing.  Purchase Agreement, at ¶ 5(c)(iii).

- <u>Closing Costs</u>:  At the Closing, Old Carco will pay, out of the proceeds of the Transaction:  (a) any fees incurred in connection with the removal of unpermitted exceptions with respect to the Real Property; (b) all city, state and county transfer taxes and fees payable in connection with the sale and/or conveyance of the Real Property; and (c) one-half of any escrow fee.  At Closing, the Buyer will pay: (a) the cost of obtaining the Title Policy (and any endorsements thereto); (b) the cost of recording the Deed; and (c) one-half of any escrow fee.  Purchase Agreement, at ¶¶ 5(e), 5(f).

- <u>Prorations and Reimbursements</u>.  Real property taxes and/or utilities are to be pro-rated at Closing in accordance with local custom as determined by the Title Company (except for such costs payable by New Chrysler under the TSA).  Old Carco shall remit to Buyer an amount equal to any and all reimbursements received by Old Carco from New Chrysler on account of Spare Parts removed from the Property between February 9, 2010 and the Closing Date to the extent such Spare Parts relate to any of the Property.  Purchase Agreement, at ¶ 5(g).

- <u>Termination</u>:  The Purchase Agreement may be terminated prior to the Closing: (a) by mutual written consent of the parties; (b) by the Buyer, upon written notice, if the Court does not enter the Bidding Procedures Order within 15 days after the Agreement Date, unless extended to a later date by mutual consent; (c) by Buyer, upon written notice, if the Court does not enter the Sale Order within 20 days after the date on which the Bidding Procedures Order is entered by the Court, unless extended by mutual consent, (d) by either party, upon written notice, if (i) the Buyer is the Successful Bidder (as defined below) and (ii) the Closing has not occurred within 20 days of the entry of the Sale Order, unless extended by mutual consent; (e) by either party, upon written notice, if (i) the Buyer is the Next Highest Bidder (as defined below) and (ii) the Closing has not occurred within 35 days of the entry of an order approving an Approved Alternative Transaction, but in no event later than April 15, 2010, unless extended by mutual consent; (f) by either party, upon written notice, if the Closing has not occurred within 70 days of the Agreement Date; (g) by either party, upon written notice, if (i) there shall be any applicable law that makes consummation of the Transaction illegal or otherwise prohibited or (ii) consummation of the Transaction would violate any nonappealable final order, decree or judgment of (A) the Court or (B) any other court or governmental authority having competent jurisdiction; (h) by either party upon the closing of an Approved Alternative Transaction; (i) by either party, upon written notice, if, on or prior to the Closing Date, the other party is in material breach of any representation, warranty, covenant or agreement in the Purchase Agreement and such breach shall not be cured within ten days of such notice; (j) by either party, upon written notice, if any of the

conditions to the other party's obligation to consummate the Transaction are neither satisfied nor waived in writing; (k) by the Buyer, upon written notice, if it is not the Successful Bidder or the Next Highest Bidder at the conclusion of the Auction; (l) by the Buyer, upon written notice, if Old Carco has entered into an agreement for an Alternative Transaction (as defined in the Purchase Agreement); and (m) by the Buyer, in the manner provided in Section 9 of the Purchase Agreement in connection with the condemnation of the Property.  Purchase Agreement, at ¶ 5(h).

- Break-up Fee:  In consideration of the Buyer's due diligence and good faith negotiation of, and entry into, the Purchase Agreement, and in reimbursement of the Buyer's incurred expenses, in the event that Old Carco (a) consummates an Approved Alternative Transaction for the Property or (b) the Buyer terminates the Purchase Agreement upon Old Carco's entry into an Alternative Transaction, Old Carco has agreed to pay the Buyer a break-up fee of (x) $600,000 (i.e., 2.2% of the Purchase Price) (the "Break-up Fee") (in the event Old Carco consummates an Approved Alternative Transaction) or (y) the amount of the net proceeds of an Alternative Transaction, not to exceed $600,000 (in the event Old Carco consummates an Alternative Transaction).  The Break-up Fee shall be payable as an administrative expense under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code on the date of the closing, and out of the proceeds, of the applicable transaction.  In no event shall the Buyer be entitled to payment of the Break-up Fee unless and until the closing of an Approved Alternative Transaction or in accordance with ¶ 7(d) of the Purchase Agreement, as applicable.  Purchase Agreement, at ¶ 7.

- Environmental Liabilities:  The Buyer will take title to the Property on an "as is" and "where is" basis.  The Buyer has agreed to indemnify, release, defend, covenant not to sue and hold harmless Old Carco from and against any claim, action, matter or obligation that may arise regarding any environmental condition of the Property, caused solely by the Buyer's activities on and/or operation of the Property.  Purchase Agreement, at ¶ 8.

- Condemnation:  If the Property is condemned prior to the Closing, in whole or in part, and such condemnation has a material adverse effect on the Buyer's intended use of the Property, the Buyer may terminate the Purchase Agreement upon written notice (delivered within ten days of learning of such condemnation) and the Deposit will be promptly refunded.  If prior to Closing, the Property is damaged by fire or other casualty to the extent the cost of repairing such damage is reasonably estimated by the parties to be $1 million or less, the Purchase Agreement shall continue and the Purchase Price shall not be reduced.  If prior to Closing, the Property is damaged by fire or other casualty in an amount in excess of $1 million, the Buyer shall have the right, upon ten days' written notice to Old Carco, to terminate the Purchase Agreement, with the Deposit to be promptly refunded.  Purchase Agreement, at ¶ 9.

- Representations: The parties make limited representations under the Purchase Agreement as to organization and good standing and authorization to consummate the Transaction. The Buyer makes an additional representation as to sufficient financing to consummate the Transaction. Purchase Agreement, at ¶¶ 13, 14.

- No Successor Liability: The parties intend, and the Sale Order shall reflect, that Buyer shall not be deemed to be a successor to Old Carco and shall not be liable for any claims against Old Carco, its predecessors or affiliates. Purchase Agreement, at ¶ 16(j).

## Extraordinary Provisions Under the Guidelines

23. The following items in the Purchase Agreement and the Sale Order may be considered Extraordinary Provisions under the "Guidelines for the Conduct of Asset Sales" promulgated pursuant to General Order M-331:

(a) Use of Proceeds. The Debtors intend to release the net proceeds of the sale of the Property to the First Lien Lenders, to whom the Property has been pledged as collateral pursuant to the First Lien Credit Agreement and as the primary economic parties in interest, in accordance with paragraph 16 of the First Lien Winddown Order.

(b) Successor Liability. The proposed form of Sale Order contains findings and provisions limiting the Buyer's successor liability. Because (a) it has been nearly a full year since the Debtors have operated the Property, (b) the Property is one parcel of real estate out of the Debtors' many remaining assets and (c) the Buyer will not be continuing the Debtors' business, the Debtors believe that a finding that the sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to section 363(f) of the Bankruptcy Code. In addition, the Debtors are providing notice of the proposed sale as set forth herein (including publication notice).

(c) Deadlines that Effectively Limit Notice. The timeline proposed for the hearing to approve the Bidding Procedures Order limits the notice period otherwise afforded to parties in interest under the Case Management Order. Nonetheless, due process is not hindered as a result of the proposed shortening of applicable notice periods where the Debtors have provided at least ten days' notice of the proposed Bidding Procedures. See Guidelines, at II.B.2 ("The 10-day notice period provided for in Local Rule 9006-1(b) should provide sufficient time, under most circumstances,

to enable any parties-in-interest to file an objection to proposed sale procedures.").[3]

(d) <u>Relief from Bankruptcy Rule 6004(h)</u>.  The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h).  The Debtors submit that such relief is appropriate under the circumstances.

## Bidding Procedures for the Property

24. The Debtors request that the Court approve the following Bidding

Procedures for the Property:[4]

(a) <u>Important Dates</u>:  The Debtors shall, in coordination with Capstone and, with respect to the third item below, subject to the consent of the First Lien Agent:

- assist Potential Bidders (as defined below) in conducting their respective due diligence investigations and accept bids until **5:00 p.m. (Eastern Time) on March 5, 2010**;

- negotiate with Qualified Bidders (as defined below) in preparation for the Auction to begin at **10:00 a.m. (Eastern Time) on March 10, 2010** if any additional Qualified Bids (as defined below) are received; and

- select the Successful Bidder (as defined below) at the conclusion of the Auction and seek authority to sell the Property to such Successful Bidder at the Sale Hearing to be held by the Court at **10:00 a.m. (Eastern Time) on March 11, 2010**.

(b) <u>Determinations by Debtors</u>.  The Debtors, in coordination with Capstone and in consultation with the First Lien Agent, shall (i) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Property, (ii) determine whether any person or entity is a Qualified Bidder, (iii) receive bids from Qualified Bidders, (iv) negotiate any bids and (v) conduct the Auction of the Property if any Qualified Bids are received (collectively, the "<u>Bidding Process</u>").  Any person or entity who wishes to participate in the Bidding Process must be a Qualified Bidder.

(c) <u>Participation Requirements</u>.  Unless otherwise ordered by the Court for cause shown, to participate in the Bidding Process, each interested person or entity

---

[3]     Contemporaneously with the filing of this Motion, the Debtors have filed a motion to shorten the notice period for the hearing to consider approval of the Bidding Procedures Order.

[4]     The description of the Bidding Procedures described herein is for the convenience of the Court and other parties in interest.  The full copy of the Bidding Procedures, which are included as part of the proposed Bidding Procedures Order attached hereto as <u>Exhibit D</u>, should be reviewed with respect to any particular question regarding the Bidding Procedures.

(a "Potential Bidder") must deliver the following (unless previously delivered) to: (i) Capstone Advisory Group, LLC, Park 80 West, 250 Pehle Avenue, Suite 105, Saddle Brook, New Jersey 07663 (Attn: John Rooney); (ii) Jones Day, 1420 Peachtree Street, N.E., Suite 800, Atlanta, Georgia 30309-3053 (Attn: Jeffrey B. Ellman, Esq.) and 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn: William Herzberger, Esq. and Carl E. Black, Esq.); and (iii) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017-3954 (Attn: Peter V. Pantaleo, Esq.), so as to be received no later than 5:00 p.m. (prevailing Eastern Time) on March 1, 2010:

    (i)    an executed confidentiality agreement in form and substance satisfactory to the Debtors;

    (ii)    a statement demonstrating to the Debtors' satisfaction a *bona fide* interest in purchasing all of the Property; and

    (iii)    sufficient information, as requested by the Debtors, to allow the Debtors to determine that the Potential Bidder has the financial wherewithal and any required authorizations to close the Transaction, including, but not limited to, current audited financial statements of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtors in their discretion in consultation with the First Lien Agent).

(d)    <u>Due Diligence</u>. If the Debtors determine, in consultation with the First Lien Agent, that a Potential Bidder has a *bona fide* interest in the Property, then no later than two business days after the Debtors make that determination and have received from a Potential Bidder all of the materials required above, the Debtors will contact any such Potential Bidder and offer such access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances, subject to the limitations on the Debtors' access to the Property under the TSA.

(e)    <u>Bid Delivery Requirements</u>. A Potential Bidder that desires to make a bid shall deliver written and electronic copies of its bid to: (i) Capstone Advisory Group, LLC, Park 80 West, 250 Pehle Avenue, Suite 105, Saddle Brook, New Jersey 07663 (Attn: John Rooney; jrooney@capstoneag.com); (ii) Jones Day, 1420 Peachtree Street, N.E., Suite 800, Atlanta, Georgia 30309-3053 (Attn: Jeffrey B. Ellman, Esq.; jbellman@jonesday.com) and 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn: William Herzberger, Esq., wherzberger@jonesday.com, and Carl E. Black, Esq., ceblack@jonesday.com); and (iii) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017-3954 (Attn: Peter V. Pantaleo, Esq.; ppantaleo@stblaw.com), so as to be received not later than 5:00 p.m. (prevailing Eastern Time) on March 1, 2010 (the "<u>Bid Deadline</u>").

(f)     Bid Requirements.  A bid is a signed document from a Potential Bidder that provides, at a minimum, that:

    (i)     the Potential Bidder offers to purchase the Property upon the terms and conditions set forth in a copy of an asset purchase agreement enclosed therewith, marked to show any proposed amendments and modifications to the Purchase Agreement (the "Marked Agreement");

    (ii)    the bid is not subject to any due diligence or financing contingency and is irrevocable until one business day following the closing of the Transaction;

    (iii)   is a bid received by the Bid Deadline; does not entitle a bidder (other than the Buyer) to any break-up fee, termination fee or similar type of payment or reimbursement; and

    (iv)    the purchase price in such bid is a higher or otherwise better offer for the Property than that described in the Purchase Agreement and herein, and such offer shall not be considered a higher and better offer unless such bid provides for net cash (or cash equivalent) consideration to the Debtors of at least $750,000 more than the Purchase Price to be paid by the Buyer.

(g)     Supporting Information for Bids.  A Potential Bidder shall accompany its bid with:  (i) written evidence of available cash or an irrevocable commitment for financing and such other evidence of ability to consummate the transaction contemplated by the applicable Marked Agreement as the Debtors may reasonably request; (ii) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed; and (iii) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtors in their analysis of issues arising with respect to any applicable antitrust laws.

(h)     Rejection of Bids.  The Debtors reserve the right, with the consent of the First Lien Agent, to reject any bid for the Property if such bid:

    (i)     is on terms that are materially more burdensome or conditional than the terms of the Purchase Agreement;

    (ii)    is a bid for less than all of the Property;

    (iii)   requires any indemnification of such Qualified Bidder; or

    (iv)    includes a non-cash instrument or similar consideration that is not freely marketable.

(i)     Deposit Requirement.  A Potential Bidder must deposit with an escrow agent selected by the Debtors (the "Deposit Agent") a deposit equal to 10% of the initial cash purchase price set forth in the Marked Agreement (any such deposit,

a "Good Faith Deposit").  The Good Faith Deposit must be made by certified check or wire transfer and will be held by the Deposit Agent in accordance with the terms of the escrow agreement to be provided with the Purchase Agreement.

(j)     Qualification of Bids.  A bid received from a Potential Bidder that meets the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder."  For purposes of the Bidding Procedures, the Buyer is a Qualified Bidder and the Purchase Agreement executed by the Buyer is a Qualified Bid.  A Qualified Bid will be valued based upon factors such as:  (i) the purported amount of the Qualified Bid; (ii) the fair value to be provided to the Debtors under the Qualified Bid; (iii) the ability to close the proposed Transaction without delay; and (iv) any other factors the Debtors, in consultation with the First Lien Agent, may deem relevant.  Within one business day after receipt from a Qualified Bidder, the Debtors shall distribute by email or facsimile a copy of each Qualified Bid to counsel to each Qualified Bidder (including the Buyer).

(k)     Selection of Baseline Bid.  Qualified Bidders that have submitted Qualified Bids are eligible to participate in the Auction.  The Debtors will select, with the consent of the First Lien Agent, the highest and best Qualified Bid or Qualified Bids for the Property (the "Baseline Bid") to serve as the starting point for the Auction.  As soon as practicable, the Debtors shall provide all Qualified Bidders with a copy of the Baseline Bid.

(l)     Time and Place for Auction.  If more than one Qualified Bid is received by the Bid Deadline, the Debtors will conduct the Auction.  The Auction shall take place at 10:00 a.m. (prevailing Eastern Time) on March 10, 2010, at the offices of Jones Day, located at 222 East 41st Street, New York, New York 10017, or such later time or such other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids.  Only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Auction.  Professionals for the First Lien Lenders shall be able to attend and observe the Auction, provided that the professionals for the Creditors' Committee shall do so at their own expense and any such expenses shall not be a "Covered Cost" under the First Lien Winddown Order.

(m)     Minimum Bid Increment.  At the Auction, participants (including the Buyer) will be permitted to increase their bids and will be permitted to bid based only upon the terms of the Baseline Bid (except to the extent otherwise authorized by the Debtors, with the consent of the First Lien Agent), subject to Buyer's right to be credited in its bid for the amount of its Break-up Fee (as described below); provided, however, if the Buyer elects to participate in the Auction, the Buyer shall have the right, but shall not be obligated, to make any bid(s) at the Auction based on and subject to the terms and conditions set forth in the Purchase Agreement (other than the purchase price) and, in such case, the Debtors will weigh and consider any differences in any such terms and conditions set forth in the Purchase Agreement as compared to the terms and conditions set forth in the

Baseline Bid in the Debtors' process of determining the Successful Bid (as defined herein). The bidding will start at the purchase price and terms proposed in the Baseline Bid, and continue in increments of at least $100,000. Notwithstanding any other provision of these Bidding Procedures, when comparing bids at the Auction, the Buyer will be credited with, and have added to the aggregate amount of any bid that the Buyer elects to make at the Auction, an amount equal to the Break-up Fee.

(n)     <u>Additional Rules for Auction</u>. The Debtors may adopt, in consultation with the First Lien Agent, rules for the Auction at any time that will best promote the goals of the Bidding Process and that are not inconsistent with any provisions of the Purchase Agreement or the Bidding Procedures described herein. Any such rules will provide that: (i) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder; (ii) all bids will be made and received in one room, on an open basis, and all other bidders will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction; and (iii) each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction.

(o)     <u>Selection of Successful Bid</u>. Immediately prior to the conclusion of the Auction, the Debtors, with the consent of the First Lien Agent, will: (i) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Transaction; (ii) identify the successful bid (the "<u>Successful Bid</u>"); and (iii) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the successful bidder (the "<u>Successful Bidder</u>"), and the amount and other material terms of the Successful Bid. At the Sale Hearing, the Debtors shall present the Successful Bid to the Court for approval.

(p)     <u>Return of Deposits</u>. The Good Faith Deposits of all Qualified Bidders, and the Deposit (as defined in the Purchase Agreement) of the Buyer, shall be held in escrow by the Deposit Agent and shall not become property of the Debtors' bankruptcy estates absent further order of the Court. The Deposit Agent shall retain the Deposit of the Buyer or the Good Faith Deposit of the Successful Bidder, as the case may be, until the earlier of the closing of the Transaction or the termination or expiration of the applicable Marked Agreement or the Purchase Agreement, as the case may be. At the closing of the Transaction contemplated by the Successful Bid, a Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit or, in the case of the Buyer, its Deposit. The Good Faith Deposits of all Qualified Bidders, other than the Successful Bidder and the Next Highest Bidder (as defined in the Bidding Procedures), shall be released by the Debtors upon the entry of the Sale Order. The Good Faith Deposits of the Successful Bidder and the Next Highest Bidder

(if not applied to the Purchase Price at closing) shall be released by the Debtors upon the earlier of (i) the closing of the Transaction or (ii) the withdrawal of the Property for sale by the Debtors. Additionally, if the Purchase Agreement is terminated, the Buyer's Deposit (as defined in the Purchase Agreement) shall be returned to the extent required by the Purchase Agreement. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. With respect to Good Faith Deposits, if (i) all conditions precedent to the Successful Bidder's or Next Highest Bidder's obligation to close the Transaction have been satisfied or waived, (ii) the Successful Bidder or the Next Highest Bidder has not terminated the applicable Marked Agreement or the Purchase Agreement, as the case may be, as may be permitted therein, (iii) the Debtors have performed their covenants and agreements thereunder and (iv) the Successful Bidder or the Next Highest Bidder has breached its covenants or agreements under the Marked Agreement or the Purchase Agreement, as the case may be, and has failed, refused or is unable to consummate the Transaction by the applicable closing date, the Debtors shall be entitled to the Good Faith Deposit as liquidated damages. Any interest of the Debtors' estates in the Good Faith Deposits or the Deposit shall constitute "First Lien Collateral" as that term is defined in the First Lien Winddown Order and shall be paid to the First Lien Agent in accordance with the terms of such order.

The Debtors believe that the proposed Bidding Procedures provide an appropriate framework for selling the Property and will enable the Debtors to review, analyze and compare all bids received to determine which bid or combination of bids is in the best interests of the Debtors' estates and creditors.

## Proposed Stalking Horse Bidding Protection

25. The Debtors are also requesting approval of the provisions of the Purchase Agreement regarding the payment of the Break-up Fee in the maximum amount of $600,000 (i.e., 2.2% of the Purchase Price). The Break-up Fee (or some portion thereof) is only payable in two discrete circumstances:

- upon the closing of an Approved Alternative Transaction,[5] provided that (a) Old Carco has not terminated the Purchase Agreement on account of

---

[5] The term "Approved Alternative Transaction" is defined in the Purchase Agreement as "any Alternative Transaction … with a Successful Bidder (including a deemed Successful Bidder) other than [the Buyer] as approved by the Bankruptcy Court pursuant to the Sale Order." Purchase Agreement, at ¶ 5(h)(v). The term "Alternative Transaction" is defined in the Purchase Agreement as "any transaction between [Old Carco] and a Person other than [the Buyer] for all or a portion of the Property that would prevent the

(i) the Buyer's material breach of any representation, warranty, covenant or agreement contained in the Purchase Agreement and such breach is not cured within ten days of the Buyer's receipt of notice of such breach from Old Carco or (ii) the Buyer's failure to (A) timely perform each of its required obligations, covenants and deliveries under the Purchase Agreement or (B) deposit the remaining balance of the Purchase Price with the Title Company prior to the Closing Date; or (b) the Buyer is not the Successful Bidder or deemed Successful Bidder (Purchase Agreement, at ¶ 7(b)); and

- if the Buyer terminates the Purchase Agreement on account of Old Carco's entry into a legally enforceable agreement for an Alternative Transaction that is not an Approved Alternative Transaction, the Buyer shall be entitled to a Break-up Fee upon the closing of such Alternative Transaction, solely out of and to the extent of the net proceeds of such transaction in an amount not to exceed $600,000. Purchase Agreement, at ¶ 7(d).

26. The Buyer's right to the Break-up Fee shall be the sole and exclusive remedy of the Buyer in the event of the closing of an Approved Alternative Transaction or Alternative Transaction, as applicable. In no event shall the Buyer be entitled to payment of the Break-up Fee unless and until the closing of an Approved Alternative Transaction or an Alternative Transaction (in accordance with section 7(d) of the Purchase Agreement), as applicable.

27. The Buyer required the inclusion of these provisions in the Purchase Agreement to be willing to serve as a stalking horse bidder. As set forth herein, the Buyer's bid establishes an appropriate floor value for the Property after months of marketing and discussions with numerous potentially interested bidders. Bankruptcy courts have approved bidding incentives similar to the Break-up Fee under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith

_____

(continued…)

consummation of the sale of the Property contemplated herein, except for those transactions pursuant to the Letter Agreement." Purchase Agreement, at ¶ 5(h)(xiv).

and in the exercise of honest judgment.  See, e.g., In re Metaldyne Corp., No. 09-13412 (MG) (Bankr. S.D.N.Y. Jul. 28, 2009) (approving break-up fee of 3% of $55.5 million cash portion of $481 million asset sale); In re Loral Space & Commc'ns Ltd., No. 03-41710 (RDD) (Bankr. S.D.N.Y. Aug. 18, 2003) (approving break-up fee of 2% of $1 billion sale); In re Magellan Health Servs., Inc., No. 03-40515 (PCB) (Bankr. S.D.N.Y. Apr. 7, 2003) (approving discrete termination and commitment fees of 2% and 3%, respectively, in connection with $50 million equity commitment); In re Adelphia Bus. Solutions, Inc., No. 02-11389 (REG) (Bankr. S.D.N.Y. Nov. 25, 2002) (approving termination fee of 2.5% of $10.7 million sale); In re Bradlees Stores, Inc., No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 11, 2001) (approving termination fee of 2% of $150 million sale); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 662 (S.D.N.Y. 1992) (approving termination fee of 3.2% of the $190 million out-of-pocket costs for $565 million sale), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.") (citation omitted).

28.     The Break-up Fee meets the "business judgment rule" standard because (a) it is not excessive compared to fees and reimbursements approved in other cases and (b) it will not diminish the Debtors' estates.  Break-up fees such as that proposed herein enable a debtor to assure a sale to a contractually-committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity of obtaining even greater benefits for the estate through an auction process.  Additionally, the maximum Break-up Fee

payable under the Purchase Agreement is 2.2% of the aggregate Purchase Price, which is a reasonable amount for a transaction of this type.

29.     The Debtors submit that the proposed Break-up Fee will not chill bidding, is reasonable and ultimately promotes the Debtors' ability to maximize the value of their estates. Accordingly, the Debtors should be authorized to offer such bid protection as is necessary in the Debtors' business judgment.  See In re Integrated Res., Inc., 135 B.R. 746 (Bankr. S.D.N.Y.), aff'd, 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).

### Proposed Notice of the Sale Hearing

30.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.  The Debtors propose that, to be considered, objections to the proposed sale or any of the remaining relief sought herein must be in writing, state the basis of such objection with specificity, conform to the Bankruptcy Rules and the Local Bankruptcy Rules and be filed with the Court and served so as to be actually received no later than 4:00 p.m. (prevailing Eastern Time) on March 10, 2010 by (a) counsel to the Debtors, Jones Day, 1420 Peachtree Street, N.E., Suite 800, Atlanta, Georgia 30309-3053 (Attn:  Jeffrey B. Ellman, Esq.) and 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn:  William Herzberger, Esq. and Carl E. Black, Esq.); (b) counsel to the First Lien Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017-3954 (Attn:  Peter V. Pantaleo, Esq.); (c) counsel to the Creditors' Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 (Attn:  Thomas Moers Mayer, Esq.); and (d) counsel to the Buyer, Arnold & Porter LLP, 399 Park Avenue, New York, New York  10022-4690 (Attn:  Michael J. Canning, Esq.).

31.	No later than February 27, 2010 (the "Mailing Deadline"), the Debtors shall serve the Sale Notice, together with a copy of the Bidding Procedures Order, by first-class mail, postage prepaid upon:  (a) counsel to the Creditors' Committee; (b) counsel to the First Lien Agent; (c) counsel to the DIP Lenders; (d) counsel to the Buyer; (e) any party who, in the past year, expressed in writing to the Debtors an interest in the Property; (f) all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Property; (g) the Internal Revenue Service; (h) the attorney general for the State of Ohio and all local environmental enforcement agencies; (i) all applicable state and local taxing authorities; (j) the U.S. Trustee; (k) the U.S. Environmental Protection Agency; (l) counsel to The Bank of New York Trust Company, N.A., in its capacity as the indenture trustee under that certain Indenture, dated as of March 1, 1985, among DaimlerChrysler Company LLC (as predecessor in interest to Old Carco), as issuer, DaimlerChrysler AG (now known as Daimler AG), as guarantor and U.S. Bank National Association; and (m) all entities that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002.

32.	In addition, as soon as practicable after the Mailing Deadline, the Debtors will publish the Sale Notice (modified as appropriate to accommodate publication) one time in the national edition of the *Wall Street Journal* and the *Cleveland Plain Dealer*.  The Sale Notice provides that any party that wishes to obtain a copy of this Motion, including all exhibits, may do so by making such a request in writing to Jones Day, 222 East 41st Street, New York, New York 10017 (Attn:  Brett Stone), Facsimile:  (212) 755-7306, or by accessing the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at www.chryslerrestructuring.com.

33.    The Debtors submit that the notice of the Auction and the Sale Hearing as provided for herein complies fully with Bankruptcy Rule 2002, Local Bankruptcy Rule 2002-1 and General Order M-331 and constitutes good and adequate notice of the sale of the Property and the proceedings with respect thereto.  Therefore, the Debtors respectfully request that the Court approve the notice procedures proposed above.

## Argument

### *Approval of the Transaction under Section 363 of the Bankruptcy Code*

34.    Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Courts in the Second Circuit have found that the decision to sell assets outside the ordinary course of business should be based upon the sound business judgment of the debtor and, where that judgment has a reasonable basis, a court ordinarily should defer to that judgment in determining whether to approve a proposed transaction.  See, e.g., Sale Opinion, at pp. 15-16 (noting that proposed sales of assets outside the ordinary course of business must be supported by "a proper business justification"); Licensing By Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate may be conducted if a good business reason exists to support it."); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983) (holding that a "judge determining a § 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (acknowledging that "the business judgment of the Debtor is the standard applied under the law in this district."); Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as

distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

35.     A sound business justification underlies the Debtors' decision to sell the Property where the proposed sale will allow the Debtors to:  (a) continue to implement the winddown of the Debtors' estates (as described in the DIP Lender Winddown Order, the First Lien Winddown Order and the Plan); (b) monetize the Property for the benefit of the Debtors' estates and creditors, including the First Lien Lenders (who are the primary economic parties in interest); and (c) avoid incurring any carrying costs associated with the Property upon the expiration of the License Period.  Moreover, given (a) the thorough marketing of the Property (as described herein and in the Chadwick Declaration), (b) the significant cash Purchase Price and Deposit being offered by the Buyer (which price must be exceeded by any Qualified Bidder under the Bidding Procedures by at least $750,000); (c) the Buyer's willingness to promptly consummate the sale on an "as is, where is" basis; and (d) the further market testing of the Property at the Auction proposed herein, with the possibility of higher and better bids, the Debtors believe that their sale of the Property will maximize value for their chapter 11 estates.

36.     As of the date of this Motion and after months of effort, the Debtors have received no definitive offer to purchase the Property that promises greater economic value to their bankruptcy estates than that embodied in the Purchase Agreement (which economic value will be further market-tested by a fair and open Auction, as described herein).  Thus, the Debtors submit that the Purchase Agreement (or any Marked Agreement submitted by a Successful Bidder) constitutes (or will constitute) the best offer for the Property, and will provide a greater recovery for the Debtors' estates than would be provided by any available alternative.

Accordingly, the Debtors' entry into the Purchase Agreement (or Marked Agreement, as the case may be) represents a sound exercise of their reasonable business judgment.

### *The Successful Bidder Will Be a "Good Faith Purchaser"*

37.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Although the Bankruptcy Code does not define "good faith," the Second Circuit Court of Appeals, in In re Gucci, has held that the:

> [g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'

126 F.3d at 390 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code)); see also Bace v. Babbitt, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25, 2008) (same; quoting Gucci); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

38.     There is little question that the Buyer — who is not an "insider" of the Debtors under section 101(31) of the Bankruptcy Code — will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. The Debtors and the Buyer have entered into the Purchase Agreement without collusion, in good faith and from arm's-length bargaining positions. There is no indication of "fraud, collusion between the purchaser and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or any similar conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. Moreover, given the rules of the Auction as set forth in the Bidding Procedures (i.e., all bids to be made in one room; all bidders being entitled to know the identity of other bidders and the details of any bids), the possibility of such fraud, collusion, unfair advantage or similar conduct being present with respect to any other Successful Bidder is essentially negligible. Thus, the Debtors expect to be able to demonstrate at the Sale Hearing that any other Successful Bidder likewise will be a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code. The consideration to be received by the Debtors pursuant to the Purchase Agreement (or under any Marked Agreement) is substantial, fair and reasonable and will have been subjected to market testing at the Auction. Accordingly, the Debtors seek a finding that the Buyer (or any other Successful Bidder through the Bidding Procedures) is a "good faith purchaser" under section 363(m) of the Bankruptcy Code and entitled to the full protection thereof.

### *Approval of Sale Free and Clear*

39.     The Debtors request approval to sell the Property free and clear of any and all liens, claims, and encumbrances (except for "Permitted Liens" under the Purchase Agreement or such exceptions as may be present in any Marked Agreement accepted by the Debtors as the Successful Bid) in accordance with section 363(f) of the Bankruptcy Code. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable nonbankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in *bona fide* dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); <u>see</u> <u>also</u> Sale Opinion, at p. 24 (stating that, when considering whether assets may be sold free and clear of any liens and interests of an entity other than the estate, "the Court must determine whether *any* of the elements of section 363(f) are satisfied") (emphasis added); <u>Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)</u>, 333 B.R. 30, 50 (S.D.N.Y. 2005) ("Where … a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in section 363(f) of the statute must also be met.").  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); <u>see</u> <u>also</u> <u>Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)</u>, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

40.     As an initial matter, the First Lien Lenders have consented to the sale of the Property free and clear of their liens under the First Lien Credit Agreement.  The Debtors propose that these liens and any other liens, claims, interests and encumbrances asserted against the assets be transferred, and attach, to the sale proceeds, except to the extent that the Buyer or another Successful Bidder agrees to take title to such assets subject to such liens.  All liens on the assets will be satisfied or will attach to the proceeds of the sale of the assets with the same force, effect and priority as such liens have on the assets, subject to the rights and defenses, if any, of

the Debtor and any party in interest with respect thereto. Moreover, the Debtors believe that each of the parties holding liens in the Property could be compelled to accept a monetary satisfaction of such interests. In addition, if a holder of a lien, claim, interest or encumbrance receives notice of this Motion and does not object within the prescribed time period, the Debtors submit that such holder may be deemed to have consented to the proposed sale. Accordingly, the Debtors submit that the sale of assets free and clear of liens, claims, interests and encumbrances satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

***Waiver of 10-Day Stay Under Bankruptcy Rule 6004(h)***

41.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of such order. See Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). The Debtors believe that such waiver is appropriate here with respect to the Sale Order because (a) all parties that have expressed interest in the Property since the Petition Date will have (i) received notice of this Motion and any entry of the Bidding Procedures Order and (ii) had the opportunity to participate in the Auction at which the Debtors propose to sell the Property and (b) the immediate consummation of this transaction permits the Debtors' to complete an important sale as part of their ongoing winddown and focus on liquidating their remaining properties and completing the other aspects their winddown efforts.

## Notice

42.     In accordance with section II.B.1 of General Order M-331, notice of this Motion has been given to: (a) counsel to the Creditors' Committee; (b) counsel to the First Lien Agent; (c) counsel to the DIP Lenders; (d) counsel to the Buyer; (e) any party who, in the past

year, expressed in writing to the Debtors an interest in the Property; (f) all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Property; (g) the Internal Revenue Service; (h) the attorney general for the State of Ohio and all local environmental enforcement agencies; (i) all applicable state and local taxing authorities; (j) the U.S. Trustee; (k) the U.S. Environmental Protection Agency; (l) counsel to The Bank of New York Trust Company, N.A., in its capacity as the indenture trustee under that certain Indenture, dated as of March 1, 1985, among DaimlerChrysler Company LLC (as predecessor in interest to Old Carco), as issuer, DaimlerChrysler AG (now known as Daimler AG), as guarantor and U.S. Bank National Association; and (m) all entities that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002.  Notice of the Sale Hearing will be provided in the manner described above.  The Debtors submit that no other or further notice need be provided.

## No Prior Request

43.     No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the

Bidding Procedures Order in substantially the form attached hereto as <u>Exhibit C</u>, approving the

Bidding Procedures; (ii) enter the Sale Order in substantially in the form attached hereto as

<u>Exhibit E</u>, authorizing the sale of the Property to the Successful Bidder at the Auction; and

(iii) grant such other and further relief to the Debtors as the Court may deem proper.


Dated: February 13, 2010               Respectfully submitted,
      New York, New York


  _s/  Corinne Ball_____
Corinne Ball
Veerle Roovers
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

David G. Heiman
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Jeffrey B. Ellman
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

# EXHIBIT A

## [Purchase Agreement]

## AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE (this "<u>Agreement</u>"), is dated as of February 12, 2010 (the "<u>Agreement Date</u>"), between OLD CARCO LLC (f/k/a Chrysler LLC), a Delaware limited liability company ("<u>Seller</u>"), and TWINSBURG INDUSTRIAL PARK LLC, a Delaware limited liability company ("<u>Purchaser</u>").

## RECITALS

WHEREAS, on April 30, 2009 (the "<u>Petition Date</u>"), Seller filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), which case is administered under Case No. 09-50002 (AJG) (the "<u>Bankruptcy Proceeding</u>").

WHEREAS, prior to the Petition Date, Seller operated a stamping plant (the "<u>Business</u>") at the Real Property (as defined in <u>Section 1</u>).

WHEREAS, Seller desires to sell, and Purchaser desires to purchase, certain property located in the County of Summit, State of Ohio, of which Seller is the owner (the "<u>Transaction</u>").

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.　　　<u>Definitions</u>.

"<u>Affiliate</u>" means any Person that is Controlled By or Affiliated With a party to this Agreement.

"<u>Affiliated With</u>" means the status of direct or indirect common ownership or management with a party to this Agreement.

"<u>Chrysler</u>" means Chrysler Group LLC.

"<u>Chrysler Equipment</u>" means the personalty, trade fixtures and equipment owned by Chrysler and identified on <u>Exhibit B</u> attached hereto and incorporated by reference herein, as modified by the terms of the Letter Agreement.

"<u>Controlled By</u>" means the possession, directly or indirectly through one or more intermediaries, of the power to direct or cause the direction of the management and policies of a Person.

"<u>Equipment</u>" means (i) the Scheduled Assets and (ii) all of the other personalty, trade fixtures and equipment, other than the Chrysler Equipment, located and/or used at the Real Property, including without limitation, equipment or parts that are out for repair, if any.

"Intangible Property" means all manuals, maintenance records, as-built and other drawings, and other similar documents and materials (whether in electronic or written form), in Seller's possession or under Seller's control (if any), relating to the Property and, to the extent transferable, any and all (i) warranties and guaranties relating to any of the Property and any and all rights and remedies of Seller, if any, with respect thereto, and (ii) governmental permits, approvals, licenses and consents.

"Letter Agreement" means that certain letter agreement dated as of January 28, 2010, by and between Chrysler and Seller relating to certain clarifications of the Master Transaction Agreement dated as of April 30, 2009.

"Liens" means, with respect to any of the Property, regardless of whether created or incurred prior to, on or after the Petition Date, any and all Monetary Liens, liens (including judicial and statutory liens), pledges, charges, options, rights of first refusal, rights of first offer, licenses to a third party, leases to a third party, security agreements, encumbrances, Claims (as defined in Section 101(5) of the Bankruptcy Code) or other adverse claims (including any options and rights of first refusal), charges, pledges, hypothecations, covenants, restrictions, interests or limitations of any kind in respect of any of the Property. For the purposes of this Agreement, without limiting the definition of a "Lien", Seller will be deemed to own subject to a Lien any asset which Seller has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset. For the purposes of this Agreement, under no circumstances shall Liens include any of the Permitted Liens and Purchaser understands and agrees that Seller's conveyance of title to the Real Property to Purchaser will be subject to the Permitted Liens.

"Monetary Liens" means any mortgages, deeds of trusts, security interests, liens for delinquent property taxes, mechanic's or materialmen's liens and other similar types of monetary liens. For the purposes of this Agreement, Monetary Liens shall include, without limitation, all delinquent real estate taxes and Items 22-27, inclusive, of Schedule B, Section Two of the Commitment. For the purposes of this Agreement, under no circumstances shall Permitted Liens include any of the Monetary Liens and Seller understands and agrees that all Monetary Liens will be released from the Property and will attach to the Sale Proceeds in the same order of priority, validity and enforceability as existing prior to the sale of the Property by Seller to Purchaser to the extent provided in the Sale Order.

"Person" means and includes an individual, partnership, association, joint venture, corporation, limited liability company, limited liability partnership, trust, trustee, any other entity or organization and any governmental entity.

"Property" means all of the Equipment (including without limitation, the Scheduled Assets), the Intangible Property and the Real Property.

"Real Property" means (i) the approximately 195 acres of land located at 2000 East Aurora Road, Twinsburg, Ohio 44087 and more specifically described on Exhibit A

attached hereto and incorporated by reference herein, (ii) all buildings, fixtures and other improvements located on the land, including without limitation, all of Seller's right, title and interest, if any, to all related facilities infrastructure, systems and utilities, (iii) all hereditaments, privileges, tenements, and appurtenances belonging to the land and the improvements and (iv) all of Seller's rights to open or proposed highways, streets, roads, development rights and other similar rights to the extent assignable, easements, strips, gores, and rights-of-way in any way affecting the land and the improvements.

"Representative" means, as to each party, its employees, officers, directors, agents, consultants (including without limitation, outside attorneys and accountants), advisors and agents.

"Sale Proceeds" means those proceeds received by Seller on account of the sale of the Property.

"Scheduled Assets" means all of the tangible personal property described on Exhibit E attached hereto and incorporated by reference herein.

"TSA" means the Transition Services Agreement, dated as of June 10, 2009 and amended as of October 1, 2009 and November 5, 2009, by and between Seller and Chrysler (a copy of the TSA and the two amendments being attached hereto as Exhibit F and incorporated by reference herein), and the Amendment No. 3 to Transition Services Agreement to be entered into by and between Seller and Chrysler is substantially in the form as provided to Seller as of the Agreement Date (the "Third Amendment").

For any party hereto, a document is "substantially in the form" of a document referred to in this Agreement when it is identical to the document referred to except for revisions necessary to correct typographical and clerical errors, changes to the date of such document and other modifications made with the consent of such party, such consent to not be unreasonably withheld.

2.     Agreement.

(a)     Sale and Purchase. Subject to the terms and conditions of this Agreement and the entry of the Sale Order (as defined in Section 6(c)), on the Closing Date (as defined in Section 5(a)), Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, receive and assume from Seller (i) insurable fee simple title to the Real Property, free and clear of all Liens, except for the Permitted Liens, and any other interests to the extent provided in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code, (ii) subject to the terms of the Letter Agreement, all right, title and interest in and to the Scheduled Assets, free and clear of all Liens and any other interests to the extent provided in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code, and (iii) subject to the terms of the Letter Agreement, all of Seller's right, title and interest, if any, in and to the Intangible Property and the Equipment (other than the Scheduled Assets) free and clear of all Liens and any other interests to the extent provided in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code.

(b)    Excluded Liabilities.  Purchaser does not assume and shall not assume any liabilities, Claims, other claims, debts, commitments and obligations of Seller of any and all kind whatsoever, whether or not relating to the Property (except for those obligations disclosed in the Permitted Liens) and/or the Business, whether absolute, accrued, unaccrued, contingent, fixed or otherwise, whether known or unknown, whether due or to become due, and whether arising prior to, on or after the Closing (as defined in Section 5(a)) (collectively, the "Excluded Liabilities").  Upon closing of the sale of the Property, pursuant to the Sale Order, Purchaser will take title to and possession of the Property free and clear of the Liens and any other interests to the extent provided in the Sale Order.

3.    Purchase Price; Deposit.  The purchase price for the Property shall be TWENTY SEVEN MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($27,500,000.00) (the "Purchase Price").  The Purchase Price shall be payable as follows:

(a)    Deposit.   Seller acknowledges that, prior to the Agreement Date, Purchaser delivered, by wire transfer and in immediately available funds, the amount of TWO MILLION SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($2,750,000.00) to First American Title Insurance Company (the "Title Company" or "Escrow Agent") as an earnest money deposit (the "Deposit").  For purposes of this Agreement, the meaning of "Deposit" shall include any earnings thereon.  The Deposit shall serve as an earnest money deposit under this Agreement and shall be released in accordance with the following procedures:

(i)    Deposit Instructions.  At the Closing, Seller and Purchaser shall jointly instruct the Escrow Agent to deliver the Deposit by wire transfer of immediately available funds, to an account designated by Seller and the full amount of the Deposit at Closing shall be applied towards the payment of the Purchase Price as a credit in favor of Purchaser.

(ii)    Termination of Agreement by Reason of Purchaser Material Breach.  If (A) Seller is not in material breach of this Agreement, (B) Purchaser has not terminated this Agreement as permitted hereunder and (C) Seller terminates this Agreement pursuant to (1) Section 5(h)(xi) or (2) Section 5(h)(xii) to the extent a closing condition set forth in Section 5(c)(iii) is not satisfied, then the Deposit shall be delivered to Seller.

(iii)    Termination of Agreement for Other Reasons.  If this Agreement is terminated for any reason whatsoever other than that stated in Section 3(a)(ii), then the Deposit will be returned to Purchaser.

(b)    Purchase Price Balance.  The balance of the Purchase Price, subject to any prorations and other credits as set forth in this Agreement, shall be delivered in immediately available funds on or before the Closing Date by Purchaser to Escrow Agent.

4.    Title Report.

(a)     Purchaser acknowledges it has obtained a title commitment, (Number NCS-420791-MICH) with an effective date as of November 30, 2009 (the "Commitment"), for the Real Property prepared by Title Company. Purchaser has approved the Commitment (other than any and all Monetary Liens) as of the Agreement Date, *provided, however,* that Purchaser shall be permitted to object to any encumbrance or defect in title that is properly recorded in the real property records of the County of Summit, State of Ohio on or after the Agreement Date ("Post Agreement Date Encumbrances") excluding those matters created, suffered or permitted by, at the request of or through Purchaser ("Post Agreement Date Objections"). Within five business days after receipt of Purchaser's Post Agreement Date Objections, Seller shall notify Purchaser if Seller is unable or unwilling to remove any such Post Agreement Date Encumbrances on or prior to the Closing Date at Seller's sole cost ("Seller's Title Notice"). If Seller is unable or unwilling to cure any such Post Agreement Date Objections, Purchaser shall have the option to notify Seller, within five business days of Purchaser's receipt of Seller's Title Notice, of Purchaser's election to terminate this Agreement in which case the Deposit shall be promptly returned to Purchaser. If Purchaser fails to timely respond to such Seller's Title Notice, Purchaser shall be deemed to have waived such exceptions and shall be required to proceed with Closing without diminution in the Purchase Price. From and after the Agreement Date until the earlier of Closing or the termination hereof, Seller shall not take any action, or fail to take any action, that would cause title to the Property to be subject to any title exceptions, other than the Permitted Liens.

(b)     Those Post Agreement Date Encumbrances that Purchaser does not disapprove of, as well as (i) any exceptions included in the Commitment that were recorded prior to the Agreement Date, (ii) real estate taxes which are not yet due and payable, (iii) matters created, suffered or permitted by or through the Purchaser, (iv) roads, highways, and other public rights of way, (v) zoning, land use and other governmental laws, rules and regulations, (vi) any matters that would be shown by an accurate survey of the Property, including, without limitation, easements, quasi-easements, licenses, covenants, rights-of-way or other similar restrictions, including any other agreements, conditions or restrictions, (vii) the Title Company's so-called "standard exceptions" except to the extent that any of the same are deleted by Title Company, (viii) rights, remedies and obligations of Seller and Chrysler relating to the Property as set forth in the TSA (the "Chrysler License"), (ix) the rights of Omnisource Corporation, an Indiana corporation ("Omnisource"), pursuant to that certain Scrap Management Agreement, dated as of April 9, 1992, as amended by the First Amendment to Scrap Management Agreement, dated as of September 3, 1992, as further amended by the Second Amendment to Scrap Management Agreement, dated as of January 15, 1995 and as further amended by the Third Amendment to Scrap Management Agreement, dated as of January 1, 2004 (as amended, the "Scrap Management Agreement") and (x) rights, remedies and obligations of Seller and Chrysler relating to the Property as set forth in the Letter Agreement, shall be "Permitted Liens"; provided, however, Seller agrees that under no circumstances shall any of the Monetary Liens be Permitted Liens and that all Monetary Liens will be released from the Property and will attach to the Sale Proceeds in the same order of priority, validity and enforceability as existing prior to the sale of the Property by Seller to Purchaser to the extent provided in the Sale Order. For the avoidance of doubt, Seller shall use reasonable efforts to deliver, but shall not be required to deliver, to Purchaser releases from any individual lienholders on the Property.

(c)     Notwithstanding any provision of this Agreement to the contrary, from and after the Agreement Date except for the Third Amendment, Seller will not amend the TSA (as it relates to the Property) without the prior written consent of Purchaser.

5.     Title; Closing; Termination.

(a)     Closing.  The closing of the Transaction contemplated by this Agreement (the "Closing") shall occur on the later of (i) the fourteenth day after the entry of the Sale Order or (ii) the second business day thereafter on which the Sale Order shall no longer be subject to an appeal as set forth in Section 5(c)(i)(B)(y) or a stay of its effectiveness; or on an earlier or later date established by mutual agreement of the parties (the "Closing Date").  The Closing shall take place at 10:00 a.m., prevailing Eastern Time, on the Closing Date, in the offices of the Title Company, or at such other time and place as may be mutually agreed upon by Seller and Purchaser.  Neither party shall be required to close unless all conditions to the obligations of such party have been satisfied or waived.  Possession of the Property shall be delivered to Purchaser at Closing, subject to the rights of Omnisource pursuant to the Scrap Management Agreement and the rights of Chrysler pursuant to the TSA to occupy and operate the Property.

(b)     Seller Deliveries.  On or before the Closing Date, Seller shall deposit, or shall cause to be deposited, the following documents with the Title Company (collectively, the "Seller's Closing Deliveries"):

(i)     a duly executed and recordable quitclaim deed conveying insurable fee simple title to the Real Property to Purchaser, free and clear of all Liens, except for the Permitted Liens, and any other interests to the extent provided in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code (the "Deed") in the form of Exhibit H attached hereto and incorporated by reference herein;

(ii)     a duly executed bill of sale and assignment (the "Bill of Sale") in the form of Exhibit I attached hereto and incorporated by reference herein, in conveying (A) all right, title and interest in and to the Scheduled Assets free and clear of all Liens and any other interests to the extent provided in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code, and (B) Seller's right, title and interest, if any, to the Equipment (other than the Scheduled Assets) and the Intangible Property free and clear of all Liens and any other interests to the extent provided in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code;

(iii)     a duly executed standard owner's affidavit in the form of Exhibit G attached hereto and incorporated by reference herein;

(iv)     a duly executed affidavit as required by Section 1445 of the Internal Revenue Code of 1986, as amended ("I.R.C."), certifying that Seller is not a "foreign person" as defined in the I.R.C.;

(v)      a true and correct copy of the Sale Order as entered by the Bankruptcy Court;

(vi)      without limiting any rights, obligations or remedies of any parties to the TSA, an assignment by Seller to Purchaser of Seller's rights and obligations under the TSA with respect to the Property, to inure to the benefit of Purchaser ("TSA Assignment"); and

(vii)      all such other certificates or forms required by law in order to transfer the Property or necessary for the recordation of the Deed.

(c)      Conditions to Closing.

(i)      The respective obligations of each party to effect the Closing hereunder and the Transaction contemplated hereby shall, except as explicitly otherwise provided in this Section 5(c)(i), be subject to the fulfillment at or prior to the Closing of the following conditions:

(A)      there shall not be in effect any preliminary or permanent injunction or other order or decree by any federal or state court or administrative agency having competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transaction contemplated in this Agreement;

(B)      the Bankruptcy Court shall have entered the Bidding Procedures Order (as defined in Section 6(c)) substantially in the form attached to this Agreement, except as Purchaser may otherwise approve, and the Sale Order approving this Agreement, substantially in the form attached to this Agreement, except as Purchaser may otherwise approve, and such Sale Order, among other things: (I) shall include a determination that Purchaser is a purchaser in good faith within the meaning of Section 363(m) of the Bankruptcy Code and, therefore, entitled to the protections of such Section, (II) shall include a finding that Seller is the sole and lawful owner of all of the Scheduled Assets, holding all right, title and interest therein, and (III) shall not have been stayed or otherwise limited as to its terms or effectiveness, which stay has not been lifted; and the Sale Order (x) shall not have been reversed or vacated at the time of Closing; and (y) shall not be the subject of an appeal or motion for rehearing or new trial solely with respect to the ownership of any Scheduled Asset, provided however, that Purchaser, in its sole and absolute discretion, may elect to proceed with the Closing even if such an appeal or a motion for rehearing or new trial on the Sale Order is pending;

(C)      the consent of Chrysler to the TSA Assignment, to the extent required; and

(D)      the delivery to Purchaser of a certification of Seller, duly executed by an authorized officer of Seller, confirming to Purchaser that the TSA has not been amended in any manner relating to the Property since the Agreement Date, excluding the Third Amendment.

CLI-1772261v8

(ii)    The obligation of Purchaser to effect the Closing hereunder and the Transaction contemplated hereby shall be subject to the fulfillment at or prior to the Closing of the following additional conditions:

(A)    the representations and warranties of Seller set forth in this Agreement shall have been true and correct in all material respects as of the Agreement Date and shall be true and correct in all material respects as of the Closing Date as though made at and as of the Closing (except to the extent that such representations and warranties are stated to be made as of a date other than the date they were made, in which case they shall have been true and correct in all material respects as of such other date);

(B)    Seller shall have timely performed and complied with each obligation, covenant, and delivery required of Seller contained in this Agreement which is required to be performed and complied with by Seller on or prior to the Closing, including without limitation, Title Company having received all of Seller's Closing Deliveries from Seller; and

(C)    Purchaser shall receive from Title Company an irrevocable commitment to issue an ALTA Owner's Policy of Title Insurance insuring fee simple title to the Real Property in Purchaser, subject only to the Permitted Liens (the "Title Policy"), in a dollar amount as determined by Purchaser, but in no event more than the Purchase Price.

Any condition specified in this Section 5(c)(ii) may be waived, in whole or in part, by Purchaser, provided that no such waiver shall be effective against Purchaser unless it is set forth in a writing executed by Purchaser.

(iii)    Seller's obligation to sell is expressly conditioned upon each of the following:

(A)    Timely performance of each obligation, covenant and delivery required of Purchaser contained in this Agreement, which is required to be performed and complied with by Purchaser on or prior to the Closing; and

(B)    On or before the Closing Date, Purchaser shall deposit with the Title Company the remaining balance of the Purchase Price in immediately available funds.

Any condition specified in this Section 5(c)(iii) may be waived, in whole or in part, by Seller, provided that no such waiver shall be effective against Seller unless it is set forth in a writing executed by Seller.

(d)    Title Company is hereby instructed that when Title Company has received confirmation that the conditions above have been satisfied and is in a position to otherwise close the Transaction as contemplated hereby, Title Company shall (i) record the Deed and deliver the Bill of Sale to Purchaser, and (ii) deliver the Purchase Price, net of any adjustments required hereby, to Seller.

(e)    At Closing, Seller shall pay the following costs out of the Sale Proceeds:

(i)    Any fees, expenses and/or costs incurred in connection with the removal of any unpermitted exceptions with respect to the Real Property pursuant to Section 4(a);

(ii)    One hundred percent (100%) of any city, state or county transfer tax or fee payable on or in connection with the sale and/or conveyance of the Real Property; and

(iii)    One-half of the cost of any escrow fee.

(f)    At Closing, the Purchaser shall pay the following costs:

(i)    The cost of the Title Policy and any endorsements to the Title Policy;

(ii)    The cost of recording the Deed; and

(iii)    One-half of the cost of any escrow fee.

(g)    <u>Prorations and Reimbursements</u>.  There shall be prorations of real property taxes and/or utilities at the Closing in accordance with local custom as determined by Title Company, provided, however, there shall not be a proration of any real property tax or utility charge to the extent paid, or required to be paid, by Chrysler under the Chrysler License. Additionally, Seller shall remit to Purchaser an amount equal to any and all reimbursements received by Seller from Chrysler on account of Spare Parts (as defined in the Letter Agreement) removed from the Property between February 9, 2010 and the Closing Date to the extent such Spare Parts relate to any of the Property being sold to Purchaser hereunder.  This provision shall survive Closing.

(h)    <u>Termination</u>.  This Agreement may be terminated prior to the Closing Date as follows:

(i)    by mutual written consent of Seller and Purchaser;

(ii)    by Purchaser, upon written notice to Seller, if the Bankruptcy Court does not enter the Bidding Procedures Order within 15 days after the Agreement Date, unless extended to a later date by mutual consent of Seller and Purchaser;

(iii)    by Purchaser, upon written notice to Seller, if the Bankruptcy Court does not enter the Sale Order within 20 days after the date on which the Bidding Procedures Order was entered by the Bankruptcy Court, unless extended to a later date by mutual consent of Seller and Purchaser,

(iv)    by either party, upon written notice to the other party, if (i) the Purchaser is the Successful Bidder (as such term is defined in the Bidding Procedures Order) and (ii) the Closing has not occurred within 20 days of the entry of the Sale Order, unless extended to a later date by mutual consent of Seller and Purchaser; <u>provided</u>, <u>however</u>, that the party seeking

to terminate this Agreement may not effect such termination if it is then in breach of its obligations hereunder in any material respect after giving effect to any applicable cure period;

(v)    by either party, upon written notice to the other party, if (i) the Purchaser is the "Next Highest Bidder" (as such term is defined in the Bidding Procedures Order) and (ii) the Closing has not occurred within 35 days after the entry of an order approving an Approved Alternative Transaction, but in no event later than April 15, 2010, unless extended to a later date by mutual consent of Seller and Purchaser; provided, however, that the party seeking to terminate this Agreement may not effect such termination if it is then in breach of its obligations hereunder in any material respect after giving effect to any applicable cure period (for purposes of this Agreement, "Approved Alternative Transaction" means any Alternative Transaction (as defined in Section 5(h)(xiv)) with a Successful Bidder (including a deemed Successful Bidder) other than Purchaser as approved by the Bankruptcy Court pursuant to the Sale Order);

(vi)    by either party, upon written notice to the other party, if the Closing has not occurred within 70 days of the Agreement Date, provided, however, that the party seeking to terminate this Agreement may not effect such termination if it is then in breach of its obligations hereunder in any material respect after giving effect to any applicable cure period;

(vii)    by either party, upon written notice to the other party, if (i) there shall be any applicable law that makes consummation of the Transaction contemplated hereby illegal or otherwise prohibited or (ii) consummation of the Transaction contemplated hereby would violate any nonappealable final order, decree or judgment of (A) the Bankruptcy Court or (B) any other court or governmental authority having competent jurisdiction;

(viii)    by either party upon the closing of an Approved Alternative Transaction, provided that the provisions regarding payment of the Break-up Fee shall survive until paid (subject to approval as part of the Bidding Procedures Order);

(ix)    by Purchaser, upon written notice to Seller, if, on or prior to the Closing Date, Seller is in material breach of any representation, warranty, covenant or agreement herein contained and such breach shall not be cured within ten (10) days of the date of notice of breach served by Purchaser claiming such material breach; provided, that the right to terminate this Agreement pursuant to this Section 5(h)(ix) shall not be available to Purchaser if it is in material breach of this Agreement at the time notice of termination is delivered;

(x)    by Purchaser, upon written notice to Seller, if any of the conditions to Purchaser's obligations to consummate the Transaction contemplated by this Agreement shall not have been satisfied, complied with or performed in any material respect as of the Closing Date and Purchaser shall not have waived in writing such failure of satisfaction, noncompliance or non-performance;

(xi)    by Seller, upon written notice to Purchaser, if, on or prior to the Closing Date, Purchaser is in material breach of any representation, warranty, covenant or agreement herein contained and such breach shall not be cured within ten (10) days of the date of

notice of breach served by Seller claiming such material breach; provided, that the right to terminate this Agreement pursuant to this Section 5(h)(xi) shall not be available to Seller if it is in material breach of this Agreement at the time notice of termination is delivered;

(xii) by Seller, upon written notice to Purchaser, if any of the conditions to Seller's obligations to consummate the Transaction contemplated by this Agreement shall not have been satisfied, complied with or performed in any material respect as of the Closing Date and Seller shall not have waived in writing such failure of satisfaction, noncompliance or non-performance;

(xiii) by Purchaser, upon written notice to Seller, if Purchaser is not the Successful Bidder or the Next Highest Bidder (as defined in the Bidding Procedures) at the conclusion of the Auction, *provided that* the provisions regarding payment of the Break-up Fee shall survive until paid (subject to approval as part of the Bidding Procedures Order);

(xiv) by Purchaser, upon written notice to Seller, if Seller has entered into a legally enforceable agreement for an Alternative Transaction which is not an Approved Alternative Transaction (for purposes of this Agreement "Alternative Transaction" means any transaction between Seller and a Person other than Purchaser for all or a portion of the Property that would prevent the consummation of the sale of the Property contemplated herein, except for those transactions pursuant to the Letter Agreement), *provided that* the provisions regarding payment of the Break-up Fee shall survive until paid (subject to approval as part of the Bidding Procedures Order); and

(xv) by Purchaser, in the manner as provided in Section 9.

(i) Effect of Termination. No termination of this Agreement pursuant to Section 5(h) shall be effective until written notice thereof is given to the non-terminating party specifying the provision hereof pursuant to which such termination is made. If validly terminated pursuant to Section 5(h), this Agreement shall be void and of no effect, and all further obligations of the parties under or pursuant to this Agreement shall terminate without further liability of any party to the other; provided, however, that the provisions of the Bidding Procedures Order, Section 3(a) (Deposit), Section 7 (as it relates to the Break-up Fee), this Section 5(i) (Effect of Termination), Section 15 (Survival) and Section 16 (Miscellaneous) of this Agreement shall survive the termination of this Agreement; provided, further, that nothing contained in this Section 5(i) shall relieve any party from liability, if any, for any breach of this Agreement.

6. Bankruptcy Court Matters.

(a) This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of any proposals that may lead to an Approved Alternative Transaction. From the Agreement Date (and any prior time) until the day of the Auction, Seller shall be permitted to, and to cause its Representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers that may lead to an Approved Alternative Transaction. Without limiting the foregoing, Seller and its Affiliates and representatives shall be permitted to respond to any such inquiries or offers and perform any and all other acts related

thereto that are required under the Bankruptcy Code or other applicable law to fulfill Seller's fiduciary duties, including, without limitation, supplying information relating to the Property to prospective purchasers.

(b)     Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event that the entry of the Sale Order shall be appealed, the parties hereto shall promptly defend such appeal with reasonable diligence.

(c)     Upon execution of this Agreement by all parties hereto, Seller will promptly file with the Bankruptcy Court a motion (the "Sale Motion"), notices and proposed orders, to the extent amended as of the date hereof each in form and substance satisfactory to Purchaser seeking the Bankruptcy Court's entry of (i) the Bidding Procedures Order, substantially in the form of Exhibit C attached hereto and incorporated by reference herein (the "Bidding Procedures Order"), approving Seller's solicitation of proposals that may lead to an Approved Alternative Transaction and the provisions of Section 7 regarding payment of the Break-up Fee (as defined in Section 7(a)) and (ii) the sale order, substantially in the form attached hereto as Exhibit D (the "Sale Order"). Without limiting the generality of the foregoing, the Sale Order shall find and provide, among other things, that: (i) the Property sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens, with such Liens to attach to the net Sale Proceeds with the same validity, force and effect, and in the same order of priority, which such Liens now have against the Property or the proceeds, subject to any rights, claims and defenses Seller or its estate, as applicable, may possess with respect thereto; (ii) Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement; (v) this Agreement and the Transaction contemplated hereby may be specifically enforced (including, without limitation, by Purchaser) against and binding upon, and not subject to rejection or avoidance by, Seller, any chapter 7 or chapter 11 trustee of Seller or any other Person; and (vi) such other provisions as reasonably requested by Purchaser.

(d)     Seller shall use its reasonable efforts to cause the Bidding Procedures Order and the Sale Order to be approved by the Bankruptcy Court as soon as reasonably practicable. Seller shall serve a copy of the Sale Motion on: (i) all Persons known to assert any interest in or Lien upon the Property (including all holders of Liens against the Property as identified by the Commitment); (ii) all parties that are entitled to notice under Bankruptcy Rule 2002; (iii) the attorneys general of all states in which the Property are located; (iv) the Office of the United States Trustee; (v) all Persons that expressed to Seller an interest in purchasing the Property; (vi) any Person appearing in the Bankruptcy Proceeding and claiming a secured interest in the Property; (vii) any Person known to the Seller and claiming a secured interest in the Property; and (viii) any and all other Persons directed by the Bankruptcy Court.

(e)     Seller shall use its commercially reasonable efforts to provide Purchaser with copies of all motions, applications and supporting papers prepared by or on behalf of the Seller (including forms of orders and notices to interested parties) directly relating to the

Property or this Agreement at least two (2) business days prior to the filing thereof, unless the exigencies of time prevent the period from being that long, with the Bankruptcy Court so as to allow Purchaser to provide reasonable comments for incorporation into same.

(f)     The Sale Order, to the extent permitted under the Bankruptcy Code or other applicable law, shall be binding upon and shall govern the acts of all Persons, including, but not limited to, any subsequently appointed chapter 11 or chapter 7 trustee of Seller, all taxing authorities, filing agents, filing officers, title agents, title companies, recorders and/or registrars of mortgages, recorders and/or registrars of deeds, administrative agencies, governmental agencies or departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file register or otherwise record or release any documents or instruments, or who may be required to report or insure as to title or state of title in or to the Property or any part thereof.

(g)     <u>Commercially Reasonable Efforts</u>.  Upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable legal requirements to consummate and make effective in the most expeditious manner practicable the Transaction contemplated hereby.

7.     <u>Break-up Fee</u>.

(a)     <u>Break-up Fee</u>.  In consideration of Purchaser's due diligence, good faith negotiations of and entry into this Agreement and as reimbursement of Purchaser's expenses incurred in connection with the Transaction contemplated by this Agreement, and subject to the approval of such payment by the Bidding Procedures Order and the closing of an Approved Alternative Transaction, the Seller shall pay to Purchaser, in accordance with the provisions in this <u>Section 7</u> and the Bidding Procedures Order, a break-up fee, inclusive of expense reimbursement, of SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($600,000.00) for the time and expense associated with due diligence, the opportunity costs of Purchaser and the negotiation of this Agreement and the value of serving as the "stalking horse" for Seller's marketing of the Property (the "<u>Break-up Fee</u>").

(b)     <u>Conditions for Payment of Break-up Fee</u>.  Subject to the Bidding Procedures Order being entered and not being reversed or vacated or its effectiveness subject to a stay, and subject to the terms of such order, Purchaser shall earn the Break-up Fee upon the closing of an Approved Alternative Transaction; provided that the Break-up Fee shall not be payable if (i) this Agreement is terminated by Seller in accordance with <u>Section 5(h)(xi)</u> or <u>Section 5(h)(xii)</u> to the extent a closing condition set forth in <u>Section 5(c)(iii)</u> is not satisfied or (ii) the Purchaser is the Successful Bidder or deemed Successful Bidder.  The Break-up Fee shall be due and payable at the time and in the manner provided in <u>Section 7(c)</u>.

(c)     <u>Payment of Break-up Fee</u>.  Subject to the satisfaction of the conditions in <u>Section 7(b)</u>, the Break-up Fee shall constitute an administrative expense allowable under section 503(b)(1) of the Bankruptcy Code and shall be due and payable pursuant to this Agreement as an

administrative priority expense of Seller under section 503(b)(1) of the Bankruptcy Code on the date of a closing of an Approved Alternative Transaction and paid out of the proceeds of such Approved Alternative Transaction. Purchaser's right to the Break-up Fee shall be the sole and exclusive remedy of Purchaser in the event that this Agreement is terminated pursuant to Section 5(h)(viii). In no event shall Purchaser be entitled to payment of the Break-up Fee unless and until the closing of an Approved Alternative Transaction or in accordance with Section 7(d) below, as applicable.

(d)     Termination Pursuant to Section 5(h)(xiv). If Purchaser terminates this Agreement pursuant to Section 5(h)(xiv), then, notwithstanding any other provision of this Agreement to the contrary, Seller shall pay the Break-up Fee (which shall be an administrative priority expense of Seller under section 503(b)(1) of the Bankruptcy Code) to Purchaser upon the closing of the Alternative Transaction identified by Purchaser as the basis of such termination, solely out of and to the extent of the proceeds of such Alternative Transaction. Purchaser's right to the Break-up Fee under this Section 7(d) shall be the sole and exclusive remedy of Purchaser in the event that this Agreement is terminated pursuant to Section 5(h)(xiv).

8.     Physical Condition of the Property. Purchaser acknowledges that the purchase of the Property by Purchaser is on an "AS IS" AND "WHERE IS" basis. Purchaser hereby agrees to indemnify, defend, release and hold harmless Seller from and against any claim, action, matter or obligation that may arise in the future regarding any environmental condition of the Property caused solely by Purchaser's activities on and/or operation of the Property. UPON CLOSING, PURCHASER EXPRESSLY AGREES TO ACCEPT THE PROPERTY, INCLUDING THE ENVIRONMENTAL CONDITION OF THE PROPERTY, "AS IS" AND "WHERE IS" AND SELLER SHALL, UNDER NO CIRCUMSTANCES, BE DEEMED TO HAVE MADE, AND SELLER HEREBY DISCLAIMS, EXCEPT FOR THOSE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 14 HEREIN, ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE CONDITION OF THE PROPERTY, ANY ENVIRONMENTAL CONDITION OF THE PROPERTY (INCLUDING, WITHOUT LIMITATION, THE PRESENCE OF ANY POLLUTANT OR CONTAMINANT, INCLUDING ANY HAZARDOUS SUBSTANCE IN, ON OR UNDER THE PROPERTY), AND THE ADEQUACY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PROPERTY OR ANY PART THEREOF. SELLER SHALL NOT BE LIABLE TO PURCHASER OR ANY SUCCESSORS OF PURCHASER FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, BUSINESS INTERRUPTION OR STRICT OR ABSOLUTE LIABILITY IN TORT, OCCASIONED BY OR ARISING IN CONNECTION WITH THE CONDITION OR ANY ALLEGED CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, LIABILITY ARISING OUT OF ANY ENVIRONMENTAL CONDITION WITH RESPECT TO THE PROPERTY. PURCHASER AGREES TO RELEASE SELLER, THE DEBTORS, THE FIRST LIEN LENDERS, THE FIRST LIEN AGENT (AS EACH IS DEFINED IN THE SALE ORDER), AND ANY SUBSIDIARY OR AFFILIATE OF SELLER, DEBTORS, THE FIRST LIEN LENDERS OR THE FIRST LIEN AGENT, FROM ANY AND ALL CLAIMS OF PURCHASER OR ANY SUCCESSORS OF PURCHASER AGAINST SELLER, THE DEBTORS, THE FIRST LIEN LENDERS, THE FIRST LIEN AGENT AND ANY

SUBSIDIARY OR AFFILIATE OF SELLER, THE DEBTORS, THE FIRST LIEN LENDERS OR THE FIRST LIEN AGENT, ARISING ON OR AFTER THE CLOSING CONCERNING THE ENVIRONMENTAL CONDITION OF THE PROPERTY, AND COVENANTS NOT TO SUE SELLER, THE DEBTORS, THE FIRST LIEN LENDERS, THE FIRST LIEN AGENT, AND ANY SUBSIDIARY OR AFFILIATE OF SELLER, THE DEBTORS, THE FIRST LIEN LENDERS OR THE FIRST LIEN AGENT, OR ANY OF THEIR RESPECTIVE EMPLOYEES, DIRECTORS OR OFFICERS OR JOIN SELLER, THE DEBTORS, THE FIRST LIEN LENDERS OR THE FIRST LIEN AGENT, AND ANY SUBSIDIARY OR AFFILIATE OF SELLER, THE DEBTORS, THE FIRST LIEN LENDERS OR THE FIRST LIEN AGENT, OR ANY OF THEIR RESPECTIVE EMPLOYEES, DIRECTORS, OFFICERS, OR AGENTS, IN ANY ACTION CONCERNING THE ENVIRONMENTAL CONDITION OF THE PROPERTY. THE PARTIES AGREE THAT THE FOREGOING RELEASE AND COVENANT SHALL RUN WITH THE PROPERTY AND BIND SUBSEQUENT PURCHASERS THEREOF AND THAT THE DEED WILL INCLUDE A REFERENCE THERETO PUTTING ANY FUTURE PURCHASERS OF THE PROPERTY ON NOTICE THEREOF UNTIL THE LATER OF THE ENTRY OF AN ORDER OF THE BANKRUPTCY COURT CLOSING THE BANKRUPTCY PROCEEDINGS OR FIVE YEARS FROM THE CLOSING DATE.

9.    Condemnation and Casualty.

(a)    Procedure Upon Condemnation. If prior to Closing, Seller is notified that the Property is to be condemned in whole or in part, which condemnation has a material adverse effect on Purchaser's intended use of the Property, Purchaser shall have the right, upon notice in writing to Seller delivered within ten (10) days after receipt of Seller's notice provided in Section 9(b), to terminate this Agreement, and thereupon the parties shall be released and discharged from any further obligations to each other, this Agreement shall become null and void and the Deposit shall be promptly refunded to Purchaser. If Purchaser does not elect so to terminate this Agreement, the Closing shall be held and Purchaser shall be entitled to all of Seller's share of any condemnation award. In no event shall Seller have any responsibility for the restoration and repair of any portion of the Property condemned.

(b)    Notice of Condemnation. Within ten (10) business days of learning of same, Seller shall notify Purchaser in writing of its receipt of official notice concerning any condemnation action.

(c)    Non-Material Casualty. If prior to Closing Date, the Property is damaged by fire or other casualty to the extent the cost of repairing such damage is reasonably estimated by Seller and Purchaser, each acting reasonably and in good faith, to be $1,000,000.00 or less, then this Agreement shall continue in full force and effect and the Purchase Price shall not be reduced.

(d)    Material Casualty. If prior to the Closing Date, the Property is damaged by fire or other casualty and such damage is not covered by Section 9(c), Purchaser shall have the right, upon notice in writing to Seller delivered within ten (10) days after Seller gives Purchaser notice of such matter as described in this Section 9(d), to

terminate this Agreement, whereupon this Agreement will terminate, the Deposit will promptly be refunded to Purchaser and neither party shall have any further rights or obligations pursuant to this Agreement, except for any provisions which expressly survive the termination of this Agreement. If Purchaser does not timely elect, or is not entitled, to terminate this Agreement as set forth above, the Purchase Price shall not be reduced, but Purchaser shall be entitled to an assignment of all of the proceeds payable to Seller with respect to fire or other casualty insurance (other than those proceeds expended by or on behalf of Seller prior to the Closing Date to restore the Property) and Seller shall have no obligation to repair or restore the Real Property.

10. <u>Default; Liquidated Damages; Specific Performance.</u> Purchaser and Seller acknowledge that it would be extremely impracticable and difficult to ascertain the actual damages that would be suffered by Seller if Purchaser fails to consummate the purchase and sale contemplated herein for any reason other than (a) Seller's failure, refusal or inability to perform any of Seller's covenants and agreements hereunder, (b) Purchaser's termination of this Agreement as permitted under this Agreement or (c) the failure of the conditions to Purchaser's obligation to close hereunder. Purchaser and Seller have considered carefully the loss to Seller occasioned by taking the Property off the market as a consequence of the negotiation and execution of this Agreement; the personal expenses of Seller incurred in connection with the preparation of this Agreement and Seller's performance hereunder; and the other damages, general and special, that Purchaser and Seller realize and recognize Seller will sustain, but which Seller cannot at this time calculate with absolute certainty. Based on all those considerations, Purchaser and Seller have agreed that the damage to Seller would reasonably be estimated to be an amount equal to the Deposit.

IF (A) SELLER IS NOT IN MATERIAL BREACH OF THIS AGREEMENT, (B) PURCHASER HAS NOT TERMINATED THIS AGREEMENT AS PERMITTED HEREUNDER AND (C) SELLER HAS TERMINATED THIS AGREEMENT AS PERMITTED UNDER (I) SECTION 5(h)(xi) OR (II) SECTION 5(h)(xii) TO THE EXTENT A CLOSING CONDITION SET FORTH IN SECTION 5(c)(iii) IS NOT SATISFIED, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT, THE DEPOSIT SHALL BE DEEMED FULL AND COMPLETE LIQUIDATED DAMAGES AND NO PARTY TO THIS AGREEMENT SHALL HAVE ANY FURTHER LIABILITY TO ANY OTHER PARTY TO THIS AGREEMENT, AND THIS AGREEMENT SHALL BE DEEMED NULL, VOID AND OF NO FURTHER FORCE AND EFFECT.

NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO ANY OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES CLAIMS BY SUCH PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

CLI-1772261v8

IF (A) PURCHASER IS NOT IN MATERIAL BREACH OF THIS AGREEMENT, (B) SELLER HAS NOT TERMINATED THIS AGREEMENT AS PERMITTED HEREUNDER AND (C) PURCHASER HAS TERMINATED THIS AGREEMENT AS PERMITTED UNDER (I) SECTION 5(h)(ix) OR (II) SECTION 5(h)(x) TO THE EXTENT A CLOSING CONDITION SET FORTH IN SECTION 5(c)(ii) IS NOT SATISFIED, THEN SELLER ACKNOWLEDGES THAT IRREPARABLE DAMAGE TO PURCHASER COULD OCCUR, NO ADEQUATE REMEDY AT LAW WOULD EXIST AND DAMAGES COULD BE DIFFICULT TO DETERMINE, AND THAT PURCHASER SHALL BE ENTITLED TO EITHER (A) ELECT TO HAVE THE DEPOSIT RETURNED TO PURCHASER AND, IN SUCH CASE, NO PARTY TO THIS AGREEMENT SHALL HAVE ANY FURTHER LIABILITY TO ANY OTHER PARTY TO THIS AGREEMENT, AND THIS AGREEMENT SHALL BE DEEMED NULL, VOID AND OF NO FURTHER FORCE AND EFFECT, OR (B) SEEK SPECIFIC PERFORMANCE OF THE TERMS HEREOF AND IMMEDIATE INJUNCTIVE RELIEF TO COMPEL PERFORMANCE OF SELLER'S OBLIGATIONS HEREUNDER, PROVIDED, HOWEVER, THAT PURCHASER MAY ONLY PURSUE SUCH SPECIFIC PERFORMANCE AFTER THE TRANSACTION HAS BEEN APPROVED BY THE BANKRUPTCY COURT IN ACCORDANCE WITH SECTION 6 HEREIN.

11. <u>Brokerage Charges</u>. Seller and Purchaser respectively represent, each to the other, that no real estate broker has been dealt with in regard to the Transaction contemplated by this Agreement. Each party agrees to indemnify and hold the other harmless from and against any and all claims for brokerage commissions arising from any broker utilized by such party and all related expenses including, without limitation, reasonable attorneys' fees and expenses.

12. <u>Notices</u>. All notices or other communications made pursuant hereto shall be in writing and shall be deemed properly delivered, given or served if (a) transmitted by facsimile, (with copy by email) or (b) sent by overnight courier service to the parties at the following addresses:

Seller:

John Rooney
Capstone Advisory Group, LLC
Park 80 West
250 Pehle Avenue, Suite 105
Saddle Brook, NJ 07663
Facsimile: (201) 587-7102
Email: jrooney@capstoneag.com

With a copy to:
William Herzberger, Esq.
Jones Day
901 Lakeside Avenue
Cleveland, OH 44114-1190
Facsimile: (216) 579-0212
Email: wherzberger@jonesday.com

CLI-1772261v8

Jeffrey B. Ellman, Esq.
Jones Day
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-3053
Facsimile: (404) 581-8330
Email: jbellman@jonesday.com


Purchaser:    Twinsburg Industrial Park LLC
Attn: Legal Department
6200 Riverside Drive
Cleveland, Ohio 44135
Facsimile: (216) 265-2632
Email: rbertram@parkcorp.com

With a copy to:

Michael J. Canning, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022-4690
Facsimile: (212) 715-1399
Email: michael.canning@aporter.com

All notices shall be deemed received (a) if transmitted by facsimile (with copy by email), on the business day when transmitted or if not transmitted prior to 5:00 p.m., prevailing Eastern Time, on the next succeeding business day; and (b) if sent by courier, one business day after it is sent. Either party may change its address for the purposes of this Section 12 by giving ten (10) days prior written notice of such change to the other party in the manner provided in this Section 12.

13.    Purchaser's Representations. As a material inducement to Seller to execute and perform its obligations under this Agreement, Purchaser represents and warrants to Seller as follows as of the Agreement Date and as of the Closing:

(a)    Organization and Good Standing. Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Purchaser has full entity power and authority to conduct its business as it is presently being conducted and to own, operate and lease its properties and assets.

(b)    Authorization. Purchaser has the requisite power and authority to execute this Agreement and the other agreements, instruments and certificates to be executed and delivered by it in connection with the Transaction contemplated by this Agreement, to perform its obligations under such agreements, and to consummate the Transaction contemplated hereby and thereby. The execution and delivery by Purchaser of

this Agreement and the consummation by Purchaser of the Transaction contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of Purchaser. This Agreement has been duly executed and delivered by Purchaser and, assuming the execution and delivery by Seller and the entry of the Sale Order, constitute valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any proceedings therefor may be brought.

(c)     Financing. Purchaser has and will have on the Closing Date sufficient cash and cash equivalents and/or existing credit facilities with sufficient borrowing capacity thereunder (and has provided Seller with satisfactory evidence thereof) to purchase the Property and to consummate the Transaction contemplated by this Agreement.

14.    Seller's Representations. As a material inducement to Purchaser to execute and perform its obligations under this Agreement, Seller represents and warrants to Purchaser, as of the Agreement Date and as of the Closing, as follows:

(a)     Organization and Good Standing. Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Subject to the limitations imposed on Seller as a result of having filed a petition for relief under the Bankruptcy Code, or pursuant to any order entered by the Bankruptcy Court, Seller has full entity power and authority to conduct the Business as it is presently being conducted and to own, operate and lease its properties and assets.

(b)     Authorization. Subject to the entry of the Sale Order and, with respect to Seller's obligations under Section 6, the entry of the Bidding Procedures Order, Seller has the requisite power and authority to execute this Agreement and the other agreements, instruments and certificates to be executed and delivered by it in connection with the Transaction contemplated by this Agreement, to perform its obligations under such agreements, and to consummate the Transaction contemplated hereby and thereby. Subject to the entry of the Sale Order, the execution and delivery by Seller of this Agreement and the consummation by Seller of the Transaction contemplated hereby and thereby have been duly authorized by all necessary corporate and other organizational action on the part of Seller. This Agreement has been duly executed and delivered by Seller and, assuming the execution and delivery by Purchaser and the entry of the Sale Order, and, with respect to Seller's obligations relating to the payment of the Break-up Fee under Section 7, the entry of the Bidding Procedures Order, constitute valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

15.    Survival.

(a)     Survival of Representations and Warranties.

(i)     The representations and warranties of Seller in this Agreement shall not survive the Closing.

(ii)     Except for the environmental indemnity set forth in <u>Section 8</u> herein ("<u>Environmental Indemnity</u>"), the representations and warranties of Purchaser in this Agreement shall not survive the Closing. The Environmental Indemnity shall survive the Closing until the later of (A) a date which is ten years after the Closing Date, or (B) the date on which the Bankruptcy Court enters an order closing the Bankruptcy Proceeding.

(iii)     The parties hereby agree that the limitations set forth above in this <u>Section 15(a)</u> on the survival of the representations and warranties of the parties shall not apply to a representation or warranty in the event that a party has committed fraud or made an intentional misrepresentation with respect to such representation or warranty.

16.     <u>Miscellaneous</u>.

(a)     <u>Assignment</u>.  Neither party may assign this Agreement without the prior written consent of the other party, except that, without the prior consent of the Seller, Purchaser shall have the right to assign this Agreement to any of its Affiliates, *provided, however,* that in any such event, Purchaser shall execute a guarantee in favor of, and in form and substance acceptable to, Seller guaranteeing the obligations under this Agreement that survive Closing, including any indemnities of Purchaser contained herein on a going forward basis.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

(b)     <u>Entire Agreement</u>.  The parties expressly acknowledge that this Agreement contains the entire agreement of the parties hereto with respect to the purchase and sale of the Property and supersedes any prior arrangements or understandings between the parties with respect thereto.  No other agreement, statement or promise made by either party hereto that is not contained herein shall be binding or valid.

(c)     <u>Amendments</u>.  This Agreement may only be amended by a written document signed by each of the parties hereto, which document shall make specific reference to this Agreement.

(d)     <u>Further Documents</u>.  Each party will, whenever and as often as it shall be reasonably requested by the other party, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such further instruments and documents, including escrow instructions, as may be necessary in order to carry out the terms and conditions of this Agreement and to complete the sale, conveyance and transfer herein contemplated and shall do any and all other acts as many be reasonably requested in order to carry out the intent and purpose of this Agreement.

(e)     <u>Severability</u>.  Should any part, term or provision of this Agreement or any document required herein to be executed or delivered at the Closing be declared invalid, void or unenforceable, all remaining parts, terms and provisions hereof shall remain in full force and effect and shall in no way be invalidated, impaired or affected thereby, provided that the

purposes and intent of this Agreement may still be achieved.

(f)    <u>Time of Essence</u>. Except as otherwise specifically provided in this Agreement, time is of the essence of this Agreement and each and every provision hereof.

(g)    <u>Applicable Law</u>. The laws of the State of Ohio, without regard to principles of conflicts of laws, will govern this Agreement and its subject matter, construction and the determination of any rights, duties or remedies of the parties arising out of or relating to this Agreement, its subject matter or any of the Transaction contemplated by this Agreement, except in such matters as are governed by the Bankruptcy Code. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder or the Transaction contemplated hereby; and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the exclusive jurisdiction and venue of the Bankruptcy Court with respect to such matters. The parties agree that any process, summons, notice or document sent by U.S. registered or certified mail addressed to a party, with a copy to the notice parties in <u>Section 12</u>, shall be effective service of process for any action, suit or proceeding brought against it in the Bankruptcy Court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in the Bankruptcy Court and any claim that any such suit, action or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum. The parties agree that a final judgment in any such suit, action or proceeding brought in the Bankruptcy Court shall be conclusive and binding upon the parties and may be enforced in any other courts to whose jurisdiction a party is or may be subject, by suit upon such judgment.

(h)    <u>Time Periods</u>. If the time for the performance of any obligation under this Agreement expires on a Saturday, Sunday or U.S. federal legal holiday, the time for performance shall be extended to the next succeeding day which is not a Saturday, Sunday or U.S. federal legal holiday.

(i)    <u>Counterparts</u>. This document may be executed in any number of counterparts, each of which shall be deemed an original, and all such counterparts shall together constitute one and the same document.

(j)    <u>No Successor Liability</u>. The parties intend that, except where expressly prohibited under applicable law, upon the Closing, Purchaser shall not be deemed to: (i) be the successor of Seller, (ii) have, de facto, or otherwise, merged with or into Seller, (iii) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller, or (iv) be liable for any acts or omissions of Seller in the conduct of the Business or arising under or related to the Property other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that Purchaser shall not be liable for any bankruptcy claims, other claims, written notices, causes of action, proceedings, complaints, investigations or other proceedings against Seller or any of its predecessors or affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of

the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Property, the Excluded Liabilities or any other obligations of Seller, including, without limitation, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Business or the Property, except as expressly provided in this Agreement.  The parties agree that the provisions substantially in the form of this <u>Section 16(j)</u> shall be reflected in the Sale Order.

[Signature pages follow]

CLI-1772261v8

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement as of the day and year first above written.

Seller:

OLD CARCO LLC, a Delaware limited liability company

By: *R.E. Kolka*
Date: *2/11/2010*

Purchaser:

TWINSBURG INDUSTRIAL PARK LLC, a Delaware limited liability company

By:_____
Date:

[Signature Page – Twinsburg Purchase Agreement]

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement as of the day and year first above written.

Seller:

OLD CARCO LLC, a Delaware limited liability company

By:_____
Date:

Purchaser:

TWINSBURG INDUSTRIAL PARK LLC, a Delaware limited liability company

By: _Joseph J. Adams_, VICE PRESIDENT
Date: 2/12/10

Exhibit A

Legal Description of the Property

PARCEL NO. 1:

SITUATED IN THE CITY OF TWINSBURG, COUNTY OF SUMMIT AND STATE OF OHIO:

AND KNOWN AS BEING PART OF LOT 12, TRACT 1-N IN ORIGINAL TWINSBURG TOWNSHIP AND MORE FULLY DESCRIBED AS FOLLOWS: BEGINNING AT AN IRON PIPE IN THE SOUTH LINE OF SAID LOT 12, TRACT 1-N AND THE NORTH LINE OF LOT 2, TRACT 1-M, WHICH IS S 88° 04' 50" E, ALONG SAID COMMON LINE, 407.21 FEET FROM AN IRON PIPE AT THE NORTHWEST CORNER OF LOT 2, TRACT 1-M, WHICH PLACE OF BEGINNING IS THE SOUTHWEST CORNER OF LAND OWNED IN 1955 BY BRUCE ROBERT SCIOTTO; THENCE S 88° 04' 50" E, ALONG THE SOUTH LINE OF SAID LOT 12, 100.09 FEET TO AN IRON PIPE AT THE SOUTHWEST CORNER OF LAND OWNED BY 1955 BY RUSSELL D. CASH AND FRANCES L. CASH; THENCE N 0° 30' W, ALONG SAID CASH'S WEST LINE, 583.29 FEET TO THE CENTER LINE OF AURORA ROAD (STATE ROUTE 82); THENCE S 89° 19' W, ALONG THE CENTER LINE OF SAID AURORA ROAD, 100.00 FEET TO SAID SCIOTTO'S NORTHEAST CORNER; THENCE S 0° 30' E, ALONG SAID SCIOTTO'S EAST LINE, 578.75 FEET TO THE PLACE OF BEGINNING AND CONTAINING, AS SURVEYED IN DECEMBER 1955 BY S.G. SWIGART &amp; SON, 1.3339 ACRES OF LAND.

PARCEL NO. 2:

SITUATED IN THE CITY OF TWINSBURG, COUNTY OF SUMMIT AND STATE OF OHIO AND KNOWN AS BEING PART OF LOT 12, TRACT 1-N IN ORIGINAL TWINSBURG TOWNSHIP AND MORE FULLY DESCRIBED AS FOLLOWS: BEGINNING AT AN IRON PIPE IN THE SOUTH LINE OF SAID LOT 12, TRACT 1-N AT THE NORTHWEST CORNER OF LOT 2, TRACT 1-M; THENCE S 88° 04' 50" E, ALONG THE SOUTH LINE OF SAID LOT 12, 76.95 FEET TO AN IRON PIPE AT THE SOUTHWEST CORNER OF LAND OWNED IN 1955 BY LEONARD KANNER AND RUTH M. KANNER; THENCE N 0° 30' W, ALONG SAID KANNER'S WEST LINE, 563.75 FEET TO THE CENTER LINE OF AURORA ROAD (STATE ROUTE 82); THENCE S 89° 19' W, ALONG THE CENTER LINE OF SAID AURORA ROAD, 116.19 FEET TO THE NORTHEAST CORNER OF LAND OWNED IN 1955 BY CYRIL MITKOFF; THENCE S 1° 00' 50" N ALONG SAID MITKOFF'S EAST LINE, 559.41 FEET TO THE NORTH LINE OF LOT 3, TRACT 1-M; THENCE S 89° 16' E, ALONG THE NORTH LINE OF SAID LOT 3, 34.31 FEET TO THE PLACE OF BEGINNING AND CONTAINING, AS SURVEYED IN DECEMBER 1955 BY S. G. SWIGART &amp; SON, 1.4651 ACRES OF LAND.

PARCEL NO. 3:

SITUATED IN THE CITY OF TWINSBURG, COUNTY OF SUMMIT AND STATE OF OHIO AND KNOWN AS BEING PART OF LOT 12, TRACT 1-N AND PART OF LOT 3, TRACT 1-M IN ORIGINAL TWINSBURG TOWNSHIP AND MORE FULLY DESCRIBED AS FOLLOWS:

BEGINNING AT AN IRON PIPE AT THE NORTHEAST CORNER OF SAID LOT 3, TRACT 1-M; THENCE N 89° 16' W, ALONG THE NORTH LINE OF SAID LOT 3, 34.31 FEET TO THE SOUTHWEST CORNER OF LAND OWNED IN 1955 BY MICHAEL LANGER AND RUTH LANGER; THENCE N 1° 00' 50" W, ALONG SAID LANGERS' WEST LINE, 559.41 FEET TO THE CENTER LINE OF AURORA ROAD (STATE ROUTE 82); THENCE S 89° 19' W, ALONG THE CENTER LINE OF SAID AURORA ROAD, 29.69 FEET TO THE WEST LINE OF SAID LOT 12, TRACT 1-N AND THE NORTHEAST CORNER OF LAND OWNED IN 1955 BY ELSIE M. BILEK; THENCE S 0° 58' 55" E, ALONG THE WEST LINE OF SAID LOT 12, BEING ALSO ELSIE M. BILEK'S EAST LINE, 558.67 FEET TO THE SOUTHWEST CORNER OF SAID LOT 12 AND IN THE NORTH LINE OF SAID LOT 3, TRACT 1-M AND SOUTH LINE OF LOT 13, TRACT 1-N OF SAID

ORIGINAL TWINSBURG TOWNSHIP; THENCE N 89° 16' W, ALONG THE NORTH LINE OF SAID LOT 3 AND THE SOUTH LINE OF SAID LOT 13, 613.65 FEET; THENCE S 0° 52' 20" E, PARALLEL WITH THE EAST LINE OF SAID LOT 3, 1608.19 FEET; THENCE S 89° 11' 30" E, 678.00 FEET TO THE EAST LINE OF SAID LOT 3; THENCE N 0° 52' 20" W, ALONG THE EAST LINE OF SAID LOT 3, 1609.08 FEET TO THE PLACE OF BEGINNING AND CONTAINING, AS SURVEYED IN DECEMBER 1955 BY S. G. SWIGART &amp; SON, 25.4104 ACRES OF LAND, OF WHICH 25.0273 ACRES ARE IN LOT 3, TRACT 1-M AND 0.3831 OF AN ACRE IS IN LOT 12, TRACT 1-N.

PARCEL NO. 4:

SITUATED IN THE CITY OF TWINSBURG, COUNTY OF SUMMIT AND STATE OF OHIO:

AND KNOWN AS BEING PART OF LOT 12, TRACT 1-N IN ORIGINAL TWINSBURG TOWNSHIP AND MORE FULLY DESCRIBED AS FOLLOWS: BEGINNING AT AN IRON PIPE IN THE SOUTH LINE OF SAID LOT 12, TRACT 1-N AND NORTH LINE OF LOT 2, TRACT 1-M WHICH IS S 88° 04' 50" E, ALONG SAID COMMON LINE, 192.05 FEET FROM AN IRON PIPE AT THE NORTHWEST CORNER OF SAID LOT 2, TRACT 1-M, WHICH PLACE OF BEGINNING IS THE SOUTHEAST CORNER OF LAND OWNED IN 1955 BY LEONARD KANNER AND RUTH M. KANNER; THENCE S 88° 04' 50" E, ALONG THE SOUTH LINE OF SAID LOT 12, TRACT 1-N, 115.10 FEET TO AN IRON PIPE AT THE SOUTHWEST CORNER OF LAND OWNED IN 1955 BY BRUCE ROBERT SCIOTTO; THENCE N 0° 30' W, ALONG SAID SCIOTTO'S WEST LINE, 574.20 FEET TO THE CENTER LINE OF AURORA ROAD (STATE ROUTE 82); THENCE S 89° 19' W, ALONG SAID AURORA ROAD CENTER LINE, 115.00 FEET TO SAID KANNER'S NORTHEAST CORNER; THENCE S 0° 30' E, ALONG SAID KANNERS' EAST LINE, 568.97 FEET TO THE PLACE OF BEGINNING AND CONTAINING, AS SURVEYED IN DECEMBER 1955 BY S. G. SWIGART &amp; SON, 1.5090 ACRES OF LAND.

PARCEL NO. 5:

SITUATED IN THE CITY OF TWINSBURG, COUNTY OF SUMMIT AND STATE OF OHIO:

AND KNOWN AS BEING PART OF LOT 12, TRACT 1-N IN ORIGINAL TWINSBURG TOWNSHIP AND MORE FULLY DESCRIBED AS FOLLOWS: BEGINNING AT AN IRON PIPE IN THE SOUTH LINE OF SAID LOT 12, TRACT 1-N AND NORTH LINE OF LOT 2, TRACT 1-M, WHICH IS S 88° 04' 50" E, ALONG SAID COMMON LINE, 507.33 FEET FROM AN IRON PIPE AT THE NORTHWEST CORNER OF SAID LOT 2, TRACT 1-M, WHICH PLACE OF BEGINNING IS THE SOUTHEAST CORNER OF LAND OWNED IN 1955 BY JOHN A. RADE; THENCE S 88° 04' 50" E, ALONG THE SOUTH LINE OF SAID LOT 12, 100.09 FEET TO THE SOUTHWEST CORNER OF LAND IN SAID LOT 12 OWNED IN 1955 BY MAMIE C. KARABEC; THENCE N 0° 30' W, ALONG SAID KARABEC'S WEST LINE, 587.84 FEET TO THE CENTER LINE OF AURORA ROAD (STATE ROUTE 82); THENCE S 89° 19' W, ALONG THE CENTER LINE OF SAID AURORA ROAD, 100.00 FEET TO SAID RADE'S NORTHEAST CORNER; THENCE S 0° 30' E, ALONG SAID RADE'S EAST LINE, 583.29 FEET TO THE PLACE OF BEGINNING AND CONTAINING, AS SURVEYED IN DECEMBER 1955 BY S. G. SWIGART &amp; SON, 1.3443 ACRES OF LAND.

PARCEL NO. 6:

SITUATED IN THE CITY OF TWINSBURG, COUNTY OF SUMMIT AND STATE OF OHIO, AND KNOWN AS BEING PARTS OF LOT 12, TRACT 1-N AND LOT 2, TRACT 1-M IN ORIGINAL TWINSBURG TOWNSHIP AND MORE FULLY DESCRIBED AS FOLLOWS: BEGINNING AT AN IRON PIPE AT THE NORTHWEST CORNER OF SAID LOT 2, TRACT 1-M; THENCE S 0° 52' 20" E, ALONG THE WEST LINE OF SAID LOT, 2912.84 FEET TO AN IRON PIPE AT THE NORTHWEST CORNER OF LAND CONVEYED BY ALEXANDER AND ISABEL DAY TO MARY M. LEONARD AND MARGARET L. EVANS BY DEED DATED OCTOBER 9, 1925, AND RECORDED IN VOLUME 1037, PAGE 23 OF THE SUMMIT COUNTY, OHIO, RECORDS; THENCE N 89° 08' 10" E, ALONG THE NORTH LINE OF SAID LAND CONVEYED TO MARY M. LEONARD AND MARGARET L. EVANS, 1203.34 FEET TO THE SOUTHWEST CORNER OF LAND OWNED IN 1955 BY JOHN E. MILLEN; THENCE N 0° 54' 40" W, ALONG SAID MILLEN'S WEST LINE, 2854.42 FEET TO THE NORTH LINE OF SAID LOT 2; THENCE N 5° 23' 40" W, CONTINUING

2

ALONG SAID MILLEN'S WEST LINE, 616.96 FEET TO THE CENTER LINE OF AURORA ROAD (STATE ROUTE 82); THENCE S 89° 19' W, ALONG THE CENTER LINE OF SAID AURORA ROAD, 542.24 FEET TO THE NORTHEAST CORNER OF LAND OWNED IN 1955 BY RUSSELL D. CASH AND FRANCES L. CASH; THENCE S 0° 30' E, ALONG SAID CASHS' EAST LINE, 587.84 FEET TO AN IRON PIPE IN THE NORTH LINE OF SAID LOT 2; THENCE N 88° 04' 50" W, ALONG THE NORTH LINE OF SAID LOT 2, 607.42 FEET TO THE PLACE OF BEGINNING AND CONTAINING, AS SURVEYED IN DECEMBER 1955 BY S. G. SWIGART &amp; SON, 87.4357 ACRES OF LAND, OF WHICH 79.5947 ACRES ARE IN LOT 2, TRACT 1-M, AND 7.8410 ACRES ARE IN LOT 12, TRACT 1-N.

PARCEL NO. 7:

SITUATED IN THE CITY OF TWINSBURG, COUNTY OF SUMMIT AND STATE OF OHIO AND KNOWN AS BEING PART OF LOT 12, TRACT 1-N IN ORIGINAL TWINSBURG TOWNSHIP AND MORE FULLY DESCRIBED AS FOLLOWS:

BEGINNING AT AN IRON PIPE IN THE SOUTH LINE OF SAID LOT 12, TRACT 1-N AND NORTH LINE OF LOT 2, TRACT 1-M, WHICH IS S 88° 04' 50" E, ALONG SAID COMMON LINE, 307.15 FEET FROM AN IRON PIPE AT THE SOUTHWEST CORNER OF SAID LOT 2, TRACT 1-M, WHICH PLACE OF BEGINNING IS THE SOUTHEAST CORNER OF LAND OWNED IN 1955 BY STANLEY M. SRODEK AND HELEN M. SRODEK; THENCE S 88° 04' 50" E, ALONG THE SOUTH LINE OF SAID LOT 12, TRACT 1-N, 100.09 FEET TO AN IRON PIPE AT THE SOUTHWEST CORNER OF LAND OWNED IN 1955 BY JOHN A. RADE; THENCE N 0° 30' W, ALONG SAID RADE'S WEST LINE, 578.75 FEET TO THE CENTER LINE OF AURORA ROAD, (STATE ROUTE 82); THENCE S 89° 19' W, ALONG THE CENTER LINE OF SAID AURORA ROAD, 100.00 FEET TO SAID SRODEKS' NORTHEAST CORNER; THENCE S 0° 30' E, ALONG SAID SRODEKS' EAST LINE, 574.20 FEET TO THE PLACE OF BEGINNING AND CONTAINING, AS SURVEYED IN DECEMBER 1955 BY S. G. SWIGART &amp; SON, 1.3234 ACRES OF LAND.

PARCEL NO. 8:

SITUATED IN THE CITY OF TWINSBURG, COUNTY OF SUMMIT AND STATE OF OHIO AND KNOWN AS BEING PART OF LOT 12, TRACT 1-N AND PART OF LOT 2, TRACT 1-M IN ORIGINAL TWINSBURG TOWNSHIP AND MORE FULLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTH LINE OF SAID LOT 2, TRACT 1-M, WHICH IS S 88° 04' 50" E, ALONG SAID LINE, 1202.82 FEET FROM AN IRON PIPE AT THE NORTHWEST CORNER OF SAID LOT 2, TRACT 1-M, WHICH POINT IS IN THE EAST LINE OF LAND OWNED IN 1955 BY MAMIE C. KARABEC; THENCE N 5° 23' 40" W, ALONG SAID KARABEC'S EAST LINE, 616.96 FEET TO THE CENTER LINE OF AURORA ROAD (STATE ROUTE 82); THENCE N 89° 19' E, ALONG THE CENTER LINE OF SAID AURORA ROAD, 783.74 FEET TO THE NORTHEAST CORNER OF LAND OWNED IN 1955 BY MARIE KARABEC; THENCE S 0° 03' 10" W, ALONG SAID MARIE KARABEC'S WEST LINE, PARALLEL WITH THE EAST LINE OF SAID LOT 12, TRACT 1-N, 647.89 FEET TO A POINT IN THE SOUTH LINE OF SAID LOT 12, TRACT 1-N, WHICH POINT IS N 88° 04' 50" W, ALONG SAID LINE, 379.50 FEET FROM A STONE AT THE SOUTHEAST CORNER OF SAID LOT 12; THENCE S 0° 47' 12' E, CONTINUING ALONG SAID MARIE KARABEC'S WEST LINE, 2819.19 FEET TO A POINT IN THE NORTH LINE OF LAND CONVEYED BY ALEXANDER AND ISABEL DAY TO MARY M. LEONARD AND MARGARET L. EVANS BY DEED DATED OCTOBER 9, 1925, AND RECORDED IN VOLUME 1037, PAGE 23 OF THE SUMMIT COUNTY, OHIO, RECORDS; THENCE S 89° 08' 10" W, ALONG THE NORTH LINE OF SAID LAND CONVEYED TO MARY M. LEONARD AND MARGARET L. EVANS, 718.50 FEET TO SAID MAMIE C. KARABEC'S SOUTHEAST CORNER; THENCE N 0° 54' 40" W, ALONG SAID MAMIE C. KARABEC'S EAST LINE, 2854.42 FEET TO THE PLACE OF BEGINNING AND CONTAINING, AS SURVEYED IN DECEMBER 1955 BY S. G. SWIGART &amp; SON, 57.9159 ACRES OF LAND OF WHICH 10.9241 ACRES ARE IN LOT 12, TRACT 1-N AND 46.9918 ACRES ARE IN LOT 2, TRACT 1-M.

PARCEL NO. 9:

SITUATED IN THE CITY OF TWINSBURG, COUNTY OF SUMMIT AND STATE OF OHIO AND KNOWN AS BEING PART OF LOT 12, TRACT 1-N AND PART OF LOT 2, TRACT 1-M IN ORIGINAL TWINSBURG TOWNSHIP AND MORE FULLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTH LINE OF SAID LOT 2, TRACT 1-M WHICH IS S 88° 04' 50" E, ALONG SAID LINE 1928.32 FEET FROM AN IRON PIPE AT THE NORTHWEST CORNER OF SAID LOT 2, TRACT 1-M AND N 88° 04' 50" W, ALONG SAID LINE, 379.50 FEET FROM A STONE AT THE NORTHEAST CORNER OF SAID LOT 2, TRACT 1-M, WHICH POINT IS IN THE EAST LINE OF LAND OWNED IN 1955 BY JOHN E. MILLEN; THENCE S 0° 47' 12" E, ALONG SAID MILLEN'S EAST LINE, 2819.19 FEET TO A POINT IN THE NORTH LINE OF THE LAND CONVEYED BY ALEXANDER AND ISABEL DAY TO MARY M. LEONARD AND MARGARET L. EVANS BY DEED DATED OCTOBER'S 9, 1925, AND RECORDED IN VOLUME 1037, PAGE 23 OF THE SUMMIT COUNTY, OHIO, RECORDS; THENCE N 89° 08' 10" E, ALONG THE NORTH LINE OF SAID LAND CONVEYED TO MARY M. LEONARD AND MARGARET L. EVANS, 379.91 FEET TO THE EAST LINE OF SAID LOT 2; THENCE N 0° 47' 30" W, ALONG THE EAST LINE OF SAID LOT 2, 2800.76 FEET TO A STONE AT THE NORTHEAST CORNER OF SAID LOT 2, TRACT 1-M AND THE SOUTHEAST CORNER OF LOT 12, TRACT 1-N; THENCE N 88° 04' 50" W, ALONG THE NORTH LINE OF SAID LOT 2, TRACT 1-M, 65.00 FEET TO AN IRON PIPE; THENCE N 0° 03' 10" E, PARALLEL WITH THE EAST LINE OF SAID LOT 12, TRACT 1-N, 662.17 FEET TO THE CENTER LINE OF AURORA ROAD (STATE ROUTE 82); THENCE S 89° 19' W, ALONG THE CENTER LINE OF SAID AURORA ROAD, 314.36 FEET TO SAID MILLEN'S NORTHEAST CORNER; THENCE S 0° 03' 10" W, ALONG SAID MILLEN'S EAST LINE, 647.89 FEET TO THE PLACE OF BEGINNING AND CONTAINING, AS SURVEYED IN DECEMBER 1955 BY S. G. SWIGART &amp; SON, 29.1880 ACRES OF LAND OF WHICH 4.7268 ACRES ARE IN LOT 12, TRACT 1-N AND 24.4612 ACRES ARE IN LOT 2, TRACT 1-M.

PARCEL NO. 10:

SITUATED IN THE CITY OF TWINSBURG, COUNTY OF SUMMIT AND STATE OF OHIO AND KNOWN AS BEING PART OF LOT 12, TRACT 1-N IN ORIGINAL TWINSBURG TOWNSHIP AND MORE FULLY DESCRIBED AS FOLLOWS: BEGINNING AT AN IRON PIPE IN THE SOUTH LINE OF SAID LOT 12, TRACT 1-N AND NORTH LINE OF LOT 2, TRACT 1-M, WHICH IS S 88° 04' 50" E, ALONG SAID COMMON LINE, 76.95 FEET FROM AN IRON PIPE AT THE NORTHWEST CORNER OF SAID LOT 2, TRACT 1-M, WHICH PLACE OF BEGINNING IS THE SOUTHEAST CORNER OF LAND OWNED IN 1955 BY MICHAEL LANGER AND RUTH LANGER; THENCE S 88° 04' 50" E, ALONG THE SOUTH LINE OF SAID LOT 12, 115.10 FEET TO AN IRON PIPE AT THE SOUTHWEST CORNER OF LAND OWNED IN 1955 BY STANLEY M. SRODEK AND HELEN M. SRODEK; THENCE N 0° 30' W, ALONG SAID SRODEK'S WEST LINE, 568.97 FEET TO THE CENTER LINE OF AURORA ROAD (STATE ROUTE 82); THENCE S 89° 19' W, ALONG THE CENTER LINE OF SAID AURORA ROAD, 115.00 FEET TO SAID LANGERS' NORTHEAST CORNER; THENCE S 0° 30' E, ALONG SAID LANGERS' EAST LINE, 563.75 FEET TO THE PLACE OF BEGINNING AND CONTAINING, AS SURVEYED IN DECEMBER 1955 BY S. G. SWIGART &amp; SON, 1.4952 ACRES OF LAND.

LESS AND EXCEPTING THEREFROM THE FOLLOWING:

SITUATED IN THE CITY OF TWINSBURG, COUNTY OF SUMMIT AND STATE OF OHIO, AND KNOWN AS BEING PART OF LOT 2, TRACT 1-M IN ORIGINAL TWINSBURG TOWNSHIP AND MORE FULLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE EAST LINE OF SAID LOT 2, WHICH POINT IS NORTH 0° 47' 30" WEST, ALONG SAID LINE, 319.17 FEET FROM A MARKED STONE AT THE SOUTHEAST CORNER OF SAID LOT; THENCE NORTH 0° 47' 30" WEST, ALONG THE EAST LINE OF SAID LOT 2, 241.83 FEET; THENCE SOUTH 89° 19' WEST PARALLEL WITH AND 3224.00 FEET DISTANT FROM THE CENTER LINE OF AURORA ROAD (STATE ROUTE 82), 2301.50 FEET TO A POINT IN THE WEST LINE OF SAID LOT 2, TRACT 1-M; THENCE SOUTH 0° 52' 20" EAST, ALONG THE WEST LINE OF SAID LOT, 249.08 FEET; THENCE NORTH 89° 08' 10" EAST, 2301.15 FEET TO THE PLACE OF BEGINNING AND CONTAINING 12.9677 ACRES OF LAND, MORE OR LESS, THERE BEING, AS SURVEYED IN MAY, 1956, BY S. G. SWIGART AND SON, 12.6375 ACRES OF LAND, EXCLUSIVE OF ACREAGE LYING WITHIN CHAMBERLIN ROAD.

THIS CONVEYANCE IS EXPRESSLY SUBJECT TO THE RIGHTS OF THE PUBLIC TO THAT PORTION OF THE PROPERTY LYING WITHIN THE BOUNDARIES OF CHAMBERLIN ROAD (C.H. 128) AS MORE FULLY SET FORTH IN THAT CERTAIN DEDICATION PLAT TO THE COMMISSIONERS OF SUMMIT COUNTY, OHIO, RECORDED MARCH 26, 1956, IN VOLUME 47, PAGE 40 OF SUMMIT COUNTY, OHIO, RECORDS.

Exhibit B

Chrysler Equipment

1.  All dies and tools located on the Property as referred to in Section 2.06(f) of the Company Disclosure Letter ("Disclosure Letter") as defined in Master Transaction Agreement among Fiat S.p.A., New Carco Acquisition LLC, Chrysler LLC and other sellers identified therein, dated April 30, 2009, as modified by that certain letter agreement dated as of January 28, 2010 (the "MTA"), described as PP&E (as defined in the MTA).

2.  The following equipment located on the Property as referred to in Section 2.06(f) of the Disclosure Letter:

    - DR/DS - Box Side Inner,
    - PM/MK - Xmember Front Floor & Rear Closure,
    - RTRM - Sliding door RH, Sliding Door LH, BSA Inner Rear, Reinf Liftgate Opng, Cowl Plenum Upper Front Door,
    - CS - Old Pacifica Tools,
    - HB - Front Door, Rear Door, Hood, Liftgate, Cowl, Cowlbar, B Pillar, Dash, Rear Closure

3.  All Purchased Inventory, as defined in Section 2.06(i) of the MTA.

Exhibit C

Bidding Procedures Order

[see attached]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                                          :
In re                                     :    Chapter 11
                                          :
Old Carco LLC                             :    Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), *et al.,*           :
                                          :    (Jointly Administered)
                         Debtors.         :
                                          :
                                          :
---------------------------------------------------------x

## ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE TWINSBURG, OHIO STAMPING PLANT, (II) APPROVING CERTAIN BIDDER PROTECTIONS AND (III) SCHEDULING A FINAL SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF

This matter coming before the Court on the motion (Docket No. [___])

(the "Motion") of the above-captioned debtors and debtors in possession (collectively,

the "Debtors") seeking, pursuant to sections 105 and 363 of the Bankruptcy Code, 11 U.S.C.

§§ 101-1532 (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local

Bankruptcy Rules"), entry of (i) an order (a) scheduling a hearing (the "Sale Hearing") to

consider approving the sale of the Debtors' Twinsburg, Ohio stamping plant and certain related

personal property (collectively, the "Property"), (b) authorizing and approving the procedures

that are attached hereto as Exhibit A (the "Bidding Procedures") for the marketing and sale of the

Property, including, but not limited to, the conduct of an auction (the "Auction") and the

allowance of certain stalking-horse bidder protections, and (c) authorizing and approving the

form and manner of the Debtors' proposed notice of the Auction and the Sale Hearing; and (ii) an

order authorizing and approving the sale of the Property (the "Sale Transaction") to the

Successful Bidder in accordance with the Successful Bid (as such terms are defined in the Bidding Procedures) (the "Sale Order"); the Court having reviewed the Motion and conducted a hearing to consider the relief requested therein (the "Hearing"); and the Court having considered the statements of counsel and the evidence presented at the Hearing;

IT IS HEREBY FOUND AND DETERMINED THAT:

A.     The Debtors have articulated good and sufficient reasons for, and the best interests of their bankruptcy estates will be served by, this Court granting certain of the relief requested in the Motion, including approval of (1) the Bidding Procedures; (2) the break-up fee of $600,000 (the "Break-up Fee") as provided for in the Agreement of Purchase and Sale, dated as of February 12, 2010 (the "Purchase Agreement"),[1] between Twinsburg Industrial Park LLC, a Delaware limited liability company ("Buyer"), and Old Carco LLC f/k/a Chrysler LLC ("Old Carco"), which Purchase Agreement is attached as Exhibit A to the Motion; and (3) the form of notice attached hereto as Exhibit B (the "Sale Notice").

B.     The Debtors have articulated good and sufficient reasons for, and the best interests of their estates will be served by, this Court scheduling a subsequent Sale Hearing to consider granting other relief requested in the Motion, including approval of the Sale Transaction and the transfer of the Property to the Successful Bidder free and clear of all Interests of any kind or nature pursuant to section 363(b) and section 363(f) of the Bankruptcy Code.

C.     The Break-up Fee to be paid to the Buyer under the circumstances described is:  (1) an actual cost and expense necessary to maximize the value of Debtors' bankruptcy estates and, as such, is entitled to priority under sections 503(b) and 507(a)(2) of the of the Bankruptcy Code; (2) commensurate to the real and substantial benefits conferred upon

---

[1]     Capitalized terms used but not defined herein have the meanings given to such terms in the Motion.

the Debtors' bankruptcy estates by the Buyer; (3) reasonable and appropriate in light of the size and nature of the proposed Sale Transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by the Buyer; and (4) necessary to induce the Buyer to continue to pursue the Sale Transaction and to continue to be bound by the Purchase Agreement.

        D.      Moreover, unless it is assured that the Break-Up Fee will be available, the Buyer is unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under the Purchase Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated by the Bidding Procedures). The Break-Up Fee induced the Buyer to submit a bid that will serve as a minimum or floor bid on which the Debtors, their creditors and other bidders can rely. The Buyer has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Property will be received. Accordingly, the Break-Up Fee is reasonable and appropriate and represents the best method for maximizing value for the benefit of the Debtors' estates.

        IT IS HEREBY ORDERED THAT:

        1.      The Motion is GRANTED to the extent set forth herein.

        2.      The Bidding Procedures, which are attached hereto as <u>Exhibit A</u>, are hereby approved and shall govern all bids and bid proceedings relating to the Property. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

        3.      The deadline for submitting a Qualified Bid (as such term is defined in the Bidding Procedures) shall be March 5, 2010. The Purchase Agreement shall be deemed to be a Qualified Bid.

4.     As further described in the Bidding Procedures, the Debtors shall conduct the Auction on March 10, 2010 if more than one Qualified Bid is timely received.

5.     The Court shall conduct the Sale Hearing on March 11, 2010 at 10:00 a.m. (prevailing Eastern Time), at which hearing the Court will consider approval of the Sale Transaction to the Successful Bidder.

6.     To be considered, objections to the proposed sale or any of the remaining relief sought in the Motion must (a) be in writing, (b) state the basis of such objection with specificity, (c) conform to the Bankruptcy Rules and the Local Bankruptcy Rules, (d) be filed with the Bankruptcy Court and (e) be served upon (i) counsel to the Debtors, Jones Day, 1420 Peachtree Street, N.E., Suite 800, Atlanta, Georgia 30309-3053 (Attn:  Jeffrey B. Ellman, Esq.) and 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn:  William Herzberger, Esq. and Carl E. Black, Esq.); (ii) counsel to the First Lien Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 3954 (Attn:  Peter V. Pantaleo, Esq.); (iii) counsel to the Creditors' Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 (Attn:  Thomas Moers Mayer, Esq.) and (iv) counsel to the Buyer, Arnold & Porter LLP, 399 Park Avenue, New York, New York 10022-4690 (Attn:  Michael J. Canning, Esq.) (collectively, the "Notice Parties"), so as to be actually received no later than 4:00 p.m. (prevailing Eastern Time) on March 10, 2010.

7.     The Break-up Fee set forth in section 7 of the Purchase Agreement is hereby approved in all respects and shall be paid to the Buyer in accordance with and as provided in the Purchase Agreement.  In accordance with section 7 of the Purchase Agreement, the Debtors' obligations to pay the Break-up Fee shall be treated as an administrative expense allowed under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.  The Buyer shall not

waive the right to payment of the Break-up Fee by bidding or rebidding at the Auction. The

Buyer's right to the Break-up Fee shall be the sole and exclusive remedy of the Buyer in the

event of an Approved Alternative Transaction or Alternative Transaction, as applicable. In no

event shall the Buyer be entitled to payment of the Break-up Fee unless and until the closing of

an Approved Alternative Transaction or in accordance with section 7(d) of the Purchase

Agreement, as applicable.

       8.     The form of the Sale Notice is hereby approved in all respects. All parties

in interest shall receive or be deemed to have received good and sufficient notice of all relief

sought in the Motion, including but not limited to the Sale Hearing, the proposed Approval

Order, the proposed sale of the Property if:

      (a)     no later than February 27, 2010 (the "Mailing Deadline"), the Debtors:
serve the Sale Notice together with a copy of this Order by first-class mail, postage
prepaid upon: (i) counsel to the Creditors' Committee; (ii) counsel to the First Lien
Agent; (iii) counsel to the DIP Lenders; (iv) counsel to the Buyer; (v) any party who, in
the past year, expressed in writing to the Debtors an interest in the Property; (vi) all
parties who are known or reasonably believed to have asserted a lien, encumbrance,
claim or other interest in the Property; (vii) the Internal Revenue Service; (vii) the
attorney general for the State of Ohio and all applicable local environmental enforcement
agencies; (xi) all applicable state and local taxing authorities; (xii) the Office of the
United States Trustee for the Southern District of New York; (xiii) the
U.S. Environmental Protection Agency; (xiv) counsel to The Bank of New York Trust
Company, N.A., in its capacity as the indenture trustee under that certain Indenture, dated
as of March 1, 1985, among DaimlerChrysler Company LLC (as predecessor in interest
to Old Carco), as issuer, DaimlerChrysler AG (now known as Daimler AG), as guarantor
and U.S. Bank National Association; and (xv) all entities that have requested notice in
these chapter 11 cases under Bankruptcy Rule 2002; and

      (b)     as soon as practicable after the Mailing Deadline, the Debtors (i) shall
publish the Sale Notice (modified as appropriate to accommodate publication) one time
in the national edition of the *Wall Street Journal* and the *Cleveland Plain Dealer* and
(ii) post the Sale Notice to the website of the Debtors' claims and noticing agent, Epiq
Bankruptcy Solutions, LLC, at www.chryslerrestructuring.com.

       9.     The failure of any objecting person or entity to timely file its objection

shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, or

the consummation and performance of the Sale Transaction contemplated by the Purchase

Agreement or a Marked Agreement (as such term is defined in the Bidding Procedures), if any,

including the transfer free and clear of all liens, claims, encumbrances and interests of the

Property transferred as part of the Sale Transaction.

10.     To the extent there is any inconsistency between the terms of this Order

and the Purchase Agreement, the terms of this Order and the exhibits hereto shall control.

11.     The Court shall retain jurisdiction over any matter or dispute arising from

or relating to the implementation, interpretation or enforcement of this Order.

Dated: New York, New York
          February ___, 2010

                                         _____
                                         UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

## BIDDING PROCEDURES[1]

### I.    Important Dates

The Debtors shall, in coordination with Capstone Advisory Group, LLC ("Capstone") and in consultation with and, with respect to the third item below, subject to the consent of JPMorgan Bank, N.A. (the "First Lien Agent"), as the agent for the Debtors' lenders under the Amended and Restated First Lien Credit Agreement, dated as of November 29, 2007, as amended:

    (A)    assist Potential Bidders (as defined below) in conducting their respective due diligence investigations and accept Bids (as defined below) until 5:00 p.m. (prevailing Eastern Time) on March 5, 2010;

    (B)    negotiate with Qualified Bidders (as defined below) in preparation for an auction (the "Auction") to begin at 10:00 a.m. (prevailing Eastern Time) on March 10, 2010 if any additional Qualified Bids are received; and

    (C)    seek authority to sell the Property to the Successful Bidder (as defined below) at the Sale Hearing to be held by the Bankruptcy Court at 10:00 a.m. (Prevailing Eastern Time) on March 11, 2010.

### II.    The Sale Hearing

At the Sale Hearing, the Debtors will seek entry of an order substantially in the form of Exhibit E to the Motion, *inter alia*, authorizing and approving the Sale Transaction (A) if no other Qualified Bid (as defined below) is received by the Debtors, to the Buyer pursuant to the terms and conditions set forth in the Purchase Agreement or (B) if another Qualified Bid is received by the Debtors, to the Buyer or such other Qualified Bidder(s) as the Debtors, in the exercise of their reasonable business judgment and with the consent of the First Lien Agent, determine to have made the highest or otherwise best offer to purchase the Property at the Auction, consistent with the Bidding Procedures. The Sale Hearing may be adjourned or rescheduled without notice, other than by an announcement of such adjournment at the Sale Hearing or in an agenda letter for such hearing.

### III.    Determination by the Debtors

The Debtors, in coordination with Capstone and the First Lien Agent, shall (A) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Property, (B) determine whether any person or entity is a Qualified

---

[1] Capitalized terms not otherwise defined herein shall have the respective meaning ascribed to them in the annexed Procedures Order.

Bidder, (C) receive bids from Qualified Bidders, (D) negotiate any bids and (E) conduct the Auction of the Property if any additional Qualified Bids are received (collectively, the "Bidding Process"). Any person or entity who wishes to participate in the Bidding Process must be a Qualified Bidder. Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Property to any person or entity who is not a Potential Bidder and who does not comply with the participation requirements below.

## IV. Participation Requirements

Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the Bidding Process, each interested person or entity (a "Potential Bidder") must deliver the following (unless previously delivered) to: (A) Capstone Advisory Group, LLC, Park 80 West, 250 Pehle Avenue, Suite 105, Saddle Brook, New Jersey 07663 (Attn: John Rooney); (B) Jones Day, 1420 Peachtree Street, N.E., Suite 800, Atlanta, Georgia 30309-3053 (Attn: Jeffrey B. Ellman, Esq.) and 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn: William Herzberger, Esq. and Carl E. Black, Esq.); and (C) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017-3954 (Attn: Peter V. Pantaleo, Esq.) so as to be received no later than 5:00 p.m. (Prevailing Eastern Time) on March 1, 2010:

(A) an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors;

(B) a statement demonstrating to the Debtors' reasonable satisfaction a *bona fide* interest in purchasing all of the Property; and

(C) sufficient information, as requested by the Debtors, to allow the Debtors to determine that the Potential Bidder has the financial wherewithal and any required authorizations to close the Sale Transaction, including, but not limited to, current audited financial statements of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtors in their discretion in consultation with the First Lien Agent).

## V. Due Diligence

If the Debtors determine, in consultation with the First Lien Agent, that a potential bidder has a *bona fide* interest in the Property, then no later than two business days after the Debtors make that determination and have received from a Potential Bidder all of the materials required above, the Debtors will contact any such Potential Bidder and offer such access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances, subject to the limitations on the Debtors' access to the Property under the Transition Services Agreement, dated as of June 10, 2009, between the Debtors and Chrysler Group LLC. All due diligence requests shall be directed to John Rooney of Capstone at (201) 587-7121. The Debtors, with the assistance of Capstone, shall coordinate all reasonable requests for additional information and due diligence access from the Potential Bidders. In the event that any such due diligence material has not previously been provided to any other Potential Bidder, the Debtors

shall simultaneously provide such materials to all Potential Bidders, as well as to counsel to the First Lien Agent and counsel to the Buyer.

Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease (A) if the Potential Bidder does not become a Qualified Bidder, (B) from and after the Bid Deadline or (C) if the Bidding Process is terminated in accordance with its terms.

## VI.    Bid Deadline

A Potential Bidder that desires to make a bid shall deliver written and electronic copies of its bid to: (A) Capstone Advisory Group, LLC, Park 80 West, 250 Pehle Avenue, Suite 105, Saddle Brook, New Jersey 07663 (Attn: John Rooney; jrooney@capstoneag.com); (B) Jones Day, 1420 Peachtree Street, N.E., Suite 800, Atlanta, Georgia 30309-3053 (Attn: Jeffrey B. Ellman, Esq.; jbellman@jonesday.com) and 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn: William Herzberger, Esq., wherzberger@jonesday.com, and Carl E. Black, Esq., ceblack@jonesday.com); and (C) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017-3954 (Attn: Peter V. Pantaleo, Esq.; ppantaleo@stblaw.com), so as to be received not later than 5:00 p.m. (Prevailing Eastern Time) on March 5, 2010 (the "Bid Deadline").

## VII.    Bid Requirements

A bid is a signed document from a Potential Bidder that provides, at a minimum, that:

(A)    the Potential Bidder offers to purchase the Property upon the terms and conditions set forth in a copy of an asset purchase agreement enclosed therewith, marked to show any proposed amendments and modifications to the Purchase Agreement (the "Marked Agreement");

(B)    the bid is not subject to any due diligence or financing contingency and is irrevocable until one business day following the closing of the Sale Transaction;

(C)    the purchase price in such bid is a higher or otherwise better offer for the Property than that described in the Purchase Agreement, and such offer shall not be considered a higher or better offer unless such bid provides for net cash (or cash equivalent) consideration to the Debtors of at least $750,000 more than the Purchase Price to be paid by the Buyer;

(D)    is a bid received by the Bid Deadline; and

(E)    does not entitle a bidder (other than the Buyer) to any break up fee, termination fee or similar type of payment or reimbursement.

A Potential Bidder shall accompany its bid with: (A) written evidence of available cash or an irrevocable commitment for financing and such other evidence of ability to consummate the transaction contemplated by the applicable Marked Agreement as the Debtors may reasonably request; (B) a copy of a board resolution or similar document demonstrating the

authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed; and (C) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtors in their analysis of issues arising with respect to any applicable antitrust laws.

A Potential Bidder must deposit 10% of the initial cash purchase price set forth in the Marked Agreement (the "Good Faith Deposit") with an escrow agent selected by the Debtors (the "Deposit Agent"). The Good Faith Deposit must be made by certified check or wire transfer and will be held by the Deposit Agent in accordance with the terms of an escrow agreement to be provided with the Purchase Agreement.

A bid received from a Potential Bidder that meets the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder." For purposes hereof, the Buyer is a Qualified Bidder and the Purchase Agreement executed by the Buyer is a Qualified Bid. A Qualified Bid will be valued based upon factors such as: (A) the purported amount of the Qualified Bid; (B) the fair value to be provided to the Debtors under the Qualified Bid; (C) the ability to close the proposed Sale Transaction without delay; and (D) any other factors the Debtors, in consultation with the First Lien Agent, may deem relevant. Within one business day after receipt from a Qualified Bidder, the Debtors shall distribute by email or facsimile a copy of each Qualified Bid to counsel to each Qualified Bidder (including the Buyer).

The Debtors reserve the right, with the consent of the First Lien Agent, to reject any bid if such bid:

(A)     is on terms that are materially more burdensome or conditional than the terms of the Purchase Agreement;

(B)     is a bid for less than all of the Property;

(C)     requires any indemnification of such Qualified Bidder; or

(D)     includes a non-cash instrument or similar consideration that is not freely marketable.

## VIII.  **Baseline Bid**

Qualified Bidders that have submitted Qualified Bids are eligible to participate in the Auction. The Debtors will select, with the consent of the First Lien Agent, the highest and best Qualified Bid or Qualified Bids (the "Baseline Bid") to serve as the starting point for the Auction. As soon as practicable, the Debtors will provide all Qualified Bidders with a copy of the Baseline Bid.

## IX.     **Auction**

If more than one Qualified Bid is received by the Bid Deadline, the Debtors will conduct the Auction. The Auction shall take place at 10:00 a.m. (Prevailing Eastern Time) on March 10, 2010, at the offices of Jones Day, located at 222 East 41st Street, New York, New York 10017, or such later time or such other place as the Debtors shall notify all Qualified

Bidders who have submitted Qualified Bids. Only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Auction. Professionals for the First Lien Agent and the Creditors' Committee shall be able to attend and observe the Auction, provided that the professionals for the Creditors' Committee shall do so at their own expense and any such expenses shall not be a "Covered Cost" under the Agreed Order (Docket No. 5981) between the First Lien Agent and the Debtors (the "First Lien Winddown Order"). If no Qualified Bids other than the Buyer's Qualified Bid are received prior to the Bid Deadline, no Auction shall be conducted.

At the Auction, participants (including the Buyer) will be permitted to increase their bids and will be permitted to bid based only upon the terms of the Baseline Bid (except to the extent otherwise authorized by the Debtors, with the consent of the First Lien Agent), subject to Buyer's right to be credited in its bid for the amount of its Break-up Fee (as described below); provided, however, if the Buyer elects to participate at the Auction, the Buyer shall have the right, but shall not be obligated, to make any bid(s) at the Auction based on and subject to the terms and conditions set forth in the Purchase Agreement (other than the purchase price) and, in such case, the Debtors will weigh and consider any differences in any such terms and conditions set forth in the Purchase Agreement as compared to the terms and conditions set forth in the Baseline Bid in the Debtors' process of determining the Successful Bid (as defined herein). The bidding will start at the purchase price and terms proposed in the Baseline Bid, and continue in increments of at least $100,000. Notwithstanding any other provision of these Bidding Procedures, when comparing bids at the Auction, the Buyer will be credited with, and have added to the aggregate amount of any bid that the Buyer elects to make at the Auction, an amount equal to the Break-up Fee.

The Debtors may adopt, in consultation with the First Lien Agent, rules for the Auction at any time that will best promote the goals of the Bidding Process and that are not inconsistent with any provisions of the Purchase Agreement or these Bidding Procedures. Any such rules will provide that: (A) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder; (B) all bids will be made and received in one room, on an open basis, and all other bidders will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction; and (C) each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction.

Immediately prior to the conclusion of the Auction, the Debtors, with the consent of the First Lien Agent, will: (A) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale Transaction; (b) identify the successful bid (the "Successful Bid") and (c) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the successful bidder or bidders (the "Successful Bidder(s)"), and the amount and other material terms of the Successful Bid. At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

## X.    Acceptance of Qualified Bids

The Debtors may, with the consent of the First Lien Agent (A) determine, in their reasonable business judgment, which Qualified Bid is the Successful Bid and the next highest or otherwise best bid (the "Next Highest Bid"); and (B) reject at any time before entry of the Sale Order any bid that, in the Debtors' reasonable judgment, is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures or the terms and conditions of the Sale Transaction or (3) contrary to the best interests of the Debtors and their bankruptcy estates.

The Debtors presently intend to consummate the Sale Transaction with the Successful Bidder, whether such entity is the Buyer or another Qualified Bidder. However, the Debtors' presentation of the Successful Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted the Successful Bid only when such bid has been approved by the Bankruptcy Court. The Debtors and the Successful Bidder shall close the Sale Transaction on or before March 31, 2010, unless extended by mutual agreement of the Debtors, the First Lien Agent and the Successful Bidder. If the Successful Bidder does not close the Sale Transaction by such date, then the Debtors shall be authorized, but not required, to close with the party that submitted the Next Highest Bid (the "Next Highest Bidder") without further order of the Bankruptcy Court, subject to the consent of the First Lien Agent. If the Debtors decide to close with the Next Highest Bidder, (A) the Debtors and the Next Highest Bidder shall have an additional 15 days to close and (B) the Next Highest Bidder shall be deemed the Successful Bidder within the meaning of these Bidding Procedures and under the Sale Order.

## XI.    Modification of Procedures

If necessary to satisfy their fiduciary duties, the Debtors may, in consultation with the First Lien Agent and such other persons as the Debtors deem appropriate, amend these Bidding Procedures or the Bidding Process at any time in any manner that will best promote the goals of the Bidding Process, including extending or modifying any of the dates described herein; provided, however, that, to the extent that any such amendment impacts the protections granted to the Buyer in these Bidding Procedures and in the Purchase Agreement, such amendment shall be subject to the Buyer's consent, the giving of such consent not to be unreasonably withheld, conditioned or delayed.

## XII.    Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders, and the Deposit (as defined in the Purchase Agreement) of the Buyer, shall be held in escrow by the Deposit Agent and shall not become property of the Debtors' bankruptcy estates absent further order of the Bankruptcy Court. The Deposit Agent shall retain the Deposit of the Buyer or the Good Faith Deposit of the Successful Bidder, as the case may be, until the earlier of the closing of the Sale Transaction or the termination or expiration of the applicable Marked Agreement or the Purchase Agreement, as the case may be. At the closing of the Sale Transaction contemplated by the Successful Bid, a Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit or, in the case of the Buyer, its Deposit. The Good Faith Deposits of all Qualified Bidders, other than the

Successful Bidder and the Next Highest Bidder, shall be released by the Debtors upon the entry of the Sale Order. The Good Faith Deposits of the Successful Bidder and the Next Highest Bidder (if not applied to the Purchase Price at closing) shall be released by the Debtors upon the earlier of (A) the closing of the Sale Transaction or (B) the withdrawal of the Property for sale by the Debtors. Additionally, if the Purchase Agreement is terminated, the Buyer's Deposit (as defined in the Purchase Agreement) shall be returned to the extent required by the Purchase Agreement. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. With respect to Good Faith Deposits, if (i) all conditions precedent to the Successful Bidder's or Next Highest Bidder's obligation to close the Transaction have been satisfied or waived, (ii) the Successful Bidder or the Next Highest Bidder has not terminated the applicable Marked Agreement or the Purchase Agreement, as the case may be, as may be permitted therein, (iii) the Debtors have performed their covenants and agreements under the applicable Marked Agreement or the Purchase Agreement, as the case may be and (iv) the Successful Bidder or the Next Highest Bidder has breached its covenants or agreements under the Marked Agreement or the Purchase Agreement, as the case may be, and has failed, refused or is unable to consummate the Transaction by the applicable closing date, the Debtors shall be entitled to the Good Faith Deposit as liquidated damages. Any interest of the Debtors' estates in the Good Faith Deposits or the Deposit shall constitutes First Lien Collateral as that term is defined in the First Lien Winddown Order and shall be paid to the First Lien Agent in accordance with the terms of such Order.

# EXHIBIT B

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman
Carl E. Black

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                          :
In re                                     :     Chapter 11
                                          :
Old Carco LLC                             :     Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), et al.,             :
                          Debtors.        :     (Jointly Administered)
                                          :
                                          :
------------------------------------------------------------ x
```

### NOTICE OF SALE AND SOLICITATION OF BIDS TO PURCHASE THE DEBTORS' TWINSBURG, OHIO STAMPING PLANT AND RELATED <u>PERSONAL PROPERTY AND TERMS AND CONDITIONS OF BIDDING PROCEDURES</u>

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      Old Carco LLC f/k/a Chrysler LLC ("Old Carco") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") have entered into a Agreement of Purchase and Sale, dated February 12, 2010 (the "Purchase Agreement"), to sell their Twinsburg, Ohio stamping plant, including, but not limited to: (a) certain real property, along with all buildings and improvements thereon and certain ancillary rights related thereto; (b) all intangible property pertaining thereto; and (c) certain personalty, trade fixtures and equipment (collectively, the "Twinsburg Property"), to Twinsburg Industrial Park LLC ("Buyer") for $27,500,000.

2.      The Debtors' ability to close the sale of the Twinsburg Property contemplated by the Purchase Agreement is subject to higher and better offers and the approval of the Bankruptcy Court.  Accordingly, the Debtors are soliciting offers for the purchase of the Twinsburg Property, and the Bankruptcy Court has entered an order (Docket No. [___]) (the "Bidding Procedures Order") approving auction and sale procedures (the "Bidding Procedures") for the Twinsburg Property.[1]  Capitalized terms not otherwise defined herein have the meaning given to them in the Bidding Procedures Order or the Bidding Procedures.

3.      In a motion filed with the Bankruptcy Court on February 13, 2010 (the "Sale Motion"), the Debtors proposed to sell the Twinsburg Property to the Buyer (or another Successful Bidder) free and clear of all liens, claims or encumbrances thereon, with all such interests in the Twinsburg Property to be transferred, and to attach, to the sale proceeds with the same validity and priority.  Among other things, the Twinsburg Property is being sold free and clear of any successor liability claims.  You may obtain a copy of the Sale Motion and the

---

[1]      A copy of the Bidding Procedures Order is attached hereto as Exhibit A.  **[Footnote omitted from publication version of notice.]**

Purchase Agreement by: (a) sending a written request to Jones Day, 222 East 41st Street, New York, New York 10017 (Attn: Brett Stone), Facsimile: (212) 755-7306, or (b) by accessing the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at www.chryslerrestructuring.com.

4. The deadline for Qualified Bids for the Twinsburg Property is March 5, 2010 at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline"). If more than one Qualified Bid for the Property is received by the Bid Deadline, the Bankruptcy Court has scheduled an auction of the Twinsburg Property (the "Auction") for **March 10, 2010 at 10:00 a.m. (Prevailing Eastern Time)** at the offices of Jones Day, located at 222 East 41st Street, New York, New York 10017. All interested parties are invited to submit a Qualifying Bid to purchase the Twinsburg Property. If no Qualified Bids (other than the Qualified Bid submitted by the Buyer) are received prior to the Bid Deadline, no Auction will be held.

5. A hearing to approve the Purchase Agreement and the sale of the Twinsburg Property to the Buyer or a Successful Bidder other than the Buyer is scheduled to be conducted on **March 11, 2010 at 10:00 a.m. (prevailing Eastern Time)**, in Room 523 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, or as soon thereafter as counsel may be heard.

6. Objections to the proposed sale of the Property or any of the remaining relief sought in the Sale Motion must (a) be in writing, (b) state the basis of such objection with specificity, (c) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the Southern District of New York, (d) be filed with the Bankruptcy Court; and (e) be served upon (i) counsel to the Debtors, Jones Day, 1420 Peachtree Street, N.E., Suite 800, Atlanta, Georgia 30309-3053 (Attn: Jeffrey B. Ellman, Esq.) and

901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn: William Herzberger, Esq. and Carl E. Black, Esq.); (ii) counsel to the First Lien Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 3954 (Attn: Peter V. Pantaleo, Esq.); (iii) counsel to the Creditors' Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq.) and (iv) counsel to the Buyer, Arnold & Porter LLP, 399 Park Avenue, New York, New York 10022-4690 (Attn: Michael J. Canning, Esq.) (collectively, the "Notice Parties"), so as to be actually received **no later than 4:00 p.m. (prevailing Eastern Time) on March 10, 2010**.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

7.      The Auction and/or Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open court or on the Bankruptcy Court's calendar or in any agenda letter submitted in connection with the Sale Hearing.

Dated: February _____, 2010                    Respectfully submitted,
         New York, New York

                                                 _s/_____
                                                 Corinne Ball
                                                 Veerle Roovers
                                                 JONES DAY
                                                 222 East 41st Street
                                                 New York, New York  10017
                                                 Telephone:  (212) 326-3939
                                                 Facsimile:  (212) 755-7306

                                                 David G. Heiman
                                                 Carl E. Black
                                                 JONES DAY
                                                 North Point
                                                 901 Lakeside Avenue
                                                 Cleveland, Ohio  44114
                                                 Telephone:  (216) 586-3939
                                                 Facsimile:  (216) 579-0212

                                                 Jeffrey B. Ellman
                                                 JONES DAY
                                                 1420 Peachtree Street, N.E.
                                                 Suite 800
                                                 Atlanta, Georgia  30309
                                                 Telephone:  (404) 521-3939
                                                 Facsimile:  (404) 581-8330

                                                 ATTORNEYS FOR DEBTORS AND
                                                 DEBTORS IN POSSESSION

**<u>EXHIBIT A</u>**

**(Bidding Procedures Order)**

**[Omitted from Publication Version]**

Exhibit D

Sale Order

[see attached]

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re                                        :       Chapter 11
                                             :
Old Carco LLC                                :       Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), *et al.*,              :
                                             :       (Jointly Administered)
     Debtors.              :
                                             :
                                             :
---------------------------------------------------------------x

## ORDER AUTHORIZING DEBTORS TO SELL
## TWINSBURG, OHIO STAMPING PLANT FREE AND CLEAR OF ALL
## LIENS, CLAIMS AND ENCUMBRANCES AND GRANTING RELATED RELIEF

This matter coming before the Court on the motion, dated February 13, 2010

(Docket No. [_____]) (the "Sale Motion"),[1] filed by the above-captioned debtors and debtors in

possession (collectively, the "Debtors") for the entry of an order pursuant to sections 105 and

363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1

of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District

of New York:  (i) authorizing and approving the entry by Debtor Old Carco LLC (f/k/a Chrysler

LLC) ("Old Carco") into that certain Agreement of Purchase and Sale, dated as of

February 12, 2010, between Twinsburg Industrial Park LLC, a Delaware limited liability

company (the "Buyer"), and Old Carco (including all exhibits, schedules and ancillary

agreements related thereto, the "Agreement") in the form attached hereto as Exhibit A, whereby

Old Carco has agreed to sell to the Buyer the real and personal property comprising the Debtors'

Twinsburg, Ohio stamping plant (collectively, as further defined in the Agreement,

---

[1]    Capitalized terms used but not defined herein shall have the meanings given to such terms in the Sale Motion.

the "Property"); (ii) authorizing and approving the sale by Old Carco of the Property free and clear of all mortgages, security interests, conditional sale or other retention agreements, pledges, liens (as such term is defined in section 101(37) of the Bankruptcy Code), claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, guaranties, debts, rights, contractual commitments, interests, judgments, demands, easements, charges, encumbrances, defects, options, rights of first refusal, encumbrances, Liens (as such term is defined in the Agreement) and restrictions of any kind or nature whether imposed by agreement, understanding, law, equity or otherwise, other than Permitted Liens as defined in the Agreement (collectively, the "Interests"); and (iii) granting certain related relief; the Court having conducted a hearing on the Sale Motion on March 11, 2010 (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; the Court having reviewed and considered, among other things, (i) the Sale Motion and the exhibits thereto, including the declaration of Peter Chadwick in support of the proposed sale of the Property (the "Chadwick Declaration"), (ii) the Agreement, (iii) the Court's prior order (Docket No. [__]), dated February **[25]**, 2010 (the "Bidding Procedures Order"), approving competitive bidding procedures for the Property, **[(iv) all objections to the proposed sale of the Property filed in accordance with the Bidding Procedures Order,]** and **[(v)]** the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that the relief requested is in the best interests of the Debtors, their estates and creditors and other parties in interest; and upon the record of the Sale Hearing and after due deliberation thereon and good cause appearing therefor:

## I.     FINDINGS OF FACT:

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[2]

### Jurisdiction, Final Order and Statutory Predicates

A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.     The Court has jurisdiction over this matter and over the property of the Debtors, including the Property to be sold, transferred or conveyed pursuant to the Agreement, and the Debtors' estates pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this case and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rule 6004(h), the parties may consummate the transactions provided for under the terms and conditions of the Agreement immediately upon entry of this Order.

### Appropriate Notice

D.     As evidenced by the affidavits of service and publication filed with the Court:  (1) proper, timely, adequate and sufficient notice of the Sale Motion, the Bidding Procedures Order (including the Bidding Procedures)**[, and]** the Sale Hearing **[and the auction conducted in accordance with the Bidding Procedures Order on March 10, 2010 (the "Auction")]** has been provided under the particular circumstances by the mailing of the Sale Motion and the mailing and publication of the Sale Notice pursuant to the Bidding

---

[2]     To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. See Fed. R. Bankr. P. 7052.

Procedures Order; and (2) no other or further notice of the Sale Motion, the Sale Hearing, the Bidding Procedures Order, the Bidding Procedures**[, the Auction]** or of the entry of this Order is necessary or shall be required.

## Good Faith

E.     The Buyer is a buyer in "good faith," as that phrase is used in section 363(m) of the Bankruptcy Code (and court decisions thereunder) and is entitled to the protections thereof. The Agreement was proposed, negotiated and entered into by the Buyer and Old Carco without collusion or fraud of any kind (including any conduct that would cause or permit the sale of the Property to be avoided under section 363(n) of the Bankruptcy Code), in good faith and from arm's length bargaining positions.

## The Debtors' Business Judgment

F.     <u>Initial Marketing Process</u>. The marketing process for the Property began around the time of the Fiat Transaction, with the Debtors receiving numerous indications of interest from various parties with respect to a potential purchase of the Property. In response to their solicitations of interest, the Debtors executed 16 non-disclosure agreements with interested parties and, as of October 16, 2009, had received seven letters of intent offering to purchase the Property. In consultation with JPMorgan Chase Bank, N.A., as the agent (the "<u>First Lien Agent</u>") under the Amended and Restated First Lien Credit Agreement, dated as of November 29, 2007 (as amended or modified, the "<u>First Lien Credit Agreement</u>"), by and among Carco Intermediate Holdco II LLC, Old Carco, the lender parties thereto (collectively, the "<u>First Lien Lenders</u>") and the First Lien Agent, the Debtors determined that the engagement of real estate brokers to market the Property was unnecessary. Pursuant to the First Lien Credit Agreement, and subject to the Permitted Liens, the First Lien Lenders have the first priority lien on the Property. During the period from October 2009 through January 2010, the Debtors

received offers from multiple purchasers, which offers (1) contained steadily increasing cash consideration and (2) were not subject to financing contingencies.

G.    The Stalking Horse Bid.  On January 29, 2010, a Non-Binding Letter of Intent/Offer was submitted on behalf of the Buyer to the Debtors, pursuant to which offer the Buyer (1) offered cash consideration well in excess of any previously-received offer, (2) offered to serve as the stalking horse bidder for the Property at auction and (3) sought certain bidding protections (as more particularly described in the Sale Motion, the "Stalking Horse Bid").  After negotiations between the Buyer and the Debtors, the Debtors determined that the Stalking Horse Bid was the most attractive offer for the Property and accepted the Stalking Horse Bid.

H.    The First Lien Lenders' Approval of the Stalking Horse Bid **[and Auction Process]**.  There are substantial carrying costs for property taxes, utilities, security and other expenses associated with the Property.  These costs currently are borne by Chrysler Group LLC f/k/a New CarCo Acquisition LLC ("New Chrysler") under the Transition Services Agreement, dated June 10, 2009, between New Chrysler and Old Carco (the "TSA").  Because New Chrysler's obligation to pay these costs expires as of July 31, 2010, the Debtors may be forced to bear the entirety of these carrying costs in the next six months.  Pursuant to paragraph 3 of the Agreed Order (Docket No. 5982) (the "DIP Lender Winddown Order") by and between the Debtors, the Debtors' debtor-in-possession lenders (collectively, the "DIP Lenders") and the Creditors' Committee, entered by the Court on November 19, 2009, the DIP Lenders, whose liens on the Property are junior to the liens securing the indebtedness under the First Lien Credit Agreement, are not funding any of the expenses associated with the sale of the Property (which Property is "First Lien Collateral" as such term is defined in the DIP Lender Winddown Order). These costs instead currently are being funded pursuant to the Agreed Order (Docket No. 5981)

(the "First Lien Winddown Order") by and between the Debtors and the First Lien Agent on behalf of the First Lien Lenders (i.e., the parties with the primary economic stake in the sale of the Property), entered by the Court on November 19, 2009, from the Reserve (as such term is defined in the First Lien Winddown Order).

I.     In accordance with paragraph 7 of the First Lien Winddown Order, the Debtors have reviewed the sale process for the Property with the First Lien Agent and the First Lien Agent has (1) designated the Property as an "Estate Asset" (as such term is defined in the First Lien Winddown Order), (2) indicated to the Debtors that the First Lien Lenders have consented to the sale of the Property pursuant to the terms of the Agreement and (3) indicated to the Debtors that the First Lien Lenders (as the primary economic parties in interest) agreed that the sale of the Property ultimately be effected pursuant to the bidding procedures and auction process established in the Bidding Procedures Order.

J.     Highest and Best Offer.  On February **[25]**, 2010, the Court entered the Bidding Procedures Order approving the Bidding Procedures for the Property.  The Bidding Procedures provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Property.  The Debtors **[conducted the Auction in accordance with the Bidding Procedures Order and]** complied with the Bidding Procedures Order in all respects.  **[The Auction was duly noticed and conducted in a non-collusive, fair and good faith manner.]** The Buyer **[participated in the Auction, submitted the Successful Bid to the Debtors and]** complied with the Bidding Procedures Order in all respects.

K.     As demonstrated by the findings of fact recited herein and the testimony and other evidence proferred or adduced at the Sale Hearing (including the Chadwick Declaration):  (1) the Debtors have adequately marketed the Property; (2) the consideration to be

paid by the Buyer under the Agreement constitutes the highest and otherwise best offer for the Property, is fair and reasonable and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory or possession thereof or the District of Columbia; (3) the proposed sale to the Buyer will provide a greater recovery for the Debtors' estates (and the First Lien Lenders) than would be provided by any other practical available alternative; and (4) no other party has offered to purchase the Property for greater economic value to the Debtors or their estates.

L.     The Buyer has provided the Debtors with a deposit in an amount equal to 10% of the initial cash consideration contemplated by the Agreement (such amount, together with the interest accrued thereon, the "Deposit"), which Deposit currently is being held by First American Title Insurance Company (the "Deposit Agent") in an interest-bearing account.

M.     Accordingly, the decision of the Debtors to consummate the sale of the Property on the terms and conditions set forth in the Agreement represents a sound and reasonable exercise of the Debtors' business judgment where, among other things, the transaction will allow the Debtors to: (1) continue to implement the winddown of the Debtors' estates (consistent with the First Lien Winddown Order); (2) monetize the Property for the benefit of the Debtors' estates, including the First Lien Lenders (who are the primary economic party in interest); and (3) avoid incurring any carrying costs associated with the Property upon the expiration of the License Period. Moreover, given (1) the thorough marketing of the Property (as described herein, in the Sale Motion, in the Chadwick Declaration and at the Sale Hearing), (2) the significant cash Purchase Price being offered by the Buyer and (3) the Buyer's willingness to promptly consummate the sale on an "as is, where is" basis, the Debtors believe that the sale of the Property will maximize value for their chapter 11 estates.

## Validity of Transfer

N.     Prior to the transactions contemplated under the Agreement, the Property, including, without limitation, the Scheduled Assets, is the property of the Debtors' estates, title thereto is vested in the Debtors' estates and Old Carco is the sole and lawful owner thereof, holding all right, title and interest therein.

O.     As of the Closing Date, the transfer of the Property to the Buyer will be a legal, valid and effective transfer of the Property and will vest the Buyer with all right, title and interest of the Debtors in and to the Property free and clear of all Interests of any kind or nature.

P.     Old Carco has full power and authority to execute the Agreement and all other documents contemplated thereby, the sale of the Property has been duly and validly authorized and Old Carco possesses all necessary corporate authority to consummate the transactions contemplated by the Agreement.  **[In accordance with section 11.1 of the TSA, Old Carco has obtained New Chrysler's consent to the assignment of Old Carco's rights and obligations under the TSA with respect to the Property set forth at Section 4(b)(iv) of the Agreement (the "TSA Assignment").]**  No other consents or approvals, other than as may be expressly provided for in the Agreement, are required by Old Carco to consummate the transactions contemplated by the Agreement.

## Section 363(f) of the Bankruptcy Code is Satisfied

Q.     Except for the rights of New Chrysler under the TSA, Old Carco may sell the Property free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  The First Lien Lenders have consented to the proposed sale of the Property hereunder within the meaning of section 363(f)(2) of the Bankruptcy Code.  Moreover, other holders of Interests who did not object, or who withdrew their objections, to the sale of the Property and the

Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the proceeds of the sale of the Property.

R.    The Buyer would not have entered into the Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Property to the Buyer were not free and clear of all Interests of any kind or nature or if the Buyer would, or in the future could, be liable for any such Interests.

## No Successor Liability

S.    The transactions contemplated under the Agreement do not amount to a consolidation, merger or *de facto* merger of the Buyer and any of the Debtors, there is no substantial continuity between the Buyer and the Debtors, there is no continuity of enterprise between the Debtors and the Buyer, the Buyer is not a mere continuation of the Debtors or the Debtors' estates and the Buyer does not constitute a successor to the Debtors or to the Debtors' estates.

T.    The transfer of the Property to the Buyer shall not subject the Buyer or any of its affiliates or subsidiaries to any liability by reason of such transfer, including, without limitation, under (1) the laws of the United States, any state, territory or possession thereof, or the District of Columbia, based in whole or part on, directly or indirectly, including without limitation, any theory of antitrust, environmental, products liability, successor or transferee liability, labor law, *de facto* merger or substantial continuity; or (2) any employment contract, understanding or agreement, including, without limitation, collective bargaining agreements, employee pension plans or employee welfare or benefit plans.

## Retention of Jurisdiction

U.   It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Agreement, and to adjudicate, if necessary, any and all disputes relating in any way to the transactions provided for under the terms and conditions of the Agreement.

## II.   CONCLUSIONS OF LAW:

NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.   The relief requested in the Sale Motion, to the extent not already granted or denied in the Bidding Procedures Order, is GRANTED, subject to the terms and conditions contained herein.

2.   All objections, if any, to the Sale Motion or the relief granted herein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits, except as expressly provided herein.

## Approval of Sale

3.   The Agreement, Old Carco's entry into the Agreement and the transactions contemplated thereby **[(including, but not limited to, the TSA Assignment)]** are hereby approved.  Pursuant to sections 105 and 363 of the Bankruptcy Code, Old Carco is authorized to perform its obligations under the Agreement.

4.   The Buyer is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code.  The sale of the Property, and the Debtors' entry into the Agreement, may not be avoided, and costs may not be recovered or punitive damages awarded, pursuant to section 363(n) of the Bankruptcy Code.

5.      Old Carco, as well as its affiliates, officers, managers, employees and agents, shall be, and hereby are, authorized and directed to fully assume, perform under, consummate and implement the terms of the Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Agreement, this Order and the sale of the Property contemplated thereby, including, without limitation, the execution of any deeds, assignments and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, any or all of the Property, as may be necessary or appropriate to the performance of Old Carco's obligations as set forth in the Agreement, without any further corporate action by Old Carco or orders of this Court.  Neither the Buyer nor the Debtors shall have any obligation to proceed with the Closing of the Agreement until all conditions precedent to their respective obligations to do so under the Agreement and this Order have been met, satisfied or waived.

6.      The sale of the Property and the consideration provided by the Buyer under the Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

7.      Effective as of the Closing, the sale of the Property by Old Carco to the Buyer shall constitute a legal, valid and effective transfer of the Property notwithstanding any requirement for approval or consent by any person and shall vest Buyer with all right, title and interest of the Debtors in and to the Property, free and clear of all Interests, pursuant to

section 363(b) and (f) of the Bankruptcy Code except for the rights of New Chrysler under the TSA.

## Transfer of Property Free and Clear

8.      Pursuant to sections 105 and 363 of the Bankruptcy Code, except for the rights of New Chrysler under the TSA, the sale of the Property shall vest Buyer with all right, title and interest of the Debtors to the Property free and clear of any and all Interests, with all such Interests and any other liabilities and claims to attach only to the proceeds of the sale (if any) with the same priority, validity, force and effect, if any, as they now have in or against the Property, subject to all claims and defenses the Debtors may possess with respect thereto. Following the Closing Date, no holder of any Interest in the Property shall interfere with the Buyer's ownership, use and enjoyment of the Property based on or related to such Interest.

9.      To the greatest extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of Old Carco with respect to the Property transferred pursuant to the Agreement, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date, provided, however, that nothing in the Agreement or this Order shall authorize the transfer of a permit or license without governmental approval where applicable nonbankruptcy law requires governmental approval of such transfer.

10.     On or before the Closing Date, all parties holding Interests of any kind are authorized and directed to execute such documents and take all other actions as may be necessary to release any Interests of any kind against the Property, as such Interests may have been recorded or may otherwise exist. If any person or entity that has filed financing statements or other documents or agreements evidencing any Interests in or against the Property shall not

have delivered to Old Carco prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction or releases of all such Interests that the person or entity has with respect to the Property, Old Carco is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Property prior to the Closing, and the Buyer is authorized to execute and file such documents after Closing, provided, however, that nothing in this paragraph shall authorize Old Carco to execute or file documents on behalf of any governmental entity, the First Lien Lenders or the First Lien Agent.

11.     The Buyer is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Buyer, its affiliates and subsidiaries shall not assume, nor be deemed to assume, nor in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any successor liability or similar liability.  Neither the purchase of the Property by the Buyer or its affiliates or subsidiaries, nor the fact that the Buyer or its affiliates or subsidiaries are using any of the Property previously operated by the Debtors, will cause the Buyer or any of its affiliates or subsidiaries to be deemed a successor in any respect to the Debtors' businesses within the meaning of any foreign, federal, state or local revenue, pension, tax, labor, employment, environmental or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations and the Employee Retirement Income Security Act), or under any products liability law or doctrine with respect to the Debtors' liability under such law or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law or doctrine, and the Buyer, its affiliates and subsidiaries shall have no liability or obligation on account of any of the foregoing.  Moreover, the Buyer shall not be deemed to:  (a) be the

successor of any of the Debtors or their estates, (b) have, *de facto* or otherwise, merged with or into any of the Debtors, (c) be a mere continuation or substantial continuation of the Debtors or the enterprise(s) of the Debtors, or (d) be liable for any acts or omissions of the Debtors in the conduct of the Debtors' businesses or arising under or related to the Property, and, to that end, the Buyers shall not be liable for any claims, written notices, causes of action, proceedings, complaints, investigations or other proceedings against the Debtors or any of their predecessors or affiliates, and the Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Property, the Debtors' businesses or any other obligations of the Debtors, including, without limitation, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Property and the Debtors' businesses.

12.    Pursuant to sections 105 and 363 of the Bankruptcy Code, but subject to the rights of New Chrysler under the TSA, all persons and entities, including, but not limited to, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, any claimant asserting a products liability claim, trade and other creditors asserting or holding an Interest of any kind or nature whatsoever against, in or with respect to any of the Debtors or the Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, the Property, the operation of the Debtors' businesses prior to the Closing Date or the transfer of the Property to the Buyer, shall be forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such

Interest or other liability against the Buyer or any of its affiliates or subsidiaries. For the avoidance of doubt, nothing in this Order shall prevent the Debtors or their successors or permitted assigns from pursuing claims, if any, against the Buyer and/or its successors and assigns under, and in accordance with the terms of, the Agreement, including, but not limited to, the Environmental Indemnity.

13.     Nothing in this Order or the Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the owner or operator of the Property after the date of entry of this Order; provided that nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.

14.     Except in respect of the rights of New Chrysler under the TSA, all persons or entities, presently or on or after the Closing Date, in possession of some or all of the Property are directed to surrender possession of the Property to the Buyer on the Closing Date or at such time thereafter as the Buyer may request.

### Additional Provisions

15.     Subject to the terms of the Agreement and the consent of the First Lien Agent, the Agreement may be modified, amended or supplemented by agreement of Old Carco and the Buyer without further action or order of the Court; provided, however, that any such modification, amendment or supplement does not materially change the terms of the Agreement or modify the express terms of this Order.

16.     The net proceeds of the sale of the Property and other amounts owing to the Debtors' estates with respect to the sale of the Property, regardless of whether such sale ultimately is consummated (including the Deposit to the extent it becomes property of the

Debtors' estates pursuant to the terms of the Agreement), shall be paid by Old Carco to the First Lien Agent consistent with the terms of the First Lien Winddown Order.

17.     The failure specifically to include any particular provisions of the Agreement or any related Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, Old Carco and the Buyer that the Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to Closing.  To the extent that any provisions of this Order conflict with the terms and conditions of the Agreement, the terms and conditions of this Order shall govern and control.

18.     This Order and the Agreement, as applicable, shall be binding upon, may be enforced against and shall govern the acts of all Persons and entities, including without limitation, the Debtors and the Buyer, their respective successors and permitted assigns, including, without limitation, any successor trustee hereinafter appointed for the Debtors' estates (including but not limited to the Liquidation Trust established pursuant to the Plan), **[New Chrysler]**, all creditors of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state and all other persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Property.  Each and every federal, state and local governmental agency, unit or department is hereby directed to accept this Order as sole and sufficient evidence of the transfer of title of the Property to the Buyer, and such agency, unit or department may rely upon this Order in consummating the transactions contemplated by the Agreement.  This Order may be recorded by the Buyer in any registry or government office.

19. As provided by Bankruptcy Rule 6004(h), this Order shall be effective immediately upon entry.

20. This Court retains jurisdiction to interpret, implement and enforce the terms and provisions of this Order, including to compel delivery of the Property, to protect the Buyer against any Interest and to enter any orders under sections 105 or 363 (or other applicable provisions) of the Bankruptcy Code necessary or appropriate to transfer the Property to the Buyer.

Dated: _____, 2010
     New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

# Exhibit E

# Scheduled Assets

## 1. Presses.

All presses, press lines and cut to length lines located at the Real Property, along with all associated equipment and feed lines (including, without limitation, all robots, destackers, washers, reoilers, bolsters, side shifters, turnovers, conveyors, uncoilers, die retrievers, shear carts, riser plates and spare parts associated with and/or used in connection with such presses and press lines), including, without limitation, the following:

| Line/No. | Description | Comments |
|---|---|---|
| 1 | Tandem Line (5 Schuler Presses) | 10 Moving Bolsters, Double Robot Destacker Washer Reoiler |
| 2 | Verson Progressive Press | 2 Moving Bolsters, Die Retriever |
| 3 | Verson Transfer Press | 2 Moving Bolsters, BT-Tri-Axis Single Destacker |
| 4 | Verson Progressive Press | 2 Moving Bolsters |
| 5 | Verson Transfer Press | 4 Moving Bolsters, Tri Axis or X-Bar Double Destacker Washer/Reoiler |
| 7 | Verson Transfer Press | 4 Moving Bolsters, Tri Axis or X-Bar Double Destacker Washer/Reoiler |
| 9 | Tandem Line (5 Schuler Presses) | 10 Moving Bolsters, 2 Side Shifters, 2 Turn Overs, Double Robot Destacker Washer Reoiler |
| 11 | Tandem Line (5 Schuler Presses) | 10 Moving Bolsters, 2 Side Shifters, 2 Turn Overs, Double Robot Destacker Washer Reoiler |
| 13 | Verson Transfer Press | 4 Moving Bolsters, Tri Axis or X-Bar Double Destacker Reoiler |
| 15 | Schuler Transfer Press | 10 Moving Bolsters, Cross Bar Double Destacker Washer/Reoiler |
| 17 | Schuler Transfer Press | 10 Moving Bolsters, Cross Bar Double Destacker Washer/Reoiler |
| 21 | Verson Transfer Press | 4 Moving Bolsters, Tri Axis Double Destacker Reoiler |
| 23 | Verson Transfer Press | 2 Moving Bolsters, Tri Axis Single Destacker |
| 24 | Muller/Weingarten Transfer Press | 2 Moving Bolsters, Tri Axis Single Destacker |
| 27 | Schuler Transfer Press | 10 Moving Bolsters, Cross Bar Double Destacker Washer/Reoiler, Atlas Riser Plates |
| A | Schuler Blanker Press | Blank Stacks, Die Retriever |
| B | Schuler Blanker Cut to Length Line | Cut to Length Line, Shear Head, Blank Stacks, Shear Cart |
| C | Schuler Blanker Press | Blank Stacks, Single Stack Turn Over, Die Retriever |
| SP 1 | Schuler 2500 Ton Tryout Press | 2 Moving Bolsters |
| SP 2 | Schuler 1500 Ton Tryout Press | 2 Moving Bolsters |
| SP 3 | Schuler 1000 Ton Tryout Press | 2 Moving Bolsters |
| SP 4 | Schuler 1000 Ton Tryout Press | 2 Moving Bolsters |
| SP 5 | Schuler 500 Ton Tryout Press | 2 Moving Bolsters |
| SP 6 | Schuler 500 Ton Tryout Press | 2 Moving Bolsters |
| SP 7 | Schuler 500 Ton Tryout Press | 1 Moving Bolster |
| SP 8 | Schuler 500 Ton Tryout Press | 1 Moving Bolster |

2. **Machine Tools**.

All dieshop and machine shop equipment and associated spare parts located at the Real Property, including, without limitation, the following:

| Name | Description | Location – Bay and Col # |
|------|-------------|--------------------------|
| Blanchard | Vertical Grinder | Bay 1 Col A5 |
| Boyar-Schultz | Profile Grinder | Bay 1 Col K5 |
| Cincinnati Bickford | 24" Drill Press | |
| Cincinnati Bickford | 21" Drill Press | |
| Carlton | Radial Arm Drill | Bay 1 Col C7 |
| Carlton | Radial Arm Drill | Bay 1 Col D7 |
| Carlton | Radial Arm Drill | Bay 1 Col D7 |
| Profile Grinder | Kindt-Collins Model | |
| Marvel Bandsaw | Series 8 Mark II | Bay 1 Col D5 |
| Marvel Bandsaw | Series 8 Mark II | Bay 1 Col D5 |
| Everett | Vertical Abrasive Cut Off Saw | Bay 1 Col I5 |
| Trinco | Sand Blaster | Bay 1 Col D5 |
| Ingersol MasterHead | CNC Planer Type Vertical Machining Center | Bay 1 Col G7 |
| Ingersol-Bohle | CNC Planer Type Vertical Machining Center | Bay 1 Col J7 |
| Ingersol | Horizontal Boring Mill | Bay 1 Col K7 |
| Ingersol | Rail Milling Machine #19370 | Bay 1 Col K7 |
| Droop-Rein | CNC Planer Type Vertical Machining Center | Bay 1 Col L7 |
| Grob Fab 18 | Die Filer | Bay 1 Col L7 |
| Carlton | Horizontal Boring Mill w/ 8' Rotary Table | Bay 1 Col B7 |
| Burn Table | Weld Burn Table | Bay 1 Col B5 |
| Master | Profile Grinder | Bay 2 Col C7 |
| Carlton | Radial Arm Drill | Bay 1 Col E7 |
| Carlton | Radial Arm Drill | Bay 2 Col D9 |
| Carlton | Radial Arm Drill | Bay 2 Col M7 |
| Carlton | Radial Arm Drill | Bay 1 Col E5 |
| Kaukauna | 4' Portable Drill | Bay 2 Col C9 |
| Face Grinder | Knee Type | Bay 2 Col C7 |
| Face Grinder | Knee Type | Bay 2 Col L7 |
| Face Grinder | Knee Type | Bay 1 Col E5 |
| Face Grinder | Knee Type | Bay 1 Col L5 |
| Clearman | Vertical Drill Press | Bay 1 Col D5 |
| Clearman | Vertical Drill Press | Bay 1 Col H5 |
| Clearman | Vertical Drill Press | Bay 1 Col J5 |
| Clearman | Vertical Drill Press | Bay 1 Col K5 |
| Clearman | Vertical Drill Press | Bay 2 Col B7 |
| Pedestal Grinder | Tool Roughing Grinder | Bay 1 Col B5 |
| Pedestal Grinder | Tool Roughing Grinder | Bay 1 Col H5 |
| Pedestal Grinder | Tool Roughing Grinder | Bay 1 Col K5 |
| Pedestal Grinder | Tool Roughing Grinder | Bay 2 Col C7 |
| Sodick | Wire EDM | Bay 2 Col A7 |
| Ingersoll | EDM | Bay 2 Col A7 |
| Ingersoll | EDM | Bay 2 Col A7 |
| DoAll | Band Saw #1 | Bay 2 Col M7 |
| Dake Johnson | Band Saw #2 | Bay 2 Col M7 |
| Dake Johnson | Band Saw #3 | Bay 2 Col M7 |

| Asset # | Manufacturer | Machine Type | Model | Specifications |
|---------|-------------|--------------|-------|----------------|
| 51000533 | Leblond | Gap Lathe | | 16" |
| 51000538 | Sidney | Engine Lathe | | |
| 51000531 | American Pacemaker | Engine Lathe | | |
| 000275492 | American Pacemaker | Engine Lathe | | |
| 51000534 | American Pacemaker | Engine Lathe | | |
| 51000564 | Hammond | Double End Pedestal Grinder | | |
| 000285742 | Marvel | Vertical Band Saw | Series 8 Mark II | |
| | Kalamazoo | Single Wheel Pedestal Grinder | | |
| AAA107483 | Davis | Keyseater | | |
| 13713006 | Cincinnati | Shaper | | 24" |
| 51000524 | Cincinnati | Shaper | | 24" |
| | Cincinnati | CNC Lathe | TC-250 Hawk | |
| AAA064606 | Cincinnati Milicron | CNC Lathe | Falcon 400 | |
| | Cincinnati | CNC Vertical Machining Center | 2000 Lancer | |
| | Lucas | Horizontal Boring Mill | | 4" |
| | Cincinnati Milicron | CNC Vertical Machining Center | Sabre 1500 | |
| | Cincinnati Milicron | CNC Vertical Machining Center | Sabre 750 | |
| | Mattison | Surface Grinder | | 24" x 48" |
| | Gallmeyer & Livingston | Surface Grinder | | 18" x 48" |
| | Cincinnati | Vertical Milling Machine | No. 4 | |
| | Milwaukie | Vertical Milling Machine | Model K | |
| | Bridgeport | Vertical Milling Machine w/ Read-out | Series II | |
| | Bridgeport | Vertical Milling Machine w/ Read-out | EZTrack | |
| | Cincinnati | Vertical Mill | Cinel 202-12 | |
| | K&T Milwaukie | Vertical Mill | No. 2 | |
| | Landis | Cylindrical Grinder | | 14" - 6' |
| | Brown & Sharpe | Universal Grinder | | |
| | Brown & Sharpe | Surface Grinder | 824 Micromaster | 8" x 24" |
| | Brown & Sharpe | Surface Grinder | 1030 Micromaster | 10" x 30" |
| | Brown & Sharpe | Surface Grinder | | 8" x 24" |
| 90013292 | Sellers | Drill Point Sharpener | | |
| 000276562 | Cincinnati Milicron | Tool & Cutter Grinder | No. 2 | |
| 51000595 | Cincinnati Milicron | Tool & Cutter Grinder | No. 2 | |
| 51000597 | Ingersoll | Tool Grinder | | |
| 51016949 | Ingersoll | Tool Grinder | | |
| 24000191 | Cincinnati | Tool & Cutter Grinder | | |
| 10020324 | Gallmeyer & Livingston | Surface Grinder | No. 25 | 6" x 18" |
| 51000905 | Hammond | Double End Pedestal Grinder | | |
| 51012495 | Cincinnati | Tool & Cutter Grinder | | |
| 51000328 | Pratt & Whitney | Tool & Cutter Grinder | | |
| 000285832 | K.O. Lee | Tool & Cutter Grinder | | |
| | Ex-cello | Double End Pedestal Grinder | | |
| 000285944 | Baldor | Tool & Cutter Grinder | | |
| | Enerpac | Arbor Press | | 200 Ton |
| | Miller | Welder | 60 Series CP 300 | |
| | Miller | Welder | Syncro Wave 250 | |

| Asset # | Manufacturer | Machine Type | Model | Specifications |
|---|---|---|---|---|
| | Lincoln | Welder | Idealarc R3R 400 | |
| | South Bend | Bench Lathe | | 10" x 36" |
| 51000583 | Grob | Vertical Band Saw | | |
| | Trinco | Glass Bead Blaster | | |
| | Carlton | Radial Arm Drill | | 6' x 19" |
| | American Pacemaker | Engine Lathe | | 14" x 30" |
| 000277309 | Gorton | Horizontal Milling Machine | | |
| 51010304 | Baldor | Double End Pedestal Grinder | | |
| 51000558 | DoAll | Vertical Band Saw | | 26" |
| | Baldor | Vertical Sander | | |
| | Marvel | Vertical Band Saw | Series 8 Mark II | |
| | K.O. Lee | Horizontal Surface Grinder | | 6" x 18" |
| | K.O. Lee | Horizontal Surface Grinder | | 6" x 18" |
| | Marvel | Vertical Band Saw | Series 8 Mark II | |
| | Cincinnati Bickford | Drill Press | | 24" |
| 51000539 | Cleerman | Drill Press | | |
| AAA185171 | Bridgeport | Vertical Mill w/ Read-out | | |
| 000258755 | Bridgeport | Vertical Mill w/ Read-out | | |
| 000258754 | South Bend | Vertical Milling Machine w/ Read-out | Chipmaster II | |
| AAA082452 | Bridgeport | CNC Vertical Machining Center | VMC 3020 | |
| 000277310 | Rock | Arbor Press | | |
| | Hammond | Double End Pedestal Grinder | | |
| | Kalamazoo | Vertical Belt Sander | | |
| | Cincinnati Bickford | Drill Press | | 24" |
| 000285808 | Dake Johnson | Vertical Band Saw | VH-40 | |
| 24002933 | DoAll | Vertical Band Saw | | |

3. **Facility Equipment and Systems**.

All facilities equipment and systems and associated spare parts located at the Real Property (including, without limitation, all bridge cranes, all rail car pullers, all scrap conveyor systems, all pressroom process water equipment (including, without limitation, chillers), all air compressors, all powerhouse systems (including, without limitation, pumps, boilers and package boilers), and all CMM measuring equipment) including, without limitation, the following:

| Equipment Type | Manufacturer | No. | Plant Location | Description | Comment |
|---|---|---|---|---|---|
| Bridge Crane | Whiting | | Bay 1 East | 50/10 T | Remote Controller |
| Bridge Crane | Whiting | | Bay 1 West | 30/10 T | |
| Bridge Crane | Whiting | | Bay 2 East | 75/30 T | Remote |
| Bridge Crane | Whiting | | Bay 2 West | 60/30 T | Remote |
| Bridge Crane | P&H | | 1 Line | 75/20 T | Remote |
| Bridge Crane | Whiting | | 3 Line East | 50/20 T | Remote |
| Bridge Crane | Whiting | | 3 Line West | 30/10 T | |
| Bridge Crane | Whiting | | 5 Line East | 75/30 T | Remote |

| Equipment Type | Manufacturer | No. | Plant Location | Description | Comment |
|---|---|---|---|---|---|
| Bridge Crane | Whiting | | 5 Line West | 30/10 T | |
| Bridge Crane | Whiting | | 7 Line | 75/30 T | Remote |
| Bridge Crane | Whiting | | 9 Line East | 75/30 T | Remote |
| Bridge Crane | Whiting | | 9 Line West | 30/10 T | |
| Bridge Crane | P&H | | 11 Line East | 75/20 T | Remote |
| Bridge Crane | Whiting | | 11 Line West | 50/10 T | |
| Bridge Crane | Whiting | | 13 Line East | 50/20 T | Remote |
| Bridge Crane | Whiting | | 13 Line West | 30/10 T | |
| Bridge Crane | Whiting | | 15 Line | 75/30 T | Remote |
| Bridge Crane | P&H | | 17 Line East | 75/20 T | Remote |
| Bridge Crane | Whiting | | 17 Line West | 60/30 T | Remote |
| Bridge Crane | Whiting | | 19 Line East | 75/30 T | Remote |
| Bridge Crane | Whiting | | 19 Line West | 60/30 T | Remote |
| Bridge Crane | Whiting | | 21 Line | 50/10 T | Remote |
| Bridge Crane | Whiting | | 23 Line east | 30/10 T | |
| Bridge Crane | Whiting | | 23 Line West (24 Line) | 50/10 T | Remote |
| Bridge Crane | Whiting | | 25 Line East | 50/10 T | |
| Bridge Crane | Whiting | | 25 Line West | 50/10 T | Remote |
| Bridge Crane | P&H | | 27 Line | 75/20 T | Remote |
| Bridge Crane | Whiting | | North Steel Bay (STL-1) | 75/30 T | Remote |
| Bridge Crane | Whiting | | Middle Steel Bay (STL-2) | 40 T | Remote |
| Bridge Crane | Whiting | | South Steel Bay (STL-3) | 75/30 T | Remote |
| Bridge Crane | Nortern | | Maint Shop | 50 T | |
| Baler House Equipment | | | | Rail Car Puller | Drive/Cable |
| Scrap Conveyor System | Mayfran | | Main | 54' Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | Baler crossover | 48' Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | North Blanker | 48" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | South Blanker | 48" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | Blanker Crossover | 48" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 01 Feeder | 48" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 03 North Feeder | 24" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 03 South Feeder | 24" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 05 Feeder | 24" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 07 Feeder | 24" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 09 Feeder | 48" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 11 Feeder | 48" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 13 North Feeder | 24" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 13 South Feeder | 24" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 15 Feeder | 48" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 17 Feeder | 48" Wide Steel Belt | |

| Equipment Type | Manufacturer | No. | Plant Location | Description | Comment |
|---|---|---|---|---|---|
| Scrap Conveyor System | Mayfran | | 21 North Feeder | 24" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 21 South Feeder | 24" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 23 North Feeder | 24" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 23 South Feeder | 24" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 24 Feeder | 48" Wide Steel Belt | |
| Scrap Conveyor System | Mayfran | | 27 Feeder | 48" Wide Steel Belt | |
| Basement Circulation Pump | | 1 | | | |
| Basement Circulation Pump | | 2 | | | |
| Basement Circulation Pump | | 3 | | | |
| Basement Circulation Pump | | 4 | | | |
| Basement Circulation Pump | | 5 | | | |
| Basement Circulation Pump | | 6 | | | |
| Roof Top Chiller | Trane | A | South | | |
| Roof Top Chiller | Trane | B | South | | |
| Roof Top Chiller | Trane | A | North | | |
| Roof Top Chiller | Trane | B | North | | |
| Basement High Pressure Compressors | Quincey | | Bay 2 | Screw Compressor - QSI-245, 300 PSIG | |
| Basement High Pressure Compressors | Hankison | | Bay 2 | Dryer PR200 | |
| Basement High Pressure Compressors | Quincey | | 15 Line | Screw Compressor - QSI-245, 300 PSIG | |
| Basement High Pressure Compressors | Hankison | | 15 Line | Dryer PR200 | |
| Basement High Pressure Compressors | Quincey | | 17 Line | Screw Compressor - QSI-245, 300 PSIG | |
| Basement High Pressure Compressors | Ultra | | 17 Line | Air Dryer UA 200WC | |
| Basement High Pressure Compressors | Bauer | | 24 Line - East | Screw Compressor - KWB10N-E3, 377 PSIG, 30.0CFM | |
| Basement High Pressure Compressors | Bauer | | 24 Line - Middle | Screw Compressor - KWB10N-E3, 377 PSIG, 30.0CFM | |
| Basement High Pressure Compressors | Bauer | | 24 Line - West | Screw Compressor - KWB10N-E3, 377 PSIG, 30.0CFM | |
| Basement High Pressure Compressors | Quincey | | 27 Line | Screw Compressor - QSI-245, 300 PSIG | |
| Basement High Pressure Compressors | Hankison | | 27 Line | Dryer HPRPA200WC | |
| Power House Air Compressor | Chicago | 1 | | 5000 CFM | |
| Power House Air Compressor | Chicago | 2 | | 5000 CFM | |
| Power House Air Compressor | Chicago | 3 | | 5000 CFM | |

| Equipment Type | Manufacturer | No. | Plant Location | Description | Comment |
|---|---|---|---|---|---|
| Power House Air Compressor | Chicago | 4 | | 5000 CFM | |
| Power House Air Compressor | Chicago | 5 | | 7500 CFM | |
| Power House Air Compressor | Ingersoll | 6 | | 8200 CFM | |
| Power House Air Compressor | | | | Compressed Air Dryer system | |
| Power House Air Compressor | | | | Compressed Cooling Water Tower | |
| Power House System Equipment | Abcor | | | Waste Water Treatment | |
| Power House System Equipment | | | | Diesel Fire Pump | |
| Power House System Equipment | | | | Electric Fire Pump | |
| Power House System Equipment | | | | Jockey Fire Pump | |
| Power House System Equipment | Union Iron Works | 1 | | Steam Boiler | |
| Power House System Equipment | Union Iron Works | 2 | | Steam Boiler | |
| Power House System Equipment | Union Iron Works | 3 | | Steam Boiler | |
| Power House System Equipment | Bryan Boiler Package | 4 | | Steam Boiler | |
| Power House System Equipment | Bryan Boiler Package | 5 | | Steam Boiler | |
| Power House System Equipment | Bryan Boiler Package | 6 | | Steam Boiler | |
| Power House System Equipment | Bryan Boiler Package | 7 | | Steam Boiler | |
| Power House System Equipment | | | | City Water Pumps (2) | |
| CMM Measuring Equipment | Brown & Sharp | | | Single Arm Horizontal Arm | |
| CMM Measuring Equipment | Brown & Sharp | | | Dual Arm Horizontal Arm | |
| CMM Measuring Equipment | DEA | | | 2206 Horizontal Arm | |
| CMM Measuring Equipment | DEA | | | 4308 Horizontal Arm | |
| CMM Room Facilities Equipment | Keaser | 1 | South | Air compressor | |
| CMM Room Facilities Equipment | Keaser | | South | Air Dryer | |
| CMM Room Facilities Equipment | Keaser | 2 | North | Air Compressor | |
| CMM Room Facilities Equipment | Keaser | | North | Air Dryer | |
| CMM Room Facilities Equipment | Speedaire | | Shop Air | Compressor | |

| Equipment Type | Manufacturer | No. | Plant Location | Description | Comment |
|---|---|---|---|---|---|
| CMM Room Facilities Equipment | | East Pltf | South CMM Bldg | A/C | |
| CMM Room Facilities Equipment | | West Pltf | North CMM Bldg | A/C | |
| Jitney Repair Facility Equipment | | | | SGV Computer Control System | |
| Jitney Repair Facility Equipment | MTC | 1 | North | Battery Changer | |
| Jitney Repair Facility Equipment | MTC | 2 | South | Battery Changer | |
| Jitney Repair Facility Equipment | Coffing Spanmaster | | Battery Room | 3 T Crane | |
| Jitney Repair Facility Equipment | Wright | 56 | Garage | 10 T Crane | |
| Jitney Repair Facility Equipment | Mohawk | | Garage | 6 T Lift | |
| Jitney Repair Facility Equipment | Challenger Lifts | | | 7.5 T SGV Lift | |
| Jitney Repair Facility Equipment | Sefac Lift | | | 25 T Grease rack Lift | |

4. **Miscellaneous Equipment**.

All granite surface plates, steel surface plates, grinding wheels, milling cutters, end mills, magnetic chucks, non-employee owned tool cabinets, parts cabinets, crane chains, crane cables, crane hooks, shackles, crane scales, steel workbenches, and "in plant" parts racks.

5. **Office Furniture**.

All office furniture and office equipment located at the Real Property.

Exhibit F

TSA and Amendments


[Copies of the TSA and Amendments Have
Previously Been Filed with the Court and Are Not Included With This Motion]

Exhibit G

Title Affidavit

OWNER'S AFFIDAVIT

STATE OF _____          :
                                :ss
COUNTY OF _____            :

PROPERTY:  See Exhibit A attached hereto

COMMITMENT NO: _____
(the "Commitment")

ON THIS _____ day of _____, 2010, before me personally appeared the undersigned, _____, _____ of OLD CARCO LLC (f/k/a Chrysler LLC), a Delaware limited liability company ("Owner"), who being duly sworn according to law and intending to be legally bound, deposes and says:

1.       That the undersigned Authorized Person of the Owner is authorized to execute this affidavit and has the ability to execute all instruments necessary to convey the Property pursuant to the Limited Liability Company Agreement.

2.       That the conveyance of the Property has been duly authorized by the Owner.

3.       That, to the actual knowledge of the undersigned and except as shown in the Commitment, there are no unrecorded leases or occupancy agreements affecting the Property, or other parties in possession.

4.       That there has not been any construction, repairs, alterations or improvements made, ordered or contracted to be made by the Owner on or to the Property, nor materials ordered by the Owner therefore within the last one-hundred eighty (180) days which has not been paid for; nor are there any fixtures ordered or installed by the Owner and attached to the Property which have not been paid for in full; and that there are no outstanding or disputed claims for any such work or item.

In addition, the Owner has requested that First American Title Insurance Company (the "Title Company") issue a policy of title insurance without exception for matters arising after the effective date of the Commitment but prior to the time the proposed insured acquires record title to the Property (the "Gap Exception"). In order to permit the Title Company to so issue its policy, the Owner does hereby agree to indemnify and hold the Title Company harmless from and against all loss, cost, damage and expense of every kind arising during the Gap Exception period as a direct result of an act of the undersigned, including reasonable

attorneys' fees and costs, which Title Company shall sustain or become liable for under its policy on account of the omission or deletion of the Gap Exception; provided that this indemnity shall cover only objectionable liens, encumbrances or other matters validly filed against the Property after the effective date of the Commitment and before the earlier of (i) the filing of the deed conveying the Property as delivered to the Title Company or (ii) twenty (20) days following release of such instrument to the Title Company by the Owner for delivery to the buyer.

THIS AFFIDAVIT is made for the purpose of aiding the Title Company in determining the marketability and/or insurability of title to the property, and to induce said Title Company to issue its policies of title insurance, and the affiant avers the foregoing statements are true and correct to the best of its knowledge and belief.

OLD CARCO LLC,

By:_____

    Name:

    Title:

STATE OF _____ :

                                      :ss.

COUNTY OF _____ :

This Instrument was acknowledged before me on _____, 2010, by _____ _____, _____ of Old Carco LLC, a Delaware limited liability company, party to this Instrument of Writing.

_____

Notary Public

Name typed:

My commission expires:

Exhibit H

Deed

## QUITCLAIM DEED

The Grantor, OLD CARCO LLC (f/k/a Chrysler LLC), a Delaware limited liability company, grants to the Grantee, TWINSBURG INDUSTRIAL PARK LLC, a Delaware limited liability company, whose tax mailing address is [6200 Riverside Drive, Cleveland, Ohio 44135], all right, title, interest, claim and demand in the real property located in the County of Summit, State of Ohio ("Premises") and described on **Exhibit A**, which is attached hereto and incorporated herein by reference.

Prior instrument references _____.

Permanent Parcel No. _____.:

**TOGETHER** with the appurtenances and all the estate and rights of the Grantor in and to said Premises;

for the sum of Ten and 00/100 Dollars ($10.00) and other valuable consideration, the receipt of which is hereby acknowledged.

Grantee acknowledges that this conveyance is made subject to (i) all applicable zoning ordinances and regulations; (ii) all real estate taxes and assessments and (iii) all easements, restrictions, covenants, reservations, conditions and other matters of record.

This Quitclaim Deed is being granted and filed in connection with Case No. 09-50002 (AJG) (the "Bankruptcy Proceeding") and pursuant to an Order issued by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") pursuant to Sections 105 and 363 of the Bankruptcy Code, approving the [Order Authorizing Debtors to Sell

_____ Free and Clear of all Liens, Claims and Encumbrances and Granting Related Relief] (the "Sale Order") such that the conveyance of the Premises shall be free and clear of all Interests to the extent defined and provided for in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code.

1.     BY GRANTEE'S ACCEPTANCE OF THIS DEED (EVIDENCED BY THE RECORDING HEREOF BY THE GRANTEE), GRANTEE EXPRESSLY AGREES TO ACCEPT THE PREMISES "AS IS" AND "WHERE IS" AND GRANTOR SHALL, UNDER NO CIRCUMSTANCES, BE DEEMED TO HAVE MADE, AND GRANTOR HEREBY DISCLAIMS, EXCEPT AS SET FORTH IN SECTION 14 OF THAT CERTAIN AGREEMENT OF PURCHASE AND SALE DATED FEBRUARY ___, 2010 BETWEEN GRANTOR AND GRANTEE, ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE CONDITION OF THE PREMISES, ANY ENVIRONMENTAL CONDITION OF THE PREMISES (INCLUDING, WITHOUT LIMITATION, THE PRESENCE OF ANY POLLUTANT OR CONTAMINANT, INCLUDING ANY HAZARDOUS SUBSTANCE IN, ON OR UNDER THE PREMISES), AND THE ADEQUACY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PREMISES OR ANY PART THEREOF.  GRANTEE AGREES TO RELEASE GRANTOR, THE DEBTORS, THE FIRST LIEN LENDERS, THE FIRST LIEN AGENT (AS EACH IS DEFINED IN THE SALE ORDER), AND ANY SUBSIDIARY OR AFFILIATE OF GRANTOR, DEBTOR, THE FIRST LIEN LENDERS OR THE FIRST LIEN AGENT, FROM ANY AND ALL CLAIMS OF GRANTEE OR ANY SUCCESSORS OF GRANTEE AGAINST GRANTOR, THE DEBTORS, THE FIRST LIEN LENDERS, THE FIRST LIEN AGENT AND ANY SUBSIDIARY OR AFFILIATE OF GRANTOR, THE DEBTORS, THE FIRST LIEN LENDERS OR THE FIRST LIEN AGENT, ARISING ON OR AFTER THE CLOSING CONCERNING THE ENVIRONMENTAL CONDITION OF THE PROPERTY, AND COVENANTS NOT TO SUE GRANTOR, THE DEBTORS, THE FIRST LIEN LENDERS, THE FIRST LIEN AGENT, AND ANY SUBSIDIARY OR AFFILIATE OF GRANTOR, THE DEBTORS, THE FIRST LIEN LENDERS OR THE FIRST LIEN AGENT, OR ANY OF THEIR RESPECTIVE EMPLOYEES, DIRECTORS OR OFFICERS OR JOIN GRANTOR, THE DEBTORS, THE FIRST LIEN LENDERS OR THE FIRST LIEN AGENT, AND ANY SUBSIDIARY OR AFFILIATE OF GRANTOR, THE DEBTORS, THE FIRST LIEN LENDERS OR THE FIRST LIEN AGENT, OR ANY OF THEIR RESPECTIVE EMPLOYEES, DIRECTORS, OFFICERS, OR AGENTS, IN ANY ACTION CONCERNING THE ENVIRONMENTAL CONDITION OF THE PROPERTY.  THE PARTIES AGREE THAT THE FOREGOING RELEASE AND COVENANT SHALL RUN WITH THE PREMISES AND BIND SUBSEQUENT GRANTEES THEREOF.

2.     PARAGRAPH 1 SHALL NOT BE REQUIRED TO BE INCLUDED IN ANY DEED, CONVEYING ALL OR A PORTION OF THE PROPERTY, WHICH IS RECORDED AFTER THE LATER OF (A) [_____, 2015], OR (B) THE DATE ON WHICH THE BANKRUPTCY COURT ENTERS AN ORDER CLOSING THE BANKRUPTCY PROCEEDING.

[SIGNATURE PAGES FOLLOW]

Dated: _____, 2010

GRANTOR:

OLD CARCO LLC (f/k/a Chrysler
LLC), a Delaware limited liability
company

By: _____
Name:  Ronald E. Kolka
Its:     Chief Executive Officer


STATE OF _____          )
                                                        )ss:
COUNTY OF _____       )

    Before me, a Notary Public in and for said County and State, personally appeared Ronald E. Kolka, the Chief Executive Officer of Old Carco LLC, a Delaware limited liability company, who acknowledged that as such Chief Executive Officer did sign the foregoing instrument on behalf of Old Carco LLC being duly authorized and that the same is his free act and deed individually and in such representative capacity and the free act and deed of Old Carco LLC.

    IN WITNESS WHEREOF, I have hereunto set my hand and official seal, at _____, this _____ day of _____, 2010.


_____
Notary Public
My Commission Expires: _____

[NOTARY SEAL]


Prepared by:
Stephanie Quaranta, Esq.
Jones Day
901 Lakeside Ave.
Cleveland, Ohio 44114-1190

Exhibit I

Bill of Sale

**THIS BILL OF SALE** is made as of the _____ day of _____, 2010 (the "Effective Date") by the undersigned, OLD CARCO LLC, a Delaware limited liability company ("Grantor"), to and for the benefit TWINSBURG INDUSTRIAL PARK LLC, a Delaware limited liability company ("Grantee").

**WHEREAS** Grantor and Grantee are parties to that certain Agreement of Purchase and Sale dated February ___, 2010 (the "Agreement") pertaining to the sale of approximately 195 acres of land located at 2000 East Aurora Road, Twinsburg, Ohio 44087 (the "Property"). Capitalized terms used herein but not otherwise defined shall have the meaning set forth in the Agreement.

**WHEREAS** as part of the transaction contemplated by the Agreement, Grantor is to give, grant, convey, assign, transfer, sell, release and deliver to Grantee, by bill of sale (A) all right, title and interest in and to the tangible personal property described on Exhibit A attached hereto (the "Scheduled Assets"), (B) all of Grantor's right, title and interest, if any, in and to all of the other personalty, trade fixtures and equipment, other than the personalty, trade fixtures and equipment owned by Chrysler Group LLC and identified on Exhibit B attached hereto, located and/or used at the Property, including without limitation, any equipment or parts which are out for repair, if any (collectively, the "Other Equipment"), (C) all of Grantor's right, title and interest, if any, in and to all manuals, maintenance records, as-built and other drawings, and other similar documents and materials (whether in electronic or written form), in Seller's possession or under Seller's control (if any), relating to the Property, the Scheduled Assets and the Other Equipment and, to the extent transferable, any and all (a) warranties and guaranties relating to any of the Property, the Scheduled Assets and the Other Equipment and any and all rights and remedies of Seller, if any, with respect thereto, and (b) governmental permits, approvals, licenses and consents (collectively, the "Intangible Property").

**NOW, THEREFORE,** pursuant to the Agreement, and for good and valuable consideration, the receipt and sufficiency of which is acknowledged by Grantee by its acceptance of this Bill of Sale, Grantor hereby GIVES, GRANTS, CONVEYS, ASSIGNS, TRANSFERS, SELLS, RELEASES and DELIVERS unto Grantee, its successors and assigns, forever, (i) subject to the terms of the Letter Agreement, all right, title, and interest in and to the Scheduled Assets free and clear of all Liens and any other interests to the extent provided in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code and (ii) subject to the terms of the Letter Agreement, all of Grantor's right, title, and interest, if any, in and to the Other Equipment and Intangible Property free and clear of all Liens and any other interests to the extent provided in the Sale Order pursuant to Section 363(b) and Section 363(f) of the Bankruptcy Code.

**TO HAVE AND TO HOLD** the Scheduled Assets, Other Equipment and Intangible Property unto Grantee, its successors and assigns, forever without warranty or representation, including without limitation, without the warranty of merchantability and/or fitness for a particular purpose. Except as set forth in this Bill of Sale, this Bill of Sale is made without recourse and without representation or warranty whatsoever, the Scheduled Assets, the Other Equipment and Intangible Property being conveyed "AS-IS". This Bill of Sale may be executed in multiple counterparts which, when integrated, shall constitute one (1) original of this Bill of Sale.

**[Signature Page Follows]**

IN WITNESS WHEREOF, Grantor and Grantee have caused this Bill of Sale to be executed by its duly authorized officer and effective as of the Effective Date.

**GRANTOR**

OLD CARCO LLC,

By:_____
Name:  Ronald E. Kolka
Title:    Chief Executive Officer

**GRANTEE**

TWINSBURG INDUSTRIAL PARK LLC

By:_____
Name:
Title:

# **EXHIBIT B**

**[Declaration of Peter Chadwick]**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
                                    :
In re                               :   Chapter 11
                                    :
Old Carco LLC                       :   Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), et al.,       :
                                    :   (Jointly Administered)
                    Debtors.        :
                                    :
------------------------------------------------------------x
```

**DECLARATION OF PETER C. CHADWICK IN SUPPORT OF
MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR
(I) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE
SALE OF TWINSBURG, OHIO STAMPING PLANT, (B) APPROVING
CERTAIN BIDDER PROTECTIONS AND (C) SCHEDULING A
FINAL SALE HEARING AND APPROVING THE FORM
AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER
AUTHORIZING THE SALE OF TWINSBURG, OHIO STAMPING PLANT
<u>FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES</u>**

I, Peter C. Chadwick, make this declaration pursuant to 28 U.S.C. § 1746 and state as follows:

1.     I am an Executive Director with Capstone Advisory Group, LLC ("Capstone"), financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors").  I submit this Declaration in support of the Motion of Debtors and Debtors in Possession for (I) an Order (A) Approving Bidding Procedures for the Sale of Twinsburg, Ohio Stamping Plant, (B) Approving Certain Bidder Protections and (C) Scheduling a Final Sale Hearing and Approving the Form and Manner of Notice Thereof; and (II) an Order Authorizing the Sale of Twinsburg, Ohio Stamping Plant Free and Clear of Liens, Claims, Interests and Encumbrances (the "Motion").[1]

2.     Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, information supplied to me by other Capstone professionals or other professionals retained by Chrysler, my review of relevant documents or my opinion based upon my experience.  If I were called upon to testify, I could and would testify to each of the facts set forth herein.

3.     In my position at Capstone, my responsibilities include advising the Debtors with respect to the sale and disposition of the Debtors' various assets, including the Property.  In connection with these responsibilities, I am familiar with the Property, the Debtors' decision to sell the Property and the Debtors' marketing program for the Property.

4.     The Property consists of:  (a) the Real Property; (b) the Intangible Property; and (c) the Equipment.  The Property was pledged as collateral to secure the Debtors' obligations under the First Lien Credit Agreement.  To the best of my knowledge, prior to the

---

[1]     Capitalized terms not otherwise defined herein have the meaning given to them in the Motion.

transactions contemplated under the Purchase Agreement, the Property, including, without limitation, the Scheduled Assets, is the property of the Debtors' estates, title thereto is vested in the Debtors' estates and Old Carco is the sole and lawful owner thereof, holding all right, title and interest therein. Pursuant to the TSA, New Chrysler (a) is entitled to use the Property through the end of the License Period on July 31, 2010 and (b) since the Closing Date (as such term is defined in the TSA), has been conducting, and currently conducts, operations at the Property. Pursuant to the TSA, New Chrysler does not pay rent for use of the Property, but is responsible for (a) all carrying costs during the License Period and (b) the phase out and deactivation of the premises at the conclusion of the License Period. The carrying costs associated with the Property are substantial and are estimated on an annual basis to be approximately $2.4 million. New Chrysler's obligation to pay these costs terminates at the expiration of the License Period on July 31, 2010. As a result, the Debtors may be forced to bear the entirety of these carrying costs in the next six months.

5.     Because the DIP Lenders, whose liens on the Property are junior to the liens supporting the loans under the First Lien Credit Agreement, are unwilling to fund the Debtors' efforts to liquidate the First Lien Lenders' collateral, these costs instead are being funded from the Reserve established from the First Lien Lenders' cash collateral pursuant to the First Lien Winddown Order. Throughout their negotiations with the Buyer, the Debtors have been in ongoing discussions with the First Lien Agent regarding both the Buyer's proposal for, and other expressions of interest in, the Property. The First Lien Agent has: (a) designated the Property as an "Estate Asset" (as such term is defined in the First Lien Winddown Order); (b) indicated to the Debtors that the First Lien Lenders have consented to the sale of the Property pursuant to the terms of the Purchase Agreement; and (c) indicated to the Debtors that the First

Lien Lenders (as the primary economic parties in interest) agreed that the sale of the Property ultimately be effected pursuant to the bidding procedures and auction process proposed in the Motion.

6.     The marketing process for the Property began around the time of the Fiat Transaction, with the Debtors receiving numerous indications of interest from various parties with respect to a potential purchase of the Property.  In response to their solicitations of interest, the Debtors executed 31 non-disclosure agreements with interested parties and, as of October 16, 2009, had received seven letters of intent offering to purchase the Property.

7.     Throughout the marketing process, the Debtors have consulted with the First Lien Agent, in its capacity as agent for the First Lien Lenders, whose liens completely encumber the Property on a first priority basis (subject to certain permitted liens).  Given the level of interest in the Property, the Debtors determined in consultation with the First Lien Agent that the engagement of real estate brokers to market the Property was unnecessary.  During the period from October 2009 through January 2010, the Debtors received offers from multiple purchasers.  These offers contained proposals for steadily increasing cash consideration.

8.     On January 29, 2010, a Non-Binding Letter of Intent/Offer was submitted on behalf of the Buyer to the Debtors, pursuant to which offer the Buyer:  (a) offered cash consideration of $27,500,000, i.e., consideration well in excess of any previously received offer; (b) offered to serve as the stalking horse bidder for the Property in connection with a Court-approved auction process; and (c) sought certain bidding protections.  The written offer submitted by the Buyer formed the basis for subsequent discussions that led to the Purchase Agreement.  After further negotiations between the Buyer and the Debtors, in consultation with the First Lien Agent, the Debtors:  (a) determined that the Stalking Horse Bid was the most

attractive offer for the Property; (b) accepted the Stalking Horse Bid; (c) executed the Purchase

Agreement; and (d) filed the Motion to obtain approval of and implement the Bidding

Procedures, pursuant to which the Debtors will attempt to maximize the value of the Property for

their chapter 11 estates and stakeholders through an Auction with any qualifying competing

bidders.

9.      The Debtors believe that the terms and conditions of the Purchase

Agreement are favorable to their estates and represent what is currently the highest and best offer

for the Property under the circumstances (subject to market testing at Auction) for the following

primary reasons.  First, the Buyer has committed funding for the transaction and is willing to

close on an expedited basis.  Second, the timely consummation of the transactions under the

Purchase Agreement will allow the Debtors to avoid incurring the substantial carrying costs

associated with the Property, while bringing in significant cash that (after payment of closing

costs and satisfaction of certain interests) can be used to reduce the claims of the First Lien

Lenders under the First Lien Credit Agreement consistent with the First Lien Winddown Order.

Third, pursuant to the Purchase Agreement, the Buyer is acquiring the Property on an "as is,

where is" basis and has agreed to indemnify Old Carco from and against any claim, action,

matter or obligation that may arise in the future regarding any environmental condition of the

Property caused solely by Purchaser's activities on and/or operation of the Property.  Fourth,

while (a) other parties have continued to express interest in the Property and (b) the Debtors

propose to seek higher and better offers for the Property pursuant to the Bidding Procedures, no

party has yet come forward with a higher and better offer.

10.      The Debtors believe that a sound business justification underlies their

decision to sell the Property where the proposed sale will allow the Debtors to:  (a) continue to

implement the winddown of the Debtors' estates (as described in the DIP Lender Winddown Order, the First Lien Winddown Order and the Plan); (b) monetize the Property for the benefit of their estates and their creditors, including the First Lien Lenders (who are the primary economic parties in interest with respect to the Property); and (c) avoid incurring any carrying costs associated with the Property upon the expiration of the License Period. Moreover, given (a) the thorough marketing of the Property (as described herein and in the Motion), (b) the significant cash Purchase Price and Deposit being offered by the Buyer (which price must be exceeded by any Qualified Bidder under the Bidding Procedures by at least $750,000), (c) the Buyer's willingness to promptly consummate the sale on an "as is, where is" basis and serve as the stalking horse bidder at the Auction and (d) the market testing of the Property at Auction proposed in the Motion, the Debtors believe that their sale of the Property will maximize value for their chapter 11 estates.

11.     As of the date hereof, the Debtors have received no definitive offer to purchase the Property that promises greater economic value to their bankruptcy estates than that embodied in the Purchase Agreement (which economic value will be market tested by a fair and open Auction, as described in the Motion). Thus, the Purchase Agreement (or any Marked Agreement submitted by a Successful Bidder) constitutes (or will constitute) the highest and best offer for the Property, and will provide a greater recovery for the Debtors' estates than would be provided by any available alternative. Accordingly, the Debtors believe that their entry into the Purchase Agreement (or a Marked Agreement, as the case may be) represents a sound exercise of their reasonable business judgment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  February 13, 2010

　　　　　　　　　　　　　　　　　s/ Peter C. Chadwick
　　　　　　　　　　　　　　　　Peter C. Chadwick
　　　　　　　　　　　　　　　　Executive Director
　　　　　　　　　　　　　　　　Capstone Advisory Group, LLC

# EXHIBIT C

## [Form of Bidding Procedures Order]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                                 :
In re                                            :    Chapter 11
                                                 :
Old Carco LLC                                    :    Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), et al.,                    :
                                                 :    (Jointly Administered)
                          Debtors.               :
                                                 :
-------------------------------------------------------------x
```

## ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE TWINSBURG, OHIO STAMPING PLANT, (II) APPROVING CERTAIN BIDDER PROTECTIONS AND (III) SCHEDULING A FINAL SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF

This matter coming before the Court on the motion (Docket No. **[____]**)

(the "Motion") of the above-captioned debtors and debtors in possession (collectively,

the "Debtors") seeking, pursuant to sections 105 and 363 of the Bankruptcy Code, 11 U.S.C.

§§ 101-1532 (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local

Bankruptcy Rules"), entry of (i) an order (a) scheduling a hearing (the "Sale Hearing") to

consider approving the sale of the Debtors' Twinsburg, Ohio stamping plant and certain related

personal property (collectively, the "Property"), (b) authorizing and approving the procedures

that are attached hereto as Exhibit A (the "Bidding Procedures") for the marketing and sale of the

Property, including, but not limited to, the conduct of an auction (the "Auction") and the

allowance of certain stalking-horse bidder protections, and (c) authorizing and approving the

form and manner of the Debtors' proposed notice of the Auction and the Sale Hearing; and (ii) an

order authorizing and approving the sale of the Property (the "Sale Transaction") to the

Successful Bidder in accordance with the Successful Bid (as such terms are defined in the Bidding Procedures) (the "Sale Order"); the Court having reviewed the Motion and conducted a hearing to consider the relief requested therein (the "Hearing"); and the Court having considered the statements of counsel and the evidence presented at the Hearing;

IT IS HEREBY FOUND AND DETERMINED THAT:

A.       The Debtors have articulated good and sufficient reasons for, and the best interests of their bankruptcy estates will be served by, this Court granting certain of the relief requested in the Motion, including approval of (1) the Bidding Procedures; (2) the break-up fee of $600,000 (the "Break-up Fee") as provided for in the Agreement of Purchase and Sale, dated as of February 12, 2010 (the "Purchase Agreement"),[1] between Twinsburg Industrial Park LLC, a Delaware limited liability company ("Buyer"), and Old Carco LLC f/k/a Chrysler LLC ("Old Carco"), which Purchase Agreement is attached as Exhibit A to the Motion; and (3) the form of notice attached hereto as Exhibit B (the "Sale Notice").

B.       The Debtors have articulated good and sufficient reasons for, and the best interests of their estates will be served by, this Court scheduling a subsequent Sale Hearing to consider granting other relief requested in the Motion, including approval of the Sale Transaction and the transfer of the Property to the Successful Bidder free and clear of all Interests of any kind or nature pursuant to section 363(b) and section 363(f) of the Bankruptcy Code.

C.       The Break-up Fee to be paid to the Buyer under the circumstances described is:  (1) an actual cost and expense necessary to maximize the value of Debtors' bankruptcy estates and, as such, is entitled to priority under sections 503(b) and 507(a)(2) of the of the Bankruptcy Code; (2) commensurate to the real and substantial benefits conferred upon

---

[1]       Capitalized terms used but not defined herein have the meanings given to such terms in the Motion.

the Debtors' bankruptcy estates by the Buyer; (3) reasonable and appropriate in light of the size and nature of the proposed Sale Transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by the Buyer; and (4) necessary to induce the Buyer to continue to pursue the Sale Transaction and to continue to be bound by the Purchase Agreement.

D.     Moreover, unless it is assured that the Break-Up Fee will be available, the Buyer is unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under the Purchase Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated by the Bidding Procedures).  The Break-Up Fee induced the Buyer to submit a bid that will serve as a minimum or floor bid on which the Debtors, their creditors and other bidders can rely.  The Buyer has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Property will be received.  Accordingly, the Break-Up Fee is reasonable and appropriate and represents the best method for maximizing value for the benefit of the Debtors' estates.

IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED to the extent set forth herein.

2.     The Bidding Procedures, which are attached hereto as Exhibit A, are hereby approved and shall govern all bids and bid proceedings relating to the Property.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.     The deadline for submitting a Qualified Bid (as such term is defined in the Bidding Procedures) shall be March 5, 2010.  The Purchase Agreement shall be deemed to be a Qualified Bid.

4.      As further described in the Bidding Procedures, the Debtors shall conduct the Auction on March 10, 2010 if more than one Qualified Bid is timely received.

5.      The Court shall conduct the Sale Hearing on March 11, 2010 at 10:00 a.m. (prevailing Eastern Time), at which hearing the Court will consider approval of the Sale Transaction to the Successful Bidder.

6.      To be considered, objections to the proposed sale or any of the remaining relief sought in the Motion must (a) be in writing, (b) state the basis of such objection with specificity, (c) conform to the Bankruptcy Rules and the Local Bankruptcy Rules, (d) be filed with the Bankruptcy Court and (e) be served upon (i) counsel to the Debtors, Jones Day, 1420 Peachtree Street, N.E., Suite 800, Atlanta, Georgia 30309-3053 (Attn:  Jeffrey B. Ellman, Esq.) and 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn:  William Herzberger, Esq. and Carl E. Black, Esq.); (ii) counsel to the First Lien Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 3954 (Attn:  Peter V. Pantaleo, Esq.); (iii) counsel to the Creditors' Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 (Attn:  Thomas Moers Mayer, Esq.) and (iv) counsel to the Buyer, Arnold & Porter LLP, 399 Park Avenue, New York, New York 10022-4690 (Attn:  Michael J. Canning, Esq.) (collectively, the "Notice Parties"), so as to be actually received no later than 4:00 p.m. (prevailing Eastern Time) on March 10, 2010.

7.      The Break-up Fee set forth in section 7 of the Purchase Agreement is hereby approved in all respects and shall be paid to the Buyer in accordance with and as provided in the Purchase Agreement.  In accordance with section 7 of the Purchase Agreement, the Debtors' obligations to pay the Break-up Fee shall be treated as an administrative expense allowed under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.  The Buyer shall not

waive the right to payment of the Break-up Fee by bidding or rebidding at the Auction.  The

Buyer's right to the Break-up Fee shall be the sole and exclusive remedy of the Buyer in the

event of an Approved Alternative Transaction or Alternative Transaction, as applicable.  In no

event shall the Buyer be entitled to payment of the Break-up Fee unless and until the closing of

an Approved Alternative Transaction or in accordance with section 7(d) of the Purchase

Agreement, as applicable.

        8.     The form of the Sale Notice is hereby approved in all respects.  All parties

in interest shall receive or be deemed to have received good and sufficient notice of all relief

sought in the Motion, including but not limited to the Sale Hearing, the proposed Approval

Order, the proposed sale of the Property if:

        (a)     no later than February 27, 2010 (the "<u>Mailing Deadline</u>"), the Debtors: serve the Sale Notice together with a copy of this Order by first-class mail, postage prepaid upon: (i) counsel to the Creditors' Committee; (ii) counsel to the First Lien Agent; (iii) counsel to the DIP Lenders; (iv) counsel to the Buyer; (v) any party who, in the past year, expressed in writing to the Debtors an interest in the Property; (vi) all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Property; (vii) the Internal Revenue Service; (vii) the attorney general for the State of Ohio and all applicable local environmental enforcement agencies; (xi) all applicable state and local taxing authorities; (xii) the Office of the United States Trustee for the Southern District of New York; (xiii) the U.S. Environmental Protection Agency; (xiv) counsel to The Bank of New York Trust Company, N.A., in its capacity as the indenture trustee under that certain Indenture, dated as of March 1, 1985, among DaimlerChrysler Company LLC (as predecessor in interest to Old Carco), as issuer, DaimlerChrysler AG (now known as Daimler AG), as guarantor and U.S. Bank National Association; and (xv) all entities that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002; and

        (b)     as soon as practicable after the Mailing Deadline, the Debtors (i) shall publish the Sale Notice (modified as appropriate to accommodate publication) one time in the national edition of the *Wall Street Journal* and the *Cleveland Plain Dealer* and (ii) post the Sale Notice to the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at www.chryslerrestructuring.com.

        9.     The failure of any objecting person or entity to timely file its objection

shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, or

the consummation and performance of the Sale Transaction contemplated by the Purchase

Agreement or a Marked Agreement (as such term is defined in the Bidding Procedures), if any,

including the transfer free and clear of all liens, claims, encumbrances and interests of the

Property transferred as part of the Sale Transaction.

10.     To the extent there is any inconsistency between the terms of this Order

and the Purchase Agreement, the terms of this Order and the exhibits hereto shall control.

11.     The Court shall retain jurisdiction over any matter or dispute arising from

or relating to the implementation, interpretation or enforcement of this Order.


Dated: New York, New York
        February ___, 2010        _____
                                  UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

**BIDDING PROCEDURES**[1]

## I.    Important Dates

The Debtors shall, in coordination with Capstone Advisory Group, LLC ("Capstone") and in consultation with and, with respect to the third item below, subject to the consent of JPMorgan Bank, N.A. (the "First Lien Agent"), as the agent for the Debtors' lenders under the Amended and Restated First Lien Credit Agreement, dated as of November 29, 2007, as amended:

(A)    assist Potential Bidders (as defined below) in conducting their respective due diligence investigations and accept Bids (as defined below) until 5:00 p.m. (prevailing Eastern Time) on March 5, 2010;

(B)    negotiate with Qualified Bidders (as defined below) in preparation for an auction (the "Auction") to begin at 10:00 a.m. (prevailing Eastern Time) on March 10, 2010 if any additional Qualified Bids are received; and

(C)    seek authority to sell the Property to the Successful Bidder (as defined below) at the Sale Hearing to be held by the Bankruptcy Court at 10:00 a.m. (Prevailing Eastern Time) on March 11, 2010.

## II.    The Sale Hearing

At the Sale Hearing, the Debtors will seek entry of an order substantially in the form of Exhibit E to the Motion, *inter alia*, authorizing and approving the Sale Transaction (A) if no other Qualified Bid (as defined below) is received by the Debtors, to the Buyer pursuant to the terms and conditions set forth in the Purchase Agreement or (B) if another Qualified Bid is received by the Debtors, to the Buyer or such other Qualified Bidder(s) as the Debtors, in the exercise of their reasonable business judgment and with the consent of the First Lien Agent, determine to have made the highest or otherwise best offer to purchase the Property at the Auction, consistent with the Bidding Procedures.  The Sale Hearing may be adjourned or rescheduled without notice, other than by an announcement of such adjournment at the Sale Hearing or in an agenda letter for such hearing.

## III.    Determination by the Debtors

The Debtors, in coordination with Capstone and the First Lien Agent, shall (A) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Property, (B) determine whether any person or entity is a Qualified

---

[1]    Capitalized terms not otherwise defined herein shall have the respective meaning ascribed to them in the annexed Procedures Order.

Bidder, (C) receive bids from Qualified Bidders, (D) negotiate any bids and (E) conduct the Auction of the Property if any additional Qualified Bids are received (collectively, the "Bidding Process").  Any person or entity who wishes to participate in the Bidding Process must be a Qualified Bidder.  Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Property to any person or entity who is not a Potential Bidder and who does not comply with the participation requirements below.

## IV.    Participation Requirements

Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the Bidding Process, each interested person or entity (a "Potential Bidder") must deliver the following (unless previously delivered) to: (A) Capstone Advisory Group, LLC, Park 80 West, 250 Pehle Avenue, Suite 105, Saddle Brook, New Jersey  07663 (Attn:  John Rooney); (B) Jones Day, 1420 Peachtree Street, N.E., Suite 800, Atlanta, Georgia 30309-3053 (Attn: Jeffrey B. Ellman, Esq.) and 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn:  William Herzberger, Esq. and Carl E. Black, Esq.); and (C) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017-3954 (Attn:  Peter V. Pantaleo, Esq.) so as to be received no later than 5:00 p.m. (Prevailing Eastern Time) on March 1, 2010:

(A)    an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors;

(B)    a statement demonstrating to the Debtors' reasonable satisfaction a *bona fide* interest in purchasing all of the Property; and

(C)    sufficient information, as requested by the Debtors, to allow the Debtors to determine that the Potential Bidder has the financial wherewithal and any required authorizations to close the Sale Transaction, including, but not limited to, current audited financial statements of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtors in their discretion in consultation with the First Lien Agent).

## V.    Due Diligence

If the Debtors determine, in consultation with the First Lien Agent, that a potential bidder has a *bona fide* interest in the Property, then no later than two business days after the Debtors make that determination and have received from a Potential Bidder all of the materials required above, the Debtors will contact any such Potential Bidder and offer such access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances, subject to the limitations on the Debtors' access to the Property under the Transition Services Agreement, dated as of June 10, 2009, between the Debtors and Chrysler Group LLC.  All due diligence requests shall be directed to John Rooney of Capstone at (201) 587-7121.  The Debtors, with the assistance of Capstone, shall coordinate all reasonable requests for additional information and due diligence access from the Potential Bidders.  In the event that any such due diligence material has not previously been provided to any other Potential Bidder, the Debtors

shall simultaneously provide such materials to all Potential Bidders, as well as to counsel to the First Lien Agent and counsel to the Buyer.

Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease (A) if the Potential Bidder does not become a Qualified Bidder, (B) from and after the Bid Deadline or (C) if the Bidding Process is terminated in accordance with its terms.

## VI.    <u>Bid Deadline</u>

A Potential Bidder that desires to make a bid shall deliver written and electronic copies of its bid to:  (A) Capstone Advisory Group, LLC, Park 80 West, 250 Pehle Avenue, Suite 105, Saddle Brook, New Jersey  07663 (Attn:  John Rooney; jrooney@capstoneag.com); (B) Jones Day, 1420 Peachtree Street, N.E., Suite 800, Atlanta, Georgia 30309-3053 (Attn: Jeffrey B. Ellman, Esq.; jbellman@jonesday.com) and 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn:  William Herzberger, Esq., wherzberger@jonesday.com, and Carl E. Black, Esq., ceblack@jonesday.com); and (C) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017-3954 (Attn:  Peter V. Pantaleo, Esq.; ppantaleo@stblaw.com), so as to be received not later than 5:00 p.m. (Prevailing Eastern Time) on March 5, 2010 (the "<u>Bid Deadline</u>").

## VII.    <u>Bid Requirements</u>

A bid is a signed document from a Potential Bidder that provides, at a minimum, that:

(A)    the Potential Bidder offers to purchase the Property upon the terms and conditions set forth in a copy of an asset purchase agreement enclosed therewith, marked to show any proposed amendments and modifications to the Purchase Agreement (the "<u>Marked Agreement</u>");

(B)    the bid is not subject to any due diligence or financing contingency and is irrevocable until one business day following the closing of the Sale Transaction;

(C)    the purchase price in such bid is a higher or otherwise better offer for the Property than that described in the Purchase Agreement, and such offer shall not be considered a higher or better offer unless such bid provides for net cash (or cash equivalent) consideration to the Debtors of at least $750,000 more than the Purchase Price to be paid by the Buyer;

(D)    is a bid received by the Bid Deadline; and

(E)    does not entitle a bidder (other than the Buyer) to any break up fee, termination fee or similar type of payment or reimbursement.

A Potential Bidder shall accompany its bid with:  (A) written evidence of available cash or an irrevocable commitment for financing and such other evidence of ability to consummate the transaction contemplated by the applicable Marked Agreement as the Debtors may reasonably request; (B) a copy of a board resolution or similar document demonstrating the

authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed; and (C) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtors in their analysis of issues arising with respect to any applicable antitrust laws.

A Potential Bidder must deposit 10% of the initial cash purchase price set forth in the Marked Agreement (the "Good Faith Deposit") with an escrow agent selected by the Debtors (the "Deposit Agent"). The Good Faith Deposit must be made by certified check or wire transfer and will be held by the Deposit Agent in accordance with the terms of an escrow agreement to be provided with the Purchase Agreement.

A bid received from a Potential Bidder that meets the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder." For purposes hereof, the Buyer is a Qualified Bidder and the Purchase Agreement executed by the Buyer is a Qualified Bid. A Qualified Bid will be valued based upon factors such as: (A) the purported amount of the Qualified Bid; (B) the fair value to be provided to the Debtors under the Qualified Bid; (C) the ability to close the proposed Sale Transaction without delay; and (D) any other factors the Debtors, in consultation with the First Lien Agent, may deem relevant. Within one business day after receipt from a Qualified Bidder, the Debtors shall distribute by email or facsimile a copy of each Qualified Bid to counsel to each Qualified Bidder (including the Buyer).

The Debtors reserve the right, with the consent of the First Lien Agent, to reject any bid if such bid:

(A)     is on terms that are materially more burdensome or conditional than the terms of the Purchase Agreement;

(B)     is a bid for less than all of the Property;

(C)     requires any indemnification of such Qualified Bidder; or

(D)     includes a non-cash instrument or similar consideration that is not freely marketable.

## VIII.    **Baseline Bid**

Qualified Bidders that have submitted Qualified Bids are eligible to participate in the Auction. The Debtors will select, with the consent of the First Lien Agent, the highest and best Qualified Bid or Qualified Bids (the "Baseline Bid") to serve as the starting point for the Auction. As soon as practicable, the Debtors will provide all Qualified Bidders with a copy of the Baseline Bid.

## IX.    **Auction**

If more than one Qualified Bid is received by the Bid Deadline, the Debtors will conduct the Auction. The Auction shall take place at 10:00 a.m. (Prevailing Eastern Time) on March 10, 2010, at the offices of Jones Day, located at 222 East 41st Street, New York, New York 10017, or such later time or such other place as the Debtors shall notify all Qualified

Bidders who have submitted Qualified Bids. Only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Auction. Professionals for the First Lien Agent and the Creditors' Committee shall be able to attend and observe the Auction, provided that the professionals for the Creditors' Committee shall do so at their own expense and any such expenses shall not be a "Covered Cost" under the Agreed Order (Docket No. 5981) between the First Lien Agent and the Debtors (the "First Lien Winddown Order"). If no Qualified Bids other than the Buyer's Qualified Bid are received prior to the Bid Deadline, no Auction shall be conducted.

At the Auction, participants (including the Buyer) will be permitted to increase their bids and will be permitted to bid based only upon the terms of the Baseline Bid (except to the extent otherwise authorized by the Debtors, with the consent of the First Lien Agent), subject to Buyer's right to be credited in its bid for the amount of its Break-up Fee (as described below); provided, however, if the Buyer elects to participate in the Auction, the Buyer shall have the right, but shall not be obligated, to make any bid(s) at the Auction based on and subject to the terms and conditions set forth in the Purchase Agreement (other than the purchase price) and, in such case, the Debtors will weigh and consider any differences in any such terms and conditions set forth in the Purchase Agreement as compared to the terms and conditions set forth in the Baseline Bid in the Debtors' process of determining the Successful Bid (as defined herein). The bidding will start at the purchase price and terms proposed in the Baseline Bid, and continue in increments of at least $100,000. Notwithstanding any other provision of these Bidding Procedures, when comparing bids at the Auction, the Buyer will be credited with, and have added to the aggregate amount of any bid that the Buyer elects to make at the Auction, an amount equal to the Break-up Fee.

The Debtors may adopt, in consultation with the First Lien Agent, rules for the Auction at any time that will best promote the goals of the Bidding Process and that are not inconsistent with any provisions of the Purchase Agreement or these Bidding Procedures. Any such rules will provide that: (A) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder; (B) all bids will be made and received in one room, on an open basis, and all other bidders will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction; and (C) each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction.

Immediately prior to the conclusion of the Auction, the Debtors, with the consent of the First Lien Agent, will: (A) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale Transaction; (b) identify the successful bid (the "Successful Bid") and (c) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the successful bidder or bidders (the "Successful Bidder(s)"), and the amount and other material terms of the Successful Bid. At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

# X. Acceptance of Qualified Bids

The Debtors may, with the consent of the First Lien Agent (A) determine, in their reasonable business judgment, which Qualified Bid is the Successful Bid and the next highest or otherwise best bid (the "Next Highest Bid"); and (B) reject at any time before entry of the Sale Order any bid that, in the Debtors' reasonable judgment, is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures or the terms and conditions of the Sale Transaction or (3) contrary to the best interests of the Debtors and their bankruptcy estates.

The Debtors presently intend to consummate the Sale Transaction with the Successful Bidder, whether such entity is the Buyer or another Qualified Bidder. However, the Debtors' presentation of the Successful Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted the Successful Bid only when such bid has been approved by the Bankruptcy Court. The Debtors and the Successful Bidder shall close the Sale Transaction on or before March 31, 2010, unless extended by mutual agreement of the Debtors, the First Lien Agent and the Successful Bidder. If the Successful Bidder does not close the Sale Transaction by such date, then the Debtors shall be authorized, but not required, to close with the party that submitted the Next Highest Bid (the "Next Highest Bidder") without further order of the Bankruptcy Court, subject to the consent of the First Lien Agent. If the Debtors decide to close with the Next Highest Bidder, (A) the Debtors and the Next Highest Bidder shall have an additional 15 days to close and (B) the Next Highest Bidder shall be deemed the Successful Bidder within the meaning of these Bidding Procedures and under the Sale Order.

# XI. Modification of Procedures

If necessary to satisfy their fiduciary duties, the Debtors may, in consultation with the First Lien Agent and such other persons as the Debtors deem appropriate, amend these Bidding Procedures or the Bidding Process at any time in any manner that will best promote the goals of the Bidding Process, including extending or modifying any of the dates described herein; provided, however, that, to the extent that any such amendment impacts the protections granted to the Buyer in these Bidding Procedures and in the Purchase Agreement, such amendment shall be subject to the Buyer's consent, the giving of such consent not to be unreasonably withheld, conditioned or delayed.

# XII. Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders, and the Deposit (as defined in the Purchase Agreement) of the Buyer, shall be held in escrow by the Deposit Agent and shall not become property of the Debtors' bankruptcy estates absent further order of the Bankruptcy Court. The Deposit Agent shall retain the Deposit of the Buyer or the Good Faith Deposit of the Successful Bidder, as the case may be, until the earlier of the closing of the Sale Transaction or the termination or expiration of the applicable Marked Agreement or the Purchase Agreement, as the case may be. At the closing of the Sale Transaction contemplated by the Successful Bid, a Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit or, in the case of the Buyer, its Deposit. The Good Faith Deposits of all Qualified Bidders, other than the

Successful Bidder and the Next Highest Bidder, shall be released by the Debtors upon the entry of the Sale Order. The Good Faith Deposits of the Successful Bidder and the Next Highest Bidder (if not applied to the Purchase Price at closing) shall be released by the Debtors upon the earlier of (A) the closing of the Sale Transaction or (B) the withdrawal of the Property for sale by the Debtors. Additionally, if the Purchase Agreement is terminated, the Buyer's Deposit (as defined in the Purchase Agreement) shall be returned to the extent required by the Purchase Agreement. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. With respect to Good Faith Deposits, if (i) all conditions precedent to the Successful Bidder's or Next Highest Bidder's obligation to close the Transaction have been satisfied or waived, (ii) the Successful Bidder or the Next Highest Bidder has not terminated the applicable Marked Agreement or the Purchase Agreement, as the case may be, as may be permitted therein, (iii) the Debtors have performed their covenants and agreements under the applicable Marked Agreement or the Purchase Agreement, as the case may be and (iv) the Successful Bidder or the Next Highest Bidder has breached its covenants or agreements under the Marked Agreement or the Purchase Agreement, as the case may be, and has failed, refused or is unable to consummate the Transaction by the applicable closing date, the Debtors shall be entitled to the Good Faith Deposit as liquidated damages. Any interest of the Debtors' estates in the Good Faith Deposits or the Deposit shall constitutes First Lien Collateral as that term is defined in the First Lien Winddown Order and shall be paid to the First Lien Agent in accordance with the terms of such Order.

**EXHIBIT B**

CLI-1776052v9

# EXHIBIT D

## [Form of Sale Notice]

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman
Carl E. Black

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                     :
In re                                :     Chapter 11
                                     :
Old Carco LLC                        :     Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), et al.,        :
                        Debtors.     :     (Jointly Administered)
                                     :
                                     :
------------------------------------------------------------ x
```

## NOTICE OF SALE AND SOLICITATION OF BIDS TO PURCHASE
## THE DEBTORS' TWINSBURG, OHIO STAMPING PLANT AND RELATED
## <u>PERSONAL PROPERTY AND TERMS AND CONDITIONS OF BIDDING PROCEDURES</u>

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.    Old Carco LLC f/k/a Chrysler LLC ("Old Carco") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") have entered into a Agreement of Purchase and Sale, dated February 12, 2010 (the "Purchase Agreement"), to sell their Twinsburg, Ohio stamping plant, including, but not limited to: (a) certain real property, along with all buildings and improvements thereon and certain ancillary rights related thereto; (b) all intangible property pertaining thereto; and (c) certain personalty, trade fixtures and equipment (collectively, the "Twinsburg Property"), to Twinsburg Industrial Park LLC ("Buyer") for $27,500,000.

2.    The Debtors' ability to close the sale of the Twinsburg Property contemplated by the Purchase Agreement is subject to higher and better offers and the approval of the Bankruptcy Court.  Accordingly, the Debtors are soliciting offers for the purchase of the Twinsburg Property, and the Bankruptcy Court has entered an order (Docket No. [___]) (the "Bidding Procedures Order") approving auction and sale procedures (the "Bidding Procedures") for the Twinsburg Property.[1]  Capitalized terms not otherwise defined herein have the meaning given to them in the Bidding Procedures Order or the Bidding Procedures.

3.    In a motion filed with the Bankruptcy Court on February 13, 2010 (the "Sale Motion"), the Debtors proposed to sell the Twinsburg Property to the Buyer (or another Successful Bidder) free and clear of all liens, claims or encumbrances thereon, with all such interests in the Twinsburg Property to be transferred, and to attach, to the sale proceeds with the same validity and priority.  Among other things, the Twinsburg Property is being sold free and clear of any successor liability claims.  You may obtain a copy of the Sale Motion and the

---

[1]    A copy of the Bidding Procedures Order is attached hereto as Exhibit A.  **[Footnote omitted from publication version of notice.]**

Purchase Agreement by: (a) sending a written request to Jones Day, 222 East 41st Street, New York, New York 10017 (Attn: Brett Stone), Facsimile: (212) 755-7306, or (b) by accessing the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at www.chryslerrestructuring.com.

        4.       The deadline for Qualified Bids for the Twinsburg Property is March 5, 2010 at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline"). If more than one Qualified Bid for the Property is received by the Bid Deadline, the Bankruptcy Court has scheduled an auction of the Twinsburg Property (the "Auction") for **March 10, 2010 at 10:00 a.m. (Prevailing Eastern Time)** at the offices of Jones Day, located at 222 East 41st Street, New York, New York 10017. All interested parties are invited to submit a Qualifying Bid to purchase the Twinsburg Property. If no Qualified Bids (other than the Qualified Bid submitted by the Buyer) are received prior to the Bid Deadline, no Auction will be held.

        5.       A hearing to approve the Purchase Agreement and the sale of the Twinsburg Property to the Buyer or a Successful Bidder other than the Buyer is scheduled to be conducted on **March 11, 2010 at 10:00 a.m. (prevailing Eastern Time)**, in Room 523 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, or as soon thereafter as counsel may be heard.

        6.       Objections to the proposed sale of the Property or any of the remaining relief sought in the Sale Motion must (a) be in writing, (b) state the basis of such objection with specificity, (c) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the Southern District of New York, (d) be filed with the Bankruptcy Court; and (e) be served upon (i) counsel to the Debtors, Jones Day, 1420 Peachtree Street, N.E., Suite 800, Atlanta, Georgia 30309-3053 (Attn: Jeffrey B. Ellman, Esq.) and

901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn: William Herzberger, Esq. and Carl E. Black, Esq.); (ii) counsel to the First Lien Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 3954 (Attn: Peter V. Pantaleo, Esq.); (iii) counsel to the Creditors' Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq.) and (iv) counsel to the Buyer, Arnold & Porter LLP, 399 Park Avenue, New York, New York 10022-4690 (Attn: Michael J. Canning, Esq.) (collectively, the "Notice Parties"), so as to be actually received **no later than 4:00 p.m. (prevailing Eastern Time) on March 10, 2010**.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

7.    The Auction and/or Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open court or on the Bankruptcy Court's calendar or in any agenda letter submitted in connection with the Sale Hearing.

Dated: February _____, 2010          Respectfully submitted,
          New York, New York

                                       _s/_____
                                       Corinne Ball
                                       Veerle Roovers
                                       JONES DAY
                                       222 East 41st Street
                                       New York, New York  10017
                                       Telephone:  (212) 326-3939
                                       Facsimile:  (212) 755-7306

                                       David G. Heiman
                                       Carl E. Black
                                       JONES DAY
                                       North Point
                                       901 Lakeside Avenue
                                       Cleveland, Ohio  44114
                                       Telephone:  (216) 586-3939
                                       Facsimile:  (216) 579-0212

                                       Jeffrey B. Ellman
                                       JONES DAY
                                       1420 Peachtree Street, N.E.
                                       Suite 800
                                       Atlanta, Georgia  30309
                                       Telephone:  (404) 521-3939
                                       Facsimile:  (404) 581-8330

                                       ATTORNEYS FOR DEBTORS AND
                                       DEBTORS IN POSSESSION

**EXHIBIT A**

**(Bidding Procedures Order)**

**[Omitted from Publication Version]**

# EXHIBIT E

## [Form of Sale Order]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                                            :
In re                                                       :     Chapter 11
                                                            :
Old Carco LLC                                               :     Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), et al.,                               :
                                                            :     (Jointly Administered)
          Debtors.                                          :
                                                            :
                                                            :
------------------------------------------------------------x
```

## ORDER AUTHORIZING DEBTORS TO SELL
## TWINSBURG, OHIO STAMPING PLANT FREE AND CLEAR OF ALL
## LIENS, CLAIMS AND ENCUMBRANCES AND GRANTING RELATED RELIEF

This matter coming before the Court on the motion, dated February 13, 2010

(Docket No. [____]) (the "Sale Motion"),[1] filed by the above-captioned debtors and debtors in

possession (collectively, the "Debtors") for the entry of an order pursuant to sections 105 and

363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1

of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District

of New York:  (i) authorizing and approving the entry by Debtor Old Carco LLC (f/k/a Chrysler

LLC) ("Old Carco") into that certain Agreement of Purchase and Sale, dated as of

February 12, 2010, between Twinsburg Industrial Park LLC, a Delaware limited liability

company (the "Buyer"), and Old Carco (including all exhibits, schedules and ancillary

agreements related thereto, the "Agreement") in the form attached hereto as Exhibit A, whereby

Old Carco has agreed to sell to the Buyer the real and personal property comprising the Debtors'

Twinsburg, Ohio stamping plant (collectively, as further defined in the Agreement,

---

[1]      Capitalized terms used but not defined herein shall have the meanings given to such terms in the Sale
         Motion.

the "Property"); (ii) authorizing and approving the sale by Old Carco of the Property free and clear of all mortgages, security interests, conditional sale or other retention agreements, pledges, liens (as such term is defined in section 101(37) of the Bankruptcy Code), claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, guaranties, debts, rights, contractual commitments, interests, judgments, demands, easements, charges, encumbrances, defects, options, rights of first refusal, encumbrances, Liens (as such term is defined in the Agreement) and restrictions of any kind or nature whether imposed by agreement, understanding, law, equity or otherwise, other than Permitted Liens as defined in the Agreement (collectively, the "Interests"); and (iii) granting certain related relief; the Court having conducted a hearing on the Sale Motion on March 11, 2010 (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; the Court having reviewed and considered, among other things, (i) the Sale Motion and the exhibits thereto, including the declaration of Peter Chadwick in support of the proposed sale of the Property (the "Chadwick Declaration"), (ii) the Agreement, (iii) the Court's prior order (Docket No. [__]), dated February **[25]**, 2010 (the "Bidding Procedures Order"), approving competitive bidding procedures for the Property, **[(iv) all objections to the proposed sale of the Property filed in accordance with the Bidding Procedures Order,]** and **[(v)]** the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that the relief requested is in the best interests of the Debtors, their estates and creditors and other parties in interest; and upon the record of the Sale Hearing and after due deliberation thereon and good cause appearing therefor:

# I. FINDINGS OF FACT:

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[2]

## Jurisdiction, Final Order and Statutory Predicates

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      The Court has jurisdiction over this matter and over the property of the Debtors, including the Property to be sold, transferred or conveyed pursuant to the Agreement, and the Debtors' estates pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this case and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rule 6004(h), the parties may consummate the transactions provided for under the terms and conditions of the Agreement immediately upon entry of this Order.

## Appropriate Notice

D.      As evidenced by the affidavits of service and publication filed with the Court:  (1) proper, timely, adequate and sufficient notice of the Sale Motion, the Bidding Procedures Order (including the Bidding Procedures)**[, and]** the Sale Hearing **[and the auction conducted in accordance with the Bidding Procedures Order on March 10, 2010 (the "Auction")]** has been provided under the particular circumstances by the mailing of the Sale Motion and the mailing and publication of the Sale Notice pursuant to the Bidding

---

[2]      To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. See Fed. R. Bankr. P. 7052.

Procedures Order; and (2) no other or further notice of the Sale Motion, the Sale Hearing, the Bidding Procedures Order, the Bidding Procedures**[, the Auction]** or of the entry of this Order is necessary or shall be required.

## Good Faith

E.         The Buyer is a buyer in "good faith," as that phrase is used in section 363(m) of the Bankruptcy Code (and court decisions thereunder) and is entitled to the protections thereof.  The Agreement was proposed, negotiated and entered into by the Buyer and Old Carco without collusion or fraud of any kind (including any conduct that would cause or permit the sale of the Property to be avoided under section 363(n) of the Bankruptcy Code), in good faith and from arm's length bargaining positions.

## The Debtors' Business Judgment

F.         Initial Marketing Process.  The marketing process for the Property began around the time of the Fiat Transaction, with the Debtors receiving numerous indications of interest from various parties with respect to a potential purchase of the Property.  In response to their solicitations of interest, the Debtors executed 16 non-disclosure agreements with interested parties and, as of October 16, 2009, had received seven letters of intent offering to purchase the Property.  In consultation with JPMorgan Chase Bank, N.A., as the agent (the "First Lien Agent") under the Amended and Restated First Lien Credit Agreement, dated as of November 29, 2007 (as amended or modified, the "First Lien Credit Agreement"), by and among Carco Intermediate Holdco II LLC, Old Carco, the lender parties thereto (collectively, the "First Lien Lenders") and the First Lien Agent, the Debtors determined that the engagement of real estate brokers to market the Property was unnecessary.  Pursuant to the First Lien Credit Agreement, and subject to the Permitted Liens, the First Lien Lenders have the first priority lien on the Property.  During the period from October 2009 through January 2010, the Debtors

received offers from multiple purchasers, which offers (1) contained steadily increasing cash consideration and (2) were not subject to financing contingencies.

G.    The Stalking Horse Bid.  On January 29, 2010, a Non-Binding Letter of Intent/Offer was submitted on behalf of the Buyer to the Debtors, pursuant to which offer the Buyer (1) offered cash consideration well in excess of any previously-received offer, (2) offered to serve as the stalking horse bidder for the Property at auction and (3) sought certain bidding protections (as more particularly described in the Sale Motion, the "Stalking Horse Bid").  After negotiations between the Buyer and the Debtors, the Debtors determined that the Stalking Horse Bid was the most attractive offer for the Property and accepted the Stalking Horse Bid.

H.    The First Lien Lenders' Approval of the Stalking Horse Bid **[and Auction Process]**.  There are substantial carrying costs for property taxes, utilities, security and other expenses associated with the Property.  These costs currently are borne by Chrysler Group LLC f/k/a New CarCo Acquisition LLC ("New Chrysler") under the Transition Services Agreement, dated June 10, 2009, between New Chrysler and Old Carco (the "TSA").  Because New Chrysler's obligation to pay these costs expires as of July 31, 2010, the Debtors may be forced to bear the entirety of these carrying costs in the next six months.  Pursuant to paragraph 3 of the Agreed Order (Docket No. 5982) (the "DIP Lender Winddown Order") by and between the Debtors, the Debtors' debtor-in-possession lenders (collectively, the "DIP Lenders") and the Creditors' Committee, entered by the Court on November 19, 2009, the DIP Lenders, whose liens on the Property are junior to the liens securing the indebtedness under the First Lien Credit Agreement, are not funding any of the expenses associated with the sale of the Property (which Property is "First Lien Collateral" as such term is defined in the DIP Lender Winddown Order).  These costs instead currently are being funded pursuant to the Agreed Order (Docket No. 5981)

(the "<u>First Lien Winddown Order</u>") by and between the Debtors and the First Lien Agent on behalf of the First Lien Lenders (<u>i.e.</u>, the parties with the primary economic stake in the sale of the Property), entered by the Court on November 19, 2009, from the Reserve (as such term is defined in the First Lien Winddown Order).

I.      In accordance with paragraph 7 of the First Lien Winddown Order, the Debtors have reviewed the sale process for the Property with the First Lien Agent and the First Lien Agent has (1) designated the Property as an "Estate Asset" (as such term is defined in the First Lien Winddown Order), (2) indicated to the Debtors that the First Lien Lenders have consented to the sale of the Property pursuant to the terms of the Agreement and (3) indicated to the Debtors that the First Lien Lenders (as the primary economic parties in interest) agreed that the sale of the Property ultimately be effected pursuant to the bidding procedures and auction process established in the Bidding Procedures Order.

J.      <u>Highest and Best Offer</u>.  On February **[25]**, 2010, the Court entered the Bidding Procedures Order approving the Bidding Procedures for the Property.  The Bidding Procedures provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Property.  The Debtors **[conducted the Auction in accordance with the Bidding Procedures Order and]** complied with the Bidding Procedures Order in all respects.  **[The Auction was duly noticed and conducted in a non-collusive, fair and good faith manner.]** The Buyer **[participated in the Auction, submitted the Successful Bid to the Debtors and]** complied with the Bidding Procedures Order in all respects.

K.      As demonstrated by the findings of fact recited herein and the testimony and other evidence proffered or adduced at the Sale Hearing (including the Chadwick Declaration):  (1) the Debtors have adequately marketed the Property; (2) the consideration to be

paid by the Buyer under the Agreement constitutes the highest and otherwise best offer for the Property, is fair and reasonable and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory or possession thereof or the District of Columbia; (3) the proposed sale to the Buyer will provide a greater recovery for the Debtors' estates (and the First Lien Lenders) than would be provided by any other practical available alternative; and (4) no other party has offered to purchase the Property for greater economic value to the Debtors or their estates.

L.     The Buyer has provided the Debtors with a deposit in an amount equal to 10% of the initial cash consideration contemplated by the Agreement (such amount, together with the interest accrued thereon, the "Deposit"), which Deposit currently is being held by First American Title Insurance Company (the "Deposit Agent") in an interest-bearing account.

M.     Accordingly, the decision of the Debtors to consummate the sale of the Property on the terms and conditions set forth in the Agreement represents a sound and reasonable exercise of the Debtors' business judgment where, among other things, the transaction will allow the Debtors to:  (1) continue to implement the winddown of the Debtors' estates (consistent with the First Lien Winddown Order); (2) monetize the Property for the benefit of the Debtors' estates, including the First Lien Lenders (who are the primary economic party in interest); and (3) avoid incurring any carrying costs associated with the Property upon the expiration of the License Period.  Moreover, given (1) the thorough marketing of the Property (as described herein, in the Sale Motion, in the Chadwick Declaration and at the Sale Hearing), (2) the significant cash Purchase Price being offered by the Buyer and (3) the Buyer's willingness to promptly consummate the sale on an "as is, where is" basis, the Debtors believe that the sale of the Property will maximize value for their chapter 11 estates.

## Validity of Transfer

N.      Prior to the transactions contemplated under the Agreement, the Property, including, without limitation, the Scheduled Assets, is the property of the Debtors' estates, title thereto is vested in the Debtors' estates and Old Carco is the sole and lawful owner thereof, holding all right, title and interest therein.

O.      As of the Closing Date, the transfer of the Property to the Buyer will be a legal, valid and effective transfer of the Property and will vest the Buyer with all right, title and interest of the Debtors in and to the Property free and clear of all Interests of any kind or nature.

P.      Old Carco has full power and authority to execute the Agreement and all other documents contemplated thereby, the sale of the Property has been duly and validly authorized and Old Carco possesses all necessary corporate authority to consummate the transactions contemplated by the Agreement.  **[In accordance with section 11.1 of the TSA, Old Carco has obtained New Chrysler's consent to the assignment of Old Carco's rights and obligations under the TSA with respect to the Property set forth at Section 4(b)(iv) of the Agreement (the "TSA Assignment").]**  No other consents or approvals, other than as may be expressly provided for in the Agreement, are required by Old Carco to consummate the transactions contemplated by the Agreement.

## Section 363(f) of the Bankruptcy Code is Satisfied

Q.      Except for the rights of New Chrysler under the TSA, Old Carco may sell the Property free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  The First Lien Lenders have consented to the proposed sale of the Property hereunder within the meaning of section 363(f)(2) of the Bankruptcy Code.  Moreover, other holders of Interests who did not object, or who withdrew their objections, to the sale of the Property and the

Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the proceeds of the sale of the Property.

R.     The Buyer would not have entered into the Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Property to the Buyer were not free and clear of all Interests of any kind or nature or if the Buyer would, or in the future could, be liable for any such Interests.

## No Successor Liability

S.     The transactions contemplated under the Agreement do not amount to a consolidation, merger or *de facto* merger of the Buyer and any of the Debtors, there is no substantial continuity between the Buyer and the Debtors, there is no continuity of enterprise between the Debtors and the Buyer, the Buyer is not a mere continuation of the Debtors or the Debtors' estates and the Buyer does not constitute a successor to the Debtors or to the Debtors' estates.

T.     The transfer of the Property to the Buyer shall not subject the Buyer or any of its affiliates or subsidiaries to any liability by reason of such transfer, including, without limitation, under (1) the laws of the United States, any state, territory or possession thereof, or the District of Columbia, based in whole or part on, directly or indirectly, including without limitation, any theory of antitrust, environmental, products liability, successor or transferee liability, labor law, *de facto* merger or substantial continuity; or (2) any employment contract, understanding or agreement, including, without limitation, collective bargaining agreements, employee pension plans or employee welfare or benefit plans.

U.      It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Agreement, and to adjudicate, if necessary, any and all disputes relating in any way to the transactions provided for under the terms and conditions of the Agreement.

## II.      CONCLUSIONS OF LAW:

NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      The relief requested in the Sale Motion, to the extent not already granted or denied in the Bidding Procedures Order, is GRANTED, subject to the terms and conditions contained herein.

2.      All objections, if any, to the Sale Motion or the relief granted herein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits, except as expressly provided herein.

**Approval of Sale**

3.      The Agreement, Old Carco's entry into the Agreement and the transactions contemplated thereby **[(including, but not limited to, the TSA Assignment)]** are hereby approved.  Pursuant to sections 105 and 363 of the Bankruptcy Code, Old Carco is authorized to perform its obligations under the Agreement.

4.      The Buyer is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code.  The sale of the Property, and the Debtors' entry into the Agreement, may not be avoided, and costs may not be recovered or punitive damages awarded, pursuant to section 363(n) of the Bankruptcy Code.

5.     Old Carco, as well as its affiliates, officers, managers, employees and agents, shall be, and hereby are, authorized and directed to fully assume, perform under, consummate and implement the terms of the Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Agreement, this Order and the sale of the Property contemplated thereby, including, without limitation, the execution of any deeds, assignments and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, any or all of the Property, as may be necessary or appropriate to the performance of Old Carco's obligations as set forth in the Agreement, without any further corporate action by Old Carco or orders of this Court. Neither the Buyer nor the Debtors shall have any obligation to proceed with the Closing of the Agreement until all conditions precedent to their respective obligations to do so under the Agreement and this Order have been met, satisfied or waived.

6.     The sale of the Property and the consideration provided by the Buyer under the Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

7.     Effective as of the Closing, the sale of the Property by Old Carco to the Buyer shall constitute a legal, valid and effective transfer of the Property notwithstanding any requirement for approval or consent by any person and shall vest Buyer with all right, title and interest of the Debtors in and to the Property, free and clear of all Interests, pursuant to

section 363(b) and (f) of the Bankruptcy Code except for the rights of New Chrysler under the TSA.

### Transfer of Property Free and Clear

8.      Pursuant to sections 105 and 363 of the Bankruptcy Code, except for the rights of New Chrysler under the TSA, the sale of the Property shall vest Buyer with all right, title and interest of the Debtors to the Property free and clear of any and all Interests, with all such Interests and any other liabilities and claims to attach only to the proceeds of the sale (if any) with the same priority, validity, force and effect, if any, as they now have in or against the Property, subject to all claims and defenses the Debtors may possess with respect thereto. Following the Closing Date, no holder of any Interest in the Property shall interfere with the Buyer's ownership, use and enjoyment of the Property based on or related to such Interest.

9.      To the greatest extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of Old Carco with respect to the Property transferred pursuant to the Agreement, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date, provided, however, that nothing in the Agreement or this Order shall authorize the transfer of a permit or license without governmental approval where applicable nonbankruptcy law requires governmental approval of such transfer.

10.     On or before the Closing Date, all parties holding Interests of any kind are authorized and directed to execute such documents and take all other actions as may be necessary to release any Interests of any kind against the Property, as such Interests may have been recorded or may otherwise exist. If any person or entity that has filed financing statements or other documents or agreements evidencing any Interests in or against the Property shall not

have delivered to Old Carco prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction or releases of all such Interests that the person or entity has with respect to the Property, Old Carco is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Property prior to the Closing, and the Buyer is authorized to execute and file such documents after Closing, provided, however, that nothing in this paragraph shall authorize Old Carco to execute or file documents on behalf of any governmental entity, the First Lien Lenders or the First Lien Agent.

11.     The Buyer is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Buyer, its affiliates and subsidiaries shall not assume, nor be deemed to assume, nor in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any successor liability or similar liability.  Neither the purchase of the Property by the Buyer or its affiliates or subsidiaries, nor the fact that the Buyer or its affiliates or subsidiaries are using any of the Property previously operated by the Debtors, will cause the Buyer or any of its affiliates or subsidiaries to be deemed a successor in any respect to the Debtors' businesses within the meaning of any foreign, federal, state or local revenue, pension, tax, labor, employment, environmental or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations and the Employee Retirement Income Security Act), or under any products liability law or doctrine with respect to the Debtors' liability under such law or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law or doctrine, and the Buyer, its affiliates and subsidiaries shall have no liability or obligation on account of any of the foregoing.  Moreover, the Buyer shall not be deemed to:  (a) be the

successor of any of the Debtors or their estates, (b) have, *de facto* or otherwise, merged with or into any of the Debtors, (c) be a mere continuation or substantial continuation of the Debtors or the enterprise(s) of the Debtors, or (d) be liable for any acts or omissions of the Debtors in the conduct of the Debtors' businesses or arising under or related to the Property, and, to that end, the Buyers shall not be liable for any claims, written notices, causes of action, proceedings, complaints, investigations or other proceedings against the Debtors or any of their predecessors or affiliates, and the Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Property, the Debtors' businesses or any other obligations of the Debtors, including, without limitation, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Property and the Debtors' businesses.

12.     Pursuant to sections 105 and 363 of the Bankruptcy Code, but subject to the rights of New Chrysler under the TSA, all persons and entities, including, but not limited to, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, any claimant asserting a products liability claim, trade and other creditors asserting or holding an Interest of any kind or nature whatsoever against, in or with respect to any of the Debtors or the Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, the Property, the operation of the Debtors' businesses prior to the Closing Date or the transfer of the Property to the Buyer, shall be forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such

Interest or other liability against the Buyer or any of its affiliates or subsidiaries. For the avoidance of doubt, nothing in this Order shall prevent the Debtors or their successors or permitted assigns from pursuing claims, if any, against the Buyer and/or its successors and assigns under, and in accordance with the terms of, the Agreement, including, but not limited to, the Environmental Indemnity.

13.     Nothing in this Order or the Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the owner or operator of the Property after the date of entry of this Order; provided that nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.

14.     Except in respect of the rights of New Chrysler under the TSA, all persons or entities, presently or on or after the Closing Date, in possession of some or all of the Property are directed to surrender possession of the Property to the Buyer on the Closing Date or at such time thereafter as the Buyer may request.

### **Additional Provisions**

15.     Subject to the terms of the Agreement and the consent of the First Lien Agent, the Agreement may be modified, amended or supplemented by agreement of Old Carco and the Buyer without further action or order of the Court; provided, however, that any such modification, amendment or supplement does not materially change the terms of the Agreement or modify the express terms of this Order.

16.     The net proceeds of the sale of the Property and other amounts owing to the Debtors' estates with respect to the sale of the Property, regardless of whether such sale ultimately is consummated (including the Deposit to the extent it becomes property of the

Debtors' estates pursuant to the terms of the Agreement), shall be paid by Old Carco to the First Lien Agent consistent with the terms of the First Lien Winddown Order.

17.     The failure specifically to include any particular provisions of the Agreement or any related Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, Old Carco and the Buyer that the Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to Closing. To the extent that any provisions of this Order conflict with the terms and conditions of the Agreement, the terms and conditions of this Order shall govern and control.

18.     This Order and the Agreement, as applicable, shall be binding upon, may be enforced against and shall govern the acts of all Persons and entities, including without limitation, the Debtors and the Buyer, their respective successors and permitted assigns, including, without limitation, any successor trustee hereinafter appointed for the Debtors' estates (including but not limited to the Liquidation Trust established pursuant to the Plan), **[New Chrysler]**, all creditors of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state and all other persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Property. Each and every federal, state and local governmental agency, unit or department is hereby directed to accept this Order as sole and sufficient evidence of the transfer of title of the Property to the Buyer, and such agency, unit or department may rely upon this Order in consummating the transactions contemplated by the Agreement. This Order may be recorded by the Buyer in any registry or government office.

19.     As provided by Bankruptcy Rule 6004(h), this Order shall be effective immediately upon entry.

20.     This Court retains jurisdiction to interpret, implement and enforce the terms and provisions of this Order, including to compel delivery of the Property, to protect the Buyer against any Interest and to enter any orders under sections 105 or 363 (or other applicable provisions) of the Bankruptcy Code necessary or appropriate to transfer the Property to the Buyer.

Dated: _____, 2010
     New York, New York

                                _____
                                UNITED STATES BANKRUPTCY JUDGE