JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                        :

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Old Carco LLC | : | Case No. 09-50002 (AJG) |
| (f/k/a Chrysler LLC), *et al.*,[1] | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

---------------------------------------------------------------x

**NOTICE OF HEARING ON THE MOTION OF DEBTORS AND DEBTORS IN
POSSESSION, PURSUANT TO SECTIONS 105, 363 AND 365 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004 AND 6006,
FOR AN ORDER (I) AUTHORIZING DEBTORS TO SELL THEIR STERLING
HEIGHTS, MICHIGAN ASSEMBLY PLANT FREE AND CLEAR OF ALL LIENS,
CLAIMS AND ENCUMBRANCES, (II) APPROVING CERTAIN ANCILLARY**

---

[1]    A second amended list of the Debtors, their addresses and tax identification numbers is located on the docket for Case
No. 09-50002 (AJG) (Docket No. 3945) and can also be found at www.chryslerrestructuring.com.

**AGREEMENTS, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN RELATED AGREEMENTS AND (IV) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      A hearing to consider the Motion of Debtors and Debtors in Possession, Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, for an Order (I) Authorizing Debtors to Sell Their Sterling Heights, Michigan Assembly Plant Free and Clear of All Liens, Claims and Encumbrances, (II) Approving Certain Ancillary Agreements, (III) Authorizing the Assumption and Assignment of Certain Related Agreements and (IV) Granting Related Relief (the "Motion"), filed by the above-captioned debtors and debtors in possession (the "Debtors"), shall be held before the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York  10004, on **March 11, 2010, at 10:00 a.m. (prevailing New York time).**

2.      Objections, if any, to the relief sought in the Motion must be made in writing, with a hard copy to Chambers, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York, state the basis of such objection with specificity, and be filed with the Bankruptcy Court and must be served in accordance with the Administrative Order, Pursuant to Bankruptcy Rule 1015(c), Establishing Case Management and Scheduling Procedures (Docket No. 661) (the "Case Management Order") so as to be actually received by the parties on the Special Service List (as defined in the Case Management Order) and counsel to Chrysler Group LLC, Dickinson Wright PLLC, 500 Woodward Avenue, Suite 4000, Detroit, Michigan 48226 (Attn:  James A. Plemmons, Esq. and Monica Labe, Esq.) and 1000 Chrysler Drive, Auburn Hills, Michigan 48326-2766 (Attn:  Holly Leese, Esq.) not later than **4:00 p.m. (prevailing New York time) on**

**March 1, 2010** (the "<u>Objection Deadline</u>").

        3.      If no objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Court an order substantially in the form attached to the Motion as Exhibit C, which order shall be submitted and may be entered with no further notice or opportunity to be heard offered to any party.

        4.      Copies of the Motion, the Case Management Order and the Special Service List (as defined in the Case Management Order) may be obtained from the Court's website at http://ecf.nysb-mega.uscourts.gov or, free of charge, at www.chryslerrestructuring.com.

Dated: February 18, 2010  
      New York, New York

Respectfully submitted,

/s/ Corinne Ball
_____

Corinne Ball
Veerle Roovers
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

David G. Heiman
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

Jeffrey B. Ellman
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
In re                                                        :  Chapter 11
                                                             :
Old Carco LLC                                                :  Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), *et al.,*                              :
                                                             :  (Jointly Administered)
                                  Debtors.                   :
                                                             :
-------------------------------------------------------------x

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION,**
**PURSUANT TO SECTIONS 105, 363 AND 365 OF THE**
**BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004 AND 6006,**
**FOR AN ORDER (I) AUTHORIZING DEBTORS TO SELL THEIR STERLING**
**HEIGHTS, MICHIGAN ASSEMBLY PLANT FREE AND CLEAR OF ALL LIENS,**
**CLAIMS AND ENCUMBRANCES, (II) APPROVING CERTAIN ANCILLARY**
**AGREEMENTS, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT**
**OF CERTAIN RELATED AGREEMENTS AND (IV) GRANTING RELATED RELIEF**

TO THE HONORABLE ARTHUR J. GONZALEZ,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Old Carco LLC f/k/a Chrysler LLC ("Old Carco") and its affiliated debtors and debtors in possession (collectively with Old Carco, the "Debtors") respectfully represent as follows:

## Background

1.     On April 30, 2009 (the "Petition Date"), Old Carco and 24 of its affiliated Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On May 19, 2009, Debtor Alpha Holding LP commenced its bankruptcy case by filing a voluntary petition under chapter 11 of the Bankruptcy Code.  By orders of the Court (Docket Nos. 97 and 2188), the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered.

2.     On May 5, 2009, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"), pursuant to section 1102 of the Bankruptcy Code.

3.     As of the Petition Date, the Debtors and their nondebtor direct and indirect subsidiaries (collectively, the "Old Carco Companies") comprised one of the world's largest manufacturers and distributors of automobiles and other vehicles, together with related parts and accessories.  On the Petition Date, the Old Carco Companies employed approximately 55,000 hourly and salaried employees worldwide, 70% of whom were based in the United States.

4.     For the 12 months ended December 31, 2008, the Old Carco Companies recorded revenue of more than $48.4 billion and had assets of approximately $39.3 billion and liabilities totaling $55.2 billion.

5.      In connection with the commencement of these cases, Old Carco and its Debtor subsidiaries, Fiat S.p.A. ("Fiat") and New Chrysler (as defined below) entered into a Master Transaction Agreement dated as of April 30, 2009 (as amended and collectively with other ancillary and supporting documents, the "MTA").  The MTA provided, among other things, that:  (a) Old Carco would transfer the majority of its operating assets to New CarCo Acquisition LLC n/k/a Chrysler Group LLC ("New Chrysler"), a newly established Delaware limited liability company formed by Fiat; and (b) in exchange for those assets, New Chrysler would assume certain of the Debtors' liabilities and pay to Old Carco $2 billion in cash (collectively with the other transactions contemplated by the MTA, the "Fiat Transaction").

6.      On May 31, 2009, this Court issued:  (a) an Opinion Granting the Debtors' Motion Seeking Authority to Sell, Pursuant to § 363, Substantially All of the Debtors' Assets (Docket No. 3073) (the "Sale Opinion"); and (b) an Opinion and Order Regarding Emergency Economic Stabilization Act of 2008 and Troubled Asset Relief Program (Docket Nos. 3074 and 3229).  On June 1, 2009 and consistent with the Sale Opinion, this Court entered an Order authorizing the Fiat Transaction (Docket No. 3232) (the "Sale Order").  Consistent with the Sale Order, the Fiat Transaction was consummated on June 10, 2009.

7.      On January 22, 2010, the Debtors filed:  (a) the Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, dated January 22, 2010 (Docket No. 6272) (as it may be further amended or modified, the "Plan"); and (b) the Disclosure Statement with Respect to the Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, dated January 22, 2010 (Docket No. 6273) (the "Disclosure Statement"). The Court approved the Disclosure Statement as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code pursuant to an order (Docket No. 6264) entered

on January 21, 2010.  The hearing to consider confirmation of the Plan currently is scheduled for March 16, 2010.

## Jurisdiction

8.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

9.      The Debtors have executed a purchase agreement (the "Purchase Agreement"), dated February 18, 2010, for the sale of their Sterling Heights, Michigan assembly plant (as further defined in the Purchase Agreement, the "Property") to New Chrysler (such purchase and sale of the Property to be hereinafter referred to as the "Transaction").  A copy of the Purchase Agreement is attached hereto as Exhibit A.  A declaration of Peter Chadwick of Capstone Advisory Group, LLC (the "Chadwick Declaration") describing the marketing process for the Property and the Debtors' decision to enter into the Purchase Agreement is attached hereto as Exhibit B.

10.      By this Motion, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 6004-1 and 6006-1 of the Local Rules (the "Local Bankruptcy Rules") for the United States Bankruptcy Court for the Southern District of New York, the Debtors seek the entry of an order in substantially the form attached hereto as Exhibit C (the "Sale Order"):  (a) authorizing the sale of the Property in a private sale to New Chrysler free and clear of liens, claims, interests and encumbrances; (b) authorizing and approving Old Carco's entry into, and performance under, (i) the Amendment No. 3 to Transition Services Agreement (the "TSA Amendment"), to be executed as of the closing date of the

Transaction (such date, the "<u>Closing Date</u>"), between Old Carco and New Chrysler in the form attached to the Purchase Agreement as Exhibit B, and (ii) the Intellectual Property License Agreement (the "<u>License</u>" and, together with the TSA Amendment, the "<u>Ancillary Agreements</u>"), to be executed as of the Closing Date, between Old Carco and New Chrysler in the form attached to the Purchase Agreement as Exhibit D; (c) authorizing the assumption, and assignment to New Chrysler, of (i) that certain Utility Services Agreement, dated as of May 24, 2004 (as amended, the "<u>Utility Services Agreement</u>"), between DTE Energy Center, LLC ("<u>DTE</u>") and Debtor Utility Assets LLC ("<u>Utility Assets</u>"), (ii) that certain Easement Agreement, dated as of May 17, 2004 (the "<u>Easement Agreement</u>" and, together with the Utility Services Agreement, the "<u>DTE Agreements</u>"), between Old Carco (as successor in interest to DaimlerChrysler Corporation) and Utility Assets, and (iii) that certain Natural Gas Exploration, Production and Sale Agreement, dated August 20, 1991 (as amended, the "<u>Natural Gas Agreement</u>" and, collectively with the DTE Agreements, the "<u>Assigned Agreements</u>"), between Old Carco (as successor in interest to Chrysler Corporation) and West Bay Exploration Company; and (d) granting certain related relief.

<u>Facts Relevant to This Motion</u>

***The Property***

11.     The Property consists of:  (a) a parcel of real property located at 38111 Van Dyke, Sterling Heights, Macomb County, Michigan (including a manufacturing and assembly facility), together with all of the Debtors' right, title and interest, if any, in and to (i) all appurtenances, improvements, fixtures, easements and rights-of-way incident thereto, (ii) any and all air, mineral and riparian rights with respect thereto and (iii) all land division rights under the Michigan Land Division Act (collectively, and as further defined in the Purchase Agreement,

the "Land"); and (b) all of the Debtors' right, title and interest, if any, in and to all personalty, trade fixtures and equipment currently located on the Land (collectively, the "Equipment").

12.     The Property was pledged as collateral to secure the Debtors' obligations under the Amended and Restated First Lien Credit Agreement, dated as of November 29, 2007 (as amended, the "First Lien Credit Agreement"), between and among Carco Intermediate Holdco II LLC, Old Carco, the lender parties thereto (collectively, the "First Lien Lenders") and JPMorgan Chase Bank, N.A., as the agent to the First Lien Lenders (the "First Lien Agent"). The First Lien Lenders hold the first priority lien on all of the Property, subject to certain permitted liens. See Agreed Order (Docket No. 5981) (the "First Lien Winddown Order") by and between the Debtors and the First Lien Agent on behalf of the First Lien Lenders, entered by the Court on November 19, 2009, at Exhibit A.

13.     Pursuant to the Transition Services Agreement, by and between Old Carco and New Chrysler, dated June 10, 2009 (as it may have been, or may be, amended or supplemented from time to time, the "TSA"), New Chrysler (a) is entitled to use the Property through April 30, 2011 (the "License Period") and (b) since the Closing Date (as such term is defined in the TSA), has been conducting, and currently conducts, operations at the Property. Pursuant to the TSA, New Chrysler does not pay rent for use of the Property during the License Period, but is responsible for (a) all carrying costs during the License Period and (b) the phase out and deactivation of the premises at the conclusion of the License Period. See Chadwick Declaration at ¶ 4; Disclosure Statement, at 27; Exhibit B.

### The Marketing of the Property

14.     The Debtors began preparations for the ultimate disposition of the Property in November 2009, at which time the Debtors were conducting preliminary negotiations with real estate brokers with respect to the necessary marketing of the Property and offering

tours of the Property to a limited number of interested parties. <u>See</u> Chadwick Declaration at ¶ 6. Shortly after the commencement of these efforts, the Debtors learned that New Chrysler had expressed an interest in continuing to manufacture and sell certain vehicle models that historically had been manufactured and assembled at the Property — <u>i.e.</u>, the Chrysler Sebring and the Dodge Avenger (together, the "<u>Vehicles</u>"). This interest was confirmed on November 4, 2009 when New Chrysler made public its "five-year plan" for profitability, which contemplated the continuing manufacture of the Vehicles. <u>See</u> <u>id.</u>

15. Following the release of New Chrysler's five-year plan in November 2009, the Debtors contacted New Chrysler to determine its specific intentions with respect to the Property. New Chrysler indicated its interest in either (a) extending the License Period beyond April 30, 2011 or (b) purchasing the Property. <u>See</u> <u>id.</u> at ¶ 7. Although the Debtors were not interested in an extension of the License Period, the Debtors and New Chrysler began negotiating a potential sale of the Property in November 2009, which negotiations ultimately produced the Purchase Agreement and the related Ancillary Agreements. <u>See</u> <u>id.</u>

16. <u>The Ancillary Agreements</u>. New Chrysler's agreement to enter into the Ancillary Agreements was a key factor in the Debtors' decision to consummate the transaction described herein. <u>See</u> <u>id.</u> at ¶ 8. Both the TSA Amendment and the License serve the same basic purpose: they materially enhance the marketability of certain other real property and related equipment and improvements owned by Old Carco. <u>See</u> <u>id.</u> The TSA Amendment promotes this end by rendering all of New Chrysler's obligations under the TSA with respect to any Owned Premises (as such term is defined in the TSA, other than the Owned Premises identified as "Newark" on Exhibit C thereto), or any portion of such Owned Premises, freely assignable upon written notice to New Chrysler by Old Carco, in its sole discretion. Any such assignment will

inure to the benefit of (a) any future owner or owners of any of the Owned Premises (or any portion thereof) that receives title directly from Old Carco (any such owner, a "Direct Owner") or (b) any future owner or owners of any of the Owned Premises (or any portion thereof) that receives title directly from a Direct Owner that did not acquire the Owned Premises for use in its business operations (any such owner, a "Future Owner"). See TSA Amendment, at ¶ 1. These permitted assignments of New Chrysler's obligations under the TSA expire one year after the License Termination Date (as such term is defined in the TSA) for the applicable Owned Premises, provided that such obligations shall revert to, and be enforceable against New Chrysler by, Old Carco upon the expiration of the applicable assignment. See id. In light of the sale proposed herein, New Chrysler will have no obligations to Old Carco under the TSA with respect to the Property (except for New Chrysler's indemnification obligations thereunder) as of the closing of the Transaction. See id. at ¶ 2.

17.     The ability of prospective purchasers of Owned Premises to enforce the Debtors' rights against New Chrysler under the TSA (e.g., the right to enforce certain decommissioning requirements with respect to Owned Premises currently licensed and operated by New Chrysler; the right to prevent material alterations to, and ensure the maintenance of, such premises) enhances the marketability and value of such premises. Absent the parties' execution of the TSA Amendment, New Chrysler's obligations under the TSA will be assignable only with New Chrysler's consent. See TSA at § 11.1. Previously, whenever the Debtors sought to sell "Owned Premises," the Debtors were obliged to negotiate with New Chrysler on a one-off basis with respect to assignments of the Debtors' rights under the TSA prior to consummating such sale. See Chadwick Declaration at ¶ 9. These serial negotiations had the potential to increase transaction costs and decrease the marketability of the Owned Premises. See id. Such obstacles

and costs are eliminated by the parties' entry into the TSA Amendment, thus increasing both the marketability of the Owned Premises and the efficiency of the Debtors' winddown efforts.

18.     The License relates only to a single property, but also assists in enhancing the value of that property for the benefit of the Debtors and their estates.  In particular, the License will assist in bolstering the recoverable value, and promoting the efficient liquidation, of the Debtors' engine facility located in Kenosha, Wisconsin and the equipment and fixtures located therein (collectively, the "Kenosha Property").  See id. at ¶ 10.  Pursuant to the License, New Chrysler, on behalf of itself and its subsidiaries, has agreed to grant Old Carco and its affiliates an irrevocable, non-exclusive, fully paid-up, perpetual, worldwide license of certain intellectual property (i.e., patents, know-how, copyrights and the complementary right to make improvements to each) necessary to continue the production and sale of the 2.7 or 3.5 Liter V-6 engines produced at the Kenosha engine facility (the "Licensed Engines"), which license is freely assignable by Old Carco to any potential purchaser or transferee of (a) all of the Kenosha engine facility, (b) one or more engine lines (or the material parts thereof) located at the Kenosha facility or (c) any equipment located at the Kenosha facility (to the extent necessary to use such equipment in substantially the same manner being used at the Kenosha facility as of the effective date of the License or during the period between such effective date and the License Termination Date for the Kenosha facility).  See License, at §§ 2; 8.3(b)(iv).

19.     Accordingly, having entered into the License, any sale by the Debtors of the Kenosha Property may include the transfer of the intellectual property necessary to manufacture the Licensed Engines.  This obviates the need for either the Debtors or any prospective purchaser of the Kenosha Property to negotiate a side agreement with New Chrysler for access to the intellectual property necessary to manufacture the Licensed Engines.  The

Debtors thus believe that the transferability of the License will substantially increase the attractiveness of the Kenosha Property to prospective purchasers. <u>See</u> Chadwick Declaration at ¶ 11.

20. <u>Sufficiency of Consideration</u>. The $20 million purchase price to be paid by New Chrysler under the Purchase Agreement together with the substantial non-monetary consideration represented by New Chrysler's entry into the Ancillary Agreements exceeds the Debtors' previously received estimates for the net proceeds expected pursuant to a sale of the Property. <u>See id.</u> at ¶ 12. In connection with the Debtors' preliminary negotiations with real estate brokers regarding the marketing and disposition of the Property, the Debtors received estimates of the gross proceeds recoverable by the Debtors in connection with a sale of the Property within a range of $8.5 million to $21 million (with the net proceeds recoverable necessarily falling short of such estimates). <u>See id.</u> The Debtors have received no other letters of intent from any party other than New Chrysler indicating an interest in the purchase of the Property. <u>See id.</u>

21. Pursuant to paragraph 3 of the Agreed Order (Docket No. 5982) (the "<u>DIP Lender Winddown Order</u>") by and between the Debtors, the Debtors' debtor-in-possession lenders (collectively, the "<u>DIP Lenders</u>") and the Creditors' Committee, entered by the Court on November 19, 2009, the DIP Lenders acknowledge that their liens on the Property are junior to the liens securing the indebtedness under the First Lien Credit Agreement and are not funding any of the expenses associated with the sale of the Property (which Property is "First Lien Collateral" as such term is defined in the DIP Lender Winddown Order). Instead, these costs currently are being funded pursuant to the First Lien Winddown Order from the Reserve (as such

term is defined in the First Lien Winddown Order) established from the First Lien Lenders' collateral.

22.  In accordance with paragraph 7 of the First Lien Winddown Order, the Debtors have reviewed the substance of their negotiations with respect to the sale of the Property and the terms of the Purchase Agreement with the First Lien Agent, and the First Lien Agent has: (a) designated the Property as an "Estate Asset" (as such term is defined in the First Lien Winddown Order); (b) indicated to the Debtors that the First Lien Lenders have consented to the sale of the Property pursuant to the terms of the Purchase Agreement; (c) indicated to the Debtors that the First Lien Lenders believe the consideration received for the Property is appropriate; and (d) indicated to the Debtors that the First Lien Lenders (as the primary economic parties in interest) prefer that the sale of the Property to New Chrysler be consummated without an auction to avoid any delay and costs associated therewith and to provide the certainty of a near-term sale.  See id. at ¶ 5.

23.  The Debtors have determined in their business judgment that the benefits of consummating a prompt private sale of the Property on the terms and conditions set forth in the Purchase Agreement outweigh any potential benefits of conducting a further marketing and overbid process for the Property where:  (a) the First Lien Lenders, as the primary economic parties in interest, have indicated to the Debtors their preference that the Debtors' estates not incur any further marketing costs with respect to the Property; (b) the Debtors have no agreement with the DIP Lenders or any other party to fund the costs that would be incurred by the Debtors' estates in connection with a further marketing process; (c) the consideration to be received in exchange for the Property (i.e., $20 million in cash plus the substantial non-monetary consideration provided pursuant to the Ancillary Agreements) exceeds the preliminary estimates

of the Property's value received by the Debtors; and (d) the extended License Period with respect to the Property (i.e., until April 30, 2011) otherwise serves to decrease the Property's immediate marketability to other potential purchasers. See id. at ¶ 13.

***Principal Terms of the Purchase Agreement***

24.    The principal terms of the Purchase Agreement are summarized below:[1]

- Acquired Assets: The Land and the Equipment. Purchase Agreement, at ¶ 1.

- Purchase Price: $20,000,000 (the "Purchase Price"). Purchase Agreement, at ¶ 2.

- Deposit: $1,000,000 in immediately available funds payable to the Title Company within three business days of the date of execution of the Purchase Agreement (the "Deposit"). Purchase Agreement, at ¶ 2(a).

- Conditions on New Chrysler's Obligation to Close: New Chrysler's obligation to close the Transaction is conditioned on: (a) Old Carco's delivery to the Title Company of (i) a quitclaim deed conveying fee simple title to the Property (the "Deed"), subject only to Permitted Liens, together with a real estate transfer tax valuation affidavit, (ii) a quitclaim bill of sale conveying title to the Equipment, (iii) an affidavit certifying that Old Carco is not a "foreign person" as such phrase is defined by the United States Internal Revenue Code, (iv) Old Carco's counterparts to the TSA Amendment and the License, (v) an "Owner's Affidavit" in the form attached to the Purchase Agreement as Exhibit C, (vi) an assignment of any and all licenses, permits, warranties and guaranties regarding the Property (to the extent assignable) and (vii) a mutually acceptable closing statement; (b) Old Carco's timely performance of all obligations, covenants and deliveries under the Purchase Agreement; (c) New Chrysler's receipt from the Title Company of the Title Policy; and (d) the Court's entry of the Sale Order, which order shall not have been reversed, vacated or stayed. Purchase Agreement, at ¶ 4(d)(i).

- Conditions on Old Carco's Obligation to Close: Old Carco's obligation to close the Transaction is conditioned on: (a) New Chrysler's delivery to the Title Company of (i) an acceptable closing statement and (ii) New Chrysler's counterparts to the TSA Amendment and the License; (b) New Chrysler's timely performance of all obligations, covenants and deliveries under the Purchase Agreement; (c) New Chrysler's deposit of the remaining portion of the Purchase

---

[1] The description of the principal terms of the Purchase Agreement set forth herein is for the convenience of the Court and other parties in interest. In the event of any inconsistency between this description and the Purchase Agreement, the terms of the Purchase Agreement shall govern. Capitalized terms used in this summary and not otherwise defined herein have the meanings given to such terms in the Purchase Agreement.

Price with the Title Company in immediately available funds on or before the Closing Date; and (d) the Court's entry of the Sale Order, which order shall not have been reversed, vacated or stayed. Purchase Agreement, at ¶ 4(d)(ii).

- <u>Closing Costs</u>: At the Closing, Old Carco will pay, out of the proceeds of the Transaction: (a) any fees incurred in connection with the removal of unpermitted exceptions with respect to the Property (as described in section 3(a) of the Purchase Agreement); (b) all city, state and county transfer taxes and fees payable in connection with the sale; and (c) one-half of any escrow fee. At the Closing, New Chrysler will pay: (a) the cost of obtaining the Title Policy and any endorsements thereto; (b) the cost of a survey of the Property; (c) the cost of recording the Deed; and (d) one-half of any escrow fee. There will be no proration of any real property taxes, assessments and/or utilities at the Closing (all of which will be paid in the ordinary course of business by New Chrysler). Purchase Agreement, at ¶¶ 4(f); 4(g); 4(h).

- <u>Physical Condition of the Property</u>: New Chrysler will take title to the Property on an "as is" and "where is" basis. New Chrysler has agreed to (a) assume the environmental condition of the Property in its condition at the Closing and (b) indemnify, release, defend, covenant not to sue and hold harmless Old Carco from and against any claim, action, matter or obligation that may arise regarding the environmental condition of the Property caused by Purchaser's activities and/or operation of the Property whether existing prior to, on or after the Closing. Purchase Agreement, at ¶ 6.

### The Assigned Agreements

25. <u>The DTE Agreements</u>. Debtors Utility Assets and Old Carco are party to two discrete agreements with DTE related to DTE's provision of utility services at the Property. Under the Utility Services Agreement, DTE provides Utility Assets with various utility services at the Property, including, but not limited to, electrical power, the provision of compressed air, water flow maintenance and water treatment (collectively, the "<u>Utility Services</u>"). The related Easement Agreement between DTE and Old Carco governs DTE's access to the Property in connection with its provision of the Utility Services.

26. <u>The Natural Gas Agreement</u>. Pursuant to the Natural Gas Agreement, non-Debtor West Bay Exploration Company ("<u>West Bay</u>") (a) conducted natural gas exploration activities on the Land and (b) constructed a well, drilling facility and piping system for the

recovery and transmission of natural gas and other liquid hydrocarbons (collectively, the "Natural Gas") to both the assembly plant located on the Property and/or certain third-party distributors of natural gas or other consumers of Natural Gas. Under the Natural Gas Agreement, any Natural Gas not delivered directly to the Property was either delivered to third party suppliers of Natural Gas to the Property for Old Carco's account or sold outright to such third parties. With respect to such Natural Gas not delivered directly to the Property, either (a) Old Carco paid West Bay for such Natural Gas at a price that was five percent lower than the published average price (for Natural Gas credited to Old Carco's account) or (b) West Bay paid Old Carco certain royalties on the sale of Natural Gas to third parties.

27.     Although the natural gas and other liquid hydrocarbons located on the Land have been depleted, West Bay continues to use the facilities constructed on the Property for the processing of Natural Gas produced at another well located in Sterling Heights, Michigan. Such processed Natural Gas is treated under the Agreement as though it had been produced on the Property, resulting in a reduction of the Natural Gas costs attendant upon the operation of the assembly plant.

***Notice of the Proposed Sale***

28.     In accordance with the Administrative Order, pursuant to Bankruptcy Rule 1015(c), Establishing Case Management and Scheduling Procedures (Docket No. 661) (the "Case Management Order"), the Debtors will provide notice of the proposed sale of the Property and the proposed assumption and assignment of the Assigned Agreements by serving this Motion on: (a) counsel to the Creditors' Committee; (b) counsel to the First Lien Agent; (c) counsel to the DIP Lenders; (d) any party who has asserted a lien or encumbrance on the Property; (e) any party who has expressed an interest to the Debtors in purchasing the Property;

(f) all parties on the Special Service List and General Service List (as such terms are defined in the Case Management Order); (g) the Internal Revenue Service; (h) the U.S. Environmental Protection Agency; (i) the U.S. Trustee; (j) the Attorney General for the State of Michigan and the Michigan Department of Environmental Quality; (k) all non-Debtor counterparties to the Assigned Agreements; and (l) counsel to The Bank of New York Trust Company, N.A., in its capacity as the indenture trustee under that certain Indenture, dated as of March 1, 1985, among DaimlerChrysler Company LLC (as predecessor in interest to Old Carco), as issuer, DaimlerChrysler AG (now known as Daimler AG), as guarantor, and U.S. Bank National Association. The Debtors submit that providing notice of the sale in this manner is reasonable and will adequately apprise interested parties of the sale of the Property, while avoiding the costs associated with having the Debtors serve this Motion on parties who are not likely to be directly impacted by the sale of the Property.

## **Extraordinary Provisions Under the Guidelines**

29.     The following are items in the Purchase Agreement and the Sale Order that may be considered "extraordinary provisions" under the "Guidelines for the Conduct of Asset Sales" promulgated pursuant to General Order M-331 (the "Guidelines"):

(a)     Private Sale.  As described above, the Purchase Agreement and Sale Order contemplate the private sale of the Property.  As described elsewhere in this Motion, the Debtors believe that a private sale is appropriate under the circumstances and maximizes the value of the Property.

(b)     Use of Proceeds.  The Debtors intend to release the net proceeds of the sale of the Property to the First Lien Lenders, to whom the Property has been pledged as collateral pursuant to the First Lien Credit Agreement and as the primary economic parties in interest, in accordance with paragraph 16 of the First Lien Winddown Order.

(c)     Waiver of Bankruptcy Rule 6004(h) Stay.  The proposed form of Sale Order seeks a waiver of the 14-day stay imposed under Bankruptcy Rule 6004(h).  The Debtors submit that such relief is appropriate under the circumstances.

# Argument

### Approval of the Sale of the Property is Appropriate
### and in the Best Interests of the Debtors' Estates and Creditors

30.     Under section 363 of the Bankruptcy Code, a debtor in possession may

sell property of its estate outside of the ordinary course of its business, subject to the approval of

the court after notice and a hearing.  See 11 U.S.C. § 363(b)(1).  Courts in the Second Circuit

have found that the decision to sell assets outside the ordinary course of business should be based

upon the sound business judgment of the debtor and, where that judgment has a reasonable basis,

a court ordinarily should defer to that judgment in determining whether to approve a proposed

transaction.  See Sale Opinion, at pp. 15-16 (noting that proposed sales of assets outside the

ordinary course of business must be supported by "a proper business justification"); Licensing

By Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial

part of a Chapter 11 estate may be conducted if a good business reason exists to support it.");

Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071

(2d Cir. 1983); In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); Stephens Indus. v.

McClung, 789 F.2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of all a

Chapter 11 debtor's assets under [section] 363(b)(1) when a sound business purpose dictates such

action."); Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville

Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct.").

31.     Courts typically consider the following four factors in determining

whether a proposed sale satisfies this standard:  (a) whether a sound business justification exists

for the sale; (b) whether adequate and reasonable notice of the sale was given to interested

parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. See, e.g., In re Weatherly Frozen Food Group, Inc., 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

32. Here, each of these factors has been satisfied. First, a sound business justification underlies the Debtors' decision to sell the Property where the proposed sale will (a) provide the Debtors with consideration (in the form of both the Purchase Price and New Chrysler's entry into the Ancillary Agreements) that exceeds the Debtors' previously-received estimates of the Property's recoverable value and (b) allow the Debtors to (i) continue to implement the winddown of the Debtors' estates (as described in the DIP Lender Winddown Order, First Lien Winddown Order and the Plan) and (ii) monetize the Property for the benefit of the Debtors' estates and creditors, including the First Lien Lenders (who are the primary economic parties in interest). See Chadwick Declaration, at ¶ 14.

33. Second, as discussed in paragraph 28 above, the Debtors will be providing adequate and reasonable notice of the proposed sale of the Property to all relevant interested parties. See, e.g., Folger Adam Sec. Inc. v. DeMatteis/MacGregor, 209 F.3d 252, 265 (3d Cir. 2000) (stating that notice is sufficient if it includes "the terms and conditions of any private sale, states the time for filing objections and, if real estate is being sold, provides a general description of the property"); In re WBQ P'ship, 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) ("'notice is sufficient if it includes the terms and conditions of the sale, if it states the time for filing objections, and if the estate is selling real estate, it generally describes the property'") (quoting In re Karpe, 84 B.R. 926, 929 (Bankr. M.D. Pa. 1988)).

34.     Third, the fact that the Property is to be sold pursuant to a private sale does not undermine the fair or reasonable nature of New Chrysler's offer for the Property.  The $20 million cash consideration to be received in exchange for the Property — without even considering the substantial additional value of the Ancillary Agreements or the absence of any brokers' fees in connection with the Transaction — falls at the upper end of the range of the previous estimates of the gross recoverable value of the Property received by the Debtors.  Moreover, (a) Old Carco's prospective ability to assign New Chrysler's obligations under the TSA with respect to Owned Premises to prospective purchasers of such premises (which ability is granted pursuant to the TSA Amendment) and (b) New Chrysler's agreement to grant Old Carco a non-exclusive and freely assignable License of certain intellectual property related to the manufacture of the Licensed Engines — consideration that is simply unavailable from any other prospective purchaser — provide Old Carco's bankruptcy estate with substantial value by enhancing the marketability and value of the Debtors' remaining assets.  Thus, New Chrysler's offer for the Property significantly exceeds the Debtors' prior expectations for the value to be recovered on account thereof.  Accordingly, under the circumstances, the private sale of the Property on the terms and conditions set forth in the Purchase Agreement maximizes the value of the Property for the Debtors' estates and represents a sound exercise of the Debtors' business judgment.  See Chadwick Declaration, at ¶ 14.

35.     Although many sales of assets outside the ordinary course of business are conducted subject to competitive bidding procedures and pursuant to public auction, section 363 of the Bankruptcy Code does not require such procedures or process.  Indeed, Bankruptcy Rule 6004(f) — which provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction" — specifically contemplates private sales.  See Fed. R. Bankr.

P. 6004(f).  The Guidelines promulgated by this Court likewise refuse to "express a preference for public over private sales as a means to maximize the sale price" of assets.  Guidelines, at page 2, note 2.

36.     Numerous courts have endorsed the sale of assets outside the ordinary course of business by means of a private sale.  See In re Bakalis, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) ("Unlike judicial sales under the Bankruptcy Act, the sale of estate property under the Bankruptcy Code is conducted by a trustee, who has ample discretion to conduct public or private sales of estate property."); Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship), 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect sales of estate property pursuant to section 363 of the Bankruptcy Code, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

37.     Accordingly, courts in this District — including this Court (earlier in these chapter 11 cases) — have approved private sales of assets where the debtors have satisfied the general standards for approval under section 363 of the Bankruptcy Code described above. See, e.g., In re Old Carco LLC (f/k/a Chrysler LLC), Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Nov. 12, 2009) (Docket No. 5937) (order approving sale of the Debtors' former Newark, Delaware assembly plant by private sale where the Debtors satisfied the requirements of section 363 of the Bankruptcy Code); In re Wellman, Inc., Case No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2009) (order approving the sale of one of the debtors' facilities by private sale, not subject to higher and better offers); In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Nov. 29, 2005) (order authorizing the sale of certain aircraft by private sale and stating that "no auction was necessary with respect to sale of the [a]ircraft").

38.     Given (a) the significant cash Purchase Price and additional consideration being offered by New Chrysler (which, in the case of the Purchase Price, is not subject to financing contingencies and, in the case of the Ancillary Agreements, is not available from other prospective purchasers) and (b) New Chrysler's willingness to promptly consummate the sale on an "as is, where is" basis, the Debtors believe that it is unlikely that an overbid process will generate higher and better offers for the Property and, thus, that the consideration described in the Purchase Agreement is fair and reasonable.  See Chadwick Declaration, at ¶ 14.

39.     In addition, the First Lien Lenders, who by virtue of their properly perfected first priority lien on the Property are entitled to the net proceeds of any sale thereof and any funding the costs of the sale process, have indicated their preference that the sale of the Property to New Chrysler be consummated without an auction to avoid any delay and costs associated therewith.  The Debtors and the First Lien Lenders agree that privately selling the Property likely will avoid the incurrence of significant sale and auction costs that (a) are unlikely to produce a higher and better offer for the Property and (b) will reduce the funds available in the Reserve to fund the Debtors' further efforts to liquidate the First Lien Lenders' collateral.  See id., at ¶ 15.

40.     Fourth, the Debtors and New Chrysler are proceeding in good faith.  New Chrysler is not an insider of the Debtors, and the transaction was negotiated in good faith and at arm's length.

41.     For all of the foregoing reasons, the proposed sale of the Property satisfies the standards of section 363 of the Bankruptcy Code governing sales of assets outside the ordinary course of business and should therefore be approved.

***New Chrysler is a "Good Faith Purchaser"***

42.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Although the Bankruptcy Code does not define "good faith," the Second Circuit Court of Appeals, in <u>In re Gucci</u>, has held that the:

> [g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'

126 F.3d at 390 (quoting <u>In re Rock Indus. Mach. Corp.</u>, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code)); <u>see</u> <u>also</u> <u>Bace v. Babbitt</u>, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25, 2008) (same; quoting <u>Gucci</u>); <u>In re Sasson Jeans, Inc.</u>, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

43. There is little question that New Chrysler — which is not an "insider" of the Debtors under section 101(31) of the Bankruptcy Code — will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. The Debtors and New Chrysler have entered into the Purchase Agreement without collusion, in good faith and from arm's-length bargaining positions. There is no indication of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or any similar conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. <u>See</u> Chadwick Declaration, at ¶ 7. Finally, as described above, the consideration to be received by the Debtors pursuant to the Purchase Agreement is

substantial, fair and reasonable.  Accordingly, the Debtors seek a finding that New Chrysler is a "good faith purchaser" under section 363(m) of the Bankruptcy Code and entitled to the full protection thereof.

***The Proposed Sale of the Property Free and Clear of
Liens, Claims and Encumbrances Should be Approved***

44.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (1)  applicable nonbankruptcy law permits the sale of such property free and clear of such interest;
>
> (2)  such entity consents;
>
> (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)  such interest is in bona fide dispute; or
>
> (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see also Sale Opinion, at p. 24 (stating that, when considering whether assets may be sold free and clear of any liens and interests of an entity other than the estate, "the Court must determine whether *any* of the elements of section 363(f) are satisfied") (emphasis added); Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.), 333 B.R. 30, 50 (S.D.N.Y. 2005) ("Where … a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in section 363(f) of the statute must also be met.").  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a);

see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

45.     As an initial matter, the First Lien Lenders have consented to the sale of the Property free and clear of their liens under the First Lien Credit Agreement.  The Debtors propose that these liens and any other liens, claims, interests and encumbrances asserted against the assets be transferred, and attach, to the sale proceeds, except to the extent that New Chrysler has agreed in the Purchase Agreement to take title subject to such liens.  All liens on the assets will either be satisfied or will attach to the proceeds of the sale of the assets with the same force, effect and priority as such liens have on the assets, subject to the rights and defenses, if any, of the Debtors and any party in interest with respect thereto.  Moreover, the Debtors believe that each of the parties holding liens in the Property could be compelled to accept a monetary satisfaction of such interests.  In addition, if a holder of a lien, claim, interest or encumbrance receives notice of this Motion and does not object within the prescribed time period, the Debtors submit that such holder may be deemed to have consented to the proposed sale.  Accordingly, the Debtors submit that the sale of assets free and clear of liens, claims, interests and encumbrances satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

### *Approval of Assumption and Assignment of the Assigned Agreements*

46.     The standard for a debtor to assume and assign an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code is whether the debtor's decision is made within its sound business judgment.  See, e.g., Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993) (noting that section 365 of the Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the

debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject.").

47.     The Debtors seek authority to assume, and assign to New Chrysler, the Assigned Agreements in connection with the sale of the Property. The assumption and assignment of the Assigned Agreements is provided for in the Purchase Agreement and is an integrated part of the transaction contemplated therein. In light of the Debtors' proposed liquidation pursuant to the Plan, the Assigned Agreements no longer provide any benefit to the Debtors' estates (beyond enhancing the value of the Property). Indeed, given the posture of these chapter 11 cases, the Assigned Agreements only serve to burden the Debtors' estates. By contrast, the Assigned Agreements have significant value to New Chrysler as the new owner and operator of the Property. Accordingly, the assumption and assignment of the Assigned Agreements is warranted, in the Debtors' business judgment, to eliminate any ongoing liabilities associated therewith and to maximize the value of the Property.

48.     Pursuant to section 365(b) of the Bankruptcy Code, prior to the assumption of the Assigned Agreements, the Debtors generally are required to (a) cure any outstanding defaults under the Assigned Agreements and (b) provide adequate assurance of New Chrysler's future performance thereunder. There are no outstanding defaults under the Assigned Agreements and, thus, no amounts need be paid to the counterparties thereto as cure in connection with the assumption of the Assigned Agreements pursuant to section 365(b) of the Bankruptcy Code. Moreover, New Chrysler's (a) continuing performance of all Debtor obligations under the Assigned Agreements during the License Period and (b) financial wherewithal to continue such performance on a prospective basis provides adequate assurance of New Chrysler's ability to perform under the Assigned Agreements in the future. Accordingly,

the requirements of cure of defaults and adequate assurance of future performance set forth at section 365(b) of the Bankruptcy Code are satisfied with respect to the Assigned Agreements.

49.     Assumption and assignment of the Assigned Agreements is thus a sound and reasonable exercise of the Debtors' business judgment and should be approved. The Debtors request that, if the non-Debtor counterparties to the Assigned Agreements fail to object to the proposed sale of the Property, such counterparties should be deemed to consent to the proposed treatment of the Assigned Agreements under section 365 of the Bankruptcy Code and this Motion. See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabeel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

***Waiver of 14-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)***

50.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, any order authorizing the sale of property pursuant to section 363 of the Bankruptcy Code is automatically stayed for 14 days after the entry of such order. See Fed. R. Bankr. P. 6004(h). Pursuant to Bankruptcy Rule 6006(d), unless the court orders otherwise, any order authorizing the assignment of an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code is automatically stayed for 14 days after the entry of such order. See Fed. R. Bankr. P. 6006(d). The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before the order is implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and Fed. R. Bankr. P. 6006(d).

51.     The Debtors believe that a waiver of the 14-day periods under Bankruptcy Rules 6004(h) and 6006(d) is appropriate here because (a) the Debtors have received no other letters of intent or similar binding offers from any party other than New Chrysler indicating an interest in the purchase of the Property and (b) the immediate consummation of this transaction

(including the assumption, and assignment to New Chrysler of, the Assigned Agreements) permits the Debtors to complete an important sale as part of their ongoing winddown and focus on liquidating their remaining properties and completing the other aspects their winddown efforts.

## **Notice**

52.     No trustee or examiner has been appointed in these chapter 11 cases.  In accordance with the Case Management Order, notice of this Motion and the proposed sale of the Property will be provided by serving the Sale Motion in the manner described in paragraph 28. The Debtors submit that no other or further notice need be provided.

## **Prior Request**

53.     No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that this Court: (i) enter the Sale Order in substantially the form attached hereto as <u>Exhibit C</u>; and (ii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: February 18, 2010
      New York, New York

Respectfully submitted,

  s/  Corinne Ball
Corinne Ball
Veerle Roovers
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

David G. Heiman
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

Jeffrey B. Ellman
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

**EXHIBIT A**

**[Purchase Agreement]**

# AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE (this "Agreement"), is dated as of February 18, 2010 (the "Agreement Date"), between OLD CARCO LLC (f/k/a Chrysler LLC), a Delaware limited liability company ("Seller"), and CHRYSLER GROUP LLC ("Purchaser").

## RECITALS

WHEREAS, Seller filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which case is administered under Case No. 09-50002 (AJG) (the "Bankruptcy Proceeding").

WHEREAS, Seller desires to sell, and Purchaser desires to purchase, certain property located in Sterling Heights, Michigan, of which Seller is the owner (the "Transaction").

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Agreement.  Upon the terms and subject to the conditions set forth in this Agreement, as approved by the Bankruptcy Court, and the Sale Order (defined in Section 5(f) below), Seller hereby agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, real property located at 38111 Van Dyke, Sterling Heights, Michigan, and more specifically described on Exhibit A attached hereto and incorporated by reference herein together with all of Seller's right, title and interest, if any, in and to all appurtenances, improvements, fixtures, easements and rights-of-way incident thereto and any and all air, mineral and riparian rights of Seller with respect thereto and all land division rights under the Michigan Land Division Act (collectively, the "Land") and all of Seller's right, title and interest, if any, in and to all personalty, trade fixtures, and equipment currently located on the Land (collectively, the "Equipment" and, together with the Land, the "Property").

2.    Purchase Price; Deposit.  The purchase price for the Property shall be TWENTY MILLION AND NO/100 DOLLARS ($20,000,000.00) (the "Purchase Price").  The Purchase Price shall be payable as follows:

(a)    A total of ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) as a deposit (the "Deposit") in immediately available funds payable to the Title Company (as defined in Section 3 below) within three (3) business days following the Agreement Date.  The Deposit shall be held in an interest bearing escrow account by the Title Company and delivered in accordance with and pursuant to the terms and conditions contained herein and shall be applied toward the Purchase Price upon the closing of the Transaction contemplated by this Agreement ("Closing"). Any interest earned on the Deposit shall be paid to Purchaser unless Seller shall be entitled to the Deposit by reason of a default by Purchaser, in which case such interest shall be paid to Seller.  Purchaser's Federal Tax I.D. Number is 27-0187394 and Seller's Federal Tax I.D. Number is 38-2673623.

(b)     The balance of the Purchase Price, plus and minus applicable prorations as set forth herein, in immediately available funds at Closing.

3.     Title Commitment.

(a) Purchaser acknowledges it has obtained, at its sole expense, a commitment number NCS 424952, Rev. #2, dated February 2, 2010 (the "Commitment") from First American Title Insurance Company (the "Title Company") and an ALTA/ACSM survey from Spalding DeDecker Associates, Inc. and McNeely & Lincoln Associates, Inc. dated January 27, 2010 (the "Survey"). Purchaser has approved the exception documents listed in the Commitment as set forth on Exhibit F attached hereto and made a part hereof (other than the liens delineated on Exhibit G attached hereto and made a part hereof, collectively referred to herein as the "Identified Liens") and the Survey as of the Agreement Date, *provided, however,* that Purchaser shall be permitted to object to any encumbrance or defect in title, other than any Permitted Lien (as defined below), that is recorded in the real property records of the County of Macomb, State of Michigan on or after the Agreement Date excluding those matters created, suffered or permitted by, at the request of or through Purchaser ("Post Agreement Date Objections"). Within five business days after receipt of Purchaser's Post Agreement Date Objections, Seller shall notify Purchaser if Seller is unable or unwilling to remove any such encumbrances or defect in title on or prior to the Closing Date (as defined below) at Seller's sole cost ("Seller's Title Notice"). If Seller is unable or unwilling to cure any such objections, Purchaser shall have the option to notify Seller within five business days of Seller's Title Notice of Purchaser's intention to terminate this Agreement in which case the Deposit shall be promptly returned to Purchaser. If Purchaser fails to timely respond to Seller's Title Notice, Purchaser shall be deemed to have waived such exceptions and shall be required to proceed with Closing without diminution in the Purchase Price. From and after the Agreement Date until the earlier of Closing or the termination hereof, Seller shall not take any action, or fail to take any action, that would cause title to the Property to be subject to any title exceptions other than the Permitted Liens.

(b) Those title exceptions that Purchaser does not disapprove of, as well as (i) any exceptions included in the Commitment that were recorded prior to the Agreement Date (other than any Identified Liens), (ii) real estate taxes, (iii) matters created, suffered or permitted by or through the Purchaser (other than any Identified Liens), (iv) roads, highways and other public rights of way, (v) zoning, land use and other governmental laws, rules and regulations, (vi) any matters shown on the Survey and (vii) rights, remedies and obligations relating to the Property set forth in the Transition Services Agreement, by and between Old Carco and New Chrysler, dated June 10, 2009 (as it may have been, or may be, amended or supplemented from time to time, the "TSA"), shall be "Permitted Liens."

(c) Notwithstanding anything contained herein to the contrary, the parties acknowledge that the description of the Property on Exhibit A attached hereto is Seller's good faith determination of the description of the Property to be sold. Seller makes no representations or warranties as to the description as set forth on Exhibit A.

4.     Title and Closing.

(a)    <u>Closing</u>.  The Closing shall occur on the later of (i) the fourteenth day after the entry of the Sale Order (as defined in Section 5(f) below) or (ii) the second business day thereafter on which the Sale Order shall no longer be subject to an appeal or a stay of its effectiveness; or on an earlier or later date established by mutual agreement of the parties (the "<u>Closing Date</u>").  The Closing shall take place at 10:00 a.m. on the Closing Date, in the offices of the Title Company, or at such other time and place as may be mutually agreed upon by Seller and Purchaser.  Neither party shall be required to close unless all conditions to the obligations of such party have been satisfied or waived (by the party entitled to waive the same).  It is acknowledged that Purchaser is currently in possession of the Property under the terms of the TSA and, upon Closing, will continue in possession as owner of the Property.  Seller shall terminate any and all written leases and occupancy agreements to which Seller is a party with respect to the Property (to the extent any exist) on or prior to the Closing Date.

(b)    <u>Seller Deliveries</u>.  On or before the Closing Date, Seller shall deposit or shall cause to be deposited the following documents with the Title Company:

(i)    a quitclaim deed conveying fee simple title to the Property to Purchaser subject only to the Permitted Liens (the "<u>Deed</u>") together with a real estate transfer tax valuation affidavit;

(ii)    a quitclaim bill of sale conveying title to all of the items of Equipment included in the Premises;

(iii)    an affidavit as required by Section 1445 of the Internal Revenue Code of 1986 (the "<u>I.R.C.</u>") certifying that Seller is not a "foreign person" as defined in the I.R.C.;

(iv)    Seller's counterpart to an amendment to the TSA in the form attached hereto as <u>Exhibit B</u> (the "<u>TSA Amendment</u>");

(v)    An Owner's Affidavit in the form attached hereto as <u>Exhibit C</u>, which the Title Company has reviewed and approved as satisfactory to delete the standard exceptions (provided Purchaser obtains a Survey sufficient to delete the standard survey exception from such policy) and insure over any gap between the Closing and recordation of the Deed;

(vi)    an assignment of any and all licenses, permits, warranties and guaranties regarding the Property (to the extent assignable);

(vii)    a mutually acceptable closing statement; and

(viii)    Seller's counterpart to a royalty free license agreement for the Kenosha 2.7 and 3.5 liter engine between Purchaser and Seller in the form attached hereto as <u>Exhibit D</u> (the "<u>License Agreement</u>") (collectively, "<u>Seller's Closing Deliveries</u>").

(c)    <u>Purchaser Deliveries</u>.  On or before the Closing Date, Purchaser shall

deposit or shall cause to be deposited the following documents with the Title Company:

      (i)      Purchaser's counterpart to the TSA Amendment;

      (ii)      a mutually acceptable closing statement; and

      (iii)      Purchaser's counterpart to the License Agreement (collectively, "<u>Purchaser's Closing Deliveries</u>").

    (d)  <u>Conditions to Closing</u>.

      (i)      Purchaser's obligation to purchase the Property is expressly conditioned upon each of the following:

          (A)      Seller delivering to the Title Company Seller's Closing Deliveries;

          (B)      Timely performance of each obligation, covenant and delivery required of Seller;

          (C)      Purchaser's receipt from the Title Company of an ALTA Owner's Policy of Title Insurance insuring fee simple title to the Property in Purchaser, in the amount of the Purchase Price, without standard exceptions (provided Purchaser obtains a Survey sufficient to delete the standard survey exception from such policy) and with gap coverage, subject only to the Permitted Liens and with the following standard endorsements to the extent available in the State of Michigan (provided Purchaser obtains a Survey sufficient to obtain the following endorsements): access endorsement, survey endorsement, owner's comprehensive endorsement, 3.1 zoning endorsement and tax parcel endorsement (the "<u>Title Policy</u>"); and

          (D)      Entry of the Sale Order, which must be in form and substance acceptable to Purchaser, and that order having not been reversed or vacated or being subject to a stay of its effectiveness.

      (ii)      Seller's obligation to sell is expressly conditioned upon each of the following:

          (A)      Purchaser delivering to the Title Company Purchaser's Closing Deliveries;

          (B)      Timely performance of each obligation, covenant and delivery required of Purchaser;

          (C)      On or before the Closing Date, Purchaser shall deposit with the Title Company the remaining balance of the Purchase Price in

immediately available funds; and

> (D) Entry of the Sale Order by the Bankruptcy Court and that order having not been reversed or vacated or being subject to a stay of its effectiveness.

(e) The Title Company is hereby instructed that when it has received confirmation from Purchaser and Seller that the conditions above have been satisfied and is in a position to otherwise close this Transaction as contemplated hereby, the Title Company shall (i) deliver and record the Deed, and (ii) deliver to Seller the Purchase Price net of any adjustments required hereby.

> (f) At Closing, Seller shall pay the following costs out of the proceeds from the sale:

>> (i) Any fees incurred in connection with the removal of any unpermitted exceptions with respect to the Property pursuant to Section 3(a) above;

>> (ii) One hundred percent (100%) of any city, state or county transfer tax or fee payable on or in connection with the sale and/or conveyance of the Property; and

>> (iii) One-half of the cost of any escrow fee.

> (g) At Closing, the Purchaser shall pay the following costs:

>> (i) The cost of the Title Policy and any endorsements to the Title Policy;

>> (ii) The cost of the Survey;

>> (iii) The cost of recording the Deed; and

>> (iv) One-half of the cost of any escrow fee.

> (h) There shall be no proration of any real property taxes, assessments and/or utilities at the Closing.

5. <u>Bankruptcy Court Matters.</u>

> (a) This Agreement is subject to approval by the Bankruptcy Court.

> (b) Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.

> (c) Upon execution of this Agreement by all parties hereto, Seller will,

within ten business days, file with the Bankruptcy Court a motion (the "Sale Motion") seeking Bankruptcy Court approval of a private sale of the Property to Purchaser pursuant to this Agreement, notices and proposed orders, each in form and substance reasonably satisfactory to Purchaser (and the Sale Motion shall also be in form and substance reasonably satisfactory to Purchaser), seeking the Bankruptcy Court's entry of the Sale Order attached hereto as Exhibit E. To the extent consistent with applicable legal requirements and the Seller's fiduciary duties, Seller shall prosecute the Sale Motion in good faith and in an expeditious manner. Any modifications or amendments to the Sale Order after the date hereof shall be subject to Purchaser's prior written approval.

Seller shall serve a copy of the Sale Motion on: (i) all entities known to assert any interest in or lien upon the Property (including all holders of liens against the Property as identified by the Commitment); (ii) all parties that are entitled to notice under Bankruptcy Rule 2002; (iii) the attorney general of the state in which the Property is located; (iv) the Office of the United States trustee for the Southern District of New York; (v) all entities that expressed to the Seller an interest in purchasing the Property; (vi) any party appearing in the Bankruptcy Proceeding and claiming a secured interest in the Property; and (vii) any and all other parties directed by the Bankruptcy Court.

(d)    Seller shall provide Purchaser with copies of all motions, applications and supporting papers prepared by or on behalf of the Seller (including forms of orders and notices to interested parties) directly relating to the Property or this Agreement at least two business days prior to the filing thereof, unless the exigencies of time prevent the period from being that long, with the Bankruptcy Court so as to allow Purchaser to provide reasonable comments which Seller shall incorporate into same.

The Sale Order, to the extent permitted under the Bankruptcy Code or other applicable law, shall be binding upon and shall govern the acts of all entities, including, but not limited to, any subsequently appointed chapter 11 or chapter 7 trustee of Seller, all taxing authorities, filing agents, filing officers, title agents, title companies, recorders and/or registrars of mortgages, recorders and/or registrars of deeds, administrative agencies, governmental agencies or departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure as to title or state of title in or to the Property or any part thereof. The Sale Order shall be recorded as an exhibit to the Deed in the Register of Deeds Office of Macomb County as part of the Closing.

(e)    Commercially Reasonable Efforts. Upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable legal requirements to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby.

(f)    Definitions. "Sale Order" shall be an order or orders of the Bankruptcy Court, in form and substance acceptable to Purchaser and Seller approving this

Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the Transaction contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) this Agreement and the Transaction are approved in all respects, (ii) the Property sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser subject only to the Permitted Liens and free and clear of all Interests (as defined in the Sale Order), including, without limitation, the Identified Liens, with such Interests to attach to the net proceeds from the sale of the Property with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or the proceeds, subject to any rights, claims and defenses Seller or its estate, as applicable, may possess with respect thereto; (iii) Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code and that Purchaser is entitled to the protections of section 363 (m) of the Bankruptcy Code and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the Transaction shall not affect the validity of the Transaction, unless such authorization is duly stayed pending such appeal; (iv) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (v) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement and the Sale Order; and (vi) this Agreement and the Transaction contemplated hereby may be specifically enforced (including, without limitation, by Purchaser) against and binding upon, and not subject to rejection or avoidance by, Seller, any chapter 7 or chapter 11 trustee of Seller or any other person.

6. <u>Physical Condition of the Property</u>. Purchaser acknowledges that the purchase of the Property by Purchaser is on an "AS IS" AND "WHERE IS" basis and Purchaser hereby agrees to assume the environmental condition of the Property in its condition at Closing and hereby agrees to indemnify, defend, release and hold harmless Seller from and against any claim, action, matter or obligation that may arise in the future regarding the environmental condition of the Property caused by Purchaser's activities and/or operation of the Property whether existing prior to, on or after the Closing. UPON CLOSING, PURCHASER EXPRESSLY AGREES TO ACCEPT THE PROPERTY "AS IS" AND "WHERE IS" AND SELLER SHALL, UNDER NO CIRCUMSTANCES, BE DEEMED TO HAVE MADE, AND SELLER HEREBY DISCLAIMS, ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE CONDITION OF THE PROPERTY, ANY ENVIRONMENTAL CONDITION OF THE PROPERTY (INCLUDING, WITHOUT LIMITATION, THE PRESENCE OF ANY POLLUTANT OR CONTAMINANT, INCLUDING ANY HAZARDOUS SUBSTANCE IN, ON OR UNDER THE PROPERTY) AND THE ADEQUACY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PROPERTY OR ANY PART THEREOF. SELLER SHALL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, BUSINESS INTERRUPTION OR STRICT OR ABSOLUTE LIABILITY IN TORT, OCCASIONED BY OR ARISING IN CONNECTION WITH THE CONDITION OR ANY ALLEGED CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, LIABILITY ARISING OUT OF ANY ENVIRONMENTAL CONDITION WITH RESPECT TO THE PROPERTY. PURCHASER AGREES TO RELEASE SELLER, THE DEBTORS (AS DEFINED IN THE SALE ORDER),

AND ANY SUBSIDIARY OR AFFILIATE OF SELLER OR THE DEBTORS FROM AND AGAINST ANY AND ALL CLAIMS AGAINST SELLER, THE DEBTORS AND ANY SUBSIDIARY OR AFFILIATE OF SELLER OR THE DEBTORS ARISING ON OR AFTER THE CLOSING CONCERNING THE ENVIRONMENTAL CONDITION OF THE PROPERTY, AND COVENANTS NOT TO SUE SELLER, THE DEBTORS, ANY SUBSIDIARY OR AFFILIATE OF SELLER OR THE DEBTORS, OR ANY OF THEIR RESPECTIVE EMPLOYEES, DIRECTORS OR OFFICERS OR JOIN SELLER, THE DEBTORS AND ANY SUBSIDIARY OR AFFILIATE OF SELLER OR THE DEBTORS, OR ANY OF THEIR RESPECTIVE EMPLOYEES, DIRECTORS, OFFICERS OR AGENTS, IN ANY ACTION CONCERNING THE ENVIRONMENTAL CONDITION OF THE PROPERTY. THE PARTIES AGREE THAT THE FOREGOING RELEASE AND COVENANT SHALL RUN WITH THE PROPERTY AND BIND SUBSEQUENT PURCHASERS THEREOF AND THAT THE DEED WILL INCLUDE A REFERENCE THERETO PUTTING ANY FUTURE PURCHASERS OF THE PROPERTY ON NOTICE THEREOF.

7. <u>Default; Liquidated Damages</u>. Purchaser and Seller acknowledge that it would be extremely impracticable and difficult to ascertain the actual damages that would be suffered by a party if the other party fails to consummate the purchase and sale contemplated herein for any reason other than (a) Seller's termination of this Agreement as permitted under this Agreement, or (b) Purchaser's termination of this Agreement as permitted under this Agreement. Purchaser and Seller have considered carefully the loss to Seller occasioned by taking the Property off the market as a consequence of the negotiation and execution of this Agreement, the personal expenses of Seller incurred in connection with the preparation of this Agreement and Seller's performance hereunder, and the other damages, general and special, that Purchaser and Seller realize and recognize Seller will sustain, but which Seller cannot at this time calculate with absolute certainty. Based on all those considerations, Purchaser and Seller have agreed that the damage to Seller would reasonably be estimated to be an amount equal to the Deposit.

ACCORDINGLY, IF ALL CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CONSUMMATE THE TRANSACTIONS HEREIN CONTEMPLATED HAVE BEEN WAIVED BY PURCHASER IN ACCORDANCE WITH THE TERMS HEREIN OR SATISFIED, IF SELLER HAS PERFORMED ITS COVENANTS AND AGREEMENTS HEREUNDER AND PURCHASER HAS NOT TERMINATED THIS AGREEMENT AS PERMITTED HEREUNDER, BUT PURCHASER HAS BREACHED ITS COVENANTS AND AGREEMENTS HEREUNDER AND HAS FAILED, REFUSED OR IS UNABLE TO CONSUMMATE THE PURCHASE AND SALE CONTEMPLATED HEREIN (THROUGH NO FAULT OF SELLER) BY THE CLOSING DATE, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT, THE DEPOSIT SHALL BE DEEMED FULL AND COMPLETE LIQUIDATED DAMAGES, NO PARTY TO THIS AGREEMENT SHALL HAVE ANY FURTHER LIABILITY TO ANY OTHER PARTY TO THIS AGREEMENT AND THIS AGREEMENT SHALL BE DEEMED NULL, VOID AND OF NO FURTHER FORCE AND EFFECT. THE FOREGOING SHALL BE SELLER'S SOLE REMEDY AGAINST PURCHASER FOR ANY CLAIM OF ANY KIND ARISING OUT OF OR RELATING TO PURCHASER'S OBLIGATIONS ARISING UNDER THIS AGREEMENT OR THE PURCHASE OF THE PROPERTY, PROVIDED, HOWEVER, THE FOREGOING SHALL NOT BE A WAIVER OF PURCHASER'S POST CLOSING INDEMNITY SET

FORTH IN SECTION 6.

If Seller has breached its covenants or agreements under this Agreement and such breach results in Seller's inability to consummate the sale as contemplated herein by the Closing Date, (i) Seller shall refund the entire Deposit to the Purchaser or (ii) Purchaser may seek to enforce the terms of this Agreement, whereby Purchaser shall be entitled to specific performance, provided, however, that Purchaser may only pursue such specific performance after the Transaction has been approved by the Bankruptcy Court in accordance with Section 5 herein. It is acknowledged that in the event Purchaser fails to commence an action for specific performance within forty-five (45) days after such default, Purchaser's sole remedy, except as provided in this Section, shall be to receive a return of the Deposit and terminate this Agreement. In no event shall Purchaser or Seller be entitled to recover any consequential or special damages for any breach of this Agreement by either party.

8. <u>Brokerage Charges</u>. Seller and Purchaser respectively represent, each to the other, that no real estate broker has been dealt with in regard to this Transaction. Each party agrees to indemnify and hold the other harmless from and against any and all claims for brokerage commissions arising from any broker utilized by such party and all related expenses including, without limitation, reasonable attorneys' fees and expenses.

9. <u>Notices</u>. All notices or other communications made pursuant hereto shall be in writing and shall be deemed properly delivered, given or served if (a) transmitted by facsimile, (with copy by email) or (b) sent by overnight courier service to the parties at the following addresses:

Seller:  John Rooney
Capstone Advisory Group, LLC
Park 80 West
250 Pehle Avenue, Suite 105
Saddle Brook, NJ 07663
Facsimile: (201) 587-7102
Email: jrooney@capstoneag.com

With a copy to:

William A. Herzberger, Esq.
Jones Day
901 Lakeside Avenue
Cleveland, OH 44114-1190
Facsimile: (216) 579-0212
Email: wherzberger@jonesday.com


Jeffrey B. Ellman, Esq.
Jones Day
1420 Peachtree Street, N.E.
Suite 800

Atlanta, Georgia 30309-3053
Facsimile: (404) 581-8330
Email: jbellman@jonesday.com

Purchaser:     Holly E. Leese, Esq., General Counsel
Chrysler Group LLC
800 Chrysler Drive CIMS 483-00-79
Auburn Hills, MI 48326-2757
Facsimile: (248)512-3984
Email: holly.leese@chrysler.com

With a copy to:

Monica J. Labe, Esq.
Dickinson Wright PLLC
38525 Woodward Avenue, Suite 2000
Bloomfield Hills, MI 48304
Facsimile: (248) 433-7274
Email: mlabe@dickinsonwright.com

All notices shall be deemed received (a) if transmitted by facsimile (with copy by email), on the business day when transmitted or if not transmitted prior to 5:00 p.m., prevailing Eastern Time, on the next succeeding business day; and (b) if sent by courier, one business day after it is sent. Either party may change its address for the purposes of this section by giving ten days' prior written notice of such change to the other party in the manner provided in this section.

10.     Purchaser's Representations.  Purchaser hereby represents and warrants to Seller that Purchaser has the full power and authority to enter into this Agreement and to perform the obligations of Purchaser hereunder, and no further consent or approval is required for this Agreement to constitute the legal, valid and binding obligation of Purchaser.

11.     Seller's Representations.  Subject to the entry of the Sale Order and that order not being reversed, modified, vacated or subject to a stay of its effectiveness, Seller hereby represents and warrants to Purchaser that Seller has the full power and authority to enter into this Agreement and to perform the obligations of Seller hereunder, no further consent or approval is required for this Agreement to constitute the legal, valid and binding obligation of Seller and that Seller has not intentionally withheld material information regarding the Property that, to the best of Seller's knowledge, Purchaser would not otherwise have or received.

12.     Assignment and Assumption of Contracts.  It is the parties' understanding that the Debtors will seek to assume and assign the following agreements pursuant to the Sale Order:  (a) that certain Utility Services Agreement, dated as of May 24, 2004, between DTE Energy Center, LLC and Utility Assets, (b) that certain Easement Agreement, dated as of May 17, 2004, between DTE Energy Center, LLC and Utility Assets and (c) that certain Natural Gas Exploration, Production and Sale Agreement dated August 20, 1991 between Seller (as successor in interest to Chrysler Corporation) and West Bay Exploration Company, evidenced of record by

Affidavit of Interest recorded in the real property records of Macomb County, Michigan (the "Macomb Recording Office") in Liber 5220, Page 115 and as assigned by the following: Assignment of Oil and Gas Leases recorded in the Macomb Recording Office in Liber 5309, Page 174; Assignment recorded in the Macomb Recording Office in Liber 5346, Page 159; Assignment of Overriding Royalty Interest recorded in the Macomb Recording Office in Liber 5346, Page 162; Assignment of Overriding Royalty recorded in the Macomb Recording Office in Liber 5380, Page 907, Assignment of Oil and Gas Leases recorded in the Macomb Recording Office in Liber 6840, Page 1; Assignment of Oil and Gas Leases recorded in the Macomb Recording Office in Liber 6909, Page 589; Assignment of Overriding Royalty Interest recorded in the Macomb Recording Office in Liber 7279, Page 827; Assignment of Oil and Gas Leases recorded in the Macomb Recording Office in Liber 7310, Page 147; and Assignment of Oil and Gas Leases recorded in the Macomb Recording Office in Liber 9481, Page 334 (such agreements, as in effect as of the date hereof and as the same may in the future be amended, modified or supplemented from time to time in accordance with their terms, collectively, the "Contracts"). Upon the entry of the Sale Order by the Bankruptcy Court, Purchaser shall be deemed to accept the foregoing assignment of the Contracts and assumes, covenants and agrees to perform and be bound by all of the terms, covenants, conditions, duties, obligations, undertakings and liabilities with respect to the Contracts. Additionally, Purchaser shall be responsible for the payment of any cure costs required pursuant to section 365(b) of the Bankruptcy Code.

13.  Miscellaneous.

(a)  No Waiver of TSA Obligations of Purchaser. Notwithstanding anything contained herein to the contrary, nothing herein shall be construed as a waiver of any right of Seller to enforce the obligations of Purchaser under the TSA with respect to the Property that arose or accrued prior to the Closing Date.

(b)  Assignment. Neither party may assign this Agreement without the prior written consent of the other party, except that, without the prior consent of the Seller, Purchaser shall have the right to assign this Agreement to any one or more persons, partnerships, corporations or other entities who or which are Affiliates as long as Purchaser remains primarily liable hereunder; provided, however, that, in any such event, Purchaser shall execute a guarantee in favor of, and in form and substance acceptable to, Seller guaranteeing the obligations under this Agreement, including the indemnities of Purchaser contained herein on a going forward basis. As used in this Agreement, the term "Affiliate" shall mean any person or entity that is Controlled By (as defined below) or Affiliated With (as defined below) Purchaser. As used in this subsection, the term (i) "Controlled By" means the possession, directly or indirectly through one or more intermediaries, of the power to direct or cause the direction of the management and policies of a person or an entity and (ii) "Affiliated With" means the status of direct or indirect common ownership or management with Purchaser. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

(c)  Entire Agreement. The parties expressly acknowledge that this Agreement contains the entire agreement of the parties hereto with respect to the purchase and sale of the Property and supersedes any prior arrangements or understandings between

the parties with respect thereto. No other agreement, statement or promise made by either party hereto that is not contained herein shall be binding or valid.

(d) <u>Amendments</u>. This Agreement may only be amended by a written document signed by each of the parties hereto, which document shall make specific reference to this Agreement.

(e) <u>Further Documents</u>. Each party will, whenever and as often as it shall be reasonably requested by the other party, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such further instruments and documents, including escrow instructions, as may be necessary to carry out the terms and conditions of this Agreement and to complete the sale, conveyance and transfer herein contemplated and shall do any and all other acts as many be reasonably requested to carry out the intent and purpose of this Agreement.

(f) <u>Severability</u>. Other than the provisions relating to the precondition of the Sale Order being entered by the Bankruptcy Court and that Sale Order not having been reversed, vacated or modified or being subject to a stay of effectiveness, should any part, term or provision of this Agreement or any document required herein to be executed or delivered at the Closing be declared invalid, void or unenforceable, all remaining parts, terms and provisions hereof shall remain in full force and effect and shall in no way be invalidated, impaired or affected thereby, provided that the purposes and intent of this Agreement may still be achieved.

(g) <u>Time of Essence</u>. Except as otherwise specifically provided in this Agreement, time is of the essence of this Agreement and each and every provision hereof.

(h) <u>Applicable Law</u>. The laws of the State of Michigan, without regard to principles of conflicts of laws, will govern this Agreement and its subject matter, construction and the determination of any rights, duties or remedies of the parties arising out of or relating to this Agreement, its subject matter or any of the Transaction contemplated by this Agreement, except in such matters as are governed by the Bankruptcy Code. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder or the transactions contemplated hereby; and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the exclusive jurisdiction and venue of the Bankruptcy Court with respect to such matters. The parties agree that any process, summons, notice or document sent by U.S. registered or certified mail addressed to a party, with a copy to the notice parties in Section 9 above, shall be effective service of process for any action, suit or proceeding brought against it in the Bankruptcy Court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in the Bankruptcy Court and any claim that any such suit, action or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum. The parties agree that a final judgment in any such suit, action or proceeding brought in the Bankruptcy Court shall be conclusive and binding upon the

parties and may be enforced in any other courts to whose jurisdiction a party is or may be subject, by suit upon such judgment.

(i)　　Time Periods. If the time for the performance of any obligation under this Agreement expires on a Saturday, Sunday or U.S. federal legal holiday, the time for performance shall be extended to the next succeeding day which is not a Saturday, Sunday or U.S. federal legal holiday.

(j)　　Counterparts. This document may be executed in any number of counterparts, each of which shall be deemed an original, and all such counterparts shall together constitute one and the same document.

[Signature pages follow]

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement as of the day and year first above written.

Seller:

OLD CARCO LLC, a Delaware limited liability company

By: _____
Date: February 17, 2010

Purchaser:

CHRYSLER GROUP LLC, a Delaware limited liability company

By: _____
Date:

[Signature Page – SHAP Purchase Agreement]

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement as of the day and year first above written.

Seller:

OLD CARCO LLC, a Delaware limited liability company

By:_____

Date:

Purchaser:

CHRYSLER GROUP LLC, a Delaware limited liability company

By: *(signature)* _____

Date: *February 18, 2010*

Exhibit A

Legal Description of the Property

Real property in the City of Sterling Heights, County of Macomb, State of Michigan, described as follows:

A tract of land situated in the East 1/2 of Section 21, Town 2 North, Range 12 East commencing at the Southeast corner of said Section 21; thence South 89 degrees 20 minutes 50 seconds West along the South line of said Section 666.00 feet; thence North 00 degrees 06 minutes 00 seconds East 60.01 feet to the point of beginning of said tract; thence South 89 degrees 20 minutes 50 seconds West 1461.12 feet; thence North 00 degrees 09 minutes 20 seconds East 600.00 feet; thence South 89 degrees 20 minutes 50 seconds West 490.00 feet to the Easterly right-of-way line of the Michigan Central Railroad; thence North 00 degrees 09 minutes 20 seconds East along said Easterly right-of-way line 1,986.70 feet; thence North 89 degrees 58 minutes 35 seconds East 24.50 feet; thence continuing along said right-of-way line North 00 degrees 09 minutes 20 seconds East 1,363.83 feet; thence North 89 degrees 57 minutes 05 seconds West 24.50 feet; thence continuing Northerly along said Easterly right-of-way line of the Michigan Central Railroad to the North line of said Section 21; thence East along said North line of Section 21 to the Northeast corner thereof; thence Southerly along the East line of said Section 21 to a point 330.00 feet North of the Southeast corner thereof; thence South 89 degrees 20 minutes 50 seconds West 665.25 feet; thence Southerly to the point of beginning excepting any portion taken, used or deeded for street, road or highway purposes.

Also excepting that portion described as: Part of the East 1/2 of Section 21, Town 2 North, Range 12 East, City of Sterling Heights, Macomb County, Michigan commencing at the Northeast corner of said Section 21; thence South 01 degree 28 minutes 59 seconds East, along the East line of said Section 21, 2,688.46 feet to the East 1/4 quarter of said Section 21; thence continuing along the East line of said Section 21, South 02 degrees 00 minutes 29 seconds East 2,288.07 feet; thence South 87 degrees 16 minutes 37 seconds West 77.0 feet to the point of beginning on the existing West right-of-way line of Highway M-53 (Van Dyke Road); thence North 02 degrees 00 minutes 29 seconds West, along a line which is 77.00 feet Westerly of (as measured at right angles) and parallel to the said East line of Section 21, 2,289.38 feet (recorded as 2,288.07 feet); thence North 01 degree 28 minutes 59 seconds West along a line which is 77.00 feet Westerly of (as measured at right angles) and parallel to the said East line of Section 21, 1,754.90 feet (recorded as 1,754.56 feet); thence South 88 degrees 31 minutes 01 seconds West 14.30 feet; thence North 03 degrees 39 minutes 28 seconds West 558.02 feet; thence North 46 degrees 40 minutes 52 seconds West 4.97 feet to the point of ending of said existing West right-of-way of Highway M-53 and the point of beginning of the new West right-of-way line of Highway M-53; thence South 01 degree 28 minutes 59 seconds East, along a line which is 116.00 feet Westerly (as measured at right angles) and parallel to the said East line of Section 21, 290.61 feet; thence South 04 degrees 01 minute 40 seconds East 270.27 feet; thence South 01 degree 28 minutes 59 seconds East, along a line which is 104.00 feet Westerly (as measured at right angles) and parallel to said East line of Section 21 585.00 feet; thence South 88 degrees 31 minutes 01 West 11.00 feet; thence South 01 degrees 28 minutes 59 seconds East 400.00 feet; thence North 88 degrees 31 minutes 01 seconds East 5.00 feet; thence South 01 degree 28 minutes 59 seconds East, along a line which is 110.00 feet Westerly of (as measured at right

angles) and parallel to the said East line of Section 21, 770.56 feet; thence South 02 degrees 00 minutes 29 seconds East along a line which is 110.00 feet Westerly of (as measured at right angles) and parallel to the said East line of Section 21, 470.44 feet; thence North 87 degrees 59 minutes 31 seconds East 6.00 feet; thence South 02 degrees 00 minutes 29 seconds East 1819.43 feet to the point of ending of the said new West right of way line of Highway M-53; thence North 87 degrees 16 minutes 37 seconds East 27.00 feet to the point of beginning. Also excepting that portion described as: Part of the Northeast 1/4 of Section 21, Town 2 North, Range 12 East, Sterling Heights, Macomb County, Michigan, commencing at the Northeast corner of said Section 21 and intersection of Van Dyke Road (77 foot half right-of-way) and 17 Mile Road (60 foot half right-of-way); thence South 01 degrees 29 minutes 12 seconds East 60.00 feet along the East line of said Section 21 and said Van Dyke Road; thence South 88 degrees 07 minutes 16 seconds West 77.00 feet to the intersection of the West right-of-way line of said Van Dyke Road and South right-of-way line of 17 Mile Road and to the point of beginning; thence South 01 degrees 29 minutes 12 seconds East 391.68 feet along the West right-of-way line of said Van Dyke Road; thence South 88 degrees 31 minutes 01 seconds West 176.14 feet; thence North 01 degrees 28 minutes 59 seconds West 110.00 feet; thence North 46 degrees 40 minutes 2 seconds West 141.58 feet; thence South 88 degrees 07 minutes 16 seconds West 195.00 feet; thence North 01 degree 52 minutes 44 seconds West 180.00 feet to the South right-of-way line of said 17 Mile Road; thence North 88 degrees 07 minutes 16 seconds East 472.82 feet along the South right-of-way line of said 17 Mile Road to the point of beginning.

The above property also described by survey as:
A parcel of land located in the East 1/2 of Section 21, Town 2 North, Range 12 East, City of Sterling Heights, Macomb County, Michigan is described as follows:
Commencing at the Southeast corner of said Section 21, thence along the South section line, also being the centerline of 16 Mile Road (variable width), South 89 degrees 20 minutes 50 seconds West 666.00 feet; thence North 00 degrees 06 minutes 00 seconds East 60.01 feet to the point of beginning; thence South 89 degrees 20 minutes 50 seconds West 1461.55 feet (recorded as 1461.12 feet); thence North 00 degrees 08 minutes 30 seconds East 600.00 feet; thence South 89 degrees 20 minutes 50 seconds West 490.00 feet; thence along the Easterly property line of Consolidated Rail Corp. the following seven courses: (1) North 00 degrees 08 minutes 30 seconds East 1986.89 feet (recorded as 1986.70 feet); (2) thence along the East-West 1/4 line of said Section 21, North 89 degrees 57 minutes 38 seconds East 24.50 feet; (3) Thence North 00 degrees 08 minutes 30 seconds East 1363.62 feet (recorded as 1363.83 feet); (4) thence North 89 degrees 57 minutes 55 seconds West 24.50 feet; (5) thence North 00 degrees 08 minutes 30 seconds East 389.42 feet: (6) thence 422.12 feet along a tangent curve to the left (having a central angle of 00 degrees 33 minutes 45 seconds, a radius of 42,996.80 feet and a chord bearing of North 00 degrees 08 minutes 23 seconds West 422.12 feet; (7) thence North 00 degrees 15 minutes 42 seconds West 460.76 feet; thence along the Southerly line of Seventeen Mile Road (South 1/2 being 60 feet wide), South 89 degrees 53 minutes 03 seconds East 2082.60 feet; thence South 00 degrees 06 minutes 57 seconds West 180.00 feet; thence South 89 degrees 53 minutes 03 seconds East 195.00 feet; thence South 44 degrees 40 minutes 58 seconds East 141.59 feet; thence South 00 degrees 30 minutes 24 seconds West 110.00 feet; thence South 89 degrees 29 minutes 36 seconds East 137.14 feet; thence along the Westerly right-of-way line of Van Dyke Avenue (M-53), being of variable width, the following ten courses:

(1) thence South 00 degrees 30 minutes 24 seconds West 211.67 feet; (2) thence South 02 degrees 02 minutes 17 seconds East 270.27 feet; (3) thence South 00 degrees 30 seconds 24 minutes West 585.00 feet (4) thence North 89 degrees 29 minutes 36 seconds West 11.00 feet; (5) thence South 00 degrees 30 minutes 24 seconds West 400.00 feet; (6) thence South 89 degrees 29 minutes 36 seconds East 5.00 feet; (7) thence South 00 degrees 30 minutes 24 seconds West 770.56 feet; (8) thence South 00 degrees 00 minutes 40 seconds East 470.44 feet; (9) thence North 89 degrees 59 minutes 20 seconds East 6.00 feet; and (10) thence South 00 degrees 00 minutes 40 seconds East 1820.06 feet; thence South 89 degrees 20 minutes 50 seconds West 561.24 feet; thence South 00 degrees 07 minutes 24 seconds West 270.03 feet to the point of beginning.

CLI-1768609v10

Exhibit B

TSA Amendment

[See attached]

# AMENDMENT NO. 3 TO
# TRANSITION SERVICES AGREEMENT

This AMENDMENT NO. 3 (this "Amendment"), dated as of _____, 2010 (the "Effective Date") to the Transition Services Agreement, dated as of June 10, 2009 (the "TSA"), by and between Old Carco LLC (f/k/a Chrysler LLC), a Delaware limited liability company (the "Company"), and Chrysler Group LLC (f/k/a New CarCo Acquisition LLC), a Delaware limited liability company ("NewCo"). All capitalized terms used but not defined herein have the meanings set forth in the TSA.

WHEREAS, the Company and NewCo wish to amend the TSA, as more fully set forth herein.

WHEREAS, this Amendment will be submitted for approval by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and undertakings contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   Without limiting any rights, obligations or remedies of any parties to the TSA, at any time on or after the Effective Date, all obligations of NewCo with respect to any Owned Premises (other than the Owned Premises identified as "Newark" on Exhibit C to the TSA), or any portion thereof, shall be assignable by the Company, in the Company's sole discretion, and inure to the benefit of (a) any future owner or owners of any of the Owned Premises (or any portion thereof) that receives title directly from the Company (the "Direct Owner") or (b) any future owner or owners of any of the Owned Premises (or any portion thereof) that receives title directly from a Direct Owner that did not acquire the Owned Premises for use in its business operations (the "Future Owner"), which shall be effective upon the sale or other conveyance of any such Owned Property, or portion thereof, without the consent of NewCo, upon written notice to NewCo ("Assignment"). All Assignments made pursuant to this Section 1 shall expire and be of no further effect between the Direct Owner or Future Owner, as applicable, and NewCo one year following the License Termination Date, provided, however, that all obligations of NewCo with respect to any Owned Premises under such Assignment shall revert back and be enforceable against NewCo by the Company upon the expiration of any Assignment.

2.   The Company acknowledges that as of the Effective Date, NewCo has purchased the Sterling Heights Assembly Plant from the Company and, except for any indemnification obligations of NewCo under the TSA, NewCo shall have no obligation with respect to the Sterling Heights Assembly Plant under the TSA arising or accruing after the Effective Date.

3.   This Amendment shall be void and of no further force and effect if the Bankruptcy Court does not approve this Amendment.

4.   Except as expressly provided herein, all of the terms and provisions in the TSA are and shall remain in full force and effect, on the terms and subject to the conditions set forth

therein. This Amendment does not constitute, directly or by implication, an amendment or waiver of any provision of the TSA, or any other right, remedy, power or privilege of any party to the TSA, except as expressly set forth herein.

5.    This Amendment shall be binding upon and inure solely to the benefit of the parties hereto and their respective permitted successors and permitted assigns. Subject to the preceding sentence, nothing herein, express or implied, is intended to or shall be deemed to confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever.

6.    This Amendment may not be amended except by an instrument in writing signed by each of the parties hereto.

7.    This Amendment shall be governed by and construed in accordance with the laws of the State of New York, excluding (to the extent permissible by law) any rule of law that would cause the application of the laws of a jurisdiction other than the State of New York.

8.    Without limiting any party's right to appeal any order of the Bankruptcy Court, each party hereby irrevocably (a) submits to the exclusive jurisdiction of the Bankruptcy Court, for the purpose of any action or proceeding arising out of or relating to this Amendment, (b) each party hereto hereby irrevocably agrees that all claims in respect to such action or proceeding may be heard and determined exclusively in the Bankruptcy Court and (c) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from the Bankruptcy Court, including a motion to dismiss on the grounds of forum non conveniens. Each of the parties hereto agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County for the resolution of any such claim or dispute. Each of the parties hereto irrevocably consents to the service of the summons and complaint and any other process in any action or proceeding relating to the transactions contemplated by this Amendment, on behalf of itself or its property, by personal delivery of copies of such process to such party. Such service shall be in lieu of any other potentially applicable requirement of service, including, without limitation, the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters. Nothing in this Section 7 shall affect the right of any party to serve legal process in any other manner permitted by law.

9.    This Amendment may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

-2-

10. If any term or other provision of this Amendment is invalid, illegal or incapable of being enforced by any rule of law, or public policy, then to the maximum extent permitted by law, all other conditions and provisions of this Amendment shall nevertheless remain in full force and effect.

*[Remainder of page left intentionally blank]*

CLI-1769348v7

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the date first written above by their respective officers thereunto duly authorized.

OLD CARCO LLC

By: _____
       Name: Ronald E. Kolka
       Title: Chief Executive Officer

CHRYSLER GROUP LLC

By: _____
       Name: Holly E. Leese
       Title: Sr. Vice President, General Counsel
       & Secretary

Exhibit C

OWNERS AFFIDAVIT

STATE OF _____          :
                              :ss
COUNTY OF _____          :

PROPERTY:  See Exhibit A attached hereto

COMMITMENT NO:  _____
(the "Commitment")

ON THIS _____ day of _____, 2010, before me personally appeared the undersigned, _____, _____ of OLD CARCO LLC (f/k/a Chrysler LLC), a Delaware limited liability company (collectively, "Owners"), who being duly sworn according to law and intending to be legally bound, deposes and says:

1.    That the undersigned Authorized Person of the Owner is authorized to execute this affidavit and has the ability to execute all instruments necessary to convey the Property pursuant to the Limited Liability Company Agreement.

2.    That the conveyance of the Property has been duly authorized by the Owner.

3.    That, to the actual knowledge of the undersigned and except as shown in the Commitment or as disclosed on the survey dated _____, 2009 prepared by Axis Surveying, Inc., there are no unrecorded leases or occupancy agreements affecting the Property, or other parties in possession.

4.    That there has not been any construction, repairs, alterations or improvements made, ordered or contracted to be made by the Owners on or to the Property, nor materials ordered by the Owners therefore within the last one-hundred eighty (180) days which has not been paid for; nor are there any fixtures ordered or installed by the Owners and attached to the Property which have not been paid for in full; and that there are no outstanding or disputed claims for any such work or item.

In addition, the Owner has requested that First American Title Insurance Company (the "Title Company") issue a policy of title insurance without exception for matters arising after the effective date of the Commitment but prior to the time the proposed insured acquires record title to the Property (the "Gap Exception"). In order to permit the Title Company to so issue its policy, the Owner does hereby agree to indemnify and hold the Title Company harmless from and against all loss, cost, damage and expense of every kind arising during the Gap Exception period as a direct result of an act of the undersigned, including reasonable attorneys' fees and costs, which Title Company shall sustain or become liable for under its policy

on account of the omission or deletion of the Gap Exception; provided that this indemnity shall cover only objectionable liens, encumbrances or other matters validly filed against the Property after the effective date of the Commitment and before the earlier of (i) the filing of the deed conveying the Property as delivered to the Title Company or (ii) twenty (20) days following release of such instrument to the Title Company by the Owner for delivery to the buyer.

THIS AFFIDAVIT is made for the purpose of aiding the Title Company in determining the marketability and/or insurability of title to the property, and to induce said Title Company to issue its policies of title insurance, and the affiant avers the foregoing statements are true and correct to the best of its knowledge and belief.

OLD CARCO LLC,

By:_____

Name:

Title:

STATE OF _____ :

                              :ss.

COUNTY OF _____ :

This Instrument was acknowledged before me on _____, 2010, by _____ _____, _____ of Old Carco LLC, a Delaware limited liability company, party to this Instrument of Writing.

_____

Notary Public

Name typed:

My commission expires:

Exhibit D

License Agreement

[See attached]

**INTELLECTUAL PROPERTY LICENSE AGREEMENT**

This LICENSE AGREEMENT (this "Agreement") is entered into this ____ day of February, 2010 (the "Effective Date") by and between CHRYSLER GROUP LLC, a Delaware limited liability company ("Licensor"), and OLD CARCO LLC, a Delaware limited liability company ("Licensee") (each a "Party," and collectively, the "Parties").

WHEREAS, Licensee is the owner of (a) the Sterling Heights Assembly Plant located at 38111 Van Dyke, Sterling Heights, Michigan (the "Sterling Heights Plant"), (b) the Kenosha Engine Facility located at 5555 30th Avenue, Kenosha, Wisconsin (the "Kenosha Facility"), and (c) the equipment and fixtures located at the Kenosha Facility used in connection with the design, development, manufacture, use or sale of the Licensed Engines (the "Kenosha Equipment");

WHEREAS, Licensor, Licensee and the other parties identified on the signature pages thereto entered into a Master Transaction Agreement, dated April 30, 2009, as amended (the "Master Transaction Agreement"), pursuant to which Licensee transferred to Licensor certain of its assets (not including the Kenosha Facility, the Sterling Heights Plant or the Kenosha Equipment).

WHEREAS, in connection with the Master Transaction Agreement, the Parties and the other parties identified on the signature page thereto entered into a Transition Services Agreement, dated as of June 10, 2009, as amended (the "Transition Services Agreement");

WHEREAS, pursuant to the Transition Services Agreement, Licensor obtained, among other things (a) a license to use the Kenosha Facility until April 30, 2011 (the "Kenosha Expiration Date"), and (b) a license to use the Sterling Heights Plant until April 30, 2011;

WHEREAS, pursuant to an Agreement of Purchase and Sale dated February ____, 2010 (the "Sterling Heights Purchase Agreement"), entered into by and between Licensor and Licensee, Licensee has agreed to sell Licensor the Sterling Heights Plant, which such Sterling Heights Purchase Agreement must be approved by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

WHEREAS, as a condition to the closing of the transaction contemplated under the Sterling Heights Purchase Agreement and as more specifically set forth herein, Licensor desires to grant to Licensee a non-exclusive license to use certain intellectual property related to Licensed Engines (defined below).

NOW THEREFORE, for the consideration set forth in the Sterling Heights Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

"Affiliate" of any Person means another Person that, as of the date on which, or at any time during which, the determination of affiliation is being made, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person; and "control" (including the terms "controlled by" and "under common

control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies or affairs of a Person, whether through ownership of voting securities, by contract or otherwise, as executor, trustee or otherwise.

"Copyrights" means copyrights in works of authorship of any type, mask works, rights of publicity, privacy and endorsement, neighboring rights, portrait rights, database rights, registrations and applications for registration thereof throughout the world, all rights therein provided by international treaties and conventions, all moral and common law rights thereto, and all other rights associated therewith.

"Confidential Information" has the meaning set forth in Section 4.1.

"Improvements" means any findings, improvement, discoveries, inventions, additions, modifications, formulations, derivative works, or changes (whether or not patented or patentable) made after the Effective Date with respect to Licensed Engines.

"Intellectual Property" means all rights in intellectual property of any type throughout the world, including Patents, Copyrights, and Know-How.

"Know-How" means know-how, trade secrets and other confidential or proprietary technical, business and other information, including manufacturing and production processes and techniques, research and development information, invention disclosures for which no Patent application has been filed, technology, drawings, specifications, designs, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, supplier lists and information.

"Licensed Copyrights" means all Copyrights used in or related to the design, manufacture, use or sale of Licensed Engines (but not including any Copyrights to the extent primarily used in or primarily related to the control of the Licensed Engines (including control software, control models, and algorithms therefore), or any Copyrights to the extent primarily used in or primarily related to the vehicles in which the Licensed Engines are used (as opposed to the Licensed Engines themselves) or any parts of such vehicles other than the Licensed Engines) that are (i) owned by or licensed to (with the right to sub-license without the consent of or payment to any Third Party) Licensor and/or any of its Subsidiaries on the Effective Date, or (ii) created, obtained or acquired by or licensed to (with the right to sub-license without the consent of or payment to any Third Party) Licensor and/or any of its Subsidiaries between (and including) the Effective Date and the Kenosha Expiration Date.

"Licensed Engines" means any 2.7 or 3.5 Liter V-6 engine that is the same as those made at the Kenosha Facility as of or prior to the Effective Date and/or between (and including) the Effective Date and the Kenosha Expiration Date, including component, spare and/or replacement parts thereof, and any Improvements to any of the foregoing made by Licensor and/or any of its Subsidiaries prior to the Kenosha Expiration Date that are to be incorporated into the engines being made at the Kenosha Facility pursuant to an approved engineering change notice of Licensor.

"Licensed Know-How" means all Know-How used in or related to the design, manufacture, use or sale of Licensed Engines (but not including any Know-How to the extent primarily used in or primarily related to the control of the Licensed Engines (including control software, control models, and algorithms therefore), or any Know-How to the extent primarily used in or primarily related to the vehicles in which the Licensed Engines are used (as opposed

- 2 –

to the Licensed Engines themselves) or any parts of such vehicles other than the Licensed Engines) that is (i) owned by, known to or licensed to (with the right to sub-license without the consent of or payment to any Third Party) Licensor and/or any of its Subsidiaries on the Effective Date, or (ii) created, obtained or acquired by, known to or licensed to (with the right to sub-license without the consent of or payment to any Third Party) Licensor and/or any of its Subsidiaries between (and including) the Effective Date and the Kenosha Expiration Date.

"Licensed Patents" means all Patents having one or more claims covering the design, manufacture, use or sale of Licensed Engines (including a control function of the Licensed Engines, but only to the extent such control function is required to make a Licensed Engine operable, and in the case of vehicles in which the Licensed Engines are used and parts of such vehicles other than Licensed Engines, only to the extent necessary to use a Licensed Engine in connection with such vehicle or parts), as well as any Licensed Know-How but only to the extent permitted pursuant to Section 2.2 below, that are (i) owned by or licensed to (with the right to sub-license without the consent of or payment to any Third Party) Licensor and/or any of its Subsidiaries on the Effective Date, (ii) obtained or acquired by or licensed to (with the right to sub-license without the consent of or payment to any Third Party) Licensor and/or any of its Subsidiaries between (and including) the Effective Date and the Kenosha Expiration Date, (iii) issuing from any Patents owned or licensed to (with the right to sub-license without the consent of or payment to any Third Party) Licensor and/or any of its Subsidiaries that are pending on the Kenosha Expiration Date, (iii) constituting a reissue, continuation, divisional, reexamination or renewal of any of the foregoing, or (iv) issuing from a Patent owned by or licensed to (with the right to sub-license without the consent of or payment to any Third Party) Licensor and/or any of its Subsidiaries filed after the Kenosha Expiration Date.

"Liquidation Trust" means, the trust established pursuant to Section IV.B of OLD CARCO LLC's "Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession," dated January 22, 2010 [Docket No. 6272] (as it may be further amended or modified, the "Plan") to hold the Liquidation Trust Assets (as defined in the Plan) and make distributions pursuant to Section V of the Plan.

"Patents" means patents, patent applications (including provisionals) and statutory invention registrations, including reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, all inventions disclosed therein and improvements thereto, foreign counterparts, and all rights therein provided by international treaties and conventions.

"Person" means an individual, corporation, partnership, limited liability company, trust, business trust, association, joint stock purchaser, joint venture, sole proprietorship, incorporated organization, governmental authority or any other form of entity.

"Representatives" means any current and former officer, current and former director, officer, manager, partner, employee, agent, shareholder, member, attorney, advisor, financial advisor, or accountant, and including, with respect to the Liquidation Trust, the Liquidating Trustee (as defined in the Plan).

"Subsidiary" of a Person means any Affiliate that the Person, directly or indirectly, controls.

"Technical Documentation" means the technical documentation that Licensor provides to Licensee pursuant to Section 3.1.

"Third Party" means any Person other than (i) Licensee, (ii) any Affiliate of Licensee, (iii) Licensor or (iv) any Subsidiary of Licensor.

# ARTICLE II
## GRANT OF LICENSE TO LICENSEE

2.1.    Grant of Patent License.  Effective as of the Effective Date, Licensor, on behalf of itself and its Subsidiaries, hereby grants to Licensee and its Affiliates an irrevocable, non-exclusive, fully paid-up, perpetual, worldwide license under the Licensed Patents to make, have made, use, import, offer to sell, sell and have sold Licensed Engines and to provide services in connection therewith.

2.2.    Grant of Know-How and Copyright License.  Effective as of the Effective Date, Licensor, on behalf of itself and its Subsidiaries, hereby grants to Licensee and its Affiliates an irrevocable, non-exclusive, fully paid-up, perpetual, worldwide license under the Licensed Know-How and the Licensed Copyrights to use such Licensed Know-How and exploit all rights in the Licensed Copyrights to make, have made, use, import, offer to sell, sell and have sold Licensed Engines and to provide services in connection therewith.

2.3.    Ownership of Improvements.  Licensor and its Affiliates and Licensee and its Affiliates shall have the right to make Improvements.  Licensor has no obligation to incorporate any Improvements, whether made by Licensor or Licensee, into the Licensed Engines and Licensee has no obligation to deliver any Improvements to Licensor.  Except as may otherwise be provided in a separate agreement such as a purchase order or supply agreement for the supply of products by Licensee or any of its Affiliates to Licensor or any of its Affiliates, with respect to any such Improvements, (i) all right, title and interest in such Improvements (including all Intellectual Property rights therein) developed by Licensee or its Affiliates, whether or not patentable, shall be owned solely by Licensee or the applicable Affiliate of Licensee, and (ii) all right, title and interest in such Improvements (including all Intellectual Property rights therein) developed by Licensor or any Affiliate of Licensor, whether or not patentable, shall be owned solely by Licensor or the applicable Affiliate of Licensor.  In the event that prior to the Kenosha Expiration Date Licensor incorporates any Improvement made by Licensee or any of its Affiliates into the Licensed Engines, then Licensee on its behalf and on behalf of its Affiliates grants to Licensor and its Affiliates an irrevocable, non-exclusive, royalty-free, fully paid-up, perpetual, worldwide license under any Copyright, Know-How and/or Patent on the Improvement to make, have made, use, import, offer to sell and sell Licensed Engines incorporating such Improvement and to provide services in connection therewith.

# ARTICLE III
## DOCUMENTATION; ASSISTANCE; FIRST REFUSAL

3.1    Delivery of Technical Documentation.  By the earlier of the Kenosha Expiration Date or within forty-five (45) days after receipt of a written request from Licensee made prior to the Kenosha Expiration Date, Licensor shall provide to Licensee, in a mutually agreeable format and media, the technical documentation listed on Schedule 3.1 that is not then already in the possession of Licensee; provided, however, that Licensor shall identify in writing

– 4 –

but shall not be required to provide any technical documentation that Licensor is restricted from providing due to an agreement with a Third Party in existence on the Effective Date. In addition, for a period of one (1) year after the Kenosha Expiration Date, upon a written reasonable request of Licensee, Licensor shall use commercially reasonable efforts to provide in a mutually agreeable format and media any additional specifically-identified technical documentation not listed on Schedule 3.1 that is reasonably necessary to manufacture the Licensed Engines as they are being manufactured at the Kenosha Facility as of the Effective Date or between (and including) the Effective Date and the Kenosha Expiration Date; provided, however, that Licensor shall identify in writing but shall not be required to provide any requested technical documentation that is not in the possession, custody or control of Licensor or its Subsidiaries or that Licensor is restricted from providing due to an agreement with a Third Party in existence on the Effective Date. If the mutually agreed format for any item of Technical Documentation is the format being utilized by Licensor as of the Effective Date, then that item of Technical Documentation will be provided at no additional charge to Licensee. If the mutually agreed format for any item of Technical Documentation is other than the format being utilized by Licensor as of the Effective Date, Licensee will bear the preapproved costs of converting that item of Technical Documentation to the mutually agreed format.

3.2     Assistance.  For a period of one year after the Kenosha Expiration Date, Licensor shall, and as applicable shall cause its Subsidiaries to, upon the request of Licensee or its Affiliates and upon commercially reasonable mutually-agreed terms and conditions, including payment (the agreement to such terms and conditions not to be unreasonably withheld or delayed by Licensor), make its and its Subsidiaries' engineering development personnel available for up to a total of eighty (80) man-hours to answer questions regarding the Technical Documentation pertaining to the Licensed Engines and parts thereof and its manufacturing personnel available for up to a total of eighty (80) additional man-hours to answer questions regarding the Technical Documentation pertaining to the manufacturing of the Licensed Engines. Nothing in this Agreement shall require Licensor to favor Licensee or Licensee's business over its own business operations or those of its Subsidiaries with respect to the allocation of resources in providing technical assistance, or require Licensor to maintain any technical knowledge or ability not otherwise maintained by Licensor in the ordinary course of its own business.

## ARTICLE IV
## CONFIDENTIALITY

4.1.     Scope.  Licensee shall employ at least commercially reasonable efforts to maintain in confidence all Know-How and Technical Documentation of Licensor and/or its Subsidiaries ("Confidential Information") that is designated in writing (if commercially practical to do so) as confidential, and shall not disclose the same to anyone other than those of its Affiliates, employees, consultants, agents or subcontractors, as are necessary in connection with Licensee's business. Licensee shall ensure that each of its employees, consultants, agents and subcontractors holds in confidence and does not make use of any such Confidential Information other than as needed to exploit the licenses in this Agreement. Licensee may also disclose to any Person to whom Licensee transfers any of its rights pursuant to Section 8.3 of this Agreement such Confidential Information as necessary for such transferee to exercise the transferred rights, provided, such transferee has agreed in writing in advance to be bound by the obligations of this

NYI-4242880v25

<u>Article IV</u> in a manner that provides for enforcement of this <u>Article IV</u> by Licensor against such transferee.

4.2.    <u>Exceptions</u>.  The obligation of confidentiality contained in <u>Section 4.1</u> of this Agreement shall not apply to the extent that (i) Licensee or its Affiliates are required to disclose information by law, order, subpoena, document request (or similar demand) or regulation of a governmental agency or a court of competent jurisdiction, <u>provided</u>, <u>however</u>, that Licensee and its Affiliates shall not make any such disclosure without promptly notifying Licensor and allowing Licensor, if possible, a reasonable opportunity to seek (at Licensor's expense) injunctive relief from (or a protective order with respect to) the obligation to make such disclosure, or (ii) Licensee can demonstrate that (A) the disclosed information was at the time of such disclosure by Licensee or its Affiliates already in the public domain or known to the industry other than as a result of actions of Licensee, its Affiliates, employees, consultants, agents or subcontractors in violation hereof; (B) the disclosed information was independently developed by Licensee or its Affiliates or received by Licensee or its Affiliates on an unrestricted basis from a source unrelated to Licensor and not under a duty of confidentiality to Licensor and/or its Subsidiaries; or (C) disclosure is made to a governmental regulatory agency as part of such agency's product license approval process, provided that such disclosure is made by Licensee or its Affiliates under any color of confidentiality permitted by law.

# ARTICLE V
# REPRESENTATIONS AND WARRANTIES/DISCLAIMER

5.1.    <u>Mutual Representations</u>.  Each Party hereby represents and warrants to the other Party as follows:

(a)    Subject to the approval of this Agreement by the Bankruptcy Court, the execution, delivery and performance of this Agreement by such Party have been duly authorized by all necessary action on the part of such Party.

(b)    Subject to the approval of this Agreement by the Bankruptcy Court, this Agreement has been duly executed and delivered by such Party and, assuming due authorization, execution and delivery by the other Party, constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms.

(c)    Subject to the approval of this Agreement by the Bankruptcy Court, such Party's execution, delivery and performance of this Agreement do not (a) violate, conflict with or result in the breach of any provision of the charter or by-laws (or similar organizational documents) of the Party, or (b) conflict with or violate any law or judgment applicable to the Party or any of its respective assets, properties or businesses.

5.2    <u>Licensor Warranties/Disclaimer</u>.

(a)    Within three (3) months after the Effective Date, Licensor shall provide Licensee an update to <u>Schedule 5.2(a)</u> of this Agreement of (i) all material Copyrights, Know-How and Patents that are licensed to Licensor and/or its Subsidiaries by a Third Party pursuant to a written agreement (other than a shrink-wrap/click-accept type of license) that are not included in the Licensed Copyrights or Licensed Patents and that Licensor reasonably believes are required to manufacture the Licensed Engines as they are being manufactured at the Kenosha Facility as of the Effective Date, and (ii) any written assertions (including offers to license) or

– 6 –

lawsuits asserting that the design, manufacture use or sale of the Licensed Engines manufactured at the Kenosha Facility as of or prior to the Effective Date infringe or violate any Intellectual Property right of any Third Party. In the event that Licensor incorporates, between the Effective Date and the Kenosha Expiration Date, any Intellectual Property (subject to any material Copyright, Know-How or Patent that Licensor has licensed from a Third Party pursuant to a written agreement (other than a shrink-wrap/click-accept type of license) and that is not included in the Licensed Copyrights, Licensed Know-How or Licensed Patents, or receives any written assertion or lawsuit asserting that the design, manufacture, use or sale of Licensed Engines infringes or violates any Intellectual Property right of any Third Party, Licensor shall promptly update Schedule 5.2(a) to identify such Copyright(s), Know-How, Patent(s), written assertion(s) or lawsuit(s).

(b)     Licensor represents and warrants to Licensee as follows:

(i)     Licensor has the requisite corporate authority to grant the licenses and rights granted hereunder to Licensee and its Affiliates on behalf of itself and its Subsidiaries.

(ii)     Between (and including) June 10, 2009 and the Effective Date, Licensor and/or its Subsidiaries have not assigned, transferred or granted an exclusive license to any non-Subsidiary Affiliate of Licensor of any Copyright, Know-How or Patent reasonably necessary to manufacture the Licensed Engines as they are being manufactured at the Kenosha Facility as of the Effective Date.

(iii)     As of the Effective Date, Licensor has not received any claim or written assertion of any claim (including any offer to license), except as set forth on Schedule 5.2(a), that the design, manufacture, use and/or sale of Licensed Engines manufactured at the Kenosha Facility as of or prior to the Effective Date infringe or violate any Intellectual Property right of any Third Party or of any non-Subsidiary Affiliate of Licensor.

(iv)     Licensor reasonably believes that the technical documentation listed on Schedule 3.1 is the material technical documentation reasonably required to manufacture the Licensed Engines as they are being manufactured at the Kenosha Facility as of the Effective Date.

5.3     Disclaimer. OTHER THAN AS PROVIDED IN ARTICLE V AND ARTICLE VI OF THIS AGREEMENT: (i) LICENSOR MAKES NO REPRESENTATIONS OR WARRANTIES (EXPRESS, IMPLIED OR STATUTORY) OF ANY KIND UNDER THIS AGREEMENT WITH RESPECT TO THE LICENSED ENGINES; (ii) THE LICENSES GRANTED HEREUNDER ARE LICENSED, AND THE TECHNICAL DOCUMENTATION AND ANY OTHER INFORMATION PROVIDED HEREUNDER ARE PROVIDED, ON AN "AS-IS, WHERE-IS" BASIS AND LICENSOR EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES WITH RESPECT TO THE FOREGOING, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ALL EXPRESS AND IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR THAT THE LICENSES GRANTED AND TECHNICAL DOCUMENTATION AND ANY OTHER INFORMATION PROVIDED HEREUNDER, THEIR USE BY LICENSEE OR THE RESULTS OBTAINED (INCLUDING WITHOUT LIMITATION THE LICENSED ENGINES) THEREBY, WILL NOT INFRINGE OR OTHERWISE VIOLATE ANY

-7-

INTELLECTUAL PROPERTY RIGHT OF ANY THIRD PERSON OR WILL BE FREE FROM DEFECT; AND (iii) LICENSOR AND ITS SUBSIDIARIES WILL NOT BE LIABLE FOR ANY DAMAGES IN CONNECTION WITH THE LICENSES GRANTED OR THE USE OF THE TECHNICAL DOCUMENTATION AND ANY OTHER INFORMATION PROVIDED HEREUNDER, INCLUDING WITHOUT LIMITATION ANY LOSS OF PROFIT, USE, GOODWILL, OR ANY DIRECT, INDIRECT, SPECIAL, EXEMPLARY, INCIDENTAL OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH, RELATED TO, OR ARISING OUT OF THE USE OF THE LICENSES, TECHNICAL DOCUMENTATION AND ANY OTHER INFORMATION PROVIDED HEREUNDER.

## ARTICLE VI
## INDEMNIFICATION

6.1.    <u>Indemnification by Licensor</u>.  Subject to <u>Section 6.3</u>, Licensor agrees to defend, indemnify, and hold harmless Licensee (including, as applicable, the Liquidation Trust) and its Affiliates and their respective Representatives (each, a "<u>Licensor Indemnitee</u>") from and against any and all damages, losses, claims, liabilities, obligations, commitments, costs or expenses, including reasonable attorneys' fees and court costs (collectively, "<u>Losses</u>"), other than lost profits or consequential damages, incurred by any Licensor Indemnitee arising out of or related to any threatened or actual claims, suits, actions or proceedings by a Third Party (a "<u>Third-Party Claim</u>") alleging or resulting from the intentional or reckless breach by Licensor or its Subsidiaries of any of the provisions contained in <u>Article V</u> of this Agreement.

6.2.    <u>Indemnification by Licensee</u>.  Subject to <u>Section 6.3</u>, Licensee agrees to defend, indemnify, and hold harmless Licensor and its Subsidiaries and their respective Representatives (each, a "<u>Licensee Indemnitee</u>") from and against any and all Losses, other than lost profits or consequential damages, incurred by any Licensee Indemnitee arising out of or related to any threatened or actual Third-Party Claim (i) alleging or resulting from the intentional or reckless breach by Licensee or its Affiliates of any of the provisions contained in <u>Article V</u> of this Agreement, or (ii) of product liability made against any Licensee Indemnitee that is based on any injury to Persons and property arising out of any defect in a Licensed Engine made by Licensee or any of its Affiliates (<u>provided</u>, <u>however</u>, that, in the case of an defect attributable to the design of a Licensed Engine, Licensee's indemnification obligations shall be limited to those designs (or portions thereof) made by Licensee or any of its Affiliates).  Licensee's indemnification obligations pursuant to this <u>Section 6.2</u> shall not apply to Licensed Engines made by, for or on behalf of Licensor or its Affiliates at the Kenosha Facility prior to the Kenosha Expiration Date or to any products supplied to Licensor or any of its Affiliates by Licensee or any of its Affiliates.  Any indemnity obligations of Licensee for any products that Licensee or any of its Affiliates supply to Licensor or any of its Affiliates shall be addressed in an applicable purchase order or supply agreement.

6.3    <u>Indemnification Procedure</u>.  With respect to each threatened or actual Third-Party Claim made against a Licensor Indemnitee or Licensee Indemnitee, as applicable, (the "<u>Indemnitee</u>"), such Indemnitee shall give the appropriate indemnifying Party (the "<u>Indemnitor</u>") written notice thereof promptly upon its receiving written notice of such Third-Party Claim, and the Indemnitor shall promptly commence the defense of such Third-Party Claim.  In the event an Indemnitee is named as defendant in any such Third-Party Claim, the

NYI-4242880v25

Indemnitor shall notify the Indemnitee of such fact and promptly furnish Indemnitee with a copy of such Third-Party Claim, and shall represent the Indemnitee in such legal action unless such Indemnitee undertakes to represent itself as a defendant in such legal action. In the event Indemnitor does not promptly assume the defense of any Third-Party Claim against an Indemnitee, or fails to diligently defend such Third-Party Claim, the Indemnitee shall have the right to assume such defense with such attorneys as it shall select, at the expense of Indemnitor. Neither Party shall settle any Third-Party Claim against the other Party without such other Party's approval unless the settlement provides for a complete and unconditional release of such other Party, without their incurring any loss or the admission of any liability.

# ARTICLE VII
# TERMINATION/EXPIRATION

7.1     Term.  Except as otherwise terminated pursuant to this Article VII, the licenses granted in this Agreement shall be perpetual.

7.2     Termination.  Any Licensee, including any Person to whom Licensee transfers or assigns this Agreement (in whole or in part) pursuant to Section 8.3, may terminate this Agreement in whole in its sole discretion with respect to itself, upon written notice to Licensor.  In the event of such termination, the licenses granted under Article II shall terminate with respect to such Licensee only.  As to any Licensee, including any assignee or transferee of a license under Section 8.3, Licensor may terminate its obligations under Articles III, V, VI and Section 8.16, in the event of a material breach by that Licensee that remains uncured after ninety (90) days written notice of the breach by Licensor to that Licensee.

7.3     Survival.  The following provisions shall survive termination of this Agreement:  Article IV, Section 6.2(ii), the remainder of Article VI (solely to the extent that any Third-Party Claim is pending upon termination), Article VII (except Section 7.4) and Article VIII.

7.4     Expiration of Certain Obligations of Licensor.

(a)     Except as otherwise provided in this Section 7.4, Licensor's representations and warranties under Article V and its obligations under Article VI  will expire two (2) years after the Kenosha Expiration Date (the "Sunset Date").

(b)     The warranty expiration of Section 7.4(a) shall not occur so long as, and to the extent that (i) Licensee is OLD CARCO LLC, the Liquidation Trust, or any Affiliate of either of the foregoing and (ii) Licensee is not operating the Kenosha Facility or using any of the Kenosha Equipment to produce a Licensed Engine for sale to, or to be used in a product for sale to, a Third Party.

(c)     If, prior to the Sunset Date, OLD CARCO LLC, the Liquidation Trust, or any Affiliate of either of the foregoing operates the Kenosha Facility or uses any of the Kenosha Equipment, in either case to produce a Licensed Engine for sale to, or to be used in a product for sale to, a Third Party, then Licensor's representations and warranties in Section 5.2(b)(iv) shall expire (solely with respect to, as applicable, OLD CARCO LLC, the Liquidation Trust, or such Affiliate) on the earlier of the Sunset Date or (solely with respect to the applicable type of

- 9 –

Licensed Engine being produced) thirty (30) days after such Person first produces a Licensed Engine for sale to, or to be used in a product for sale to, a Third Party.

(d)     If OLD CARCO LLC, the Liquidation Trust, or any Affiliate of either of the foregoing assigns or transfers this Agreement (in whole or in part) pursuant to Section 8.3(b)(i) or Section 8.3(b)(iv) prior to the Sunset Date, then Licensor's representations and warranties in Section 5.2(b)(iv) shall expire (solely with respect to such assignee or transferee) on the earlier of the Sunset Date or (solely with respect to the applicable type of Licensed Engine being produced) thirty (30) days after such assignee or transferee first produces a Licensed Engine for sale to, or to be used in a product for sale to, a Third Party.

(e)     Notwithstanding anything in this Section 7.4 to the contrary, neither OLD CARCO LLC nor the Liquidation Trust may make a claim against Licensor for the benefit of or based on any claim or assertion by any Person to whom this Agreement was assigned or transferred (in whole or in part) to the extent the provisions of this Section 7.4 would otherwise prevent such Person from making such claim directly against Licensor.

## ARTICLE VIII
## MISCELLANEOUS

8.1     Notices.  All notices or other communications made pursuant hereto shall be in writing and shall be deemed properly delivered, given or served if (a) transmitted by facsimile, (with copy by email) or (b) sent by certified or registered mail or overnight courier service to the Parties, in each case at the following addresses:

Licensee:     John Rooney
              Capstone Advisory Group, LLC
              Park 80 West
              250 Pehle Avenue, Suite 105
              Saddle Brook, NJ 07663
              Facsimile:  (201) 587-7102
              Email:  jrooney@capstoneag.com

              With a copy to:

              William A. Herzberger, Esq.
              Jones Day
              901 Lakeside Avenue
              Cleveland, OH 44114-1190
              Facsimile:  (216) 579-0212
              Email:  wherzberger@jonesday.com


              Jeffrey B. Ellman, Esq.
              Jones Day
              1420 Peachtree Street, N.E.
              Suite 800

NYI-4242880v25

Atlanta, Georgia 30309-3053
Facsimile: (404) 581-8330
Email: jbellman@jonesday.com

Licensor:      Chief Patent Counsel
Chrysler Group LLC
800 Chrysler Drive CIMS 483-02-19
Auburn Hills, MI 48326-2757
Facsimile: 248-944-6537
Email: res85@chrysler.com"

All notices shall be deemed received (a) if transmitted by facsimile (with copy by email), on the business day when transmitted or if not transmitted prior to 5:00 p.m., prevailing Eastern Time, on the next succeeding business day; and (b) if sent by mail or courier, one business day after it is sent. Either Party may change its address for the purposes of this <u>Section 8.1</u> by giving ten days prior written notice of such change to the other Party in the manner provided in this Section.

        8.2    <u>Successors and Assigns</u>. This Agreement binds and inures to the benefit of the Parties hereto and their respective permitted successors and assigns (including, as applicable, the Liquidation Trust), who shall be deemed the "Licensor" or "Licensee," respectively, for all purposes hereunder.

        8.3    <u>Assignment</u>.

        (a)    Except as provided in <u>Section 8.3(b)</u> of this Agreement, this Agreement and the rights and obligations hereunder shall not be assignable or transferable by any Party (including by operation of law in connection with a merger, change of control or consolidation of such Party) without the prior written consent of the other Party hereto.

        (b)    Notwithstanding <u>Section 8.3(a)</u> of this Agreement:

        (i) Either Party shall be permitted to assume this Agreement in bankruptcy or assign and/or transfer this Agreement without the prior written consent of the other Party to any Person (other than an Affiliate) with which it may merge or consolidate or that acquires substantially all of its business (whether by equity or asset transaction) to which this Agreement relates;

        (ii) Licensor shall be permitted to assign and/or transfer this Agreement without the prior written consent of Licensee to any Affiliate that controls Licensor or to any Affiliate with which Licensor may merge or consolidate or that acquires substantially all of Licensor's business (whether by equity or asset transaction) to which this Agreement relates; <u>provided</u>, <u>however</u>, that any assignment or transfer of Licensed Copyrights, Licensed Know-How or Licensed Patents to any Person is subject to the licenses granted to Licensee and its Affiliates herein;

        (iii) Licensee shall be permitted to assign and/or transfer this Agreement to any of its Affiliates without the prior written consent of Licensor; and

        (iv) Licensee (including, for clarity, any assignee or transferee of Licensee) shall be permitted to assign and/or transfer in whole or in part this Agreement and/or any of its rights hereunder (on the same terms as granted to Licensee under this

- 11 -

Agreement, including without limitation the provisions of <u>Article II, IV, Section 5.3, Section 6.2, Article VII, and Article VIII</u> (but not including <u>Section 8.7(a)</u>)) without the prior written consent of Licensor to any and/or all of the following, provided that such assignee and/or transferee agrees in writing to be bound by the applicable provisions of this Agreement: (A) any and/or all purchasers or transferees of all the Kenosha Facility, (B) any and/or all purchasers or transferees of one or more engine lines at the Kenosha Facility or a material part thereof, and/or (C) any and/or all purchasers or transferees of any other Kenosha Equipment (but only to the extent necessary for the purchasers or transferees to use such Kenosha Equipment in substantially the same manner (including, as applicable, to make substantially the same part of a Licensed Engine) being used at the Kenosha Facility as of the Effective date or during the period between (and including) the Effective Date and the Kenosha Expiration Date). For the avoidance of doubt, pursuant to this subsection (iv), Licensee may assign and/or transfer identical or overlapping rights to multiple purchasers and/or transferees.

(c)     Upon any assignment or transfer of this Agreement (in whole or in part) by OLD CARCO LLC, the Liquidation Trust or any of their Affiliates, as applicable, pursuant to <u>Section 8.3(b)(i)</u> or <u>Section 8.3(b)(iv)</u>, OLD CARCO LLC, the Liquidation Trust, their Affiliates, as applicable, and all Representatives of the foregoing shall be automatically released from all (in the event of a complete assignment or transfer) or from the applicable portion (in the event of an assignment or transfer in part) of its obligations arising under this Agreement on and after the date of such assignment or transfer.

(d)     Any attempted assignment in violation of this <u>Section 8.3</u> shall be void.

8.4     <u>Waiver</u>.  The failure of any Party to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement or to exercise any right hereunder, will not operate or be construed as a waiver of that Party's right to insist upon strict compliance in the future.  No waiver of any term, condition or other provision of this Agreement is effective against a Party unless acknowledged by such Party in writing.

8.5     <u>Unenforceability</u>.  If a court of competent jurisdiction holds any one or more of the provisions of this Agreement to be unenforceable, such unenforceability will not affect any other provision.  In such event, the Parties will substitute a provision that is as close as possible to the intent of the original unenforceable provisions.

8.6     <u>Governing Law</u>.  This Agreement is to be governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard to any conflict of law provisions that would require application of any other law.

8.7     <u>Consent to Jurisdiction</u>.

(a)     Without limiting any Party's right to appeal any order of the Bankruptcy Court, each Party hereby irrevocably (1) submits to the exclusive jurisdiction of the Bankruptcy Court, for the purpose of any action or proceeding arising out of or relating to this Agreement, and (2) agrees that all claims in respect to such action or proceeding may be heard and determined exclusively in the Bankruptcy Court and (3) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from the Bankruptcy Court, including a motion to dismiss on the groups of forum non conveniens. Each of the Parties hereto agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced

- 12 –

in other jurisdictions by suit on the judgment or in any other manner provided by law; provided, however, that if the Bankruptcy Case has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County for the resolution of any such claim or dispute and in the event that this court does not have subject matter jurisdiction, to the state courts of New York in New York County.

(b)     Each of the Parties hereto irrevocably consents to the service of the summons and complaint and any other process in any action or proceeding relating to the transactions contemplated by this Agreement, on behalf of itself or its property, by personal delivery of copies of such process to such Party. Such service shall be in lieu of any other potentially applicable requirement of service. Nothing in this Section 8.7 shall affect the right of any Party to serve legal process in any other manner permitted by law.

8.8     Waiver of Jury Trial. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

8.9     Entire Agreement. This Agreement, including any schedules and exhibits attached hereto, constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and, except to the extent otherwise contemplated by this Agreement, supersedes all previous oral and written agreements, proposals, negotiations, representations, commitments and other communications among the Parties with respect to its subject matter.

8.10     Amendments. This Agreement may not be revised, discharged, altered, amended, modified or renewed except by a writing signed by duly authorized representatives of the Parties.

8.11     Counterparts. This Agreement may be executed simultaneously in one or more counterparts, each of which is deemed an original and all of which together constitute one and the same instrument.

8.12     Relationship of Parties. Nothing contained in this Agreement will be construed as (a) creating a joint venture, association, partnership, franchise or agency relationship between the Parties, (b) making any Party the agent or employee of the other Party for any purpose whatsoever or (c) making a Party liable for the debts or obligations of the other Party, unless expressly provided in this Agreement or another agreement. All services performed under this Agreement will be performed by the Parties as an independent contractors. Each of the Parties will be responsible for, and will withhold or pay, or both, as may be required by law, all taxes pertaining to the employment of its personnel and/or performance of any services by it.

8.13     Headings. The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

8.14     Time Periods. If the time for the performance of any obligation under this Agreement expires on a Saturday, Sunday or U.S. federal legal holiday, the time for performance shall be extended to the next succeeding day which is not a Saturday, Sunday or U.S. federal legal holiday.

NYI-4242880v25

8.15　Export Control.　Each Party hereby agrees to comply with all export laws and restrictions and regulations of the Department of Commerce or other United States or non-United States agency or authority, and not to knowingly export, or allow the export or re-export of any Licensed Know-How or any direct product thereof in violation of any such restrictions, laws or regulations.

8.16　Further Assurances.　Each Party will, whenever and as often as it shall be reasonably requested by the other Party, for no additional monetary remuneration, take or cause to be taken all actions and execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such further instruments and documents, as may be necessary in order to carry out the terms and conditions of this Agreement and to consummate and make effective transactions herein contemplated and shall do any and all other acts as many be reasonably requested in order to carry out the intent and purpose of this Agreement; provided, however, that nothing in this Section 8.16 shall be deemed to amend or expand the obligations of Licensor and/or its Subsidiaries to provide Technical Documentation, services and/or support, which are fully set forth in Sections 3.1 and 3.2 of this Agreement.

8.17　Bankruptcy.　The Parties intend that the licenses in Section 2.1 and Section 2.2 be considered licenses to "intellectual property" as defined in Section 101 of the U.S. Bankruptcy Code and that Licensee be entitled to exercise all rights as a licensee of "intellectual property" under Section 365(n) of the Bankruptcy Code in the event of the bankruptcy of Licensor or any Subsidiary.

*Remainder of the page intentionally left blank; signature page follows.*

NYI-4242880v25

IN WITNESS WHEREOF, Licensor and Licensee have caused this Agreement to be executed as of the date first written above by their respective duly authorized officers.

Licensor:

CHRYSLER GROUP LLC, a Delaware limited liability company

By:_____
Name:
Title:
Date:

Licensee:

OLD CARCO LLC, a Delaware limited liability company

By:_____
Name:
Title:
Date:

15303768.1

## Engine Documentation

- Electronic Bill of Materials ("EBOM") for the Licensed Engines
- 2D & 3D Catia drawings and models of the Licensed Engines (Note: May not be available for every part and nature of drawings and models may differ, such as depending on whether they are purchased parts or parts made by Licensor)
- Engine Description
- Fastener Torques
- List of the suppliers of parts for the Licensed Engines
- Standards (via purchased subscription as made available to Chrysler Group LLC suppliers)
- Stress lab reports (Note: Are not available for every part)
- Engine Only (i.e, excludes vehicle, transmission, and any other non-engine parts, assemblies and systems): Performance, emissions and fuel consumption status

## Manufacturing Documentation

- Process layouts of the Kenosha Facility with operational descriptions and process flows
- Facilities layouts of the Kenosha Facility and process flows
- Kenosha Equipment documentation (Note: May not be available for every piece of equipment and nature of documentation may vary depending on the equipment and what the vendor provided)
- Material value stream maps

NYI-4242880v25

<u>**SCHEDULE 5.2(a)**</u>
**(Third Party Copyrights, Know-How and Patents; Infringement Assertions)**

1.　　**Third Party Copyrights, Know-How and Patents**

- Any Copyright, Know-How or Patent licensed to Licensor or its Subsidiaries pursuant to a purchase order with a supplier identified in the list of suppliers provided in the Technical Documentation.

　　*[**To be updated by Licensor as provided in <u>Section 5.2(a)</u>.**]*

2.　　**Infringement Assertions**

　　*[**To be updated by Licensor as provided in <u>Section 5.2(a)</u>.**]*

NYI-4242880v25

Exhibit E

Sale Order

[See attached]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11
                                          :
Old Carco LLC                             :    Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), et al.,             :
                                          :
          Debtors.                        :    (Jointly Administered)
                                          :
                                          :
------------------------------------------------------------x
```

## ORDER (I) AUTHORIZING DEBTORS TO SELL THEIR STERLING HEIGHTS, MICHIGAN ASSEMBLY PLANT FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (II) APPROVING CERTAIN ANCILLARY AGREEMENTS, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN RELATED AGREEMENTS AND (IV) GRANTING RELATED RELIEF

This matter coming before the Court on the motion, dated February 18, 2010 (the "Sale

Motion"),[1] filed by the above-captioned debtors and debtors in possession (collectively,

the "Debtors") for the entry of an order pursuant to sections 105, 363 and 365 of title 11 of the

United States Code (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 6004-1 and 6006-1 of the

Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New

York:  (i) authorizing and approving the entry by Debtor Old Carco LLC (f/k/a Chrysler LLC)

("Old Carco") into that certain Agreement of Purchase and Sale, dated as of February 18, 2010,

between Chrysler Group LLC (f/k/a New CarCo Acquisition LLC) (the "Buyer") and Old Carco

in the form attached hereto as Exhibit 1 (the "Purchase Agreement"), whereby Old Carco has

agreed to sell to the Buyer certain property associated with the Debtors' Sterling Heights,

Michigan assembly plant (as more specifically defined in the Purchase Agreement,

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sale
Motion.

the "Property"); (ii) authorizing and approving the sale by Old Carco of the Property free and

clear of all mortgages, security interests, equitable interests, conditional sale or other retention

agreements, pledges, liens (as such term is defined in section 101(37) of the Bankruptcy Code),

including the Identified Liens (as defined in the Purchase Agreement), claims (as that term is

defined in section 101(5) of the Bankruptcy Code), obligations, guaranties, debts, rights,

contractual commitments, interests, judgments, demands, rights of way, easements,

encroachments, charges, encumbrances, defects, options, rights of first refusal, transfer, receipt

of income or any other attributes of ownership, and restrictions of any kind or nature whether

imposed by agreement, understanding, law, equity or otherwise, excluding only the Permitted

Liens (as such term is defined in the Purchase Agreement) (all of the above, excluding only the

Permitted Liens, are collectively referred to herein as the "Interests"); (iii) authorizing and

approving Old Carco's entry into (A) the Amendment No. 3 to Transition Services Agreement

(the "TSA Amendment"), to be executed as of the Closing Date, between Old Carco and the

Buyer in the form attached to the Purchase Agreement as Exhibit B, and (B) the Intellectual

Property License Agreement (the "License" and, together with the TSA Amendment,

the "Ancillary Agreements"), to be executed as of the Closing Date, between Old Carco and the

Buyer in the form attached to the Purchase Agreement as Exhibit D, which Ancillary

Agreements serve as additional consideration provided by the Buyer in connection with the sale

of the Property; (iv) authorizing the assumption, and assignment to Buyer, of (A) that certain

Utility Services Agreement, dated as May 24, 2004 (as amended, the "Utility Services

Agreement"), between DTE Energy Center, LLC ("DTE") and Debtor Utility Assets LLC

("Utility Assets"), (B) that certain Easement Agreement, dated as of May 17, 2004

(the "Easement Agreement" and, together with the Utility Services Agreement, the "DTE

Agreements"), between DTE and Old Carco (as successor in interest to DaimlerChrysler Corporation) and (C) that certain Natural Gas Exploration, Production and Sale Agreement, dated August 20, 1991 (as amended, the "Natural Gas Agreement" and, collectively with the DTE Agreements, the "Assigned Agreements"), between Old Carco (as successor in interest to Chrysler Corporation) and West Bay Exploration Company; and (v) granting certain related relief; the Court having conducted a hearing on the Sale Motion on March **[11]**, 2010 (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; the Court having reviewed and considered, among other things, (i) the Sale Motion and the exhibits thereto (including the declaration of Peter Chadwick in support of the proposed sale of the Property); (ii) the Purchase Agreement (including the Ancillary Agreements attached as exhibits thereto); and (iii) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing;

## I.     FINDINGS OF FACT:

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[2]

### Jurisdiction, Final Order and Statutory Predicates

A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.     The Court has jurisdiction over this matter and over the property of the Debtors, including the Property to be sold, transferred or conveyed pursuant to the Purchase Agreement, and the Debtors' estates pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a

---

[2]     To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. See Fed. R. Bankr. P. 7052.

core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this case and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

      C.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the parties may consummate the transactions provided for under the terms and conditions of the Purchase Agreement and the Ancillary Agreements immediately upon entry of this Order.

### Notice of the Sale Motion

      D.    As evidenced by the affidavits of service filed with the Court: (1) proper, timely, adequate and sufficient notice of the Sale Motion and the Sale Hearing has been provided under the particular circumstances by the mailing of the Sale Motion; and (2) no other or further notice of the Sale Motion, the Sale Hearing or of the entry of this Order is necessary or shall be required.

### Good Faith

      E.    The Buyer is a buyer in "good faith," as that phrase is used in section 363(m) of the Bankruptcy Code (and court decisions thereunder) and is entitled to the protections thereof. The Purchase Agreement and the Ancillary Agreements were proposed, negotiated and entered into by the Buyer and Old Carco without collusion or fraud of any kind (including any conduct that would cause or permit the sale of the Property, the Purchase Agreement or the Ancillary Agreements to be avoided, costs to be recovered or punitive damages to be awarded under section 363(n) of the Bankruptcy Code), in good faith and from arm's length bargaining positions.

### The Debtors' Business Judgment

      F.    Pursuant to the Transition Services Agreement, by and between Old Carco and the Buyer, dated June 10, 2009 (as it may have been, or may be, amended or supplemented

from time to time, the "TSA"), the Buyer (1) is entitled to use the Property through April 30, 2011 (the "License Period") and (2) since the Closing Date (as such term is defined in the TSA), has been conducting, and currently conducts, operations at the Property.

G. The Debtors began preparations for the ultimate disposition of the Property in November 2009, at which time the Debtors were conducting preliminary negotiations with real estate brokers with respect to the necessary marketing of the Property and offering tours of the Property to a limited number of interested parties. Shortly after the commencement of these efforts, the Debtors learned that the Buyer had expressed an interest in continuing to manufacture and sell certain vehicle models that historically had been manufactured and assembled at the Property — i.e., the Chrysler Sebring and the Dodge Avenger (together, the "Vehicles"). This interest was confirmed on November 4, 2009 when the Buyer made public its "five-year plan" for profitability, which contemplated the continuing manufacture of the Vehicles.

H. Following the release of the Buyer's five-year plan in November 2009, the Debtors contacted the Buyer to determine its specific intentions with respect to the Property. The Buyer indicated its interest in either (1) extending the License Period beyond April 30, 2011 or (2) purchasing the Property. Although the Debtors were not interested in an extension of the License Period, the Debtors and the Buyer began negotiating a potential sale of the Property in November 2009, which negotiations ultimately produced the Purchase Agreement and the related Ancillary Agreements. The Buyer's agreement to enter into the Ancillary Agreements was a key factor in the Debtors' decision to consummate the Transaction.

I. The $20 million purchase price to be paid by the Buyer under the Purchase Agreement together with the substantial non-monetary consideration represented by the Buyer's

entry into the Ancillary Agreements (which agreements enhance the marketability of certain real property and related equipment and improvements owned by Old Carco) exceed the Debtors' previously-received estimates for the net proceeds expected pursuant to a sale of the Property. Specifically, in connection with the Debtors' preliminary negotiations with real estate brokers regarding the marketing and disposition of the Property, the Debtors received estimates of the gross proceeds recoverable by the Debtors in connection with a sale of the Property within a range of $8.5 million to $21 million (with the net proceeds recoverable necessarily falling short of such estimates). The Debtors have received no letters of intent from any party other than the Buyer indicating an interest in the purchase of the Property.

J.       No brokers were involved in consummating the transactions contemplated by the Purchase Agreement or the Ancillary Agreements, and no brokers' commissions are due to any person in connection with the transactions described in this Order.

K.       Pursuant to paragraph 3 of the Agreed Order (Docket No. 5982) (the "DIP Lender Winddown Order") by and between the Debtors, the Debtors' debtor-in-possession lenders (collectively, the "DIP Lenders") and the Creditors' Committee, entered by the Court on November 19, 2009, the DIP Lenders acknowledge that their liens on the Property are junior to the liens securing the indebtedness under the First Lien Credit Agreement and are not funding any of the expenses associated with the sale of the Property (which Property is "First Lien Collateral" as such term is defined in the DIP Lender Winddown Order). Instead, these costs currently are being funded pursuant to the Agreed Order (Docket No. 5981) (the "First Lien Winddown Order") by and between the Debtors and the First Lien Agent on behalf of the First Lien Lenders (i.e., the parties with the primary economic stake in the sale of the Property),

entered by the Court on November 19, 2009, from the Reserve (as such term is defined in the First Lien Winddown Order) established from the First Lien Lenders' collateral.

L.     In accordance with paragraph 7 of the First Lien Winddown Order, the Debtors have reviewed the substance of their negotiations with respect to the sale of the Property and the terms of the Purchase Agreement with the First Lien Agent, and the First Lien Agent has (1) designated the Property as an "Estate Asset" (as such term is defined in the First Lien Winddown Order), (2) indicated to the Debtors that the First Lien Lenders have consented to the sale of the Property pursuant to the terms of the Purchase Agreement, (3) indicated to the Debtors that the First Lien Lenders believe the consideration received for the Property to be appropriate and (4) indicated to the Debtors that the First Lien Lenders (as the primary economic parties in interest) prefer that the sale of the Property to the Buyer be consummated without an auction to avoid any delay and costs associated therewith and to provide the certainty of a near-term sale.

M.     The decisions of the Debtors to enter into (1) the Purchase Agreement, which provides for the private sale of the Property to the Buyer, and (2) the Ancillary Agreements, which provide the Debtors with substantial consideration in connection with the sale of the Property, represent sound and reasonable exercises of the Debtors' business judgment. Among other things, the Debtors have determined in their business judgment that the benefits of consummating a prompt private sale of the Property on the terms and conditions set forth in the Purchase Agreement outweigh any potential benefits of conducting a further marketing and overbid process for the Property where (1) the First Lien Lenders, as the primary economic parties in interest, have indicated to the Debtors their preference that the Debtors' estates not incur any further marketing costs with respect to the Property, (2) the Debtors have no agreement

with the DIP Lenders or any other party to fund the costs that would be incurred by the Debtors' estates in connection with a further marketing process, (3) the consideration to be received in exchange for the Property (i.e., the $20 million cash Purchase Price and the substantial non-monetary consideration provided pursuant to the Ancillary Agreements) exceeds the preliminary estimates of the Property's value received by the Debtors and (4) the extended License Period with respect to the Property (i.e., until April 30, 2011) otherwise serves to decrease the Property's immediate marketability to other potential purchasers. Moreover, the Debtors have determined that (1) Old Carco's prospective ability to assign the Buyer's obligations under the TSA with respect to Owned Premises (as such term is defined in the TSA) to prospective purchasers of such premises, which ability is granted pursuant to the TSA Amendment, and (2) the Buyer's agreement to grant Old Carco a non-exclusive license to use certain intellectual property related to the manufacture of certain engines, as set forth in the License, provide Old Carco's bankruptcy estate with substantial value by enhancing the marketability of certain real property and related improvements owned by Old Carco.

N.       Accordingly, under the circumstances, the private sale of the Property on the terms and conditions set forth in the Purchase Agreement maximizes the value of the Property for the Debtors' estates.

## Validity of Transfer

O.       Prior to the transactions contemplated under the Purchase Agreement, the Property is the property of the Debtors' estates and title thereto is vested in the Debtors' estates.

P.       Old Carco has full power and authority to execute the Purchase Agreement and all other documents contemplated thereby (including the Ancillary Agreements), the sale of the Property has been duly and validly authorized and Old Carco possesses all necessary corporate authority to consummate the transactions contemplated by the Purchase

Agreement. No other consents or approvals, other than as may be expressly provided for in the Purchase Agreement, are required by Old Carco to consummate the transactions contemplated by the Purchase Agreement.

### Section 363(f) of the Bankruptcy Code is Satisfied

Q.     Except as may otherwise be provided in the Purchase Agreement or this Order, Old Carco may sell the Property free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied. The First Lien Lenders have consented to the proposed sale of the Property hereunder within the meaning of section 363(f)(2) of the Bankruptcy Code. Moreover, other holders of Interests who did not object, or who withdrew their objections, to the sale of the Property and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the proceeds of the sale of the Property.

### Assumption and Assignment of the Assigned Agreements

R.     The assumption and assignment of the Assigned Agreements are integral to the Purchase Agreement, are in the best interests of the Debtors and their bankruptcy estates and represent the reasonable exercise of the Debtors' sound business judgment. There are no outstanding defaults under the Assigned Agreements and, thus, no amounts need be paid to the counterparties thereto as cure in connection with the assumption of the Assigned Agreements pursuant to section 365(b) of the Bankruptcy Code, the requirements of which have been satisfied. Further, the Buyer has provided adequate assurance of future performance under the Assigned Agreements in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code.

Accordingly, the Assigned Agreements can be assumed by the Debtors and assigned to the Buyer, as provided for in the Sale Motion and the Purchase Agreement.

## Retention of Jurisdiction

S.    It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Purchase Agreement, and to adjudicate, if necessary, any and all disputes relating in any way to the transactions provided for under the terms and conditions of the Purchase Agreement.

## II.    CONCLUSIONS OF LAW:

NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    The relief requested in the Sale Motion is granted in its entirety, subject to the terms and conditions contained herein.

## Approval of Sale

2.    The Purchase Agreement and all exhibits affixed thereto (including, but not limited to, the Ancillary Agreements), Old Carco's entry into the Purchase Agreement and the transactions contemplated thereby (including, but not limited to, Old Carco's entry into the Ancillary Agreements) are hereby approved. Pursuant to sections 105 and 363 of the Bankruptcy Code, Old Carco is authorized and directed to perform its obligations under the Purchase Agreement and all exhibits affixed thereto (including, but not limited to, the Ancillary Agreements).

3.    The Buyer is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code.

4.    Old Carco shall be, and hereby is, authorized and directed to fully assume, perform under, consummate and implement the terms of the Purchase Agreement together with

any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Purchase Agreement, this Order and the sale of the Property contemplated thereby including, without limitation, the execution of and performance under the Ancillary Agreements, the execution of any deeds, assignments and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession any or all of the Property, as may be necessary or appropriate to the performance of Old Carco's obligations as set forth in the Purchase Agreement, without any further corporate action by Old Carco or orders of this Court. The Buyer shall have no obligation to proceed with the closing of the Purchase Agreement until all conditions precedent to its obligation to do so under the Purchase Agreement have been met, satisfied or waived.

5. The sale of the Property and the consideration provided by the Buyer under the Purchase Agreement (including the Buyer's entry into the Ancillary Agreements) is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law. The sale of the Property, and the Debtors' entry into the Purchase Agreement and the Ancillary Agreements, may not be avoided, and costs may not be recovered or punitive damages awarded, pursuant to section 363(n) of the Bankruptcy Code.

6. Effective as of the Closing Date, the sale of the Property by Old Carco to the Buyer shall constitute a legal, valid and effective transfer of the Property, notwithstanding any requirement for approval or consent by any person and shall vest the Buyer with all right, title and interest of the Debtors in and to the Property, free and clear of all Interests of any kind, pursuant to section 363(f) of the Bankruptcy Code.

## Transfer of Property Free and Clear

7.     Pursuant to sections 105 and 363 of the Bankruptcy Code, the sale of the Property shall vest Buyer with all right, title and interest of the Debtors to the Property free and clear of any and all Interests, with all such Interests and any other liabilities and claims to attach only to the proceeds of the sale (if any) with the same priority, validity, force and effect, if any, as they now have in or against the Property, subject to all claims and defenses the Debtors may possess with respect thereto.  Following the Closing Date, no holder of any Interests in the Property shall interfere with the Buyer's use and enjoyment of the Property based on or related to such Interests.

8.     To the greatest extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of Old Carco with respect to the Property transferred pursuant to the Purchase Agreement, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date, provided, however, that nothing in the Purchase Agreement or this Order shall authorize the transfer of a permit or license without governmental approval where applicable nonbankruptcy law requires governmental approval of such transfer.

9.     On or before the Closing Date, all parties holding Interests of any kind are authorized and directed to execute such documents and take all other actions as may be necessary to release any Interests of any kind against the Property, as such Interests may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements or other documents or agreements evidencing any Interests in or against the Property shall not have delivered to Old Carco prior to the Closing Date after request therefor, in proper form for

filing and executed by the appropriate parties, termination statements, instruments of satisfaction or releases of all such Interests that the person or entity has with respect to the Property, Old Carco is hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Property prior to the Closing Date, and the Buyer is authorized to execute and file such documents after the Closing Date; provided, however, that nothing in this paragraph shall authorize Old Carco to execute or file documents on behalf of the First Lien Lenders or the First Lien Agent (unless the First Lien Agent so consents) or any governmental entity.

10.     All persons and entities, including, but not limited to, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, any claimant asserting a products liability claim, trade and other creditors asserting or holding an Interest of any kind or nature whatsoever against or in the Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) shall be forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interest against the Buyer or any of its affiliates or subsidiaries; provided, however, the foregoing shall not prevent the Debtors or their successors or permitted assigns from pursuing claims, if any, against the Buyer and/or its successors and assigns in accordance with the terms of the Purchase Agreement, the Ancillary Agreements, the TSA, the MTA or other agreements.

11.     Nothing in this Order or the Purchase Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations (or any associated liabilities for penalties, damages, cost recovery or

injective relief) that any entity would be subject to as the owner or operator of the Property after the date of entry of this Order. Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.

12. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Purchase Agreement or the Ancillary Agreements.

13. Except (a) as expressly provided otherwise in the Purchase Agreement or this Order and (b) in connection with Permitted Liens, all persons or entities, presently or on or after the Closing Date, in possession of some or all of the Property are directed to surrender possession of the Property to the Buyer on the Closing Date or at such time thereafter as the Buyer may request.

## Assumption and Assignment of the Assigned Agreements

14. Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Debtors' assumption, and assignment to the Buyer, of the Assigned Agreements is hereby approved, and all requirements of section 365 of the Bankruptcy Code are hereby deemed satisfied.

15. The Assigned Agreements shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in the Assigned Agreements that prohibits, restricts or conditions such assignment or transfer (including those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code). There shall be no assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption or assignment of the Assigned Agreements. The Assigned Agreements may not be terminated, or the rights of any party modified in any respect, including pursuant to any "change of control" or anti-assignment clauses, by any other party thereto as a result of the transactions contemplated by the Purchase Agreement.

16.     All non-Debtor counterparties to the Assigned Agreements hereby are forever barred, estopped and permanently enjoined from asserting against the Debtors or the Buyer, their successors or assigns or the property of any of them, any default under the Assigned Agreements existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of the Assigned Agreements shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Agreements.

17.     Upon the Closing, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assigned Agreements.

### Additional Provisions

18.     Subject to the terms of the Purchase Agreement, the Purchase Agreement may be modified, amended or supplemented by agreement of Old Carco and the Buyer without further action or order of the Court; *provided, however*, that any such modification, amendment or supplement does not materially change the terms of the Purchase Agreement or modify the express terms of this Order.

19.     The failure specifically to include any particular provisions of the Purchase Agreement or any related agreement (including, but not limited to, the Ancillary Agreements) in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court, Old Carco and the Buyer that the Purchase Agreement and any related agreements (including, but not limited to, the Ancillary Agreements) are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to the Closing Date. To the extent that any provisions of this

Order conflict with the terms and conditions of the Purchase Agreement, the terms and conditions of this Order shall govern and control.

20. This Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Property or a bill of sale transferring good and marketable title in the Property to Purchaser and this Order, the Purchase Agreement and any related agreements (including, but not limited to, the Ancillary Agreements), as applicable, shall be binding upon, may be enforced against and shall govern the acts of all Persons and entities, including without limitation, the Debtors and the Buyer, their respective successors and permitted assigns and any affiliates or subsidiaries thereof (including, without limitation, any successor trustee, examiner, "responsible person" or other fiduciary appointed for the Debtors' estates), all creditors and equity holders of any Debtor (whether known or unknown), filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, recording agencies, secretaries of state and all other persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Property. Each and every federal, state and local governmental agency, unit or department is hereby directed to accept this Order as sole and sufficient evidence of the transfer of title of the Property to the Buyer, and such agency, unit or department may rely upon this Order in consummating the transactions contemplated by the Purchase Agreement. This Order may be recorded by the Buyer in any registry or government office.

21. Nothing contained in any plan confirmed in these chapter 11 cases, any order of the Bankruptcy Court confirming such plan or any other order entered in these

chapter 11 cases (or any subsequent chapter 7 case) shall be deemed to modify the provisions of the Purchase Agreement or the Ancillary Agreements or the terms of this Order.

22.      As provided by Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry.

23.      This Court retains jurisdiction to interpret, implement and enforce the terms and provisions of this Order, the Purchase Agreement and all amendments thereto, any waivers and consents thereunder and any agreements executed in connection therewith in all respects, including to compel delivery of the Property, to protect the Buyer against any Interest and to enter any orders under sections 105 or 363 (or other applicable provisions) of the Bankruptcy Code necessary or appropriate to transfer the Property to the Buyer.

Dated: _____, 2010
        New York, New York

_____
CHIEF UNITED STATES BANKRUPTCY JUDGE

Exhibit F

Exceptions

1.     Mortgage dated May 24, 2004 and recorded May 27, 2004 as Liber 15479, Page 640, made by DTE Energy Center LLC, a Delaware limited liability company, to J.P. Morgan Trust Company, National Association, a national banking association, to secure an indebtedness in the amount of $(no amount given), and the terms and conditions thereof.

   NOTE: (Limited to Mortgagor's rights under the Easement Agreement recorded in Liber 15448, Page 158.)

2.     A financing statement recorded May 25, 2004 as Liber 15462, Page 364 of Official Records.

   | Debtor: | DTE Energy Center LLC |
   | Secured party: | JP Morgan Trust Company, National Association |

   NOTE: (Limited to Debtor's rights under the Easement Agreement recorded in Liber 15448, Page 158.)

   A continuation statement was recorded May 14, 2009 as Liber 19784, Page 787 of Official Records.

   According to the public records, the security interest of the secured party was assigned to The Bank of New York Mellon Trust Company, N.A., as Trustee by document recorded May 19, 2009 as Liber 19792, Page 140 of Official Records.

3.     Terms and conditions of Easement granted to the County of Macomb to construct, operate and maintain sanitary sewer across and through the land as recited in Liber 2288, Page 172.

4.     Terms and conditions of Easement to the Michigan Central Railroad Company to construct, reconstruct, maintain, repair and use railroad trackage over and across captioned land as set forth in Liber 1047, Page 437.

5.     Terms and conditions of Easements for overpass in favor of the City of Sterling Heights as recorded in Liber 3311, Page 314.

6.     Right of Way granted to the Detroit Edison Company over the land as set forth in Liber 3365, Page 155.

7.     Terms and conditions of Department of Army Easement for Railway Right-of-Way dated as set forth in Liber 3393, Page 32.

8.  Terms and conditions of a Natural Gas Exploration, Production and Sale Agreement dated August 20, 1991 between Chrysler Corporation and West Bay Exploration Company evidenced of record by Affidavit of Interest recorded in Liber 5220, Page 115 and the following assignments of such interest: Liber 5309, Page 174; Liber 5346, Page 159; Liber 5346, Page 162; Liber 5380, Page 907, Liber 6840, Page 1; Liber 6909, Page 589; Liber 7279, Page 827; Liber 7310, Page 147 and Liber 9481, Page 334.

9.  Terms and conditions of a Hold Harmless and Indemnification Agreement between Chrysler Corporation and the City of Sterling Heights as set forth in Liber 6575, Page 74.

10. Terms and conditions of Agreement On-Site Fire Protection System between Chrysler Corporation and The City of Sterling Heights as set forth in Liber 3623, Page 599.

11. Terms and conditions of Agreement between Chrysler Corporation and the City of Sterling Heights as set forth in Liber 3942, Page 479.

12. Terms and conditions of Agreements between Chrysler Motors Corporation and the City of Sterling Heights concerning a sanitary sewer service system as set forth in Liber 4763, Page 352 and Liber 4763, Page 357.

13. Terms and conditions of a Notice of Variance and a related Hold Harmless and Indemnification Agreement as set forth in Liber 10394, Page 397 and Liber 10394, Page 415.

14. Terms and conditions of IFEC Letters of Agreement as set forth in Liber 8592, Page 410 and in Liber 17052, Page 615.

15. Terms and conditions of Detroit Edison Overhead Easement (Right of Way) as set forth in Liber 10748, Page 704.

16. Terms and conditions of Easement Agreement between DTE Energy Center, LLC and DaimlerChrysler Corporation as set forth in Liber 15448, Page 158.

17. Terms and conditions of Notice of Administrative Modification of Variance to Concrete Code as set forth in Liber 18201, Page 975.

18. Terms and conditions of a Public Utility Easement in favor of the City of Sterling Heights as set forth in Liber 18280, Page 52.

19. ALTA/ASCM Land Title Survey prepared by Spalding DeDecker Associates, Inc., Project No. SM10-003, dated January 27, 2010 discloses the following:

    a.  Proposed right-of-way line along Northern property line;
    b.  Fence encroaches across property line in various places;
    c.  Asphalt and concrete encroach across property line in various places;

d.   Bus stop enclosure encroaches onto subject property along East boundary line;

e.   Railroad tracks located on subject property without benefit of recorded easements;

f.   Concrete Drive and pump house located on subject property without benefit of recorded easements; and

g.   High voltage transmission lines and substation located on subject property without benefit of recorded easements.

Exhibit G

Identified Liens

1. Proceedings pending in the United States Bankruptcy Court of the Southern District of New York entitled: In re Old Carco LLC, Debtor, Case No. 09-50002, and numerous cases.

2. Mortgage dated January 2, 2009 and recorded February 13, 2009 as Liber 19654, Page 400, made by Chrysler LLC, a Delaware limited liability company, f/k/a DaimlerChrysler Corporation, to The United States Treasury, to secure an indebtedness in the amount of $4,000,000,000.00, and the terms and conditions thereof.

3. Assignment of Lease and Rents by Chrysler LLC, a Delaware limited liability company, f/k/a DaimlerChrysler Corporation to The United States Department of the Treasury, recorded February 13, 2009 in Liber 19654, Page 426.

4. A financing statement recorded February 26, 2009 as Liber 19671, Page 271 of Official Records.
   Debtor:               Chrysler LLC f/k/a DaimlerChrysler Corporation
   Secured Party:        The United States Department of the Treasury

5. Mortgage dated May 5, 2009 and recorded October 15, 2009 as Liber 19986, Page 1, made by Chrysler LLC, a Delaware limited liability company and a debtor and debtor-in-possession in a case pending under Chapter 11 of Title 11 of the United States Code, to The United States Department of Treasury, to secure an indebtedness in the amount of $4,100,000,000.00 and the terms and conditions thereof.

6. Assignment of Leases and rents by Chrysler LLC, a Delaware limited liability company and a debtor and debtor-in-possession in a case pending under Chapter 11 of Title 11 of the United States Code to the Lender Parties hereto from time to time, recorded October 15, 2009 in Liber 19986, Page 36.

7. A financing statement recorded October 15, 2009 in Liber 19986, Page 55 of Official Records.
   Debtor:               Chrysler LLC
   Secured party:        The United States Department of Treasury

8. Any and all liens of the First Lien Lenders as defined and referenced in the Sale Order and Motion.

# EXHIBIT B

**[Chadwick Declaration]**

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
David G. Heiman

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
Jeffrey B. Ellman

Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------------------x
                                       :
In re                                  :   Chapter 11
                                       :
Old Carco LLC                          :   Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), et al.,          :
                                       :   (Jointly Administered)
                        Debtors.       :
                                       :
--------------------------------------------------------------x
```

## DECLARATION OF PETER C. CHADWICK IN SUPPORT OF MOTION OF DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004 AND 6006, FOR AN ORDER (I) AUTHORIZING DEBTORS TO SELL THEIR STERLING HEIGHTS, MICHIGAN ASSEMBLY PLANT FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (II) APPROVING CERTAIN ANCILLARY AGREEMENTS, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN RELATED AGREEMENTS AND (IV) GRANTING RELATED RELIEF

I, Peter C. Chadwick, make this declaration pursuant to 28 U.S.C. § 1746 and state as follows:

1.      I am an Executive Director with Capstone Advisory Group, LLC ("Capstone"), financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors").  I submit this Declaration in support of the Motion of Debtors and Debtors in Possession, Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, for an Order (I) Authorizing Debtors to Sell Their Sterling Heights, Michigan Assembly Plant Free and Clear of All Liens, Claims and Encumbrances, (II) Approving Certain Ancillary Agreements, (III) Authorizing the Assumption and Assignment of Certain Related Agreements and (IV) Granting Related Relief (the "Motion").[1]

2.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, information supplied to me by other Capstone professionals or other professionals retained by Chrysler, my review of relevant documents or my opinion based upon my experience.  If I were called upon to testify, I could and would testify to each of the facts set forth herein.

3.      In my position at Capstone, my responsibilities include advising the Debtors with respect to the sale and disposition of the Debtors' various assets, including the Property.  In connection with these responsibilities, I am familiar with the Property, the Debtors' decision to sell the Property and the Debtors' marketing program for the Property.

4.      The Property consists of the Land and the Equipment.  The Property was pledged as collateral to secure the Debtors' obligations under the First Lien Credit Agreement.

---

[1]      Capitalized terms not otherwise defined herein have the meaning given to them in the Motion.

Pursuant to the TSA, New Chrysler (a) is entitled to use the Property through the end of the License Period on April 30, 2011 and (b) since the Closing Date (as such term is defined in the TSA), has been conducting, and currently conducts, operations at the Property. Pursuant to the TSA, New Chrysler does not pay rent for use of the Property during the License Period, but is responsible for (a) all carrying costs during the License Period and (b) the phase out and deactivation of the premises at the conclusion of the License Period.

5. Because the DIP Lenders, who acknowledge that their liens on the Property are junior to the liens supporting the loans under the First Lien Credit Agreement, are unwilling to fund the Debtors' efforts to liquidate the First Lien Lenders' collateral, these costs instead are being funded from the Reserve established from the First Lien Lenders' cash collateral pursuant to the First Lien Winddown Order. The Debtors have reviewed the substance of their negotiations with respect to the sale of the Property and the terms of the Purchase Agreement with the First Lien Agent, and the First Lien Agent has: (a) designated the Property as an "Estate Asset" (as such term is defined in the First Lien Winddown Order); (b) indicated to the Debtors that the First Lien Lenders have consented to the sale of the Property pursuant to the terms of the Purchase Agreement; (c) indicated to the Debtors that the First Lien Lenders believe the consideration received for the Property is appropriate; and (d) indicated to the Debtors that the First Lien Lenders (as the primary economic parties in interest) prefer that the sale of the Property to New Chrysler be consummated without an auction to avoid any delay and costs associated therewith and to provide the certainty of a near-term sale.

6. The Debtors began preparations for the ultimate disposition of the Property in November 2009, at which time the Debtors were conducting preliminary negotiations with real estate brokers with respect to the necessary marketing of the Property and offering

tours of the Property to a limited number of interested parties. Shortly after the commencement of these efforts, the Debtors learned that New Chrysler had expressed an interest in continuing to manufacture and sell certain vehicle models that historically had been manufactured and assembled at the Property — i.e., the Chrysler Sebring and the Dodge Avenger (together, the "Vehicles"). This interest was confirmed on November 4, 2009 when New Chrysler made public its "five-year plan" for profitability, which contemplated the continuing manufacture of the Vehicles.

7.      Following the release of New Chrysler's five-year plan in November 2009, the Debtors contacted New Chrysler to determine its specific intentions with respect to the Property. New Chrysler indicated its interest in either (a) extending the License Period beyond April 30, 2011 or (b) purchasing the Property. Although the Debtors were not interested in an extension of the License Period, the Debtors and New Chrysler began negotiating a potential sale of the Property in November 2009, which negotiations ultimately produced the Purchase Agreement and the related Ancillary Agreements. The Debtors and New Chrysler entered into the Purchase Agreement without collusion, in good faith and from arm's-length bargaining positions, with no indication of fraud, collusion between New Chrysler and the Debtors or any similar conduct. No brokers were involved in consummating the transactions contemplated by the Purchase Agreement or the Ancillary Agreements, and no brokers' commissions are due to any person in connection with the transactions described in the Motion.

8.      New Chrysler's agreement to enter into the Ancillary Agreements was a key factor in the Debtors' decision to consummate the transaction described herein. Both the TSA Amendment and the License materially enhance the marketability of certain real property and related equipment and improvements owned by Old Carco. The TSA Amendment promotes

this end by rendering all of New Chrysler's obligations under the TSA with respect to any Owned Premises (as such term is defined in the TSA, other than the Owned Premises identified as "Newark" on Exhibit C thereto), or any portion of such Owned Premises, freely assignable upon written notice to New Chrysler by Old Carco, in its sole discretion, with any such assignment to inure to the benefit of any Direct Owner or Future Owner.

9. The ability of prospective purchasers of Owned Premises to enforce the Debtors' rights against New Chrysler under the TSA (e.g., the right to enforce certain decommissioning requirements with respect to Owned Premises currently licensed and operated by New Chrysler; the right to prevent material alterations to, and ensure the maintenance of, such premises) enhances the marketability and value of such premises. Absent the parties' execution of the TSA Amendment, New Chrysler's obligations under the TSA will be assignable only with New Chrysler's consent. Previously, whenever the Debtors sought to sell "Owned Premises," the Debtors were obliged to negotiate with New Chrysler on a one-off basis with respect to assignments of the Debtors' rights under the TSA prior to consummating such sales. These serial negotiations had the potential to increase transaction costs and decrease the marketability of the Owned Premises. Such obstacles and costs are eliminated by the parties' entry into the TSA Amendment, thus increasing both the marketability of the Owned Premises and the efficiency of the Debtors' winddown efforts.

10. The License relates only to a single property, but also assists in enhancing the value of that property for the benefit of the Debtors and their estates. In particular, the License will assist in bolstering the recoverable value, and promoting the efficient liquidation, of the Kenosha Property. Pursuant to the License, New Chrysler, on behalf of itself and its subsidiaries, has agreed to grant Old Carco and its affiliates an irrevocable, non-exclusive, fully

paid-up, perpetual, worldwide license of certain intellectual property (i.e., patents, know-how, copyrights and the complementary right to make improvements to each) necessary to continue the production and sale of Licensed Engines, which license is freely assignable by Old Carco to any potential purchaser or transferee of (a) all of the Kenosha engine facility, (b) one or more engine lines (or the material parts thereof) located at the Kenosha facility or (c) any equipment located at the Kenosha facility (to the extent necessary to use such equipment in substantially the same manner being used at the Kenosha facility as of the effective date of the License or during the period between such effective date and the License Termination Date for the Kenosha facility).

11.     Accordingly, having entered into the License, any sale by the Debtors of the Kenosha Property may include the transfer of the intellectual property necessary to manufacture the Licensed Engines.  This obviates the need for either the Debtors or any prospective purchaser of the Kenosha Property to negotiate a side agreement with New Chrysler for access to the intellectual property necessary to manufacture the Licensed Engines.  The transferability of the License thus substantially increases the attractiveness of the Kenosha Property to prospective purchasers.

12.     The $20 million purchase price to be paid by New Chrysler under the Purchase Agreement together with the substantial non-monetary consideration represented by New Chrysler's entry into the Ancillary Agreements exceeds the Debtors' previously received estimates for the net proceeds expected pursuant to a sale of the Property.  In connection with the Debtors' preliminary negotiations with real estate brokers regarding the marketing and disposition of the Property, the Debtors received estimates of the gross proceeds recoverable by the Debtors in connection with a sale of the Property within a range of $8.5 million to

$21 million (with the net proceeds recoverable necessarily falling short of such estimates). The Debtors have received no other letters of intent from any party other than New Chrysler indicating an interest in the purchase of the Property.

13.     The Debtors have determined in their business judgment that the benefits of consummating a prompt private sale of the Property on the terms and conditions set forth in the Purchase Agreement outweigh any potential benefits of conducting a further marketing and overbid process for the Property where: (a) the First Lien Lenders, as the primary economic parties in interest, have indicated to the Debtors their preference that the Debtors' estates not incur any further marketing costs with respect to the Property; (b) the Debtors have no agreement with the DIP Lenders or any other party to fund the costs that would be incurred by the Debtors' estates in connection with a further marketing process; (c) the consideration to be received in exchange for the Property (i.e., $20 million in cash plus the substantial non-monetary consideration provided pursuant to the Ancillary Agreements) exceeds the preliminary estimates of the Property's value received by the Debtors; and (d) the extended License Period with respect to the Property (i.e., until April 30, 2011) otherwise serves to decrease the Property's immediate marketability to other potential purchasers.

14.     A sound business justification underlies the Debtors' decision to sell the Property where the proposed sale will allow the Debtors to (a) continue to implement the winddown of the Debtors' estates (as described in the DIP Lender Winddown Order, First Lien Winddown Order and the Plan) and (b) monetize the Property for the benefit of the Debtors' estates and creditors, including the First Lien Lenders (who are the primary economic parties in interest). Moreover, given (a) the significant cash Purchase Price and additional consideration being offered by New Chrysler (which, in the case of the Purchase Price, is not subject to

financing contingencies and, in the case of the Ancillary Agreements, is not available from other prospective purchasers) and (b) New Chrysler's willingness to promptly consummate the sale on an "as is, where is" basis, it is unlikely that an overbid process will generate higher and better offers for the Property and, thus, that the consideration described in the Purchase Agreement provides maximum value to their chapter 11 estates.

15.     In addition, the First Lien Lenders have indicated their preference that the sale of the Property to New Chrysler be consummated without an auction to avoid any delay and costs associated therewith.  The Debtors and the First Lien Lenders have agreed that privately selling the Property likely will avoid the incurrence of significant sale and auction costs that (a) are unlikely to produce a higher and better offer for the Property and (b) will reduce the funds available in the Reserve to fund the Debtors' further efforts to liquidate the First Lien Lenders' collateral.

16.     As of the date hereof, the Debtors have received no letters of intent or similar binding offers to purchase the Property that promise greater economic value to their bankruptcy estates than that embodied in the Purchase Agreement.  Thus, the Purchase Agreement constitutes the highest and best offer for the Property, and will provide a greater recovery for the Debtors' estates than would be provided by any available alternative (including a public sale or auction of the Property).  Accordingly, the Debtors' entry into the Purchase Agreement represents a sound exercise of their reasonable business judgment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  February 18, 2010

  s/ Peter C. Chadwick
Peter C. Chadwick
Executive Director
Capstone Advisory Group, LLC

**EXHIBIT C**

**[Proposed Sale Order]**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                                            :
In re                                                       :      Chapter 11
                                                            :
Old Carco LLC                                               :      Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), *et al.*,                             :
                                                            :      (Jointly Administered)
        Debtors.                                            :
                                                            :
                                                            :
------------------------------------------------------------x
```

## ORDER (I) AUTHORIZING DEBTORS TO SELL THEIR STERLING HEIGHTS, MICHIGAN ASSEMBLY PLANT FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (II) APPROVING CERTAIN ANCILLARY AGREEMENTS, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN RELATED AGREEMENTS AND (IV) GRANTING RELATED RELIEF

This matter coming before the Court on the motion, dated February 18, 2010 (the "Sale Motion"),[1] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 6004-1 and 6006-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York: (i) authorizing and approving the entry by Debtor Old Carco LLC (f/k/a Chrysler LLC) ("Old Carco") into that certain Agreement of Purchase and Sale, dated as of February 18, 2010, between Chrysler Group LLC (f/k/a New CarCo Acquisition LLC) (the "Buyer") and Old Carco in the form attached hereto as Exhibit 1 (the "Purchase Agreement"), whereby Old Carco has agreed to sell to the Buyer certain property associated with the Debtors' Sterling Heights, Michigan assembly plant (as more specifically defined in the Purchase Agreement,

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sale Motion.

the "Property"); (ii) authorizing and approving the sale by Old Carco of the Property free and

clear of all mortgages, security interests, equitable interests, conditional sale or other retention

agreements, pledges, liens (as such term is defined in section 101(37) of the Bankruptcy Code),

including the Identified Liens (as defined in the Purchase Agreement), claims (as that term is

defined in section 101(5) of the Bankruptcy Code), obligations, guaranties, debts, rights,

contractual commitments, interests, judgments, demands, rights of way, easements,

encroachments, charges, encumbrances, defects, options, rights of first refusal, transfer, receipt

of income or any other attributes of ownership, and restrictions of any kind or nature whether

imposed by agreement, understanding, law, equity or otherwise, excluding only the Permitted

Liens (as such term is defined in the Purchase Agreement) (all of the above, excluding only the

Permitted Liens, are collectively referred to herein as the "Interests"); (iii) authorizing and

approving Old Carco's entry into (A) the Amendment No. 3 to Transition Services Agreement

(the "TSA Amendment"), to be executed as of the Closing Date, between Old Carco and the

Buyer in the form attached to the Purchase Agreement as Exhibit B, and (B) the Intellectual

Property License Agreement (the "License" and, together with the TSA Amendment,

the "Ancillary Agreements"), to be executed as of the Closing Date, between Old Carco and the

Buyer in the form attached to the Purchase Agreement as Exhibit D, which Ancillary

Agreements serve as additional consideration provided by the Buyer in connection with the sale

of the Property; (iv) authorizing the assumption, and assignment to Buyer, of (A) that certain

Utility Services Agreement, dated as May 24, 2004 (as amended, the "Utility Services

Agreement"), between DTE Energy Center, LLC ("DTE") and Debtor Utility Assets LLC

("Utility Assets"), (B) that certain Easement Agreement, dated as of May 17, 2004

(the "Easement Agreement" and, together with the Utility Services Agreement, the "DTE

Agreements"), between DTE and Old Carco (as successor in interest to DaimlerChrysler Corporation) and (C) that certain Natural Gas Exploration, Production and Sale Agreement, dated August 20, 1991 (as amended, the "Natural Gas Agreement" and, collectively with the DTE Agreements, the "Assigned Agreements"), between Old Carco (as successor in interest to Chrysler Corporation) and West Bay Exploration Company; and (v) granting certain related relief; the Court having conducted a hearing on the Sale Motion on March **[11]**, 2010 (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; the Court having reviewed and considered, among other things, (i) the Sale Motion and the exhibits thereto (including the declaration of Peter Chadwick in support of the proposed sale of the Property); (ii) the Purchase Agreement (including the Ancillary Agreements attached as exhibits thereto); and (iii) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing;

## I.   FINDINGS OF FACT:

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[2]

### Jurisdiction, Final Order and Statutory Predicates

A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.     The Court has jurisdiction over this matter and over the property of the Debtors, including the Property to be sold, transferred or conveyed pursuant to the Purchase Agreement, and the Debtors' estates pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a

---

[2] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. See Fed. R. Bankr. P. 7052.

core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this case and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

        C.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the parties may consummate the transactions provided for under the terms and conditions of the Purchase Agreement and the Ancillary Agreements immediately upon entry of this Order.

## Notice of the Sale Motion

        D.      As evidenced by the affidavits of service filed with the Court:  (1) proper, timely, adequate and sufficient notice of the Sale Motion and the Sale Hearing has been provided under the particular circumstances by the mailing of the Sale Motion; and (2) no other or further notice of the Sale Motion, the Sale Hearing or of the entry of this Order is necessary or shall be required.

## Good Faith

        E.      The Buyer is a buyer in "good faith," as that phrase is used in section 363(m) of the Bankruptcy Code (and court decisions thereunder) and is entitled to the protections thereof.  The Purchase Agreement and the Ancillary Agreements were proposed, negotiated and entered into by the Buyer and Old Carco without collusion or fraud of any kind (including any conduct that would cause or permit the sale of the Property, the Purchase Agreement or the Ancillary Agreements to be avoided, costs to be recovered or punitive damages to be awarded under section 363(n) of the Bankruptcy Code), in good faith and from arm's length bargaining positions.

## The Debtors' Business Judgment

        F.      Pursuant to the Transition Services Agreement, by and between Old Carco and the Buyer, dated June 10, 2009 (as it may have been, or may be, amended or supplemented

from time to time, the "TSA"), the Buyer (1) is entitled to use the Property through April 30, 2011 (the "License Period") and (2) since the Closing Date (as such term is defined in the TSA), has been conducting, and currently conducts, operations at the Property.

G.      The Debtors began preparations for the ultimate disposition of the Property in November 2009, at which time the Debtors were conducting preliminary negotiations with real estate brokers with respect to the necessary marketing of the Property and offering tours of the Property to a limited number of interested parties.  Shortly after the commencement of these efforts, the Debtors learned that the Buyer had expressed an interest in continuing to manufacture and sell certain vehicle models that historically had been manufactured and assembled at the Property — i.e., the Chrysler Sebring and the Dodge Avenger (together, the "Vehicles").  This interest was confirmed on November 4, 2009 when the Buyer made public its "five-year plan" for profitability, which contemplated the continuing manufacture of the Vehicles.

H.      Following the release of the Buyer's five-year plan in November 2009, the Debtors contacted the Buyer to determine its specific intentions with respect to the Property. The Buyer indicated its interest in either (1) extending the License Period beyond April 30, 2011 or (2) purchasing the Property.  Although the Debtors were not interested in an extension of the License Period, the Debtors and the Buyer began negotiating a potential sale of the Property in November 2009, which negotiations ultimately produced the Purchase Agreement and the related Ancillary Agreements.  The Buyer's agreement to enter into the Ancillary Agreements was a key factor in the Debtors' decision to consummate the Transaction.

I.      The $20 million purchase price to be paid by the Buyer under the Purchase Agreement together with the substantial non-monetary consideration represented by the Buyer's

entry into the Ancillary Agreements (which agreements enhance the marketability of certain real property and related equipment and improvements owned by Old Carco) exceed the Debtors' previously-received estimates for the net proceeds expected pursuant to a sale of the Property. Specifically, in connection with the Debtors' preliminary negotiations with real estate brokers regarding the marketing and disposition of the Property, the Debtors received estimates of the gross proceeds recoverable by the Debtors in connection with a sale of the Property within a range of $8.5 million to $21 million (with the net proceeds recoverable necessarily falling short of such estimates). The Debtors have received no letters of intent from any party other than the Buyer indicating an interest in the purchase of the Property.

J.     No brokers were involved in consummating the transactions contemplated by the Purchase Agreement or the Ancillary Agreements, and no brokers' commissions are due to any person in connection with the transactions described in this Order.

K.     Pursuant to paragraph 3 of the Agreed Order (Docket No. 5982) (the "DIP Lender Winddown Order") by and between the Debtors, the Debtors' debtor-in-possession lenders (collectively, the "DIP Lenders") and the Creditors' Committee, entered by the Court on November 19, 2009, the DIP Lenders acknowledge that their liens on the Property are junior to the liens securing the indebtedness under the First Lien Credit Agreement and are not funding any of the expenses associated with the sale of the Property (which Property is "First Lien Collateral" as such term is defined in the DIP Lender Winddown Order). Instead, these costs currently are being funded pursuant to the Agreed Order (Docket No. 5981) (the "First Lien Winddown Order") by and between the Debtors and the First Lien Agent on behalf of the First Lien Lenders (i.e., the parties with the primary economic stake in the sale of the Property),

entered by the Court on November 19, 2009, from the Reserve (as such term is defined in the First Lien Winddown Order) established from the First Lien Lenders' collateral.

L.   In accordance with paragraph 7 of the First Lien Winddown Order, the Debtors have reviewed the substance of their negotiations with respect to the sale of the Property and the terms of the Purchase Agreement with the First Lien Agent, and the First Lien Agent has (1) designated the Property as an "Estate Asset" (as such term is defined in the First Lien Winddown Order), (2) indicated to the Debtors that the First Lien Lenders have consented to the sale of the Property pursuant to the terms of the Purchase Agreement, (3) indicated to the Debtors that the First Lien Lenders believe the consideration received for the Property to be appropriate and (4) indicated to the Debtors that the First Lien Lenders (as the primary economic parties in interest) prefer that the sale of the Property to the Buyer be consummated without an auction to avoid any delay and costs associated therewith and to provide the certainty of a near-term sale.

M.   The decisions of the Debtors to enter into (1) the Purchase Agreement, which provides for the private sale of the Property to the Buyer, and (2) the Ancillary Agreements, which provide the Debtors with substantial consideration in connection with the sale of the Property, represent sound and reasonable exercises of the Debtors' business judgment. Among other things, the Debtors have determined in their business judgment that the benefits of consummating a prompt private sale of the Property on the terms and conditions set forth in the Purchase Agreement outweigh any potential benefits of conducting a further marketing and overbid process for the Property where (1) the First Lien Lenders, as the primary economic parties in interest, have indicated to the Debtors their preference that the Debtors' estates not incur any further marketing costs with respect to the Property, (2) the Debtors have no agreement

with the DIP Lenders or any other party to fund the costs that would be incurred by the Debtors' estates in connection with a further marketing process, (3) the consideration to be received in exchange for the Property (i.e., the $20 million cash Purchase Price and the substantial non-monetary consideration provided pursuant to the Ancillary Agreements) exceeds the preliminary estimates of the Property's value received by the Debtors and (4) the extended License Period with respect to the Property (i.e., until April 30, 2011) otherwise serves to decrease the Property's immediate marketability to other potential purchasers. Moreover, the Debtors have determined that (1) Old Carco's prospective ability to assign the Buyer's obligations under the TSA with respect to Owned Premises (as such term is defined in the TSA) to prospective purchasers of such premises, which ability is granted pursuant to the TSA Amendment, and (2) the Buyer's agreement to grant Old Carco a non-exclusive license to use certain intellectual property related to the manufacture of certain engines, as set forth in the License, provide Old Carco's bankruptcy estate with substantial value by enhancing the marketability of certain real property and related improvements owned by Old Carco.

N. Accordingly, under the circumstances, the private sale of the Property on the terms and conditions set forth in the Purchase Agreement maximizes the value of the Property for the Debtors' estates.

## Validity of Transfer

O. Prior to the transactions contemplated under the Purchase Agreement, the Property is the property of the Debtors' estates and title thereto is vested in the Debtors' estates.

P. Old Carco has full power and authority to execute the Purchase Agreement and all other documents contemplated thereby (including the Ancillary Agreements), the sale of the Property has been duly and validly authorized and Old Carco possesses all necessary corporate authority to consummate the transactions contemplated by the Purchase

Agreement. No other consents or approvals, other than as may be expressly provided for in the Purchase Agreement, are required by Old Carco to consummate the transactions contemplated by the Purchase Agreement.

## Section 363(f) of the Bankruptcy Code is Satisfied

Q. Except as may otherwise be provided in the Purchase Agreement or this Order, Old Carco may sell the Property free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied. The First Lien Lenders have consented to the proposed sale of the Property hereunder within the meaning of section 363(f)(2) of the Bankruptcy Code. Moreover, other holders of Interests who did not object, or who withdrew their objections, to the sale of the Property and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the proceeds of the sale of the Property.

## Assumption and Assignment of the Assigned Agreements

R. The assumption and assignment of the Assigned Agreements are integral to the Purchase Agreement, are in the best interests of the Debtors and their bankruptcy estates and represent the reasonable exercise of the Debtors' sound business judgment. There are no outstanding defaults under the Assigned Agreements and, thus, no amounts need be paid to the counterparties thereto as cure in connection with the assumption of the Assigned Agreements pursuant to section 365(b) of the Bankruptcy Code, the requirements of which have been satisfied. Further, the Buyer has provided adequate assurance of future performance under the Assigned Agreements in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code.

Accordingly, the Assigned Agreements can be assumed by the Debtors and assigned to the Buyer, as provided for in the Sale Motion and the Purchase Agreement.

### Retention of Jurisdiction

S.      It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Purchase Agreement, and to adjudicate, if necessary, any and all disputes relating in any way to the transactions provided for under the terms and conditions of the Purchase Agreement.

## II.     CONCLUSIONS OF LAW:

NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      The relief requested in the Sale Motion is granted in its entirety, subject to the terms and conditions contained herein.

### Approval of Sale

2.      The Purchase Agreement and all exhibits affixed thereto (including, but not limited to, the Ancillary Agreements), Old Carco's entry into the Purchase Agreement and the transactions contemplated thereby (including, but not limited to, Old Carco's entry into the Ancillary Agreements) are hereby approved.  Pursuant to sections 105 and 363 of the Bankruptcy Code, Old Carco is authorized and directed to perform its obligations under the Purchase Agreement and all exhibits affixed thereto (including, but not limited to, the Ancillary Agreements).

3.      The Buyer is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code.

4.      Old Carco shall be, and hereby is, authorized and directed to fully assume, perform under, consummate and implement the terms of the Purchase Agreement together with

any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Purchase Agreement, this Order and the sale of the Property contemplated thereby including, without limitation, the execution of and performance under the Ancillary Agreements, the execution of any deeds, assignments and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession any or all of the Property, as may be necessary or appropriate to the performance of Old Carco's obligations as set forth in the Purchase Agreement, without any further corporate action by Old Carco or orders of this Court. The Buyer shall have no obligation to proceed with the closing of the Purchase Agreement until all conditions precedent to its obligation to do so under the Purchase Agreement have been met, satisfied or waived.

5. The sale of the Property and the consideration provided by the Buyer under the Purchase Agreement (including the Buyer's entry into the Ancillary Agreements) is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law. The sale of the Property, and the Debtors' entry into the Purchase Agreement and the Ancillary Agreements, may not be avoided, and costs may not be recovered or punitive damages awarded, pursuant to section 363(n) of the Bankruptcy Code.

6. Effective as of the Closing Date, the sale of the Property by Old Carco to the Buyer shall constitute a legal, valid and effective transfer of the Property, notwithstanding any requirement for approval or consent by any person and shall vest the Buyer with all right, title and interest of the Debtors in and to the Property, free and clear of all Interests of any kind, pursuant to section 363(f) of the Bankruptcy Code.

## **Transfer of Property Free and Clear**

7.       Pursuant to sections 105 and 363 of the Bankruptcy Code, the sale of the Property shall vest Buyer with all right, title and interest of the Debtors to the Property free and clear of any and all Interests, with all such Interests and any other liabilities and claims to attach only to the proceeds of the sale (if any) with the same priority, validity, force and effect, if any, as they now have in or against the Property, subject to all claims and defenses the Debtors may possess with respect thereto. Following the Closing Date, no holder of any Interests in the Property shall interfere with the Buyer's use and enjoyment of the Property based on or related to such Interests.

8.       To the greatest extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of Old Carco with respect to the Property transferred pursuant to the Purchase Agreement, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date, provided, however, that nothing in the Purchase Agreement or this Order shall authorize the transfer of a permit or license without governmental approval where applicable nonbankruptcy law requires governmental approval of such transfer.

9.       On or before the Closing Date, all parties holding Interests of any kind are authorized and directed to execute such documents and take all other actions as may be necessary to release any Interests of any kind against the Property, as such Interests may have been recorded or may otherwise exist. If any person or entity that has filed financing statements or other documents or agreements evidencing any Interests in or against the Property shall not have delivered to Old Carco prior to the Closing Date after request therefor, in proper form for

filing and executed by the appropriate parties, termination statements, instruments of satisfaction or releases of all such Interests that the person or entity has with respect to the Property, Old Carco is hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Property prior to the Closing Date, and the Buyer is authorized to execute and file such documents after the Closing Date; provided, however, that nothing in this paragraph shall authorize Old Carco to execute or file documents on behalf of the First Lien Lenders or the First Lien Agent (unless the First Lien Agent so consents) or any governmental entity.

10.     All persons and entities, including, but not limited to, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, any claimant asserting a products liability claim, trade and other creditors asserting or holding an Interest of any kind or nature whatsoever against or in the Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) shall be forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interest against the Buyer or any of its affiliates or subsidiaries; provided, however, the foregoing shall not prevent the Debtors or their successors or permitted assigns from pursuing claims, if any, against the Buyer and/or its successors and assigns in accordance with the terms of the Purchase Agreement, the Ancillary Agreements, the TSA, the MTA or other agreements.

11.     Nothing in this Order or the Purchase Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations (or any associated liabilities for penalties, damages, cost recovery or

injunctive relief) that any entity would be subject to as the owner or operator of the Property after the date of entry of this Order. Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.

12.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Purchase Agreement or the Ancillary Agreements.

13.     Except (a) as expressly provided otherwise in the Purchase Agreement or this Order and (b) in connection with Permitted Liens, all persons or entities, presently or on or after the Closing Date, in possession of some or all of the Property are directed to surrender possession of the Property to the Buyer on the Closing Date or at such time thereafter as the Buyer may request.

## Assumption and Assignment of the Assigned Agreements

14.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Debtors' assumption, and assignment to the Buyer, of the Assigned Agreements is hereby approved, and all requirements of section 365 of the Bankruptcy Code are hereby deemed satisfied.

15.     The Assigned Agreements shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in the Assigned Agreements that prohibits, restricts or conditions such assignment or transfer (including those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code). There shall be no assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption or assignment of the Assigned Agreements. The Assigned Agreements may not be terminated, or the rights of any party modified in any respect, including pursuant to any "change of control" or anti-assignment clauses, by any other party thereto as a result of the transactions contemplated by the Purchase Agreement.

16. All non-Debtor counterparties to the Assigned Agreements hereby are forever barred, estopped and permanently enjoined from asserting against the Debtors or the Buyer, their successors or assigns or the property of any of them, any default under the Assigned Agreements existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of the Assigned Agreements shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Agreements.

17. Upon the Closing, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assigned Agreements.

## Additional Provisions

18. Subject to the terms of the Purchase Agreement, the Purchase Agreement may be modified, amended or supplemented by agreement of Old Carco and the Buyer without further action or order of the Court; *provided*, *however*, that any such modification, amendment or supplement does not materially change the terms of the Purchase Agreement or modify the express terms of this Order.

19. The failure specifically to include any particular provisions of the Purchase Agreement or any related agreement (including, but not limited to, the Ancillary Agreements) in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court, Old Carco and the Buyer that the Purchase Agreement and any related agreements (including, but not limited to, the Ancillary Agreements) are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to the Closing Date. To the extent that any provisions of this

Order conflict with the terms and conditions of the Purchase Agreement, the terms and conditions of this Order shall govern and control.

20.     This Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Property or a bill of sale transferring good and marketable title in the Property to Purchaser and this Order, the Purchase Agreement and any related agreements (including, but not limited to, the Ancillary Agreements), as applicable, shall be binding upon, may be enforced against and shall govern the acts of all Persons and entities, including without limitation, the Debtors and the Buyer, their respective successors and permitted assigns and any affiliates or subsidiaries thereof (including, without limitation, any successor trustee, examiner, "responsible person" or other fiduciary appointed for the Debtors' estates), all creditors and equity holders of any Debtor (whether known or unknown), filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, recording agencies, secretaries of state and all other persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Property.  Each and every federal, state and local governmental agency, unit or department is hereby directed to accept this Order as sole and sufficient evidence of the transfer of title of the Property to the Buyer, and such agency, unit or department may rely upon this Order in consummating the transactions contemplated by the Purchase Agreement.  This Order may be recorded by the Buyer in any registry or government office.

21.     Nothing contained in any plan confirmed in these chapter 11 cases, any order of the Bankruptcy Court confirming such plan or any other order entered in these

chapter 11 cases (or any subsequent chapter 7 case) shall be deemed to modify the provisions of the Purchase Agreement or the Ancillary Agreements or the terms of this Order.

22.     As provided by Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry.

23.     This Court retains jurisdiction to interpret, implement and enforce the terms and provisions of this Order, the Purchase Agreement and all amendments thereto, any waivers and consents thereunder and any agreements executed in connection therewith in all respects, including to compel delivery of the Property, to protect the Buyer against any Interest and to enter any orders under sections 105 or 363 (or other applicable provisions) of the Bankruptcy Code necessary or appropriate to transfer the Property to the Buyer.

Dated: _____, 2010
      New York, New York

_____
CHIEF UNITED STATES BANKRUPTCY JUDGE